ELIZABETH A. STRANGE
Acting United States Attorney
District of Arizona
WALLACE H. KLEINDIENST
MARY SUE FELDMEIER
Assistant U.S. Attorneys
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone:  520-620-7300
wallace.kleindienst@usdoj.gov
mary.sue.feldmeier@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | CR 15-01723-TUC-RCC (DTF) |
|---|---|
| Plaintiff, | |
| vs. | GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR DAUBERT HEARING REGARDING VIDEO EVIDENCE (DOC. 94) |
| Lonnie Ray Swartz, | |
| Defendant. | |

The United States of America, by and through its undersigned attorneys, responds as follows to defendant's Motion Under Daubert and FRE 403 and FRE 702 to Determine Admissibility of Video Evidence (Doc. 94).

A.   <u>Facts and Background</u>

The defendant is charged with the second degree murder of J.A.E.R.  It is the position of the government that on October 10, 2012, the defendant, a United States Border Patrol (USBP) Agent, murdered J.A.E.R. by shooting him, while the defendant stood within the Roosevelt Reservation at the International Boundary fence between the United States and Mexico.  The area where the shooting occurred is monitored by two USBP cameras, identified as Camera 24 and Camera 27.

The government expects that the evidence will show that on October 11, 2012, the morning after the shooting, a USBP Field Technology Officer (FTO) received a request to

1   pull the camera footage for Cameras 24 and Camera 27, starting on October 10, 2012, at
2   2315 hours, through the next morning at 0015.  At that time, the USBP was using two
3   Digital Video Recording (DVR) systems, each with 16 inputs, to store the data from the
4   numerous USBP cameras in use in the field.  The camera data was saved for 90 days on
5   the DVRs, and then written over with new data as the 90-days expired.  On October 11,
6   2012, the TFO proceeded to the DVR housing the data for Cameras 24 and 27, and using
7   an attached keyboard selected the date and a time range that began fifteen minutes prior to,
8   and ended 15 minutes after the range requested.  The TFO then inserted a CD in the CD
9   writer (tray).  The TFO then burned the data from the DVR to the CD, and marked the front
10  of the CD with a date and time range.  The TFO is expected to testify that there is no
11  function on the DVR writer that would permit him to "compress" or otherwise alter the
12  size of the video data he copied from the DVR hard drive to the CD.   Furthermore, the
13  data was copied to the disk in an .exe format which is a proprietary program developed by
14  the maker of the DVR, that does not allow the end-user to edit or otherwise alter the .exe
15  file.
16       The CD containing the original copy of the video was turned over to the FBI and
17  placed in evidence.  The FBI ultimately turned that evidence over to DHS-OIG, who is
18  holding the original disk in evidence.  Both the government and defense experts have been
19  given copies of the data on the original CD and have been offered the opportunity to
20  examine the original disk.
21       The DVRs that recorded the video in question were ultimately surplused by the
22  USBP when the USBP obtained new cameras.  When DHS-OIG and U.S. Attorney's
23  Office requested to preserve the DVRs on September 22, 2015, it was learned that they had
24  been disposed of by UNICOR on or about September 18, 2017.   However, the TFO is
25  expected to testify that the DVRs in question were installed at the USBP using the factory
26  settings, and that the USBP does not tinker with the settings to compress video to save
27  space. Rather, before purchasing a DVR, the USBP determines their space requirements
28  by calculating the number of inputs to the DVR, the 30-frame-rate-per-second minimum

1    rate requirement for video, and the 90-day preservation requirement.  They then obtain a
2    DVR that can accommodate those needs, along with the necessary terabytes of disk space
3    to hold the data.  That was done when the DVRs in question were ordered and installed.
4    Furthermore, when video data is copied from the DVR to a CD, the TFO only has one
5    option – burn a complete copy of the data in the requested date/time range from the DVR
6    to the CD.  The DVR gives the user no options to "downgrade" or "compress" the files.

7    It is the government's position that examination of the DVRs would not have
8    produced a different result than could be obtained from examining the .exe files preserved
9    by the TFO on October 11, 2012.  Furthermore, the government will be able to establish a
10   chain of custody for the video files, and as such any objection by the defense goes to
11   weight, not admissibility, of the video evidence.  At trial it is expected that several of the
12   government's witnesses will be able to identify themselves and the defendant in the video
13   recordings, thus independently authenticating them.  Finally, the videotapes are relevant
14   because they depict the actual shooting, the events leading up to the shooting and the
15   handling of the evidence and crime scene on the Mexican side of the border after the
16   shooting.  Regarding expert James Tavernetti, the government expects at a hearing to
17   demonstrate both the reliability of his opinions and the relevance of those opinions to the
18   case at hand.

19   B.    Legal Arguments

20         1.    Admissibility of the Video Files

21   The defendant objects to admissibility of the video files collected into evidence by
22   the government the morning after the shooting, arguing that they are unreliable.  (Doc. 94,
23   pp. 1-2.) Defendant contends that the video files are based on a "flawed copy of the original
24   video," because they are "highly compressed copies of the two videos in this case instead
25   of [ ] the originally recorded videos from the Digital Video Recording System (DVR) that
26   recorded them."  (Doc. 94, p. 3.)

27   The government expects to be able to show that the video files in evidence are of
28   the same quality as the original video that was stored on the DVR for 90 days after the

shooting. However, even if the government were unable to establish that fact to the Court's satisfaction, and the Court were to find it is possible that the videos in evidence were in some way "compressed" from that which was previously stored on the DVDs, the quality of the videos goes to the weight, not the admissibility of the evidence. "The district court does not abuse its discretion when it admits evidence that meets the minimum requirements for authentication under the Federal Rules of Evidence and allows the defense to argue that the jury should give the evidence minimal weight." *United States v. Ortiz*, 776 F.3d 1042, 1045 (9th Cir. 2015). Here, the government can establish a chain of custody for the video files in evidence, and witnesses on the scene can independently identify themselves and the defendant in the videos and establish that the events depicted in the video took place during the events alleged in this case. Accordingly, the defendant's motion to suppress the video files should be denied.

2. <u>Daubert Challenge to Expert James Tavernetti</u>

Apart from the original video files themselves, the defendant challenges the admissibility of the testimony and 3D animations prepared by the government's forensic video expert, James Tavernetti. The defendant does not challenge Mr. Tavernetti's qualifications or the computer technology he used to render his video products. Rather, defense argues that his renderings are not based on "sufficient facts or data" (presumably because of the aforementioned complaint about the video quality) and that Mr. Tavernetti's "principles and methods" are unreliable. (Doc. 94, pp. 8-9.) The defense does not elaborate on specifically which principles and methods Mr. Tavernetti used that are unreliable.

Federal Rule of Evidence 702 allows expert testimony that will assist a trier of fact in understanding the evidence or in determining a fact in issue, so long as "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed.R.Evid. 702. It is the trial court's responsibility to ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). In making this

determination, the court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and ... whether that reasoning or methodology properly can be applied to the facts in issue." Id. at 592-93.  In other words, the trial court must find that the evidence is reliable, and that it will help the trier of fact understand a fact in issue. *Id.* at 592.  "The inquiry is a flexible one, and its focus must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 580.

The government expects to show that Mr. Tavernetti created several video exhibits, that by way of separate motion, the government will move to admit at a hearing prior to trial.  The government will lay out in more detail in that motion what it expects to show to establish reliability of those exhibits.  In short however, the government expects that the evidence will show that Mr. Tavernetti used methods and computer programs that are widely accepted and used in his field.  Mr. Tavernetti relied not only on the videos discussed in the defendant's motion, but also on numerous photographs of the crime scene, detailed measurements taken at the crime scene, data collected by expert Michael Haag via 3D scanning equipment that collected the minute dimensions and details of the overall crime scene, a crime scene visit, mathematical calculations, and followup measurements and video.  In many instances, Mr. Tavernetti is able to validate his findings and renderings through independent pieces of evidence that both led him to the same result.  At the motion to admit evidence, the government expects that the evidence will show that Mr. Tavernetti's factual videos will be useful to the triers of fact in understanding the location of the evidence, the overall crime scene terrain, the location and distance between the defendant and the victim, and illustrate the government's theory of the approximate timing of the sixteen shots fired by the defendant, vis a vis the victim's location.

Wherefore, the United States of America respectfully requests a hearing, and requests that this Court deny the defendant's Motion Under Daubert and FRE 403 and FRE 702 to Determine Admissibility of Video Evidence (Doc. 94).

| | |
|---|---|
| 1 | |
| 2 | Respectfully submitted this 10th day of April, 2017. |
| 3 | |
| 4 | ELIZABETH A. STRANGE<br>Acting United States Attorney<br>District of Arizona |
| 5 | |
| 6 | *s/Mary Sue Feldmeier* |
| 7 | MARY SUE FELDMEIER<br>Assistant U.S. Attorney |

Copy of the foregoing served electronically or by other means this 10th day of April, 2017, to:

Sean C. Chapman, Esq.
Jim Calle, Esq.
Amy Krauss, Esq.