**Sean C. Chapman**
**Law Office of Sean C. Chapman, P.C.**
100 North Stone Avenue, Suite 701
Tucson, Arizona 85701
Telephone: (520) 622-0747
Fax: (520) 628-7861
Arizona State Bar No. 012088
Attorney for Defendant *Swartz*
Sean@seanchapmanlaw.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| UNITED STATES OF AMERICA, | ) | CR15-1723 TUC RCC(DTF) |
|---|---|---|
| | ) | |
| Plaintiff, | ) | **MOTION FOR SANCTIONS** |
| | ) | **(*BRADY* VIOLATION) AND** |
| v. | ) | **MOTION TO RECUSE THE** |
| | ) | **UNITED STATES ATTORNEY'S** |
| Lonnie Ray Swartz, | ) | **OFFICE FOR THE** |
| | ) | **DISTRICT OF ARIZONA** |
| Defendant. | ) | |

It is expected that excludable delay under Title 18, United States Code, § 3161(h)(1)(F) will occur as a result of this motion or an order based thereon.

The defendant, through counsel undersigned, pursuant to the Fifth Amendment's Due Process Clause and the Sixth Amendment's right to a fair trial, hereby moves this Court to impose sanctions against the U.S. Attorney's Office ("USAO") and order the recusal of the United States Attorney's Office for the District of Arizona. The legal basis for this motion, discussed in detail below, is the government's suppression of key exculpatory evidence until shortly before the upcoming firm trial date, and its actions in

1

connection with the key exculpatory evidence, all of which has prejudiced the Defendant and caused one of the prosecutors originally assigned to the investigation to now be a material trial witness.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    ISSUES PRESENTED

The issues presented in this motion are: (1) whether the Court should impose sanctions against the government for *Brady* violations that have occurred as the result of the government's failure to disclose key exculpatory evidence until the eve of trial, and (2) whether the Court should order the United States Attorney's Office for the District of Arizona recused from further representation of the government in this matter as a sanction, and because one of its prosecutors is now a material witness in this matter.

### II.    FACTS

The government charged defendant Lonnie Swartz, a United States Border Patrol Agent, with Second Degree Murder in violation of 18 U.S.C. § 1111(a) and (b). (Doc. 1.) Specifically, the government alleges that, without legal justification and acting with malice aforethought, Agent Swartz shot and killed Jose Antonio Elena-Rodriguez.  The trial is set for October 24, 2017.

On October 10, 2012, Agent Swartz, along with other law enforcement agents, responded to the international border in Nogales in an effort to apprehend two marijuana smugglers who were attempting to climb over the fence and escape into Mexico.  As

Agent Swartz approached the scene, drug cartel members, including Elena-Rodriguez, started throwing rocks from the Mexican side of the border at federal and local law enforcement officers, in a concerted effort to help the two smugglers who remained on top of the fence avoid apprehension. Agent Swartz was in the area being bombarded with rocks. He also knew there were several other agents in the area being rocked. In addition, Agent Swartz observed a police dog get hit with a rock, and he became aware that a fellow agent was hit as well. Acting in defense of himself and others, Agent Swartz fired on the rock throwers from three firing positions. One of the rock throwers, Elena-Rodriguez, was killed.

The government extensively investigated this shooting for three years before seeking an indictment in October, 2015. The USAO has dedicated two prosecutors to this matter since its inception in October 2015. They have worked with investigators from the FBI and the Department of Homeland Security's Office of Inspector General ("OIG"). One OIG special agent has been working full time on this matter for several years.

### A.  Manipulation of Key Evidence on the Critical Issue of When Elena-Rodriguez Suffered the Fatal Head Wound

At trial, there will be no dispute that Agent Swartz shot and killed Elena-Rodriguez. The evidence will show the decedent and others, standing in Mexico, were rocking Agent Swartz and other agents in his immediate vicinity. The two key issues that will be essential to the jury's determination of guilt or innocence in this matter are: (1) whether Agent Swartz acted in self-defense when he shot Elena-Rodriguez; and (2)

whether Elena-Rodriguez was fatally shot in the head while he was standing or after he collapsed to the ground.

The government's theory is that after the first volley of shots, Elena-Rodriguez collapsed to the ground but was still alive and no longer a threat to Agent Swartz. Nevertheless, the government argues, Agent Swartz continued to fire at him. Under this theory, Agent Swartz acted without legal justification and with malice aforethought by continuing to shoot at Elena-Rodriguez after he was incapacitated by the first set of shots and went to the ground.

The defense maintains that one of the first shots fired by Swartz from his first firing position hit the decedent in the head, instantly killing him and causing him to collapse.  It is the defense position that Agent Swartz was legally justified in using lethal force.   Further, because the decedent was fatally injured with one of the very first shots while he was an active threat, Agent Swartz is not criminally liable for Elena-Rodriguez's death, even if he continued to fire at him after he was killed, and collapsed to the ground.

Thus, unquestionably, evidence bearing on exactly when Elena-Rodriguez suffered the fatal head wound is key, material evidence in this case. From the outset of this prosecution two years ago, both parties have prepared their cases - through investigation, retention of experts, and extensive pretrial litigation - to support their respective positions on this issue.

The two Mexican pathologists who performed the decedent's autopsy in Mexico,

Drs. Javier Diaz Trejo and Absalon Madrigal Godinez, produced a report that was disclosed to the defense in 2016.  The report, written in October of 2012, concludes that the cause of death was a "wound to the encephalic [head] tissue by a projectile fired by a firearm," but it did not address when, in the sequence of shots, Elena-Rodriguez suffered the fatal head wound. The report also does not touch upon the decedent's physical position when he received the fatal shot or whether he was alive after he collapsed to the ground.

To overcome the inconclusive autopsy report, the government has tried to strengthen its position by extracting individual still images from a rapidly moving piece of unreliable thermal video[1] taken at the time of the shooting, which the government claims shows movement by the decedent after he hit the ground. The government's animation expert, James Tavernetti, used these images to fabricate[2] illustrations purporting to show movement by Elena-Rodriguez after he fell to the ground. In addition to these thermal images, the government also disclosed an expert who opined that blood spatter on a wall near where the decedent fell indicates he was shot while his head was on the ground or possibly raised in the air. The government's late disclosure of the blood spatter expert necessitated a continuance of the then-firm trial date. (Doc. 114.)

The defense retained Dr. Cyril Wecht, a pathologist who after reviewing the

---

[1]  The only expert testimony provided to this Court regarding the thermal video was that it is inherently unreliable and completely unsuitable for the purpose of discerning subtle motions.

[2]  Mr. Tavernetti has no expertise in thermal image interpretation.

evidence concluded that the fatal head wound occurred while the victim was standing, after which he immediately collapsed. The government has disclosed its own expert pathologist who, based on, among other things, the unreliable thermal video discussed above, concluded that Elena-Rodriguez was knocked to the ground by a shot to his back that left him alive and able to move his head until he suffered the fatal shot in the head.

In light of the parties' competing theories regarding when the decedent was killed (standing or prone on the ground), the findings and opinions of Drs. Diaz and Madrigal, the Mexican pathologists who actually observed the decedent's body and who conducted the only autopsy in this case, are critically important. The government has known, however, since at least August of 2014, that the Mexican pathologists agreed with the defense's theory, but did not disclose this fact to the defense until a few weeks ago.  The disclosure that the government did provide (in 2016) on this issue was misleading.

Three documents demonstrate the government's withholding and manipulating of key evidence regarding when Elena-Rodriguez suffered the fatal head wound until 60 days prior to the trial date: (1) the original autopsy report dated October 11, 2012; (2) a Nov. 28, 2016 government report summarizing an interview of Dr. Diaz four years after he completed the autopsy; and (3) an August, 2017 disclosure regarding government interviews of Dr. Diaz and witnesses Marquez-Zarate and Villareal, that took place on Aug. 19, 2014.

/ / /

### 1.   *Statements Made by Pathologist Dr. Diaz*

Early in 2016 the government disclosed Drs. Diaz and Madrigal as expert witnesses. The government further indicated in this disclosure that these witnesses would testify consistently with their findings and opinions contained in their autopsy report. As discussed above, Dr. Diaz in his Oct. 11, 2012 autopsy report provided no opinion regarding whether Elena-Rodriguez was upright or prone when he suffered the fatal head wound.

In early 2017, the government disclosed a report of a Nov. 28, 2016 interview of Dr. Diaz conducted by the OIG case agent and two AUSAs. Also present were other Mexican and U.S. agents and an interpreter. According to this report, Dr. Diaz opined – now four years after his autopsy report - that Elena-Rodriguez could have been knocked to the ground from other wounds where he then could have suffered the fatal head shot while still alive.  According to Dr. Diaz, Elena-Rodriguez's head could have been lifted off the ground when he was shot. This last point is critical because Dr. Diaz's newly minted opinion aligned nicely with the opinions of other experts retained by the government. Coincidentally, the government chose not to record this interview so it is impossible to know exactly what Dr. Diaz said to the prosecutors and investigators.

Now, less than 60 days prior to trial, the defense has learned that the government withheld key, substantive evidence regarding Dr. Diaz's opinions for roughly three years. This evidence is not a report but the personal notes, both handwritten and typewritten, of

one of the AUSAs[3] present for an interview of Dr. Diaz on August 19, 2014. On Aug. 17, 2017, the lead AUSA on the case disclosed these notes.

According to the notes and a brief letter from the lead AUSA, the two assigned AUSAs and the OIG case agent traveled to Mexico on August 19, 2014, to interview three witnesses including Dr. Diaz. Before these interviews took place, the AUSAs instructed the OIG case agent to leave the room. The AUSAs also elected, despite the critical nature of Dr. Diaz's testimony, to not record their interview of him. The only document memorializing the substance of Dr. Diaz's interview are the AUSA's notes.

The lead prosecutor's decision to order the case agent from the interview was so unusual that about one month later the FBI interviewed the OIG case agent about the incident.  She told the FBI investigator that she was directed to wait outside because the room was "crowded." She also told the FBI investigator that she had not received a report from the prosecutors about the interview, nor even been told who they interviewed.

The AUSA's notes indicate a drastically different version of Dr. Diaz's opinions than previously disclosed. As noted above, Dr. Diaz in his 2016 interview allowed for the possibility that Elena-Rodriguez could have been knocked to the ground from other shots where he then suffered the fatal head wound while still alive. But according to the AUSA's notes, in 2014 Dr. Diaz believed unequivocally that Elena-Rodriguez was standing when he suffered an initial shot to his head that instantly killed him and resulted

---

[3]  This particular AUSA is no longer assigned to the case, but she worked on it for a substantial period of time and remains at the U.S. Attorney's Office in Tucson.

in his fall to the ground. The AUSA's notes record Dr. Diaz's opinion as follows: "First impact was to the head = death, then he was shot up." The reason, Dr. Diaz explained at that time, was that the initial shot to the head caused the decedent to lose balance and fall, consistent with contusions on the decedent's face. Dr. Diaz was then *specifically asked* if he could rule out a shot in the back causing collapse and then a shot to the head while Elena-Rodriguez was on the ground (i.e., government's theory, disclosed in 2016 report). Dr. Diaz, according to the 2014 notes, responded: "No, I think he was standing and back was to the shooter. The first impact he was standing because on the body there were 5-6 impact wounds and [they] displace in a different direction because of the impact and his position." The AUSA also noted Diaz as opining: "First wound was to the head because the injury made the person lose balance." Without question, Dr. Diaz's 2014 statements, two years after the autopsy and two years before his 2016 statements, support the defendant's version of events in this case.

Additionally, the notes indicate that in 2014, Dr. Diaz couldn't recall any injury to the spinal cord being revealed during the autopsy, and indeed this is consistent with Dr. Diaz's 2012 autopsy report, which is silent with respect to a spinal cord injury. The government's subsequent report in 2016, however, states that Dr. Diaz does recall an injury to the spinal column. This is significant because Dr. Diaz's 2014 opinions, hidden until recently, contradict the government's current theory that the decedent was first shot in the back, which paralyzed him and caused him to fall to the ground where he suffered

the fatal shot to the head.

There is no question that the government knew the information provided by Dr. Diaz in 2014 was crucial exculpatory evidence for the defense. It appears that the contents of this interview were withheld for three years and only released two months before trial so that the government would have a strategic advantage at trial. Also without explanation, the government purposefully chose to interview a key witness with neither the case agent nor a recording device to memorialize the substance of the interview - something seasoned prosecutors would only do if they were trying to prevent the development of evidence harmful to the government's case. As a result, the government attorneys have made themselves impeachment witnesses for the defense in this matter. In fact, the government has agreed to accept service of a trial subpoena on behalf of the AUSA who generated the 2014 notes.

It is no coincidence that the government informed undersigned counsel two weeks ago that it no longer intends to call Dr. Diaz as a trial witness. Instead, they intend to call Dr. Madrigal, a much more junior pathologist, to attest to the autopsy findings. It was only after being questioned about their late disclosure and their election not to call Dr. Diaz that the prosecutors have now agreed to keep Dr. Diaz on the government's witness list. This necessary concession, however, does not eliminate the conflict of interest because the note-taking AUSA's testimony will be necessary in rebuttal regardless of who calls Dr. Diaz to the witness stand, particularly since Dr. Diaz's opinions have

evolved over time to now support the government's case.

The AUSA's 2014 notes also reflect additional statements by Dr. Diaz that have not previously been disclosed. They include the following:

- Elena-Rodriguez's upper body came into contact with the wall of the house where he fell.
- Statements involving the manner in which Elena-Rodriguez's clothing were collected and preserved.
- "Photos" were taken of Elena-Rodriguez's body with styluses in the "wounds" to indicate the wound paths and bullet trajectories.
- The various trajectories established that the initial wound suffered by Elena-Rodriguez took place when he was standing and, after falling, he suffered the remainder of his wounds.
- The pathologists did not clean the bullets found in or around Elena-Rodriguez so any trace evidence would still exist.

These statements further bolster Dr. Diaz's original opinion that Elena-Rodriguez suffered the fatal head shot while standing. But, importantly, they also indicate that Dr. Diaz deciphered the sequence of wounds suffered by Elena-Rodriguez by determining and photographing his various wounds with a stylus inserted into each wound so he could determine the trajectory of the bullets causing them. Thus far, the government continues to insist that these important photographs do not exist save for one that was disclosed.

## B. Evidence Regarding Trajectory of Bullets in Decedent's Body

As indicated above, the government also failed to disclose critical information regarding the wound paths as determined by the Mexican pathologists. This is significant because the parties are attempting to extrapolate from the angles/trajectories of the wound paths the various positions of the decedent (i.e. prone or standing) when he received

various bullet wounds.  The autopsy report indicates that the pathologists explored the majority of the wounds using a "probe" or "stylet," which provided guidance on the wound path and the bullet trajectory into the body. The defense has also learned recently that the government has failed to disclose photographs of the pathologists using these stylets during the autopsy.  Such evidence is obviously critical to determining the bullet trajectories.

## C. Contradictory Evidence Regarding Previously Disclosed Eyewitness

### 1.   Statements Made by Witnesses Marquez-Zarate and Villareal

The AUSA who took notes of Dr. Diaz's interview on August 19, 2014 also took notes of other witnesses interviewed on that date. Importantly, one of these witnesses saw what transpired on the Mexican side of the border before, during and after the shooting. Jose Carlos Marquez-Zarate presented himself to Mexican authorities on the night of the shooting and provided a statement to them. In this statement to Mexican authorities, which was disclosed in early 2016, Marquez-Zarate said that he saw law enforcement officers on the U.S. side of the border talking with two smugglers, that four rock throwers appeared and began their attack on the officers, that he heard gunfire and that the rock throwers had run away. However, the newly disclosed AUSA's notes reflect several critical, previously undisclosed statements by Marquez-Zarate, including the following:

- He said they threw rocks "here" and on Inginerios Street.
- The rock throwers were on corner of the doctor's office. [Elena-Rodriguez was shot and killed next to this corner.]
- He did not believe Elena-Rodriguez was a rock thrower but he also stated

> that he had been entering his home when the first shots were fired and that
> he first saw Elena-Rodriguez after he was on the ground.

It is apparent the AUSAs were showing Marquez-Zarate a diagram of the local streets that he used to identify the specific location where the rock throws attacked the agents. This information is not available from any other source since the nearby border camera to the west was focused on the U.S. side of the border and the far more distant east camera only had a very long and truncated view of the Mexican side of the border. The diagram or map used by the AUSAs has not been disclosed to the defense.

These statements are incredibly important to the defendant since, according to the AUSA's notes, Marquez-Zarate's statements precisely locate where the rock throwers were positioned during the attack, i.e. at the corner of the Mexican doctor's office. This is critical to Swartz because Elena-Rodriguez was shot next to this same corner. It is apparent that Marquez-Zarate did not see Elena-Rodriguez get shot but his statements establish that Elena-Rodriguez was within a few feet of the rock throwers and it helps rebut the government's assertion, perhaps now withdrawn, that Elena-Rodriguez was just an innocent pedestrian who happened to get caught up in the shooting. At the very least, Marquez-Zarate's previously undisclosed statements put the rock throwers in close proximity to Elena Rodriguez, which supports the defense's contention that he was actively involved in the attack on the law enforcement officers.

The AUSA's notes also reflect statements by someone named "Villareal" who said "Item #16 is a bullet under body" but "can't tell from looking at them" but "they were

labeled in a [indecipherable handwriting]." He also indicates that bullet 16 "impacts against wall or something. I think we could with 50% assurance." There is no information regarding the identity of Villareal. However, these statements will likely involve the number and location of bullets found near Elena-Rodriguez's body.

Without question, the AUSAs who participated in the 2014 interviews acted improperly by failing to ensure that the statements made by Dr. Diaz, Marquez-Zarate and Villareal were properly memorialized and disclosed to the defense in a timely manner. Their statements are clearly exculpatory and should have been immediately disclosed. Further, the prosecutors' conduct in removing the OIG case agent from the interview room created the untenable situation whereby they are now witnesses in this case.

## II.   ARGUMENT

### A.   The Government Violated the Mandates of *Brady* and its Progeny

#### 1. *Law and Department of Justice Policy*

Government disclosure of material exculpatory and impeachment evidence is part of the constitutional guarantee to due process guaranteed by the Fifth Amendment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. United States*, 405 U.S. 150, 154 (1972). The law requires the disclosure of exculpatory and impeachment evidence when such evidence is material to guilt or punishment. *Brady*, 373 U.S. at 87; *Giglio*, 405 U.S. at 154. In *Giglio*, the Supreme Court found that the reliability of a given witness may be

determinative of an accused's guilt or innocence; therefore, the failure to disclose evidence that may be used to impeach the witness's credibility falls within the ambit of "material evidence" under *Brady.* 405 U.S. at 154. Because they arise from Constitutional obligations, *Brady* and *Giglio* evidence must be disclosed regardless of whether the defendant makes a request for exculpatory or impeachment evidence. *Kyles v. Whitley*, 514 U.S. 419, 432-33, 438 (1995) (Due process imposes an "inescapable" duty on the prosecutor "to disclose known, favorable evidence rising to a material level of importance.").

Exculpatory and impeachment evidence is material to a finding of guilt—and thus the Constitution requires disclosure—when there is a reasonable probability that effective use of the evidence will result in an acquittal. *United States v. Bagley*, 475 U.S. 667, 676 (1985). Recognizing that it is sometimes difficult to assess the materiality of evidence before trial, prosecutors generally must take a broad view of materiality and err on the side of disclosing exculpatory and impeaching evidence. *Kyles*, 514 U.S. at 439. While ordinarily, evidence that would not be admissible at trial need not be disclosed, this policy encourages prosecutors to err on the side of disclosure even if admissibility is a close question. Thus, to the extent a prosecutor is uncertain about the materiality of a piece of evidence, "the prudent prosecutor will resolve doubtful questions in favor of disclosure." *Id.* (*quoting United States v. Agurs,* 427 U.S. 97, 108 (1976)); *see also id.* (The prosecutor is "the representative ... of a sovereignty ... whose interest ... in a

criminal prosecution is not that it shall win a case, but that justice shall be done.") (*quoting Berger v. United States,* 295 U.S. 78, 88 (1935)); *United States v. Alvarez*, 86 F.3d 901, 905 (9th Cir. 1996).

Finally, disclosure of *Brady* information is timely when it is produced at a time that it will be valuable to the accused. *United States v. Aichele*, 941 F.2d 761, 764 (9th Cir. 1991); *United States v. Gamez-Orduno*, 235 F.3d 453, 461 (9th Cir. 2000). The test is whether "the lateness of the disclosure so prejudiced [the defendant's] preparation or presentation of his defense that he was preventing from receiving his constitutionally guaranteed fair trial." *United States v. Miller*, 529 F.2d 1125, 1128 (9th Cir. 1976).

The government's recent disclosure, in its possession since 2014, clearly falls within the ambit of *Brady* and its progeny. The government's handling of this evidence therefore violated Agent Swartz's Fifth and Sixth Amendment rights. In addition to the duty imposed on the government by the *Brady* doctrine, its dictates are also embodied in specific guidelines applicable to federal prosecutors set forth in the United States Attorney's Manual ("USAM"). While the USAM guidelines may not have "the force of law," *United States v. Fernandez*, 231 F.3d 1240, 1246 (9th Cir. 2000), the U.S. Supreme Court has long referenced them as the authoritative standards to which federal prosecutors are held. *See, e.g. Carachuri-Resendo v. Holder*, 560 U.S. 563, 579 (2010) (citing to the USAM as "underscoring the significance of § 851 procedures"); *National Association of Women, Inc. v. Scheidler*, 510 U.S. 249, 261 (1994) (citing the amended

USAM guideline regarding RICO prosecutions as informing the interpretation of the RICO statute); *Young v. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 801-02 (1987) (citing the USAM as reason that "courts can reasonably expect that the public prosecutor will accept the responsibility for prosecution" of contempt actions); *Sedima S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 502-03 (1985) (citing USAM to demonstrate that prosecutorial discretion is a restraining influence on the expanded use of mail and wire fraud statutes). Accordingly, the Ninth Circuit has also found violations of policies set forth in the USAM as relevant to determining whether a defendant's constitutional rights have been violated. *See, e.g. United States v. Goodwin*, 57 F.3d 815, 818 (9th Cir. 1995) (citing the USAM guideline requiring defendant to be provided with "Advise of Rights" form as one factor in determining whether his fifth amendment rights were violated).

The government's actions in this case were contrary to several provisions of the USAM. Section 9-5.001 provides as follows:

> **Disclosure of exculpatory and impeachment information beyond that which is constitutionally and legally required.** Department policy recognizes that a fair trial will often include examination of relevant exculpatory or impeachment information that is significantly probative of the issues before the court but that may not, on its own, result in an acquittal or, as is often colloquially expressed, make the difference between guilt and innocence. *As a result, this policy requires disclosure by prosecutors of information beyond that which is "material" to guilt as articulated in Kyles v. Whitley, 514 U.S. 419 (1995), and Strickler v. Greene, 527 U.S. 263, 280-81 (1999).* …

> **Additional exculpatory information that must be disclosed.** A prosecutor must disclose information that is inconsistent with any element of any crime charged against the defendant or that establishes a recognized

affirmative defense, regardless of whether the prosecutor believes such information will make the difference between conviction and acquittal of the defendant for a charged crime.

**Additional impeachment information that must be disclosed.** A prosecutor must disclose information that either casts a substantial doubt upon the accuracy of any evidence—including but not limited to witness testimony—the prosecutor intends to rely on to prove an element of any crime charged, or might have a significant bearing on the admissibility of prosecution evidence. This information must be disclosed regardless of whether it is likely to make the difference between conviction and acquittal of the defendant for a charged crime.

**Information.** Unlike the requirements of *Brady* and its progeny, which focus on evidence, the disclosure requirement of this section applies to information regardless of whether the information subject to disclosure would itself constitute admissible evidence.

USAM § 9-5.001(C) (Emphasis added). It is clear from these guidelines that the Department of Justice expects its prosecutors to not only abide by the constitutional imperative as interpreted by the Supreme Court (as expressly noted by the title of the first quoted paragraph), but to go further by disclosing any evidence that cuts against the government's case against a defendant, whether or not such evidence is admissible.

The USAM also discusses the timing of such disclosure:

**Exculpatory information.** Exculpatory information must be disclosed reasonably promptly after it is discovered. …

**Impeachment information.** Impeachment information, which depends on the prosecutor's decision on who is or may be called as a government witness, will typically be disclosed at a reasonable time before trial to allow the trial to proceed efficiently. …

USAM § 9-5.001(D)(1) and (2). Here, the exculpatory information was known by the

government (indeed, it was *created* by them) nearly three full years before it was disclosed. There is no reasonable explanation for this delay; indeed, it is reasonable to draw the adverse conclusion that the delay was intentional, meant to restrict its usefulness to the defense. The government's mal-intent is likewise manifest in its decision not to call Dr. Diaz as a trial witness, which is an obvious attempt to eliminate the impeachment value of the newly disclosed evidence. That decision, however, does not accomplish that objective. Dr. Diaz will now be called as a defense witness and, as discussed below, the late disclosure of the new evidence is prejudicial to the defense.

The manipulation by the government of critical, exculpatory and/or impeachment evidence, in violation of clear constitutional principles and DOJ guidelines - by seasoned prosecutors - justifies the Court in finding that recusal of the U.S. Attorney's Office for the District of Arizona, as argued below, is a necessary remedy for that office's conflicts of interest in this case. The imposition of a significant sanction is particularly appropriate because these issues were of the government's own making, in conscious disregard of constitutional and internal rules counseling against these types of actions. Moreover, the government has demonstrated a pattern of late disclosure in order to gain a strategic advantage at trial. This is wholly improper. The Court is authorized to, and must, impose a sanction sufficient to deter the government from engaging in this type of conduct. *See United States v. Ross*, 372 F.3d 1097, 1111-12 (9th Cir. 2004) (discussing the propriety of sanctions generally, and stating that sanctions may be necessary when prosecutors fail to

fulfill their duty "to win fairly, staying well within the rules.") (citation omitted).

## 2. The Defendant Has Been Prejudiced By the Government's Recent Disclosure

The government purposefully withheld essential evidence that is central to the most critical issue in this case, along with additional evidence that supports the Defendant's affirmative defense. There exists no reasonable explanation as to why this evidence was not disclosed in a timely fashion.

On Aug. 19, 2014, two AUSAs, the OIG case agent, a DOJ Civil Rights attorney and government experts Lucian and Michael Haag traveled to Mexico to interview Dr. Diaz, Marquez-Zarate and at least one other witness, Villareal. There were also a number of Mexican officials present for those interviews. Despite knowing the importance of these witnesses, the AUSAs ordered the OIG case agent out of the room. In all other instances known to the defense, the case agent recorded investigative activity and then generated a report. In anticipation of a claimed argument by the government that the room was too "crowded" to allow the presence of the OIG agent, the defense would note that the government elected to keep both AUSAs, one DOJ attorney and two expert witnesses[4] in the room even though one of the attorneys or one of the duplicative expert witnesses could have been asked to leave. These circumstances strongly suggest a decision to avoid any official record these interviews.

---

[4] Lucien and Michael Haag are a father-son team engaged in various forensic sciences. In this case, it appears Michael was involved in all aspects of the work completed by Lucien, which meant that Lucien could have been asked to leave the reportedly crowded room as opposed to OIG case agent.

Three years after these important interviews, the government turned over only the personal notes of the AUSA. In light of the collective experience of the AUSAs involved, these facts should be sufficient for the Court to draw an adverse inference regarding their intent in this matter.

The government will undoubtedly argue that there is no prejudice here because disclosure was made prior to trial; however, the government's disclosure of the AUSA's notes just weeks before the firm trial date does not cure the prejudice to the Defendant. The late disclosure means the Defendant must now scramble to confer with his experts, particularly his pathologist, regarding Dr. Diaz's 2014 opinion and how it fits into the evolution of his opinions. Defendant must now investigate Marquez-Zarate's statements, determine his multiple vantage points and prepare for this new testimony to be elicited. Defendant must now seek to identify, locate and investigate Villareal to determine whether he should be called as a trial witness. Presumably, both Marquez-Zarate and Villareal are Mexican citizens domiciled in Mexico who likely have no status to enter or remain in the United States; thus additional, significant (and time-consuming) steps will have to taken should these witness's testimony at trial be deemed necessary.

Moreover, the AUSA's notes are hard to decipher and differ between the handwritten and typewritten version. Their cryptic nature make their use for purposes of cross-examination problematic, particularly because some of the notes cannot be deciphered at all. Complicating matters further, defendant requested an interview with the

authoring AUSA but she has declined, so the defense is unable to accurately assess their potential impact on the case.

The government's new disclosure also reveals additional areas of nondisclosure by the government. These include the government's failure to disclose the autopsy photographs showing styluses in Elena-Rodriguez's wounds, which, according to the AUSA's notes involved multiple "photographs" for multiple "wounds." In addition, the map referenced by Marquez-Zarate has apparently not been disclosed. Finally, as a result of these deficiencies, the defendant is requesting that the OIG agent be made available to the defense for interview to determine whether any other unrecorded, undocumented interviews of key witnesses have occurred in this case.

This Court's supervisory powers "are a means by which the federal courts fulfill their role in the criminal justice system: 'Judicial Supervision of the administration of criminal justice in the federal courts implies the duty of establishing and maintaining civilized standards of procedure and evidence.'" *Ross*, 372 F.3d 1097, 1107 (*citing McNabb v. United States*, 318 U.S. 322, 340 (1943)). In light of the government's unconstitutional disclosure violations, the authoring AUSA's refusal to submit to an interview and the continuing harm to the Defendant, this Court should sanction the government by: (1) precluding Dr. Diaz from providing any testimony other than that reflected in his autopsy report and his 2014 interview; and (2) precluding the government from eliciting any testimony from its experts regarding the timing of the fatal shot in this

case, whether the decedent was upright or prone, and whether the decedent was alive after he collapsed to the ground. This remedy mitigates the prejudice caused by late disclosure and, importantly, provides a deterrence to the government's conduct, which created this problem in the first instance.

**B.     The U.S. Attorney's Office for the District of Arizona Must Be Recused Because At Least One of Its Attorneys is Now a Material Trial Witness**

### *1.  Law and Department of Justice Policy*

District judges have substantial latitude in deciding whether counsel must be disqualified in a criminal case. *United States v. Frega*, 179 F.3d 793, 799 (9th Cir. 1999) (internal quotation and citation omitted). One circumstances that has been held to warrant disqualification is where, as here, the prosecutor would be a witness at trial. *United States v. Prantil*, 764 F.2d 548, 552-53 (9th Cir. 1985). In this case, at least two AUSA's (the prosecutor who took notes at the 2014 interviews and the prosecutor who was present and continues to represent the government in this matter) are likely to be called as trial witnesses. As the Ninth Circuit explained:

> The witness-advocate rule prohibits an attorney from appearing as both witness and an advocate in the same litigation. This venerable rule is a necessary corollary to the more fundamental tenet of our adversarial system that juries are to ground their decisions on the facts of the case and not on the integrity or credibility of the advocates. Accordingly, adherence to this time-honored rule is more than just an ethical obligation of individual counsel; enforcement of the rule is a matter of institutional concern implicating the basic foundations of our system of justice.

*Id.* at 552-53.  The Court went on to describe additional, specific policy goals served by

the witness-advocate rule in the context of a criminal prosecution, which include: (1) the prosecutor's loss of objectivity; (2) the risk of improper vouching; (3) the risk of confusing the jury; (4) the risk that public confidence in the judicial system will erode as a result of an appearance of impropriety. *Id.* at 553 (citing cases). For all of these reasons, the Court said, "[a]ttorneys must elect in which capacity they intend to proceed, either as counsel or as a witness, and promptly withdraw from the conflicting role." *Id.*

The problem created by the way this investigation was handled, however, is not ameliorated by the mere disqualification of only those prosecutors who have been directly assigned to this case. Rather, as addressed below, the entire U.S. Attorney's Office for the District of Arizona must be recused from prosecuting Agent Swartz.

Office-wide recusals may be rare, but they are nonetheless contemplated by a Justice Department framework. *United States v. Weyhrauch*, 544 F.3d 969, 973-74 (9th Cir. 2008) (citing sections of the USAM and 28 U.S.C. § 515). The USAM provides:

> When United States Attorneys, or their offices, become aware of an issue that could require a recusal in a criminal or civil matter or case as a result of a personal interest or professional relationship with parties involved in the matter, they must contact General Counsel's Office .... The requirement of recusal does not arise in every instance, but only where a conflict of interest exists or there is an appearance of a conflict of interest or loss of impartiality.

USAM § 3-2.170 – Recusals. This section does not specifically address the circumstances created by the government's conduct here, but it does speak to the Department's rightful concern when its prosecutors develop an actual or perceived conflict, or when their

impartiality is compromised. The extraordinary conduct of the AUSAs implicates both of these concerns.

### 2. Recusal of the Entire U.S. Attorney's Office for the District of Arizona is Warranted in this Case.

Although the recusal of an entire U.S. Attorney's Office is considered an extraordinary remedy, *United States v. Bolden*, 353 F.3d 870, 878 (10th Cir. 2003), it is appropriate in this case. An experienced, longtime Assistant U.S. Attorney from the U.S. Attorney's Office for the District of Arizona made a purposeful decision to take steps that resulted in the withholding of information from the defendant that violated Brady and its progeny, that were also contrary to important provisions of the USAM. This conduct spanned three years and has now involved at least two other AUSAs for the District of Arizona.

The government's decision to not otherwise record the interviews with Dr. Diaz, Marquez-Zarate and Villareal resulted in two AUSAs and a DOJ attorney becoming advocate-witnesses. Although the government has not attempted to prevent the AUSA who authored the notes from being called as a witness, the federal courts have universally condemned the practice of a government prosecutor testifying at a trial in which she is participating; such testimony is permitted only if required by a compelling need. *U.S. v. Schwartzbaum*, 527 F.2d 249, 253 (2d Cir. 1975) (condemning practice of prosecutors testifying at trial in which she is participating); *see United States v. Birdman*, 602 F.2d 547, 553 (3d Cir. 1979) (collecting cases). The circumstances in this case are particularly

problematic because the AUSA who authored the notes will be asked to testify about an incident that that was caused by the AUSA who participated in the interviews and who remains a prosecutor in this case.  The AUSA who took notes of the interview will now be placed in the untenable position of being required to testify under oath to facts detrimental to a significant case being prosecuted by her colleagues, her Office, and one in which she devoted a tremendous amount of time.  Pressure for her to testify favorably to the government will be significant.  In fact, her bias toward the government is already reflected by her decision to decline an invitation to be interviewed by the defense.

## III.   CONCLUSION

For all the foregoing reasons, based on the extraordinary circumstances in this case, the entire U.S. Attorney's Office for the District of Arizona should be recused from prosecuting this case. Additionally, as a sanction, the Court should preclude the government from presenting testimony to support its theory that the fatal shot to the decedent was not received while he was standing, or that the decedent was alive on the ground.

Respectfully submitted this 11[st] day of September, 2017:

LAW OFFICES OF SEAN CHAPMAN, P.C.

BY:   /S/ Sean C. Chapman
Sean Chapman
Attorney for Defendant

## CERTIFICATE OF SERVICE

The undersigned certifies that on September 11, 2017, caused to be electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which sent notification to the following:

Wallace H. Kleindienst
Mary Sue Feldmeier
Wallace.Kleindienst@usdoj.gov
Mary.Sue.Feldmeier@usdoj.gov
US Attorneys Office – Tucson, AZ
405 W. Congress, Suite 4800
Tucson, AZ 85701-4050

Serena Lara