ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona
WALLACE H. KLEINDIENST
MARY SUE FELDMEIER
Assistant U.S. Attorneys
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone:  520-620-7300
wallace.kleindienst@usdoj.gov
mary.sue.feldmeier@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | CR-15-01723-TUC-RCC (DTF) |
|---|---|
| Plaintiff, | |
| vs. | GOVERNMENT'S MOTION IN LIMINE TO LIMIT SCOPE OF POTENTIAL TESTIMONY OF DOJ ATTORNEYS |
| Lonnie Ray Swartz, | |
| Defendant. | |

The United States of America, by and through its undersigned attorneys, moves to define the scope of any potential testimony by U.S. Department of Justice (DOJ) attorneys Karen Rolley and Henry Leventis, and in support states as follows:

I.   Background

The defendant has served trial subpoenas on DOJ attorney Karen Rolley, Washington D.C., and Middle District of Tennessee Assistant U.S. Attorney Henry Leventis, collectively "DOJ attorneys."  In August 2014, while in Nogales, Sonora, Mexico, the DOJ attorneys took notes of a conversation with Mexican pathologists Dr. Javier Diaz Trejo and Dr. Absalon Madrigal Godinez, who performed the autopsy of the victim in this case, J.A.E.R.  The case agent was located in the reception area adjacent to the office where the conversation took place, and did not take notes or generate a report. Accordingly, if Dr. Diaz or Dr. Madrigal testify inconsistently with the notes of the DOJ

attorneys, one or both of the DOJ attorneys could become relevant impeachment witnesses for the defense.

By this motion the government seeks a pretrial ruling from the court limiting any potential testimony of the DOJ attorney to their recollection of the doctors' statements. Fed.R.Civ.P. 45(c)(3)(A)(iii) provides that a court may quash *or modify* a subpoena if it finds that the subpoena "requires disclosure of privileged or other protected matter and no exception or waiver applies[.]"  The U.S. Supreme Court has held that a federal agency's deliberative and decision-making process is privileged up to the point of the final determination. *N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975).

II.     <u>Defense Indications It Will Exceed Scope of Proper Examination</u>

Based on communications and court filings indicating that the defense is intending to introduce evidence of what it terms "the failure of the DOJ to preserve critical testimony" of the Mexican pathologists, the government is concerned that the defendant may attempt to exceed the limited scope of the DOJ attorneys' relevant testimony, and delve into the DOJ attorneys' recollections and opinions related to the investigative team's privileged deliberative and decision-making process.  By email dated October 17, 2017, defense requested:

> Since it appears that Karen Rolley will be a witness for the defense, and she has refused an interview, I am requesting that you provide a detailed explanation as to why Ms. Rolley is no longer working on this particular prosecution.  I think such evidence will be relevant to her credibility as a witness when she testifies at trial.

(Exhibit #1, attached).  The government declined to produce the information.  (Exhibit #1.)

By letter dated November 8, 2017, defense stated:

> This letter is in response to yours dated November 7, 2017.  With respect to interviews of Karen Rolley and Henry Leventis, I would like to ask them about the interview of the two Mexican pathologists that took place in August 2014.  I would like to know if their notes are accurate.  I would like to know why the case agent was excused from this critical interview.  I would also like to know (and I make the same request to you) whether there were other instances in this case where interviews took place without being recorded, and in the absence of the case agent.  If so, who was interviewed, what was said, and when did these interviews occur?  Were there other interviews where the case agent was affirmatively asked to leave by either AUSA?

Case 4:15-cr-01723-RCC-DTF   Document 313   Filed 02/16/18   Page 3 of 8

(Exhibit A, attached.)

On February 7, 2018, the defense gave notice of an "expert" in investigations to "testify regarding the failure of the DOJ to preserve critical testimony of the two Mexican pathologists in the August, 2014 meeting by either recording their statements or having an investigator present" (exhibit #3).  Finally, in multiple filings and court hearings the defense has sought to paint the lack of an investigator's notes or report regarding the August 2014 interview as a critical failure in the investigation.  This is despite the fact that they have detailed notes and typed memos from two (2) attorneys who will be available as witnesses as to the content of the doctors' communications with them during the August 2014 meeting, should the doctors testify in a manner inconsistent with their previous statements.  Additionally, the government arranged for audio recorded, defense interviews of both Mexican pathologists in December 2017, where defense had the opportunity to explore with them the August 2014 meeting.

III.    The DOJ Attorneys' Testimony Is Limited To Those Statements Of The Doctors That Is Inconsistent With The Doctors' Trial Testimony.

In the event either Mexican pathologist testifies at trial in a manner inconsistent with their statements as recorded in the DOJ attorneys' notes and memos, the government agrees that the DOJ attorneys' recollection of what the doctors said to them in 2014 would be proper impeachment.  However, the scope of that testimony is limited to *the portions of the doctors' statements to the DOJ attorneys that are inconsistent with their trial testimony.*  Should the DOJ attorneys' notes or memos become relevant impeachment, the government further stipulates to those portions of the notes and/or memos that are relevant to the potential impeachment of either Dr. Diaz or Dr. Madrigal, in lieu of testimony by the DOJ attorneys.  Along those lines, the government has sent to defense counsel and submitted in camera to the court a copy of the DOJ attorney notes with requested redactions.

Based on the communications in exhibits #1, #2, and #3, and the other indications that the defendant is pursuing a theory of defense that the investigations in this case were

- 3 -

deeply flawed,[1] the government anticipates that the defense will seize the opportunity to wander beyond the scope of impeachment if they have the opportunity to call the DOJ attorneys to the stand. The government seeks to have this court preclude the defendant from eliciting general testimony about all of the events on August 2014 (which included a crime scene visit, testing at the crime scene, and conversations with other witnesses and investigators), their opinions, the reasons they are not on the trial team, or anything else *that is not the statements of Drs. Diaz and Madrigal.* All of these other areas of inquiry either directly infringe on the attorney work product and/or the government deliberative process privilege(s) or are facts that are so intertwined with these privileges the defendant risks eliciting privileged information if he ventures beyond the mere content of the doctors' statements. There are plenty of other witnesses who observed the events of August 19, 2014, who can testify to what they saw without implicating the attorney work product privilege.

"At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." *United States v. Nobles*, 422 U.S. 225, 238 (1975). This privilege applies in both criminal and civil cases. *Id.* at 236. Queries into what the DOJ attorneys saw and did on August 19, 2014, and their opinions and thought process that day will enter into areas protected by these privileges.

"The Supreme Court has also recognized a 'deliberative process' privilege which protects from discovery all "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formed." *United States v. Furrow*, 100 F.Supp.2d 1170, 1174 (C.D. California 2000) (in the context of a DOJ internal death penalty memorandum), quoting *Sears Roebuck & Co.,* 421 U.S. at 150 (1975) (internal quotations removed). "By shielding such documents

---

[1] The government has filed a separate motion to preclude Mr. Rini's testimony in doc. 305, incorporates arguments from that motion into this one.

1 from discovery, the deliberative process privilege encourages forthright and candid
2 discussions of ideas and, therefore, improves the decision making process." *Assembly of*
3 *the State of Cal. v. United States Dep't of Commerce*, 968 F.2d 916, 920 (9th Cir.1992).
4 "Evidence regarding the basis or strategy of prosecutorial decisions or investigations is
5 rarely subject to disclosure." *Miller v. Mehltretter*, 478 F.Supp.2d 415, 430 (W.D. New
6 York 2007). Here, the two DOJ attorneys participated in this very investigation from its
7 inception, for a period of approximately three (3) years. They have knowledge, and no
8 doubt opinions, regarding the DOJ's and U.S. Attorney's Office's advisory opinions,
9 recommendations, and deliberations concerning the investigation and charging of this case
10 that are privileged and should be protected by limiting the scope of the defendant's
11 examination of them during trial.

12 The government requests a bright line be drawn at the statements made by Dr.
13 Madrigal and Dr. Diaz. The other factual material learned by the DOJ attorneys during the
14 Nogales, Sonora, Mexico crime scene visit in August 2014, including their memories of
15 the set-up of the office, who was present, etc., is so interwoven with the deliberative process
16 that they cannot be severed. *See United States v. Fernandez*, 231 F.3d 1240, 1246-47 (9th
17 Cir. 2000) (finding the factual material in the internal DOJ death penalty memorandum at
18 issue was "so interwoven with the deliberative material that it is not severable"). Here,
19 where the defense is entitled to that one piece of information that only the DOJ attorneys
20 possess – their recollection of the details of the conversation with Dr. Diaz – the line should
21 be clearly drawn there. The defense is not entitled to examine them about their other factual
22 observations of that day, as that information can be obtained from other witnesses to the
23 same event, including the doctors themselves.

24 For the reasons outlined below, it is highly unlikely that either DOJ attorneys'
25 testimony will be necessary, save the two paragraphs in Mr. Leventis' memorandum that
26 attributes several statements to both doctors. As to that point, as set forth below, both
27 doctors recall that it would have been Dr. Diaz, the lead investigator and pathologist, not
28 Dr. Madrigal, who spoke that day on behalf of the team.

### B. Dr. Diaz

Based on the December 6, 2017 interview of Dr. Diaz, the government anticipates that Dr. Diaz will testify that (1) either the head or spinal shot could have been the first shot that brought J.A.E.R. to the ground; and (2) during the August 2014 meeting he **did** make the statements recorded in both DOJ attorneys' notes. In that case, neither Ms. Rolley, nor Mr. Leventis have relevant testimony to offer.

At the December 6, 2017 interview, Dr. Diaz stated in the presence of case agent Sarah Arrasmith that as to the August 2014 meeting he did most of the talking (not Dr. Madrigal) and remembers stating that he believes the shot to J.A.E.R.'s head above the ear was the first shot and it was a fatal wound. Dr. Diaz further explained that prior to that August 2014 meeting he had not reviewed his autopsy report and was discussing the case from his memory of the autopsy two years earlier. Accordingly, if Dr. Diaz denies making these statements in August 2014, he can be impeached with SA Arrasmith's statement regarding his adoption of the 2014 statements in her presence in 2017, negating the need to call either DOJ attorney as a witness.

Should Dr. Diaz testify that he did not make specific statements attributable to him in the DOJ attorneys' notes and memos, that were not covered in the meeting attended by SA Arrasmith, the DOJ attorneys' notes and memos become relevant as to those specific instances of inconsistency; but not the entire statement.

### B. Dr. Madrigal

Based on the December 8, 2017 defense interview of Dr. Madrigal, the government anticipates that Dr. Madrigal will testify that (1) either the head or spinal shot could have been the first shot that brought J.A.E.R. to the ground; and (2) he did not recall making any statements at the August 2014 meeting, as Dr. Diaz was the senior pathologist and would have been the one doing the talking. This does not conflict with Ms. Rolley's notes, since she attributes no statements to Dr. Madrigal. It would conflict with Mr. Leventis' notes and memorandum, which attribute several of the statements about the first shot and damage to J.A.E.R.'s body to "both" doctors or "DD and DM."

During the 2017 defense interview, Dr. Madrigal was asked questions about this issue. At pages 39-46, 128-142, and 173-180, Dr. Madrigal described the August 2014 meeting at the PGR's offices in Nogales, Sonora, Mexico, as taking place in the office of the deputy and the adjoining reception area. He explained the office was a four by five meter space with no conference table, with people both standing and sitting because there were not enough seats for everyone. People were meeting inside the deputy's office, and that others, including Dr. Madrigal, could not fit in the office and were just outside of it, in the reception area. Dr. Madrigal could not see the people in the office, which apparently included the DOJ attorneys and Dr. Diaz. When asked about the statements in the attorney notes attributed to both doctors, Dr. Madrigal said that perhaps Dr. Diaz made the statements, since as the senior investigator/doctor Dr. Diaz would have been the one to speak for them.

When Dr. Madrigal testifies that he did not make the statements in August 2014, it is possible the defense may wish to impeach him by calling Mr. Leventis to testify to that portion of his notes and memo that reflect that "DD and DM" or "both doctors" "believe the bullet wound to the head was the first wound because all of the other wounds have a rear to forward, right to left trajectory. . . believe the first bullet that struck Elena caused his death. . . believe that the shot to the head which killed Elena caused him to lose his balance. They believe the scrapes to Elena's hands and face were the result of being propelled forward by the impact to the cranial area." (Leventis memo, p. 2, submitted *in camera*.) As to Ms. Rolley, she has no impeaching testimony to offer regarding Dr. Madrigal.

IV.   Conclusion

The only relevant and admissible testimony the DOJ attorneys may offer in this matter is what they heard Dr. Diaz and Dr. Madrigal say, in the event either doctor denies making the 2014 statements recorded by the DOJ attorneys.

The defendant should be precluded from calling the DOJ attorneys as fact witnesses to tell the jury what they observed on August 19, 2014; as there are other witnesses to these

events who can testify without violating the attorney work product and/or government deliberative privilege(s). The defendant should also be precluded from asking the DOJ attorneys any questions intended to elicit their opinions or impressions, which are protected by the work product and/or deliberative process privilege(s).

Wherefore, the United States of America respectfully requests that this Court limit the scope of Ms. Rolley's and Mr. Leventis' testimony solely to rebuttal of any inconsistent statements provided by Drs. Diaz and Madrigal during their testimony at trial.

Respectfully submitted this 16th day of February, 2018.

ELIZABETH A. STRANGE
First Assistant United States Attorney
District of Arizona

*s/Mary Sue Feldmeier*

MARY SUE FELDMEIER
Assistant U.S. Attorney

Copy of the foregoing served electronically or by
other means this 16th day of February, 2018, to:

Sean C. Chapman, Esq.
Jim Calle, Esq.