**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| **United States of America,** | ) | |
| | ) | No.  **CR-15-1723-TUC-RCC-DTF** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Tucson, Arizona |
| | ) | April 4, 2018 |
| **Lonnie Ray Swartz,** | ) | 4:10 p.m. |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |


**BEFORE:  THE HONORABLE RANER C. COLLINS, JUDGE**


**REPORTER'S EXCERPTED TRANSCRIPT OF PROCEEDINGS**


**JURY TRIAL**
**Day 10**

**(TESTIMONY OF EMMA LEW)**


Official Court Reporter:
Candy L. Potter, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 36
Phoenix, Arizona 85003-2151
(602) 322-7246

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1

2                        **A P P E A R A N C E S**

3

 For the Government:
4         U.S. Attorney's Office Tucson
          By:  **Wallace Heath Kleindienst**, Esq.
5              **Mary Sue Feldmeier,** Esq.
          405 West Congress Street, Suite 4800
6         Tucson, Arizona 85701

7  For the Defendant:
          Law Offices of Sean C. Chapman
8         By:  **Sean Christopher Chapman**, Esq.
          100 North Stone Avenue, Suite 701
9         Tucson, Arizona 85701

10        Law Office of Jim E. Calle
          By:  **Jamie Ernest Calle, III,** Esq.
11        2315 East Hawthorne Street
          Tucson, Arizona 85719

12

13

14

15

16

17

18

19

20

21

22

23

24

25

─────CR-15-1723-TUC-RCC - April 4, 2018─────

1

2                          **I N D E X**

3  **GOVERNMENT WITNESS:**       **DIRECT**    **CROSS**    **REDIRECT**  **RECROSS**

4  EMMA LEW
   By Ms. Feldmeier          4

5

6

7  Discussion Held at Sidebar          33

8

9

10

11                     **INDEX OF EXHIBITS**

    **EXHIBIT**                             **IDENT**    **RECEIVED**
12
    NO.        DESCRIPTION
13
    278        Lew, Emma - Forensic Pathology
14             Consultant Report                 13

15  279        Lew, Emma - GSW Diagram           13      14

16  302        Diagram of GSW's
               10 entry wounds with pictures     16
17
    308        Diagram of GSW's - 10
18             exit/extracted wounds w/pictures  16

19  381        Grey mannequin                    15

20

21

22

23

24

25

                 UNITED STATES DISTRICT COURT

Emma Lew – Direct Examination

1    (The following excerpt is the testimony of Emma Lew.)

2         THE COURT:  Miss Lew, come on up.

3         THE CLERK:  Raise your right hand, please.

4    (EMMA LEW, GOVERNMENT WITNESS, SWORN.)

5         THE CLERK:  Thank you.  Please be seated.                    16:10:24

6         Please pull the microphone over to you.  Speak

7    directly into it.

8         State your name for the record and spell your last

9    name.

10         THE WITNESS:  Yes.  My name is Emma Lew, L-E-W.            16:10:47

11                    DIRECT EXAMINATION

12    BY MS. FELDMEIER

13    Q.  Where are you employed?

14    A.  I am employed with the Miami Dade County Medical Examiner

15    Department in Miami, Florida.                                    16:11:01

16    Q.  And what is your job description?

17    A.  I am actually the Chief Medical Examiner for the Medical

18    Examiner Department.

19    Q.  Okay.

20         THE COURT:  Doctor, could you move that mic in front        16:11:11

21    of your mouth more?  You're turning away from it as you speak.

22         THE WITNESS:  I'm sorry, Your Honor.  I'll try.

23    BY MS. FELDMEIER:

24    Q.  There.  You good?

25    A.  Yes.

5

1  Q.  And how long have you been with the Medical Examiner's

2  Office in Miami Dade?

3  A.  Since July 1st of 1991.

4  Q.  And what did you do before that?

5  A.  Before that I worked for three years as a staff pathologist    16:11:31

6  at the Royal University in my home city of Saskatoon,

7  Saskatchewan, Canada.

8  Q.  And where did go to school?

9  A.  I went to medical school in Saskatoon, Saskatchewan.  Did a

10  one-year rotating internship in Vancouver, British Columbia.    16:11:49

11  And that is also where I started my four-year residency

12  straining in pathology.

13  Q.  And what is pathology?

14  A.  Pathology is the practice of medicine using laboratory

15  techniques such as the autopsy.    16:12:07

16  Q.  And does pathology necessarily mean a dead body?

17  A.  No, there are other branches of pathology, like chemistry,

18  microbiology, hematology, and then there's anatomical

19  pathology.

20  Q.  Okay.  And so you focus, however, on the examination of a    16:12:24

21  deceased person; correct?

22  A.  That was part of my training, yes.  And now I'm totally

23  focused on examination of dead bodies.

24  Q.  Okay.  And approximately how many autopsies do you think

25  you've done in your -- well how many have you done at Miami    16:12:41

1    Dade?

2    A.  In Miami Dade County jurisdiction I have conducted at least

3    5,000 autopsies.

4    Q.  And prior to that?

5    A.  Prior to that, close to 1,000 autopsies in -- mostly          16:12:51

6    in -- well, in Canada, in England, in some of the Caribbean

7    nations who do not have their own forensic pathologist.

8    Q.  Have you ever done consulting work?

9    A.  Yes, I have.

10   Q.  What's consulting?                                             16:13:11

11   A.  Consulting is when someone, whether it be law enforcement

12   or the county attorney or the state attorney or the United

13   States Attorney, or private attorneys, want an opinion from a

14   forensic pathologist.

15   Q.  And so in this case did the United States Attorney's Office    16:13:32

16   hire you to review the evidence in this case?

17   A.  Yes, they did.

18   Q.  And with the ultimate idea in mind of giving us some

19   guidance and opinions on the cause of death and perhaps the

20   order of certain gunshot wounds?                                   16:13:49

21   A.  Yes.

22   Q.  Now, do you have any special interests in gunshot wounds?

23   A.  I do.  I enjoy, if that's the right word, working on

24   gunshot wound cases.  It's intellectually satisfying to me.

25   Q.  Have you ever trained in gunshot wound cases?                  16:14:09

Emma Lew – Direct Examination

1  A.  As a forensic pathologist, all of us train in gunshot

2  wounds.

3  Q.  And do you train other people in gunshot wounds?

4  A.  Yes.  The Miami Dade County Medical Examiner Department is

5  a training facility for pathologists who want to subspecialize        16:14:24

6  in forensic pathology.

7  Q.  And so you've had an opportunity to train others on the

8  examination of gunshot wounds in deceased persons?

9  A.  Yes.

10  Q.  Have you had an opportunity to publish in that area?        16:14:36

11  A.  Yes, I have.  I am co-author and co-editor of a forensic

12  biology textbook, and I wrote the chapter on gunshot wounds.

13  And I've written a few papers on gunshot wounds.

14  Q.  Have you had the opportunity to work on victims that have

15  suffered gunshot wounds?        16:15:00

16  A.  Yes.  The most recent one was March 30th, last Friday.

17  Q.  Okay.  So you are obviously actively performing autopsies

18  as part of your job.

19  A.  Yes, that is correct.

20  Q.  Now, let's talk a little bit about your reimbursement for        16:15:15

21  your work here on this case.

22        Is the United States Attorney's Office paying an

23  amount for your hours of testimony?

24  A.  Yes, they are.

25  Q.  How much approximately per hour?        16:15:29

UNITED STATES DISTRICT COURT

Emma Lew – Direct Examination

```
1    A.  For testimony, about $330 an hour.
2    Q.  And then for your consultation and your review of the
3    files, approximately how much an hour?
4    A.  I believe just over $100 an hour.
5    Q.  Do you see any of that money?                           16:15:44
6    A.  I will bill, but all the money goes back to the Miami Dade
7    County Medical Examiner Department.
8    Q.  And so you will simply receive your salary?
9    A.  Yes.
10   Q.  And they don't pay you overtime, do they?              16:15:57
11   A.  I work a lot of overtime, but I never get paid for it.
12   Q.  All right.  In preparation to help you review this case,
13   did the United States provide you with what's been listed in
14   your report as four pages of items?
15   A.  Yes, four pages of 30 items.                            16:16:16
16   Q.  Okay.  Could -- I guess at the risk of kind of boring the
17   jury here, could you please go over what items you were
18   provided?
19         And you don't have to probably get into the specifics
20   on that number 1.                                           16:16:36
21   A.  Number 1 is list of folders containing photographs, and
22   they are of various items, including the crime scene.
23         Number 2 is the Mexican autopsy report.  There were
24   two separate translations provided to me.
25         Number 3 is the Mexican toxicology report.            16:16:57
```

────────── **Emma Lew – Direct Examination** ──────────

1          Number 4 is Mexican Harrison report.

2          Number 5 is the Mexican Walker test report.

3          Number 6 is the Mexican comparative forensic

4    ballistics reports –– report.

5          Number 7 is the birth and death certificates of                  16:17:15

6    Mr. Jose Elena Rodriguez.

7          Number 8 is a memorandum of interview of Dr. Diaz

8    Trejo and Dr. Madrigal Godinez, with attachments and

9    photographs.

10          Number 9 is a memorandum of interview of Manuel Diaz          16:17:42

11    Osuna with photographs.

12          Number 10 is memorandums of interview of Juan Pablo

13    Espinoza Armenta.

14          Number 11 is a memorandum of interview of Blas Cota

15    Mendez with diagrams and photographs.                              16:18:05

16          Number 12 is the Mexican crime scene report with

17    attached photographs.

18          Number 13 is the Mexican crime scene color photographs

19    taken on October 12th, 2012.

20          Number 14 is Border Patrol Critical Incident Team            16:18:19

21    Total Station diagram and evidence list.

22          Number 15 is a list of folders containing various

23    files created by forensic animator James Tavernetti.

24          Number 16 is a memorandum of interview that contains a

25    timeline chronology of the events captured on the videos in the    16:18:44

─── Emma Lew – Direct Examination ───

1  Tavernetti file.

2  Q.  Is that Tavernetti file specifically the side-by-side

3  video?

4  A.  Yes, it is.

5  Q.  Okay.                                           16:18:57

6  A.  Number 17 is Lucien and Michael Haag December 20, 2014

7  illustrated report.

8        And number 18 is August 19, 2014, scene work by both

9  Michael and Luke Haag.

10       Number 19 is Lucien Haag illustrated supplemental    16:19:15

11  report from August 19 of 2014.

12       Number 20 is Michael Haag September 24, 2014

13  supplemental report.

14       Number 21 is Michael Haag December 24th, 2014

15  supplemental report.  This one is on the projectile     16:19:35

16  examination.  The previous one, number 20, was the laser -- 3D

17  laser scanning of the shooting scene.

18       Number 22 is Lucien Haag biographical information.

19       Number 23 is Michael Haag curriculum vitae.

20       Number 24 is Bevel, Gardner & Associates forensic    16:19:59

21  blood spatter report, with attached Tom Bevel biographical data

22  and CV.

23  Q.  Now as I'm listening to you, Dr. Lew, we have then e-mailed

24  disclosure and items sent via USA Affects, which is the United

25  States Attorney's Dropbox; correct?                     16:20:22

UNITED STATES DISTRICT COURT

11

─────── Emma Lew - Direct Examination ───────

1   A.  Yes.

2   Q.  And I'm looking at the names of the things listed here.

3   And are those similar -- they appear to be the same photographs

4   you just read out as number 1, and then some of Tavernetti's

5   exhibits; is that correct?                                      16:20:37

6   A.  Yes.

7   Q.  Okay.  And specifically, and maybe of interest here, what

8   were the primary pieces of evidence that you focused on?  What

9   was the -- actually the first thing you opened?

10  A.  I honestly don't remember the first thing I opened.  This   16:20:51

11  was a few months ago last year.  But the things I focused on

12  and were most helpful to me were the translated autopsy reports

13  and the photographs from both the crime scene and the autopsy.

14  Q.  Did you also have an opportunity to view the Border Patrol

15  camera videos?                                                  16:21:12

16  A.  Yes, I did.

17  Q.  Then after you made your reviews, did you have -- did

18  you -- did you have additional information that's listed on

19  page 4 at the bottom?

20  A.  Yes, I did.                                                 16:21:31

21  Q.  What date was that additional information received?

22  A.  On August the 7th, 2017.

23  Q.  Would that be August 2nd?

24      Am I reading that right, August 2, 2017?

25  A.  Oh, yes, I'm sorry.                                         16:21:50

—— Emma Lew – Direct Examination ——

1        On August the 2nd, 2017, I had the opportunity to

2   actually visit the U.S. Mexico border in Nogales, Arizona where

3   the scene took place.  And I was able to interview Dr. Madrigal

4   and Dr. Diaz through an interpreter.

5   Q.  Then after that did the United States pose four questions          16:22:14

6   to you?

7   A.  Yes, they did.

8   Q.  And so did that guide in some ways the areas that you were

9   going to explore in your consultation?

10  A.  Yes, they did.                                                     16:22:29

11  Q.  And what were the four questions that were asked of you?

12  A.  Number 1, which of the ten bullets that struck Jose Elena

13  was fatal bullet or bullets.

14        Number 2, when in sequence was the fatal bullet or

15  bullets inflicted during the course of the discharge of the          16:22:47

16  firearm by the defendant?

17        Number 3, which gunshot wounds were inflicted when the

18  victim was alive, and which, if any, were inflicted after

19  death?

20        Number 4, was the victim's movement between his              16:23:01

21  initial contact with the pavement, in brackets, left face

22  abrasions and injuries to the back of his hands, close

23  parenthesis, and his final resting position as documented in

24  the crime scene photographs consistent with antemortem

25  voluntary movement or postmortem spasmodic involuntary            16:23:25

1    movement.

2    Q.  So after you took all of the questions, the evidence into

3    consideration, did you generate a report?

4    A.  Yes, I did.

5    Q.  Okay.  So I'm showing you --                              16:23:39

6        (Discussion off the record between counsel.)

7    BY MS. FELDMEIER:

8    Q.  I'm showing you what's been marked as 278.

9        Do you recognize that?

10   A.  Yes, I do.                                                16:24:15

11   Q.  What is it?

12   A.  One of these is my report that I generated after reviewing

13   all of the information provided to me.

14       The second one is a body diagram that I made notes on.

15   Q.  Okay.  And the body diagram, is that labeled Exhibit 279?  16:24:31

16   A.  Yes it is.

17   Q.  And tell us how you went about doing -- or producing this

18   body diagram, Exhibit 279.

19   A.  After reviewing the autopsy report and the autopsy

20   photographs, I was able to create this diagram showing the    16:24:53

21   location of the gunshot wounds.  Actually the location of the

22   exit wounds, where the bullets came out of the body, as well as

23   the entrance wounds, where the bullet went into the body, and I

24   also was able to place the location of projectiles or bullets

25   that were found in the body.                                  16:25:18

1   Q.  And was this diagram useful to you in determining the

2   potential trajectories of the bullets?

3   A.  Yes.

4   Q.  And in determining the answers to the questions that were

5   asked of you.                                                    16:25:33

6   A.  Yes.

7          MS. FELDMEIER:  At this time I'd move the admission of

8   Exhibit 279, the diagram.

9          MR. CHAPMAN:  The diagram I have no objection to.

10         THE COURT:  It can be admitted.                           16:25:48

11      (Exhibit No. 279 admitted into evidence.)

12         MS. FELDMEIER:  Can that be published to the jury,

13  please?

14  BY MS. FELDMEIER:

15  Q.  I noticed you have on 279 a little -- what's the word I'm    16:25:52

16  looking for, index -- down at the bottom.

17         What are you trying to explain by the various colors?

18  A.  I was trying to explain what my markings were on the body

19  diagram, with a round circle to indicate an entrance wound,

20  where the bullet entered the body, an X for exit wounds where    16:26:19

21  bullets came out of the body, and a yellow dot to indicate

22  where projectiles were found inside the body.

23  Q.  Now, would it be helpful to explain to the jury the various

24  wounds in this case by going wound by wound?

25  A.  Yes, it would.                                               16:26:50

─────── Emma Lew – Direct Examination ───────

1    Q.  And would it be useful to you to use a figure of a human, a

2    foam figure, so that you can place the various wounds on that

3    figure?

4    A.  Yes.

5    Q.  Are you -- would you also be able to demonstrate for us the          16:27:04

6    trajectory of each of the wounds by using certain knitting

7    needles that I have here with me, that you could place in the

8    body according to the descriptions in the autopsy report?

9    A.  Yes.

10          MS. FELDMEIER:  Your Honor, at this time I would             16:27:20

11   request the ability to use a mannequin that we have actually

12   labeled as the next exhibit, I think it's 381.

13          THE COURT:  You mean the mannequin that's being

14   brought in the back?

15          MS. FELDMEIER:  That one.                                  16:27:43

16          And to have Dr. Lew step down from the podium as we go

17   through the various wounds.  And I will provide her with a

18   microphone.

19          THE COURT:  You may step down.

20          THE WITNESS:  Thank you, Your Honor.                       16:28:01

21   BY MS. FELDMEIER:

22   Q.  Okay.  Dr. Lew, I'm going to give you this microphone.  It

23   needs to stay pretty close.

24          Could you position with Agent Arrasmith here where you

25   would like this?                                                  16:28:13

--------Emma Lew – Direct Examination--------

1    A.  That is fine.

2            Thank you.

3            MS. FELDMEIER:  The mannequin is Exhibit 381.

4            If I could also request that Exhibits No. 302 and 308

5    be brought into the courtroom.  They previously have been                16:28:33

6    admitted.  And they would be placed on an easel.

7        (Discussion held off the record.)

8            MS. FELDMEIER:  If there's anyone in the jury who

9    cannot see the demonstratives, please raise your hand and we'll

10   move them.                                                               16:29:49

11   BY MS. FELDMEIER:

12   Q.  All right.  Dr. Lew, which bullet wound should we start

13   with?

14   A.  What I can do is just start from the top of the body and

15   work my way down, and show where the gunshot wounds were on the          16:30:02

16   body, and the pathways through the body as described by the

17   Mexican pathologists in their autopsy report.

18           The -- Dr. Madrigal and Dr. Diaz described the outside

19   of the body, then they described the inside of the body.

20           For us in the United States we have additional                   16:30:31

21   information that we must obtain from the body.  We follow the

22   track of each bullet from its entrance on the skin right

23   through the body to either an exit wound where it came out of

24   the body or to where a projectile stays in the body.

25           So although that was not done in this particular case,          16:30:52

Emma Lew – Direct Examination

1  because of my experience I was able to do that.

2  So I'm going to show you the pathways, as I understand

3  them, based on my experience and based on the information given

4  to me by the Mexican pathologists' report, autopsy report,

5  guided by their photographs as well.                              16:31:14

6  Q.  And, Dr. Lew, is it standard in the medical profession to

7  start examining a body from the head and working your way down?

8  A.  I just find that's convenient, rather than go all over the

9  place.  There will be a couple of wounds I'll take out of

10 order, but generally I'll start from the head and work my way    16:31:30

11 down so we have some order.

12 Q.  I'm holding here, for the record, knitting needles that are

13 approximately 18 to 20 -- probably about 18 inches long, and

14 they will be used to demonstrate the various trajectories.

15 A.  There was one gunshot wound described on the right side of   16:31:51

16 the head.

17 And excuse me while I put the knitting needle through.

18 It went in the right side of the head.  And this

19 projectile went through the scalp, went through the skull, went

20 through the right side of the brain, injured the right side of  16:32:17

21 the brain stem, went through the left side of the brain, went

22 through the left side of the skull.  And the projectile was

23 recovered just underneath the scalp on the left side of the top

24 of the head.

25 So the pathway through the body -- everything is           16:32:34

18

Emma Lew – Direct Examination

1   relative to the body.  So as you can see, the pathway through

2   the body is from back to front, right to left, and going up in

3   the body.

4        The next gunshot wound we'll talk about was on the

5   left side of the back of the head and neck area.                    16:32:51

6        Now this gunshot wound, of course, went inside the

7   left side of the back of the head.  It went through the soft

8   tissues of the face and came out the left cheek area.

9        So this pathway was from back to front, right to left,

10  and going upward in the body.                                        16:33:28

11       This one, of course, the first one we talked about,

12  having gone through the skull and the brain, was what we call

13  immediately incapacitating.  And the victim is usually not able

14  to move after that.  And death would occur within seconds to

15  minutes.                                                             16:33:49

16       This gunshot wound that went through the fleshy parts

17  the face was not lethal.

18       The next wound I want to talk about goes in the left

19  upper back area.  And Dr. Madrigal and Diaz were able to put in

20  their probe.  And it went in going from back to front and right  16:34:11

21  to left.  But they couldn't get any further because it hit the

22  spine.

23       Now from their internal examination to me I believe

24  the bullet struck the right side of several vertebra of the

25  spine, moving from the thoracic level, that's T8 up to T7, T6,    16:34:30

UNITED STATES DISTRICT COURT

─── Emma Lew – Direct Examination ───

1   T5, and T4.

2          So inside the body, after striking the spine, the

3   bullet moved up.  And the projectile was found above -- at the

4   bottom of the neck in that little groove right here.

5   (Indicating.)  It did not fracture -- it did not fracture the        16:34:51

6   breast plate, it went up through the chest and ended up right

7   here where the bullet was recovered.  (Indicating.)

8          Now, using common sense, having gone through the

9   chest, it went through the aorta, which is the largest artery

10  of the body coming direct out of the heart.                          16:35:10

11         So this wound would have bled profusely internally,

12  but would not have been as immediately incapacitating in terms

13  of dying as the head wound.  However, having struck the spine,

14  it would have injured the spinal cord and paralyzed him from

15  the waist down, or even higher.                                      16:35:35

16         So having received this shot, he would not remain

17  standing any longer, he would collapse.

18         The next wound I want to talk about was on the right

19  mid back.

20         Now, the doctors were able to tell that this pathway         16:35:54

21  was from back to front, right to left, and upward.  And in

22  going through all the evidence, I found an exit wound -- or

23  they described an exit wound on the front of the left axilla or

24  the left armpit.

25  Q.  Is that on this one?                                             16:36:12

Emma Lew – Direct Examination

1   A.  Right here.  This hole right here.  (Indicating.)

2        So I've made -- this projectile went through the

3   chest, through both lungs most likely, because logic would tell

4   you --

5   Q.  Do you need to get some water?                              16:36:33

6   A.  Okay.  Logic tells us if it goes from one side of the body

7   to other, through the chest, it would go through both lungs.

8   And there is evidence of that.  And the doctors did say that

9   there were perforations in the lungs.

10        Thank you.                                                16:36:53

11        Now I'm ready for the next wound.

12  Q.  Okay.

13  A.  Okay.  So that was called number 6 in the report.

14        Now the next bullet I'm going to put right here.

15  (Indicating.)  Again, this pathway was from back to front,       16:37:18

16  right to left, and going upward in the body.

17        And there was another exit wound on the left side of

18  the chest.  And I believe that this bullet was the one that

19  exited the left side of the chest under the armpit.

20        There it is, right there.  (Indicating.)                  16:37:41

21        So you can see how these two pathways are more or less

22  parallel with the bullet, exiting here and here respectively.

23  (Indicating.)

24        Now the next one is -- this wound was on the left side

25  of the back.  This pathway was from back to front and going      16:38:22

1  upward.  I'm going to come back to this.

2       The next wound was also from back to front and going

3  upward.  And I will come back to these wounds.

4       So let's go on with the next wound.

5       There was a gunshot wound on the back of the right    16:38:48

6  upper arm, and the doctors determined that it went from back to

7  front and upward in the body.

8       There was another wound on the left upper back,

9  about -- approximately here.  (Indicating.)  And this wound

10 went from back to front -- back to front, left to right and   16:39:11

11 upward.  They found a projectile on the front of the left upper

12 arm that belonged to this pathway.  And the doctors actually

13 identified this pathway.  And they recovered that bullet from

14 the front of the left upper arm.

15      There was another gunshot wound on the back of the      16:39:42

16 left upper arm.  And, again, the pathway was from back to front

17 and going upward in the body.  They found a projectile under

18 the skin on the front of the left upper arm in the biceps area.

19      This is the projectile they recovered from this wound

20 on the left upper back.  This projectile in the biceps area was  16:40:11

21 the one from the back of the left upper arm.  (Indicating.)

22      Do we have all the gunshot wounds?

23      Okay.  Now, in addition to the projectile here and

24 the projectile here that were recovered from this gunshot

25 wound on the left upper back and the left gunshot wound to the  16:40:49

Emma Lew – Direct Examination

1    left upper arm, there's an exit wound right here on the outside

2    of the left upper arm, and there's a projectile on the outside

3    of the left upper arm near the elbow that are not accounted

4    for.

5            I believe those are related to this gunshot wound    16:41:07

6    here, and this gunshot wound here.  (Indicating.)

7            Now, when you look at the pathways of these two

8    gunshot wounds, it doesn't make sense that one would come out

9    the arm here and the projectile would end up here; correct?  It

10   doesn't make sense.  Until you raise the left upper arm.    16:41:28

11           Now, this mannequin is a bit stiff but, of course, you

12   in real life would be able to move your body and your shoulder

13   around a little bit.  So, therefore, it is likely that this

14   wound on the left lower back went up this way and ended up

15   under the skin on the outside of the left upper arm.  And this    16:41:55

16   one went up and actually came out the outside of the left upper

17   arm.

18           So with the arm raised like that, that explains how

19   these pathways going from back to front and upward ended up in

20   the left upper arm.    16:42:18

21   Q.  Do you need assistance?

22   A.  I think that's --

23   Q.  That covers it?

24   A.  That covers the gunshot wounds.

25   Q.  So now would you like to show us how we could accomplish,    16:42:38

UNITED STATES DISTRICT COURT

1  for example, this number 4 wound from the height you saw and

2  the -- on any of these wounds, frankly, from the height we saw

3  out at the crime scene down to where the victim was found?

4  A.  This wound that strikes the spine I believe would have

5  caused immediate paralysis from the -- I guess, from the chest          16:43:00

6  level on down.  So there would be no movement possible in the

7  legs.

8        And because there was injury to the spine from T8 up

9  to T4 level, I could tell the bullet was moving upward.

10  Especially when the pathologist found the bullet up here.             16:43:22

11  (Indicating.)  So the pathway was going upward.

12        Now they were only able to determine back to front and

13  right to left because they hit bone, the projectile hit bone,

14  and they were not able to follow the track of the bullet inside

15  the body.                                                             16:43:40

16        Now to accomplish this, it looks like it's going in

17  straight.  However -- perhaps at this time we can put it on the

18  ground.  And if you can put --

19        Okay.  We can start off with him like that.

20  Q.  So with this hypothetical -- can you hear me -- if the           16:44:24

21  person is running and bent slightly at the waist, are you able

22  to accomplish gunshot wound 4?

23  A.  Yes.  This one going into the spine would be consistent

24  with that scenario, because if you're running, you're not going

25  to be running like this, you're going to be running a little        16:44:42

Emma Lew – Direct Examination

```
 1    bit more with your upper body bent over.  Most people don't run

 2    straight up like this.

 3           And because he's running, he's got the momentum

 4    already.  So when the bullet strikes the spine and causes

 5    paralysis, he's already moving forward and he lands on the          16:44:59

 6    front of his body like this.  (Indicating.)

 7           Now we have evidence from the abrasions or the scrapes

 8    on his -- on the left side of his face and scrapes on the backs

 9    of his hands, that he landed face down on the left side of his

10    face and on top of his hands.                                       16:45:17

11           We can't really show that with the arms, we'd have

12    to take the arms off.  But that's how this would be

13    accomplished.

14           MS. FELDMEIER:  Would it help us if we moved the

15    mannequin backwards?                                                16:45:32

16           JUROR:  Yes.

17           MS. FELDMEIER:  All right.  Let's do that.

18    BY MS. FELDMEIER:

19    Q.  Okay.  With gunshot wound 4 bringing the individual to the

20    ground --                                                           16:45:53

21    A.  Yes.

22    Q.  -- and the left side of the face impacting the ground --

23    A.  Yes.

24    Q.  -- how does -- what position would the body need to be in

25    in order to accomplish the back wounds?                             16:46:03
```

UNITED STATES DISTRICT COURT

**Emma Lew – Direct Examination**

1   A.  I think I'm going move to move it so --

2   Q.  Oh, I see what you're doing.

3   A.  -- he's facing the jury.

4   Q.  Okay.  So my question is, assuming the theory that number 4

5   brought the victim to the ground -- and you've just testified       16:46:36

6   about the abrasions to the face.

7   A.  Yes.

8   Q.  Would that be consistent with impact to pavement?

9   A.  Yes, it would.

10  Q.  And then there are also abrasions found on the underside of     16:46:46

11  the arms.  What would that be consistent with, in your opinion?

12  A.  That would be consistent with him, as he's pitching forward

13  and landing on the left side of his face, his arms were

14  underneath the body.  So when he landed with his weight on his

15  hands, it scraped, resulted in abrasions or scrapes on the         16:47:06

16  backs of his hands.

17  Q.  Now you've already testified that at this point he would

18  still have movement of his arms, voluntary movement.  The

19  question is:  Would -- when one receives such an impact to the

20  back, pitching them forward, is that something that the body       16:47:24

21  has enough time to make a conscious decision to try to protect

22  itself, or is it a reflexive action?

23  A.  It's hard to say.  Some people fall so fast they don't have

24  a chance to put out their arms.

25          In this case we have evidence he fell on the backs of      16:47:42

1   his hands because there were abrasions.

2           Now, after being down, these two wounds here that go

3   on the right side of the back, that go through the right lung

4   and the left lung, and come out -- come out here and on the

5   side of the chest, would have resulted in bleeding.                    16:48:06

6           Now, you need time to bleed.  It's not an instant

7   death.  And the -- and Dr. Madrigal and Diaz found between

8   1,000 and 1500 milliliters of blood in the chest cavity.  That

9   meant he was alive for a while in order for him to be bleeding

10  into his chest cavity.                                                 16:48:32

11          Now keeping that in mind --

12  Q.  Is there anything I can do to assist with adjusting?

13  A.  Soon.

14  Q.  Okay.

15  A.  Now we have evidence already he fell on the left side of           16:48:48

16  his face and on the backs of his hands; right?  But these two

17  wounds on the left side of back require that the left upper arm

18  be up.  So after -- likely after he fell he was able to reach

19  out.

20  Q.  Am I positioning this correctly, Dr. Lew?                          16:49:11

21  A.  Yes.

22  Q.  Or would it be more like this?

23  A.  It has to be like that.

24          But then, you look at these pathways, these are right

25  to left.  Correct?  These are more straight into the back.  So        16:49:22

1    how do we explain that?

2          And we explain that by having him flat first.  Okay,

3    bullets travel in a straight line.  So if the gun was here, you

4    can see how this pathway and this pathway would be consistent

5    with his position.                                          16:49:44

6          It is not consistent with this position -- I'm

7    sorry -- this gunshot wound here or here because the gun is

8    over here.  (Indicating.)

9          Now in order to make it consistent --

10   Q.  Should I move that arm?                                 16:50:03

11   A.  Because in order -- if you tilt him up a little bit, now

12   you can see how this gunshot wound and this gunshot wound is

13   consistent.  (Indicating.)

14   Q.  And where do those two exit?

15   A.  Those are the ones that exited here, and the projectile   16:50:24

16   stayed here.  (Indicating.)

17   Q.  So in this mannequin it would be to this forearm area?

18   A.  To the left upper arm.

19   Q.  Okay.

20   A.  So at some point Mr. Rodriguez was up on his right side  16:50:39

21   reaching with his left hand upward.  That has to be the

22   situation to make the physical evidence what it is.

23   Q.  Now you did review the crime scene photographs, and in that

24   the decedent is more flat; correct?  And the arm is brought

25   back.                                                       16:51:09

Emma Lew - Direct Examination

1    A.  Yes.

2    Q.  So what explains how the arm would go from this position to

3    the final resting position?  Is that voluntary movement or

4    involuntary?

5    A.  After receiving these two gunshot wounds where the bullets          16:51:23

6    end up in the left upper arm, the left arm has to be brought

7    back closer to the body, to its final resting position, as you

8    see in the crime scene photographs.

9    Q.  Okay.

10   A.  So there was movement in order to bring this arm that was           16:51:39

11   up here back to here.  (Indicating.)

12   Q.  And does that movement indicate life?

13   A.  Yes.  Because in order to receive these two gunshot wounds

14   he was up on his right side a little bit.  And the physical

15   evidence that supports that is that there was a lot of blood on        16:51:59

16   the shirt associated with this gunshot wound to the spine, and

17   the blood was draining down to the right side.  And that can be

18   explained by the body being up on the right side.

19   Q.  Okay.  So then how do you explain the fatal head shot

20   wound?                                                                  16:52:24

21   A.  As I said before, and I'm sure Dr. Madrigal and Dr. Diaz

22   would have said so also, this gunshot wound through the head,

23   from right to left, and ending up on the left side of the top

24   of the head would be immediately incapacitating.  In other

25   words, he would not remain standing.                                   16:52:42

Emma Lew – Direct Examination

1    And because it went through the brain and injured the

2  right side of the brain stem -- and the brain stem controls

3  heart rate and respiration -- death would occur within seconds,

4  or minutes, a couple minutes.

5    So in order for that to happen --                         16:53:04

6  Q.  Let me hold that while you work.

7    Actually this one will pick you up a lot better.

8  A.  The terminal position of the head was turned slightly to

9  the left as you see here.  In order for the gunshot wound to

10  occur on the right side of the head, that's not possible with   16:53:34

11  his head in that position.

12    So at some point while he was on the ground his head

13  had to have been -- his head had to have been in a position

14  where the right side of his face was facing the gun.

15  Q.  And is it possible, Dr. Lew, that the right side of the     16:54:03

16  face could have been facing either from this hard position

17  where he slammed into the sidewalk, or in that lifted position

18  where he's rotating up, maybe lifting his head?

19  A.  I suspect it was somewhat up, because after receiving this

20  shot, he would have collapsed.  And in order for him to         16:54:25

21  collapse facing the other way, his head had to have been up and

22  maybe in the process of turning, so that after receiving the

23  shot, he just drops according to gravity.

24  Q.  Okay.  Do you have any other points that we could make with

25  this, or do you want to retake the stand?                       16:54:47

1   A.  This gunshot wound, although it looks bad because it's to

2   the back of the left of the head, I believe was one of the last

3   wounds sustained.

4        And if we put the head in its terminal position

5   facing to the left -- a little bit, yes.  There wasn't a lot                16:55:04

6   of bleeding from this wound.  Now where the bullet came out on

7   the left cheek, there was a dribble of blood going down

8   towards the pavement.  And that tells me that he was already

9   face down on the pavement when he sustained this gunshot

10  wound.                                                                       16:55:34

11       And not only that, other evidence is that his shirt,

12  just below where this gunshot wound was, had two bullet holes.

13  And in order to have two bullet holes in the clothing

14  associated with this gunshot wound, the clothing, the fabric

15  was bunched up, so that the bullet went through several layers              16:55:53

16  of the T-shirt before striking the head.

17       And there was a little curved bruise underneath this

18  entrance wound, and that would have been very consistent with

19  the collar of the shirt.

20  Q.  So you're saying that the collar of a cotton T-shirt could              16:56:12

21  cause a bruise on a body?

22  A.  Yes, it can.

23  Q.  You've seen this before?

24  A.  Yes.

25  Q.  Okay.                                                                    16:56:20

1   A.  Usually it's jewelry and other things like that.

2   Q.  Okay.  So is there anything else about the body position

3   that we want to discuss?

4        Now, you're not saying that you can tell this jury, I

5   know out of ten shots this is one, this is two, this is three,          16:56:40

6   et cetera; correct?

7   A.  No, that's not what I'm saying.  I'm saying that certain

8   shots had to have come first, and other shots could not have

9   come --

10  Q.  Ahead of those.                                                       16:56:55

11  A.  Yes.

12  Q.  Yes.  Okay.

13       So it's possible, for example, that these little back

14  arm shots that didn't cause terminal damage could have occurred

15  at any point in this procedure.                                          16:57:07

16  A.  Yes, that is possible.

17  Q.  Okay.  And is it -- would it be accurate to say that this

18  entire movement -- giving you the hypothetical that the victim

19  hit the ground, and then eight full seconds passed before the

20  next volley of shots started, if I give you that hypothetical,          16:57:27

21  why does -- is eight seconds enough time for someone to get up

22  and run away?

23  A.  Well, that's it.  Most people, if they're not -- if they

24  fall forward, they're going to try and get up and move.

25  However, Mr. Rodriguez could not.  And there is no evidence            16:57:45

1   that he moved below the waist, there was no movement at all,

2   whereas most people would try to get up and run off if they

3   were not injured in the spine like he was.

4   Q.  So in addition to the forensic evidence you've shown us

5   about the upper body movement, did you also view the video in      16:58:03

6   this case?

7   A.  Yes.

8   Q.  And did you see movement?

9   A.  I saw movement.  I saw movement that would be consistent

10  with him up on the right side of his chest.  And there's          16:58:12

11  movement of the left arm.  And that would be entirely

12  consistent with these gunshot wounds to the left side of the

13  back, which ended up in the left upper arm.

14  Q.  So do you have an opinion for this jury on whether or not

15  Mr. Elena was still alive after -- whatever first shot brought    16:58:32

16  him to the ground?

17  A.  Yes, because there was movement of the head.  He landed on

18  the left side of his face first, and then he was -- had to have

19  been in a position so that he could sustain the wound to the

20  right side of his head.                                           16:58:51

21        And finally he then rested in the final position on

22  the right side of his face, instead of when he first landed on

23  the left side of his face.

24        And then, of course, in order to sustain these two

25  gunshot wounds where the pathways were slightly different from    16:59:06

─────── Emma Lew – Direct Examination ───────

```
 1   these two over here, he had to have been up on his right side,

 2   and -- for the bullets from these two wounds to end up in the

 3   left upper arm.

 4           So there was movement after Mr. Rodriguez was on the

 5   ground.                                                          16:59:23

 6           MS. FELDMEIER:  Thank you, Dr. Lew.

 7           If you want to retake the stand.

 8           THE COURT:  Can I see counsel for a second?

 9       (At sidebar on the record.)

10           THE COURT:  She's here for the night, I'm sure.  So I    16:59:54

11   don't think there's any flights leaving Tucson tonight.

12           How much longer do you think you got?

13           MS. FELDMEIER:  Just a little, short wrap up kind of

14   thing.

15           THE COURT:  Do you want to talk to her tonight or do     17:00:06

16   you want to talk to her tomorrow?

17           MR. CHAPMAN:  I'd rather wait.

18           MS. FELDMEIER:  We'd like to get her on the 12:50

19   flight, she's -- there's a 12:50 flight tomorrow, to get her

20   out of here.                                                     17:00:16

21           MR. CHAPMAN:  I don't think I've spent more than 40

22   percent on cross yet.

23           MS. FELDMEIER:  Right.

24           MR. CHAPMAN:  Forty minutes on cross yet.

25           THE COURT:  You are tired.                               17:00:23
```

Emma Lew – Direct Examination

1          MR. CHAPMAN:  Yeah.

2          THE COURT:  All right.  You want to finish it, we'll

3  stop.

4          MS. FELDMEIER:  We'll stop here.

5      (End of discussion at sidebar.)                          17:00:47

6          THE COURT:  Go ahead.  Don't mind us.

7          MS. FELDMEIER:  This is a good stopping point for the

8  Government, Your Honor.

9          THE COURT:  I thought you said you had a few more

10 questions.                                                   17:00:54

11         MS. FELDMEIER:  I'd rather do them in the morning.

12         THE COURT:  9:30 in the morning.

13         But before you leave, there is a -- I'll tell you

14 exactly what it is -- a teacher's rally outside the building.

15 So please take your juror badges off when you leave outside the  17:01:30

16 building.  I think it's teachers wear red or something like

17 that.  That's what's going on outside.  So take your badges off

18 when you go outside the building.

19         We'll start tomorrow morning at 9:30.

20         Remember -- before you leave.  I'm not through.  I've  17:01:53

21 got lots to say.

22         We'll start tomorrow at 9:30.  We will not have court

23 on Friday.  We will have court Monday, Tuesday, Wednesday,

24 Thursday of next week.  Okay?

25         Remember the admonitions; no news, no research, no    17:02:14

1    investigation, no discussing the case, no making up your mind.

2        See you tomorrow morning at 9:30.

3    (Jury out at 5:02 p.m.)

4    (Further proceedings held on the record not included in

5    this transcript.)

6

7                                  -oOo-

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                        C E R T I F I C A T E

5

6          I, CANDY L. POTTER, do hereby certify that I am duly

7   appointed and qualified to act as Official Court Reporter for

8   the United States District Court for the District of Arizona.

9          I FURTHER CERTIFY that the foregoing pages constitute

10  a full, true, and accurate transcript of all of that portion of

11  the proceedings contained herein, had in the above-entitled

12  cause on the date specified therein, and that said transcript

13  was prepared under my direction and control.

14         DATED at Phoenix, Arizona, this 5th day of April,

15  2018.

16

17

18                             s/Candy L. Potter_____
19                             Candy L. Potter, RMR, CRR

20

21

22

23

24

25