**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| **United States of America,** | ) | |
| | ) | No.  **CR-15-1723-TUC-RCC-DTF** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Tucson, Arizona |
| | ) | April 9, 2018 |
| **Lonnie Ray Swartz,** | ) | 9:27 a.m. |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE RANER C. COLLINS, JUDGE**

**<u>REPORTER'S EXCERPTED TRANSCRIPT OF PROCEEDINGS</u>**

**<u>JURY TRIAL</u>**
**<u>DAY 12</u>**

**<u>(TESTIMONY OF LONNIE SWARTZ)</u>**

Official Court Reporter:
Candy L. Potter, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 36
Phoenix, Arizona 85003-2151
(602) 322-7246

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

CR-15-1723-TUC-RCC – April 9, 2018

1

2                    **A P P E A R A N C E S**

3

For the Government:
4        U.S. Attorney's Office Tucson
         By:  **Wallace Heath Kleindienst**, Esq.
5              **Mary Sue Feldmeier,** Esq.
         405 West Congress Street, Suite 4800
6        Tucson, Arizona 85701

7  For the Defendant:
         Law Offices of Sean C. Chapman
8        By:  **Sean Christopher Chapman**, Esq.
         100 North Stone Avenue, Suite 701
9        Tucson, Arizona 85701

10       Law Office of Jim E. Calle
         By:  **Jamie Ernest Calle, III,** Esq.
11       2315 East Hawthorne Street
         Tucson, Arizona 85719

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CR-15-1723-TUC-RCC – April 9, 2018

1

2                                    **I N D E X**

3

    **DEFENSE WITNESS:**          **DIRECT**      **CROSS**      **REDIRECT**   **RECROSS**

4
    LONNIE SWARTZ
5   By Mr. Chapman              7
    By Mr. Kleindienst                        45
6   By the jury                               112
    By Mr. Chapman                                          112
7

8

9
    Discussion Held at Sidebar          4, 101, 104, 112
10

11

12

13

14                           **INDEX OF EXHIBITS**

    **EXHIBIT**                                    **IDENT**    **RECEIVED**
15
    NO.          DESCRIPTION
16
    134          Photograph of MX crime scene
17               from USA, JAER covered              93

18  287          FACTS tracking system
                 October 2011 – August 2012          51
19
    295          Report of Assault on Service
20               Employee dated 4-25-12              67

21  296          Report of Assault on Service
                 Employee dated 4-29-12              63
22
    329          Video – Side-by-side w/highlights
23               Swartz, Wynecoop, Zuniga            38

24

25

—CR-15-1723-TUC-RCC – April 9, 2018—

1      (The following excerpt is the testimony of Lonnie Swartz.)

2      (At sidebar on the record at 9:27 a.m.)

3          MS. FELDMEIER:  Counsel gave us a good faith witness

4   list and order, and said he may call Lonnie Swartz, and all of

5   a sudden this morning he walks in and says he's going to call          09:27:07

6   Lonnie as his first witness.

7          THE COURT:  Okay.

8          MS. FELDMEIER:  I just think that's really a lot of

9   gamesmanship that wasn't necessary and hasn't been happening in

10  this trial.  So we're just putting it on the record.                   09:27:17

11         We'd ask that another witness be called first so we

12  have time to prepare for his cross-examination.  We've been

13  preparing for all the other cross-examinations all --

14         THE COURT:  You're not ready for his cross-examination

15  yet?                                                                    09:27:29

16         MS. FELDMEIER:  We've been preparing for all the other

17  ones this weekend, Your Honor.  So I'm just putting that on the

18  record, for what it's worth.

19         MR. CHAPMAN:  What I said was I would give them a good

20  faith effort estimate of the witnesses.  And I said that              09:27:38

21  calling him was a strategic decision which I hadn't made yet.

22  And I made it over the weekend, and I'm calling him.

23         THE COURT:  Okay.

24         MS. FELDMEIER:  He can do that.  I'm just -- I guess

25  we're just putting on the record that the brinksmanship here,          09:27:53

─ **CR-15-1723-TUC-RCC – April 9, 2018** ─

1    that was uncalled for, and has not happened up to this point.

2    And I'm disappointed.

3              THE COURT:  I'm positive that it was not

4    brinksmanship.

5              MR. KLEINDIENST:  At least he could have called us        09:28:03

6    over the weekend to let's us know, just as a matter of

7    courtesy.

8              MS. FELDMEIER:  He's been calling us all weekend about

9    the stipulation, Your Honor, for Rolley and Leventis, and he

10   could have very well called us over the weekend and told us        09:28:11

11   that.

12             So I'm just putting that on the record for whatever

13   it's worth.

14             MR. CHAPMAN:  I also have Dr. Miller in the courtroom.

15   He's going to observe Mr. Swartz's testimony.

16             MR. KLEINDIENST:  He's going to testify after?

17             MR. CHAPMAN:  Yeah, he's going to testify after.

18             MS. FELDMEIER:  And we just got a PowerPoint for

19   Dr. Miller this morning, Your Honor.

20             THE COURT:  All right.                                    09:28:28

21             MS. FELDMEIER:  It may take some time, we may ask for

22   a break before cross-examination.

23             THE COURT:  Of Dr. Miller?

24             MS. FELDMEIER:  Well, either we don't have the folders

25   up here, Your Honor, because we were told that there were five      09:28:36

—CR-15-1723-TUC-RCC – April 9, 2018—

1    experts being called before Lonnie.

2           MR. CHAPMAN:  Actually, that's not what I said.

3           MS. FELDMEIER:  Well, I know he played games,

4    Your Honor.

5           MR. CHAPMAN:  It's not gamesmanship when someone's          09:28:45

6    freedom is on the line.

7           THE COURT:  All right.  That's enough.

8           I have a pretty good idea that Mr. Kleindienst will be

9    ready when Mr. Swartz is ready to be cross-examined.  I'll be

10   surprised if he's not.                                            09:29:03

11      (End of discussion at sidebar.)

12      (Jury in at 9:31 a.m.)

13          THE COURT:  Let the record reflect the jury has

14   returned back to the courtroom, the presence of all counsel and

15   the defendant.                                                    09:31:10

16          Good morning.

17          JURY:  Good morning.

18          THE COURT:  I trust you all had a good weekend.

19          JURY:  Yes.

20          THE COURT:  You may call your next witness.               09:31:16

21          MR. CHAPMAN:  Defense calls Lonnie Swartz.

22          THE CLERK:  Raise your right hand, please.

23      (LONNIE SWARTZ, DEFENSE WITNESS, SWORN.)

24          THE CLERK:  Thank you, please be seated.

25          Please pull the microphone over to you.  Speak            09:31:42

—Lonnie Swartz – Direct Examination—

1   directly into it.

2          State your full name for the record and please spell

3   your last name.

4          THE DEFENDANT:  My name is Lonnie Swartz, S-W-A-R-T-Z.

5          THE COURT:  Pull that microphone closer to you.          09:31:56

6                    DIRECT EXAMINATION

7   BY MR. CHAPMAN:

8   Q.  Can you also take a moment to pour yourself a cup of water.

9          Lonnie, can you tell us how old are you?

10  A.  I'm 43 years old.          09:32:20

11  Q.  Are you married?

12  A.  I am.

13  Q.  How long have you been married?

14  A.  Twenty years this year.

15  Q.  All right.  Is your wife in the courtroom this morning?     09:32:29

16  A.  Yes, she is.

17  Q.  Do you have any children?

18  A.  No, I do not.

19  Q.  How far did you get in school?

20  A.  High school education.          09:32:44

21  Q.  And when did you graduate?

22  A.  I got my diploma in 1995.

23  Q.  Before we talk about your career with the Border Patrol, I

24  want to ask if you have any experience in other -- any other

25  fields?          09:33:06

─── **Lonnie Swartz - Direct Examination** ───

1  A.  Yes, sir, I do.

2  Q.  Tell us what those are.

3  A.  I've been in the construction field since 1993.  Heavy

4  construction, concrete, form work, high-rises, concrete parking

5  structures, underground drainage facilities, power plants,          09:33:20

6  water treatment facilities, that sort of thing.

7  Q.  Okay.  When did you join the Border Patrol?

8  A.  I entered on duty on September 6th, 2010.

9  Q.  All right.  And how did that begin, where did you start?

10  A.  After leaving -- we left Tucson, I believe, on September     09:33:52

11  5th, and we arrived at the Border Patrol Academy on September

12  6th, 2010, in Artesia, New Mexico.

13  Q.  And what's in Artesia?

14  A.  The Border Patrol Training Academy.

15  Q.  All right.  And what was involved there, what kind of        09:34:11

16  training did you get and how long did it last?

17  A.  Our initial training lasted from September 6th, 2010, until

18  November 29th, 2010.  And that entailed law, physical

19  techniques, firearms training, that sort of thing.

20  Q.  All right.  And how long did that training last?            09:34:47

21  A.  Again, it was from September 6th, 2010, until November 29th

22  in 2010, until we graduated.

23  Q.  Okay.  So a couple months.  What happened after you

24  graduated?

25  A.  If you were not fluent in Spanish you stayed another couple  09:35:05

1   of months in order to be proficient enough to be -- to graduate

2   in Spanish.

3   Q.  Did you have to do that?

4   A.  Yes, I did.

5   Q.  So when did you ultimately graduate from the Academy?          09:35:21

6   A.  I left the Academy, I believe it was February 1st, 2011,

7   that's fairly close.

8   Q.  All right.  And while you were at the Academy did you get

9   instruction on use of handguns and other weapons?

10  A.  Yes, sir, I did.                                               09:35:40

11  Q.  And did you get instruction on the use of force policies

12  for the Border Patrol?

13  A.  Yes.

14  Q.  When to use different levels of force, when lethal force

15  was necessary, that type of thing?                                09:35:51

16  A.  Yes.

17  Q.  All right.  So you graduated on February 2011.  What did

18  you do after that, where did you go?

19  A.  I was stationed at the Nogales Border Patrol station in

20  Nogales, Arizona.                                                 09:36:06

21  Q.  And when did you first arrive there?

22  A.  I believe it was February 14th or February 15th.

23  Q.  Of 2011?

24  A.  Of 2011, yes.

25  Q.  So that would have been the only station that you worked at   09:36:19

—Lonnie Swartz – Direct Examination—

1   up until the time that this incident happened?

2   A.  That is correct.

3   Q.  All right.  And what did your duties generally involved

4   when you arrived at the Nogales Border Patrol Station?

5   A.  I'm sorry, sir, can you repeat that, please?          09:36:40

6   Q.  What did your duties generally involve when you arrived at

7   the Nogales Border Patrol Station?

8   A.  When we first arrived at the Border Patrol Station in

9   Nogales we were assigned to a field training unit.  You were in

10  the field training unit -- we had a field training officer that   09:36:54

11  would work with you for a specific amount of time on day shift,

12  then you were transferred to a different field training officer

13  for a swing shift, and then ultimately you had a different

14  field training officer for the midnight shift.

15  Q.  Okay.  So field training unit is essentially a method by   09:37:11

16  which the Border Patrol establishes that you're proficient,

17  they train you how to do things, basically?

18  A.  Yes, sir.  They take you in the field and show you the area

19  of responsibility.

20  Q.  All right.  So how long did that field training last?   09:37:29

21  A.  I don't know exactly.  I want to say to was probably three

22  to four months, three-and-a-half months.  That's close.

23  Q.  All right.  And then that would put you in roughly, what,

24  May 2011, when you got off the field training unit?

25  A.  May, maybe June.  Again, it's an estimation.          09:37:54

──────Lonnie Swartz – Direct Examination──────

1    Q.  All right.  And then at a certain point you transitioned

2    from being a probationary employee to a non-probationary

3    employee.  Do you know when that happened, roughly speaking?

4    A.  I believe it was in late August or in September of 2011.

5    Q.  All right.  Now, after you arrived at the Nogales Station,      09:38:20

6    did you become certified in the use of the PLS launcher?

7    A.  Yes, I did.

8    Q.  Was that mandated?

9    A.  No.  It was up to you if you want to be certified for it or

10   not.                                                               09:38:43

11   Q.  Why did you do it?

12   A.  It gave us more options when we were working the AOR

13   Nogales, east and west side.

14   Q.  Same question for the FN 303.

15   A.  I was certified in that, yes, sir.                             09:38:56

16   Q.  And again, no one mandated that you do -- obtain those

17   certifications?

18   A.  No, sir, we were not required.

19   Q.  Were you certified in both of those devices in October of

20   2012?                                                             09:39:12

21   A.  Yes, I was.

22   Q.  Now, how did that work?  Once you became certified, were

23   you -- did you just take them out in the field, was one issued

24   to you, or how did it work?

25   A.  If you were working in the field in designated areas, when     09:39:31

---

**Lonnie Swartz – Direct Examination**

1   you would check out equipment from duty issue, you can request

2   a PLS if there was one available.

3   Q.  And prior to the events in this case, had you checked out

4   these devises in the past?

5   A.  Many times.                                                    09:39:50

6   Q.  All right.  And had you used them?

7   A.  I used the PLS, as I've deployed that on more than one

8   occasion.

9   Q.  Okay.  And is it fair to say that the PLS is an alternative

10  to using deadly force?                                             09:40:09

11  A.  Yes, sir, it is.

12  Q.  All right.  And the prosecutor elicited testimony from, I

13  think, a Mr. Wecht a week or two ago about various past

14  instances where you had used less lethal devices.

15          Do you remember that testimony?                            09:40:32

16  A.  Yes, sir, I do.

17  Q.  All right.  And do you agree with the summary of those

18  prior acts and what had occurred?

19  A.  As far as, sir?

20  Q.  As far as -- that those events that Mr. Wecht testified     09:40:46

21  actually happened; right?

22  A.  Yes, sir, they did.

23  Q.  And you prepared a report in each instance; is that right?

24  A.  Yes, sir, I did.

25  Q.  Why did you prepare a report?                                  09:41:01

**Lonnie Swartz – Direct Examination**

1   A.  Whenever you deploy any less lethal device, whether it be a

2   PLS, an FN 303, collapsible steel baton, your OC spray, any of

3   these items that are used in the field, you must report it.

4   And there is a use of force report done on these.

5   Q.  So you did what you were required to per policy?                    09:41:21

6   A.  Yes.

7   Q.  Is that right?

8   A.  Yes.

9   Q.  Did you make up any of these reports?

10  A.  No.                                                                 09:41:32

11  Q.  Did anybody with the Border Patrol discipline you and say

12  you didn't use appropriate force in any of these events?

13  A.  No.

14  Q.  You were just acting according to your training; right?

15  A.  That is correct, sir.                                              09:41:48

16  Q.  And I'll state the obvious, but have you been rocked in the

17  past?

18  A.  Many times.

19  Q.  And when I say "in the past," I mean before October 2012.

20  A.  Yes, sir.                                                          09:42:10

21  Q.  And how many times, roughly speaking, did that happen?

22  A.  I don't know the exact number, sir.  I'd say anywhere from

23  five to seven times.  Maybe more, but that's just an estimate.

24  Q.  And how big were the rocks that were typically thrown?

25  A.  They were large sized, hand sized.                                 09:42:31

1   Q.  Hand sized?

2   A.  That would fit in your hand.  They were large-sized rocks.

3   Q.  Okay.  Baseball sized?

4   A.  I would agree with that, yes.

5   Q.  Were they the size that if one had hit you it would have                09:42:44

6   potentially caused you serious injury?

7   A.  Absolutely.

8   Q.  So in those instances when you were rocked in the past, had

9   you used less lethal force in response?

10  A.  I had on numerous occasions.                                            09:43:04

11  Q.  Okay.  Have you ever been disciplined by the Border Patrol

12  for using excessive force?

13  A.  No, I've never been disciplined, no.

14  Q.  Did your training with the Border Patrol include the idea

15  that rocks are to be treated as potential deadly weapons?                   09:43:34

16  A.  Yes, we were trained that way, sir.

17  Q.  When were you first told that?

18  A.  We were first -- that was brought to our attention at the

19  Border Patrol Academy in Artesia, New Mexico.

20  Q.  So before you even got to Nogales.                                      09:43:48

21  A.  Before I even got to Nogales, yes, sir.

22  Q.  And were you aware of prior instances prior to 2012 where

23  agents had been seriously injured by rocking events?

24  A.  Yes, I do.

25  Q.  Can you give us some examples?                                          09:44:06

───── **Lonnie Swartz – Direct Examination** ─────

1   A.  At the Border Patrol Academy first we were shown video

2   clips of different -- at different times before that from

3   incidents that have occurred from San Diego all the way down to

4   Texas.  And some of them had live footage on them, and they

5   were quite graphic.                                                    09:44:27

6        One of the ones that we were shown was an agent in

7   South Texas, I believe it was in 2010, there was an agent by

8   the name of Randy DeLeon and he was nearly killed by chunks of

9   concrete thrown at his skull along the Texas border.

10        Another incident that happened in Nogales, there was     09:44:45

11   an Agent Simodey that got struck in the face.  And I've spoken

12   to Agent Simodey on numerous occasions in the past, and I know

13   he had to have reconstructive surgery done on his face.

14   Q.  All right.  The point is is that before this shooting event

15   in October of 2012, you were well aware that rocks can -- could   09:45:09

16   inflict serious bodily injury; is that true?

17   A.  That is true, sir.

18   Q.  All right.  Now, prior to this event had you worked this

19   area west of the DeConcini Port of Entry?

20   A.  I had, many times.                                           09:45:39

21   Q.  As a field agent?

22   A.  As a field agent.

23   Q.  And what was your impression of the area prior to this

24   event?

25   A.  The area is a known smuggling route for individuals in       09:45:53

1    Mexico trying to further their narcotics north.  They use this

2    area frequently.  And they scale the fence.  And they

3    usually -- they usually run their narcotics up to either I-19,

4    or they'll run over the freeway and they'll actually take it up

5    to it an area we refer to as Crawford Canyon, which is north of     09:46:19

6    I-19, to an awaiting vehicle.

7    Q.  In your view is this a dangerous area for agents to work?

8    A.  Absolutely.

9    Q.  Is it even more dangerous when it's dark out?

10   A.  Yes, it is.                                                     09:46:36

11   Q.  I assume that in your career you have apprehended both

12   undocumented aliens and drug traffickers.  How did they act,

13   generally speaking?  Were they different in any way when you

14   tried to apprehend them?

15   A.  Between the two, they're very different.                        09:47:04

16   Q.  Can you tell us how?

17   A.  When you apprehend a group of undocumented immigrants that

18   come north of the border, most of the time, generally speaking,

19   they're compliant.  They know that they've been apprehended and

20   they comply.                                                        09:47:23

21        When you are dealing with drug smugglers, it's a

22   completely different story.  They have an item to protect, and

23   they are -- they're combative.  And they just don't throw their

24   hands up and say, okay, you got me.  It's going to be a

25   struggle.                                                           09:47:40

—Lonnie Swartz – Direct Examination—

1   Q.  Are they sometimes armed?

2   A.  They are armed.  There's -- I know of a couple instances

3   where they were armed.

4   Q.  There's been some testimony during the course of the trial

5   that -- from other agents that rocks are used to further drug          09:47:57

6   organizations, either by helping smugglers get back into

7   Mexico, or keeping agents away from drugs in the United States.

8        Do you agree with that testimony?

9   A.  I do.

10  Q.  Okay.  I want to walk you through what happened in this            09:48:11

11  case.

12       First of all, tell the jury where you were assigned

13  that night.

14  A.  On the evening of October 10th, 2012, I was assigned to the

15  southbound operations at the DeConcini Port of Entry in               09:48:42

16  Nogales, Arizona.

17  Q.  And when did you start that night, do you remember?

18  A.  It was in the afternoon.  It was either 2:00 p.m. or

19  4:00 p.m.  I don't recall exactly.

20  Q.  All right.  And what were your duties?                            09:48:58

21  A.  You were going to be part of one of two things working the

22  southbound operations, you would either work the vehicles

23  traveling south back into Mexico from the United States, or

24  you'd be working the southbound pedestrian traffic walking into

25  Mexico.                                                               09:49:17

—————— **Lonnie Swartz – Direct Examination** ——————

1          And that evening I was assigned to the southbound

2     pedestrian traffic.

3     Q.  What were you looking for?

4     A.  Generally you're looking for currency, undeclared currency.

5     You're looking for firearms, you're looking for ammunition.          09:49:29

6     Those are the items that are mostly seen going into Mexico.

7     Q.  All right.  Did you have any less lethal devices, like

8     PLS Launcher, or anything like that with you that night?

9     A.  I did not.

10    Q.  Okay.  Why not?          09:49:49

11    A.  When you work the port of entry, at the DeConcini Port of

12    Entry, you're interacting with the public throughout the entire

13    evening, throughout your entire shift.  These items cannot be

14    secured on you, they do not have shoulder straps, and they're

15    very -- they're intimidating to the public.  And they don't          09:50:06

16    serve a purpose for work in -- that type of work at the port of

17    entry.

18    Q.  So when you say they're intimidating, what do you mean by

19    that?

20    A.  Well --          09:50:23

21    Q.  In the context of working the port, you don't want to scare

22    people walking through?

23    A.  It doesn't fit the profile, as far as a law enforcement

24    person working a port.  When you're interacting with the public

25    you might have to search some items that they might be having          09:50:36

───── **Lonnie Swartz – Direct Examination** ─────

1    with them going into Mexico.  These items, they're going to get

2    in the way of your duties.  And they just look very

3    intimidating.

4          And besides that they're also frowned upon by the

5    supervisors of the port.                                          09:50:53

6    Q.  So they don't want you to have those items when you're,

7    working the port?

8    A.  No.

9    Q.  Okay.  At some point you found out that something was going

10   on west of the port.  Tell us what you found out and how you    09:51:06

11   found out.

12   A.  It was in the evening hours.  I had my radio on the actual

13   port channel.  The DeConcini Port of Entry has its own radio

14   frequency channel.  We were -- we were basically standing

15   around on the pedestrian walkthrough.  There wasn't really      09:51:24

16   anything going on.

17         And Agent Porter was scanning Nogales radio dispatch

18   Beny 2 frequency, which works the -- all radio traffic for

19   the -- west of the DeConcini Port of Entry that night.

20         Agent Porter asked if I was listening to Beny 2.  And     09:51:42

21   I says, no, I have my radio on the port channel.  He says,

22   well, they're getting ready to run a 46 load at Camera Pole.

23   Q.  All right.  And how did you react to that?  What did you

24   do?

25   A.  I turned my radio frequency from the port channel over to   09:52:04

— Lonnie Swartz - Direct Examination —

1   Beny 2.  And as I did -- I didn't have it on there but a few

2   seconds, and a camera operator says, they're TBS, which is

3   turning back south.  Basically they came north for a quick

4   second, and now they're climbing the international boundary

5   fence back into Mexico at Camera Pole.                         09:52:26

6   Q.  Okay.  And what did you do at that point?

7   A.  I believe I didn't switch my channel back over to the port

8   channel.  And again, we were -- there wasn't anything going on,

9   there was no traffic that night as far as walking into Mexico.

10         And then it wasn't that long, I mean, time frame         09:52:44

11   estimation, a couple minutes maybe, at most.  Radio camera

12   called out something as, hey, guys I got another group coming

13   over down at Blind Center, I got two packers.

14   Q.  Okay.  Were you able to see anything from where you were at

15   that point?                                                    09:53:07

16   A.  At the port where I was standing right then and there, no.

17   Q.  All right.  So what happened after you heard that radio

18   call?

19   A.  Agent Porter, Agent Wynecoop and myself elected to go

20   assist the agents working West International Street, and        09:53:22

21   just -- and to assist.  Because we had nothing going on.  And,

22   you know, we want to help out our fellow agents, so that's --

23   we walked out from our pedestrian area.  There was two agents

24   left there.  I believe it was -- again, it's been a long time,

25   but I believe Agent Similton and I believe Agent Grijalva,     09:53:42

1    were -- they stayed back at the pedestrian walkthrough and we

2    walked out into the customs lot.

3    Q.  So is the customs lot to the west of the port of entry

4    there?

5    A.  Yes.  There's a side gate used by CBP personnel just before     09:53:57

6    you go through the turnstile into Mexico.  We walked out

7    through that gate, and that leads you right into the customs

8    lot to the west of the port of entry.

9    Q.  All right.  And were you able to see anything up the road

10   at point?                                                           09:54:12

11   A.  When we stepped out into the customs lot, all of us at this

12   point had our radio set on Beny 2.  And we saw a shadow on the

13   top of the border fence.  But it was a shadow, it was quite a

14   ways, but you can make out an individual that's on the fence

15   cap.                                                                09:54:30

16   Q.  Okay.  So what happened after that?

17   A.  We waited there for a few -- it seemed like a long time, it

18   was a few minutes.  We had a supervisor, a port supervisor walk

19   by us and asked us, hey, what are you guys looking at?  And we

20   says, they're getting ready to run a dope load just on the          09:54:47

21   other side of Blind Center there.  And he looked over, and he

22   even said, oh, I can see the guy on the fence.  And then he

23   walked past us.

24           And a few seconds later we could see the two

25   individuals slide down the fence on the United States side of       09:55:01

Lonnie Swartz - Direct Examination

1    the fence.

2    Q.  Okay.  What happened after that?

3    A.  We saw two shadows run northbound -- north across West

4    International Street towards the houses and wherever they were

5    going.                                                              09:55:17

6    Q.  Are you still in the customs parking lot at this point?

7    A.  We are.

8    Q.  All right.  Then what happened?

9    A.  When we saw the two shadows run across road, the three of

10   us -- meaning Agent Porter, Agent Wynecoop and myself --           09:55:26

11   started running from the customs lot westbound towards that

12   location, towards the Blind Center location.

13   Q.  All right.  And tell me, were they in front of you or

14   behind you?

15   A.  When we started running, Agent Porter and Wynecoop were in      09:55:44

16   front of me.  They had -- they had a little bit of distance in

17   front of me.

18   Q.  Okay.  As you were running up West International, did any

19   vehicles pass you?

20   A.  As I'm running -- I ran just past the Blind Center, right       09:55:59

21   at the Blind Center location that we've referred to, and I

22   heard a vehicle revving its engine going by me quite quickly.

23   Q.  Do you know who that was?

24   A.  It was a Nogales Police SUV vehicle.

25   Q.  Okay.  Did that turn out to be the officer that had the         09:56:18

1   police dog?

2   A.  Yes, yes, it did.

3   Q.  Okay.  So what happened after you passed -- that vehicle

4   passed you?

5   A.  I believe I stopped running, and I was walking up the road        09:56:30

6   on the north side of West International Street from the Blind

7   Center to the location of where the Nogales Police Officer had

8   stopped his vehicle.

9   Q.  Were Porter and Wynecoop in front of you?

10  A.  They were, but at this time I don't know how far up ahead          09:56:56

11  of me that they were.  They might have already been where the

12  police officer was.

13  Q.  Okay.  So what happened when you arrived at the scene?

14  A.  I get up to where the two individuals were seen running

15  back south across West International, and they were                    09:57:15

16  already -- one was already on top of the fence.  And there was

17  another individual that was struggling to get up the fence.

18  Q.  Okay.  Who is -- what kind of law enforcement presence was

19  there at that point?

20  A.  There was multiple Border Patrol agents there, and there          09:57:32

21  was a Nogales Police Officer there at that time that I saw.

22  Q.  Okay.  Now, at some point did you become aware that one of

23  the individuals on the fence had a knife?

24  A.  I did.

25  Q.  How did you become aware of that?                                  09:57:48

Lonnie Swartz – Direct Examination

1   A.  I believe it was Agent Devowe verbally says, hey, watch

2   out, that guy's lot a large fixed-blade knife in his back

3   pocket.

4   Q.  Did that elevate your concerns about what was going on

5   there?                                       09:58:07

6   A.  Absolutely.

7   Q.  All right.  Now, usually when -- I mean, I assume that

8   you've been in circumstances before where someone is attempting

9   to scale the fence and get into Mexico.  Is that true?

10   A.  Yes.                                       09:58:21

11   Q.  So what typically do you do in that kind of circumstance?

12   A.  Well, if they're right against the fence and they haven't

13   started climbing the fence, you would apprehend the individual.

14   However, if they've already climbed the fence and they're well

15   on their way up, you're not going to climb the fence after   09:58:38

16   them, you're going to back off.  And you're going to wait for a

17   resolve to the situation.  Either they're going to slide down

18   because they can't get up, or they're going to get to the top

19   of the fence and they're going to slide down in Mexico.

20   Q.  So if they're up on the fence, what do you do?  Typically   09:58:54

21   what do you do?

22   A.  We wait.  We basically wait because, you know, if they

23   can't make it all the way up they're going to slide down and

24   we're going to arrest them.  But if they're on the fence, we're

25   not going to climb up after them, sir.                  09:59:09

Lonnie Swartz - Direct Examination

1    Q.  Okay.  So we've established that you've arrived, you're

2    standing there.  I think there's a Nogales Police Officer

3    nearby, and there's also -- you're aware that there are also

4    several Border Patrol Agents nearby; is that right?

5    A.  Yes, I know that -- I know for a fact that myself, Agent          09:59:30

6    Wynecoop and Agent Porter was somewhere around there.  And I

7    saw Agent Plooy and Agent Devowe.

8    Q.  All right.  And you've heard that one of the individuals on

9    the fence has a knife --

10   A.  I did.                                                           09:59:48

11   Q.  -- at this point?

12   A.  Yes.

13   Q.  What happened after that?

14   A.  We were waiting -- again, we were waiting to see if this

15   individual was going to make it to the top of the fence.             09:59:56

16   Because if he didn't make it to the top of the fence, it's

17   already known from another agent that he is armed, and we want

18   to make sure, you know, that he would be apprehended.  We

19   didn't want anybody to fall into the fatal funnel if the

20   individual had fallen down the fence.                                10:00:19

21           So at that time we were standing on the street waiting

22   for a resolution on their part whether they were going to make

23   it up or not.

24   Q.  Okay.  And describe the lighting on West International.

25   A.  West International, the lighting, it's -- I -- it's lit,         10:00:33

Lonnie Swartz – Direct Examination

1   but -- it's lit enough like you would see in a normal

2   neighborhood, I guess, in the evening hours on the American

3   side.  They had a street light or two.  So it wasn't pitch

4   black.

5   Q.  What did it look like on the Mexican side?                    10:00:53

6   A.  It was much darker, much darker.

7   Q.  Okay.  So at some point do you become aware that rocks are

8   being thrown at you and the other agents?

9   A.  I do.

10  Q.  Okay.  Tell us about that.                                    10:01:10

11  A.  Agent Wynecoop and I were in the street, we were -- we were

12  by officer -- the canine officer's vehicle.  Agent Wynecoop was

13  to my right.  At this time I was looking at the individuals on

14  the fence, and I heard Agent Wynecoop say, I think we're

15  getting rocked.                                                   10:01:35

16         And I remember looking at Agent Wynecoop, and he had

17  this sick look on his face.  And I go, what?  And he goes, I

18  think we're getting rocked.

19         And when he said that, I heard a loud ping on the top

20  of the international boundary fence.                              10:01:52

21  Q.  Okay.  When you heard that ping, what did you -- what did

22  you think it was?

23  A.  I knew it was a rock immediately.  I've experienced this in

24  the past.  I knew exactly what that sound was.

25  Q.  Okay.  What happened after that?                             10:02:06

—— Lonnie Swartz – Direct Examination ——

1    A.   Immediately following that, right after we –– I heard that

2    loud bang, ping on the fence, I heard Agent Wynecoop, he goes,

3    shit, I'm hit.  And he leaned down towards his right leg.  He

4    didn't drop to the ground, but he leaned down towards his right

5    leg.                                                                    10:02:35

6         Immediately following that I heard like a

7    hollow –– like a hollow thud, that –– it's very hard to compare

8    it with something.  It was just a hollow thud.

9         And an agent behind me, I don't know, it could have

10   been Devowe, it could have been Plooy, I don't know.  One of       10:02:53

11   them says –– he was yelling, hey, your dog's been hit, your

12   dog's been hit.

13   Q.   Okay.  So at this point we have a man on the fence with a

14   knife.  We have Wynecoop saying that he was hit with a rock.

15   You hear a sound of a thud which you interpret may be the          10:03:16

16   police dog getting hit.  And you hear someone say, hey, your

17   dog's been hit.  Is that right?

18   A.   That's exactly right, sir.

19   Q.   All right.  So what were you thinking at that point?

20   A.   This has got to stop, somebody is going to get hurt.          10:03:38

21   Q.   Were you scared?

22   A.   Yes.

23   Q.   Were you concerned about the safety of the other officers

24   and the agents that were there?

25        MR. KLEINDIENST:  I would object to really the                10:03:53

─────── **Lonnie Swartz - Direct Examination** ───────

1    continual leading nature of the questions.  If he could just

2    ask nonleading questions and the witness could answer.

3           THE COURT:  Try and ask nonleading questions,

4    Mr. Chapman.

5    BY MR. CHAPMAN:                                              10:04:05

6    Q.  Did you have any concerns?  And if you did, what were they?

7    A.  I was scared.  I was scared to be hit by a rock.  I was

8    scared for my partner that had just been hit by a rock.  I

9    was -- I had other agents behind me that I didn't know where

10   they were at, but I know they were in the vicinity.  And I knew  10:04:23

11   that we were getting rocked at this point.

12   Q.  So what did you do?

13   A.  I elected to defend myself and my fellow agents and that

14   police officer.

15   Q.  All right.  Describe for the jury what you did physically,  10:04:41

16   what your actions were from that point forward.

17   A.  You want me to step down?

18   Q.  What?

19   A.  Would you like me to step down and demonstrate?

20   Q.  If I need you to I will ask you to.  But I think you can    10:04:54

21   just describe it right now.

22   A.  At this point I drew out my weapon, which is a .40 caliber

23   Heckler & Koch P2000 pistol.

24   Q.  Lonnie, if you feel like you would be better able to

25   explain it in front of the jury, that's fine.                  10:05:17

─────── **Lonnie Swartz – Direct Examination** ───────

1           Judge, with your permission.

2           THE COURT:  You may step down.

3           THE WITNESS:  At --

4           THE COURT:  Just a second.

5   BY MR. CHAPMAN:                                              10:05:34

6   Q.  Why don't you come over here.  I'm just going to hold the

7   microphone so you can show the jury.

8   A.  I was -- at this point I'm in the middle of the street, I'm

9   by the police officer's SUV.  I don't know exactly where I'm at

10  in the street, but I know I'm exposed.                        10:05:53

11          After hearing my partner get hit, the rock hit the

12  fence, and after hearing that thud and an agent saying your

13  dog's been hit, I drew my weapon out.  I drew my weapon out of

14  its holster.

15          And as we're trained, you draw your weapon out of your  10:06:13

16  holster, you're like this.  (Indicting.)  And this is called a

17  high search.  And what it is, your finger is off the trigger.

18  You carry the weapon at a 45-degree angle so you can kind of

19  see in front of you.

20          The high search, it's just a way that we're taught in   10:06:27

21  the Border Patrol Academy to carry our pistol, unless you have

22  to use your pistol.  So that's what I did, I had my weapon out

23  and I had it at high search.

24  Q.  All right.  You can go ahead and sit down again.

25          Thank you, Sherry.                                      10:06:45

1      All right.  So you drew your weapon out, you put it at

2  high search.  Then what did you do after that?

3  A.  I started moving cautiously towards the international

4  boundary fence.  I started walking south very cautiously

5  towards the fence.                                              10:07:08

6  Q.  All right.  And ultimately you arrived.  Did you look

7  through the fence?

8  A.  I remember I got within four feet, five feet, it might have

9  been six feet, but it was four or five feet.  I got that close

10  to the fence to where I can start to see down through the      10:07:26

11  international boundary fence into the country of Mexico.

12  Q.  Okay.  And what -- what could you see when you looked

13  through the fence?

14  A.  Again, this time I still had my weapon at high search, I'm

15  looking through the fence.  And when I get into that four,     10:07:44

16  five, maybe six-foot range, as I'm looking down I immediately

17  saw a dark subject, and then followed by another dark subject

18  to my right of him, or to the west of him.

19      So I had two subjects that I could see at this point.

20  Q.  And what was the lighting like when you were looking       10:08:03

21  through the fence into Mexico?

22  A.  It was dark, it was low light, very low light.

23  Q.  Could you tell anything about the two subjects you were

24  looking at, their age, their gender, or anything like that?

25  A.  No.  You can't tell that, no.                              10:08:17

Lonnie Swartz – Direct Examination

1  Q.  Could you tell whether they were adults or children?

2  A.  They -- by the size of the shadows, again, they were dark

3  shadows, they appeared to be adult-sized subjects.

4  Q.  All right.  So what did you do -- when you looked through

5  the fence, were they making any motions with their arms?          10:08:34

6  A.  When I had my weapon at high search, when I first saw them,

7  again, I saw the first one and the second one.  And

8  when -- right when I saw the first one, I immediately picked up

9  the second one.  And then I seen the first one make a complete

10  throwing motion, followed almost in unison by the second       10:08:52

11  person, which again is to the right or the west of that first

12  individual that I saw.

13  Q.  Okay.  At that point what did you do?

14  A.  At that point I brought my weapon up, I presented my

15  weapon.  At this point I had my finger on the trigger.  And now  10:09:15

16  I was still closing the gap on the fence, international

17  boundary fence, and my weapon is in very close proximity to the

18  fence at this time.

19        The first individual made a cock back motion, and I

20  fired.                                                           10:09:32

21  Q.  And do you know how many shots you fired?

22  A.  No, sir, I don't.

23  Q.  What did you see happen to that individual when you fired

24  the shots?

25  A.  When I fired, that individual appeared to start going down,  10:09:46

—————— **Lonnie Swartz – Direct Examination** ——————

1  he made that motion like he was going down to the ground.

2  Q.  Okay.  I want -- before we move forward I'm going to ask

3  you about something else.

4       Once you -- before you approached the fence, had you

5  made a decision that it was probably necessary to use deadly          10:10:08

6  force?

7  A.  That was the only tool that I had on my belt to stop that

8  threat.  That was all I had.

9  Q.  All right.  From that point forward, were you focused on

10  the threat or were you looking back behind you at where the          10:10:28

11  agents and the police officers were?

12  A.  I never looked behind me after that point.  I was solely

13  focused on the threat at hand, to stop them rocks from coming

14  over that fence.

15  Q.  All right.  So let's go back.                                    10:10:42

16       You fired your weapon, you seen somebody start to

17  fall.

18  A.  Yes.

19  Q.  What happened after that?

20  A.  I stopped firing.                                               10:10:52

21  Q.  Okay.  And then what did you do?

22  A.  I remember moving westbound down the international boundary

23  fence from that position.

24  Q.  Why did you move westbound?

25  A.  I was -- I was looking to see if there was any more rock        10:11:08

––––Lonnie Swartz – Direct Examination––––

1    throwers to the west of where I was just at.

2    Q.  All right.  Did you ultimately come to a stop at a second

3    position?

4    A.  I did.

5    Q.  And tell the jury what you saw at that point.                    10:11:20

6    A.  I perceived another rock thrower, of an individual rocking,

7    and I fired my weapon again.

8    Q.  Lonnie, the physical evidence in this case is very clear,

9    it shows that the deceased was on the ground at that point, and

10   you were actually firing into his back.                             10:11:50

11        Were you aware of that at the time?

12   A.  No, I was not.  Sir, the only thing I saw was a second rock

13   thrower, that's what I fired on.

14   Q.  Tell the jury as you can the best memory that you have of

15   this event, this part of the event.                                 10:12:09

16   A.  When I started moving down the fence line to that second

17   position, things started getting very distorted.  I'm not a

18   head doctor, I don't know why, but things were starting to get

19   distorted and things were very grey.  I don't know how far I

20   moved down the fence line.  I have no idea.  But when I saw         10:12:35

21   that second -- perceived that second rock thrower, when I

22   fired, things get very, very unclear, very unclear at this

23   point.

24   Q.  Let me ask you a couple other questions about that.

25        When you fired your weapon, at any point did you hear          10:12:52

UNITED STATES DISTRICT COURT

Lonnie Swartz – Direct Examination

1  your weapon going off?

2  A.  I never heard my weapon fire, never.

3  Q.  Do you know how many shots you fired, from either the first

4  or the second position?

5  A.  No, I don't, sir.                                    10:13:13

6  Q.  Do you know whether you ejected a magazine onto the ground?

7  A.  I never remember reloading the magazine, never.

8  Q.  Did you ultimately find a magazine on the ground?

9  A.  I did.  I heard -- I kicked it when I was backing away from

10 the fence, I heard it on the ground.                     10:13:32

11 Q.  Prior to that moment when you discovered it, were you aware

12 that you had ejected a magazine and reloaded?

13 A.  No, no, I didn't.

14 Q.  Were you aware that you fired from a third position?

15 A.  No, sir.                                             10:13:48

16      MR. KLEINDIENST:  I'm sorry, what was that last

17 answer?  Court reporter?

18    (Answer read back.)

19      MR. KLEINDIENST:  No?

20 BY MR. CHAPMAN:                                          10:14:12

21 Q.  Tell us what you did after you fired from that position,

22 the last position that we just talked about.

23      MR. KLEINDIENST:  He doesn't remember firing from that

24 position, so I would object to the question.

25      THE COURT:  Overruled.                              10:14:53

1          THE WITNESS:  I stepped back away from the fence.  And

2    when I did, I heard a metallic sound at my feet.

3    BY MR. CHAPMAN:

4    Q.  And what did you do after that?

5    A.  I looked down and I picked up the object, and it was a          10:15:03

6    spent magazine.

7    Q.  Was it yours?

8    A.  I believe so, because I was the only one that I saw right

9    there next to the fence.

10   Q.  What did you do after that?                                      10:15:16

11   A.  I took the magazine and I placed it in my cargo pocket.

12   Q.  Okay.  And after that, what did you do?

13   A.  I believe I got on my hand-held radio and I called Nogales

14   radio dispatch 865.  I don't know if this is verbatim, but it

15   was something in the realm of, shots fired, one 10-7 Mike side.     10:15:42

16   Q.  You've described issues with your memory.  Have you tried

17   to remember everything that happened?

18   A.  Sir, since that night I don't know why I can't remember

19   certain things.  I've struggled with this for five-and-a-half

20   years, of everything.  I don't know why.  I want to remember.       10:16:19

21   It's like -- it's a piece of my memory, it's a piece of my life

22   that's been wiped away, and I can't get it.  I've looked for it

23   and I can't find it.

24   Q.  Does that bother you?

25   A.  Yeah.                                                           10:16:36

Lonnie Swartz – Direct Examination

1    Q.  After you called out on the radio, what did you do?

2    A.  I went across the street.  I went north across West

3    International Street.

4    Q.  And where did you end up?

5    A.  Next to a wooden telephone pole or a light pole.                    10:16:53

6    Q.  What happened next?

7    A.  I threw up, uncontrollable.

8    Q.  Take a drink of water, Lonnie.

9    A.  I'm sorry.

10   Q.  Why?                                                                10:17:27

11   A.  Because I had just discharged my weapon at a human being.

12   Q.  Do you know how long this whole event took place, from the

13   time you approached the fence until the time it was finished

14   and you were finished firing?

15   A.  I have no idea.                                                     10:18:09

16        Sir, can I have just a minute, please?

17   Q.  Sure.

18        Do you remember telling the rock throwers to stop?

19   A.  I don't know if I did or not.

20   Q.  When the rocks started coming down, could you tell where            10:18:36

21   they were coming from?

22   A.  I knew they were coming from the country of Mexico, but I

23   did not know exactly where they were coming from, no.

24   Q.  If you had had a PLS Launcher that night, would you have

25   used it?                                                               10:19:21

UNITED STATES DISTRICT COURT

—**Lonnie Swartz – Direct Examination**—

1   A.  Yes, I would have.

2          MR. CHAPMAN:  I'm going to show the witness what's

3   been previously marked, and I believe it's been admitted, as

4   Government's 1329 (sic) side-by-side.

5          THE CLERK:  1329?                                    10:19:56

6          MR. CHAPMAN:  1329 side-by-side.

7          THE COURT:  Just to the witness?

8          MR. CHAPMAN:  Well, I'd like the jury to see it as

9   well, Your Honor.  So I want to make sure it's admitted.

10          THE CLERK:  I'm not sure which exhibit number that is.   10:20:15

11          MR. CHAPMAN:  I'm sorry, defense exhibit.

12          THE CLERK:  1329 I do not have entered, unless it's

13   entered as a --

14          MR. CHAPMAN:  Do you have any objection if we admit

15   this exhibit?                                              10:20:34

16          MS. FELDMEIER:  What is it?

17          MR. CHAPMAN:  It's 1329, side-by-side.

18      (Discussion off the record between counsel.)

19          MS. FELDMEIER:  Yeah, it's already been admitted.

20          THE COURT:  Are you moving for its admission also?    10:20:55

21          MR. CHAPMAN:  Yes, I am, Judge.

22          THE COURT:  Any objection?

23          MS. FELDMEIER:  No, Your Honor, it's the same as the

24   Government's.

25          MR. CHAPMAN:  I think it's already been admitted.    10:21:02

UNITED STATES DISTRICT COURT

---

**Lonnie Swartz – Direct Examination**

1    THE COURT:  Under a different number?

2    MR. CHAPMAN:  Yeah.

3    THE COURT:  It's admitted again.

4    BY MR. CHAPMAN:

5    Q.  So, Agent Swartz, what I want to do is just not show you          10:21:09

6    this entire video, but go through certain parts of it and ask

7    you where you were when certain things occurred.

8         All right.  So in a few seconds we're -- I think we're

9    going to see some shadows cross the road.

10        Right there on the right side of the screen you see a          10:22:08

11   shadow crossing the road in the middle?

12   A.  Yes, sir.

13   Q.  Is that the first thing you saw when you were in the

14   customs lot west of the port, did you see that individual?

15   A.  No.  When this individual was running back south towards          10:22:25

16   the international boundary fence, at this point I was somewhere

17   right around the Blind Center.

18   Q.  Okay.  So let's move forward.

19        Okay.  Can you see your position in the right side of

20   the video?                                                            10:22:56

21   A.  I don't believe so.  There's two individuals, but I don't

22   think either one of those are actually me in the video.

23   Q.  Could that have been Wynecoop and Porter?

24        MR. KLEINDIENST:  Judge -- I'm sorry.

25   BY MR. CHAPMAN:                                                       10:23:13

1    Q.   Is he the one that's circled in blue?

2    A.   I see the one that's circled in blue.

3    Q.   Would that be either Wynecoop or Porter?

4    A.   It would be either Wynecoop or Porter; that's correct.

5    Q.   Okay.  I'm going to move forward a little bit.                    10:23:24

6              Okay.  At this point can you see -- at this point are

7    you moving forward up West International?

8    A.   I am.  Again, I'm somewhere around the Blind Center, maybe

9    west of the Blind Center, but it looks like the tree's blocking

10   me at this point.                                                      10:24:03

11   Q.   Okay.  So let's run it forward a little bit.

12             Do you see the red circle there?

13   A.   Yes, sir, I see it.

14   Q.   Is that you?

15   A.   I believe that is me, yes.                                        10:24:16

16   Q.   At this point were you able to see the two gentlemen on the

17   fence shown in the left screen?

18   A.   From that distance I can see two individuals, and they were

19   probably the shadowy figures, but I can see two individuals on

20   the fence.                                                            10:24:33

21   Q.   Okay.  Let's run it a little bit more.

22             Okay.  Left side red circle, is that you?

23   A.   That is me, sir.

24             MR. KLEINDIENST:  Sorry about that.

25             MR. CHAPMAN:  Are you okay?                                  10:25:25

—Lonnie Swartz – Direct Examination—

1    MR. KLEINDIENST:  Yes.

2  BY MR. CHAPMAN:

3  Q.  So at this point you're seen on the left side walking up

4  the street.  Are Wynecoop and Porter in front of you?

5  A.  I don't think that Agent Porter was in front of me.  I          10:25:38

6  believe Wynecoop was in front of me at this point.  I don't

7  recall if I saw Agent Porter in the street at this time.

8  Q.  Now -- okay.  So the green circle, who would that be, on

9  the left side of the screen?

10  A.  That's the Nogales Police Officer, canine -- with his          10:26:03

11  canine.

12  Q.  All right.  So he gets his dog out when you're pretty close

13  to the scene at that point, you're coming up?

14  A.  Yes.  And I remember seeing him pull his dog out of his

15  vehicle when I arrived.  I do remember that.                       10:26:20

16  Q.  So in your position here on the left side of the screen,

17  where roughly are you?  Are you still on the street or you one

18  the sidewalk or what?

19  A.  I believe I'm still on the street, on the northern part of

20  the street, but I believe I'm still on the street.                 10:26:39

21  Q.  Okay.  I'm going to cue it forward.  And I want you to tell

22  me to stop, as best you recall, at the point when you realize

23  that rocks are being thrown.  Okay?

24  A.  All right, sir.

25  Q.  By the way, can you tell what the Nogales Police Officer       10:27:21

UNITED STATES DISTRICT COURT

Lonnie Swartz - Direct Examination

1   with the dog is doing at this point?

2   A.  He was saying something to the individuals on the fence,

3   but I couldn't hear what it was.

4   Q.  You appear at this point on the right side, if you're the

5   red circle, to be on the side of the street or possibly on the          10:28:20

6   sidewalk.  Do you know what you were doing at that point?

7   A.  I believe we were still just observing the two individuals

8   on the fence, just to get a resolution if one was going to

9   slide down, or they were going to just make it to the top and

10  slide back into the country of Mexico.                                    10:28:39

11  Q.  So stop me when you think the rocks started.

12  A.  We're getting real close.

13          Right in there.

14  Q.  Okay.  Take a look at the yellow circle on the right side

15  of the screen.  How many rock throwers do you think are there            10:29:48

16  at that point?

17  A.  It appears to be three dark shadows, three individuals.

18  Q.  All right.  And was it at that point, roughly speaking,

19  that you elected to use force?

20  A.  Yes, sir, but --                                                      10:30:08

21  Q.  Let me cue that back just a couple seconds.  Because the

22  yellow highlight shows the actions of three rock throwers in

23  relation to your movements on the other side.  So let me just

24  cue that back again.

25          Okay.  Once you began to move forward to respond to               10:30:35

1    this situation, did you look back at all?

2    A.  I never looked back, no, I was -- my focus was on -- it was

3    looking south.

4    Q.  All right.  Here you are at the fence.  Were you aware at

5    the time that there were more than two rock throwers?                10:31:04

6    A.  No, I was not, I only saw two.

7    Q.  All right.  So this would be the first position that you

8    fired from?

9    A.  That would be the first position, yes.

10   Q.  Now you're seen -- tell us what you're doing after that        10:31:22

11   first position.  I'm going to cue it back.  And watch the

12   left-hand side of the screen.

13          What are you doing there?

14   A.  I'm running westbound.

15   Q.  Why?                                                           10:32:00

16   A.  I was looking to see if there was anymore rock throwers to

17   the west.

18   Q.  It looks like you -- if we look at the right side of the

19   screen now, follow that, you may have stopped.

20          Let me back that up a little bit.                           10:32:19

21          Just watch the right side.  Tell us what you're doing.

22   A.  I'm against the fence.  I can't tell.

23   Q.  You do recall firing from the second position though;

24   right?

25   A.  I remember firing my weapon from the second position.          10:32:38

────── **Lonnie Swartz - Direct Examination** ──────

1   Q.  Do you remember walking away from the fence and then coming

2   back like that?

3           MR. KLEINDIENST:  Just ask him what he remembers,

4   Judge --

5           THE WITNESS:  No.

6           MR. KLEINDIENST:  -- and not lead the witness.

7           THE WITNESS:  No.

8           THE COURT:  Answer may stand.

9           THE WITNESS:  I don't remember walking back away from

10  the fence and going back again, no, I do not.                10:32:57

11  BY MR. CHAPMAN:

12  Q.  Okay.  So let's keep watching on the left side.  And I

13  guess the right side.

14          Tell us what you're doing at that point.

15  A.  It appears I picked up an object, which I believe is my   10:33:10

16  magazine.

17  Q.  I'm going to cue that back again.

18          Stop me when you think you picked up the magazine.

19  A.  Right there.

20  Q.  Okay.                                                     10:33:27

21  A.  Just past -- or just before that.

22  Q.  Okay.  So continue on, what are you doing here?

23  A.  I believe I'm calling out on the radio.  I'm putting an

24  item in my cargo pocket and calling out on the radio.  And I'm

25  still walking westbound down the international border fence    10:33:47

─── **Lonnie Swartz – Direct Examination** ───

1    seeing if there are anymore rock throwers.

2    Q.  What's happening here?

3    A.  I'm still -- it appears that I'm still scanning the area

4    left to right going back and forth looking.

5        (Discussion off the record between defense counsel.)     10:34:44

6    BY MR. CHAPMAN:

7    Q.  There's been some testimony earlier in the trial that you

8    said something on the radio like, 10-7 Mike side.

9    A.  Yes, sir.

10   Q.  What does that mean?                                      10:35:20

11   A.  That's letting Nogales radio dispatch know that there's one

12   person that's down in Mexico.  10-7 means there's an individual

13   down.  Mike side is what we refer to as short for Mexico side

14   of the international boundary fence.

15   Q.  There's been testimony also in this case about whether or  10:35:43

16   not a dog is physical property or you can apply deadly force to

17   the dog.  Do you remember that testimony?  Or deadly force to

18   defend a dog.

19   A.  I do remember the testimony, yes.

20   Q.  Was the dog on a leash?                                    10:36:01

21   A.  The dog was on a leash, sir.

22   Q.  Was it attached to a Nogales Police Department Officer?

23   A.  That officer was in close proximity connected to that dog

24   by a leash; that is correct.

25   Q.  Do you believe then at the time the dog was hit the officer 10:36:17

——— **Lonnie Swartz – Cross-Examination** ———

1    also would have been at risk of getting hit by a rock?

2    A.  He was at extreme risk that close to where that rock struck

3    that dog, yes.

4         MR. CHAPMAN:  I have no further questions.

5         THE COURT:  Let's go ahead and take our morning recess          10:36:35

6    so we don't interrupt the cross-examination.  It will be about

7    ten minutes, ten minutes.

8         Thank you.

9      (Recess at 10:36 a.m., until 10:52 a.m.)

10        THE COURT:  Let the record show the presence of the            10:52:33

11   jury, presence of all counsel and the defendant.

12        Whenever you're ready, Mr. Kleindienst.

13        MR. KLEINDIENST:  Thank you, Your Honor.

14                        CROSS-EXAMINATION

15   BY MR. KLEINDIENST:                                                 10:52:49

16   Q.  Good morning, Mr. Swartz.

17   A.  Good morning, sir.

18   Q.  You testified that you had prior employment experience as

19   a -- was it an electrician or carpenter?

20   A.  I was a concrete form carpenter, sir.                          10:53:31

21   Q.  And that was where?

22   A.  In Las Vegas.

23   Q.  And it was after that that you joined the Border Patrol?

24   A.  Yes.

25   Q.  And you had no prior law enforcement experience?               10:53:39

UNITED STATES DISTRICT COURT

46

1   A.   No, I did not.

2   Q.   And you attended the Academy in Artesia; is that correct?

3   A.   That is correct, sir.

4   Q.   Now do you remember Allen Foraker who testified last week?

5   A.   I remember Allen Foraker, yes.                          10:53:53

6   Q.   Do you remember him being one of the instructors at the

7   Academy?

8   A.   Yes, I do.

9   Q.   And do you remember that he displayed a PowerPoint

10  presentation that he played here in the court?  Do you remember  10:54:02

11  that?

12  A.   I remember he played -- as far as here in the court, sir?

13  Q.   Yeah, the judgment pistol shooting PowerPoint presentation.

14  A.   I don't exactly remember what he put up on here, but I know

15  he spoke about it, sir.                                     10:54:17

16  Q.   You don't remember me putting on different slides that were

17  part of what's called the judgment pistol shooting?

18  A.   I looked at slides, sir, but I don't remember exactly what

19  the slides looked like.

20  Q.   You were in court with all of us when he testified;      10:54:31

21  correct?

22  A.   Yes, sir, I was.

23  Q.   And are you telling us that you don't remember him playing

24  selected slides from what's called the judgment pistol

25  shooting?                                                   10:54:42

Lonnie Swartz – Cross-Examination

1  A.  Sir, I remember you putting on slides, but I don't remember

2  exactly verbatim of what the slides were, sir, that's what I'm

3  testifying to.

4  Q.  Okay.  Now, you would not deny that the instruction that

5  you received at the Academy was what Mr. Foraker testified           10:54:56

6  about?

7  A.  I would say that was correct.

8  Q.  Okay.  Any quibble at all with his testimony?

9  A.  I'm sorry, sir, can you repeat that?

10  Q.  I mean, are you saying that you would agree with his          10:55:10

11  testimony, that the people in your class that he instructed,

12  his testimony is the instruction that you received; right?

13  A.  I would say that's accurate, sir, yes.

14  Q.  Okay.  And you remember when he testified that you could

15  only use lethal force when it was necessary and both reasonable   10:55:25

16  under the circumstances; correct?

17  A.  Yes, sir.

18  Q.  And do you remember him testifying that necessary meant

19  last resort, that that's the last thing you should do, you

20  should elect to do, is to use lethal force?                       10:55:38

21  A.  I remember him saying that, sir.

22  Q.  And you don't have any qualms about that?

23  A.  Well, sir, the last resort can also become the first

24  resort.  It depends on the totality of the circumstances, sir.

25  Q.  My question was, is the word necessary in the use of force    10:55:53

—————————— **Lonnie Swartz − Cross−Examination** ——————————

1   policy was defined as the last resort, that before you take a

2   human being's life, if you can take some other option, that's

3   not −− that's not the last resort.  If you can take some other

4   option other than killing somebody, that that isn't necessary

5   to use lethal force.  That's what he's said.                    10:56:12

6           Would you disagree with that?

7   A.  Sir, I'm sorry, still don't understand it the way you're

8   placing it.  I apologize.

9   Q.  If you have other options short of lethal force, then you

10  should take those rather than kill somebody; correct?           10:56:28

11  A.  Again, it depends on the totality of the circumstances,

12  where you're at on the use of force continuum, the totality of

13  everything as a whole, sir.

14  Q.  Now can you tell us what the law is, when you understand

15  you can use lethal force?                                       10:56:44

16  A.  When an individual or individuals have the means, the

17  opportunity, and the intent to inflict serious physical injury,

18  disfigurement or death.

19  Q.  I think it's grievous bodily injury, isn't it, Mr. Swartz?

20  A.  I'm trying to read it as best I can without looking at the  10:57:03

21  manual, sir.

22  Q.  In fact, the guideline is under the handbook that you were

23  given −−

24          MR. CHAPMAN:  Objection.  Your Honor, if he's going to

25  refer to a document, I'd ask that it be shown to the witness.   10:57:20

1          MR. KLEINDIENST:  Sure.

2          THE COURT:  All right.

3      (Discussion off the record between Government counsel.)

4          MS. FELDMEIER:  Can you get me on the table, Sherry?

5          THE CLERK:  Are you plugged in?                        10:58:23

6          MR. KLEINDIENST:  If you go to page 14.

7  BY MR. KLEINDIENST:

8  Q.  Okay.  You recognize this as an excerpt of the Use of Force

9  Handbook; correct?

10  A.  Yes, sir.                                                 10:59:06

11  Q.  Have you looked at this handbook lately?

12  A.  I have seen that handbook lately, yes, sir.

13  Q.  Okay.  In fact, you remember getting it at the Academy when

14  you were a student?

15  A.  Yes, sir, I remember getting it.                          10:59:15

16  Q.  And --

17          MR. CHAPMAN:  For clarification, which edition is it?

18          MR. KLEINDIENST:  This is the one that was issued

19  October 2010.

20  BY MR. KLEINDIENST:                                           10:59:24

21  Q.  And do you recall that in that handbook it says, only that

22  force which is both reasonable and necessary may be used in any

23  given situation?

24          MR. CHAPMAN:  Which paragraph are you talking about?

25          MR. KLEINDIENST:  Paragraph 1.                        10:59:38

─────────── **Lonnie Swartz – Cross-Examination** ───────────

1          THE WITNESS:  Yes, sir, I can see that.

2     BY MR. KLEINDIENST:

3     Q.  Do you agree with that?

4     A.  Absolutely, that's our policy.

5     Q.  Okay.  And if we go on to the next page.  Under C2 do you          10:59:45

6     recall that in the handbook that you're only authorized to use

7     deathly force when necessary, that is when the officer or agent

8     has a reasonable belief that the subject of such force poses an

9     imminent danger of death or serious physical injury to the

10    agent or to another person?          11:00:12

11    A.  I can see that there, yes, sir.

12    Q.  Okay.  You agree with that too; right?

13    A.  Yes, sir, I do.

14    Q.  Okay.  In fact, you became an instructor yourself, didn't

15    you?          11:00:24

16    A.  I'm sorry, sir?

17    Q.  You became a firearms instructor; right?

18    A.  I did become a firearms instructor.

19    Q.  You neglected to tell us that?  Was that not important?

20          MR. CHAPMAN:  Objection, argumentative.          11:00:35

21          THE COURT:  Sustained.

22    BY MR. KLEINDIENST:

23    Q.  When did you become a firearms instructor?

24    A.  I believe it was in June of 2012.  It might be July, but I

25    think it was in June.          11:00:44

1   Q.  Tell the members of the jury how you became an instructor,

2   what you had to do.

3   A.  To become an instructor for the Border Patrol, a

4   solicitation is sent out via e-mail.  You can elect to put in

5   it for it.  You volunteer for it.  Based on -- if nobody else          11:00:59

6   puts in for it -- I was a junior agent, so I ended up getting

7   the slot even though I was a junior agent because nobody else

8   put in for it.  And that's how I got it, under the e-mail

9   solicitation.

10  Q.  You had to have a certain amount of firearm accuracy               11:01:17

11  though, however, to become an instructor; correct?

12  A.  Yes, but I don't recall exactly what that is.

13  Q.  Do you recall what your marksmanship scores were when you

14  were a Border Patrol Agent?

15  A.  At that time, no, not at that time.                                11:01:32

16  Q.  Have you seen your scores recently when you were at the

17  Border Patrol in terms of marksmanship?

18  A.  You would have to refer -- give me a year, or be more

19  specific, please.

20  Q.  Well, let me hand you what's been marked as Exhibit 287.           11:01:47

21         May I show this to the witness?

22         THE COURT:  You may.

23  BY MR. KLEINDIENST:

24  Q.  Do you recognize this exhibit, Mr. Swartz?

25  A.  It has my name on it, and it is FACTS, but I will tell you         11:02:08

—————— **Lonnie Swartz – Cross–Examination** ——————

1    on the monitor -- my monitor it's very fuzzy, sir, it's not

2    very clear.

3    Q.  Okay.  I'll show you the hard copy, maybe you can see it

4    better.

5          MR. KLEINDIENST:  May I approach the witness,                    11:02:22

6    Your Honor?

7          THE COURT:  You may.

8          THE WITNESS:  Sir, on the screen it's fuzzy.

9    BY MR. KLEINDIENST:

10   Q.  Take a look at the actual Exhibit 287.                             11:02:30

11         Do you see -- do you recognize what this document?

12   A.  This is the tracking system that we use for the Border

13   Patrol to enter scores of each agent when they qualify.  We

14   qualify four times a year.  And during those qualifications it

15   will show -- it will give you a date, what you -- what weapon    11:02:55

16   you qual'd with at that time, and your score.

17   Q.  And what time period does this cover, Mr. Swartz?

18   A.  This covers -- it starts in October of 2011.  And it

19   ends --

20   Q.  On October 14th, 2012?                                            11:03:15

21   A.  No.  It appears August 30th of 2012.

22   Q.  I'm sorry.  I'm looking at the wrong exhibit.

23         And this pertains to your scores and your

24   qualifications as a Border Patrol Agent; right?

25   A.  Yes.  Again, it covers the time frame from October 31st,   11:03:32

1    2011, until August 30th of 2012.

2    Q.  And it rates your accuracy with a firearm; correct?

3    A.  It shows multiple weapons, sir.

4    Q.  Right.  But it measures your accuracy with a pistol.

5    A.  This does show that, yes.                                    11:03:52

6    Q.  Right.

7          And on the top, very top line, do you see your

8    accuracy rating is when you qualified during this time period?

9    A.  This is dated October 31st, 2011.  It says P2000 pistol,

10   which was my serial number at the time.                          11:04:09

11   Q.  Right.

12   A.  And it shows a score of 344 out of a total score of 360.

13   Q.  And what was the percentage of accuracy?

14   A.  96 percent.

15   Q.  And then again does it show a subsequent qualification with  11:04:25

16   the firearm?

17   A.  One moment, sir.

18          Again, it shows a date of January 13th, 2012.  You

19   want the same P2000, sir?

20   Q.  Yes.                                                         11:04:53

21   A.  For the P2000 pistol, it shows a score of 341 out of a

22   total of 360.

23   Q.  And what was your accuracy rating?

24   A.  It says 95 percent.

25   Q.  So you were 96 percent accurate with the use of your pistol  11:05:06

─── **Lonnie Swartz – Cross-Examination** ───

1   when you qualified on that date; correct?

2   A.  Yes, on October -- or excuse me, January 13, 2012.

3   Q.  Okay.  And does it show any other qualification score with

4   your pistol?

5   A.  Yes, it does, it shows June 1st, 2012.                    11:05:20

6   Q.  And what was your accuracy rating?

7   A.  Bear with me, sir, the writing is small.  I'm just trying

8   to follow it across.

9        It shows a score of 329 out of a total 360, and it

10  shows a 91 percent accuracy rate.                            11:05:46

11  Q.  Okay.

12  A.  I have another date of August 19, 2012, P2000 pistol, a

13  score of 346 out of a total of 360.

14  Q.  What was the accuracy rating on that?

15  A.  96 percent, sir.                                         11:06:11

16  Q.  You were 96 percent accurate?

17  A.  On August 19th, 2012.

18  Q.  And that was about two months prior to the death of Jose

19  Elena in this case; correct?

20  A.  Just under two months.                                   11:06:23

21  Q.  Okay.  Thank you.

22       Now, do you recall that to become an instructor you

23  had to have a certain accuracy with the firearm?

24  A.  You did.  There was a minimum, but I do not recall the

25  minimum.                                                     11:06:36

Lonnie Swartz – Cross-Examination

1    Q.  You don't recall the minimum now?

2    A.  No, I do not.

3    Q.  Okay.  But you do recall that you had to have accuracy with

4    a pistol and with the other weapons to qualify to become an

5    instructor?                                                    11:06:48

6    A.  That is correct.

7    Q.  There was a certain threshold amount there; correct?

8    A.  There -- yes.

9    Q.  And in your case, you were scoring in the 90 plus accuracy

10   ratings with the pistol; correct?                             11:06:58

11   A.  On the dates shown on that paperwork, yes.

12   Q.  Right.

13           And as you just said, two months prior to the shooting

14   in this case, you were above 90 percent accurate with your

15   pistol.                                                        11:07:10

16   A.  That is correct.

17   Q.  And accuracy means that you're shooting at a target;

18   correct?

19   A.  You're shooting at a paper target in a controlled

20   environment.                                                   11:07:19

21   Q.  And accuracy means that you got a certain number of shots

22   within that target to show that you were accurate with the

23   pistol?

24   A.  Yes, sir.

25   Q.  Okay.  You wouldn't deny to this jury that you are an      11:07:30

**Lonnie Swartz – Cross-Examination**

1  accurate shooter?

2  A.  No, sir, I wouldn't.

3  Q.  Okay.  In fact, you were very accurate, weren't you?

4  A.  Yes, according to that paperwork I was 91 percent to 96

5  percent.                                                      11:07:44

6  Q.  Now, tell us what you had to do to become an instructor.

7  A.  After being accepted into the instructor program, there was

8  two agents that came I believe from Artesia, New Mexico, they

9  came to the Nogales Border Patrol Station.  They brought

10 everything with them to teach the class for I believe it was a   11:08:04

11 total of two weeks.

12 Q.  And the purpose of the class was to do what?

13 A.  The purpose of the class was to go over everything needed

14 to become a firearms instructor, and anything and everything

15 that entitled with that.                                         11:08:22

16 Q.  And that meant you also reviewed the use of force policy;

17 correct?

18 A.  Yes, we went over the use of force policy.

19 Q.  And you were instructed how to teach that to other agents

20 in the field; correct?                                           11:08:33

21 A.  We were, yes.

22 Q.  And, in fact, do you remember that you were shown during

23 the instructor class the judgment pistol shoot PowerPoint?

24 A.  That is part of the class, but I'd be lying to you if I

25 said I remember like -- I remember watching it.  But, yes, that  11:08:48

Lonnie Swartz – Cross-Examination

```
 1   was part of the instruction.
 2   Q.  But you were given an instructor's guide once you graduated
 3   from the instructor's program to teach other agents; correct?
 4   A.  We were given paperwork.  But again, sir, that's been
 5   almost six years ago.  I don't remember exactly what we were        11:09:02
 6   given, but we were given literature.
 7   Q.  Well, not only literature, but you were also given what's
 8   called the judgment pistol shooting because you were going to
 9   use that to teach other agents what the law required before you
10   could use lethal force.                                             11:09:15
11   A.  It's possible.  But, again, I'd be dishonest to you if I
12   remember exactly what every piece of paperwork was in that we
13   received.
14   Q.  Now, how many times -- you testified that you've been
15   rocked in the past?                                                 11:09:27
16   A.  Yes, sir, I did.
17   Q.  And you testified that you knew of two rockings that
18   injured an agent; is that correct?
19   A.  I know of two, yes.
20   Q.  Only two?                                                       11:09:37
21   A.  That an agent was actually seriously injured, yes, that I
22   know of.
23   Q.  And the first one was?
24   A.  The first one I know of is Agent Randy DeLeon, that we were
25   talked -- that they talked to us at the Academy.  They also        11:09:48
```

UNITED STATES DISTRICT COURT

—————— **Lonnie Swartz – Cross-Examination** ——————

1    talked about it when we got to the Nogales Border Patrol

2    Station in the field training unit.

3    Q.  And what was the other one?

4    A.  Agent Simoti.

5    Q.  What happened in Agent Simoti's case?                     11:10:00

6    A.  Agent Simoti was hit by a chunk of concrete on his face,

7    and I believe that he had to have full facial or partial facial

8    reconstruction because of that incident.

9    Q.  Wasn't it that correct that Agent Simoti was up against the

10   fence?                                                        11:10:16

11   A.  I don't know if he was exactly against the fence or not.  I

12   know he was near the fence.

13   Q.  He was near the fence?

14   A.  Yes, he was.

15   Q.  And wasn't it a fact that somebody dropped a concrete block 11:10:22

16   on his head?

17   A.  That may be.

18   Q.  Okay.  That's different from small rocks coming over the

19   fence that happened in this case; correct?

20   A.  It would be different.                                    11:10:33

21   Q.  You would agree with me?

22   A.  I would agree with you, yes.

23   Q.  There's quite a different between a cement block being

24   dropped on his head versus rocks coming over the fence?

25   A.  If that were the case, if it was a cement block dropped    11:10:43

**Lonnie Swartz – Cross–Examination**

1   vertically down, it would be different than this case.

2   Q.  Well, you tell me.  You were told about it, so is that what

3   happened?

4   A.  I remember that I was being told numerous times through

5   field training unit that he was hit by pieces of concrete.          11:10:54

6   Q.  You wouldn't deny the fact though it was actually just

7   dropped on his head?

8   A.  I don't know that to be 100 percent true, I don't.

9   Q.  Well, that was important to you to know that; correct?

10  A.  It was important to know that when you are near the fence     11:11:07

11  these things can happen.

12  Q.  Exactly.  And you were told by your journeymen that if

13  possible you stay away from the fence; right?

14  A.  We were told not to stay away from the fence, sir.  We were

15  told that when you get near the fence, bad things can happen.      11:11:22

16  We were all told that, all agents are told that.

17  Q.  That bad things can happen?

18  A.  They can happen near the fence, yes.

19  Q.  So let's get back to your situation.  You'd been rocked how

20  many times as an agent prior to the night of October 10th?        11:11:33

21  A.  Again, this is only an estimation.  I would say anywhere

22  from five to seven, maybe eight times.  But it's an estimation.

23  Q.  And you heard the testimony of Kevin Hecht about those

24  prior instances when you used less than lethal force; right?

25  A.  I remember Mr. Hecht testifying to that, yes.                  11:11:51

1   Q.  And there were approximately how many instances, do you

2   remember?

3   A.  That he testified on -- can you clarify that, sir, please?

4   Q.  Yeah.  How many different instances did he testify in court

5   about when you used nonlethal force or less than lethal force?   11:12:04

6   A.  Five, six, seven.  I don't recall the exact number, sir.

7   Q.  Okay.  About the same number of times that you've been

8   rocked; correct?

9   A.  I would say that's fairly close, if not accurate.

10  Q.  Is it a fair statement that every time then that you have   11:12:19

11  been rocked in the past, you used some type of force?

12  A.  Yes, I used nonlethal force because I had that available at

13  my disposal at that time, sir.

14  Q.  You didn't take cover?

15  A.  No, I did not take cover.                                    11:12:34

16  Q.  You elected to use some type of force?

17  A.  Yes, using a less lethal is using some type of force, yes,

18  sir.

19  Q.  And you could have backed away but you decided not to?

20         MR. CHAPMAN:  Object to the form of the question.  I'm    11:12:46

21  not sure which event he's referring to.

22         THE COURT:  Be more specific.

23  BY MR. KLEINDIENST:

24  Q.  Of the rocking events where you used less than lethal

25  force, did you have the option of taking cover and you said     11:12:54

61

Lonnie Swartz - Cross-Examination

1    yes?

2    A.  No, did we have the option to take cover?

3    Q.  Did you in those instances?

4    A.  I don't recall if I did.

5            However, sir, in our policy, it is not stated that

6    whenever there's a rocking that we have to take cover.

7    Q.  There's nothing at all stated in the policy about that.

8    A.  No, sir.  You don't have to run and hide and take cover

9    when you are being rocked, sir.

10   Q.  Where is that in the use of force policy?

11   A.  Sir, you need -- can you please clarify that, because I'm

12   not understanding what you're saying.

13   Q.  You said that the policy is you don't have to run and take

14   cover.

15   A.  I said it's not written in policy that does not say when

16   you are being rocked, wherever it is, outside, left, east or

17   west, wherever it is along the international boundary fence,

18   that it is mandatory or that you should run and hide and seek

19   cover during a rocking, sir.

20   Q.  Where is that written down?

21           MR. CHAPMAN:  He just asked and answered the question,

22   Your Honor.

23           THE COURT:  Sustained.

24   BY MR. KLEINDIENST:

25   Q.  Is it the Use of Force Handbook that you got from the

11:13:03

11:13:15

11:13:26

11:13:41

11:13:48

UNITED STATES DISTRICT COURT

1    Academy?

2    A.  That we have to run and hide?

3    Q.  I'm not talking about running and hiding, I'm just talking

4    about taking cover if you have that option.

5    A.  I don't know exactly what you're referring to and how it's        11:13:57

6    written, sir.  I'm not understanding the question, I'm sorry.

7    Q.  Well, my question to you is, is there anything in the Use

8    of Force Handbook that you were given at the Academy, and also

9    as an instructor, that said that you could make a decision

10   whether or not to take cover or use lethal force.  Is there          11:14:14

11   anything in the handbook that says that?

12   A.  That says we have to take cover?

13   Q.  Not that you have to, but if you have that option you

14   should consider it.

15   A.  I don't know if it's in there or not, sir.  I don't recall       11:14:26

16   it ever being written like that.

17   Q.  So you never saw a written policy that said that; correct?

18   A.  That says that we have to run and seek cover, I don't.

19   Q.  In the instances where you used less than lethal force,

20   each time you used less than lethal force; correct?  You'd          11:14:41

21   agree with me?

22   A.  That -- sir, I apologize, I'm not understanding your

23   question.

24   Q.  That's all right.  The times when you were rocked and you

25   used less than lethal force, you elected to use less than          11:14:53

1   lethal force rather than take cover?

2   A.  I did, yes, that is correct.

3   Q.  And cover was an option?

4   A.  I don't recall if cover was an option on those or not, I

5   don't.                                                                    11:15:05

6   Q.  Where did those occur?

7   A.  You would have to show me the report and I can tell you

8   exactly where they occurred.

9   Q.  Okay.  Let's look at Exhibit 296.

10          MR. CHAPMAN:  What number?                                        11:15:23

11          MR. KLEINDIENST:  296.

12          MS. FELDMEIER:  Madam Clerk, can we just have it on

13  counsel's computer and the witness?

14  BY MR. KLEINDIENST:

15  Q.  This was an incident that took place on April 29th, 2012;            11:15:43

16  correct?

17  A.  April 29th, 2012, date and time of incident 1510, 3:10 p.m.

18  Q.  And this took place on the east side of the port of entry?

19  A.  I'm looking, sir.  It's moving.

20  Q.  Do see on the narrative on page 2?                                    11:16:09

21          MS. FELDMEIER:  I'm sorry guys.

22  BY MR. KLEINDIENST:

23  Q.  Do you want to go ahead and read that and refresh your

24  memory, Mr. Swartz?

25  A.  Would you like me to read the narrative out loud or to               11:16:26

1    myself, sir?

2    Q.  Just to yourself.

3          MR. CHAPMAN:  Your Honor, I think these are admitted

4    so the jury -- it could be published.

5          THE CLERK:  It is?                                    11:16:37

6          MR. CHAPMAN:  I'd ask that they be published.

7          THE COURT:  That's fine.  Go ahead and publish it.

8          THE WITNESS:  It's gone, sir.

9          MS. FELDMEIER:  Sorry, I centered it to try and

10   bring --                                                   11:17:04

11   BY MR. KLEINDIENST:

12   Q.  Does that refresh your memory about this incident?

13   A.  I'm not done reading it, sir, it kept moving on the screen.

14   Q.  I'm sorry.  Take your time.

15   A.  All right, sir, I've read it.                          11:17:35

16   Q.  Does that refresh your memory about this incident?

17   A.  That incident took place, it's going to be east of the

18   DeConcini Port of Entry.  It's an area that we know as Tricky

19   Wash, it's a low lying area.  That area is heavily trafficked

20   for undocumented immigrants and narcotics smuggling in that  11:17:52

21   area.

22   Q.  Does that refresh your recollection that you elected to use

23   less than lethal force rather than taking cover or backing

24   away?

25   A.  Yes, sir, I used a stingball deployed.                 11:18:07

───── **Lonnie Swartz - Cross-Examination** ─────

1   Q.  Tell the jury would is stingball is.

2   A.  A stingball it's going to the size of a baseball.  It's got

3   a rubber shell around it.  And it looks very similar to -- if

4   you've seen a hand grenade in movie or in a picture.  It has

5   the same type of detonating system.  It has a metal spoon that          11:18:27

6   comes off the top and it has a pull pin.  And what this does --

7   again, it's the size of a baseball, maybe slightly bigger.

8   When you pull the pin, that is a safety pin, it will not go

9   off.  You have the spoon in your hand between the actual ball

10  itself and your hand.  So you've got a piece of metal.  So it's          11:18:45

11  still rendered safe until you throw it and release it.

12         Inside of this unit you have, I believe it's 15 rubber

13  .32 caliber balls.  So when you make the election to throw this

14  less lethal device, you have, I believe it's two to

15  two-and-a-half seconds before the device detonates.  When it          11:19:06

16  detonates, it explodes, it separates, and it shoots out those,

17  I believe, again, 15 or so .32 caliber rubber balls.  And it

18  expels those into a 360 degree area.  I don't know the exact

19  area of the effectiveness, but that's what it does.

20  Q.  And in this case that's what you used?          11:19:30

21  A.  I did use that, yes, I did.

22  Q.  That was an election that you made?

23  A.  That was an election that I made.

24  Q.  And you didn't have to, you could have taken cover and

25  moved away from the individuals throwing rocks; correct?          11:19:42

UNITED STATES DISTRICT COURT

────────── **Lonnie Swartz - Cross-Examination** ──────────

1   A.  Sir, again, we don't have to take cover.

2   Q.  I'm just asking you a question.  I know you say you don't

3   have to take cover.  But in this case you elected to use some

4   type of force rather than backing away so you wouldn't be in

5   the range of the rocks.  That's my question.                    11:19:55

6       Is that response yes or no?

7   A.  Well, I can't answer that yes or no, and I'd like to

8   elaborate on that.  There's a reason why I'd like to explain.

9       In this area known as Tricky Wash, it is an open area.

10  There are houses north of that road.  But if I deployed that   11:20:08

11  stingball, that means I was exposed and I was in the open.

12  And, therefore, if I'm being rocked and I go try to run or try

13  to get out of the area, now I've taken my focus off the threat,

14  which is on the south side of that fence, and now I can become

15  a potential target.                                             11:20:27

16  Q.  My question to you simply is, could you have backed away so

17  you didn't have to use less than lethal force?  That's my

18  question.  Just yes or no.

19  A.  I disagree with that, sir.  No.

20  Q.  So you do not --                                            11:20:41

21  A.  Not safely without being struck by a rock, no.  I do

22  not -- I do not agree with that.

23  Q.  The next incident that you used less than lethal force was

24  on -- these are somewhat out of order, but let me --

25      MS. FELDMEIER:  295.                                        11:21:14

1          MR. KLEINDIENST:  295?

2    BY MR. KLEINDIENST:

3    Q.  Do you remember this incident, Mr. Swartz?

4    A.  It's dated April 25th, 2012.  I believe it says 2206 hours.

5    Q.  And in this instance you were being rocked by rocks coming          11:21:39

6    over from the -- from Mexico; correct?

7    A.  Yeah, but I didn't see the area here.

8          Do you want me to read this as well, sir?

9    Q.  Sure.

10   A.  Yes, sir, I've read the narrative.                                  11:22:33

11   Q.  You used less than lethal force in that instance?

12   A.  I did.

13   Q.  That was something you elected to do?

14   A.  It was.

15   Q.  You didn't have to?                                                 11:22:39

16   A.  This incident here, in the narrative it also states that

17   there was an undocumented immigrant that was on the north side

18   of the fence, which I apprehended.  Also in that general area

19   was another Border Patrol Agent.

20   Q.  My question -- here's my question:  You had a vehicle to           11:22:55

21   get into to avoid being rocked; correct?

22   A.  I don't know exactly where I was in relation to this

23   vehicle when the rocking happened.

24   Q.  Did you have a vehicle that you could have retreated to and

25   get in your vehicle and not have to use less than lethal force?       11:23:09

— Lonnie Swartz – Cross-Examination —

1    A.  Sir, on this particular incident, being that there is one

2    UDA out there, to get in my vehicle, then that person is also

3    exposed and that agent is exposed.  Now where my rock

4    was -- excuse me, my rock -- my vehicle was in relation to the

5    rocking that happened, I don't know.  I could have been some          11:23:29

6    distance away to where that's the -- where I chose to use that

7    use of force on there.

8         To go back to that and tell you like it happened

9    yesterday, even reading the narrative, because the incident was

10   that distance ago, that time frame, again, I would be dishonest      11:23:46

11   to you to say that my vehicle was, you know, two feet, three

12   feet from me to where I can just run back in my vehicle.  I

13   can't honestly tell you that.

14   Q.  The fact -- the point of the matter is that every time you

15   got rocked in the past you used some type of force.                  11:24:02

16   A.  Less lethal force, I did, sir.

17   Q.  Yes.

18        MR. CHAPMAN:  Objection, it's referring to these

19   incidents or all incidents?  What is he talking about?

20        MR. KLEINDIENST:  All of them.                                   11:24:13

21        THE COURT:  Be more specific, Mr. Kleindienst.

22   BY MR. KLEINDIENST:

23   Q.  In all of the incidents prior to October 10th, 2012, when

24   you were rocked you used some type of force?

25   A.  Less lethal force; that is correct, sir.                          11:24:22

UNITED STATES DISTRICT COURT

—— Lonnie Swartz – Cross-Examination ——

1   Q.   Okay.  Now, the night in question, you testified that you

2   were at the port of entry working with Agents Porter and

3   Wynecoop and others; correct?

4   A.   Yes, sir, that is correct.

5   Q.   By the way -- well, let me move on.                          11:24:46

6        Can you tell the jury what you saw when you saw the

7   second set of subjects run across the street?

8   A.   Sir, are you referring to when I was running westbound on

9   West International Street?

10  Q.   Yes.                                                         11:25:07

11  A.   When I was running westbound on West International Street,

12  I saw two shadows run across the street southbound on West

13  International to the international boundary fence.

14  Q.   And you saw them climb the fence?

15  A.   I saw them climbing the fence, yes.                          11:25:20

16  Q.   And you were behind Wynecoop and Porter; correct?

17  A.   Yes, they were in front of me running.  They were much

18  faster than me.

19  Q.   Where did Porter go?

20  A.   I don't know where Agent Porter went.                        11:25:30

21  Q.   You don't know where he went that night?

22  A.   He was in that general area, but did I see exactly where he

23  went?  No.  Do I know now where he went?  I do know where he

24  was at now, but then I did not.

25  Q.   Let me just play back the video for you.                     11:25:47

UNITED STATES DISTRICT COURT

─────── **Lonnie Swartz – Cross-Examination** ───────

1      MS. FELDMEIER:  This is 329.

2          MR. KLEINDIENST:  Is this the one that's highlighted?

3          MS. FELDMEIER:  Yes.

4   BY MR. KLEINDIENST:

5   Q.  Can you tell us when you see yourself in the video?        11:26:10

6   A.  Right now, sir.

7   Q.  So the person that's circled in blue is Agent Wynecoop;

8   correct?

9   A.  Sir, I believe that to be true, but I can't be exactly

10  sure.  I can't tell by this screen, sir.                      11:26:46

11  Q.  He was the person that was running in front of you down

12  West International Street.

13  A.  Him and Agent Porter.  But to definitively say on that

14  picture that that is Wynecoop, I cannot say that.

15  Q.  Okay.  So you're circled in red; correct?                 11:26:59

16  A.  Yes, sir, I am.

17          MR. KLEINDIENST:  Can you go ahead and play it,

18  Mary Sue?  If you want to stop it right there.

19  BY MR. KLEINDIENST:

20  Q.  At this point in time there's been other Border Patrol    11:27:19

21  agents who responded to the scene before you got there;

22  correct?  Do you remember that?

23  A.  No, sir, I did not know that from -- at that point in time.

24  I knew that there was agents working in that general area,

25  because we always have agents assigned to that area.  But where 11:27:33

UNITED STATES DISTRICT COURT

**Lonnie Swartz – Cross-Examination**

1    they were exactly, I don't.

2    Q.  I'm just asking that as you were running down the street or

3    walking down the street, according to the video the canine

4    officer had already showed up; correct?

5    A.  That is true.                                             11:27:47

6    Q.  And there was two or three Border Patrol vehicles that had

7    already showed up; correct?

8    A.  According to the video.  Not by my sight at that particular

9    time.  I would have to get much closer before I saw those

10   Border Patrol vehicles.                                       11:28:00

11   Q.  So you don't remember seeing the Border Patrol vehicles

12   where you were at that point in time?

13   A.  At that point in time I can't definitively say that I saw

14   the two Border Patrol vehicles there.

15   Q.  Okay.                                                     11:28:10

16   A.  But I do remember Officer Zuniga.

17   Q.  Let's stop right here.

18        Now at 231315, do you see yourself in the left-hand

19   screen?

20   A.  I do, sir.                                                11:28:28

21   Q.  And do you see Officer Wynecoop?

22   A.  Again, sir, they're blurry.  You would have to go more

23   forward.

24   Q.  Well, you understood from when the video was played in

25   court that Officer Wynecoop was circled in blue; correct?  I  11:28:41

**Lonnie Swartz – Cross-Examination**

1  mean you remember that testimony?

2  A.  If this is the same, yes, it would be him circled in blue,

3  yes, sir.

4  Q.  Okay.  And you remember that Officer Zuniga is circled in

5  green; correct?                                                  11:28:54

6  A.  I can see that right here, yes.

7  Q.  And you're circled in red?

8  A.  I am circled in red.

9  Q.  And do you see yourself on the left-hand side of the

10  screen, as well as the right-hand side of the screen, walking   11:29:03

11  by a car?

12  A.  I see that.

13  Q.  Do you know what -- whose vehicle that was that you walked

14  by?

15  A.  No, I don't recall.                                         11:29:11

16  Q.  Okay.  Now, you testified that you didn't pull your gun

17  until when?

18  A.  I remember drawing my firearm when -- after the rock hit

19  the fence, after Agent Wynecoop was hit, and after I heard the

20  thud which was related to the dog being struck.                 11:29:28

21  Q.  You have a clear memory of that?

22  A.  No, that's just what I remember, sir.

23  Q.  But that's what you remember?

24  A.  That's just what I remember, sir, yes, sir.

25  Q.  That's what you testified here today in court?             11:29:38

─────────── **Lonnie Swartz – Cross-Examination** ───────────

1    A.  I did testify to that.

2    Q.  In fact, you pulled your gun right now, didn't you?

3    A.  Can you roll the tape more?

4    Q.  Sure.

5          You have your gun out at 231321.                                          11:29:50

6    A.  I do have it out right there.

7    Q.  Does that refresh your memory?

8    A.  It does not.  I do not recall pulling my weapon at that

9    point.  But that video shows me had my weapon out, yes, it

10   does.                                                                            11:30:05

11   Q.  You don't recall that?

12   A.  I do not recall drawing my weapon at that time, no, I do

13   not.

14   Q.  Why would you have drawn your weapon at that time,

15   Agent Swartz?                                                                    11:30:12

16   A.  In the Border Patrol you can draw your weapon any time you

17   might think that you may need it.  And with that being said,

18   whenever you're dealing with drug smugglers, they are

19   unpredictable, and until the scene is secured, when you're

20   dealing with a drug smuggler, you can draw your weapon for the                   11:30:26

21   safety of yourself and your fellow agents.

22         But again, at this particular time I do not recall

23   drawing my weapon.

24   Q.  Well, you know at this point in time no drug smugglers were

25   within danger -- or a threat to any of the agents; correct?                      11:30:43

UNITED STATES DISTRICT COURT

Lonnie Swartz – Cross-Examination

1    You had two people on the fence.

2    A.  Not only did we have the two people on the fence, but I

3    believe it was Agent Devowe that stated he's got a large knife

4    in his back pocket.

5    Q.  But my question to you is, is that what we have the                    11:30:56

6    situation where you walked down West International Street, is

7    you had two people on the fence trying to get over to Mexico;

8    right?

9    A.  That's what it shows, yes, sir.

10   Q.  Do you know of any other people in the area that were a               11:31:08

11   threat to you and the other agents?

12   A.  To my knowledge at that time, no.

13   Q.  No.  So I guess my question is, going back to this, you

14   don't remember pulling your gun, but you now obviously realize

15   that you did.                                                             11:31:23

16   A.  Yes.  According to that video I did draw my weapon.  Down

17   by whatever vehicle that was, I drew my weapon out.

18   Q.  And you never put it back; correct?

19   A.  I had to have because I remember when I went towards the

20   international boundary fence I pulled my weapon.                          11:31:36

21   Q.  Okay.  We'll roll the tape and just see if you put your

22   weapon back.

23        You still have your weapon out?

24   A.  I do.

25   Q.  Do you remember putting it back?                                      11:31:53

UNITED STATES DISTRICT COURT

**Lonnie Swartz – Cross-Examination**

1    A.  I can't say that I remember putting it back because I don't

2    remember drawing it out at this point, sir.

3            MR. KLEINDIENST:  Okay.  That's fine.  If you want to

4    stop it right there.

5    BY MR. KLEINDIENST:

6    Q.  Now you never saw the person on the fence reach for his

7    knife like he was going to throw it at any of you, did you?

8    A.  No, I did not.

9    Q.  Okay.  You never saw him make any threatening motions;

10   correct?                                                         11:32:48

11   A.  No, I did not.

12   Q.  In fact, you knew what they were trying to do was get back

13   to Mexico; right?

14   A.  They were attempting to get back to Mexico, yes.

15   Q.  Did not want to get arrested by you all; correct?           11:32:55

16   A.  That is correct.

17   Q.  Okay.  So their intent was not to do harm to you or anybody

18   else in the street, their intent was just to climb the fence

19   and go back home; correct?

20   A.  Sir, I can't speculate on their intent at that time.        11:33:07

21   Q.  Well, you evaluated the situation as an agent, right, when

22   you got to the scene.  Wasn't that your evaluation?

23   A.  That was not my evaluation.

24   Q.  They still posed a threat to you?

25   A.  When you have an individual on the fence that has a knife    11:33:18

1   in their back pocket, and you have an agent that states, hey,

2   watch out, he's got a knife in his back pocket, if that

3   individual somehow gets tired and does not make it to the top

4   of that fence and slides down there, and slides down to the

5   ground, we are trained that a fatal funnel can happen with an          11:33:35

6   individual with a fixed-blade weapon.  And a fatal funnel is 21

7   feet or less.

8           And if that person were to slide down that fence and

9   hit the ground, there's no indication that he's going to throw

10  his hands up and say, okay, fine, I'm tired, arrest me.  You          11:33:50

11  don't know what that person's going to do.  He is a drug

12  smuggler, and until he is in handcuffs or until he is on the

13  other side of the fence in the country of Mexico, I cannot

14  speculate on what his intent is.

15  Q.  Isn't it true basically that when you got to the scene that       11:34:07

16  night the situation was basically over, the operation?

17  A.  When they're on the fence like that --

18  Q.  Just my question is --

19  A.  It's --

20      (Court reporter interruption.)

21  BY MR. KLEINDIENST:

22  Q.  When you walked down the street --

23          THE WITNESS:  Sorry.

24  BY MR. KLEINDIENST:

25  Q.  -- the situation was basically over; correct?                     11:34:24

---
Lonnie Swartz - Cross-Examination
---

1      MR. CHAPMAN:  What situation?  The drug smuggling

2    operation?

3      MR. KLEINDIENST:  Yes.

4      THE WITNESS:  It could possibly be just that.  But you

5    don't know.                                                    11:34:36

6    BY MR. KLEINDIENST:

7    Q.  Do you remember -- do you remember telling Dr. Miller that?

8    A.  I might have -- I might have stated that to Dr. Miller,

9    it's possible, yes.

10   Q.  That the situation was basically over; correct?            11:34:43

11   A.  If that's what -- if that's what I said to Dr. Miller, then

12   that's what I said.

13   Q.  And so what everybody was doing was just making sure they

14   got back safely to Mexico, that nobody perceived that as a

15   threat at that time.                                           11:34:58

16   A.  We were --

17   Q.  Yes or no.  Is that what your perception was?

18   A.  Well, No, sir, that's not.  I'd like to elaborate on that.

19   Q.  Sure.  Go ahead.

20   A.  You say when they go safely back to Mexico, I don't know    11:35:07

21   what that means.

22   Q.  My question is, is that by the time you got there, even

23   though you had your gun drawn the entire time, the situation

24   was basically over.  You didn't have a situation ongoing.  You

25   had two people trying to get back to Mexico.                   11:35:23

UNITED STATES DISTRICT COURT

1    A.  We had two people on the fence that were attempting to get

2    back into Mexico.

3    Q.  Right.

4         Okay.  So you remembered earlier today that you didn't

5    pull your gun until the rocks started falling; right?          11:35:43

6    A.  I don't recall pulling my weapon until the rocks -- until

7    Agent Wynecoop was struck, or the rock hit the fence and the

8    dog.

9         MR. KLEINDIENST:  Now -- actually you can stop it

10   right now.                                                     11:35:58

11   BY MR. KLEINDIENST:

12   Q.  You heard Mr. Wynecoop's testimony in court; right?

13   A.  I did.

14   Q.  He did not testify that he called out to you or to anybody

15   else that he had been hit with a rock, did he?                11:36:06

16   A.  That was his recollection.

17   Q.  You also had the chance to read his Grand Jury transcript;

18   right?

19   A.  I don't believe I read his --

20   Q.  Do you remember talking to Dr. Miller, who's in court      11:36:17

21   today, telling Dr. Miller that you had read the transcript of

22   Wynecoop and other agents?

23   A.  I do not recall reading the transcript of Wynecoop and

24   other agents.  I do not remember making that statement, no.

25   Q.  You knew that -- your testimony today is that Agent        11:36:31

1    Wynecoop, although he said he didn't say he had been hit by a

2    rock, you heard him say that, and you heard him say it twice;

3    correct?

4    A.  Do you want me to repeat what he said, sir?

5    Q.  Yeah.                                                              11:36:46

6    A.  He said, shit, I'm hit, I'm hit.  That's what he said, and

7    he leaned down towards his leg.

8    Q.  Did you look and see what happened?

9    A.  No, no, I didn't.

10   Q.  Why not?                                                          11:36:53

11   A.  I was more focused on the threat at hand, to stop the rocks

12   coming over.

13   Q.  That's when you first heard the rock -- about a rock, is

14   when Wynecoop, according to you, said he had been hit in the

15   foot?                                                                 11:37:06

16   A.  No, before he was hit in the foot, the first thing that he

17   said is, he says -- he looked at me and he says, I think we're

18   getting rocked.  And then I was looking south at the fence.

19   And then he says -- and I looked over to him, and he goes, I

20   think we're getting rocked.  And he had this sick look on his        11:37:18

21   face.  That's when I heard that loud ping off the top plate of

22   the international border fence.  Okay?

23        And then right after that he goes, shit, I'm hit, I'm

24   hit, and he leaned down towards his right leg.

25   Q.  You remember that very clearly?                                   11:37:34

UNITED STATES DISTRICT COURT

**Lonnie Swartz - Cross-Examination**

1    A.  I remember that very clearly.

2    Q.  And you remember very clearly that there was a hollow thud?

3    What was that?

4    A.  Following Agent Wynecoop being struck and him saying what

5    he said about being hit, then I heard like a thud sound, like                    11:37:46

6    just this hollow thud.  And followed by that -- there was an

7    agent behind me, again, I don't know if it was Plooy or another

8    agent, was saying, your dog's been hit, your dog's been hit.

9    Q.  And where were you at the time?

10   A.  I was in the street somewhere.                                               11:38:04

11   Q.  Where?

12   A.  Sir, I don't know.

13   Q.  Where were you in relationship to the canine officer and

14   his dog?

15   A.  I believe the canine officer was in front of me somewhere.                  11:38:11

16   But to say exactly where -- but I know they were in front of me

17   somewhere.

18   Q.  Do you remember that Agent Wynecoop after he got hit with

19   the rock took cover?

20   A.  He -- that was his testimony.                                               11:38:24

21   Q.  Well, what do you remember?

22   A.  I was focused on the fence and the south.  I didn't -- my

23   focus was not on Agent Wynecoop, where he went after he was

24   struck or -- I was just focused on electing to protect myself,

25   protect my fellow agent, and protect that police officer,                       11:38:41

——— **Lonnie Swartz – Cross-Examination** ———

1   that's what I was focused on was that fence.

2   Q.  So your testimony is you don't know that Agent Wynecoop

3   took cover and didn't need protection.  You didn't know that?

4   A.  I do not know --

5            MR. CHAPMAN:  Object to the form of the question        11:38:54

6   regarding whether he needed cover.

7            THE COURT:  Overruled.

8            THE WITNESS:  Can you restate the question?

9            THE COURT:  Whoa, whoa, whoa, one of you at a time.

10            THE WITNESS:  Sorry, sir.

11            THE COURT:  At least two seconds between the question

12   and --

13            MR. KLEINDIENST:  Sorry, Your Honor.

14            THE COURT:  -- the answer.

15   BY MR. KLEINDIENST:                                           11:39:10

16   Q.  My question to you is, you don't know where Agent Wynecoop

17   went.  You didn't seen to find out.

18   A.  No, sir, my focus was on stopping that threat from coming

19   over that fence.

20   Q.  The question is just yes or no.                           11:39:19

21            MR. CHAPMAN:  Argumentative.

22            THE COURT:  Overruled.

23   BY MR. KLEINDIENST:

24   Q.  Did you see where Agent Wynecoop went?

25   A.  I did not.                                                11:39:25

Lonnie Swartz – Cross-Examination

1   Q.  Did you see where Officer Zuniga went?

2   A.  No, my focus wasn't on them anymore at that time.

3   Q.  Just a yes or no question.  Did you see where Officer

4   Zuniga went?

5   A.  I did not.                                            11:39:35

6   Q.  Okay.  So you don't know whether or not he took adequate

7   cover; correct?

8   A.  I don't know if he did or not.

9   Q.  You didn't seek to find out?

10  A.  No.  Again, like I previously stated --              11:39:43

11  Q.  Just listen.  Did you seek to find out if Agent -- or

12  Officer Zuniga had taken sufficient cover?

13  A.  No, I did not.

14  Q.  And you didn't seek to find out if Agent Wynecoop took

15  sufficient cover, did you?                               11:39:56

16  A.  No --

17  Q.  Just yes or no.

18  A.  No, I did not.

19  Q.  There was nobody else out in the street at the time;

20  correct?                                                 11:40:03

21  A.  I don't --

22  Q.  Besides Agent Zuniga -- or Officer Zuniga, Agent Wynecoop

23  and you.

24  A.  Those are the only -- myself, Agent Wynecoop and that

25  officer are the only ones that I know that are in the street  11:40:12

UNITED STATES DISTRICT COURT

1    itself.

2    Q.  Okay.  Where were the other agents on the scene?

3    A.  I couldn't tell you, sir.  I know Agent Plooy and Devowe

4    were behind me at that time, as far as when the dog was struck.

5    Where they went from there I couldn't tell you.                      11:40:27

6    Q.  My question is, before you advanced to the fence, did you

7    know whether or not the other agents on the scene were in

8    danger of being hit by a rock?

9    A.  We were all in danger of being hit by a rock.

10   Q.  How do you know that they were in danger of being hit by a    11:40:41

11   rock if you don't know where they were?

12   A.  It's dark, it's low light out there, those rocks were

13   coming on over.  I don't need to be hit with a rock to know

14   that rocks are coming.

15         I have more, sir.                                              11:40:57

16   Q.  Go ahead.

17   A.  My partner was struck.  I heard that rock hit that fence.

18   That police canine was struck, which that officer was in very

19   close proximity.  I don't need anymore than that to defend

20   myself and my fellow agents and that officer when those rocks    11:41:12

21   are raining down.  I don't have to look up and say, well, it's

22   dark out, but that one looks big enough, okay, I can react.  I

23   don't to wait until somebody gets hit in the head and their eye

24   is hanging out -- you know, I don't have the to wait for that.

25   Q.  Did you know whether or not Agent Plooy was in danger of      11:41:29

Lonnie Swartz - Cross-Examination

1    being hit by any of these rocks that came over the fence?  Yes

2    or no.

3    A.  I don't know where Agent Plooy was at the time.

4    Q.  Do you know if Agent Devowe was in danger of being hit by

5    any rocks?  Yes or no.                                              11:41:40

6    A.  I don't know where Agent Devowe was exactly.

7    Q.  Do now if he Agent Porter was in any danger of being hit by

8    the rocks?  Yes or no.

9    A.  I don't know where Agent Porter was at this time.

10   Q.  Did you even know that Officer Garcia of the police          11:41:49

11   department for Nogales was out there in the scene?

12   A.  I did not know Officer Garcia was even on scene at all.

13   Q.  Okay.  So with respect to all those other agents, you don't

14   know whether or not the rocks were coming far enough over the

15   fence to be a threat to them?  Yes or no.                         11:42:06

16   A.  I don't know where and how far the rocks were coming over.

17   Q.  Did you go on your microphone and ask, was anybody in

18   danger of being hit by a rock before you advanced to the fence?

19   A.  I didn't have time for that.

20   Q.  You didn't have time for that?                                11:42:22

21   A.  No, sir.  Those rocks were coming over quickly, and I had

22   to act quickly.  I only had seconds to act to stop that threat,

23   sir.

24   Q.  But you don't know where all the other agents were?

25   A.  No, I know there any the vicinity.  But if you were to show   11:42:34

UNITED STATES DISTRICT COURT

_____ **Lonnie Swartz – Cross-Examination** _____

1    me a man and say, well, Agent Plooy was here and Agent Wynecoop

2    was here and Agent Wynecoop was here, I can't tell you that.

3    I'd be dishonest to you and this Court if I said that.

4    Q.  You could have yourself gotten behind Officer Zuniga's

5    vehicle as cover; correct?                                    11:42:51

6    A.  I elected to defend myself, sir.

7    Q.  My question is, could you have taken cover behind Agent

8    Zuniga's vehicle?  Yes or no.

9    A.  I don't know if I could have.  I elected to defend myself

10   and my partner and that officer.                              11:43:01

11   Q.  You were standing right next to the vehicle; correct?

12   A.  I was by a vehicle.

13   Q.  And you could have moved over and taken cover when the

14   rocks were coming over, but you didn't.

15   A.  I elected to protect myself and my partner and that       11:43:10

16   officer, that's what I elected to do, sir.

17   Q.  Now, when you made that decision to defend yourself and the

18   others, you didn't run to the fence, did you?

19   A.  I walked cautiously to the fence.

20   Q.  You were walking into the zone of danger, weren't you?     11:43:26

21   A.  That's why I was cautious, sir.

22   Q.  Well, if the rocks were that much of a threat, why would

23   you take your time to walk from Officer -- or Agent Zuniga's

24   car to the fence?  Why would you not run to the fence if you

25   thought it was such a dangerous threat?                       11:43:42

1    A.  Because the fence is not solid.  The fence has open

2    perforations in it, per se, for lack of a better term.  They

3    have an opening.  The opening I'm estimating here is to be

4    three inches opening.

5            When I'm approaching that fence and I'm trying to look    11:43:57

6    down into the country of Mexico, rocks can still penetrate that

7    fence.  And more than rocks, more than rocks that can penetrate

8    that fence can be a bottle, it can be any other object that can

9    explode on that fence and hit me in the face.

10            So as I'm going toward that fence I'm moving    11:44:14

11    cautiously and looking for the threat.  I'm not going to run

12    right up to a fence without knowing exactly who is on the other

13    side and where they are in relation to where I'm approaching

14    that fence.

15   Q.  Did any rocks come close to you?    11:44:26

16   A.  Come --

17   Q.  As you walked across the street.

18   A.  Did any rocks come close to me where, sir?

19   Q.  As you walked across the street.

20   A.  As I'm approaching fence?    11:44:36

21   Q.  As you walked across the street.

22   A.  I don't remember if any rocks did.

23   Q.  You never saw a rock, did you?

24   A.  No, I heard a rock.

25   Q.  You only heard a rock, but you never saw any rocks?    11:44:43

1    A.  No.  And I don't have to see a rock to know when there's a

2    rocking, sir.  I can hear it.  My training and experience

3    dictates that.

4    Q.  My question to you is, is that you never saw a rock you

5    just heard what you thought was a rock, that entire night?                11:44:56

6    A.  I heard what I know was a rock, sir.

7            MR. KLEINDIENST:  Do you want to play the video?

8    BY MR. KLEINDIENST:

9    Q.  So if we look at you, you're in red.  In fact, you're

10   behind another vehicle and you walk across the street.                    11:45:12

11           I don't know if the rocks started yet.  You tell me

12   when the rocking is started.

13           Has the rocking started?

14   A.  I don't believe so just yet.  It might be right in here or

15   just a little after.                                                      11:46:08

16   Q.  And you were standing next to Officer Zuniga's vehicle;

17   correct?

18   A.  I am to the east, northeast corner of Agent Zuniga's

19   -- Officer Zuniga's vehicle.  And Agent Wynecoop is to my

20   right.  He's actually closer to the vehicle.                              11:46:22

21   Q.  Now you're walking across the street.

22   A.  I'm cautiously approaching the fence across the street,

23   yes, sir.

24   Q.  But you saw nothing come over towards you?

25   A.  At this point in time I don't recall if -- my focus,                  11:46:31

1    again -- I would have to break my focus of looking through the

2    fence into Mexico to look up in the air to try to see a rock in

3    the darkness of the night.

4            No, I did not look up in the air, sir.

5    Q.  Now you would agree with me that when you got up to the          11:46:47

6    fence --

7            If you want it play it, Mary Sue.

8            Before you fired your gun, you would agree with me

9    that you were not in any danger of any rocks coming over the

10   fence and hitting you; correct?                                      11:47:03

11   A.  Over the top of the fence?

12   Q.  Yes, sir.

13   A.  No, I don't believe that where I'm standing a rock can come

14   and hit me up on top of the head or anything right there, no.

15   Q.  Exactly.  So you weren't -- you weren't threatened by any        11:47:13

16   rocks?

17   A.  However, they could come through the fence, sir.

18   Q.  I understand that.  But no rock was going to come over the

19   fence and hit you on top of the head; right?

20   A.  At that point in time, by looking at this, if I knew only        11:47:24

21   that those were the only rock throwers from that position, then

22   I would say yes.  But at that point I didn't know that's

23   exactly only -- that, hey, you only have these rock throwers,

24   there's nobody to the west, there's no more people to the east.

25   Based on that information alone, at that time I would say no.        11:47:40

─────── **Lonnie Swartz - Cross-Examination** ───────

1    Q.  You were not -- you were not in a threatening position?

2    A.  I was -- I was.  There's perforations in the fence.

3    Q.  Other than a rock coming through the fence -- which, of

4    course, you didn't see it, but other than a rock coming through

5    the fence you were not in danger of being rocked; correct?      11:47:56

6    A.  Based on this -- on this right here, with only the three

7    individuals here, no.

8    Q.  Okay.

9    A.  Not on the top, no.

10   Q.  So tell us what you saw when you came to the fence.         11:48:05

11   A.  I saw -- I saw two individuals, two dark figures.

12   Q.  You can't describe them any more than that?

13   A.  No, sir.  They were dark adult-sized subjects.  I saw two.

14   I saw -- I first saw one, and then immediately I saw a second

15   one to the right or to the west of that first one, sir.          11:48:24

16   Q.  Did you call out to them?

17   A.  I don't recall saying anything.  I don't recall.

18   Q.  Why not?

19   A.  I just don't remember if I did.  But I don't remember.

20   Q.  Why wouldn't you have called out to them in Spanish to stop  11:48:35

21   throwing rocks?

22   A.  You don't have to give a command.

23   Q.  Go ahead.

24   A.  If you can, you can, but you don't have to.  It's not

25   policy that you have -- but I don't recall if I did or not.      11:48:46

Lonnie Swartz - Cross-Examination

1   Q.  But you did not?

2   A.  I don't recall.  I can't tell you I didn't if I don't

3   recall, sir.

4   Q.  Fair enough.

5          So what happened next?                                11:48:55

6   A.  Upon seeing the first individual, I then saw a second

7   individual.  They were -- again, they were adult-sized

8   subjects.  I can't give you any more description than that.

9          I then seen the first individual make a forward

10  throwing motion, followed in unison by the second individual.  11:49:12

11  Q.  When did you fire your gun?

12  A.  At that time I brought my weapon up.  Again, I'm in very

13  close proximity to the fence.  I seen the first individual make

14  a cock back motion like this, that's when I fired.

15  Q.  How many times did you fire?                              11:49:29

16  A.  I don't recall, sir.

17  Q.  You don't recall?

18  A.  No, I don't recall.

19  Q.  What happened then?

20  A.  I saw the subject start like he was making a motion like he  11:49:38

21  was going down.

22  Q.  What did you do, do you fire again?

23  A.  I stopped.

24  Q.  You stopped shooting?

25  A.  I stopped, yes.                                           11:49:49

UNITED STATES DISTRICT COURT

Lonnie Swartz – Cross-Examination

1    Q.  So you can't tell us how many times you fired your gun?

2    A.  No, sir.

3    Q.  You can tell us in quite vivid detail that Agent Wynecoop

4    had a sick look on his face, and told you twice that he had

5    been hit by a rock, but you can't tell this jury how many shots          11:50:03

6    you fired?

7    A.  No, sir, I can't.  I'd be dishonest to this jury and this

8    Court if I said I remembered exactly how many shots I fired.  I

9    don't recall.

10   Q.  And what's the next thing you did?                                    11:50:14

11   A.  I moved westbound down the fence.

12   Q.  Why?

13   A.  I was seeing if there was any more rock throwers.

14   Q.  Did you see any more?

15   A.  When I got down the fence, I did see what I perceived to be          11:50:24

16   a second rock thrower, sir.

17   Q.  Where was he?

18   A.  Where was the individual?

19   Q.  Yeah.

20   A.  The individual was in the street or in the sidewalk.  I             11:50:33

21   don't recall as -- when I'm moving down to the second position,

22   things get very distorted.  I don't know why, I just -- I can't

23   explain it.  I'm not a doctor of the mind, I don't know why it

24   does that.

25        I just -- I moved down the fence, and I looked for              11:50:53

UNITED STATES DISTRICT COURT

1    what I perceived to be a second rock thrower, and I fired my

2    weapon.

3    Q.  What were you firing at?

4    A.  What I perceived to be a second rock thrower, sir.

5    Q.  That was different from the first one; correct?  The first        11:51:05

6    rock thrower that you say you saw go down.

7    A.  The first rock thrower that I fired my weapon on, he made

8    the motion like he was going down and I stopped, yes.

9    Q.  You didn't stop and look and make sure he went down?

10   A.  No, sir, I move down the fence.                                    11:51:21

11   Q.  Isn't part of your training to make sure that the threat

12   has been eliminated?  Wouldn't you stand there and watch and

13   make sure that after you shot the person that he was no longer

14   a risk?

15   A.  I believe what I saw a person to be stopped, we're trained        11:51:33

16   to stop the threat.  And from my perception, from that point

17   that individual appeared to be stopped, and that's why I

18   stopped firing and I went westbound down the fence to see if

19   there was any more rock throwers.

20   Q.  So there's no more reason to shoot at the person who was         11:51:48

21   down on the ground; correct?

22   A.  No, sir, not -- that's why I moved.

23   Q.  That's why you moved?

24   A.  That's why I moved.

25   Q.  But there was no more reason to shoot at him because he was       11:51:57

1    down on the ground and he was no longer a threat; correct?

2    A.  That correct.

3    Q.  So how far did you move down the fence?

4    A.  I don't know.  It didn't seem very far.  I don't know.

5    Again, I don't know how far I moved down.  I don't know.          11:52:09

6    Q.  Where was the second rock thrower?

7    A.  I believe that what I perceived the second rock thrower to

8    be in the street -- the street or the sidewalk.  Again, it was

9    very dimly lit.  And as I'm going down the fence, again, as I

10   stated earlier, things started to get very unclear, very grey.   11:52:26

11   Q.  Let me show you Exhibit No. 6 -- actually 134, which has it

12   been admitted into evidence.

13        Do you recognize this photograph as being admitted

14   into evidence in this case?

15   A.  Yes, sir, I've seen this photograph.                         11:52:58

16   Q.  And the lighting's pretty good?

17   A.  There's -- I don't know if the lighting is good or if it's

18   a flash or what, but there is light on this photograph.

19   Q.  Right.  And you're telling us that it was so dark out there

20   that you're not sure what happened to the first person you shot  11:53:12

21   at, and you're not sure where the other person was; is that

22   correct?

23   A.  Can you say that --

24   Q.  Yeah.  The lighting -- your testimony is, the lighting was

25   not good enough for you to tell what happened to the first       11:53:26

1   person you shot at and where the second person actually was?

2   A.  When I saw the first person, I saw them to make that motion

3   to go down.  Where they went down at, whether they were in the

4   street or the sidewalk, I can't tell you.  These are split

5   second decisions that I'm making.                              11:53:43

6           Now when I moved westbound down the fence, down the

7   fence line, and I looked and I perceived another rock thrower,

8   I fired.  Exactly where they were at in translation to that, I

9   can't honestly tell you that.

10  Q.  My question is about the lighting.  The lighting was clear   11:53:58

11  enough for you to be able to see not only the person who was on

12  the ground, but as you say, the second rock thrower.

13          Just yes or no.

14  A.  The lighting -- it was dimly lit, sir.  It was much darker

15  from where -- what I was looking into.                         11:54:11

16          MR. KLEINDIENST:  If we can go back to the videotape.

17  BY MR. KLEINDIENST:

18  Q.  So if we watch the videotape after you fired from the first

19  position --

20          Do you want to stop right there?                       11:54:30

21          Do you see anybody else on the street other than the

22  person laying on the ground?

23  A.  Yes, sir.

24  Q.  Where?

25  A.  I see an individual on -- it appears on the video to be on   11:54:37

*Lonnie Swartz – Cross-Examination*

1    a motorcycle.

2    Q.  Is that the person you thought was the second rock thrower?

3    A.  I don't -- I can't definitively say what I perceived when I

4    moved down the fence, other than I saw a second rock thrower.

5    I don't believe I saw anybody on a motorcycle.  I saw a person          11:54:56

6    making -- like a rock -- person throwing a rock.

7    Q.  My question to you is, look at the left side of the screen.

8    Do you see anybody else other than the person down on the

9    ground?

10   A.  On the left screen I do not see anybody else on the screen         11:55:09

11   than is on the ground.

12   Q.  You're not saying the person on the motorcycle was throwing

13   rocks, are you?

14   A.  Well, no, they're on the right.  I thought that's what you

15   were asking me, as far as did I see the person on the                  11:55:21

16   motorcycle earlier.

17   Q.  I'm talking about the screen on the left.

18   A.  No, sir.

19   Q.  Okay.  Now it's about eight or nine seconds that you run

20   down the fence.  Would you disagree with that or would you             11:55:36

21   agree?

22   A.  It's a few seconds to go down the fence.  I don't know

23   exactly what the time frame is.

24   Q.  And you can't remember because everything's grey; correct?

25   A.  Things are starting to get distorted at this time, sir.           11:55:46

─── **Lonnie Swartz – Cross-Examination** ───

1    Q.  Isn't that a convenient way, Mr. Swartz, for not having to

2    account for your specific actions that night, by all of a

3    sudden -- when you can remember everything else so clearly, all

4    of a sudden everything gets grey?

5    A.  Sir, all I can tell you is what I remember that night.      11:56:01

6    Q.  Okay.  Let's look at the screen now.

7         Can you tell us where the second rock thrower is?

8    A.  I do not see on this screen -- on --

9    Q.  Look at the left side of the screen.

10   A.  -- where there is another rock thrower.                    11:56:18

11   Q.  Where was the other rock thrower that you thought you saw,

12   where was he located?

13   A.  On the street or on the sidewalk.  But I perceived a second

14   threat, that's why I fired my weapon.

15   Q.  Do you want to draw an X where you think you saw the second 11:56:28

16   person?

17   A.  I would be dishonest to you if I drew an X on the screen to

18   definitively say exactly where I saw -- again, when I got down

19   to this second shooting position, I perceived a second threat.

20   Q.  Did you shoot at him?                                       11:56:43

21   A.  I fired my weapon.

22   Q.  How many times?

23   A.  I don't know, sir.

24   Q.  You don't remember?

25   A.  I don't recall, no.                                        11:56:49

UNITED STATES DISTRICT COURT

**Lonnie Swartz – Cross-Examination**

1  Q.  Is that part of the grey zone now all of a sudden you're in

2  you can't remember how many times you fired your weapon?

3  A.  Again, sir, all you tell you is what I remember that night.

4  Q.  What happened after that?

5  A.  What happened after I fired my weapon?                     11:57:01

6  Q.  Yes.

7  A.  I backed away from the fence.

8  Q.  And what happened then?

9  A.  I heard a metallic sound at my feet, sir.

10  Q.  And that was your magazine; correct?                      11:57:13

11  A.  Yes, it was --  yes, it was my magazine.

12  Q.  You remember hearing that, but you don't remember where the

13  second rocker was that you say you shot at?

14  A.  That's correct, sir.

15  Q.  Do you remember changing your magazine?                   11:57:24

16  A.  No, sir, I do not remember reloading, no.

17  Q.  Do you remember after you changed your magazine going back

18  up to the fence --

19  A.  No.

20  Q.  -- a third time?                                          11:57:34

21  A.  No, sir, I don't.

22  Q.  You don't remember that at all?

23  A.  Sir, all I can tell you, what I remember.  And I remember

24  going to that second firing position.  I remember firing my

25  weapon on a second rock thrower.  From there I remember backing   11:57:45

UNITED STATES DISTRICT COURT

**Lonnie Swartz – Cross-Examination**

1   away from the fence.  That's what I remember.

2   Q.  You don't remember going to the fence a third time?

3   A.  No, sir, I don't.

4   Q.  You don't remember firing a third time?

5   A.  No, sir, I don't.                                    11:57:57

6   Q.  You have no explanation for why you did?

7   A.  All I can say, sir, is again what I remember that night.

8   Q.  Okay.  Let me ask you this:  How many bullets entered the

9   body of Jose Antonio Elena?

10  A.  According to the autopsy, I believe they recovered       11:58:11

11  nine -- excuse me.  I think they recovered six projectiles from

12  his body, and I believe there was three that they recovered

13  from the street, according to the reports, if I'm accurate on

14  that.

15  Q.  Actually, just to refresh your memory, there was ten bullet  11:58:28

16  wounds to Jose's body; correct?  Does that refresh your memory?

17  A.  Yes.  I thought you were asking me about actual rounds

18  recovered.

19  Q.  Bullet wounds to the body.  There were ten?

20  A.  Yes, sir.                                              11:58:42

21  Q.  And there was two bullets that were found -- or two

22  expended bullets that were found on the ground on either side

23  of his body; correct?

24  A.  I believe so.

25  Q.  And you heard the testimony of Mr. Haag who found evidence  11:58:51

UNITED STATES DISTRICT COURT

1    that on the wall next to the body there was evidence of other

2    bullet strikes; correct?

3    A.  I believe he had testimony to that, yes, sir.

4    Q.  So we're talking about how many bullets total -- by my

5    count, anywhere from ten to 13 bullets were either in the body          11:59:06

6    or near the body of Jose Antonio Elena?

7    A.  Sir, it's my recollection that they recovered nine bullets,

8    sir, six out of the body and three off the ground.  I don't

9    know if that's what you're asking me.

10   Q.  We know that ten hit the body, so that's ten; right?              11:59:24

11   A.  Okay.

12   Q.  And we know they recovered three on the ground; correct?

13   A.  I believe there was three on the ground, yes.

14   Q.  And do you recall Mr. Haag's testimony that one of the ones

15   that was recovered from the ground probably just hit the wall          11:59:37

16   and didn't go through the body?

17   A.  I believe that's what he said, yes.

18   Q.  So that would make it at least now 11 bullet; correct?

19   A.  Okay.  Yes.  I'm not disagreeing with you.  I don't know

20   the exact count.                                                       11:59:53

21   Q.  And then Mr. Haag testified that there was evidence of

22   other bullet impacts on the wall.  You heard his testimony?

23   A.  He said there was.

24   Q.  Right.

25   A.  Yes, sir.                                                          12:00:02

─────────── **Lonnie Swartz – Cross–Examination** ───────────

1    Q.  So there could have been at least more than 11 bullets

2    fired either into Jose Antonio Elena, or it hit the wall near

3    where he was?

4    A.  It's speculation.  I don't know, sir.

5    Q.  Do you know how many rounds you fired that night?          12:00:15

6    A.  No, sir, I don't.

7    Q.  Can you tell this jury why at least ten of the 16 rounds

8    that were fired ended up in the body of the first rock thrower?

9    A.  Sir, all I can tell you is that night I perceived a

10   second -- I perceived a second rock thrower, a second threat,   12:00:31

11   and I fired.

12   Q.  Do you have an explanation for why ten of the 16 bullets

13   ended up in the body of Jose Antonio Elena?  Is my question.

14   A.  No, sir.

15   Q.  You can't tell us?                                          12:00:46

16   A.  No.  I know that to be true now, the fact that

17   he -- according to the autopsy report, that he received those

18   wounds on his back.  But all I --

19   Q.  Go ahead.

20   A.  All I can tell you is what I perceived that night and what  12:00:58

21   I fired on.

22       In the Border Patrol, sir, we are not trained to shoot

23   anybody that is laying prone on the ground when they pose no

24   threat of means, opportunity, intent.  And I would never

25   intentionally fire upon anybody who did not pose that threat.   12:01:17

1   When I moved down to that second shooting position, I perceived

2   a second threat.  That's why I fired.

3          I don't know how many rounds I fired.

4   That's –– that's the way I remember it, sir.

5   Q.  But they all went into the body of Jose Antonio Elena.                    12:01:31

6   A.  Sir, again, that's all I can tell you, is I fired on a

7   second individual when I moved town that fence.  That's what I

8   remember, sir.

9       (Discussion off the record between Government counsel.)

10         MR. KLEINDIENST:  Judge, is this a good time to take          12:02:01

11  the lunch break?

12      (At sidebar on the record.)

13         THE COURT:  How much more do you think you have?

14         MR. KLEINDIENST:  Twenty minutes, maybe.

15         THE COURT:  Let's go ahead and finish.                        12:02:21

16         MR. KLEINDIENST:  Okay.

17      (End of discussion at sidebar.)

18         THE COURT:  We're going to go into the lunch hour a

19  little bit.

20      (Discussion off the record between Government counsel.          12:02:51

21  BY MR. KLEINDIENST:

22  Q.  When the video –– as the video goes, tell us where you

23  think you fired at the second rocker.

24          And by the way, do you see the street light here on

25  the left?                                                            12:04:03

─────────── **Lonnie Swartz - Cross-Examination** ───────────

1    A.  I do, sir.

2    Q.  And that light was obviously lit that night when the

3    shooting happened; right?

4    A.  Yes, sir.

5    Q.  Okay.                                                    12:04:08

6            Where did you see the second rocker?

7    A.  Sir, again, as I previously stated, on the left screen I do

8    not see another rocker at this time, on the screen itself.

9    Q.  You don't remember how many times you fired your gun from

10   any of the three positions; correct?                         12:04:34

11   A.  No, sir, I don't.

12   Q.  You don't remember moving down the fence for more than a

13   couple seconds; correct?

14   A.  It didn't seem like I went very far down the fence, no.

15   Q.  You don't remember where the second rocker was that you say  12:04:44

16   you shot at; correct?

17   A.  Either he was in the street or he could have been by the

18   sidewalk.  But to definitively say, no, I just perceived a

19   second threat, that's why I fired.

20   Q.  You don't remember now many rounds you fired.             12:04:59

21   A.  No, sir.

22   Q.  You don't remember changing your magazine.

23   A.  No, sir, I don't.

24   Q.  But you do now remember hearing your foot hit the magazine

25   on the ground; right?                                        12:05:09

———— **Lonnie Swartz – Cross-Examination** ————

1    A.  Yes, sir, I do.

2    Q.  And you remember picking it up.

3    A.  Yes, I do.

4    Q.  And you remember putting it in your pocket.

5    A.  I put it in my cargo pocket.                          12:05:14

6    Q.  And then you were backing away from the fence; correct?

7    A.  I remember backing away from the fence.

8    Q.  And then you remember getting on your radio and saying

9    something; right?

10   A.  I believe I got on the radio before I backed away from the   12:05:23

11   fence, sir.

12   Q.  And you remember speaking on the radio; correct?

13   A.  Yes, sir, I do.

14   Q.  And what do you remember saying?

15   A.  It was -- again, it's not verbatim, but shots fired,    12:05:32

16   there's one 10-7 Mike side, I believe.

17   Q.  You remember saying that?

18   A.  Something very close to that, yes, if not that.

19   Q.  And then you remember going back to the telephone pole.

20   A.  Yes, sir, I do, I remember the telephone pole.         12:05:46

21   Q.  And then you remember vomiting.

22   A.  Yes.

23   Q.  And now on the stand today you sat there and cried at the

24   end of your testimony on direct.  Do you remember that?

25   A.  Yes, I did.                                            12:05:56

──────── **Lonnie Swartz – Cross–Examination** ────────

1   Q.  Were you crying for yourself or were you crying for the

2   person you just had killed?

3   A.  Sir, I was crying because I discharged my weapon at a human

4   being.  And I don't ever feel good about that, ever.

5   Q.  There were points throughout that night where you could          12:06:12

6   have made the decision not to use lethal force, but you decided

7   to do so; correct?

8   A.  That was the only thing on my belt to stop them rocks.  My

9   partner was already hit.  I had a police dog that was struck.

10  That rock almost hit that officer.  It's dark, I can't see them    12:06:29

11  coming over the fence.  I don't know how many rocks are coming

12  over the fence, but I heard the one on the fence, and my

13  partner is hit, and I'm going to defend myself and I'm going to

14  defend my partner.

15          MR. KLEINDIENST:  I have nothing further.                   12:06:43

16          MR. CHAPMAN:  No further questions.

17          THE COURT:  Jurors have any questions, please place

18  them in writing.

19      (At sidebar on the record.)

20          THE COURT:  How are the PLS and the FN 303 typically        12:07:30

21  carried if they don't have straps?

22          What are the sizes of these devices?

23          Is the $CO_2$ canister attached to the grip of the

24  pepperball gun, or is it -- is it carried separate?

25          Does the Border Patrol require a report to be               12:08:00

UNITED STATES DISTRICT COURT

1    completed for every rocking incident or only ones where less

2    than lethal or lethal force was used?

3              Have you been involved in any rockings where you did

4    not complete a report?

5              Did any Border Patrol agents or Nogales Police call          12:08:15

6    out that they had retreated and/or found suitable cover from

7    the rocks?

8              Have you ever had to fire your weapon in the line of

9    duty?

10             Was there anyone still on the fence when you fired          12:08:42

11   your weapon?

12             I assume this is before.

13             MS. FELDMEIER:  No -- oh.

14             THE COURT:  Are Border Patrol agents required to have

15   a psychological evaluation or assessment annually?                    12:08:59

16             Are you taking some medications for some health issue?

17             Can you tell us what those medications are?  Before

18   October 10th, 2012, and now.

19             MR. CHAPMAN:  I don't think that's appropriate to ask.

20             MR. CALLE:  Is there any testimony?                         12:09:26

21             THE COURT:  I don't think there is any testimony about

22   it.

23             Is he on any now?

24             MR. CHAPMAN:  I don't believe so, but I don't know.

25             THE COURT:  If you ask could you -- I don't know what       12:09:39

```
 1    that means.
 2             MS. FELDMEIER:  I bet that's not another question.
 3             THE COURT:  I think they started then stopped.
 4             If less lethal weapons were available to you, would
 5    you rather use it than firing your gun?                        12:10:02
 6             Were there less lethal weapons not available in your
 7    agency or did you not equip yourself with it?
 8             Who's supposed to provide you with this?
 9             Why did you not make a report on this incident?
10             Did you shout for --                                  12:10:22
11             MS. FELDMEIER:  Did you shout for -- shout for a
12    warning before you fired?
13             THE COURT:  Did you shout -- yeah, that look like
14    warning to you?
15             MR. CHAPMAN:  I think it's warning.                   12:10:37
16             THE COURT:  Before you fired your gun.
17             Do you have corrective lenses or contact lenses?
18             If yes, were you wearing them on the night of the
19    shooting?
20             Do not recall pulling out his gun the first time at   12:10:57
21    231331, but remembered doing it when he got closer to boundary
22    fence.
23             I'm not sure if that's a question or an observation.
24             I'll just leave it like it is.  All right.
25         (End of discussion at sidebar.)                           12:11:15
```

Lonnie Swartz - Jury Questions

1     THE COURT:  Mr. Swartz, I have several questions from

2  the jurors I'm going to ask on their behalf.

3     THE WITNESS:  Yes, sir.

4     THE COURT:  How are the PLS and the FN 303 typically

5  carried if they don't have straps?                          12:11:38

6     THE WITNESS:  These less lethal force devices are

7  carried in the vehicle with the agent who is either working a

8  static X, or if they're on a roving patrol they'll have

9  some -- some agents will have these in the vehicle, they'll

10  have them usually laying on top of the passenger seat, because   12:12:01

11  we're usually working by ourselves.

12     When you elect to use this weapon, again, it's in your

13  hands the entire time.  Again, there's no -- I don't ever

14  recall seeing anyone with a shoulder strap like you would have

15  with a shotgun or a rifle.  But they're typically kept in the   12:12:18

16  vehicle on the seat so they're easily readily accessed.

17     THE COURT:  What are the sizes of these devices?

18     THE WITNESS:  The -- of the PLS and 303, sir?

19     THE COURT:  Yes.

20     THE WITNESS:  The PLS -- again, this is just an          12:12:35

21  estimation, the sizes of them.  I would say they're probably

22  anywhere from 30 to 34 inches long.  They use compressed air to

23  launch a projectile down a barrel.  And the PLS will generally

24  have anywhere from -- again, this an estimation, 60 to 80

25  projectiles in a hopper that sits above the barrel.          12:12:58

UNITED STATES DISTRICT COURT

1    The FN 303 is a different identify type of less

2    lethal, where instead of using loosely placed balls inside of a

3    hopper, this one actually uses a disk magazine that will hold

4    the actual rounds.  And I believe it holds 12 to 15.

5    THE COURT:  Is the CO2 cannister attached to the grip          12:13:18

6    of the pepperball gun or is it carried separately?

7    THE WITNESS:  On the pepperball launcher the CO2

8    canister is actually used as the stock of the less lethal

9    device.  They actually incorporate that in, so when you bring

10   it up to your shoulder, that is actually part of the stock      12:13:35

11   system.

12   On the FN 303, the air device is along the barrel on

13   the side, one side of the -- like the left or the right side, I

14   don't recall.

15   THE COURT:  Does the Border Patrol require a report to          12:13:47

16   be completed for every rocking incident, or only ones where

17   less than lethal or lethal force was used?

18   THE WITNESS:  If an agent calls out a rocking on the

19   radio, I believe a report is generated.  However, whenever a

20   less lethal device is used in response to a rocking, that is     12:14:07

21   always reported.  There is always some type of record of that.

22   THE COURT:  Have you been involved in any rockings

23   where you did not complete a report?

24   THE WITNESS:  No.  It is per policy by Border Patrol

25   policy that if you are involved in a rocking and you deploy      12:14:23

Lonnie Swartz – Jury Questions

1   less lethal, whether it be hand thrown stingballs, hand thrown

2   chemical munitions, a pepper launcher, or an FN 303, a report

3   is made.

4           THE COURT:  Did any Border Patrol agents or Nogales

5   Police call out that they had retreated and/or found suitable          12:14:42

6   cover from the rocks?

7           THE WITNESS:  Nobody called on the radio that said

8   they had retreated from the rocks, no, not that I heard.

9           THE COURT:  Are Border Patrol agents required to have

10  a psychological evaluation or assessment annually?                     12:14:58

11          THE WITNESS:  I do not believe so.

12          THE COURT:  Have you ever had to fire your weapon in

13  the line of duty?

14          THE WITNESS:  No, this was the first time.

15          THE COURT:  Was there anyone still on the fence when           12:15:16

16  you fired your weapon?

17          THE WITNESS:  I do not recall.  My focus was on the

18  threat in the country of Mexico, I don't know if they were on

19  the fence or not at that time.

20          THE COURT:  If less lethal weapons were available to           12:15:32

21  you, would you rather use it than firing your gun?

22          THE WITNESS:  If I had had a less lethal device on me,

23  I would have used that option first.

24          THE COURT:  Were there less lethal weapons not

25  available in your agency or did you not equip yourself with it?        12:15:48

UNITED STATES DISTRICT COURT

Lonnie Swartz – Jury Questions

1          THE WITNESS:  Sir, I don't understand the question.

2    Can you repeat it, please?

3          THE COURT:  Were there less lethal weapons not

4    available in your agency or did you not equip yourself with it?

5          THE WITNESS:  The night that this incident happened,          12:16:01

6    again, I was working the port of entry.  I don't know if there

7    was even a POS available that night.  But even in the event

8    that there was, work in the port of entry, that's not something

9    that you would have on your person.  Again, that's

10   inappropriate.  It's intimidating to the public.  And it just          12:16:20

11   does not -- that item would not be appropriate for the type of

12   work that we were performing that night.

13         THE COURT:  Who's supposed to provide you with a less

14   than lethal weapon?

15         THE WITNESS:  Every night before you go out into the          12:16:37

16   field, no matter what shift you're on, day shift, swing shift

17   or midnight shift, they will have a muster.  At a muster all of

18   the field agents that are out in the field that particular

19   shift will all go into a room, and the supervisor will discuss

20   trends that are happening, things that need to be discussed          12:16:55

21   over that shift.

22         When that briefing is over, if you need to check out

23   an item, you will go to what is called the equipment issue.

24   Equipment issue is the actual -- it's a window, and you'll have

25   supervisors that work in that area.  And if you request,          12:17:08

1    whether it be a long rifle, a long gun like a rifle, or a

2    shotgun, or a less lethal device, you will check it out and

3    they will scan it out to your star number for that shift.

4              THE COURT:  Why did you not make a report on this

5    incident?                                                          12:17:26

6              THE WITNESS:  I'm sorry, sir, can you please --

7              THE COURT:  Why did you not make a report on this

8    incident?

9              THE WITNESS:  On this incident I did call over the

10   radio and I notified 865 radio dispatch of what had happened.      12:17:37

11   Again, I called out shots fired, one 10-7 Mike side.

12             After that incident you are not required to make any

13   type of report.  That is all done by the supervisors at this

14   time, because it's a critical incident.

15             THE COURT:  Did you shout a warning before you fired     12:18:00

16   your gun?

17             THE WITNESS:  I don't know if I did or not.  I may

18   have, I might not have.  I don't recall.

19             THE COURT:  Do you wear glasses or contact lenses?

20             THE WITNESS:  No, I do not.  I have 20/20 vision.        12:18:13

21             THE COURT:  Those are all the questions from the

22   jurors.  You may step down.

23             We'll take our afternoon recess.

24             Excuse me, lunch recess.  It's not afternoon yet.

25             Let's come back at -- let me see counsel.                12:18:34

Lonnie Swartz – Redirect Examination

1        (At sidebar on the record.)

2            THE COURT:  I was going to take the break because this

3    could take five minutes to ask questions based on the jurors'

4    questions or it could take 45 minutes to ask questions on the

5    jurors' questions.  I'm not sure which --                     12:18:58

6            MR. CHAPMAN:  I only have one question to ask him, a

7    clarification on when he has to report rocking incidents, that

8    was it?

9            THE COURT:  Did you have something?

10           We'll ask that one question then.                     12:19:09

11       (End of discussion at sidebar.)

12           THE COURT:  Go ahead, Mr. Chapman.

13                        REDIRECT EXAMINATION

14   BY MR. CHAPMAN:

15   Q.  I just wanted to clarify.  When there's a rocking incident 12:19:21

16   but you don't have to use any kind of force, do you have to

17   report that also?  Or is it just when you deploy some level of

18   force that you have to file a report?

19   A.  You know, sir, I believe it's just when we use a level of

20   force.  But I could be wrong in stating that it's reported or  12:19:41

21   not.  I believe there's a report, but I cannot be certain if

22   rocks are just coming over the fence.

23           MR. CHAPMAN:  Okay.  Thank you.

24           THE COURT:  All right.  Now you may step down.

25           THE WITNESS:  Thank you, sir.                         12:19:55

UNITED STATES DISTRICT COURT

1          THE COURT:  And we're going to take our lunch recess.

2   How about 1:40?  One four zero.  One four zero.

3          Thank you.  Remember the admonitions.

4      (Recess at 12:20 p.m.)

5      (Further proceedings held on the record not included in

6   this transcript.)

7

8                            -oOo-

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CR-15-1723-TUC-RCC – April 9, 2018

1

2

3

4                    C E R T I F I C A T E

5

6         I, CANDY L. POTTER, do hereby certify that I am duly

7    appointed and qualified to act as Official Court Reporter for

8    the United States District Court for the District of Arizona.

9         I FURTHER CERTIFY that the foregoing pages constitute

10   a full, true, and accurate transcript of all of that portion of

11   the proceedings contained herein, had in the above-entitled

12   cause on the date specified therein, and that said transcript

13   was prepared under my direction and control.

14         DATED at Phoenix, Arizona, this 10th day of April,

15   2018.

16

17

18

19                              s/Candy L. Potter_____
                                Candy L. Potter, RMR, CRR

20

21

22

23

24

25

UNITED STATES DISTRICT COURT