**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

———————————

| | | |
|---|---|---|
| **United States of America,** | ) | |
| | ) | No.  **CR-15-1723-TUC-RCC-DTF** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Tucson, Arizona |
| | ) | March 23, 2018 |
| **Lonnie Ray Swartz,** | ) | 3:22 p.m. |
| | ) | |
| Defendant. | ) | |
| ————————————————— | ) | |

**BEFORE:  THE HONORABLE RANER C. COLLINS, JUDGE**

**REPORTER'S EXCERPTED TRANSCRIPT OF PROCEEDINGS**

**JURY TRIAL**
**DAY 4**

**(TESTIMONY OF JOHN ZUNIGA)**

Official Court Reporter:
Candy L. Potter, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 36
Phoenix, Arizona 85003-2151
(602) 322-7246

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

CR-15-1723-TUC-RCC – March 23, 2018

1

2                    **A P P E A R A N C E S**

3

For the Government:
    U.S. Attorney's Office Tucson
    By:  **Wallace Heath Kleindienst**, Esq.
         **Mary Sue Feldmeier,** Esq.
    405 West Congress Street, Suite 4800
    Tucson, Arizona 85701

For the Defendant:
    Law Offices of Sean C. Chapman
    By:  **Sean Christopher Chapman**, Esq.
    100 North Stone Avenue, Suite 701
    Tucson, Arizona 85701

    Law Office of Jim E. Calle
    By:  **Jamie Ernest Calle, III,** Esq.
    2315 East Hawthorne Street
    Tucson, Arizona 85719

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CR-15-1723-TUC-RCC – March 23, 2018

1

2                        **I N D E X**

3    **GOVERNMENT WITNESS:**        **DIRECT**    **CROSS**    **REDIRECT**   **RECROSS**

4    JOHN ZUNIGA
     By Ms. Feldmeier          4
5    By Mr. Chapman                         33
     By Ms. Feldmeier                                  40
6    By the jury                            47
     By Ms. Feldmeier                                  50
7    By Mr. Chapman                                                        50

8

9

10   Discussion held at sidebar         30, 36, 45

11

12

13

14                      **INDEX OF EXHIBITS**

15   **EXHIBIT**                             **IDENT**   **RECEIVED**

16   <u>NO</u>.        <u>DESCRIPTION</u>

17   12A       Camera 24 video              23

18   12C       Camera 27 video              23

19   328       Video – side-by-side         328

20   1018      Zuniga interview 10-25-12    35

21   1458      Fredericks file:  Cam 4 and 6
               synchronized_Request2.mp4    33
22

23

24

25

UNITED STATES DISTRICT COURT

──────── John Zuniga – Direct Examination ────────

1      (The following excerpt is the testimony of

2   John Zuniga.)

3      (Jury in at 3:22 p.m.)

4      THE COURT:  Let the record show the jury has returned

5   back to the courtroom, the presence of all counsel and                    15:23:40

6   defendant.

7      You may call your next witness.

8      MS. FELDMEIER:  We call Officer John Zuniga.

9      THE CLERK:  Raise your right hand, please.

10   (JOHN ZUNIGA, GOVERNMENT WITNESS, SWORN.)                                 15:24:00

11      THE CLERK:  Thank you.  Please be seated.

12      Please pull the microphone directly in front of you

13   and speak directly into it.

14      State your full name for the record and spell your

15   last name.                                                               15:24:14

16      THE WITNESS:  My name is John V. Zuniga, Z-U-N-I-G-A.

17      THE COURT:  Agent Zuniga, have you been told that the

18   rule has been invoked in this case?

19      THE WITNESS:  Yes, Your Honor.

20      THE COURT:  All right.  You may proceed.                              15:24:27

21                    DIRECT EXAMINATION

22   BY MS. FELDMEIER:

23   Q.  Where are you employed?

24   A.  The City of Nogales --

25   Q.  In what capacity?  Okay.                                             15:24:55

1    A.  City of Nogales Police Department.

2    Q.  All right.  What you need to do is have that mic right up

3    next to your mouth so it gets picked up.

4    A.  Sorry about that.

5    Q.  No worries.                                              15:25:06

6          So when did you enter on duty as a Nogales Police

7    Officer?

8    A.  April 5th, 1999.

9    Q.  Did you go through an academy?

10   A.  That is correct.                                         15:25:16

11   Q.  Which one?

12   A.  Southern Arizona Law Enforcement Training Center in Tucson,

13   Arizona.

14   Q.  How long is that?

15   A.  Approximately about 17 weeks.                            15:25:22

16   Q.  Oh, wow.  Okay.

17          And as you moved on through the ranks of the Nogales

18   Police Department, did you eventually become a canine officer?

19   A.  That is correct.

20   Q.  When did that happened?                                  15:25:36

21   A.  I was assigned to the Canine Unit June 2nd, 2008.

22   Q.  And were you assigned a canine at that time?

23   A.  That is correct.

24   Q.  Which canine?

25   A.  His name is Tesko.                                       15:25:48

1    Q.   Does Tesko live with you?

2    A.   Yes.

3    Q.   Tesko is now retired?

4    A.   He's been retired, yes, since 2013.

5    Q.   All right.  So in 2008 you got assigned Tesko.                    15:25:58

6         And why don't you tell the ladies and gentlemen of the

7    jury how you learned to work with a dog like Tesko.

8    A.   Well, it's probably been the best joy of my career to

9    actually, you know, work with a German Shepherd that he thinks

10   he's smarter than everybody else.  He's done a lot.  He did a    15:26:22

11   lot of good work for us.

12        I still have him.  He's at home.  He's going a little

13   deaf right now, he can't hardly see.  But it's been a great --

14   a great part of my career to have had him to work with.

15   Q.   With Tesko?                                                      15:26:48

16   A.   Oh, yeah.

17   Q.   When did Tesko retire?

18   A.   July 10th, 2013.

19   Q.   You've since been assigned another dog; right?

20   A.   That is correct.                                                 15:26:58

21   Q.   But we're going to stick with Tesko here, because he was

22   your partner, your canine partner at the time of the incident

23   that's on trial here, October 10th of 2012; correct?

24   A.   That is correct.

25   Q.   So what type of training did you and Tesko go through in        15:27:10

—John Zuniga – Direct Examination—

1   2008?

2   A.  We attended the Arizona Department of Corrections Canine

3   Academy in Tucson, Arizona.

4   Q.  And how long was that?

5   A.  That was approximately ten weeks.                    15:27:22

6   Q.  And during that time what was Tesko trained to do?

7   A.  He was trained to find the odors of narcotics.  And he also

8   served -- he had a second -- we call them purposes, it was a

9   dual purpose.

10  Q.  Okay.

11  A.  So his first purpose was to find narcotics, and the second

12  was as an apprehension or patrol dog.

13  Q.  Okay.  So in other words, if a suspect started to run away

14  from you, you could cue Tesko to go after the suspect?

15  A.  Yes, I give him a command, and he'd go catch him for us.  15:27:57

16  Q.  Okay.  Did you also train Tesko to be around firearms?

17  A.  Firearms?

18  Q.  Yes.

19  A.  Yes, that is correct.

20  Q.  How would you train Tesko to be around firearms?      15:28:10

21  A.  We would -- basically it was part of training where I would

22  hold the dog in one hand, my left hand, and I would perform

23  drills on -- at the firing range.  And I would shoot my gun so

24  he would get accustomed to that.  So he -- if I would -- if I

25  were to ever encounter a situation where I needed to discharge  15:28:39

─────── **John Zuniga - Direct Examination** ───────

1  my gun, the dog knew -- or he knew that that could happen and

2  he wouldn't like bite my hand or hurt me basically.

3  Q.  So Tesko learned to become accustomed to the idea if you

4  shot your gun that it was okay?

5  A.  Yes.                                                   15:28:56

6  Q.  All right.  What about being hit with objects, was Tesko

7  also trained on being hit?

8  A.  I wouldn't say getting hit.  We have certain drills that we

9  do as part of your -- as apprehension work.

10      We knew that if we ever had to encounter this dog to       15:29:16

11  actually apprehend somebody, which is he would bite somebody,

12  the chances of a suspect, you know, hitting him was going to be

13  likely, you know, could happen.

14  Q.  Certainly, they want to beat him off; right?

15  A.  Right.  Hit him or do something to him.                    15:29:34

16      As part of that training we would simulate, you know,

17  covering his eyes, and we use padded sticks as part of the, you

18  know, work that we perform.  And that would ensure that if my

19  dog went in for a suspect or apprehended somebody, he would

20  hold them for me, he would stay there.  And if he got hit, you  15:29:59

21  know, he would stay on the suspect --

22  Q.  On the suspect.

23  A.  -- without letting him get away from us.

24  Q.  And if Tesko gets hit, what is -- how does he react?

25  A.  Well, no one likes to get hit.  So he would definitely let  15:30:15

—John Zuniga – Direct Examination—

1  you know.  He would either -- definitely try to bite you or

2  growl or show you that that's not what he likes.

3  Q.  Okay.  So on October the 10th of 2012, were you on duty

4  that night?

5  A.  That is correct.                                          15:30:37

6  Q.  And do you remember what shift you were working?

7  A.  It was like a late swing, like a late swing shift is what

8  we call it.

9  Q.  Approximately what times does that cover?

10  A.  It usually covers anywhere between, you know, 2:00 to     15:30:47

11  10:00.  Just sometimes -- or later, sometimes we would come in

12  later.

13  Q.  Okay.  And on that night did you work past 10:00 o'clock?

14  A.  That is correct.

15  Q.  And do you know why, if you recall?                       15:31:04

16  A.  I don't remember.  I think I was just -- we had -- I don't

17  really recall, but I know it was after 10:00 that I was --

18  Q.  And what type of vehicle were you in?

19  A.  I was a 2012 Ford Expedition.

20  Q.  Is it marked?                                             15:31:22

21  A.  Completely.

22  Q.  Could you describe the markings on it?

23  A.  Yes.  The front part of the vehicle was black, and the

24  rear, and the middle was white.  And then it had "police" on

25  the side.  And then I believe the rear windows on the side said  15:31:37

─── **John Zuniga – Direct Examination** ───

1   "canine" in red.  And then in the back of the window it said,

2   "caution canine."  And then I think that's it.

3   Q.  And how were you dressed?

4   A.  In my -- we call it our rough uniform, it's just basically

5   a cargo pants, and like a cargo shirt, it's got embroidered --          15:31:58

6   it doesn't have like the steel badge, it's an embroidered badge

7   and embroidered name.

8   Q.  And did you wear a duty belt that evening?

9   A.  Yes, I had my duty belt.

10  Q.  What does that contain?                                             15:32:16

11  A.  My firearm, my firearm magazines, flashlight holder, my

12  Taser, handcuffs, baton, mace, my alarm for my dog, my keys.

13  Q.  Pretty weighted down there.

14  A.  Yeah.  It's a lot of --

15  Q.  And what's this thing about the alarm for your dog?  You            15:32:41

16  were telling me about that earlier, I thought it was kind of

17  interesting.

18  A.  Yeah, it's like a little pager.  It goes on your gear belt

19  and it monitors the sensors inside the vehicle, make sure that

20  the dog is cool.                                                        15:32:52

21       It also serves as a deployment measure, so if I were

22  to get, you know, get hurt or somebody's trying to hurt me, I

23  can press a button, the door would open and the dog comes out

24  and helps me.

25  Q.  That's kind of neat.                                                15:33:07

1    So that evening sometime around 2323 -- which would

2    translate I believe to what time, 11:23?

3    A.  Yes.

4    Q.  Sometime that evening did you receive a dispatch from the

5    Nogales Police Dispatcher?                                    15:33:21

6    A.  Yes.

7    Q.  Okay.  What was the general content of that?

8    A.  Just, you know, they dispatch -- one of the other officers

9    that was with me, Officer Garcia, to the area of West

10   International.  We call it West I for short.  Of a couple      15:33:37

11   suspicious males wearing camouflage clothing.

12   Q.  Where were you and Officer Garcia when this call came in?

13   A.  Lower downtown, there's a bank.  The bank is still there,

14   it's not longer -- it used to belong to the Bank of America.

15   In the little parking lot.                                    15:33:57

16   Q.  Were you guys in your vehicles?

17   A.  Yes, side by side.

18   Q.  I guess you guys call -- what do you call that, window to

19   window or something?  No, I said that wrong.

20       Car to car.                                               15:34:09

21   A.  Yeah, car to car.  Just kind of -- (Indicating.)

22   Q.  Okay.  So that came over.  You're working that night.

23       What happens next?

24   A.  So the call comes out.  He responds to that call.  I'm

25   facing the -- on the opposite end, so he takes off, and then I  15:34:24

———— **John Zuniga – Direct Examination** ————

1   just follow, I try to catch up to him.

2   Q.  What route do you take to get to West I?

3   A.  West Crawford Street.  You take West Crawford Street, make

4   a left on North Sonoita, that merges onto Interstate 19, and

5   then you hang a left, and that turns into Compound, which is          15:34:46

6   later West International.

7   Q.  And as you're driving, are you overhearing the dispatches

8   from Officer Garcia?

9   A.  Yes.

10  Q.  And at some point does Officer Garcia pull to a stop and          15:34:57

11  yell out, "I've got two, I've got two," and starts to run?

12  A.  Yeah.  He said something to the effect that he had -- he

13  had a couple bodies, and that he saw -- I think I believe he

14  called out "bundles," which is a word we use for narcotics.

15  Q.  So did you initially think you were going to go in and just       15:35:20

16  back him up getting the bundles?

17  A.  Yes.  Originally, I mean, we thought two male subjects, we

18  just want to go talk to them or find out what they're doing

19  there, but then it turned to that.

20  Q.  All right.  So do you have any recollection of a call             15:35:37

21  coming out that Quinardo Garcia let you know that there might

22  be dogs in the area he was heading?

23  A.  Yeah.  I believe I told him that I wanted to go over there

24  and get my dog off, because -- you know, to check the area,

25  because sometimes they do that, they'll come in, they drop off       15:35:55

1    the drugs, and then they run back and we can't find them

2    sometimes.  So we use the dog to find them for us.

3    Q.  But then you decided not to take the dog in where

4    Officer Garcia was because there was already dogs in that area;

5    right?                                                          15:36:14

6             MR. CHAPMAN:  Objection, leading.

7             MS. FELDMEIER:  I'll rephrase that.

8    BY MS. FELDMEIER:

9    Q.  Did you make a decision not to go in with Officer Garcia?

10   A.  Yeah.  He said that in the area where he was at that there  15:36:23

11   was a couple of dogs that belonged to the house there.  So he

12   didn't think it would be a good idea for me to come in there.

13   Q.  Do you agree?

14   A.  Oh, yes.

15   Q.  Okay.  So what did you do next?                             15:36:34

16   A.  So then what I did is I -- as I entered West International

17   Street, I could see the people on the fence, climbing the

18   fence.  So then I just -- I came up and I parked in the center

19   of the street there.

20   Q.  And once you got there and parked in the center of the      15:36:52

21   street, what did you do next?

22   A.  I got out of my patrol car and I started speaking to them

23   in Spanish.

24   Q.  What did you guys talk about?

25   A.  I was, you know, telling them, hey, come down.  You guys     15:37:07

1   need to come down, it's dangerous.  And, you know, just trying

2   to get them to come down off the fence.

3   Q.  Did they respond?

4   A.  No, they didn't really -- they didn't really, you know, say

5   anything at first.                                    15:37:27

6   Q.  What did you notice about their body positions on the

7   fence?

8   A.  Well, as they were -- as they kept getting, you know, up

9   into the fence line, one of them almost slipped and fell.

10  Q.  Okay.  Then what happened?                         15:37:43

11  A.  He just said, hey, I'm giving up.

12  Q.  Okay.  And then did the other guy say anything?

13  A.  The other guy said, no, no, we're not giving up.  I'm going

14  to help you.  So he kind of came down the fence and he helped

15  him with his shoulder and he, you know, made sure that he tried 15:38:03

16  to get back up and to the top of the fence.

17  Q.  What did you do when that happened?

18  A.  Well, since he had told me he was going to come down, I

19  came back and I grabbed my dog.

20  Q.  Okay.                                              15:38:25

21  A.  I took him out of my patrol car and had him ready in case.

22  Q.  And where did you bring the dog to?

23  A.  I just brought him down to the -- next to my patrol car on

24  the side there, and had him just -- had with him me on a leash,

25  on a short leash.                                      15:38:43

1   Q.   Okay.  And what were you -- were you trying to cue the dog

2   or do anything with the dog?

3   A.   I wanted them to -- I wanted them to know that I had him,

4   so I just made him bark a few times.

5   Q.   Okay.  How do you do that?                              15:38:55

6   A.   I tell him to bark.

7   Q.   Oh, really?  Wow.

8            So he barked a couple times and then what happened?

9   A.   He'll bark.

10  Q.   Okay.  And then what happened?                          15:39:05

11  A.   After a few barks, you know, we -- you know, we just -- you

12  know, we remained there.  We just kind of -- we kind of waited

13  to see what they're going to do.

14  Q.   Okay.  What's your enforcement goal at this point?

15  A.   Wait and see.                                           15:39:23

16  Q.   Okay.

17  A.   Just to see what --

18  Q.   Sounds like you've done this before.

19  A.   Yes.

20  Q.   All right.  So up to this point was everything pretty much  15:39:29

21  a normal enforcement day for you?

22  A.   Yes.

23  Q.   Then at some point does something happen that changes

24  things a little bit?

25  A.   Yes.  I notice -- or hear rocks coming over.             15:39:44

─────John Zuniga – Direct Examination─────

1  Q.  Now when you say you hear, what are you hearing?

2  A.  One of the -- you hear some like little thumping, you

3  know -- (Indicating.)

4  Q.  Oh, like when you skip a rock over the water but instead

5  you're skipping it on something hard?                    15:40:08

6  A.  Yes.

7  Q.  Okay.

8  A.  So when I heard -- I'm looking up at them, you hear

9  something.  And then I immediately said, okay, these are rocks,

10  so I decided to look higher.                             15:40:21

11  Q.  What did you see?

12  A.  And then I saw a rock in the air.

13  Q.  It actually was like going over your head?

14  A.  Yes.

15  Q.  All right.  So what did you do next?                 15:40:29

16  A.  I backed out -- I backed out of where my patrol car was at,

17  and I was trying to -- you know, trying to take cover, trying

18  to find -- trying to hide.

19  Q.  And while you're doing that, what are the two subjects on

20  the fence doing?                                         15:40:45

21  A.  You know, they still stayed up there.  I didn't -- I don't

22  remember a lot.  But I know they were still up there for a

23  while.

24  Q.  So you're backing around.

25      And, again, is this something you've encountered in    15:41:02

UNITED STATES DISTRICT COURT

─ **John Zuniga – Direct Examination** ─

1   the past in your law enforcement experience, rocks coming over

2   and you're getting out of the way with your dog?

3   A.   Well, this is the first time I encountered it with a dog.

4   Q.   Okay.

5   A.   But I have -- we have been rocked in our cars.                    15:41:15

6   Q.   Okay.  Previously?

7   A.   Yes.  A long time, a while back.

8   Q.   Now let's just get this out of the way.  Have you been

9   rocked before?

10  A.   Yes.                                                              15:41:25

11  Q.   How many times?

12  A.   Say a couple, at least two, three times.

13  Q.   And where do those rockings normally occur?

14  A.   On the -- near the border fence.

15  Q.   Okay.  On the east or the west side, if you recall?           15:41:34

16  A.   The ones I recall have been on the east side.

17  Q.   East side.  So that's where Hamburger Hill is?

18  A.   Yes.  East International Street.

19  Q.   So this is the first time you've been rocked on the west

20  side?                                                                 15:41:48

21  A.   Yes.

22  Q.   So in those situations, what did you do, generally?

23  A.   I was just trying to get to an area where I wouldn't get

24  hit by the rocks.

25  Q.   Were you in the process during any of those of apprehending   15:42:02

————John Zuniga – Direct Examination————

1    anyone?

2    A.  I'm sorry?

3    Q.  Were you in the process of arresting anyone during any of

4    those rockings?

5    A.  On my prior --                                              15:42:13

6            MR. CHAPMAN:  Objection, that calls for a legal

7    conclusion, Your Honor.

8            THE COURT:  Whether he was apprehending somebody or

9    not?

10           MR. CHAPMAN:  Yes.                                       15:42:20

11           THE COURT:  Overruled.

12           THE WITNESS:  You mean prior?

13           MS. FELDMEIER:  Yeah.

14           THE WITNESS:  Yes.  We've been rocked for that

15    purpose.                                                        15:42:27

16    BY MS. FELDMEIER:

17    Q.  Okay.  And what do you do?

18    A.  You try to get away.

19    Q.  Do you leave the guy behind and run away, or do you take

20    him with you?                                                   15:42:33

21    A.  Well, the times we've -- you know, we've had to either let

22    him go, or if we have him we try to take him away.

23    Q.  So if they weren't already in your grasp --

24    A.  Correct.

25    Q.  -- you would take cover?                                    15:42:47

—John Zuniga – Direct Examination—

1   A.  Yes.

2   Q.  If I'm understanding right.

3        And if you already had them and you were in the

4   process of arresting them, you would take them with you --

5   A.  Yes.                                                    15:42:53

6   Q.  -- to a place of safety?

7   A.  Get them away from the area.

8   Q.  And did you ever shoot a rocker?

9   A.  No.

10  Q.  With your gun?                                          15:42:59

11  A.  No.

12  Q.  Okay.  All right.  So this day you've got the dog, the

13  rocks are coming over the fence.  Tell us what happens next.

14  A.  So there's -- these rocks are coming down, and I hide on

15  the opposite end of the patrol car.  And then that's when I   15:43:17

16  hear gunshots.

17  Q.  Okay.  And did you know where they were coming from?

18  A.  No, not -- not -- I mean, when I was behind the car, no, I

19  didn't know where they were coming from.

20  Q.  What did you do next?                                   15:43:33

21  A.  I put my dog back into the patrol car, and then I ran into

22  like -- I call it a -- it was a little hiding spot, a little

23  cove between some trees and a brick wall, and I hunkered in

24  there.

25  Q.  And when did you finally come back out?                 15:43:53

1  A.  Well, once all the gunshots were over, you -- you know, you

2  start seeing officers and Border Patrol agents kind of walking

3  around the area, and then you kind of figured that everything

4  was, you know, okay, it was safe to come out.

5  Q.  Okay.  And when you came -- and let me just back up.          15:44:16

6        At any point during this time when -- let's start with

7  when the rocks started coming.  Did you pull your gun?

8  A.  No.

9  Q.  Okay.  And then after you put -- you backed up with Tesko,

10  did you have your gun out when you had Tesko out?                15:44:33

11  A.  No.

12  Q.  You put Tesko away and you started to run back into cover.

13  Did you pull your gun?

14  A.  Yes.  Once I was in that area I took my gun out.

15  Q.  So you waited until you got to cover, then you pulled the    15:44:44

16  gun?

17  A.  Yes.

18  Q.  And then what direction did you face?

19  A.  Well, I was -- I was literally -- the fence was in front of

20  me.                                                             15:44:56

21  Q.  Okay.

22  A.  So that's -- I just had my gun there with me and just

23  waited.

24  Q.  All right.  And kept a field of vision out on --

25  A.  Yeah.                                                       15:45:04

—————————— John Zuniga - Direct Examination ——————————

1    Q.  Could you see anything from where you were hunkered down?

2    A.  No.

3    Q.  Okay.  No cars, no fence?

4    A.  Just my patrol car.

5    Q.  Okay.  You could keep an eye on the patrol car.                15:45:11

6    A.  My patrol car and the fence.

7    Q.  Did you see anything damage your patrol car while Tesko was

8    in it?

9    A.  No.

10   Q.  All right.  I'd like to show you then a video, it's a         15:45:19

11   side-by-side.  I believe it's 328, but I'm going to verify

12   that.  Okay.  328, the side-by-side full, it's previously been

13   admitted.

14          THE CLERK:  Just one second.  I'm not collecting.

15          MS. FELDMEIER:  You know why you're not collecting?        15:46:08

16   Because I'm not plugged in.  Well, I am.

17          THE CLERK:  Here we go.

18   BY MS. FELDMEIER:

19   Q.  All right.  I've cued this forward a little bit.

20          Officer, you've seen this before; correct?                 15:46:22

21   A.  That is correct.

22   Q.  All right.  I'd like you, as we go through this, to show us

23   where you arrive on scene.

24   A.  Okay.  I'm going to look at the screen that's kind of white

25   and grey.                                                         15:46:42

─────── John Zuniga – Direct Examination ───────

1    Q.  On the right side?

2    A.  On the right side to me.

3    Q.  And do you want to go ahead and circle your vehicle?

4    A.  On the screen?

5    Q.  Yep.                                                          15:47:00

6    A.  (Indicating.)

7    Q.  There you go.

8            All right.  You can hit clear now.  Just tap the

9    bottom of the screen, it will clear.

10           Now what are you doing here?                              15:47:08

11   A.  I'm assessing the situation.  I'm getting out of my car.

12   Q.  Now if you look on the screen on the left, can you see

13   yourself there?

14   A.  Yes.  Down here.

15   Q.  What did you just do?                                         15:47:26

16   A.  I'm getting my dog out.

17   Q.  Okay.  And he's with you.

18   A.  He's down here.

19   Q.  Is this the part where you're telling him to bark?

20   A.  Yeah.                                                         15:47:45

21   Q.  Okay.  And is that you in the bottom left screen there

22   pointing up at the fence?

23   A.  Yes.

24   Q.  At this point nothing unusual is happening, you're just

25   waiting?                                                          15:48:11

UNITED STATES DISTRICT COURT

1   A.  Yeah, we're just waiting.

2   Q.  Now if you can tell me, as we're watching this video, when

3   you think the first rocks start come over.  I'm going to hit

4   pause.

5          Did you just gesture to the guys on the fence, or       15:49:12

6   raise your hand?

7   A.  Yeah.  I'm still talking to them, or saying something.

8   Q.  So you've tried to establish some communication with these

9   folks; right?

10  A.  Yes.                                                        15:49:24

11  Q.  Now this film doesn't have the wider screen, it's been kind

12  of truncated.  So I know there was a cue that you were looking

13  for about your movements.  So I'm going to take you over to a

14  different view, which is 12A.

15         I'm going to fast forward through to this part closer    15:49:57

16  to the time when the rocks start coming down.

17         No, that's not the right one either.  It's 12C.  Sorry

18  about that.

19         Okay.  We're at about 23:14, we zoom out.  And then

20  this is where I'd ask you to show us where you believe the      15:50:26

21  rocks started coming.

22         As you can see, the screen is a little wider when we

23  don't have it on side-by-side.

24         So what's the point of establishing communication with

25  these people on the fence?                                      15:50:50

UNITED STATES DISTRICT COURT

—————— **John Zuniga – Direct Examination** ——————

1    A.  Sometimes they'll come down.  They'll listen.

2    Q.  Okay.

3    A.  They'll give up.

4    Q.  So is that you down there in the bottom left?  We can

5    barely see you; right?                                      15:51:15

6    A.  Yes.  I think --

7    Q.  Back up a little?

8    A.  If you back up a little bit.

9         So I think somewhere -- somewhere here --

10   Q.  Just as you kind of disappear off the screen on the left?   15:51:28

11   A.  Yeah, because I think I'm still talking to them there.  You

12   can see me, I have a hat on.

13        So there's a point there where I'm not on there

14   anywhere, where I think that's probably when the first rocks

15   started coming down.                                        15:51:47

16   Q.  All right.  Let's get you to that spot.  I'll freeze it as

17   soon as I get you past this part.

18        Were you backing up there?

19   A.  Probably right there.  (Indicating.)

20   Q.  All right.  So that's at about 23:15:35 on this camera.   15:52:18

21        Then what I'm going to do is play this through,

22   because I think there's going to be a real quick screen grab of

23   you shortly after the shots are fired.

24        And you've reviewed that both with me and with defense

25   counsel; right?                                             15:52:38

─────John Zuniga – Direct Examination─────

1    A.  Yes.

2    Q.  Right there.

3    A.  Yeah.

4    Q.  So the first shots have been fired.  Where are you?

5    A.  Should I circle it?                                   15:52:57

6    Q.  Please do.

7    A.  Right here.  (Indicating.)

8    Q.  Okay.  Now at this time or at any time prior to this when

9    the rocks were still coming, did you see your dog get hit by a

10   rock?                                                     15:53:14

11   A.  No.

12   Q.  Did you feel your dog get hit by a rock?

13   A.  No.

14   Q.  Did Tesko react as though he had been hit by something?

15   A.  No.                                                   15:53:22

16   Q.  After you came out from the brush later, were you told by

17   somebody that your dog had been hit?

18   A.  Yes.

19   Q.  What happened?

20   A.  I want to say it was -- I can't remember if it was right   15:53:31

21   when I was putting him in or right after, somewhere around

22   there, an agent, I don't know who he was, said, hey, your dog

23   got hit, your dog got hit.

24   Q.  That was a Border Patrol Agent; right?

25   A.  Yes.                                                  15:53:51

1  Q.  So what did you do to follow up on that after the shooting

2  ended?

3  A.  I went back to my car, opened up the door where he's at.

4  He's got -- it's got a special kennel inside.  So he came out.

5  You know, I kind of put my hands on him.  Really there's no way                15:54:08

6  to see, you know, so you just kind of feel, check his sides.

7  Q.  Did he flinch?

8  A.  No.

9  Q.  Did you find any gooey spots where there was blood?

10 A.  No.                                                                          15:54:27

11 Q.  Tesko since 2008 has gone home with you every night and

12 lives with you at your house; right?

13 A.  Yes.

14 Q.  You and Tesko work together and live together; isn't that

15 right?                                                                           15:54:38

16 A.  Yes.

17 Q.  In your opinion was your dog Tesko hit by a rock that

18 night?

19 A.  No, in my opinion I don't think he was hit.

20 Q.  Okay.  Now we have one last demonstrative.  If you could               15:54:47

21 step down.  I need you to mark where you were when this event

22 happened.

23         So if you would grab that poster for me, I'll get

24 this.

25         Okay.  Like the other microphone, we have to hold them          15:55:21

1    really close.

2    A.  Okay.

3    Q.  We don't have to do a lot of detail here.  But show how you

4    came on the scene and kind of where you parked and where the

5    jumper was.                                                          15:55:34

6    A.  So I came off of here.  Came around this way.  And I want

7    to say parked I think somewhere around right here.

8    (Indicating.)

9    Q.  Now you came off of this little thing that none of us know

10   what it is?                                                          15:55:49

11   A.  Yes, it's a water facility or something.

12   Q.  Yes.  A Nogales Police Officer knows what this is.  So this

13   is a water facility.

14        All right.  So you parked kind of off that driveway,

15   is that what you're thinking?                                        15:56:00

16   A.  Yes, somewhere right around here.  (Indicating.)

17   Q.  All right.  Now, when you first heard the rocks dribble

18   along the ground and then saw it come over your head -- I'm

19   going to give you a pen that has your initials on it, JZ -- and

20   if you could put that where you think you were standing when        15:56:15

21   the first rocks started coming over.

22   A.  I want to take a guess right there.  (Indicating.)

23   Q.  Okay.  And if you recall, we were looking at the video and

24   your vehicle was parked in the middle of the road.  So you

25   disappeared off screen.                                             15:56:40

1    Would it be fair to say you disappeared off screen as

2  you were kind of rounding the back of your vehicle?

3  A.  That is correct.

4  Q.  So you're thinking maybe the rocks started when you were in

5  front or on the side of it?                                    15:56:51

6  A.  Um-hum.

7  Q.  Okay.  And then you headed toward the back?

8  A.  Yes.

9  Q.  All right.  I think that's -- when they called you out to

10  West I, tell us, what's West I?                                15:57:02

11  A.  This -- this street right here is West International

12  Street.  (Indicating.)

13  Q.  And so does that street basically -- because you had told

14  me when we were talking that -- I said, which is the 100 block,

15  and you said, I just know where West I is.                     15:57:19

16    Does the port of entry have anything to do with that

17  designation in your brain, East I versus West I?

18  A.  Does the port?

19  Q.  Yeah.

20  A.  I just think it just separates it.                         15:57:31

21  Q.  It does?  Okay.

22  A.  It -- the port separates West International and East

23  International.

24  Q.  Perfect.

25    Then have you ever had opportunity to have the Nogales       15:57:40

1    Police Department liaison with the Mexican Police Department in

2    order to get some enforcement action from Mexico, to help you?

3    A.  We call it in through our dispatch.

4    Q.  Yes.

5    A.  So if you need something, you know, you just kind of let          15:57:57

6    them know.  And so I know that we call on -- if we see

7    something, we'll try to call and get them to come out and help

8    us out.

9    Q.  And have they been known to respond?

10   A.  Yes.                                                              15:58:10

11   Q.  Okay.

12       (Discussion off the record between Government counsel.)

13   BY MS. FELDMEIER:

14   Q.  You talked about the little gully or the little area that

15   you went for cover after you put Tesko up.  Can you show us          15:58:23

16   that?

17   A.  It would be right in here, right on the side right here.

18   (Indicating.)

19   Q.  So on the side of that little plant, there's a -- how would

20   you describe these objects around the outside?                      15:58:31

21   A.  Well, this line, really what it is is a wall.

22   (Indicating.)

23   Q.  Okay.

24   A.  So it's a perimeter.  So I'm assuming here that it ends

25   here, and then the wall starts here again.  (Indicating.)           15:58:41

─────── **John Zuniga – Direct Examination** ───────

1          So somewhere in here close to the wall.  (Indicating.)

2  Q.  So you stayed relatively close to the sidewalk, you didn't

3  go way back?

4  A.  No, no.

5  Q.  And you were hunched down right here with your gun pointing          15:58:51

6  towards the fence line?

7  A.  Yes.  Well, you know, I had -- I had my gun here on

8  my -- just kind of --

9  Q.  I'm going to hold this.  You explain how you were holding

10  your gun.          15:59:06

11  A.  So I think I had it like this, just right here.

12  (Indicating.)

13  Q.  Okay.  That makes sense.

14          You can take a seat.

15     (Discussion off the record between Government counsel.)          15:59:55

16          MS. FELDMEIER:  No other questions at this time,

17  Your Honor.

18          THE COURT:  Mr. Chapman.

19     (Discussion held off the record between counsel.)

20          MR. CHAPMAN:  May we approach, Your Honor?          16:01:32

21     (At sidebar on the record.)

22          MR. CHAPMAN:  The video that I was -- with -- that

23  Fredericks did, the audio is properly synced with the

24  side-by-side?

25          MR. CALLE:  I'm sorry?          16:01:52

UNITED STATES DISTRICT COURT

 1          MR. CHAPMAN:  The audio is synced with the

 2     side-by-side?

 3          MR. CALLE:  We had Zuniga verify it.

 4          MR. CHAPMAN:  Yeah.  Okay.  So, Judge, what I want to

 5     do --                                                        16:01:58

 6          MS. FELDMEIER:  Okay.  So did you guys disclose that

 7     to me, on that last disk?

 8          MR. CHAPMAN:  No, it was before that.

 9          MR. CALLE:  Yeah, this is before.  It's been around

10     for a while.                                                 16:02:05

11          MS. FELDMEIER:  About a week, the one that came over

12     with viruses and then you had it resent?

13          MR. CALLE:  I've sent you guys so much stuff -- I

14     don't know.

15          MS. FELDMEIER:  Yeah, I haven't seen it yet, but that   16:02:11

16     doesn't mean they didn't send it.

17          MR. CHAPMAN:  I'm going to connect up and admit the

18     video that I want to play a couple seconds of, about ten

19     seconds with the audio.  The jury's already heard this, but I

20     want them to hear it again when he's on the stand, where he's  16:02:26

21     saying, I'm getting rocked, I'm getting rocked.

22          THE COURT:  When Zuniga is saying that?

23          MR. CHAPMAN:  Yes.

24          MS. FELDMEIER:  And they've synced it to the video, to

25     the best of their -- right?                                  16:02:38

1          MR. CALLE:  Yeah, Zuniga verified it, we showed it to

2     him.

3          MS. FELDMEIER:  He said, that looks right?

4          MR. CALLE:  To be clear, he said, that's close.

5          MS. FELDMEIER:  Yeah, as long as it comes out like          16:02:43

6     that, I don't care if you play it.

7          MR. CHAPMAN:  I just want them to hear his voice.

8          MS. FELDMEIER:  I get you.  That's fine.

9          THE COURT:  Right.

10          MR. CHAPMAN:  But I want the jury to be able to see          16:02:51

11     the video while it's -- the ten seconds.

12          THE COURT:  All right.

13          MS. FELDMEIER:  As long as you -- maybe you can

14     just --

15          THE COURT:  Just indicate that he's watched the video          16:02:59

16     with you, and he helped you understand what was there, or

17     something like that.

18          MR. CHAPMAN:  Okay.

19          MS. FELDMEIER:  And he thought it was close.

20          THE COURT:  Ask him if he's been shown the video with          16:03:10

21     the voice attached to it, was it his voice, did he recognize

22     it, that kind of stuff.

23          MR. CHAPMAN:  Okay.

24          THE COURT:  All right.

25          (End of discussion at sidebar.)          16:03:18

1                       CROSS-EXAMINATION

2     BY MR. CHAPMAN:

3     Q.  Hello.  How are you?

4     A.  Good.  Thank you.

5     Q.  I don't think we've met before today.  But do you remember          16:03:43

6     meeting with my investigator, Randy Downer?

7     A.  Yes.

8     Q.  And do you remember him showing you a video which was

9     attached to some audio, pretty similar to what you've seen the

10    Government has shown you today?          16:04:00

11    A.  Correct.

12    Q.  And you were asked if your voice was heard on the audio, a

13    portion of it?

14    A.  Yes.

15    Q.  And whether -- the timing of when your voice was heard, it          16:04:09

16    seems to be synced fairly well with the video?

17    A.  That is correct.

18             MR. CHAPMAN:  All right.  Your Honor, for this limited

19    purpose I would ask that the defense be allowed to play a

20    portion of Exhibit 1458 to the jury.          16:04:27

21             MS. FELDMEIER:  No objection.

22             THE COURT:  1458?

23             MR. CHAPMAN:  Yes.

24    BY MR. CHAPMAN:

25    Q.  All right.  So what I want to do is, I'm going to play it,          16:04:39

1   about ten seconds, because we've all seen it many times by now.

2   And I just want you to tell me if you recognize your voice in

3   it.  Okay?

4   A.  Okay.

5   Q.  And hopefully we'll get audio.                                    16:04:56

6       (Exhibit No. 1458 played.)

7   BY MR. CHAPMAN:

8   Q.  All right.  So the individual that said, we're getting

9   rocked, we're getting rocked, was that you?

10  A.  That is me.                                                       16:05:20

11  Q.  There seems to be a level of stress in your voice in that

12  audio that doesn't exist in your testimony today; is that fair

13  to say?  You seemed stressed out on the -- on the audio.

14  A.  Yes.

15  Q.  I mean, you were getting rocked; right?                          16:05:37

16  A.  Correct.

17  Q.  It's a scary experience.

18  A.  Yes.

19  Q.  Okay.  Did you see rocks coming over the fence?

20  A.  At least one.                                                     16:05:58

21  Q.  Okay.  So your decision when you saw that and realized

22  that, was to call it out over the radio; right?

23  A.  Yes.

24  Q.  And also to take cover; correct?

25  A.  Correct.                                                          16:06:13

1   Q.  And to draw your weapon?

2   A.  Correct.

3   Q.  Okay.  You said that at some point someone told you that

4   your dog had been hit; is that right?

5   A.  Yes.                                                        16:06:41

6   Q.  And it was a Border Patrol Agent?

7   A.  Yes.

8   Q.  Is it possible that that happened before the shots were

9   fired?

10  A.  I don't remember.                                          16:06:52

11  Q.  All right.  I'm going to refer you -- and I know this

12  happened a long time ago.  I'm going to show you a document

13  regarding a statement that you gave way back in -- on October

14  25th of 2012, and ask you to review a question and an answer

15  that you gave, and see if that helps refresh your memory.      16:07:10

16  A.  Okay.

17      MS. FELDMEIER:  Is this just to the witness,

18  Mr. Chapman?

19      MR. CHAPMAN:  Yes, just to the witness at this time.

20  BY MR. CHAPMAN:                                                16:07:40

21  Q.  And I'm referring to Defense Exhibit 1018, page 14.

22      And Officer Zuniga, I just want you to --

23      Well, let me ask you, do you remember giving this

24  statement back in October of 2012?

25  A.  Yes.                                                       16:08:10

**John Zuniga – Cross-Examination**

1  Q.  Okay.  I pulled up the transcript for you.  And I want you

2  to take a look at this page.

3       And actually, let's back up so we can get some

4  context.  Start reading from page 13, last paragraph.  JZ is

5  your -- and you don't have to read it out loud, just read that        16:08:38

6  paragraph.  And let me know when you're done and I'll flip to

7  the next page.

8  A.  Okay.

9  Q.  So what you're talking about in the statement is you're

10  explaining to the interviewer what happened and where you were        16:09:02

11  when the shooting occurred and that type of stuff; right?

12  A.  Correct.

13  Q.  All right.  So keep reading down to where it says "okay."

14  A.  Okay.

15  Q.  So you're explaining to the interviewer at that time what        16:09:45

16  happened.  And I'd like you to read it out loud, the part that

17  says JZ for your name, starting with, he doesn't understand.

18  Read it out loud to the jury.  And then I'll ask you some

19  questions about it.

20       MS. FELDMEIER:  Objection, Your Honor.  He can use        16:10:05

21  this to refresh his recollection, ask him if he said it or

22  didn't say it, but he can't just read prior interviews.

23     (At sidebar on the record.)

24       THE COURT:  Let's use it to refresh his recollection        16:10:28

25  first.

**John Zuniga - Cross-Examination**

1    MR. CHAPMAN:  Yes, she's right about that.

2    THE COURT:  All right.

3    (End of discussion at sidebar.)

4    BY MR. CHAPMAN:

5    Q.  So let me ask it this way:  Do you remember back in          16:10:41

6    October -- excuse me, November 16th, 2012, telling Special

7    Agent Stacey Gutierrez with the FBI that somebody told you that

8    your dog had been hit before the shots were fired?

9    A.  I don't remember exactly when -- I know I was told by an

10   agent that my dog had been hit, and I said that.               16:11:15

11   Q.  But you don't remember whether it was before or after the

12   shots were fired?

13   A.  No.

14   MR. CHAPMAN:  Your Honor, again, I'd ask that he be

15   allowed to read this portion of the transcript.               16:11:31

16   THE COURT:  All right.

17   BY MR. CHAPMAN:

18   Q.  I'm going to cue it up for you again.

19   Okay.  Go ahead and read on the screen the paragraph

20   that starts with JZ, colon, he didn't understand.             16:11:55

21   Read that for the jury.

22   A.  He doesn't understand what's happening here, he doesn't

23   understand, you know, if we're getting -- he doesn't understand

24   what is a rock -- I'm sorry, understand what a rock is, or he

25   doesn't understand that stuff so -- so as I'm running, I come  16:12:14

—John Zuniga – Cross-Examination—

1   around to get in here somewhere, that's when the -- the agent

2   says, your dog's been hit, your dog's been hit.  So I didn't

3   know what he -- I don't know what he had been hit, you know,

4   whether if it was a rock -- or -- or what, I was just like,

5   what do you mean, you know, he's been hit?  So -- and then as        16:12:37

6   I -- as I -- as I start to get in there, that's when I hear the

7   gunfire.

8   Q.  All right.  That seems to indicate -- and that statement

9   was given a month after this event.

10          That seems to indicate that you were told your dog had    16:12:56

11   been hit before the shots were fired; is that correct?

12   A.  Yeah.

13   Q.  Can we agree that your memory back in November of 2012 is

14   probably better about what happened than it is now?

15   A.  Probably, yes.                                                 16:13:13

16   Q.  And how -- how long was the leash that you had Tesko on?

17   A.  Either about -- between four to six feet.

18   Q.  So does that mean that if Tesko was hit by a rock you were

19   four to six feet away from that rock?

20   A.  That is correct.                                               16:13:39

21   Q.  You agree that that video that Miss Feldmeier showed you

22   shows that you're still in the street when shots begin to be

23   fired?

24   A.  Yes.

25   Q.  And if you're in the street and rocks are falling, you're     16:13:58

John Zuniga – Cross-Examination

1   still at risk of being hit by a rock, aren't you?

2   A.  Yes.

3   Q.  You've worked in Nogales for a long time?

4   A.  Yes.

5   Q.  In your experience how quickly can drug smugglers get up                16:14:27

6   and over the fence with a pack of marijuana?

7   A.  Pretty fast.

8   Q.  Can you give us an estimate?

9   A.  It just depends on the mule.  It depends -- it could be

10  anywhere a couple minutes, it could be less than a minute.                  16:14:54

11  Q.  Okay.  Do you agree that rocks can cause -- have the

12  potential to cause serious physical injury?

13  A.  Yes.

14  Q.  Did you hear any sounds that were similar to rocks falling

15  through trees, hitting the leaves of trees?                                 16:15:24

16  A.  I didn't.

17  Q.  Did you see any rocks land and bounce on the ground?

18  A.  I heard them bouncing on the ground.

19  Q.  You heard it?

20  A.  I heard the -- originally when they were landing, that's                 16:16:37

21  when I looked up.

22  Q.  Were the gaps in the fence, in your opinion, wide enough

23  for rocks to get through, if they were thrown in that

24  direction?

25  A.  They can.  I don't know exactly how -- how wide to be                    16:17:23

UNITED STATES DISTRICT COURT

1  exact, but --

2  Q.  Were you worried that you were going to get hit by a rock,

3  is that why you took cover?

4  A.  Yes.

5  Q.  Were people on the Mexican side of the border saying                16:17:38

6  anything to you or yelling anything in your direction?

7  A.  I don't remember.  I think there might -- I don't remember,

8  to be -- they could have.  They usually do.

9  Q.  Do you remember anyone yelling profanity from the Mexican

10  side?                                                                  16:18:05

11  A.  You could hear -- I mean, you could hear -- there

12  was -- there's like an -- it's real echo-ish there, so you

13  can -- I don't know exactly what they were saying, but they

14  were yelling stuff.  Usually they yell things.

15        MR. CHAPMAN:  All right.  May I have a minute, Judge?           16:18:26

16        THE COURT:  You may.

17     (Discussion off the record between defense counsel.)

18        MR. CHAPMAN:  No further questions.

19        THE COURT:  Miss Feldmeier?

20                    REDIRECT EXAMINATION                                 16:18:57

21  BY MS. FELDMEIER:

22  Q.  That night could you hear the Border Patrol radio

23  frequency?

24  A.  Not on my -- we don't have the same frequency.

25  Q.  Okay.  So you and Border Patrol are on totally different          16:19:17

UNITED STATES DISTRICT COURT

1   frequencies?

2   A.  Correct.

3   Q.  Let's walk through the series, again, of what happened

4   when.

5        I heard you testify on direct that you heard rocks          16:19:31

6   skittling off the ground, and you saw one go overhead.

7   A.  Correct.

8   Q.  Then from there did you draw your gun?

9   A.  No.

10  Q.  What did you do?                                             16:19:42

11  A.  I went around my patrol car.

12  Q.  And you had Tesko on leash?

13  A.  Yes.

14  Q.  And then as you're coming around the patrol car --

15       Well, let me back that up.                                 16:19:53

16       When in relation to that did you hear "shots fired"?

17  A.  It was probably right after.  I mean, it was probably right

18  after when I ended up going around my patrol car.

19  Q.  Now let's talk about that transmission that defense counsel

20  played for all of us.  You -- as I recall it's, we're getting   16:20:17

21  rocked, we're getting rocked.  Somebody chimes in and says,

22  well, get out of there.  Is that correct?

23  A.  Yes.

24  Q.  So maybe a two-second gap and then we hear you say, shots

25  fired, shots fired.                                             16:20:32

─── **John Zuniga – Redirect Examination** ───

1    A.  That is correct.

2    Q.  So try to put yourself back in that time.  And you're on

3    your radio.  As you're calling in rocks, had there been any

4    gunshots yet?  Or you think you're just calling in rocks?  If

5    you remember.                                          16:20:51

6    A.  I think I was just calling in rocks.

7    Q.  And then who chimed in with that direction to just get out

8    of there?

9    A.  Another officer.

10   Q.  Was he a supervisor or a senior officer?              16:21:00

11   A.  I think it was a Senior Officer Morella.

12   Q.  Okay.  And then would you have had to reactivate your

13   microphone, if that's the right word for it, to call out, shots

14   fired, shots fired?

15   A.  Yeah, you have to press on it.  I don't carry a mic, I      16:21:18

16   carry a handheld, so I probably had to take it out.

17   Q.  Oh, so you had to take it out to talk.

18         Do you know if you even have time to put it back in

19   before you realized shots were being fired and you needed to

20   call that?                                              16:21:32

21   A.  I don't remember.

22   Q.  Okay.  Fair enough.

23         So at that point you still have Tesko on leash.

24   A.  Yes.

25   Q.  Do you draw your gun?                                16:21:41

1   A.  No.

2   Q.  Then what happens next?

3   A.  I put him into the car.

4   Q.  Okay.

5   A.  And I run into the -- next to the little block house there,       16:21:51

6   the wall.

7   Q.  How many shots do you think you heard?

8   A.  Maybe ten.

9   Q.  Were there any gaps between any of the shots?

10  A.  No.  I don't know if -- I mean, it just -- it was just an       16:22:11

11  event.  So I couldn't say if it was like -- it wasn't something

12  that -- I don't remember exactly.  So I know there was gunfire,

13  I just don't know how much -- or the time.

14  Q.  Okay.  And whether or not it was timed out in sequences?

15  A.  Correct.       16:22:35

16  Q.  Okay.  As soon as the shots were fired, did any more rocks

17  come over?

18  A.  That I don't know.  I don't remember -- I mean, I know that

19  the -- as soon as the -- you're saying once the shots were

20  completely --       16:23:01

21  Q.  No.  Once somebody started shooting, did the rocking stop?

22  A.  As far as I can remember, yeah.  Yes.

23  Q.  So in that clip in the video that we saw, Mr. Swartz had

24  already finished his first three shots while you were behind

25  the car holding your dog.       16:23:20

─── **John Zuniga – Redirect Examination** ───

1          So there were no rocks anymore at that point?

2    A.  I was on the other side, so, yeah --

3          MR. CHAPMAN:  Objection, calls for speculation.

4          THE COURT:  Overruled.

5    BY MS. FELDMEIER:                                               16:23:33

6    Q.  Okay.  You're a state-certified police officer; right?

7    A.  Yes.

8    Q.  And you're a state-certified canine handler; right?

9    A.  Yes.

10   Q.  And you can take care of your dog, can't you?            16:23:44

11   A.  Yes.

12   Q.  And you can take care of yourself?

13   A.  Yes.

14   Q.  Did you ever call out that you were hit that night?

15   A.  I never called out that I was hit.                        16:23:56

16   Q.  Did you ever call out your dog was hit?

17   A.  I don't remember.  I don't know if I -- I think I might

18   have said something to the effect of, that an agent had told me

19   that my dog --

20   Q.  No, but later --                                          16:24:12

21   A.  Yeah, yeah.

22   Q.  I'm talking about right then, before the shots start --

23   A.  No.

24   Q.  -- do you ever just howl in pain or let somebody know that

25   you're in dire straights?                                     16:24:20

UNITED STATES DISTRICT COURT

─────── **John Zuniga – Redirect Examination** ───────

1   A.  No.

2   Q.  In fact, you call in, we're getting rocked, we're getting

3   rocked?

4   A.  Correct.

5   Q.  Did you ever ask Lonnie Swartz to go to the fence and          16:24:26

6   defend you and your dog?

7   A.  No.

8   Q.  Did you and your dog need defending that night?

9   A.  No.

10          MS. FELDMEIER:  I have no other questions.                 16:24:38

11          THE COURT:  If the jurors have any questions, please

12   place them in writing.

13      (At sidebar on the record.)

14          THE COURT:  We'll start back Tuesday at 9:30.

15          MS. FELDMEIER:  We'll start with Officer Plooy then,       16:25:09

16   will be our last scene witness.

17          THE COURT:  You had hoped to get through Plooy today,

18   hadn't you?

19          MS. FELDMEIER:  Yeah.

20          THE COURT:  If you hadn't had that difficulty this         16:25:17

21   morning, you might have made it.

22          MS. FELDMEIER:  You're probably right.

23          THE COURT:  What exactly did you tell the individual

24   climbing the fence?

25          The other times you had rocks thrown at you, were you      16:25:36

―――― **John Zuniga ― Redirect Examination** ――――

1    inside or outside your vehicle?

2          Right after the shooting you stated you saw multiple

3    agents walking around the scene.  How long after the shooting

4    was an attempt made to secure the scene?

5          MS. FELDMEIER:  That's a good one.                        16:25:56

6          THE COURT:  When you heard the first shots, did you

7    immediately know who fired them?

8          Is Nogales Police policy not to engage suspects on the

9    fence, such as try to stop them or grab them off the fence?

10         Is your canine protected inside the vehicle if a rock    16:26:22

11   were to break through the vehicle?

12         Could you tell if more than one voice was yelling from

13   the Mexico side of the fence?

14         If rocks are lethal, why was the canine not examined

15   by a veterinarian for any internal bleeding?                   16:26:47

16         MR. CHAPMAN:  Sounds kind of argumentative.

17         THE COURT:  It is argumentative, the way it's phrased.

18         I'll ask if he was examined.  I'll ask if he was

19   examined.  I won't ask it quite that way.

20         Did you feel you were in grave danger that evening?      16:27:04

21         Was your dog in the vehicle before shots fired?

22         Why did you place your canine in the vehicle at that

23   time?

24         All right.

25      (End of discussion at sidebar.)                             16:27:24

John Zuniga – Jury Questions

```
 1            THE COURT:  Officer Zuniga, I have several questions

 2   that the jurors have asked, I'm going to ask on their behalf.

 3            THE WITNESS:  Yes, Your Honor.

 4            THE COURT:  What exactly did you tell the individual

 5   climbing up the fence?                                        16:27:45

 6            THE WITNESS:  I was just trying to have him to come

 7   down.  You know, to give up, come down.  That's all.

 8            THE COURT:  Do you recall what you said specifically?

 9            THE WITNESS:  I'm sorry, Your Honor?

10            THE COURT:  Do you recall what you specifically said?  16:28:02

11            THE WITNESS:  Specifically, no.  I know I spoke in

12   Spanish.  I'm fluent in Spanish.  So I know I -- the best I can

13   recall is just saying, hey, come down, come down.  You know,

14   because I've seen people fall.  And so I wanted them to come

15   down.                                                         16:28:22

16            THE COURT:  The other times you had rocks thrown at

17   you, were you inside or outside your vehicle?

18            THE WITNESS:  Outside, outside my patrol car.

19            THE COURT:  Right after the shooting you stated you

20   saw multiple agents walking around the scene.  How long after  16:28:37

21   the shooting was an attempt made to secure the scene?

22            THE WITNESS:  I think as soon as I start seeing people

23   walking around, agents, they knew that -- I thought the scene

24   was safe.  I want to say -- I don't know exactly timeframe

25   wise, but I know that -- I couldn't really -- I couldn't really  16:29:02
```

──────── **John Zuniga - Jury Questions** ────────

1   say how long it took them to secure it.

2          THE COURT:  When you heard the first shots, did you

3   immediately know who fired them?

4          THE WITNESS:  Immediately, no.  I didn't know.

5          THE COURT:  Is it NPD policy not to engage suspects on

6   the fence?

7          THE WITNESS:  We don't have a policy that I could say

8   that we go off of.  It's just -- it's something that we -- from

9   past practices, we try not to engage anybody on -- that's on

10  the fence.  Because if you do, you know, what if they fall and

11  blame you.  So we don't engage anybody on -- physically on the

12  fence.

13         THE COURT:  Is your canine protected inside the

14  vehicle if a rock were to break through the windows?

15         THE WITNESS:  Yes.  Actually, yes.  It's a full kennel

16  that's made out of metal.  It's got fans and little holes and

17  stuff, so if something were to break through, a rock,

18  definitely he wouldn't be hurt.

19         THE COURT:  Could you tell if more than one voice was

20  yelling from the Mexico side of the fence?

21         THE WITNESS:  No, I couldn't tell.

22         THE COURT:  Did you have your canine examined by a

23  veterinarian for any internal bleeding?

24         THE WITNESS:  I want to say I did take him to the vet.

25  I checked him out myself.  I mean, it's something that we do

16:29:26

16:29:58

16:30:20

16:30:43

16:31:06

UNITED STATES DISTRICT COURT

anyways, we check them out.  You know, I like to check my dog

at least -- at least once per shift, during the shift.

        But if I remember correctly, I want to say I did take

him to the vet.

        THE COURT:  Do you know when?                    16:31:26

        THE WITNESS:  I think it was couple days right after,

or that following -- I think it was that week.  That following

day, or whatever, I took him, just in case, got him checked.

        THE COURT:  Did you feel you were in grave danger that

evening?                                                 16:31:40

        THE WITNESS:  Grave danger?  Not grave.  I knew that I

could -- you know, any time that there's something that's going

on, like rocks and that stuff being thrown, I mean, you could

get hurt.  But at far as -- you know, grave to me is if

somebody's shooting at me, then I could probably tell you yes.  16:32:11

        At that moment I was just trying to get out of the

area, get out of the way.

        THE COURT:  Was your dog in the vehicle before shots

fired?

        THE WITNESS:  No, I don't think -- I don't think he     16:32:28

was in -- I don't think he was inside the car yet.

        THE COURT:  Why did you place your canine in the

vehicle at that time?

        THE WITNESS:  Because -- when it relates to gunfire, I

just knew I wanted to have him secured in the car.  And then,   16:32:54

1    you know, I can go and try to take, you know, take care of

2    myself.  I just felt that I had to put him inside of the car

3    and give him -- you know, so he didn't bite me.  Because he

4    probably would.  If I would have kept him a little bit longer,

5    he probably would have ended up biting me.                    16:33:17

6          THE COURT:  Miss Feldmeier, any questions based upon

7    the jurors' questions?

8        (Discussion off the record between Government counsel.)

9          THE COURT:  I think that's a yes.

10         MS. FELDMEIER:  It is.                                   16:33:36

11                     REDIRECT EXAMINATION

12   BY MS. FELDMEIER:

13   Q.  Well, it is a follow-up to one of the juror's questions.

14   Do you think you may have gotten him examined by the vet.

15         Do you remember the vet saying there was anything        16:33:45

16   wrong?

17   A.  No.

18   Q.  You would remember that; right?

19   A.  No.

20         THE COURT:  Mr. Chapman?                                 16:33:52

21                     RECROSS-EXAMINATION

22   BY MR. CHAPMAN:

23   Q.  I think you just said that you put him in the vehicle

24   because of gunfire.  Did I hear that right?

25   A.  Yeah.  The question was if -- if I had put my dog into the 16:34:02

 1    patrol car because of the gunfire.

 2    Q.   Okay.  So then we can assume that you didn't put him in the

 3    vehicle until after the shooting had started or stopped; is

 4    that right?

 5    A.   I know I put him in the car.  You know --                          16:34:20

 6    Q.   If you don't remember, that's fine.

 7    A.   I don't -- I don't remember that part, you know.  I know

 8    that --

 9    Q.   That's okay.

10         So let me ask you another question though.  I mean,            16:34:34

11    you did take cover behind the vehicle when the rockings

12    started.  And you drew your weapon.  Is that true?

13    A.   I don't think -- I don't remember drawing my weapon.  My

14    weapon was drawn when I was away, when I was by myself.

15    Q.   Okay.  At any rate, you took cover behind the vehicle at       16:34:55

16    one point when the rockings started; is that correct?

17    A.   Yes.

18    Q.   And you did that because you wanted to protect yourself and

19    protect your dog; correct?

20    A.   Yes.                                                           16:35:11

21    Q.   From what?

22    A.   From the rocks.

23    Q.   Right?

24         And we can agree that rocks can cause serious injury;

25    right?                                                              16:35:25

—————— John Zuniga – Recross–Examination ——————

1    A.   Yes.

2    Q.   Especially if they land on your head.

3              MS. FELDMEIER:  Your Honor, this is going beyond the

4    scope of the jurors' questions.

5              THE COURT:  It is going past the jury's questions,          16:35:31

6    Mr. Chapman.

7              MR. CHAPMAN:  Thank you.  I'm done.

8              THE COURT:  Agent Zuniga, you're name ends in a Z.

9              THE WITNESS:  Yes, Your Honor.

10             THE COURT:  We're going to quit for the day.              16:35:43

11             THE WITNESS:  Okay.

12             THE COURT:  No, your name begins with Z.

13             We're going to quit for the day.

14             You can step down.

15             We're going to reconvene on Tuesday.  Not until          16:35:55

16   Tuesday, but we'll start at 9:30.

17             Once again, all weekend, no news.  No television, no

18   radio, no newspapers.  No news.  No internet research.  No

19   investigation.  No talking about the case.  Don't make up your

20   mind about the case.                                             16:36:21

21             Have a good weekend.

22        (Proceedings concluded at 4:38 p.m.)

23

24                         -oOo-

25

C E R T I F I C A T E

I, CANDY L. POTTER, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 10th day of April, 2018.


                              s/Candy L. Potter_____
                              Candy L. Potter, RMR, CRR