**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| **United States of America,** | ) | |
| | ) | No.  **CR-15-1723-TUC-RCC-DTF** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Tucson, Arizona |
| | ) | April 12, 2018 |
| **Lonnie Ray Swartz,** | ) | 4:11 p.m. |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE RANER C. COLLINS, JUDGE**

**REPORTER'S EXCERPTED TRANSCRIPT OF PROCEEDINGS**

**JURY TRIAL**
**DAY 15**

**(TESTIMONY OF PHILIP TROMPETTER)**

Official Court Reporter:
Candy L. Potter, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 36
Phoenix, Arizona 85003-2151
(602) 322-7246

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

CR-15-1723-TUC-RCC – April 12, 2018

1

2                    **A P P E A R A N C E S**

3

For the Government:
    U.S. Attorney's Office Tucson
    By:  **Wallace Heath Kleindienst**, Esq.
         **Mary Sue Feldmeier,** Esq.
    405 West Congress Street, Suite 4800
    Tucson, Arizona 85701

For the Defendant:
    Law Offices of Sean C. Chapman
    By:  **Sean Christopher Chapman**, Esq.
    100 North Stone Avenue, Suite 701
    Tucson, Arizona 85701

    Law Office of Jim E. Calle
    By:  **Jamie Ernest Calle, III,** Esq.
    2315 East Hawthorne Street
    Tucson, Arizona 85719

CR–15–1723–TUC–RCC – April 12, 2018

1

2                              **I N D E X**

3   **GOVERNMENT WITNESS:**        **DIRECT**      **CROSS**      **REDIRECT**   **RECROSS**

4   PHILIP TROMPETTER
    By Ms. Feldmeier          4
5   By Mr. Chapman                            19
    By Ms. Feldmeier                                         31
6   By the jury                               36

7

8

9   Discussion Held at Sidebar            20, 35

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

─── **Philip Trompetter – Direct Examination** ───

1      (The following excerpt is the testimony of Philip

2   Trompetter.)

3          THE COURT:  This next witness is being called by the

4   Government.  We're trying to get this witness on and off today.

5          THE CLERK:  Raise your right hand please.                    16:11:34

6      (PHILIP TROMPETTER, GOVERNMENT WITNESS, SWORN.)

7          THE CLERK:  Thank you.  Please be seated.

8          Please pull the microphone over to you, speak direct

9   into it.

10         State your name for the record and spell your last        16:11:49

11   name.

12         THE WITNESS:  It's Philip with one L, S. Trompetter,

13   T-R-O-M-P-E-T-T-E-R.

14                        DIRECT EXAMINATION

15   BY MS. FELDMEIER:                                                 16:12:00

16   Q.  What is your occupation?

17   A.  I'm a clinical psychologist that specializes in police and

18   forensic psychology.

19   Q.  And could you give the jury a thumbnail sketch of your

20   background?                                                       16:12:10

21   A.  Education?

22   Q.  Start with education.

23   A.  I have a bachelor's degree in psychology from Penn State

24   University, I have master's and a Ph.D. in clinical psychology

25   from the University of Tennessee.                                 16:12:23

Philip Trompetter – Direct Examination

1              I first became licensed as a psychologist in 1972, and

2     since that time, since the late 1970s, I've specialized in

3     working with law enforcement agencies and with the courts.

4     Q.  All right.  And are you board certified?

5     A.  I am.                                                              16:12:42

6     Q.  Could you explain that to the jury?

7     A.  Board certification in psychology is similar to what it is

8     in medicine, at least in California.  I would assume in Arizona

9     as well.  If you're a physician or if you're a psychologist, if

10    you're licensed, you could practice any specialty in medicine    16:12:57

11    or psychology.  We, as patients or clients, have no idea

12    whether or not a person is competent in the specialty.  To be

13    board certified is to go in front of a group of board certified

14    specialists, to present written work, be orally examined, and

15    then if you pass muster, then you are considered board           16:13:18

16    certified.

17              So I'm one of 73 board certified police psychologists.

18    Q.  In the United States?

19    A.  Yes.

20    Q.  And have -- that particular board also has certain public    16:13:28

21    offices that are held, and I believe you've held some of those;

22    right?

23    A.  I have.

24    Q.  And are you actually the past president?  You've been the

25    president for the last year?                                     16:13:42

1    A.  I was.

2    Q.  Okay.  You've been a presenter in the area of police

3    psychology; is that true?

4    A.  Yes.

5    Q.  You do continuing education in that area?                       16:13:51

6    A.  I do.

7    Q.  You're also involved in peer review.  What is peer?  I saw

8    a lot of that on your resume.

9    A.  About ten years ago a group of eight senior police

10   psychologists decided that we wanted to start reviewing each       16:14:03

11   other's work, not necessarily to present our best work, but

12   some of the work that we've done where there may have been a

13   bad outcome, and to present all of the data to our colleagues

14   and get feedback about whether or not there was anything we may

15   have done wrong.                                                    16:14:21

16          So we do this twice a year.  And we have our next

17   meeting coming up actually in three weeks.

18   Q.  And you've also published?

19   A.  I have.

20   Q.  Over a dozen articles?                                         16:14:30

21   A.  I'm sorry?

22   Q.  Are you a prolific publisher?

23   A.  I've probably published 12 or 14 articles.

24   Q.  Okay.  That's sounds prolific to me.

25          And are you paid for your work here for the                 16:14:42

1    Government?

2    A.  I am.

3    Q.  And could you give us a ballpark figure on what you've been

4    paid and what you're going to be paid for today's testimony?

5    A.  Up through Tuesday I've billed $8,606.25.  I've been paid    16:14:51

6    for some of that.  I just haven't yet been paid -- or haven't

7    billed for the time involved in coming to Tucson and

8    testifying.

9    Q.  And that's usually like a flat fee to come in and testify?

10   A.  If it's less than a day, I charge by the hour.  If I get to    16:15:09

11   a full day, then I have an -- I have a day rate.

12   Q.  And what is that day rate?

13   A.  My day rate is $3,000.

14   Q.  Okay.  Now, what do you do in your current practice?

15   A.  In my current practice I perform a lot of forensic    16:15:26

16   evaluations of criminal defendants on various legal issues, the

17   most common is whether they're competent to stand trial.  But

18   what's most relevant, I think, for this trial is my work in

19   police psychology.  I talk to officers after shootings.  I

20   conduct evaluations of officers where there's some question as    16:15:46

21   to whether they continue to be psychologically suitable to work

22   as a cop.  I do training of officers in various things that

23   psychologists have some expertise in.

24        And I've been involved in the last five years in

25   testifying as an expert in these kinds of cases,    16:16:04

1    officer-involved shooting cases, that either turn into a

2    criminal case or a civil case.

3    Q.  And up until today have you always testified on behalf of

4    the officer?

5    A.  I've always testified -- I've always been hired and called    16:16:18

6    by the defense up until this case.

7    Q.  Okay.  You said that you interview officers after a

8    shooting.  Is that several weeks after the shooting?  Explain

9    to me -- or to the jury how you come in contact with officers

10   who have been involved in a shooting.    16:16:37

11   A.  In the early 1980s a concept called critical incident

12   stress debriefings came about, it was mostly with paramedics,

13   and it quickly spread into other first responders, law

14   enforcement and fire.  And it's because we found that so many

15   of these first responders were stressing out after these major    16:16:56

16   incidents and developed alcohol problems or stress problems.

17        So this technique seemed to be very useful in allowing

18   these first responders to bounce back after these incidents.

19        So my -- my style has always been -- I usually get a

20   call from a street sergeant after there's been an    16:17:16

21   officer-involved shooting.  I always go to the scene.

22   Sometimes the officers are still there.  I want to see the

23   scene.

24   Q.  Why?

25   A.  I want to see the scene, because when I go back to the    16:17:26

1    department and have a conversation with the officer, if I don't

2    know what actually happened out there, or if I don't know what

3    the scene actually looked like, then if the officer is talking

4    to me about what they perceived, and there's inaccuracies, I

5    have no way of knowing that unless I have been out there before                16:17:46

6    and seen it, and gotten briefed usually on the investigators

7    that are on the scene already.

8         So I always made it a practice of doing an immediate

9    debriefing and going to the scene.

10   Q.  And then you would meet then with the actual officer who         16:17:59

11   was involved in the shooting in a patient/client setting; is

12   that right?

13   A.  Yes.

14   Q.  Okay.  And about how many times have you done this since

15   the '80s?                                                            16:18:11

16   A.  You know, I always have to estimate that, because I never

17   keep -- kept a count.  But in my area in Northern California we

18   would generally have maybe six to ten officer-involved

19   shootings a year.  You're usually debriefing or talking with

20   more than one officer in these incidents.  So I've estimated         16:18:27

21   before somewhere between 350 and 500 officers I've debriefed.

22   Q.  Okay.  And in this particular case did we send you some

23   materials that you relied on?

24   A.  Yes.

25   Q.  And do you have that in front of you?  That might be             16:18:43

—— Philip Trompetter – Direct Examination ——

1    quicker than me trying to read it.

2    A.  I do.

3    Q.  Generally speaking, did we provide you with the Grand Jury

4    transcripts of the scene witnesses?

5    A.  Yes.                                                                16:18:54

6    Q.  What else?

7    A.  You provided me with a video from the east camera, I think

8    it's called, and the west camera of the -- just before, during

9    the incident, and after the incident.  I saw animations, I

10   think it's called the Tavernetti exhibits.                             16:19:11

11   Q.  And with those ones, you saw a select few, you saw the all

12   movement, which is where the little place markers -- the

13   various colored place markers are.  You saw the fly around

14   where you -- to get a view of the scene, where the evidence

15   markers was, Mr. Swartz's gun, a video of a walk up to the            16:19:32

16   fence line itself so you could see that.  The hand-held

17   recording, I mean.  And the perspective from below from where

18   the victim was lying.

19   A.  Yes.

20   Q.  Okay.                                                              16:19:46

21   A.  I saw crime scene photos.

22   Q.  Yes.

23   A.  I think they were called Pierce photos and another one was

24   a thumb drive.  It looks like some were taken in Mexico, some

25   were taken on the American side.  Some of them included autopsy       16:19:59

Philip Trompetter – Direct Examination

1   photos.

2   Q.  And then did we send you the synced-up video, the

3   side-by-side so you could see both of the cameras together --

4   A.  Yes.

5   Q.  -- as opposed to separately?                                    16:20:11

6           Subsequently yesterday did we go ahead

7   and -- yesterday or the day before, go ahead and send you the

8   trial testimony of the defendant in this case, Lonnie Swartz?

9   A.  Yes.

10  Q.  And did we also send you the testimony of a Dr. Laurence        16:20:20

11  Miller?

12  A.  Yes.

13  Q.  You've had a chance to review those?

14  A.  Yes.

15  Q.  Okay.  I would like to go ahead and just run through a          16:20:28

16  couple of concepts from that and ask for your comments on it.

17          Dr. Miller talked about something called threat

18  magnification.  Based on your research and your experience, can

19  you talk to us a little bit about threat magnification and

20  whether that is a common term?                                      16:20:50

21  A.  I was surprised to see the term.  I've read just about

22  everything there is in police psychology, and I've been working

23  a lot in officer-involved shootings, and I've never run across

24  that term of threat magnification, so I wasn't sure exactly

25  what Dr. Miller meant by that.  I just know that in the police      16:21:05

UNITED STATES DISTRICT COURT

—— **Philip Trompetter – Direct Examination** ——

1  psychology literature there is no such concept.

2  Q.  Okay.  But you do acknowledge that there is sort of a

3  sister concept of the auditory –– or both the tunnel vision and

4  then the auditory exclusions?

5  A.  I do.  And I just assumed Dr. Miller was trying to make the          16:21:21

6  point that what officers will do in these deadly force

7  confrontations is they'll zoom in on the threat, and maybe

8  that's what he meant by magnification of the threat.

9          But I thought there was an implicit statement that

10  somehow normal threats somehow become larger because they're          16:21:39

11  magnified based on the brain function and the physiology, I

12  thought that was a misleading term.

13  Q.  Because that's not anything that you –– you've read

14  literature on, that there's a physiological response?

15  A.  There's nothing that magnifies a deadly threat.  A deadly          16:21:56

16  threat is like pregnancy, I mean, you're pregnant or you're not

17  pregnant, it's not like a little bit of deadly, or a lot of

18  deadly, deadly is deadly.

19          So there's nothing that I know of in the literature

20  that magnifies that.          16:22:12

21  Q.  Okay.  Let's talk about the memory gap that both the

22  defendant testified to and Dr. Miller spoke to.

23          As you may recall, the video shows about a five second

24  approach to the fence, defendant at the fence for about five

25  seconds, during which time it produces three shell casings.          16:22:30

─────── **Philip Trompetter - Direct Examination** ───────

1   Defendant moves up the fence line for seven to eight seconds,

2   stays attached to the fence for a period of time, where it

3   produces, based on circumstantial evidence, ten shell casings,

4   backs up, reloads, comes back, and three more shell casings are

5   ejected at that time.  For a total time period from the first                16:22:48

6   shot being fired out of that gun until the last shot of 34

7   seconds.

8        You may recall the defendant's testimony was, he

9   remembers the first -- he remembers the first two rockers.  He

10  remembers perhaps moving.  He remembers another threat.  And      16:23:04

11  then it's a grey area, and he does not account for why he

12  stopped shooting or what he's shooting at during said grey area

13  or memory gap.

14       Do you have comments on that?

15       MR. CHAPMAN:  Objection, vague.                              16:23:20

16       THE COURT:  Overruled.

17       THE WITNESS:  Well, there's no doubt, and I'm sure the

18  jury has heard, that there are a lot of perceptual and memory

19  distortions that happen in officer-involved shootings.

20  Officers frequently cannot remember certain aspects of the       16:23:31

21  incident.  And usually the things that they can't remember are

22  the things that were not really central to the threat.  They

23  usually were things in the periphery.  We're just biologically

24  wired to focus in on the threat.  Some people call it tunnel

25  vision.                                                          16:23:52

─────── **Philip Trompetter – Direct Examination** ───────

1    So I think that some of what Dr. Miller and Agent

2  Swartz testified to is consistent with the literature.

3    What wasn't consistent though was when officers focus

4  on a threat, that's what they remember.  They remember the

5  threat.  They don't remember things in the periphery of the          16:24:11

6  threat.

7    So when Agent Swartz was talking about perceiving a

8  threat, the first thrower, he describes somebody that I believe

9  the evidence shows was actually there.  When he moved down the

10  fence line and said that he thought he saw a second shooter or     16:24:28

11  a second thrower, but then it went grey.  That seemed to me to

12  be very different and inconsistent with my experience and the

13  police psychology literature.

14    Because, if anything, if he's decided that this is a

15  deadly force situation triggering ten rounds, he should          16:24:47

16  remember that.  He should have perceived that threat.  And he

17  should have been able to say why he stopped on that -- after

18  ten rounds, because he perceived that threat was no longer

19  present.

20    So that I thought was inconsistent with my experience     16:25:02

21  and with what the literature shows.  Officers always remember

22  the threat because they have to justify the shooting.

23  Q.  So you have never had an officer in all the 300 to 500

24  interviews you've done where they cannot -- they have a blank

25  space about the threat?                                           16:25:21

**Philip Trompetter – Direct Examination**

1  A.  I have never once had that happen.  If anything, you'll see

2  intensified visual details by some officers.  They will tell

3  you in great detail that they believe they saw the hollow point

4  on the barrel of the gun, or they saw a Rolex watch on the

5  person's wrist, or the hair standing up, an incredible amount    16:25:38

6  of detail that they couldn't even believe.

7       So the enhanced details and the very precise memories

8  are about the threat.  The things that they don't remember are

9  things that are really not important, how many rounds they

10  fired, whether they reload, those kinds of other things that    16:25:55

11  Agent Swartz said and I thought were consistent with the

12  science.

13  Q.  All right.  What about the significant fact in this

14  case -- well, significant to me, I don't know if it is to you.

15  But he empties his magazine, the ten rounds, and has not        16:26:08

16  identifying the threat or what he's shooting at -- or tells us

17  today he can't tell us.  He backs up, he reloads, he fires

18  again.

19       And again, you're not saying that the -- you're saying

20  the reload, lack of memory of the reload is something that is   16:26:24

21  common, that does happen, right, because it's an automatic

22  movement?

23  A.  The mechanical actions that go along with responding to a

24  deadly threat are not remembered because they're not paying

25  attention to it, it's just not vital.                          16:26:38

─── **Philip Trompetter – Direct Examination** ───

1    Q.  But what about the idea that once he starts firing again,

2    he's got 12 bullets in that gun, and he chooses to stop at

3    three?

4    A.  What was noteworthy to me is that he didn't remember, I

5    think, approaching the fence for the third time, doesn't                    16:26:53

6    remember anything about it, couldn't identify a threat.  So he

7    can't explain why he felt like he needed to deliver deadly

8    force because of a threat.  And that, again, is sort of

9    consistent with what I just said about the second volley of

10   shots.                                                                       16:27:09

11        Officers in my experience always remember and can

12   describe the threat.  They may be inaccurate about where the

13   person was, or what their position was, or what they were

14   wearing, or whether they had a beard or no beard.  But they can

15   tell you what they perceived the threat to be.                               16:27:24

16   Q.  Okay.  Let's talk about what I termed with Dr. Miller and I

17   think he adopted was the idea of a hallucination of a figure in

18   the middle of the street, or wherever it was, that doesn't show

19   up in any of the evidence.

20        Have you ever had in your experience, or read in the                    16:27:41

21   literature, that officers in a deadly-threat situation have

22   hallucinations of a threat that's not really there?

23   A.  No.

24   Q.  Let's talk about the physical reaction of throwing up after

25   the shooting.                                                                16:28:00

---
**Philip Trompetter - Direct Examination**
---

1      You've explained to us that you've been there right

2   after the shootings.  Have you ever seen an officer have a

3   violent physical reaction, to include throwing up, or maybe

4   even just sobbing uncontrollably?

5   A.  I've never had an officer throw up on scene.  I've had                 16:28:13

6   officers later, after things start sinking in, when they find

7   out information about the victim, when they get a chance to

8   really start processing it, develop various kinds of physical

9   problems.  But on scene, but -- with one exception.

10  Q.  What's that?                                                           16:28:31

11  A.  Where I had one officer who was injured after an extended

12  fight with a man that weighed 260 pounds more than her, who was

13  taken in an ambulance ride and became very emotional in that

14  ambulance ride, and feel very -- she couldn't identify why she

15  was upset, but she was very demonstrably upset.                           16:28:54

16      With that exception on scene, and within usually

17  minutes after, I've never seen anyone develop that kind of

18  emotionality.

19      Later on when we're in an office and we're talking and

20  I'm asking questions and asking for feelings, then I'll see      16:29:11

21  some emotionality.

22  Q.  Okay.  Did you find the video in this case to be helpful?

23  A.  I thought it was one of the most important things -- pieces

24  of evidence that I had.

25  Q.  Why?                                                                  16:29:26

─── **Philip Trompetter – Direct Examination** ───

1  A.  For the same reason that I thought it important always to

2  go by a crime scene or a shooting scene before I would talk to

3  an officer.  I needed to see what actually happened and what

4  the scene looked like before I would go and talk and listen to

5  the officer, so I can determine whether or not the officer's          16:29:42

6  perceptions were distorted, I can find out whether or not the

7  shooting may be a bad shooting, or a justified shooting.

8  Because those things were all important to me in trying to

9  figure out how to assist this officer.

10       I think that, even when I'm not doing that role, but          16:29:59

11  I'm hired by the defense to take a look at a shooting and to

12  provide some expert testimony, if that's possible, if there's

13  videos, body cam videos or dash cam videos, or any kinds of

14  photographic evidence that helps me know exactly what happened

15  out there, then I'm in a better position to be able to judge          16:30:20

16  the credibility of the officer that I'm evaluating or talking

17  to.

18  Q.  Was there something else about the length of this

19  particular shooting, I'm using the 34-second first to last

20  shot, that's unusual also in your practice?          16:30:38

21  A.  Yes.

22  Q.  What is that?

23  A.  Most shootings, as probably everybody knows, they happen in

24  split seconds.  Usually officers have a third of a second to

25  react to a deadly threat in front of them.  And they have to          16:30:50

1    make quick decisions with very little time.

2         This was a situation that extended, in my

3    understanding, over 34 seconds.  And while maybe the first

4    volley of three shots could have been viewed as a quick

5    split-second making a decision, from my view of the other          16:31:08

6    evidence it seemed to me that the ten shots and the last three

7    shots were done in more of a methodical way with an officer who

8    had plenty of time to assess whether or not there was actually

9    a threat.

10             MR. CHAPMAN:  Objection.                                  16:31:27

11             THE COURT:  Objection will be sustained.

12             MR. CHAPMAN:  Beyond his area of expertise.

13             THE COURT:  Objection will be sustained.

14             MS. FELDMEIER:  May have a moment with counsel?

15         (Discussion off the record between Government counsel.)       16:31:35

16             MS. FELDMEIER:  No other questions.  Thank you.

17             THE COURT:  Mr. Chapman.

18                       CROSS-EXAMINATION

19    BY MR. CHAPMAN:

20    Q.  Good afternoon, sir.                                          16:31:52

21    A.  Good afternoon.

22    Q.  Did you know that I first learned that you were going to be

23    testifying in this case last night?

24    A.  I didn't.

25    Q.  The Government hadn't disclosed anything about your           16:32:02

─────Philip Trompetter – Cross-Examination─────

1   testimony to me until they gave me your report of an interview

2   that they did with you in November of last year.  But I didn't

3   get it until last night.  Did you know that?

4   A.  I did not.

5           MS. FELDMEIER:  Objection, Your Honor.  Can we                16:32:17

6   approach at sidebar?

7       (At sidebar on the record.)

8           MS. FELDMEIER:  I didn't want to say this in front of

9   the jury, but Mr. Chapman has had notice of Philip Trompetter

10  since we produced our witness list.  We did put him on the       16:32:35

11  witness list at the beginning.  We said Dr. Trompetter, and we

12  sent him the resume.

13          THE COURT:  But you didn't give him the report until

14  yesterday.

15          MS. FELDMEIER:  Right.  Because he's a rebuttal          16:32:43

16  witness, and that's fair.

17          But he has had notice, he's had plenty of time to

18  research him and to look at his resume.

19          THE COURT:  But he's talking about the report.

20          MS. FELDMEIER:  Right.  But he made it sound like the    16:32:51

21  notice part, like I only first heard about you yesterday.  And

22  that's not accurate.  He's known about him for over a month.

23          THE COURT:  All right.

24          MS. FELDMEIER:  So I just wanted to kind of clear that

25  up.                                                              16:33:00

─────── **Philip Trompetter – Cross-Examination** ───────

1      MR. CHAPMAN:  I'll clear that up.

2      MS. FELDMEIER:  Thank you.

3      THE COURT:  All right.

4    (End of discussion at sidebar.)

5  BY MR. CHAPMAN:                                                    16:33:10

6  Q.  The point is, Mr. Trompetter, that this case has been going

7  on for five years, the trial has been going on for almost four

8  weeks now, and for some reason these prosecutors decided to

9  wait until 4:47 p.m. yesterday to give me a report.

10      MS. FELDMEIER:  Objection, Your Honor, this witness        16:33:33

11  has said he does not know when the report -- Mr. Chapman is

12  testifying.

13      THE COURT:  Overruled.

14      MR. CHAPMAN:  I'm just asking him if he knows.

15      THE COURT:  Overruled.

16  BY MR. CHAPMAN:

17  Q.  They waited until 4:47 yesterday to summarize what you were

18  going to say, which goes back to an interview that happened in

19  November of last year.

20      Did you know that?                                          16:33:54

21  A.  I did not.

22  Q.  So you'll forgive me if I'm a little disjointed in my

23  questions.  Okay?

24  A.  I forgive you.

25  Q.  I did send you some articles about officer-involved         16:34:03

UNITED STATES DISTRICT COURT

─────Philip Trompetter – Cross-Examination─────

1    shootings -- or I sent them to Miss Feldmeier.  Did you have an

2    opportunity to review them?

3    A.  I did.

4    Q.  All right.  And she told me that you were familiar with

5    three of the articles; is that correct?                          16:34:24

6    A.  I was familiar with the Alpert article, Artwohl article,

7    and the Honeg/Lewinski article.  I was not familiar with the

8    one I believe from an M.D.

9    Q.  Okay.  I'm going to ask you a few questions about those

10    articles in a second.  But first I want to ask you this:         16:34:45

11          You indicated you reviewed Dr. Miller's report.  Did

12    you go to the crime scene?

13    A.  I did not.

14    Q.  Are you aware that the Government waited three years to

15    indict this case?                                                16:35:01

16          MS. FELDMEIER:  Objection, relevance with this

17    witness.

18          THE COURT:  Sustained.

19    BY MR. CHAPMAN:

20    Q.  All right.  I'm going to go through some of Dr. Miller's     16:35:11

21    report.  Do you have it in front of you?

22    A.  I do.

23    Q.  Why don't you turn to page 7, and look at the section

24    entitled Sensory and Perceptual Adaptations, first paragraph.

25          Have you read it?                                         16:35:55

1    A.  I have.

2    Q.  All right.  He writes, the most common phenomenon is a

3    distortion in time perception.  Paradoxically this can take two

4    seemingly opposite patterns.  Many officers recalled isolated

5    events of a shooting episode as occurring in slow motion.          16:36:11

6             Do you agree with that concept?

7    A.  I do.

8    Q.  One of the articles that I asked you to review was an

9    article by Alexis Artwohl.  Do you recall that?

10   A.  I do.                                                          16:36:29

11   Q.  And do you know who she is?

12   A.  I do.

13   Q.  And hang on just a second.

14            Tell the jury who she is.

15   A.  Alexis Artwohl, I believe, is a Tusconian, if that's the      16:36:44

16   right term.  She's had her police psychologist experience in

17   the Portland Police Bureau in Oregon until she retired and now

18   has done a lot of work on officer-involved shootings, and has

19   published some of the most important work on helping us

20   understand the various perceptual distortions and memory          16:37:05

21   impairments that occur in officer-involved shootings.

22   Q.  And the article I asked you to read was in the October 2002

23   issue of the FBI Law Enforcement Bulletin generated by the

24   Department of Justice; is that right?

25   A.  Yes.                                                          16:37:24

────── **Philip Trompetter – Cross-Examination** ──────

 1    Q.  The same entity that employs these two prosecutors right

 2    here.

 3            I want to refer you to some of the statements that she

 4    made in the article and ask if you agree.

 5            She points out examples or statistical numbers of          16:37:41

 6    different memory issues and perceptual difficulties experienced

 7    by officers in officer-involved shootings; is that right?

 8    A.  Yes.

 9    Q.  And in the study that she was involved in, which I think

10    involved 157 officers, 62 percent of them reported distortion,     16:38:11

11    sensory distortion in terms of slow motion.

12            Does that sound right to you?

13    A.  It does.

14    Q.  84 percent noticed that sounds seemed diminished.  True?

15    A.  Yes.                                                            16:38:31

16    Q.  79 percent reported tunnel vision.  True?

17    A.  True.

18    Q.  74 percent said they responded on, quote, auto pilot, close

19    quote, with little or no conscious thought.

20    A.  True.                                                          16:38:46

21    Q.  Is that true?

22    A.  Yes, sir.

23    Q.  And what does that mean, going on auto pilot?

24    A.  Auto pilot I believe to most of us means that there's

25    several actions that are involved in a deadly force response by    16:38:57

Philip Trompetter - Cross-Examination

1   a police officer that the officer doesn't have to think about.

2   In the same way that you and I and the jury and the people in

3   this room don't have to think about applying the brakes if we

4   need to stop a car or putting our foot on the accelerator.

5   Those are in our muscle memory.  All we have to decide to do is    16:39:16

6   to stop or to go.

7            So I think what she's talking about there is drawing

8   your holster, re-holstering, squeezing the trigger, counting

9   rounds.  Those are the kinds of things that officers go on

10  automatic about.  Not that they're automatons that don't have     16:39:35

11  the ability or the requirement to think it through as they're

12  doing it.

13  Q.  Getting back to Dr. Miller's report, he states on page 7

14  that tunnel vision can occur in as many as 70 percent of the

15  cases of an officer-involved shooting.                            16:39:53

16           That's second paragraph of page -- that subsection we

17  were just talking about.

18           I'm sorry, I misread that.  He writes:  In some cases

19  peripheral vision may be narrowed as much as 70 percent.

20           Do you agree with that?                                  16:40:12

21  A.  I do.

22  Q.  Getting back to Art -- Dr. Artwohl's article, she also

23  writes that in this study she found that 46 percent of officers

24  involved experience memory loss of some of their behavior

25  during the event.  True?                                          16:40:36

─── **Philip Trompetter – Cross-Examination** ───

1   A.  True.

2   Q.  And it doesn't specify what fragment of the behavior, just

3   some of the behavior; right?

4   A.  Her article doesn't specify.

5   Q.  Did you say that you also reviewed the human factors          16:40:48

6   article by Mr. Lewinski?

7   A.  I knew the article and briefly re-reviewed the Honig

8   Lewinski article that you provided.

9   Q.  Now, Lewinski is a professor at the Minnesota State

10  University, and he's recognized as an expert in this field,      16:41:19

11  isn't he?

12  A.  Yes.

13  Q.  And he published an article in the Law Enforcement

14  Executive Forum in 2008.  And that's the one that you reviewed?

15  A.  If that's the Honig Lewinski, yes.                            16:41:38

16  Q.  Yes.  He basically says in this article that under high

17  stress the focus and process of the brain shifts from one of

18  thinking to one of reacting.  And that the focus of the

19  operation shifts from the new brain and the hippocampus to the

20  amygdala, also known as the old brain.                           16:42:31

21       Do you agree with that statement?

22  A.  He's -- Audrey Honig and Bill Lewinski are making reference

23  to an Alexis Artwohl article where she's quoting a psychologist

24  by the name of Epstein.  And it's Epstein's work that talks

25  about that, how in high stress situations essentially all of     16:42:49

1    these biological functions occur, that I think Dr. Miller

2    testified to very nicely.

3          So I'm no expert in the specifics of the physiology of

4    the brain, but I've no reason to disagree with the statement in

5    that Honig Lewinski article.                                    16:43:07

6    Q.  And you have no issue with Dr. Miller's testimony on the

7    biological facets of how the brain reacts in a high stress

8    situation?

9    A.  I have no issue with that.

10   Q.  This article also indicates that an officer operating under  16:43:22

11   low light conditions can fail to accurately identify

12   individuals or objects in close proximity, and will be more

13   vulnerable to respond to furtive movements.

14         He also points out that the problem, that use of force

15   training usually occurs during the day, while many            16:44:01

16   officer-involved shootings occur at night or in low light

17   conditions.

18         Do you agree with that?

19   A.  I do.

20   Q.  And you know that this case involved low light conditions   16:44:12

21   and occurred at night?

22   A.  I believe -- I know it occurred at about 11:15 at night.

23   So I don't know how precisely I'm aware of whether the lighting

24   conditions were adequate or not adequate.  But I know it wasn't

25   daylight, and I think there was a street lamp.                 16:44:29

1  Q.  Getting back to Artwohl's article, she drew excerpts at the

2  beginning of perceptual difficulties experienced by individual

3  police officers, and cited them in her article.  And I want to

4  read a few of them to you and see if you've encountered similar

5  reports by officers that you've spoken to.                        16:44:53

6        The first one she wrote about, the officer told her,

7  the suspect -- I saw the suspect suddenly point his gun at my

8  partner.  As I shot him I saw my partner go down in a spray of

9  blood.  I ran over to my partner and he was standing there

10 unharmed.  The suspect never even got off a shot.                 16:45:12

11       Is that consistent with the types of things you've

12 heard from police officers over the course of your career?

13 A.  Yes.

14 Q.  Here's another one.

15       When I got home after the shooting, my wife told me     16:45:25

16 that I had called her on my cellphone during the pursuit of the

17 violent suspect just prior to the shooting.  I have no memory

18 of making that phone call.

19       Is that consistent too?

20 A.  Yes.                                                          16:45:40

21 Q.  Here's another one.

22       I told the SWAT team that the suspect was firing at me

23 from down a long, dark hallway about 40 feet long.  When I went

24 back to the scene the next day, I was shocked to discover that

25 he had actually been only about five feet in front of me in an   16:45:56

**Philip Trompetter – Cross-Examination**

1   open room.  There was no dark hallway.

2          Is that consistent with the types of things you've

3   been told in the past?

4   A.  Yes, that's a very common phenomena.

5   Q.  Common -- how could it be common?  This individual is          16:46:12

6   saying, I thought the person was 40 feet away and it turned out

7   to be five feet.

8   A.  But those are the kinds of distortions that happen in these

9   kinds of situations.

10  Q.  It's an indication of how extreme stress can warp and        16:46:27

11  percept -- change your perception; right?

12  A.  Yes.

13  Q.  And just because he said that, he thought it was 40 feet

14  away, doesn't mean he was lying.  It's what he perceived at the

15  time; right?                                                       16:46:49

16  A.  I agree.

17  Q.  Here's another one:  During a violent shootout I looked

18  over, drawn to the sudden mayhem, and was puzzled to see beer

19  cans slowly floating through the air past my face.  What was

20  even more puzzling was they had the word "federal" printed on    16:47:05

21  the bottom.  They turned out to be shell casings ejected by the

22  officer who was firing next to me.

23          Have you ever heard of anything like that?

24  A.  I have.

25  Q.  So this guy is so stressed out that he has projected the      16:47:16

UNITED STATES DISTRICT COURT

1    size of a shell casing that's this big to the size of a beer

2    can, and he's so focused on it that he can see the word

3    "federal" stamped on the back of the shell casing?

4    A.  Yes.

5    Q.  The truth is is that you believe that there's some things     16:47:33

6    that were unusual about this case, and you've stated them, but

7    you can't get into Swartz's mind.  Nobody can.  You don't know

8    what he was thinking at the time, do you?

9    A.  That's correct.

10        (Discussion off the record between defense counsel.)        16:48:11

11   BY MR. CHAPMAN:

12   Q.  Sir, you testified that you -- that you really hadn't

13   experienced the notion of threat -- you testified you really

14   hadn't heard of threat magnification and it wasn't used in this

15   field.  And, of course, we just heard that a few minutes ago,     16:48:48

16   we didn't have a chance to respond.  But my co-counsel here has

17   done some research.

18        And I'm just going to ask you:  Were you aware that

19   on -- in May of 2010 the Journal of Personality wrote an

20   article called Personality and Defensive Reactions; Fear, Trait     16:49:07

21   Anxiety, and Threat Magnification?

22        Were you aware of that?

23   A.  I'm not aware of that.

24        My testimony, Mr. Chapman, was that I've never read

25   that term in the police psychology literature.                    16:49:18

UNITED STATES DISTRICT COURT

──── **Philip Trompetter - Redirect Examination** ────

1   Q.  And it goes on to talk about threat magnification.

2        The extent of this threat magnification mediated the

3   positive association between fear and orientation away from the

4   threat.

5        You're not aware of this article?                          16:49:38

6   A.  I'm not.

7        MR. CHAPMAN:  I don't have any further questions.

8        THE COURT:  Miss Feldmeier, anything further?

9        MS. FELDMEIER:  Real quick, Your Honor.

10       THE COURT:  The lawyers can do research, you can't.        16:50:04

11       MS. FELDMEIER:  And we're abysmal at it.

12                      REDIRECT EXAMINATION

13  BY MS. FELDMEIER:

14  Q.  So the article that counsel just suggested to you was

15  someone stating we investigated this theory in two separate     16:50:34

16  studies using a threat scenario research strategy.  It

17  shows -- it's just a real short little blurb here, so I can't

18  even tell --

19       It looks like the authors of this article an Adam

20  Perkins, Andrew Cooper, Maura Abdelall, Luke Smillie and        16:50:55

21  Philip Corr.

22       Are any of those individuals police psychologists,

23  that you're aware of?

24  A.  Not to my knowledge.

25  Q.  In fact, police officers are trained, because of the fact   16:51:07

*Philip Trompetter – Redirect Examination*

```
 1   that it's known they're going to come into high threat

 2   situations, it's part of their job.

 3   A.  Yes.

 4   Q.  And so one -- well, I don't want to put you outside the

 5   area of your expertise, but what is the purpose of training an     16:51:35

 6   officer to encounter these -- you train officers.  So what's

 7   the purpose of training officers on high threat situations?

 8   A.  Well, part of the reason that we train officers is to

 9   overcome these biological responses.  We don't -- none of us

10   should be responding just biologically to what we perceive as a    16:51:55

11   threat.  And that's why we train our officers, we give them

12   guidance, we give them rules to go by, rules of engagement,

13   give them various options.

14           MR. CHAPMAN:  Objection, Your Honor, this is use of

15   force testimony, it's not appropriate in this witness.            16:52:10

16           THE COURT:  Overruled.  I'll let him finish his

17   answer.

18           THE WITNESS:  So I think -- part of the training of

19   officers, particularly in deadly force confrontations, is to

20   have some -- some protocol, some schema if you will, to go by     16:52:23

21   to help them offset what their biology wants them to do.  And

22   we expect them to abide by that.

23   BY MS. FELDMEIER:

24   Q.  And that's part of the psychologist in you, is you know

25   that's how the brain works, and so you encourage the training.    16:52:41
```

──────── **Philip Trompetter – Redirect Examination** ────────

1    That would be your professional advice as a psychologist;

2    right?

3    A.   Sure.

4    Q.   Now Mr. Chapman read you a couple of series of examples out

5    of the Artwohl article.                                              16:52:56

6         Am I correct in understanding that Artwohl's position

7    is that memory loss of officer behavior during the event is not

8    uncommon?

9    A.   Well, there's memory loss of lots of things, including

10   memory loss for some of your own behavior.                           16:53:13

11   Q.   Okay.  And his examples of no memory of making a phone

12   call, for example, to your wife, is that the kind of memory

13   loss that you and I were discussing on direct examination we

14   heard from Mr. Swartz?

15   A.   Well, I mean, there's probably various explanations for it.     16:53:32

16   But I think the -- I think every explanation would have as a

17   bottom line, the officer wasn't paying that much attention to

18   what he was doing on the phone or the officer would remember

19   that phone call.  The officer was obviously distracted or

20   preoccupied with other things, as would be understandable.          16:53:51

21   Q.   So is the point of your testimony really the basic fact

22   that we heard from the defendant that he has a memory loss

23   involving the threat itself, and a memory loss of why he

24   stopped shooting at said threat.  Is that the issue?

25   A.   Well, I'm going to push and I'm going to pull.                   16:54:11

Philip Trompetter – Redirect Examination

1   Q.  Go ahead.

2   A.  I think there's clearly memory impairment for officers in

3   officer-involved shootings for the majority of the officers.  I

4   have never once seen a case though where an officer had a

5   memory loss for the threat that they were delivering deadly          16:54:26

6   force toward.

7   Q.  Okay.  In fact, when we see the bullet casings flying by

8   they look like beer cans, he's focused on things that could

9   hurt him.

10  A.  Well, the distinction too, is, you know, there's clearly        16:54:40

11  perceptual distortions.  And I know Dr. Miller talked about the

12  distortion.

13          A distortion is different than a hallucination, if I

14  can --

15  Q.  Yes.                                                            16:54:52

16  A.  A hallucination is where you see or you hear or you feel

17  something that is absolutely not there, it's just not present.

18          A perceptual distortion is where you, say visually, is

19  you see something but you misinterpret what it is.  So in this

20  case, just as an example, if Agent Swartz had said, as he was      16:55:06

21  scanning to the west and there was like an electrical box on

22  the corner that he misperceived as a rock thrower, that would

23  be more believable than saying, he doesn't remember -- he can't

24  articulate any threat.  That just seemed to me to me to be

25  inconsistent with my experience and with the science.              16:55:28

UNITED STATES DISTRICT COURT

—Philip Trompetter – Redirect Examination—

1          MS. FELDMEIER:  No other questions, Your Honor.

2          THE COURT:  Jurors have any questions, please place

3     them in writing.

4        (At sidebar on the record.)

5          THE COURT:  I'm going to give you the instructions            16:55:50

6     that I've worked on so far, let you take them home, take a look

7     at them.  And then we can meet Monday morning at 9:00 o'clock

8     and hash out anything we have problems with.

9          MR. CHAPMAN:  And start close at --

10          THE COURT:  At 10:00.  Can we do that?                        16:56:10

11          MR. CHAPMAN:  Yeah.

12          THE COURT:  Okay.

13          MR. CALLE:  There is one issue.  The issue is, we have

14     all these exhibits, and --

15          THE COURT:  You can check with Sherry today.                 16:56:18

16          MR. CALLE:  I'm talking about, how does the

17     jury -- like the last time we did this, we actually provided a

18     computer for the jury.

19          THE COURT:  We may have to do that.

20          MR. CALLE:  I have one.                                       16:56:30

21          THE COURT:  Okay.  We'll do that.

22          MS. FELDMEIER:  Maybe yours will work.

23          THE COURT:  Yours will probably work, too.

24          All right.  So I'll have the jury come back Monday at

25     10:00.  We'll meet at 9:00 o'clock on Monday.                     16:56:37

─────── **Philip Trompetter – Jury Questions** ───────

```
 1            I'm going to have them give you a packet to take home

 2    with you.

 3            This is the whole purpose we came over here.

 4            If the officers are trained to counter biological

 5    reactions in high stress situations, why do officers still have      16:56:50

 6    biological reactions to high stress situations?

 7            How many officer-involved shootings have you

 8    physically been at when they occurred?

 9            Do you ask each police officer after the shooting if

10    they had any nausea or vomiting?                                     16:57:10

11            If you -- if you were to evaluate Agent Swartz of his

12    action on October 10, 2012, what's your evaluation of him?

13            No, not that one.

14            MS. FELDMEIER:  Do you think that's a question?

15    Probably not.                                                        16:57:29

16            THE COURT:  Did you have a chance to talk to Swartz

17    about the incident?

18            No, I'm not going to ask him that one either.

19        (End of discussion at sidebar.)

20            THE COURT:  I have a couple questions from the jury.         16:57:43

21            If the officers are trained to counter biological

22    reactions in high stress situations, why do officers still have

23    biological reactions to high stress situations?

24            THE WITNESS:  Well, the training doesn't really stop

25    the biological reactions, it just helps them manage it.  So          16:58:02
```

1    that would basically be my response to that.

2          THE COURT:  How many officer-involved shootings have

3    you physically been at when they occurred?

4          THE WITNESS:  As the shooting occurred?

5          THE COURT:  Yes.                                          16:58:17

6          THE WITNESS:  None.

7          THE COURT:  Do you ask each police officer after a

8    shooting if they had any nausea or vomiting?

9          THE WITNESS:  I ask them if they have any kinds of

10    physical symptoms.                                             16:58:29

11          THE COURT:  Miss Feldmeier?

12          MS. FELDMEIER:  Nothing.

13          THE COURT:  Mr. Chapman?

14          MR. CHAPMAN:  No further questions.

15          THE COURT:  Thank you.  You may step down.              16:58:36

16          THE WITNESS:  Thank you, Your Honor.

17      (Further proceedings held on the record not included in

18    this transcript.)

19

20                           -oOo-

21

22

23

24

25

1

2

3

4                     C E R T I F I C A T E

5

6          I, CANDY L. POTTER, do hereby certify that I am duly

7   appointed and qualified to act as Official Court Reporter for

8   the United States District Court for the District of Arizona.

9          I FURTHER CERTIFY that the foregoing pages constitute

10  a full, true, and accurate transcript of all of that portion of

11  the proceedings contained herein, had in the above-entitled

12  cause on the date specified therein, and that said transcript

13  was prepared under my direction and control.

14          DATED at Phoenix, Arizona, this 4th day of June,

15  2018.

16

17

18                           s/Candy L. Potter_____
19                           Candy L. Potter, RMR, CRR

20

21

22

23

24

25