**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| **United States of America,** | ) | |
| | ) | No.  **CR-15-1723-TUC-RCC-DTF** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Tucson, Arizona |
| | ) | March 21, 2018 |
| **Lonnie Ray Swartz,** | ) | 2:09 p.m. |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE RANER C. COLLINS, JUDGE**

<u>**REPORTER'S EXCERPTED TRANSCRIPT OF PROCEEDINGS**</u>

<u>**JURY TRIAL**</u>
<u>**DAY 2**</u>

**(TESTIMONY OF GARY WEAVER)**

Official Court Reporter:
Candy L. Potter, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 36
Phoenix, Arizona 85003-2151
(602) 322-7246

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

CR-15-1723-TUC-RCC – March 21, 2018

1

2                                  **A P P E A R A N C E S**

3

   For the Government:
4        U.S. Attorney's Office Tucson
         By:  **Wallace Heath Kleindienst**, Esq.
5             **Mary Sue Feldmeier**, Esq.
         405 West Congress Street, Suite 4800
6        Tucson, Arizona 85701

7  For the Defendant:
         Law Offices of Sean C. Chapman
8        By:  **Sean Christopher Chapman**, Esq.
         100 North Stone Avenue, Suite 701
9        Tucson, Arizona 85701

10       Law Office of Jim E. Calle
         By:  **Jamie Ernest Calle, III**, Esq.
11       2315 East Hawthorne Street
         Tucson, Arizona 85719

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                        **I N D E X**

3    **GOVERNMENT WITNESS:**        **DIRECT**    **CROSS**    **REDIRECT**  **RECROSS**

4    GARY WEAVER
     By Ms. Feldmeier         4
5    By Mr. Calle                        16
     By Ms. Feldmeier                               30
6

7

8

9    Discussion Held at Sidebar        13

10

11

12                      **INDEX OF EXHIBITS**

13   **EXHIBIT**                              **IDENT**   **RECEIVED**

14   NO.       DESCRIPTION

15   12A       Camera 24_20121010_2030-2400.exe   11        9

16   12B       Camera 24_20121011_0000-0030.exe   9         9

17   12C       Camera 27_20121010_2300_2400.exe   12        9

18   12D       Camera 27_20121011_0000-0030.exe   9         9

19   1371      E-mails re video camera            23        25

20

21

22

23

24

25

─── **Gary Weaver – Direct Examination** ───

1      (The following excerpt is the testimony of Gary Weaver.)

2           THE COURT:  You may call your next witness.

3           MS. FELDMEIER:  Gary Weaver.

4      (GARY WEAVER, GOVERNMENT WITNESS, PREVIOUSLY SWORN.)

5           THE CLERK:  Please speak directly into the microphone.    14:09:57

6           State your full name for the record and please spell

7  your last name.

8           THE WITNESS:  Gary Weaver, W-E-A-V-E-R.

9           MS. FELDMEIER:  I'll get the hang of it, Your Honor.

10          May I have a moment?                                      14:10:57

11          THE COURT:  Sure.

12     (Discussion off the record between counsel.)

13          MS. FELDMEIER:  All right.  Thank you, Your Honor.

14                       DIRECT EXAMINATION

15  BY MS. FELDMEIER:                                                 14:11:15

16  Q.  Please state your name again.

17  A.  Gary Weaver.

18  Q.  Where are you employed?

19  A.  I'm a federal employee employed by the Office of

20  Information and Technology, which is under the Customs & Border   14:11:23

21  Protection.

22  Q.  And how long have you been employed there?

23  A.  Directly since 2006.

24  Q.  And prior to that?

25  A.  Prior to that I was a contractor.  I started -- my IT         14:11:32

**Gary Weaver – Direct Examination**

1  experience starts back in 1979 when I was a senior electrical

2  engineering analyst for the defense contractor at Newport News

3  Shipbuilding.  I did the design and implementation of

4  communications and tactical systems on Los Angeles class

5  submarines, SMM-688.                                    14:11:52

6  Q.  And so you've been in the IT field ever since?

7  A.  Yes.

8  Q.  What were your duties in October of 2012?

9  A.  I was the IT administrative person over the DVR systems, in

10 addition to other IT functions; network analysis, deploying new  14:12:04

11 hardware, fixing problems.

12 Q.  And which -- at what location?

13 A.  At the Nogales Border Patrol Station.

14 Q.  Were you familiar with the surveillance cameras and the

15 DVRs, since they were in your area of responsibility?         14:12:18

16 A.  Primarily the DVRs, but the cameras, yes.

17 Q.  Would you explain for the jury which DVRs you had?

18 A.  We -- for field operations we had dedicated two DVRs, and

19 they were exclusively just to videotape operations out in the

20 field where Border Patrol had placed cameras.  On those two    14:12:37

21 DVRs there were 16 cameras on each one.  So a total of 32

22 cameras on two DVRs.

23 Q.  And when we're talking about cameras, are these infrared or

24 are these daytime cameras?

25 A.  There's a mixture, we have infrared and daytime cameras,    14:12:50

—Gary Weaver – Direct Examination—

1  and they're placed in locations however Border Patrol want them

2  placed.

3  Q.  So could you explain to the jury, what's a daytime camera?

4  A.  A daytime camera is a camera that uses available light to

5  illuminate the scene, just think of a normal camera you use to        14:13:04

6  take a picture outside.

7        An infrared camera is a camera that uses infrared IR

8  and kind of zeroes in on heat.

9  Q.  Okay.  And when you had -- would you have an infrared and a

10  daytime in the same location?                                        14:13:18

11  A.  Yes.

12  Q.  And when that happened, how many ports were they using on

13  the DVR?

14  A.  Both ports fed one channel on the DVR.  And the operator

15  would switch back and forth between the cameras, whatever           14:13:31

16  camera they chose to meet their purpose.

17  Q.  So in other words, the camera operator can switch daytime,

18  nighttime, daytime, nighttime, and it's just to going to feed

19  into the same video feed?

20  A.  Yes.                                                            14:13:42

21  Q.  Okay.  What was your -- how often does this DVR take on

22  recordings?

23  A.  These DVRS were configured to run 24 hours a day.  And

24  their capacity was purchased so they would go 90 days, 24 hours

25  a day, before they would automatically override.                   14:14:00

Gary Weaver – Direct Examination

1  Q.  And then in the course of your duties were you ever asked

2  to pull tape for investigations?

3  A.  Yes.  I would be notified when that was necessary.

4  Q.  And in those cases were you directly involved in the

5  investigations?                                              14:14:15

6  A.  My only job was to pull the video and provide it to the

7  Border Patrol.

8  Q.  And then how would you know which video to pull?

9  A.  They would tell me.

10  Q.  So on October the 11th of 2012, did someone ask you to pull  14:14:23

11  some video from two cameras?

12  A.  Yes.  I received an e-mail from supervisory Border Patrol

13  Agent Christopher Knab requesting video.

14  Q.  And how many cameras did he ask for?

15  A.  Two, I believe, yes.                                      14:14:38

16  Q.  And do you remember the camera numbers he asked for?  If

17  you recall.

18  A.  I believe one was 24, and there was another one.

19  Q.  Okay.  Now does that mean anything to you, 24

20  and -- whatever the other one was?                           14:14:51

21  A.  Those numbers mean locations, and those locations are

22  determined by the Border Patrol.  Wherever they would put a

23  camera, they would give it a designation so they would know

24  what it is.

25  Q.  But that particular designation is not necessarily how your  14:15:01

UNITED STATES DISTRICT COURT

─────── **Gary Weaver – Direct Examination** ───────

1   DVR is set up; right?

2   A.  No.

3   Q.  So what would you do to determine which DVR to go to to get

4   this?

5   A.  Normally the requestor will tell us which camera it was.          14:15:09

6   And there was a matrix that a link was maintained, so they

7   would know, for example, camera 24 was channel 4, for example.

8   Q.  I'm going to show you what's been marked as Exhibit 12 for

9   identification.

10          Do you recognize that?                                        14:15:32

11  A.  Yes, this is my handwriting.

12  Q.  And can you tell us which cameras and what date and time

13  ranges were pulled, according to your handwriting?

14  A.  The first camera is camera 24.  The date is October 10th

15  through the 11th.  And the time is 2300, or 11:00 p.m. to 12:30       14:15:45

16  the next day.

17          So that tells me for camera 24 there's video that

18  starts on the 11th, and goes to the 11th up until 12:30.

19          Camera 27 looks like it's the same thing, the video

20  starts 11:00 p.m. and goes through midnight and up until 12:30        14:16:07

21  a.m. the next day.

22          MS. FELDMEIER:  I move the admission of Exhibit No.

23  12.

24          MR. CALLE:  No objection, Your Honor.

25          THE COURT:  12 can be admitted.                               14:16:19

UNITED STATES DISTRICT COURT

---

**Gary Weaver – Direct Examination**

1          (Exhibit No. 12 admitted into evidence.)

2     BY MS. FELDMEIER:

3     Q.  If I can direct your attention, Mr. Duran (sic), over to

4     number 12 on this list.  I'm sort of circling it here with my

5     cursor.  It says 12A.                                    14:16:51

6          THE COURT:  No one can see it except you.

7          MS. FELDMEIER:  Oh, lovely.

8     BY MS. FELDMEIER:

9     Q.  All right.  Direct your attention here to this -- under

10    Exhibit 12 it says, DVD USBP camera 24, 27.  Underneath it   14:17:08

11    there's four files.

12          Except for the exhibit marker that's been placed to

13    the left of them, do you recognize the naming protocol of these

14    four files that I'm highlighting, 12A through D?

15    A.  Yes.  Those are the videos that I produced as requested by  14:17:27

16    Supervisor Knab.

17    Q.  All right.  Now, the jury's going to be looking at these

18    videos a lot in the next couple of weeks.  So I would like it

19    if you could walk us through some of the markings that are on

20    them, and some of the other numbers we're going to see on there  14:17:43

21    and how they all match up.

22    A.  If I could point out one thing also.

23    Q.  Yes.

24    A.  If you notice the name of the file, the extension is .exe,

25    that's the container particular to these DVRs that will tell   14:17:55

---

UNITED STATES DISTRICT COURT

**Gary Weaver – Direct Examination**

1  you how these videos were made.

2  Q.  And what does this one tell you?

3  A.  The settings on the DVR, there was several settings, and

4  for investigatory purposes you can create video that is native

5  video to the DVR with a decompression algorithm and a player          14:18:12

6  all built into one.

7  Q.  And why, what's the point of that?

8  A.  Because, number one, it makes it portable for the user and

9  it actually protects the video because it's hard to modify this

10  once it's produced.                                                   14:18:27

11  Q.  Okay.  So you purposely chose the executable file format?

12  A.  Yes.

13  Q.  So directing your attention then to the first one, that

14  naming protocol, what is that telling us?

15  A.  That's the name of the camera, camera 24.  And there's a         14:18:40

16  dates, 2012-10-10, so that's October 10th, 2012, 2300 to 2400,

17  that's 11:00 p.m. to midnight.

18  Q.  And then just below it we have another camera 24.  Why do

19  we have two?

20  A.  Because that's where the day change occurred.  That next         14:18:56

21  camera is October 11th, 2012, same camera 24, but it starts at

22  midnight and stops at 12:30 a.m.

23  Q.  And then following down, the next camera?

24  A.  Camera 27, October 10th, 2012, camera 27 started at 11:00

25  p.m., 2300 hours, and stopped at midnight.  Camera 27 picks up       14:19:18

Gary Weaver – Direct Examination

1    on October 11th, 2012, at midnight, and runs until 12:30.

2    Q.  Now what I'm going to do is I'm going to open one of these

3    up so that you can then describe for us some other information.

4         We're going to start with camera 24.  I'm going to go

5    ahead and expand.  It's probably going to make it really tough    14:19:44

6    to see.

7         And we're going to go ahead and hit pause so we're not

8    distracted by movement.

9         And this is Exhibit 12A.  Now looking at 12A I see

10   across -- I thought I just opened camera 24.                       14:19:57

11   A.  You did.

12   Q.  All right.  Why does it say camera 4?

13   A.  So you'll see the -- starting at the top left, the date and

14   the time that the sequence was created, and it says camera 4.

15   So remember I said we have two DVRs, there were 16 channels        14:20:11

16   per.  So this is channel 4 -- or camera 4 on one of the two

17   DVRs.

18   Q.  I'm going to use my cursor and I'm going to direct your

19   attention down to the bottom left.  And again, we have a date

20   and a time.  But I'm going to go to the second little box here.    14:20:26

21        What does that tell us?

22   A.  That tells us which DVR this came from.  So this came from

23   camera 4 -- channel 4 of DVR number 2.

24   Q.  And then we go to the right, and is there another

25   indicator?                                                         14:20:40

UNITED STATES DISTRICT COURT

—— Gary Weaver – Direct Examination ——

1  A.  That's a field -- a data field that we could put in exactly

2  what channel 4 or camera 4 was recording.  In this case camera

3  24.

4  Q.  And what I'm going to do is go back over now to camera 27,

5  Exhibit 12C.                                                    14:21:00

6          And again, we thought we were in camera 27.  But if

7  you could, walk us through what we're looking at.

8  A.  Again, this is October 10th at 10:59, almost 2300 hours.

9  It's camera 6 -- or that's channel 6 on this DVR.  And if we

10  look down at the bottom we can see that it's DVR number 1.  And  14:21:21

11  we can know that DVR-1 is set up to record camera 27.

12  Q.  Because that's in the next box?

13  A.  Yes.

14  Q.  So what we know is that both videos of this incident were

15  recorded on two separate DVRs.                                  14:21:38

16  A.  Correct.

17  Q.  That brings me to the next question.

18          Are you familiar with something called clock drift?

19  A.  Yes.

20  Q.  What is that?                                               14:21:47

21  A.  In electronic devices and devices that are based on

22  crystals to produce the time, there is a possibility that they

23  can run at different rates.  Normally in computers and

24  electronic devices there is a centralized reference time server

25  that the devices communicate with --                           14:22:03

——Gary Weaver – Direct Examination——

1      MR. CALLE:  Your Honor --

2      THE WITNESS:  -- to address the time issue.

3      MR. CALLE:  I'm going to object.  Can we approach the

4  bench?

5      THE COURT:  Sure.                                        14:22:10

6    (At sidebar on the record.)

7      THE COURT:  We made it 53 minutes before our first

8  bench conference.

9      MR. CALLE:  I needed to hear what this -- what we were

10 talking about here.  I let her talk a little bit.  But I don't   14:22:31

11 remember any disclosure on clock drift.

12     THE COURT:  He talked about there's a time that shows

13 up on the DVR that's not the same as the actual time.  That's

14 what he's talking about.

15     MR. CALLE:  But there's no reports, there's nothing in   14:22:45

16 the record.

17     MS. FELDMEIER:  Well, he's not an expert, he's just

18 the IT guy.

19     MR. CHAPMAN:  Clock drift sounds like a matter of

20 expert opinion to me.                                         14:22:55

21     MR. CALLE:  Right.

22     THE COURT:  I think he testified about it when he came

23 in front of me the last time.

24     MS. FELDMEIER:  Like why they would be off by --

25     MR. CALLE:  I just went through his transcript, I      14:23:00

─── Gary Weaver – Direct Examination ───

1    don't remember --

2              THE COURT:  There's a time that shows up --

3              MR. CALLE:  The difference between the two?

4              MS. FELDMEIER:  Yeah.

5              MR. CALLE:  All right.  That's fine.                    14:23:05

6              MS. FELDMEIER:  That's what I mean.  That's what clock

7    drift is.

8              MR. CALLE:  That will help with the jury.  They'll

9    understand why there is a difference.

10             MS. FELDMEIER:  Yeah, they need to understand why      14:23:14

11   there's a difference between --

12             THE COURT:  Okay.

13             MS. FELDMEIER:  That's all we're going at.

14        (End of discussion at sidebar.)

15             THE COURT:  You may continue.                          14:23:24

16   BY MS. FELDMEIER:

17   Q.  Let me cut to the chase, Mr. Weaver.  If I told you that a

18   movement match of camera 27 and camera 24, they match the

19   movement within it, it shows that this -- one of them is

20   running at a four second difference from the other one, what    14:23:37

21   would you say to that?

22   A.  I would say that's a symptom of time drift or clock drift.

23   Q.  Is that because each DVR is not programmed exactly down to

24   the teeniest second?

25   A.  Correct.  And they're not referencing a centralized time    14:23:52

—Gary Weaver – Direct Examination—

1  server.  I set these up, and when I did they were started at

2  the same time.  So over a period of time you can have drift, if

3  they don't synchronize.  And it looks like what happened here.

4  Q.  Okay.  Now another thing, if I tell you that we're going to

5  see things on this video screen that claim to be happening at          14:24:10

6  11:15 at night, but we know from other evidence that it really

7  happened at 11:30, what is that a symptom of?

8  A.  That would tell me that's -- the video took the reference

9  from the DVR it was recorded from.  So if that time was drifted

10 15, ten minutes, that's the time that's going to be on the            14:24:29

11 screen.

12 Q.  In your experience is that unusual, clock drift?

13 A.  It's not unusual.  And we try to prevent that by having all

14 electronic devices synchronized to a centralized time server,

15 but if they can't talk to the centralized reference clock, it's      14:24:46

16 going to drift.

17 Q.  Okay.  At the time that these DVDs were burned, how long

18 did the Border Patrol have these DVRs?

19 A.  These DVRs were purchased in 2009.

20 Q.  And this happened in 2012.                                        14:25:10

21 A.  Yes.

22 Q.  And since then, do you still have these or have you gone

23 greater and bigger?

24 A.  They've gone greater and bigger.

25         MS. FELDMEIER:  Okay.  If I may have a moment.                14:25:20

1          THE COURT:  You may.

2      (Discussion off the record between Government counsel.)

3          MS. FELDMEIER:  No further questions.

4          THE COURT:  Mr. Calle.

5                     CROSS-EXAMINATION                        14:25:31

6  BY MR. CALLE:

7  Q.  Hello, Mr. Weaver.

8  A.  Sir.

9  Q.  You were the person that participated in the purchase of

10 these DVRs; is that correct?                                14:26:21

11 A.  I assisted Border Patrol, yes.

12 Q.  And there were certain requirements that the Border Patrol

13 had set when they asked you to purchase these DVRs; is that

14 correct?

15 A.  There was a standard.  We wanted to exceed that          14:26:34

16 requirement.  The standard at that time was for 30-day

17 retention with automatic overwrite.  But we wanted to do better

18 than that, because it gives you more time to work different

19 issues that may come over 90 days as opposed to 30.

20 Q.  And what you were doing was you were replacing a VHS, a    14:26:51

21 tape system with a digital system.  Is that fair to say?

22 A.  Yes, sir.

23 Q.  And the system that you were purchasing had enough ports to

24 handle all of the 32 cameras; correct?

25 A.  Sixteen per, yes.                                         14:27:06

1  Q.  Sixteen per.  They had two terabytes of space in them, so

2  as you said they could record and you could retain the data for

3  up to 90 days.

4  A.  Yes.

5  Q.  But if a request came to you for a portion of the video          14:27:15

6  after that 90-day window had passed, that video no longer

7  existed; is that true?

8  A.  It would be automatically overwritten.

9  Q.  Because that's the way the system has --

10  A.  Yes.                                                            14:27:31

11  Q.  -- been set up.

12          And in addition to the requirements in terms of the

13  size of that system, there was also requirements in reference

14  to the quality of the system; is that correct?

15  A.  Yes.                                                            14:27:43

16  Q.  And you wanted to be able to record at the highest quality

17  possible; correct?

18  A.  Yes.

19  Q.  And you wanted to be able to record at 30 frames per

20  second.                                                            14:27:55

21  A.  Yes.

22  Q.  Now, as a reference, movies are made at 24 frames per

23  second --

24  A.  Yes.

25  Q.  -- is that correct?                                            14:28:02

**Gary Weaver – Cross-Examination**

1          And with 30 frames per second, one of the

2    things -- one of the things that the frame rate impacts is

3    motion; is that correct?

4    A.  Yes.

5    Q.  And the more frames per second, then the more accurate,          14:28:14

6    more detailed will be the motion that's depicted in the video.

7    A.  Yes.

8    Q.  Now, in addition there's something called the common

9    interface format.  If I understand your previous testimony,

10   that was something that was a selection that you could make          14:28:34

11   when you were setting up the DVRs in this case; is that

12   correct?

13   A.  That was the top resolution that this DVR could support,

14   yes.

15   Q.  So in 2009 when you purchased these DVRs, you were the one        14:28:44

16   that set them up.

17   A.  I set them up when they arrived, yes.

18   Q.  And the way you set them up in 2009 was for them to record

19   incoming video streams at 30 frames per second; correct?

20   A.  Yes.          14:29:01

21   Q.  And you also wanted it to be captured at what is called

22   4CIF or 4 Common Intermediate Format.

23   A.  Yes.

24   Q.  Now this gets really technical, and I want you to be able

25   to explain to the jury what we're talking about.          14:29:14

─────Gary Weaver – Cross-Examination─────

1          4CIF makes a reference to the resolution of the video

2    that's being captured; is that correct?

3    A.  Yes.

4    Q.  And at 4CIF what we're talking about is 704 lines of

5    resolution across the bottom, and then 480 lines of resolution          14:29:30

6    top to bottom; is that correct?

7    A.  Yes.

8    Q.  So when we talk about 1080 screens, people are somewhat

9    familiar with what that means, that's the resolution on a

10   screen; is that correct?          14:29:47

11   A.  Yes.

12   Q.  And what we have here in terms of what this DVR system was

13   trying to capture, was 4CIF, which is 740 -- I'm sorry, 704 by

14   480 lines of resolution; is that correct?

15   A.  Yes.          14:30:02

16   Q.  Now in 2009 you were the one that made these settings on

17   the DVRs; correct?

18   A.  Initial configuration, yes.

19   Q.  Did you ever change that before 2010 -- I'm sorry, 2012

20   when this incident came up and you needed to record this video?          14:30:18

21   A.  No, sir.

22   Q.  So at the time you made the election -- or you were asked

23   to record the videos in this case, your expectation would be

24   that the output from these DVRs would be at 30 frames per

25   second and at 4CIF; is that correct?          14:30:38

**Gary Weaver – Cross-Examination**

1  A.  Yes.  And it also depends on what the camera is set at.

2  Which, again, I did the DVRs.

3  Q.  Okay.  Now the cameras and DVRs that you oversaw --

4  specifically the DVRs, this is considered to be critical Border

5  Patrol infrastructure; is that correct?                          14:31:03

6  A.  Yes.

7  Q.  What does that mean?

8  A.  It means it must stay on on-line recording at all times.

9  Q.  And it must function as it is intended; is that correct?

10  A.  Correct.                                                      14:31:14

11  Q.  And if anything came to your knowledge indicating that the

12  system was not functioning correctly, you would have to correct

13  that.

14  A.  Yes.

15  Q.  Is that fair to say?                                          14:31:26

16  A.  Yes.

17  Q.  You might have to do what's called a Significant Incident

18  Report if there was some problem with this system.

19  A.  Yes.  If the system went on-line (sic), that could be

20  considered a Significant Incident Report.                        14:31:39

21  Q.  There's also something called a compression rate.  And in

22  this particular case the compression rate was something that we

23  call H.264.

24  A.  Yes.

25  Q.  And H.264 is essentially -- it's an algorithm.  But what an   14:31:54

21

1  algorithm is, it's essentially a series of instructions.

2  A.  Yes.

3  Q.  And with an algorithm in reference to a DVR, what it's

4  doing is it's essentially saying, here's video that's incoming,

5  but we don't need to store every little bit of that data          14:32:13

6  because it's -- under the algorithm it might be redundant.  So

7  we just copy some things forward within the data.  Is that fair

8  to say?

9  A.  Actually it only encodes what changes.

10 Q.  Well, that's what I'm saying.                                  14:32:27

11 A.  Okay.

12 Q.  It will simply copy forward the things that don't change,

13 but it will update the things that do change.

14 A.  That's a reference frame, it will keep that.

15 Q.  That's correct.                                                14:32:37

16      So in this case the expectation was that the

17 compression would be pursuant to the H.264.

18 A.  Within H.264 there are several profile layers.  So when I

19 did the configuration, you could actually pick from quality

20 level to low, medium, high, highest.  Highest being least        14:32:57

21 compression and taking the most space and requiring the most

22 bandwidth.

23 Q.  And what did you set it at, the highest?

24 A.  The highest.

25 Q.  That's correct.                                                14:33:08

1   A.  Highest quality, meaning lowest compression.

2   Q.  Now in terms of copying the videotapes that you created

3   onto these CDs, is it fair to say that no one can come in and

4   change the video quality because you had already preset it?

5   A.  You can't change the video quality, no, you'd have to take    14:33:30

6   the system down.

7   Q.  And it's also fair to say that what was copied onto those

8   CDs is what existed on the DVRs.

9   A.  Yes.

10  Q.  That's your testimony?                                         14:33:45

11  A.  That's the native format; correct.

12  Q.  You testified that there was a visible light camera, and

13  you also said that there was an infrared camera.  Do you

14  understand the difference between infrared and thermal imaging?

15  A.  Thermal comes under the heading of -- for example, there's    14:34:03

16  a company called Fligger that makes what they call IR cameras

17  that have thermal capabilities.

18         But under -- the term most people use is IR.

19  Q.  So to be fair, what you're saying is that you were in

20  general making reference to a camera as being infrared; is that   14:34:21

21  correct?

22  A.  Correct.

23  Q.  And you -- under your terminology it could have been a

24  general reference, so it could be infrared or thermal?

25  A.  Yes.                                                           14:34:33

1   Q.  Let me ask you about the -- well, first let me pull up an

2   exhibit here.

3           Let me show you what is marked as Exhibit 1371.  Do

4   you see that?

5   A.  Yes.                                                    14:35:03

6   Q.  And do you see that these are e-mails between you and -- at

7   least initially between you and Mary Sue -- between

8   Miss Feldmeier and yourself, the U.S. Attorney?

9   A.  Yes.

10  Q.  And what you were doing is you were forwarding the          14:35:17

11  communications that documented the directive that you got to

12  copy this video; is that correct?

13  A.  To put the video on CD or DVD, yes.

14  Q.  Is that right?

15  A.  Yes.                                                    14:35:30

16  Q.  And then if we go further down, there's a second piece of

17  this -- of this e-mail string.  In this e-mail string you are

18  providing an indication of how you were involved in the

19  purchase of this DVR; is that correct?

20  A.  No, what I'm looking at right now is Charles Whitney, they  14:35:59

21  were talking about what happened to the DVR.  They were

22  disposed of.

23  Q.  Well, that, yeah -- well, let's talk about that.

24          The DVRs in this case were ultimately disposed during

25  the pendency of the investigation of this case; is that       14:36:14

1    correct?

2    A.   That I don't know, because I left the station in 2015.  And

3    at the time if -- those machines still could have been running.

4    I wasn't there, so I don't really know.

5         But I do know they ended up at Tucson Sector and we          14:36:26

6    tried to find them.  And that's when I talked to the property

7    officer, and that's Chuck Whitney, and do you have these?  And

8    that's what that response came.

9    Q.   Right, that the DVRs no longer existed.

10   A.   Yes.                                                         14:36:38

11   Q.   Okay.  Now, if we look at this particular -- do you see the

12   frame I'm showing you right here?

13   A.   Yes.  Looks like a DVR, yes.

14   Q.   DVR?  Okay.

15        That was the DVRs that you purchased in this case?           14:36:48

16   A.   Yes, that's one of -- there's actually two.  You can't see

17   the bottom, but they're the same.

18   Q.   Okay.  And below that is the information in reference to

19   the purchase of these DVRs; is that correct?

20   A.   Yes.                                                         14:37:00

21   Q.   Sorry I keep moving it so much.

22        But you see that that -- essentially this is a

23   compilation of the e-mails that you received and you provided

24   to the Government; is that correct?

25   A.   Yes.                                                         14:37:10

1           MR. CALLE:  Your Honor, I move for the admission of

2    1371.

3           THE COURT:  1371?

4           MR. CALLE:  Exhibit 1371.

5           THE COURT:  What number does your exhibits start with?    14:37:22

6           MR. CALLE:  We were told to start at over 700,

7    Your Honor.

8           THE COURT:  And you already got from 700 to 1371?

9           MR. CALLE:  That's correct, Your Honor.

10          THE COURT:  Any objection?                                14:37:33

11          MS. FELDMEIER:  Objection, relevance.

12          THE COURT:  Overruled.

13          MS. FELDMEIER:  Okay.

14       (Exhibit No. 1371 admitted into evidence.)

15   BY MR. CALLE:                                                    14:37:43

16   Q.  So let's go back to the photograph of the DVR.

17          Those are the DVRs.  And apparently that is a picture

18   showing the two DVRs in this case; is that correct?

19   A.  Yes.

20   Q.  Now in the middle there's a little locking mechanism.  And   14:37:56

21   that locking mechanism is essentially to prevent access to the

22   hard drives; is that correct?

23   A.  No.  That controls the doors.  But the drives themselves

24   have a lock.  If you look to the left of that -- that's to keep

25   the drives from being removed from the device.  That lock in    14:38:12

1  the middle is the one for the doors that close over the doors.

2  Q.  Okay.  But the hard drives separately have locking

3  mechanisms; is that correct?

4        MR. CHAPMAN:  Judge, I'm sorry.  We're having issues

5  with the monitors over here.  I don't know if the jury is          14:38:28

6  seeing this.

7        THE COURT:  They can still see.

8        We're going to have it worked on during our next

9  break.

10        Go ahead.                                                    14:38:39

11        MR. CALLE:  Thank you, Your Honor.

12  BY MR. CALLE:

13  Q.  Okay.  In terms of how you were asked to copy this

14  videotape, there's an e-mail in front of you that is from

15  Christopher Knab dated October 11th, 2012; is that correct?        14:39:08

16  A.  Yes, sir.

17  Q.  Who is Mr. Knab?

18  A.  Christopher Knab at the time was a supervisory Border

19  Patrol Agent, and in the stage of his duties were related to

20  requesting stuff like this from us, or IT.                         14:39:23

21  Q.  Now, in this -- this e-mail, he's indicating that he wants

22  you to copy camera 27 -- 24 and 27 from a particular time

23  frame; is that correct?

24  A.  Yes.

25  Q.  That references two different videos; is that correct?         14:39:39

Gary Weaver - Cross-Examination

1    A.  Two different cameras.

2    Q.  Two different cameras.

3         Were you ever made aware that there was a third

4    videotape that existed?

5    A.  I only got what you see, and that's what we produced.    14:39:52

6    Q.  And no one ever alerted you to the fact that there was a

7    third videotape of this incident that needed to be copied?

8    A.  No, sir.  All you have is right there.

9    Q.  And as we talked about earlier, if no one alerted you

10   within the 90-day period, this third video, assuming it exists,    14:40:09

11   would have been destroyed, it would have been overwritten.  Is

12   that fair to say?

13   A.  Yes.

14   Q.  Now in terms of the method of collection, you have a Border

15   Patrol Agent, supervisory Border Patrol Agent, who sent you an    14:40:28

16   e-mail asking you to collect this videotape; correct?

17   A.  Yes.

18   Q.  You were not contacted by the Federal Bureau of

19   Investigation?

20   A.  No, sir.    14:40:40

21   Q.  You were not contacted by the Critical Incident Team of the

22   Border Patrol, were you?

23   A.  I don't know what his reason was, he may have been working

24   with the CIT, he may have been notified.  I don't know that to

25   be a fact.  But he contacted me.    14:40:53

UNITED STATES DISTRICT COURT

──────Gary Weaver – Cross-Examination──────

1    Q.   He's a manager at the Nogales Station.

2    A.   Yes.

3    Q.   At that time.

4    A.   Yes.

5    Q.   Okay.  So here we're in a murder investigation, and someone          14:40:58

6    is asking you to collect the only eyewitness evidence of what

7    took place on the south side of the border by e-mail; is that

8    correct?

9    A.   Yes.

10   Q.   So you make a copy of this on CDs; correct?                          14:41:17

11   A.   I extracted the videos requested.

12   Q.   And then above there you're asked -- you asked, who do I

13   bring it to?

14   A.   Yes.

15   Q.   And by e-mail someone says -- Mr. Brian Brown of the                 14:41:31

16   Nogales Border Patrol Station says, hey, bring it to me.

17   A.   Yes.

18   Q.   So with this critical evidence from this case involving a

19   murder charge, you go and you drop off these videos onto

20   Mr. Brian Brown's chair.                                                  14:41:49

21   A.   Mr. Brian Brown was a deputy patrol agent in charge, yes,

22   number 2.

23   Q.   The answer is yes.

24        Did anyone ever ask you to sign a chain of custody

25   form in reference to the collection of this video, how you               14:42:01

─── **Gary Weaver – Cross-Examination** ───

1    handled it, who you distributed it to, and making sure that the

2    person that you distributed it to had signed this chain of

3    custody form?

4    A.  No.

5    Q.  In terms of the collection of this video, you followed a          14:42:12

6    policy in reference to the retention period, is that fair to

7    say?  In other words -- let me change my question.

8              When you were copying -- making the election and

9    copying -- actually copying this video from the DVR onto these

10   CDs, what policies were controlling your actions?                     14:42:50

11   A.  I was controlled by the request.

12   Q.  Correct, the request.

13             But what policies were you following in terms of the

14   forensic collection of this video?

15   A.  There are best practices that DHS follows.  And our best          14:43:04

16   practices are a culmination from the National Institute of

17   Standards and Technology.  Homeland Security has a Science and

18   Technology.  These are best practices that come down.

19   Q.  Did you have a check sheet in front of you?

20   A.  Was there a check sheet for this?  No.                            14:43:23

21   Q.  At the time that you were actually making the collection of

22   this evidence, were you, in fact, mindful of what you are

23   claiming today, that there was some policy, best practices that

24   you were following?

25   A.  It's standard, that's how we're trained.  For example, that      14:43:41

1    goes into each manufacturer, what is the best process to create

2    these files and how to handle it.  For example, you could have

3    a --

4    Q.  Sir, I'm sorry, let me ask the question.

5          So after you delivered this video to Mr. Brian Brown          14:44:01

6    at the Nogales Station and put it onto his chair, did you write

7    a report about your activities, how you collected it and who

8    asked you for it and where you delivered it?

9    A.  No, that was not a requirement.

10   Q.  The fact is, no one ever asked you to write a report, did    14:44:19

11   they?

12   A.  Correct.

13          MR. CALLE:  Your Honor, that's all I have.

14          THE COURT:  Miss Feldmeier.

15                      REDIRECT EXAMINATION                          14:44:45

16   BY MS. FELDMEIER:

17   Q.  Mr. Weaver, you were asked about whether or not you set the

18   settings on the DVRs to the highest quality that you could.

19   A.  Yes.  And that's why we purchased those DVRs, because they

20   could do that.                                                   14:44:59

21   Q.  But let's say that I have a camera on a pole and it's from

22   2000, and it records -- and it only can take pictures at a

23   certain resolution.  Can this new DVR of yours somehow jazz up

24   that camera?

25   A.  No.  You can't get information where information does not    14:45:15

Gary Weaver – Redirect Examination

1    exist.  The DVR is simply going to record.  And what its

2    setting is -- for example, in that case 30 frames, and that

3    resolution.  But if the camera can't do that, you're not going

4    to magically create data that doesn't exist.

5    Q.  So it really does depend upon which of the two items is          14:45:31

6    more high tech --

7    A.  Yes.

8    Q.  -- the camera or the DVR.

9    A.  Yes.

10   Q.  And you said those were new DVRs at the time.                    14:45:38

11   A.  Yes.

12   Q.  There was some discussion about the DVRs eventually

13   being -- what's the word I'm looking for -- surplused.

14   A.  Yes.

15   Q.  By the time that request was made to try to find the DVRs,       14:45:48

16   several years had passed; correct?

17   A.  Yes.

18   Q.  Since the incident.

19   A.  Yes.

20   Q.  So even if those DVRs had been located somewhere at the          14:45:56

21   United States Border Patrol, would we expect to find a video

22   from four years earlier on it?

23   A.  At their current setting, after 90 days the video was

24   overwritten probably multiple times.

25   Q.  So in other words, even if we had found the DVRs, they           14:46:12

Gary Weaver – Redirect Examination

1  would have given us no information?

2  A.  Correct.

3  Q.  Some ado was made about the fact that you didn't know that

4  this was an important homicide.  Did you ever know what the

5  crimes are that you're pulling DVR for?                          14:46:25

6  A.  No.  I'm simply given a request from a person who is

7  responsible for that, and we just do it.

8  Q.  Okay.  And once you do that -- let's say the agent comes

9  back to you, do you ever get them coming back to you and

10  complaining?                                                    14:46:39

11  A.  If there was something wrong with the video.  Because once

12  we give it to them they have to review it.  If they see an

13  issue with it, then they will report that to us.  But otherwise

14  if they don't, we -- the video is fine.

15  Q.  And so if an agent comes back to you and says, hey, you      14:46:50

16  missed the whole incident, I need a different time frame, what

17  do you do?

18  A.  We have to go back and pull it again, which is -- we had an

19  agreement with our partners in Border Patrol that we would

20  normally give a little time before and a little time after.  So  14:47:06

21  let's say, for example, a request came in for 7:20 to 7:40, we

22  would go from 7:00 o'clock to 8:00 o'clock, not knowing what

23  exactly the time was, so they could take the video and they

24  could review it, and if it was satisfactory they would keep it.

25  Q.  And the investigators have 90 days to come back to you and   14:47:26

1   raise any issues that they have with the video and get more and

2   more copies; isn't that right?

3   A.  Yes.

4   Q.  So if the FBI in this case had a problem with this video

5   and it didn't show the incident, they could have made a request          14:47:38

6   back through the chain of command; correct?

7   A.  Yes.

8   Q.  And you would have done what you were told to do; right?

9   A.  Yes.

10  Q.  And you would have burned 50 copies if that's what the              14:47:47

11  patrol chief told you to do.

12  A.  Yes.

13          MS. FELDMEIER:  I have no other questions.

14          THE COURT:  Jurors have any questions for this

15  witness, please place it in writing.                                    14:47:57

16          It appears there are none.  You may step down.

17          THE WITNESS:  Thank you, sir.

18          THE COURT:  Thank you.

19     (Further proceedings held on the record not included in

20  this transcript.)

21

22                              -oOo-

23

24

25

CR-15-1723-TUC-RCC – March 21, 2018

1

2

3

4                    C E R T I F I C A T E

5

6          I, CANDY L. POTTER, do hereby certify that I am duly

7    appointed and qualified to act as Official Court Reporter for

8    the United States District Court for the District of Arizona.

9          I FURTHER CERTIFY that the foregoing pages constitute

10   a full, true, and accurate transcript of all of that portion of

11   the proceedings contained herein, had in the above-entitled

12   cause on the date specified therein, and that said transcript

13   was prepared under my direction and control.

14         DATED at Phoenix, Arizona, this 4th day of June,

15   2018.

16

17

18

                              s/Candy L. Potter_____
19                            Candy L. Potter, RMR, CRR

20

21

22

23

24

25

UNITED STATES DISTRICT COURT