**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| **United States of America,** | ) | |
| | ) | No.  **CR-15-1723-TUC-RCC-DTF** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Tucson, Arizona |
| | ) | March 22, 2018 |
| **Lonnie Ray Swartz,** | ) | 9:30 a.m. |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE RANER C. COLLINS, JUDGE**

**REPORTER'S EXCERPTED TRANSCRIPT OF PROCEEDINGS**

**JURY TRIAL**
**DAY 3**

**(TESTIMONY OF SHANDON WYNECOOP)**

Official Court Reporter:
Candy L. Potter, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 36
Phoenix, Arizona 85003-2151
(602) 322-7246

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

CR-15-1723-TUC-RCC – March 22, 2018

1

2                    **A P P E A R A N C E S**

3

For the Government:
4       U.S. Attorney's Office Tucson
        By:  **Wallace Heath Kleindienst**, Esq.
5            **Mary Sue Feldmeier,** Esq.
        405 West Congress Street, Suite 4800
6       Tucson, Arizona 85701

7  For the Defendant:
        Law Offices of Sean C. Chapman
8       By:  **Sean Christopher Chapman**, Esq.
        100 North Stone Avenue, Suite 701
9       Tucson, Arizona 85701

10      Law Office of Jim E. Calle
        By:  **Jamie Ernest Calle, III,** Esq.
11      2315 East Hawthorne Street
        Tucson, Arizona 85719

12

13

14

15

16

17

18

19

20

21

22

23

24

25

─── CR-15-1723-TUC-RCC – March 22, 2018 ───

```
 1

 2                           I N D E X

 3    GOVERNMENT WITNESS:        DIRECT    CROSS    REDIRECT   RECROSS

 4    SHANDON WYNECOOP
      By Mr. Chapman                         5
 5    By Mr. Kleindienst                              27
      By the jury                           44
 6    By Mr. Kleindienst                              45

 7


 8    Discussion held at Sidebar          13, 40, 43

 9

10                        INDEX OF EXHIBITS

11    EXHIBIT                                 IDENT    RECEIVED

12    NO.        DESCRIPTION

13    5A         Concrete rubble (Item 17)      33       35

14    5E         Concrete rubble (Item 21)      39       43

15    5F         Concrete rubble (Item 22)      37       38

16    5G         Stone (Item 23)                15       15

17    54         Photograph of close-up of
                 sidewalk with concrete rubble  36       37
18
      55         Photograph of close-up of
19               K-9 Unit with concrete rubble  31       32

20    311        Aerial photograph of crime scene  5

21    329        Video – Side-by-side w/highlights 47

22    1508       Rock                           16

23    1509       BP vehicle front                8        9

24    1510       BP vehicle back                 9       10

25
```

CR-15-1723-TUC-RCC – March 22, 2018

1        (The following excerpt is the testimony of Shandon

2    Wynecoop.)

3        (Proceedings being at 9:30 a.m.)

4            THE COURT:  Let the record reflect the jury's returned

5    to the courtroom, the presence of all counsel and the                09:30:08

6    defendant.

7            And it looks like we're starting on time.  All right.

8    We got one time done, we'll keep striving for excellence.

9            Please be seated.

10           Mr. Chapman, you may begin your cross-examination.            09:30:20

11           MR. CHAPMAN:  Thanks, Judge.

12           I'd like to use one of the exhibits that we used

13   yesterday.  Is that right?

14           THE COURT:  You may.

15       (Discussion held off the record.)                                09:32:03

16           MR. CHAPMAN:  Hello?  I guess it's working.

17           THE COURT:  Hang on just a second, would you please,

18   Mr. Chapman?

19           It's okay, just let us know when you're ready.

20           MR. CHAPMAN:  Okay.

21           THE COURT:  We're concerned about you.

22           MR. CHAPMAN:  I really appreciate that.

23           THE COURT:  I'm talking to the juror, not you.

24           MR. CHAPMAN:  I thought you were talking to me.

25   Sorry.                                                               09:32:49

```
 1                        CROSS-EXAMINATION

 2   BY MR. CHAPMAN:

 3   Q.  Good morning, Mr. Wynecoop.

 4   A.  Good morning, sir.

 5   Q.  I'm going to ask you to come down here and look at this       09:32:53

 6   exhibit with me.  It's Government's Exhibit 311.  So come on

 7   down.

 8            We're going to try to share this hand-held mic.  Okay?

 9            First of all, I put the exhibit upside down.  So can

10   you help me turn it, take it off and put it the other way?       09:33:21

11            Thank you.

12            All right.  So I want you to walk through again what

13   you did yesterday and explain to the jury where everything is

14   here.  And I'm going to give you the mic and the pointer, and I

15   want you to start on the east side with roughly where the port   09:33:50

16   is, and go all the way west to this area right here.

17   (Indicating.)

18   A.  Okay.

19   Q.  Okay.  So here you go.  Start where the port is and then

20   move forward.                                                    09:34:05

21   A.  Right here is -- the customs parking lot is on the other

22   side of this entryway here, I suppose.  (Indicating.)

23            We ran through -- or straight up the road here,

24   stopping in this general area where the vehicles ended up

25   parked.  (Indicating.)                                           09:34:21
```

1          The gentlemen were on the fence about right here.

2   (Indicating.)

3          After everything had happened, the rocking and moving

4   backwards, and after the rocking and once the shooting started,

5   moving back out into the road, probably 30 or 40 yards down the          09:34:36

6   fence eastward until the gentlemen climbed all the way over the

7   fence south.  And then I returned back to the north side of the

8   road into this area.  (Indicating.)

9   Q.  So I want to give the jury a perspective of where

10  everything is.                                                          09:34:58

11          Can you show us where the camera pole is?

12  A.  Right there.  (Indicating.)

13  Q.  Okay.  And is it fair to characterize the area from the

14  port to here as one segment of the area that's patrolled and

15  it's called what?                                                       09:35:17

16  A.  Blind Center to Camera Pole.

17  Q.  Okay.  And then what is the area west of the Camera Pole

18  called?

19  A.  Usually call it 410.  The 410 area will cover a portion of

20  that.                                                                   09:35:34

21  Q.  Now, where did the Border Patrol vehicles that are

22  monitoring the smuggling activities usually set up?

23  A.  Right here is actually a Border Patrol vehicle in this

24  satellite view.  Usually parked somewhere right here.  Or

25  they'll park down here by the customs parking lot facing          09:35:54

—Shandon Wynecoop – Cross-Examination—

1  westward.  And then the 410 guy is usually out in this area

2  where the road ends.  (Indicating.)

3  Q.  All right.  I'm going to use the pointer and refer to a

4  specific area, these two small houses right here.

5  (Indicating.)  Are you familiar with those?                      09:36:13

6  A.  Yes, sir.

7  Q.  All right.  Are you familiar with what -- or do you know

8  whether an elderly couple was living in this house back in

9  2012?

10  A.  I don't know if they were living there then.  But          09:36:29

11  I'm -- I'm pretty sure it was the same -- the same people that

12  have lived there since I've been in the Border Patrol.

13  Q.  Okay.  Was it common for drug smugglers to run up the

14  driveway to that house and then hide in the vegetation back

15  here?  (Indicating.)                                            09:36:55

16  A.  Yes.

17  Q.  So this was a pretty well-beaten path for drug smugglers to

18  run?

19  A.  That's correct.  Through both of these areas, through the

20  driveway and then through -- next there's kind of a long trail  09:37:06

21  that goes through here.  (Indicating.)

22  Q.  We talked yesterday -- or Mr. Kleindienst asked you a lot

23  of questions yesterday about rocks that were thrown.  And my

24  question is:  Were you aware that there was testimony yesterday

25  that rocks actually reached back into the tree area here?       09:37:25

**Shandon Wynecoop — Cross-Examination**

1    (Indicating.)

2    A.  I was not aware of that, no.

3    Q.  You can go ahead and sit down.

4           MR. CHAPMAN:  Sherry, is that up?

5           THE CLERK:  It should be, but I don't see anything          09:38:46

6    yet.

7    BY MR. CHAPMAN:

8    Q.  While I'm doing that, let me ask you a couple questions.

9           So knowing now that rocks were going all the way back

10   into that vegetated area, would that change your perception of     09:39:02

11   how dangerous this event was?

12   A.  A little bit, yeah.

13          I was moving back towards that area, but I guess if

14   there was already rocks coming back in there.

15          THE CLERK:  It is up.          09:39:32

16          MR. CHAPMAN:  Okay.  Thank you.

17          I want to show the witness what's been marked but not

18   admitted as Defendant's 1509.

19   BY MR. CHAPMAN:

20   Q.  Do you see that, Agent Wynecoop -- or former Agent          09:40:31

21   Wynecoop?

22   A.  Yes, sir.

23   Q.  Can you tell us what that is?

24   A.  It's a rock-proof vehicle so -- it's typically used on an

25   X.          09:40:41

UNITED STATES DISTRICT COURT

1   Q.  Does that photo reasonably and accurately depict what --

2   the type of protections that Border Patrol vehicles were

3   equipped with around the time that this shooting occurred?

4   A.  Yes, sir.

5           MR. CHAPMAN:  All right.  Move to admit 1509.                09:40:54

6           MR. KLEINDIENST:  No objection.

7           THE COURT:  It can be admitted.  It can be shown to

8   the jury if you wish.

9       (Exhibit No. 1509 admitted into evidence.)

10  BY MR. CHAPMAN:                                                      09:41:05

11  Q.  What was the primary purpose of the metal grates that are

12  on all the windows?

13  A.  To prevent broken windows from rockings.

14  Q.  Also I assume to prevent injuries to the agents that were

15  inside?                                                             09:41:26

16  A.  Correct.

17  Q.  All right.  I'm going to show you another exhibit.

18          MR. CHAPMAN:  This has not been admitted.  I would

19  publish it to the witness, Your Honor.

20  BY MR. CHAPMAN:                                                     09:41:56

21  Q.  Can you tell us what that -- tell me what that is?

22  A.  Same thing, just a different view, just another rock-proof.

23  This is from sitting on top of Hamburger Hill.

24          MR. CHAPMAN:  All right.  Move to admit 1510.

25          MR. KLEINDIENST:  Objection, Your Honor, as to               09:42:11

1   relevance, it's not in the area that's at issue in this case.

2        THE COURT:  Overruled.

3      (Exhibit No. 1510 admitted into evidence.)

4   BY MR. CHAPMAN:

5   Q.  Again, you see this metal mesh on the back.                    09:42:19

6        It's fair to say that rocks -- when you were with the

7   Border Patrol, you were trained that rocks could cause death or

8   serious physical injury; is that true?

9   A.  Right.  Yes.

10  Q.  Probably from the very first day that you joined the          09:42:35

11  Border Patrol.

12  A.  Correct.

13  Q.  And you were aware back in 2012, like all the other agents,

14  that agents had been injured badly by rocks in the past.

15  A.  Correct.                                                       09:42:51

16  Q.  And I assume that many days when you showed up at muster,

17  which is when agents assemble before they go out in the field,

18  the threat of rocking events was discussed, wasn't it?

19  A.  Every so often, yes.

20  Q.  It's fair to say that it's a constant concern for agents in   09:43:09

21  the Nogales area that work along the border fence?

22  A.  It's -- yeah, it's brought up frequently.

23  Q.  Because you want to be safe.

24  A.  Right.

25  Q.  Right?                                                         09:43:23

─────── **Shandon Wynecoop – Cross-Examination** ───────

1    A.   Yeah.

2    Q.   And that's why we have rock-proof vehicles; correct?

3    A.   Right.

4    Q.   And that's why sometimes you have to wear Kevlar vests,

5    protective clothing, that type of thing?                          09:43:35

6    A.   Right.

7    Q.   By the way, the agents on this night when this event

8    occurred, did they have helmets on?

9    A.   No.

10   Q.   Do agents ever wear helmets around the border?            09:43:46

11   A.   Not typically, no.

12   Q.   Do you think they should?

13   A.   I've never seen anybody wear a helmet, other than the bike

14   patrol.

15   Q.   Do you think they should?                                    09:43:59

16        MR. KLEINDIENST:  Objection as to relevance,

17   Your Honor.

18        THE COURT:  Sustained.

19        MR. CHAPMAN:  I'm going to show the witness another

20   exhibit.                                                          09:44:20

21      (Discussion off the record between defense counsel.)

22   BY MR. CHAPMAN:

23   Q.   All right.  While Jim's looking for that, I'm going to ask

24   you some more questions.

25   A.   Okay.                                                         09:45:13

**Shandon Wynecoop – Cross-Examination**

1  Q.  When it comes to training for an agent, were you ever

2  trained that you cannot use deadly force in response to rocks

3  being thrown at you?

4  A.  No.

5  Q.  In fact, wasn't it at the time Border Patrol policy that        09:45:34

6  agents are essentially supposed to apply what's called a use of

7  force continuum to any threat situation?

8  A.  Correct.

9  Q.  Isn't that right?

10  A.  Correct.        09:45:53

11  Q.  So what you were trained to do is look at means,

12  opportunity and intent; is that right?

13  A.  Right.

14  Q.  For example, if someone is trying to throw a rock at you

15  but he's 500 yards away, he has the intent and he has the        09:46:08

16  means, he has the rock, but he doesn't have the opportunity

17  because he's too far away; right?

18  A.  Right.

19  Q.  So all those things have to come together in order to use

20  some level of force.        09:46:29

21  A.  Correct.

22  Q.  Fair to say?

23  A.  Yes.

24  Q.  And that could be anything from -- that's really agent

25  discretion in doing what's reasonable or -- trying to do what's        09:46:38

1   reasonable under the circumstances.  Is that true?

2   A.  Yes, sir.

3   Q.  So, for example, hypothetical situation, you're by the

4   fence, it's dark, there are rocks coming down, you don't know

5   how big they are, somebody next to you gets hit.  You may have          09:46:55

6   a wide array of options to you.

7        MR. KLEINDIENST:  Your Honor, I'm going to object at

8   this time.  One, it's way beyond the scope of direct.  And

9   also, he's trying to make him into an expert witness.

10       (At sidebar on the record.)                                        09:47:22

11       MR. KLEINDIENST:  I'll rephrase my objection, because

12  he is out town, we did agree that they could cross-examine him

13  on things beyond the scope of direct, but not in a leading

14  fashion.

15       THE COURT:  Correct.                                               09:47:35

16       MR. KLEINDIENST:  But I would object to asking this

17  witness hypothetical questions about use of force.  He's not an

18  expert and not qualified as an expert.

19       MR. CHAPMAN:  That's not what it's about.  It's about

20  his training.  Because they're going to present --                      09:47:45

21       THE COURT:  You can certainly ask him about his

22  training.  I don't know if you can use a hypothetical for his

23  training.

24       MR. CHAPMAN:  Okay.  I'll try to tailor it in that

25  fashion.                                                                09:47:57

1          (End of discussion at sidebar.)

2               THE COURT:  You may continue.

3    BY MR. CHAPMAN:

4    Q.  Let me try to ask it in a different way.

5               The way you were trained is that in a situation where          09:48:11

6    you're getting rocked or you're facing some other deadly force,

7    you may have a wide array of options to you.  Is that true?

8    A.  Yes.

9    Q.  That's your training?

10   A.  Yes.          09:48:25

11   Q.  But there's no policy with the Border Patrol that you are

12   trained on that dictates that you have to take cover when

13   you're getting rocked.

14   A.  No, not that I believe.

15   Q.  And your training was that you could do alternate things          09:48:37

16   that were reasonable.  You could take cover.  Or if you had

17   less lethal options, you could use them.  Or if you felt it was

18   necessary, you could use deadly force.

19   A.  Correct.

20   Q.  Right?          09:48:58

21   A.  Yep.

22   Q.  You're trained to use deadly force to protect yourself or

23   third persons.

24   A.  Correct.

25   Q.  Correct?          09:49:06

Shandon Wynecoop – Cross-Examination

1    A.  Yep.

2        (Discussion off the record between counsel.)

3            MR. CHAPMAN:  I move to admit Exhibit 5G.

4            MR. KLEINDIENST:  No objection.

5            THE COURT:  5G will be admitted.                    09:49:48

6        (Exhibit No. 5G admitted into evidence.)

7            MR. CHAPMAN:  May I approach the witness?

8            THE COURT:  You may.

9    BY MR. CHAPMAN:

10   Q.  Agent Wynecoop, I'm going to ask you to trust me when I   09:50:05

11   tell you that later in the trial there's going to be evidence

12   that that was one of the rocks that was collected after the

13   shooting event.  Okay?

14           MR. KLEINDIENST:  I'm sorry, I didn't hear the

15   question.                                                   09:50:17

16           THE COURT:  One of the rocks collected after the

17   shooting.

18           MR. KLEINDIENST:  I would object to the way he phrases

19   the question.  It's a fact not in evidence.  It's not what the

20   evidence will reflect.                                      09:50:27

21           THE COURT:  Overruled.

22   BY MR. CHAPMAN:

23   Q.  That's one of the rocks they collected.  Okay?

24   A.  Okay.

25   Q.  Pick it up.  How heavy is it?                           09:50:35

Shandon Wynecoop – Cross-Examination

1    A.  A couple pounds.

2    Q.  All right.  When you testified yesterday you said that a

3    rock bounced and hit your foot, but you weren't injured.

4    A.  Correct.

5    Q.  How big was that rock?                                      09:50:52

6    A.  Smaller than this one.

7    Q.  Was it a baseball size?

8    A.  Probably baseball size, yeah.

9         MR. CHAPMAN:  Your Honor, I'd like to show the witness

10   what's been marked as 1508 as a demonstrative exhibit only.     09:51:10

11        THE COURT:  Okay.

12        MR. CHAPMAN:  May I approach?

13        THE COURT:  You may.

14        That's 1508 in his left hand?

15        MR. CHAPMAN:  Yes.                                          09:51:32

16   BY MR. CHAPMAN:

17   Q.  And that is not a rock that was collected in this case.

18   The only reason why I'm showing you is to ask you if that was

19   the -- roughly the size of the rock that bounced --

20   A.  Yes.                                                         09:51:42

21   Q.  -- near your foot?

22   A.  Yes, sir.

23   Q.  Pick it up.  Does it feel heavy?

24   A.  Maybe eight ounces, ten ounces maybe.  Less than a pound.

25   Q.  But it's similar to the rock that hit your foot?            09:51:59

---
**Shandon Wynecoop - Cross-Examination**
---

1    A.  Correct.

2    Q.  Can we agree that if that rock had traveled another couple

3    feet in the air and hit you in the face that you probably would

4    have been seriously injured?

5         MR. KLEINDIENST:  Objection, Your Honor --                    09:52:15

6         THE WITNESS:  Probably.

7         THE COURT:  Sustained.

8    BY MR. CHAPMAN:

9    Q.  Agent Wynecoop, you were scared to death when you were

10   getting rocked, weren't you?                                       09:52:25

11   A.  I was pretty scared, yeah.

12   Q.  When I interviewed you in this case, you said that you were

13   thinking about your wife and children --

14   A.  That's correct.

15   Q.  -- when you were getting rocked.  Why is that?                 09:52:38

16   A.  Because I want to go home.

17   Q.  I don't want to embarrass you, I just want to know why.

18   A.  I just want to go home.

19   Q.  What do you mean by that?

20   A.  I didn't want to end up in a hospital.  There's other cases    09:52:50

21   that popped up in my head where I know that people ended up in

22   the hospital, severely injured.

23   Q.  You told me, quote, I didn't want to get hit, I have a wife

24   and kids.

25   A.  Yes.                                                           09:53:08

Shandon Wynecoop – Cross-Examination

1   Q.  It was a stressful event.

2   A.  It was.

3   Q.  Is it possible -- let me ask this:  You said you didn't

4   remember saying that you'd been hit or verbally indicating that

5   you'd been hit yesterday when you were on the stand.  Is it          09:53:27

6   possible that, given the stressful nature of this, that you

7   actually did say something and you just don't remember it?

8   A.  It's always possible.  I just don't remember saying -- I

9   don't recall saying it.

10  Q.  Do you know if all the rocks that were thrown were             09:53:40

11  collected in this case?

12  A.  I have no idea.

13  Q.  Did you look to the north of the street past the sidewalk

14  to see if there were any rocks in the vegetated area that

15  looked out of place that may have been thrown?                     09:54:18

16  A.  I did not.

17  Q.  Do you know if anybody for the Government did?

18  A.  I don't.

19  Q.  Could you see the rocks when they were coming down?

20  A.  A few of them.  That's why I thought there was only four or    09:54:37

21  five rocks, that's what I could see.

22  Q.  So you're not testifying that only four or five rocks were

23  thrown.  You're testifying that those were the ones that you

24  could see?

25  A.  Correct.                                                       09:54:51

**Shandon Wynecoop — Cross-Examination**

1   Q.  Could you see where the rocks were coming from

2   specifically?

3   A.  No.

4   Q.  Did that make it more dangerous?

5   A.  Yes.                                                    09:55:03

6   Q.  Why?

7   A.  I didn't know what direction they were coming from, I just

8   saw them once they were in the air.  I didn't know how many

9   people were throwing rocks.  And so I didn't know how long it

10  was going to continue.                                      09:55:14

11  Q.  Did it seem like a lot of rocks were landing around where

12  you were?

13  A.  All the ones that I saw landed in my general area.

14  Q.  Was it your impression then that somebody on the Mexican

15  side had a pretty good idea where you were located?          09:55:34

16         MR. KLEINDIENST:  Objection, Your Honor, as to

17  speculation.

18         THE COURT:  Overruled.

19         THE WITNESS:  Yes.

20  BY MR. CHAPMAN:                                              09:55:47

21  Q.  How big does a rock have to be to take your eye out?

22         MR. KLEINDIENST:  Objection, Your Honor.

23         THE COURT:  Sustained.

24         THE WITNESS:  A lot smaller --

25         MR. CHAPMAN:  You don't have to answer.  He sustained  09:55:59

1   the objection.

2   BY MR. CHAPMAN:

3   Q.  When this is all happening, you're seeing things, you're

4   seeing rocks come down, you said that the police dog may have

5   been hit.                                                          09:56:31

6   A.  Right.

7   Q.  You're perceiving things that you see and hear in front of

8   you; right?

9   A.  Right.

10  Q.  But you're not testifying to the jury that Lonnie saw the     09:56:39

11  same things or perceived the same things that you did; right?

12          MR. KLEINDIENST:  Objection.

13          THE COURT:  Overruled.

14          THE WITNESS:  Right.

15  BY MR. CHAPMAN:                                                    09:56:49

16  Q.  You don't know where he was looking at the time that the

17  rock rolled up at your foot.

18  A.  Right.

19  Q.  You don't know what he was doing when you thought that the

20  police dog got hit.                                                09:57:01

21  A.  Correct.

22  Q.  Did your training when you were at the Border Patrol

23  dictate that you had to be hit and injured with a rock before

24  you were entitled to respond?

25  A.  No.                                                            09:57:35

Shandon Wynecoop - Cross-Examination

1   Q.  Was there any way to know when that rock rolled up on your

2   foot whether Agent Swartz knew that you were injured or not?

3   A.  Not from my perspective, no.

4   Q.  Did you tell him, I'm okay?

5              MR. KLEINDIENST:  Objection, Your Honor.  Asked and    09:57:56

6   answered.  He didn't say anything.

7              THE COURT:  Sustained.

8              He doesn't remember saying anything.

9              MR. KLEINDIENST:  Right.

10  BY MR. CHAPMAN:                                                   09:58:05

11  Q.  Did you tell him the dog's okay when the dog was hit?

12             MR. KLEINDIENST:  Objection.

13             THE COURT:  Same objection?

14             MR. KLEINDIENST:  He didn't say anything, so --

15             THE COURT:  Sustained.                                 09:58:18

16  BY MR. CHAPMAN:

17  Q.  The dog was on a leash; right?

18  A.  Correct.

19  Q.  So can we agree that Officer Zuniga was in close proximity

20  to the dog when the dog was hit, assuming it was?                 09:58:28

21  A.  Right.

22  Q.  So when those rocks started coming down, do you agree that

23  you were at risk and Officer Zuniga was at risk?

24             MR. KLEINDIENST:  Objection, Your Honor, as to what

25  Officer Zuniga's status was.  He can testify about himself, but   09:58:45

─────── Shandon Wynecoop – Cross-Examination ───────

1    not as to others.

2              THE COURT:  Sustained.

3              Take half of the question out.

4    BY MR. CHAPMAN:

5    Q.  Where was Officer Zuniga when the rocks started coming          09:58:55

6    down?

7    A.  He was on the south side of his vehicle in between the

8    fence and the -- yeah, southwest side of his vehicle.

9    Q.  It was your assessment that when he was in that position he

10   was at risk from the rocks?                                        09:59:12

11   A.  I would believe so.

12   Q.  And were you?

13   A.  Yes.

14   Q.  You were at the Port of Entry; right?

15   A.  Yes, sir.                                                       09:59:34

16   Q.  My understanding is that agents working at the Port of

17   Entry are not allowed to have PLS launchers or pepperball

18   launchers that look like big guns; is that right?

19   A.  I don't know what the actual rule for that was, but none of

20   us carried any of that stuff.                                      09:59:55

21   Q.  The expectation was that you wouldn't because you didn't

22   want to intimidate the public.

23   A.  Correct.

24   Q.  So when you're working the port, generally the agents

25   working there just have their side arm and that's it.              10:00:07

1    A.   Yep.

2    Q.   The point I'm trying to get at is that when you responded

3    to this, you didn't have less lethal options that could have

4    been used to deter these rock throwers.

5    A.   No, sir.                                                    10:00:24

6    Q.   Did Agent Swartz have any?

7    A.   No, sir.

8    Q.   When you arrived, you saw that one of the backpackers that

9    was on the fence had an eight-inch double-edged blade in his

10   back pocket?                                                     10:00:50

11   A.   Side pocket.

12   Q.   Side pocket?

13   A.   Correct.

14   Q.   And that's why you pulled out your gun; is that right?

15   A.   Correct.                                                    10:00:58

16   Q.   The rocks started falling after Officer Zuniga arrived?

17   A.   Correct.

18   Q.   Some of them were baseball sized?

19   A.   Yes.

20   Q.   You don't know if the dog was hit, but the dog acted like  10:01:11

21   it was hit, it made a sound?

22   A.   No, just the way it moved.

23   Q.   Okay.  Before any shots were fired, you heard Agent Swartz

24   say something to the effect of, stop throwing rocks?

25   A.   Correct.                                                    10:01:33

24

**Shandon Wynecoop – Cross-Examination**

1    Q.  One of the reasons that you took cover is that you couldn't

2    see where the rocks were coming from because it was dark and

3    they were being thrown over the fence; is that right?

4    A.  Right.

5    Q.  And that makes it more dangerous than if you know exactly        10:01:51

6    where the rock thrower is and you can see the rock coming at

7    you.

8    A.  Correct.

9    Q.  After the shooting did you observe Agent Swartz?

10   A.  I did.                                                           10:02:30

11   Q.  Did he seem to be upset?

12   A.  Yes.

13   Q.  Was he crying?

14   A.  He made sobbing noises, yeah.  I mean, I couldn't tell, I

15   was far enough away where I couldn't see.                           10:02:42

16   Q.  Did he throw up?

17   A.  Yes, sir.

18   Q.  Is it fair to say that drug smugglers commonly use rocks as

19   a tactic to help get their drugs in the country or get

20   smugglers back out safely?                                          10:03:05

21   A.  As a distraction, yes.

22   Q.  Is it also fair to say that sometimes you would apprehend

23   an undocumented alien who was coming to the country to work.

24   Is that true?

25   A.  Yes.                                                            10:03:26

UNITED STATES DISTRICT COURT

1  Q.  And sometimes you'd apprehend a drug smuggler; right?

2  A.  Yes.

3  Q.  And that, generally speaking, drug smugglers tended to be

4  more violent; is that true?

5  A.  They're more aggressive.                                    10:03:40

6  Q.  On your first day with the Border Patrol you were shown

7  graphic photos of an agent that was hit by a rock?

8  A.  Yes.

9  Q.  The very first day.

10  A.  Our first day.                                             10:03:56

11  Q.  You're trained that rocks are deadly?

12  A.  Yes, can be.

13  Q.  You're trained that a rock, even the size of a golf ball,

14  can do serious damage?

15      MR. KLEINDIENST:  I think we've gone over this,            10:04:09

16  Your Honor.

17      THE WITNESS:  No.

18      MR. KLEINDIENST:  I would object as asked and

19  answered.

20      THE COURT:  He didn't mention the golf ball before.       10:04:13

21      MR. KLEINDIENST:  No golf balls?

22      But as to the other testimony it's repetitive of what

23  he's already asked this witness.

24      THE COURT:  He's just about through with this line of

25  questioning.                                                   10:04:23

─────Shandon Wynecoop – Cross-Examination─────

1          MR. CHAPMAN:  I think I'm just about through.

2     BY MR. CHAPMAN:

3     Q.  Is that true, your training was that even a rock the size

4     of a golf ball --

5     A.  Correct.                                                    10:04:32

6     Q.  Let me ask you one last question -- or series of them.

7          This fence that separates the border there, it's iron;

8     right, it's made of iron?

9     A.  Yes, sir.

10    Q.  And it exudes rust?                                         10:04:55

11    A.  Yes.

12    Q.  And if you put your hands on it, you get rust on your

13    hands?

14    A.  You will, yeah.

15    Q.  My question is:  As an agent working that area, was one of  10:05:06

16    the things that you looked for to determine whether someone had

17    been involved in a smuggling event is whether they had rust

18    stains on their pants or their shoes or their hands?

19    A.  They stand out if you're in the downtown area.  I mean, in

20    the desert not so much, but in the downtown area if they're     10:05:25

21    walking around you can tell.

22    Q.  So that's one of the things that you would look for?

23    A.  Yeah.

24         MR. CHAPMAN:  No further questions.  Thank you.

25         THE COURT:  Mr. Kleindienst.                               10:06:10

UNITED STATES DISTRICT COURT

REDIRECT EXAMINATION

1  BY MR. KLEINDIENST:

2  Q.  Mr. Chapman, one of his first questions was, did you know

3  there was testimony yesterday that rocks made it into that

4  brushy area that he pointed out.                           10:06:42

5  A.  Right.

6  Q.  Do you recall that question?

7  A.  Yes.

8  Q.  And do you understand that the witness who testified didn't

9  say he saw any rocks, he just heard something in the trees?   10:06:48

10 Did you know that?

11 A.  I did not know that.

12 Q.  He didn't tell you that, did he?

13 A.  No.

14 Q.  He said that there were rocks being thrown, but that wasn't  10:06:55

15 the testimony.

16 A.  Okay.

17 Q.  Okay.  You accept that as a fact?

18 A.  Yes, sir.

19 Q.  Okay.  Now, when you were trained as a Border Patrol Agent,  10:07:02

20 were you ever trained to take cover?

21 A.  If we could.

22 Q.  If you could?

23 A.  Yes.

24 Q.  And if you had cover available, were you trained that      10:07:16

UNITED STATES DISTRICT COURT

**Shandon Wynecoop – Redirect Examination**

1    rather than engage in somebody with lethal force, if you could

2    take cover, that it's preferable to take cover?

3    A.  It was kind of left on the individual to make that

4    decision.

5    Q.  Okay.  Well, this night you took cover; right?                10:07:29

6    A.  I did.

7    Q.  And did you see other agents take cover?

8    A.  Yes.

9    Q.  Did you see any other agents pull their gun out and go to

10   the fence other than Officer Swartz?                              10:07:41

11   A.  No.

12   Q.  No.

13         Taking cover is just one of the many tactics available

14   to you as an agent; correct?

15   A.  Yes.                                                          10:07:52

16   Q.  Now, you testified that you were trained that rocks can

17   cause injuries, serious injuries at times; right?

18   A.  Yes, sir.

19   Q.  You've never seen an agent hit by a rock, have you?

20   A.  Personally, no.                                               10:08:08

21   Q.  No.

22         And you know -- you were told about one agent who had

23   serious damage caused by a rock; correct?

24   A.  Correct.

25   Q.  And that was an Agent Simoti; is that right?                  10:08:16

———— Shandon Wynecoop – Redirect Examination ————

1   A.   That's right.

2   Q.   And you were shown a photograph of Agent Simoti's damage to

3   his face the first day you were in Nogales; correct?

4   A.   Yes, sir.

5   Q.   And you were told that this is what might happen to you          10:08:27

6   because it happened to him; right?

7   A.   Right.

8   Q.   Now, you didn't actually see what happened to Agent Simoti;

9   right?

10  A.   No.                                                              10:08:37

11  Q.   You didn't know how long ago it was that that photograph

12  was taken?

13  A.   I just knew it was relatively close to when I started.

14  Q.   Okay.  Since then, since you were first shown that

15  photograph of Agent Simoti who had gotten hit by a rock, were       10:08:47

16  you ever shown any other photographs of agents at the Nogales

17  Station?

18  A.   No.

19  Q.   Did you know of any agents at the Nogales Station who had

20  been hit by a rock while you were there?                            10:08:59

21  A.   Just vehicles.

22  Q.   Just vehicles?

23  A.   Not people; right.

24  Q.   So at muster, when there's a discussion about what's going

25  to happen each day, at muster you never heard a supervisor talk     10:09:07

1    about this agent, Agent Smith got hit by a rock last night?

2    A.  No.

3    Q.  You never heard that?

4    A.  No.

5    Q.  Rocking is just part of the lay of the land there in                    10:09:17

6    Nogales; correct?

7    A.  Right.

8    Q.  It's one of the things that you, as a Border Patrol Agent,

9    you come to expect, that while you're working in Nogales that's

10   just part of the job.  Is that a fair statement?                           10:09:31

11   A.  Yes.

12   Q.  And you're taught that you need to be vigilant about rocks

13   when they come over the fence; correct?

14   A.  Right.

15   Q.  And you're also taught that you don't have to stand your               10:09:41

16   ground if you're being rocked; right?

17   A.  Right.

18   Q.  You can retreat if you can safely retreat; right?

19   A.  Right.

20   Q.  And that's what you did that night.                                    10:09:49

21   A.  Yes.

22   Q.  You did not pull your gun that night, did you?

23   A.  No.

24   Q.  Even though a rock bounced along the street and may have

25   hit your foot, you didn't pull your gun out and shoot, did you?           10:09:57

─────── Shandon Wynecoop – Redirect Examination ───────

1    A.   No.

2    Q.   Now, Mr. Chapman showed you --

3         MR. KLEINDIENST:  If I can approach the witness.

4         THE COURT:  You may.

5    BY MR. KLEINDIENST:                                    10:10:11

6    Q.   He showed you Exhibit No. 5G.

7         Do you want to hold that up to the jury?

8         Do you know where that rock came from?

9    A.   I don't.

10   Q.   Do you know whether or not that rock could have been thrown    10:10:28

11   100 feet up in the air and land over on the American side?

12   A.   No.

13   Q.   Why not?

14   A.   Because I didn't see it.

15   Q.   You didn't see it.                                10:10:36

16        It's a pretty big rock, isn't it?

17   A.   Pretty big.

18   Q.   Okay.  But you did see some rocks that actually fell on the

19   street in front of you; right?

20   A.   Right.                                            10:10:44

21   Q.   Let me show you what's been marked as Exhibit 55.

22        MS. FELDMEIER:  What is it?

23        MR. KLEINDIENST:  55.

24   (Discussion off the record between Government counsel.)

25   BY MR. KLEINDIENST:                                    10:11:28

32

Shandon Wynecoop – Redirect Examination

1   Q.   Looking at Exhibit 55, do you recognize what it is?

2   A.   Yes.

3   Q.   And what is that?

4   A.   The rock near the front right tire -- passenger tire of

5   agent -- or Officer Zuniga's vehicle.                              10:11:37

6   Q.   He's the canine officer; right?

7   A.   Correct.

8   Q.   And do you recognize in that photograph a rock that's been

9   marked with the number 17?

10  A.   Yes, sir.                                                     10:11:48

11  Q.   Do you recall that being one of the rocks that came over

12  that night?

13  A.   I wouldn't have seen that one.

14  Q.   Okay.  But did it look like the ones that were coming over?

15  A.   About.                                                        10:11:58

16          MR. KLEINDIENST:  May I move this into evidence,

17  Your Honor, number 55?

18          MR. CHAPMAN:  No objection.

19          THE COURT:  55 can be admitted.

20      (Exhibit No. 55 admitted into evidence.)                       10:12:06

21          MR. KLEINDIENST:  Can I publish it to the jury?

22          THE COURT:  You may.

23  BY MR. KLEINDIENST:

24  Q.   I'm going to zoom it out.

25          And we're looking at Officer Zuniga's vehicle?             10:12:27

UNITED STATES DISTRICT COURT

33

———— Shandon Wynecoop – Redirect Examination ————

1   A.  Yes, sir.

2   Q.  And then if I zoom it in, do you see the number 17?

3   A.  Yes, sir.

4   Q.  Now, you didn't mark that particular rock; right?

5   A.  No.                                                        10:12:41

6   Q.  Do you recall though that the rocks that were being thrown

7   that night were marked later for -- during the investigation?

8   A.  Just through pictures.

9   Q.  Just through pictures.  Okay.

10           Let me show you that rock, if I could.               10:12:51

11           MR. KLEINDIENST:  Can I approach the witness,

12  Your Honor?

13           THE COURT:  You may.

14  BY MR. KLEINDIENST:

15  Q.  Let me show you Exhibit 5A for identification.            10:13:10

16           Do you see on that brown paper bag in Exhibit 5A a

17  number?

18  A.  Yes, sir.

19  Q.  What number do you see?

20  A.  17.                                                        10:13:24

21  Q.  17.

22           And what's in that bag?

23  A.  It looks like a chunk of concrete actually.

24  Q.  Not a rock?

25  A.  Right.                                                     10:13:34

UNITED STATES DISTRICT COURT

Shandon Wynecoop – Redirect Examination

1    Q.  A chunk of concrete?

2    A.  Right.

3    Q.  What happens when concrete hits the ground, in your

4    experience?

5    A.  It breaks apart.                                          10:13:41

6    Q.  It breaks apart, into pieces?

7    A.  Right.

8    Q.  Can you go ahead and cut that open?

9    A.  Does it matter where?

10   Q.  The top, please.                                          10:13:49

11        And what have you removed from the exhibit bag?

12   A.  The piece of concrete.

13   Q.  Piece of concrete.

14        Does that look like the types of projectiles that were

15   coming over the fence that night?                            10:14:11

16   A.  It could have been.  It was dark.

17   Q.  It was dark.  But you saw them on the sidewalk after it was

18   all over; correct?

19   A.  Yeah.  I don't remember -- I mean, I thought they were

20   rocks.                                                        10:14:22

21   Q.  You thought they were rocks?

22   A.  Right.  I thought they were rocks.

23   Q.  If I told you that what you're holding in your hand is what

24   was next to Officer Zuniga's vehicle, would that refresh your

25   memory that that was one that came over?                     10:14:34

─── Shandon Wynecoop – Redirect Examination ───

1    A.  I wasn't standing on that side of the vehicle.  I mean, it

2    could have been on that side.  This wasn't landed by me.

3    Q.  Okay.  Does it look like the types of concrete you saw

4    coming over?

5    A.  It was jagged, yeah.                                        10:14:48

6    Q.  It was jagged.

7            MR. KLEINDIENST:  I would move that into evidence,

8    Your Honor.

9            MR. CHAPMAN:  No objection.

10           THE COURT:  It can be admitted.                          10:14:53

11       (Exhibit No. 5A admitted into evidence.)

12           MS. FELDMEIER:  What number was that?

13           THE COURT:  5A.

14           THE WITNESS:  5A.

15           MR. KLEINDIENST:  Can I publish that to the jury?        10:15:06

16           THE COURT:  Sure.

17           You can go ahead and ask questions.

18           MR. KLEINDIENST:  I was going to retrieve it from the

19    jury.

20           THE COURT:  They won't throw it at you.                  10:16:10

21           MR. KLEINDIENST:  I hope not.

22           Could you put that back in the bag?

23           Thank you.

24           Let me show you --

25           If I can approach the witness.                          10:16:28

UNITED STATES DISTRICT COURT

36

1          THE COURT:  You may.

2     BY MR. KLEINDIENST:

3     Q.  -- Exhibit 54.

4          Can you look at that exhibit and tell the jury if you

5     know what that looks like, or recognize it?                    10:16:40

6     A.  Yeah, that's about the area where I was standing.

7     Q.  When you were being -- when you took cover or when you were

8     being rocked?

9     A.  Right after the rocking started and where I moved back for

10    cover.                                                          10:16:55

11    Q.  Is that in the street or is that on the sidewalk?

12    A.  On the sidewalk.

13    Q.  On the sidewalk?

14    A.  Correct.

15    Q.  And do you see in the photograph what appears to be the     10:17:00

16    same thing that we just saw?

17    A.  It looks like jagged rocks, a little bigger than this one

18    here.

19    Q.  And would it be a fair statement that those would be the

20    types of rocks you saw coming over that night?                 10:17:16

21    A.  Yes, sir.

22          MR. KLEINDIENST:  Okay.  I move 54 into evidence,

23    Your Honor.

24          MR. CHAPMAN:  I haven't seen it.

25          No objection.                                             10:17:32

1           THE COURT:  54 will be admitted.

2      (Exhibit No. 54 admitted into evidence.)

3           MR. KLEINDIENST:  May I publish it to the jury?

4           THE COURT:  You may.

5  BY MR. KLEINDIENST:                                              10:17:37

6  Q.  Can you tell the jury what we're looking at?

7  A.  It's four rocks that are on the sidewalk where I was

8  standing.

9  Q.  And can you put a mark where you were standing?

10 A.  I would have been around in this area.  (Indicating.)    10:17:53

11 Q.  Okay.  And where is the taxicab that you stood behind

12 initially when the rocking started?

13 A.  Right there.  (Indicating.)

14 Q.  And Officer Zuniga's vehicle would be where?

15 A.  It's hard to tell on this screen, but right here.         10:18:09

16 (Indicating.)

17 Q.  Okay.

18      (Discussion off the record between Government counsel.)

19           MR. KLEINDIENST:  Let me zoom in for a second.

20      (Discussion off the record between Government counsel.)    10:19:04

21           MR. KLEINDIENST:  May I approach the witness,

22 Your Honor?

23           THE COURT:  You may.

24 BY MR. KLEINDIENST:

25 Q.  Let me show you what's been marked as 5F as in Frank.      10:19:22

Shandon Wynecoop – Redirect Examination

1    A.   Okay.

2    Q.   And again, can you see on that paper bag by 5F a number 22?

3    A.   Yes, sir.

4    Q.   And we have on the screen numbered placards, so to speak;

5    correct?                                                          10:19:43

6    A.   Right.

7    Q.   Do you see the number 22 on the screen?

8    A.   Yes, sir.

9    Q.   And can you look in the bag and do you recognize what's in

10   there?                                                            10:19:50

11   A.   Yes, sir.

12   Q.   And what is it?

13   A.   Another piece of concrete.

14   Q.   Like the one we just saw?

15   A.   Correct.                                                     10:19:54

16   Q.   And do you recall that that's the type of rocks or rubble

17   that you saw coming over the fence?

18   A.   Yeah, that's about right.

19        MR. KLEINDIENST:  I would move that into evidence,

20   Your Honor.                                                       10:20:04

21        MR. CHAPMAN:  No objection.

22        THE COURT:  22 (sic) will be admitted.

23       (Exhibit No. 5F admitted into evidence.)

24   BY MR. KLEINDIENST:

25   Q.   And if you could cut it open at the top.                     10:20:08

UNITED STATES DISTRICT COURT

─────── Shandon Wynecoop - Redirect Examination ───────

1          What do you find inside the bag?

2    A.  A piece of concrete.

3    Q.  You want to just take it out and show it to the jury?

4          MR. KLEINDIENST:  Can you all see that?

5    BY MR. KLEINDIENST:

6    Q.  And that appears to correspond with number 22 in the

7    photograph?

8    A.  From what I can tell.

9    Q.  From what you can tell.

10          Okay.  You want to go ahead and put it back in the          10:20:57

11    bag?

12          MR. KLEINDIENST:  Can you switch over to Mary Sue's

13    feed?

14          THE CLERK:  This is a new photograph?

15          MR. KLEINDIENST:  No, it's the same photograph.          10:21:51

16          THE CLERK:  Same photograph?

17          MR. KLEINDIENST:  May I approach the witness?

18          THE COURT:  You may.

19    BY MR. KLEINDIENST:

20    Q.  Agent Wynecoop, Mr. Wynecoop, let me show you Exhibit 5E.          10:22:03

21          And do you see on the brown bag in that exhibit the

22    number 21?

23    A.  Yes, sir.

24    Q.  And do you see the number 21 in the photograph that's on

25    the screen?          10:22:17

─────Shandon Wynecoop – Redirect Examination─────

1   A.  Yes, sir.

2   Q.  Okay.  And what's contained in 5 -- is it E that I just

3   gave you?

4   A.  Another piece of concrete.

5   Q.  Okay.  Do you want to go ahead and open the bag up?                10:22:25

6          THE COURT:  While he's doing that, can I see counsel?

7      (At sidebar on the record.)

8          THE COURT:  Are you going to go concrete by concrete?

9          MR. KLEINDIENST:  No.  This is the last concrete.

10         THE COURT:  All right.                                          10:22:50

11     While I got you here, when you guys are talking to

12  each other, your microphone is on, so we can hear everything

13  Mary Sue is saying.

14         MS. FELDMEIER:  At the table?

15         THE COURT:  At the table.  Right now.  When you were          10:23:02

16  coaching him about opening the bag and put the rocks back in,

17  we can hear everything.

18         MR. CHAPMAN:  Can you hear us?

19         THE COURT:  I haven't.  But make sure the green light

20  is off.                                                               10:23:13

21     (End of discussion at sidebar.)

22         THE COURT:  You may continue.

23         MR. KLEINDIENST:  I think -- did you display that to

24  the jury?

25  BY MR. KLEINDIENST:

UNITED STATES DISTRICT COURT

41

1   Q.  And, again, how would you describe that as -- what the

2   object is?

3   A.  Another piece of concrete.

4   Q.  And that was in the bag with Exhibit No. -- is it number

5   21; correct?                                                      10:23:47

6   A.  Right, Exhibit 5E, number 21.

7   Q.  You would agree with me that the rocks that -- or the

8   concrete rubble that you've showed to the jury that's been

9   admitted into evidence isn't similar to the two big rocks that

10  Mr. Chapman showed you; correct?                                  10:24:34

11  A.  Right.

12  Q.  They're quite a bit smaller?

13  A.  Yes.

14  Q.  And they appear not to be rocks, but just pieces of

15  concrete rubble?                                                  10:24:45

16  A.  Right.

17  Q.  Mr. Chapman asked you about rust on individuals that you

18  see in Nogales on the American side.  And I think you said that

19  you see rust typically where on the clothing?

20  A.  Shoes, the knees of the pants, hands.  Sometimes the front    10:25:16

21  of the shirt.

22  Q.  Sometimes the front of the shirt?

23  A.  Sometimes.

24  Q.  And when you see somebody like that in Nogales, what is

25  that an indication of?                                            10:25:28

1   A.  They probably just got off the fence.

2   Q.  They probably just got off the fence.

3         But you don't know for sure unless you actually stop

4   the person and look at what the object is on the clothing;

5   correct?                                                      10:25:40

6   A.  Right.

7   Q.  But oftentimes you'll see it on the front of the shirt; is

8   that correct?

9   A.  As often as not.

10  Q.  As often as not?  Okay.                                   10:25:47

11        Finally, Mr. Wynecoop, you were trained at the Academy

12  and at the station about the use of lethal force.  And that

13  night you did not, did you?

14  A.  Right.

15  Q.  You made another decision; right?                         10:26:11

16  A.  Right.

17  Q.  And what was that decision?

18  A.  Put distance between myself and the fence.

19  Q.  And after you did that, were you hit by any rocks?

20  A.  No.                                                       10:26:23

21        MR. KLEINDIENST:  No.

22        I have nothing further.

23        THE COURT:  Jurors have any questions, please place

24  them in writing.

25        I'm hearing at least one, two.                          10:26:31

─── **CR-15-1723-TUC-RCC – March 22, 2018** ───

1          Counsel.

2      (At sidebar on the record.)

3          THE CLERK:  Did you move 5E in?

4          MR. KLEINDIENST:  I will move at this time 5E.

5          MR. CHAPMAN:  No objection.                         10:27:03

6      (Exhibit No. 5E admitted into evidence.)

7          THE COURT:  First question is:  In the video from

8  yesterday, did you have your weapon drawn when your back was to

9  Agent Swartz?

10          I'll ask it.                                        10:27:13

11          Is it an expectation and/or a directive as a Border

12  Patrol officer to stay with someone who is climbing the fence

13  until they reach the ground?

14          I'll ask it.

15          Are we to assume that the pieces of concrete are      10:27:32

16  intact as thrown and not fragments of a larger piece of

17  concrete?

18          That's an assumption they'd have to make.

19          MR. CHAPMAN:  I would ask that that question be asked.

20          THE COURT:  But you're having him speculate on        10:27:51

21  whether --

22          MR. CHAPMAN:  I think what it's getting to, one of the

23  questions is, did any of these pieces of concrete break up when

24  they hit the ground.

25          THE COURT:  True.  He doesn't know.                   10:28:02

─── **Shandon Wynecoop – Juror Questions** ───

1    MR. CHAPMAN:  Well, we don't know he doesn't know.

2    THE COURT:  I'll ask him if he knows, I'll ask him

3    that.

4    There's one more.

5    How long were you at the Nogales Station?                    10:28:11

6    All right.  And we'll take our break after this

7    witness steps down.

8    MR. KLEINDIENST:  I may have a couple of questions,

9    maybe after the break.

10    THE COURT:  After the break?  I prefer to get rid of     10:28:26

11    him.

12    MR. CHAPMAN:  Let's do it now.

13    (End of discussion at sidebar.)

14    THE COURT:  I have several questions on behalf of the

15    jury that I will ask on their behalf.                          10:28:41

16    Do you know whether or not the pieces of concrete that

17    have been shown to you are fragments and part of a larger piece

18    of concrete?

19    THE WITNESS:  I do not know that.

20    THE COURT:  How long were you at the Nogales Station?    10:28:59

21    THE WITNESS:  Prior to the rocking, it was -- I was in

22    the field for about 15 months, I believe.

23    THE COURT:  And you were based out of the Nogales

24    Station?

25    THE WITNESS:  Correct.                                        10:29:21

Shandon Wynecoop – Redirect Examination

```
 1            THE COURT:  Is it an expectation and/or a directive as

 2    a Border Patrol officer to stay with someone who is climbing

 3    the fence until they reach the ground?

 4            THE WITNESS:  It was -- I mean, it was a personal

 5    choice, I guess, just to make sure they got one way or another.      10:29:40

 6    Because if they fell on the north side, we need to apprehend

 7    them, or just make sure they get to the south side.

 8            THE COURT:  In the video from yesterday, did you have

 9    your weapon drawn when your back was to Agent Swartz?

10            THE WITNESS:  I did.                                         10:29:54

11            THE COURT:  Any questions based upon the jurors'

12    questions, Mr. Kleindienst?

13            MR. KLEINDIENST:  Can I bring up Exhibit 329?

14            MS. FELDMEIER:  It was admitted yesterday.

15            MR. KLEINDIENST:  It was admitted yesterday.                 10:30:20

16                    REDIRECT EXAMINATION

17    BY MR. KLEINDIENST:

18    Q.  While they're looking for that, you testified that you had

19    your back to Agent Swartz when you were out in the street?

20    A.  Correct.                                                        10:30:28

21    Q.  And that's when you had your gun?

22    A.  Right.

23    Q.  And that's when you were -- what were you focused on?

24    A.  Right.

25    Q.  The two people on the fence?                                    10:30:34
```

Shandon Wynecoop – Redirect Examination

1  A.  Correct.

2  Q.  When is the first time that you learned that the gunfire

3  was coming from Agent Swartz and not from Mexico?

4  A.  After he started getting on the radio and saying that there

5  was somebody down on the south side.                    10:30:50

6  Q.  Somebody down.  What was the code word you used?

7  A.  10-7.

8  Q.  And that meant deceased?

9  A.  Deceased, possibly deceased.

10 Q.  Before that point in time you didn't know who was doing the   10:30:59

11 shooting?

12 A.  I didn't know where the shooting was coming from.  It just

13 happened quick.

14 Q.  When do you remember pulling out your gun for the first

15 time after you put it away when you first saw the knife and    10:31:08

16 realized it wasn't a threat?

17 A.  As soon as Officer Zuniga pulled his canine from the

18 vehicle I was re-holstered.

19 Q.  Okay.  You re-holstered.

20        When did you pull your gun the second time?           10:31:19

21 A.  After shots fired and I entered into the road again.

22 Q.  Okay.  And we saw that on the video yesterday, walking into

23 the street with your gun held in a high position; correct?

24 A.  Correct.

25 Q.  Looking at --                                          10:31:35

─── Shandon Wynecoop - Redirect Examination ───

1          THE COURT:  329.

2          MR. KLEINDIENST:  Looking at Exhibit 329 which was

3   admitted yesterday --

4          Does the jury have that on the screen?

5          THE CLERK:  Yes.                                  10:31:50

6   BY MR. KLEINDIENST:

7   Q.  Do you see again where you're at?

8   A.  Yes, sir.

9   Q.  And you've been given a certain color; right?

10  A.  Right.                                               10:31:57

11  Q.  And that color is?

12  A.  Blue.

13  Q.  And do you see where Agent Swartz is?

14  A.  Yes.

15  Q.  And what color is the circle around him?           10:32:03

16  A.  Red.

17  Q.  And then Officer Zuniga?

18  A.  Green.

19  Q.  He's green.

20         And he's in the front of his vehicle at that point in  10:32:11

21  time?

22  A.  Right.

23  Q.  Okay.  Now Officer Zuniga is the one that we can see in

24  red, you're behind the vehicle and we can just barely see the

25  top of your head; right?                                10:32:35

─────── **Shandon Wynecoop – Redirect Examination** ───────

1   A.  Agent Swartz is the one --

2   Q.  I mean Agent Swartz.  Excuse me.

3   A.  Yes.

4   Q.  Okay.  That's not you?

5   A.  No.                                                      10:32:42

6   Q.  And can you tell if Agent Swartz has his gun out?

7   A.  The posturing that he has, it looks like it.

8   Q.  Now rocks hadn't started to fall at this point in time, had

9   they?

10  A.  No, not yet.                                             10:32:54

11          MR. KLEINDIENST:  That's all I have.

12          THE COURT:  Mr. Chapman, any questions based upon the

13  jurors' questions?

14          MR. CHAPMAN:  No, Your Honor.

15          THE COURT:  Thank you.                               10:33:11

16          You may step down.

17          THE WITNESS:  Thank you, sir.

18      (Further proceedings held on the record not included in

19  this transcript.)

20

21                          -oOo-

22

23

24

25

—CR-15-1723-TUC-RCC – March 22, 2018 —

1

2

3

4                    C E R T I F I C A T E

5

6         I, CANDY L. POTTER, do hereby certify that I am duly

7    appointed and qualified to act as Official Court Reporter for

8    the United States District Court for the District of Arizona.

9         I FURTHER CERTIFY that the foregoing pages constitute

10   a full, true, and accurate transcript of all of that portion of

11   the proceedings contained herein, had in the above-entitled

12   cause on the date specified therein, and that said transcript

13   was prepared under my direction and control.

14         DATED at Phoenix, Arizona, this 4th day of June,

15   2018.

16

17

18

19                         s/Candy L. Potter_____
                           Candy L. Potter, RMR, CRR

20

21

22

23

24

25

UNITED STATES DISTRICT COURT