**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| **United States of America,** | ) | |
| | ) | No. **CR-15-1723-TUC-RCC-DTF** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Tucson, Arizona |
| | ) | March 27, 2018 |
| **Lonnie Ray Swartz,** | ) | 9:29 a.m. |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE RANER C. COLLINS, JUDGE**

<u>**REPORTER'S EXCERPTED TRANSCRIPT OF PROCEEDINGS**</u>

<u>**JURY TRIAL**</u>
<u>**DAY 5**</u>

**(TESTIMONY OF JEFF PLOOY)**

Official Court Reporter:
Candy L. Potter, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 36
Phoenix, Arizona 85003-2151
(602) 322-7246

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

CR-15-1723-TUC-RCC – March 27, 2018

1

2                          **A P P E A R A N C E S**

3

 For the Government:
4       U.S. Attorney's Office Tucson
        By:  **Wallace Heath Kleindienst**, Esq.
5            **Mary Sue Feldmeier,** Esq.
        405 West Congress Street, Suite 4800
6       Tucson, Arizona 85701

7  For the Defendant:
        Law Offices of Sean C. Chapman
8       By:  **Sean Christopher Chapman**, Esq.
        100 North Stone Avenue, Suite 701
9       Tucson, Arizona 85701

10      Law Office of Jim E. Calle
        By:  **Jamie Ernest Calle, III,** Esq.
11      2315 East Hawthorne Street
        Tucson, Arizona 85719

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                              **I N D E X**

3   **GOVERNMENT WITNESS:**      **DIRECT**    **CROSS**    **REDIRECT**  **RECROSS**

4   JEFF PLOOY
    By Mr. Kleindienst        4
5   By Mr. Chapman                         36
    By Mr. Kleindienst                                43
6   By the jury                            49
    By Mr. Kleindienst                                45
7

8

9

10  Discussion Held at Sidebar             47

11

12

13

14                          **INDEX OF EXHIBITS**

15  **EXHIBIT**                                  **IDENT**   **RECEIVED**

16  NO.        DESCRIPTION

17  6          Photograph - 2 bundles of
               marijuana                        19
18
    191        Photograph of US crime scene
19             Vehicles, looking west           14

20  311        Aerial photograph of crime scene  29

21

22

23

24

25

─── **Jeff Plooy – Direct Examination** ───

```
 1        (The following excerpt is the testimony of Jeff Plooy.)

 2             THE COURT:  You may call your next witness.

 3             MR. KLEINDIENST:  The Government calls Jeff Plooy to

 4   the stand, Your Honor.

 5             THE CLERK:  Raise your right hand, please.                    09:29:30

 6        (JEFF PLOOY, GOVERNMENT WITNESS, SWORN.)

 7             THE CLERK:  Thank you.  Please be seated.

 8             Please pull the microphone over to you, speak directly

 9   into it.

10             State your full name for the record and please spell        09:29:47

11   your last name.  And it does move over.

12             THE WITNESS:  My name is Jeff Plooy, last name is

13   spelled P-L-O-O-Y.

14             THE COURT:  Sir, the Rule has been invoked in this

15   case, have you been informed of that matter?                          09:30:00

16             THE WITNESS:  Yes, yes.

17             THE COURT:  All right.  Thank you.

18             Mr. Kleindienst, whenever you're ready.

19             MR. KLEINDIENST:  Thank you.

20                          DIRECT EXAMINATION                             09:30:12

21   BY MR. KLEINDIENST:

22   Q.  Good morning.

23   A.  Good morning.

24   Q.  Can you speak in a loud and clear voice so the folks over

25   here can hear you?                                                    09:30:30
```

UNITED STATES DISTRICT COURT

**Jeff Plooy - Direct Examination**

1   A.   Okay.  You can hear me or not?

2   Q.   I can hear you.

3   A.   Okay.  Good.

4   Q.   Can you tell us what you do for a living?

5   A.   I am a Border Patrol Agent.                          09:30:35

6   Q.   And where do you work?

7   A.   I work out of the Nogales Station.  Currently I'm in sector

8   prosecutions as a case agent.

9   Q.   What does that mean?

10  A.   It means, right now what we do is we take cases from the   09:30:46

11  agents in the field, whether it be smuggling of narcotics or

12  people, or anybody that's like a possible aggravated felony,

13  basically different cases that they want to present to the

14  United States Attorney, we take them, get them all ready, do

15  all the -- you know, get everything nice in order and present   09:31:05

16  it to the United States Attorney for prosecution.

17        And then from there if it gets accepted we help

18  indict, Grand Jury, help the AUSA's investigate the cases, and

19  help them at trial, also testify at trial if need be.

20  Q.   How long have you been doing that?                    09:31:17

21  A.   I've been doing that since January of last year.

22  Q.   Is that a detail?

23  A.   Yes, it is.

24  Q.   Prior to going on that detail, what did you do?

25  A.   Border Patrol Agent for the Nogales Station since September   09:31:24

—— **Jeff Plooy – Direct Examination** ——

1    2011.

2    Q.  Since September 2011?

3    A.  Yes.

4    Q.  In the Nogales Station?

5    A.  At the Nogales Station, that's where I transferred, yes.    09:31:34

6    Q.  Had you worked at another Border Patrol Station prior --

7    A.  Yes --

8        (Court reporter interruption.)

9            THE WITNESS:  Sorry.

10   BY MR. KLEINDIENST:

11   Q.  That's all right.  We'll both slow down.

12   A.  All right.  Sounds good.

13   Q.  Okay.  Prior to coming to the Nogales Station in 2011, had

14   you worked at another station?

15   A.  Yes, I did.    09:31:46

16   Q.  And what station was that?

17   A.  I worked at the Calexico, California Station from March of

18   2007 until September 2011.

19   Q.  When you came to the Nogales Station in 2011, can you just

20   describe the types of things you did as a Border Patrol Agent?    09:31:58

21   A.  Various things you did, either you worked on the -- worked

22   on the line, basically what we called line watch duties.  So

23   either you sat at an X watching them, having surveillance on

24   the fence, or you were a roving agent going back and forth into

25   a different area, and you would respond to either things you    09:32:16

**Jeff Plooy - Direct Examination**

1    saw or anything anybody else called out.

2        For the most part, trying to apprehend anybody either

3    crossing illegally, or anybody trying to cross any contraband

4    through illegally.  As far as anything --

5    Q.  Sounds like you pretty much have done everything.          09:32:33

6    A.  Pretty much, yeah.  Well, let's not get crazy.

7    Q.  Pardon?

8    A.  Not everything.  I'm sure there's a lot more.

9    Q.  Okay.  But quite a few things?

10   A.  Yes.                                                       09:32:42

11   Q.  Let me direct your attention to the night of October 10th,

12   2012.

13   A.  Okay.

14   Q.  Do you recall being on duty that night?

15   A.  Yes, I do.                                                 09:32:49

16   Q.  And do you recall what your assignment was?

17   A.  I was a roving patrol unit, what called a POE to POE.  So

18   there's two different POEs in Nogales, there's the DeConcini

19   POE and then west of it is the Mariposa POE.  And it's about

20   a -- maybe about a two-mile stretch between there of either    09:33:03

21   it's a city -- it's a residential area, and then it's a

22   hills -- a bunch of hills.  Not so much mountainous, but a

23   hilly area all the way to the other POE.

24       So we have Xs in that area, which are basically people

25   that are going to watch the fence or watch the area, the high   09:33:17

—— Jeff Plooy – Direct Examination ——

1    traffic areas where people cross.  And then I was kind of the

2    roving person, so if there is anything crossing that area, a

3    sensor went off, a sensor going off, either -- or anybody

4    cross, the radios or cameras or another agent spotted, I would

5    go to that area and help out and assist.                          09:33:33

6    Q.  What time did you go on duty that day?

7    A.  I believe it might have been -- it was 4:00 p.m. duty that

8    day.

9    Q.  At 4:00 p.m.?

10   A.  I believe so.                                                 09:33:45

11   Q.  Were you working by yourself?

12   A.  That day, yes.

13   Q.  What kind of vehicle were you driving?

14   A.  I was driving a Tahoe, a marked Tahoe unit, with lights and

15   sirens and identifying patches.                                  09:33:53

16   Q.  Is that like a Chevy or a GMC Tahoe?

17   A.  Chevrolet Tahoe.

18   Q.  Chevrolet Tahoe.

19        Do you know what a kilo unit it?

20   A.  Yes, I do.                                                    09:34:02

21   Q.  How is that different from a kilo unit?

22   A.  A kilo unit is a Silverado or a Ford F-150 --

23        (Court reporter interruption.)

24        THE WITNESS:  I'm sorry.

25        THE COURT:  Yeah, you both are racing each other.  We       09:34:12

─────── **Jeff Plooy – Direct Examination** ───────

1    can't go at this pace all day.

2            THE WITNESS:  Okay.  Sorry.  Fast talker, Your Honor.

3            So it's a pickup that will -- it has like a -- a

4    little like a holding unit on the back of it, so instead of it

5    being an open bed, it has like a holding person unit on top of

6    that so you can hold multiple people in there.

7            My Tahoe was just a regular SUV, but it has a cage

8    behind it so you can fit only three people in the back of that,

9    where the kilo unit you can fit, I think, six individuals in

10   there.

11   BY MR. KLEINDIENST:

12   Q.  Okay.  Let me direct your attention to about 11:00 o'clock

13   that night.  Do you recall responding to the West International

14   fence near -- say between the Camera Pole X and the 410 X?

15   A.  Yes.

16   Q.  What was your purpose for responding there?

17   A.  The cameras had called out that they saw -- they thought

18   they saw two people attempting to smuggle narcotics north of

19   the line.

20   Q.  Where were you at that time when you heard that radio call?

21   A.  I believe I was on what's called Target Range Road.

22   Q.  Target Range Road?

23   A.  Target Range Road.  Yeah, I was responding that way.

24   Q.  And how close to West International would that road be?

25   A.  Anywhere from about a half mile to a mile away.

─── **Jeff Plooy – Direct Examination** ───

1   Q.  West or east of the road?

2   A.  West of it.

3   Q.  West of the location?

4   A.  West of the location, yes.

5   Q.  And once you heard that radio broadcast, what did you do?    09:35:28

6   A.  I -- as -- immediately drove to that area to respond.  So I

7   had to go east on Target Range Road, hit the 19 south for maybe

8   about -- not even like an eighth of a mile, then it exits off

9   to International immediately.

10          So I went to International from Target Range through    09:35:46

11  Interstate 19.

12  Q.  What happened then?

13  A.  What happened then is the radio -- two other agents were

14  responding to that, it was Agent Devowe and Agent Brown.  And

15  by the time -- before I'd got there the camera had called out    09:35:58

16  that the two individuals were -- went back south and jumped the

17  fence with the narcotics.

18  Q.  Did you meet up with Agent Devowe and Agent Brown?

19  A.  Yes, I did.

20  Q.  And were they driving in the same vehicle or in a different    09:36:10

21  vehicle?

22  A.  They were the two Xs, so they were in two separate

23  vehicles.

24  Q.  Okay.  What did you all do then after you learned that

25  the -- one or more of the people had come across had gone back    09:36:21

**Jeff Plooy - Direct Examination**

1  south to Mexico?

2  A.  We did like an immediate search in the area where they --

3  camera said that they were crossed.  Even though they said that

4  they thought they had the marijuana bundles on the back of

5  their backs, we just did a quick look.                          09:36:35

6        And then right afterwards the camera operator let us

7  know that, hey, there's going to be a separate group crossing

8  east of the Camera Pole.  So for that time we just decided

9  to -- we just kind of played coy, like we'll see if we can get

10  them to cross north, because they'll play -- they'll play this  09:36:51

11  cat and mouse game of running back, running south.

12        Instead of, you know, like -- instead of having to go

13  back and forth, back and forth, we're just going to see if we

14  can let them go north a little bit and see if we can apprehend

15  them.                                                           09:37:05

16        So at the time when they were calling it out, we

17  stayed there and kind of laid low, kind of acted like we were

18  just talking to each other, see if they were going to cross.

19  Q.  Now when you all got out of your vehicles to look for any

20  contraband because of those other individuals, did you find    09:37:15

21  any?

22  A.  No, we did not.

23  Q.  Where did you search?

24  A.  We searched -- it's called the -- basically right in the

25  north side of West International where the cars were, and then  09:37:24

**Jeff Plooy – Direct Examination**

1   the front area of what's called the Red Brick House.  It's kind

2   of a -- I don't know if it's a duplex or an apartment building,

3   but it's -- the landmark we call it the Red Brick, because it's

4   the only red brick house in that area.

5        So we searched the front of that area, we searched                09:37:38

6   around the cars, and then around the trash cans that were in

7   that vicinity.

8   Q.  And your search was unsuccessful?

9   A.  No, we -- yeah, it was unsuccessful there.

10  Q.  Now where you and Agent Devowe and Brown were waiting,            09:37:47

11  where is that in relationship to the Camera Pole X which the

12  jury has heard about?

13  A.  We were waiting directly about 100, 200 yards west of the

14  Camera Pole.

15  Q.  Were you visible to anybody who was on that portion of           09:37:59

16  West I, at the Camera Pole?

17  A.  If you were on the very top, yes.

18  Q.  How about if you were east of the Camera Pole X?

19  A.  Probably not.

20  Q.  Okay.  So did there come a time when you heard the              09:38:12

21  dispatcher indicate there might be some other people scaling

22  the fence onto West I?

23  A.  Yes.

24  Q.  About how long after the first incident did that incident

25  occur?                                                              09:38:26

─────── **Jeff Plooy - Direct Examination** ───────

1  A.  Minutes later.

2  Q.  Minutes?

3  A.  Yes.

4  Q.  What did you do?

5  A.  We laid low for a bit, stayed there talking, trying to,    09:38:30

6  like I said, see if we could get them a little farther north.

7  And then at that point I believe there was another -- we gave

8  it some time and they told -- then the camera operator, I

9  believe, told us to move in, and there was possibly other

10  people running in at the same time going for them.    09:38:48

11  Q.  Okay.  And what did you do exactly?

12  A.  We responded.  Once we heard that other people were

13  responding and that they were saying that they were going

14  south, we decided to respond.  We got in our vehicles and

15  responded to the area.    09:39:02

16  Q.  Do you remember who was first in line in your vehicles?

17  A.  I believe it was Agent Devowe.  I can't say 100 percent

18  certain.  But I think he was -- I know I was the second person,

19  but I think he was the first agent that -- of us three.

20  Q.  And the other agent would be?    09:39:14

21  A.  Agent Brown.

22  Q.  Agent Brown.

23       Where did you all drive to?

24  A.  We drove to the -- basically directly -- a couple -- like

25  20 yards west of the Camera Pole, and drove and parked right    09:39:25

─────── **Jeff Plooy – Direct Examination** ───────

 1   along the fence.  Or 20 yards east, sorry.  Twenty yards east

 2   of the --

 3   Q.  Twenty yards east?

 4   A.  Twenty yards east of the Camera Pole.  Sorry.

 5            MR. KLEINDIENST:  May I approach the witness,          09:39:39

 6   Your Honor?

 7            THE COURT:  You may.

 8   BY MR. KLEINDIENST:

 9   Q.  Let me just show you, Agent Plooy, what has been already

10   admitted as Exhibit 191.                                       09:39:51

11       (Discussion off the record between Government counsel.)

12            MR. KLEINDIENST:  Let me just kind of adjust this.

13            Does the jury have it on their screen?

14   BY MR. KLEINDIENST:

15   Q.  Looking at Exhibit 191, do you see a number of vehicles?   09:40:26

16   A.  Yes.

17   Q.  And do you recognize the street that the vehicles are on?

18   A.  Yes, I do.

19   Q.  And do you recognize this from the night of October 10th,

20   2012?                                                          09:40:38

21   A.  Yes, I do.

22   Q.  Can you indicate to the jury which vehicle was yours, if

23   you see it in there?

24   A.  Yes.  The Tahoe with the -- on the very -- between the two

25   kilo units right there.  (Indicating.)                         09:40:49

**Jeff Plooy - Direct Examination**

1    Q.    You want to put -- okay.  You can just circle it.

2    A.    Right there.  (Indicating.)

3    Q.    And the vehicle in front would be?

4    A.    I believe it was Agent Devowe's.

5    Q.    And the vehicle behind yours?                                09:40:59

6    A.    Would be Agent Brown's.

7    Q.    Now did any of these vehicles have armored cages on them?

8    A.    What?

9    Q.    Armored cages?

10   A.    I don't remember any of them having -- I know definitely    09:41:09

11   the one in front doesn't have it.  I don't know if --

12   Q.    Did your Tahoe have it?

13   A.    My Tahoe did not, no.

14   Q.    Okay.  When you parked your vehicle, what did you do?

15   A.    I went to where the camera operator told me that she        09:41:25

16   thought that the bundles of marijuana were hidden.

17   Q.    And where exactly did you go then?

18   A.    I went to the -- there's a little empty lot just north of

19   where -- maybe east and north of where these vehicles are.  And

20   there's like -- it's an empty lot between two houses, has a      09:41:41

21   little bit of an embankment and a tree over there.  I walked

22   towards where the tree was, and there's a bunch of grass, and

23   walked over there attempting to find the bundles of marijuana.

24   Q.    Now were you armed that night?

25   A.    Was I what?                                                  09:41:55

**Jeff Plooy – Direct Examination**

1   Q.   Were you armed?

2   A.   Yes, I was.

3   Q.   And what kind of weapon did you have with you?

4   A.   On me I had my service pistol.  And then in my vehicle I

5   had locked up an M4 rifle.                                              09:42:04

6   Q.   When you exited your vehicle to go search for the

7   contraband, did you take out the long gun?

8   A.   No, I did not.

9   Q.   You did not.  So you just had your side arm?

10  A.   Yes.                                                               09:42:14

11  Q.   Did you have it drawn?

12  A.   No.

13  Q.   So you testified you went up on top of this berm to the

14  area where the dispatcher said the individuals had been?

15  A.   Yes.                                                               09:42:23

16  Q.   Do you know who else went up there?  Did you see?

17  A.   As far as I know, Agent Devowe and Agent Brown went up

18  there with me.

19  Q.   Anybody else?

20  A.   I don't remember anybody else at the time.  There was other       09:42:33

21  people on scene, but I don't remember seeing anybody else.

22  Q.   Do you remember when you went up on top of the berm if the

23  canine officer from the Nogales Police Department had showed

24  up?

25  A.   Yes.                                                              09:42:44

---

**Jeff Plooy – Direct Examination**

1  Q.  Do you know when you went on top of the berm if the canine

2  dog had been brought out at that point in time?

3  A.  Yes.

4  Q.  Do you remember seeing anybody on the fence?

5  A.  Yes.                                                    09:42:55

6  Q.  And what did you see?

7  A.  I saw two individuals on the top of the fence trying to

8  like make their way back south.

9  Q.  Did you see anything on them, on their back?

10  A.  At the time, no, I did not.                            09:43:05

11  Q.  You did not?

12  A.  No.

13  Q.  So you went on top of the berm with Agent Devowe and

14  Agent Brown.  What did you do then?

15  A.  I went and found the -- one of the bundles of narcotics.  09:43:13

16  Q.  How far from the beginning of the berm did you find the

17  bundle?

18  A.  Maybe about ten feet from the top -- from where the tree

19  was at.

20  Q.  Ten feet from -- when you say where the tree was at --   09:43:27

21  A.  To like where the berm -- where the berm goes up from the

22  sidewalk.

23  Q.  Right.

24  A.  North of that.  So about -- maybe five to ten feet, if

25  that.  But I want to say it was about ten feet away from the  09:43:39

─────── **Jeff Plooy - Direct Examination** ───────

1    start -- from the crest of the berm going up to where the tree

2    is at, north.

3    Q.  What did you do with the bundle?

4    A.  I took possession of it.

5    Q.  In terms of securing it.                                    09:43:49

6    A.  I seized it and had it on my person at the time.

7    Q.  And do you know what Agent Devowe and Agent Brown were

8    doing?

9    A.  Agent Devowe had grabbed the other -- he found the other

10   bundle of marijuana.                                            09:44:01

11   Q.  How far away was the bundle that he found from the one that

12   you found, if you remember?

13   A.  I couldn't -- close by, but I couldn't tell you

14   approximately how many feet.  Maybe -- maybe ten feet from me.

15   Q.  Ten feet from you?                                          09:44:13

16   A.  Yeah.

17   Q.  Roughly in the same area?

18   A.  Pretty much the same exact area, yes.

19   Q.  And what did you see Agent Brown do, if anything?

20   A.  I never -- I saw him -- I saw him look -- he came up with    09:44:22

21   us.  And after that I don't remember really seeing him.  I was

22   kind of more focused, oh, great, got the bundle.  I was kind

23   of -- oh, I'm done.

24   Q.  You're done?

25   A.  Yeah.  I got what I'm looking for.                          09:44:35

**Jeff Plooy – Direct Examination**

1   Q.  Done for the night?

2   A.  No, just done with the search.  So once I found mine,

3   Devowe found his, all right, we got what we came for, cool.

4   Q.  Is what you've just described to the jury a common

5   occurrence on your job that you would find -- you would try to   09:44:49

6   apprehend individuals but also search for bundles and find them

7   and secure them?

8   A.  Yes, yeah.

9   Q.  Was there anything unusual about this night?

10  A.  Not at that point, no, just a normal night.   09:45:01

11  Q.  Normal night.

12       If I could show you what's been marked and admitted as

13  Exhibit No. 6.

14       Can you all see that?

15       Do you recognize what's depicted on the screen as   09:45:22

16  Exhibit 6?

17  A.  Yes.

18  Q.  What is that?

19  A.  Those are -- looks like bundles of marijuana.

20  Q.  How do they compare to the bundle that you found that   09:45:31

21  night?

22  A.  Look pretty similar.  They all kind of have the pretty much

23  same exact look to them.  They're always -- either they're

24  wrapped in burlap or cellophane.  Those look like they're

25  wrapped in cellophane tape.   09:45:46

**Jeff Plooy - Direct Examination**

1    Q.   Okay.  And do they have like straps on them?

2    A.   Yes.

3    Q.   After you located that one bundle, you saw Devowe find and

4    secure the second bundle; correct?

5    A.   Yes.                                                      09:46:12

6    Q.   What happened then?

7    A.   Right around that point is when we started -- like I said,

8    me -- we started hearing rocks hitting the fence.  People were

9    saying, there's rocks coming.  You can see them like either on

10   the fence or hitting the ground.                              09:46:28

11   Q.   Did you see the rocks?

12   A.   I mean, it's been five years ago, so it's a lot of stuff is

13   just like kind of blurry.

14   Q.   Take your time.

15   A.   One thing is I definitely remember hearing them.  And then  09:46:41

16   you can hear them -- I remember hearing them on the fence and

17   then hearing them on the street.

18   Q.   Okay.  You could hear them but you didn't see them?

19   A.   I couldn't -- I can't recall if I remember seeing them.

20   Q.   Were any of the rocks getting close to where you were at?  09:46:56

21   A.   Where I was at, I was in a secure location with the tree

22   covering me.  So in my area I had plenty of cover due to the

23   tree right -- pretty much right above -- right on top of me and

24   where I was on the berm.  I was -- none of them were going to

25   get close to me, from what I could tell.                      09:47:15

**Jeff Plooy - Direct Examination**

1   Q.  So you felt like you had secure cover from any rocks that

2   might make its way all the way up to the berm; correct?

3   A.  Yes.

4   Q.  Did you actually ever see a rock land on the berm?

5   A.  No.                                                        09:47:24

6   Q.  No.

7           Later on that night did you go down in the street and

8   the sidewalk on West I?

9   A.  Yes.

10  Q.  Did you see rocks on the street and sidewalk?            09:47:31

11  A.  Oh, yeah, I saw them.

12  Q.  Okay.  But none of the rocks that you saw on the street and

13  sidewalk, none of those came to where you were in your position

14  of cover?

15  A.  No, none of them did.                                    09:47:42

16  Q.  You said you heard some yelling on the street?  What do you

17  remember about that?

18  A.  Like, I can't remember exact words.  I just remember

19  people -- which is a normal -- normal thing in our duties, if

20  someone's throwing rocks, someone's going to yell and tell     09:47:57

21  everybody, hey, heads up, rocks are coming.

22  Q.  When you were located by the tree with the bundle, were you

23  able to see the street and the sidewalk?

24  A.  A potion of it, yes.

25  Q.  Okay.  Did you see anybody approach the fence?           09:48:08

Jeff Plooy - Direct Examination

1   A.  At the time --

2   Q.  Or anybody at the fence?

3   A.  I really wasn't paying too much of attention at that --

4   before the incident occurred.

5   Q.  Why is that?                                                    09:48:23

6   A.  Just because I'm just laying low waiting for -- waiting for

7   either them to get done or people to leave, or -- I'm just in a

8   secure area, why am I going to go out in the open and get hit

9   and put myself in danger and then have someone else have to

10  take care of me?                                                   09:48:38

11        So it's just -- I have -- I have secured the

12  narcotics.  They're throwing rocks so that we don't get those.

13  Might as well keep it here, I got it secure.  You know, I'm

14  basically a custodian of whatever is going on there with the

15  bundles, I can keep it there.  Plus, I'm in a safe place so      09:48:51

16  there's really no reason for me to leave the area and get

17  myself in danger at the time.

18  Q.  So you stayed where you were at?

19  A.  Yes.

20  Q.  You've obviously been involved where rocks have been thrown    09:48:59

21  over the fence in the past; correct?

22  A.  Yes.

23  Q.  The rocks that were being thrown that night that you heard,

24  did you determine if that was more of a distraction to what was

25  going on with the two people on top of the fence?                 09:49:11

UNITED STATES DISTRICT COURT

—**Jeff Plooy – Direct Examination**—

1     MR. CHAPMAN:  Objection, leading.

2     THE COURT:  Sustained.

3  BY MR. KLEINDIENST:

4  Q.  What was your -- what was your conclusion as to why the

5  rocks were being thrown, the ones that you heard that night?     09:49:19

6  A.  Either one of two reasons, either they want to throw rocks

7  because they -- they're mad that we're going after their

8  -- either they're doing it to distract the two guys on the --

9  on top of the fence, or because we're trying to get

10  their -- we're trying to get the narcotics that they want to --     09:49:35

11  they would want to come back and get.

12  Q.  Okay.  Did you ever see anybody at the fence?

13  A.  At the -- before the incident happened, no.

14  Q.  And let me rephrase the question just so we're clear.

15     After you heard the rocks hitting the sidewalk and the     09:49:54

16  street, at some point in time did you see somebody, an agent,

17  at the fence?

18  A.  Eventually, yes.

19  Q.  Eventually, yes.

20  A.  Yes.     09:50:06

21  Q.  How long was it after you first heard the sound of rocks

22  did you see somebody at the fence?

23  A.  About four or five shots in.

24  Q.  Four or five shots in?

25  A.  Yes.     09:50:17

**Jeff Plooy - Direct Examination**

1   Q.  So you heard gunshots before you saw somebody at the fence?

2   A.  Yes.

3   Q.  How many gunshots did you hear first?

4   A.  Before I saw him?

5   Q.  Um-hum.                      09:50:30

6   A.  Probably three to five.

7   Q.  What ran through your mind when you heard the gunshots?

8   A.  I don't know where these gunshots are coming from, so I

9   ducked and got as much cover as I could.

10   Q.  Even more cover?            09:50:41

11   A.  Yes.

12   Q.  You were more concerned about the gunshots than the sounds

13   of the rocks hitting the street?

14   A.  Yes.

15   Q.  Did you then -- did you have an ability just to look out   09:50:47

16   onto the street to see what was happening at the fence?

17   A.  Yes.

18   Q.  After you heard the first round of gunshots, did you hear

19   more gunshots?

20   A.  Yes.                      09:51:02

21   Q.  Was there a break in time between the first group and the

22   next sounds of gunshots?

23   A.  Yes.

24   Q.  About how long would you estimate?

25   A.  A few seconds maybe.       09:51:11

**Jeff Plooy – Direct Examination**

1   Q.  Where did you think the gunshots were coming from?

2            MR. CHAPMAN:  I'm sorry, I didn't hear his response.

3            THE COURT:  A few seconds maybe.

4   BY MR. KLEINDIENST:

5   Q.  Where did you think the gunfire was coming from, did you

6   know?

7   A.  I had no idea at the time.

8   Q.  At the time.

9   A.  No.

10  Q.  Okay.

11  A.  Like south of me, if that makes sense.

12  Q.  Pardon?

13  A.  You could tell they were south of my position, they weren't

14  north.

15  Q.  Okay.  But you felt you were in a secure position and had

16  sufficient cover?

17  A.  Yes.

18  Q.  Right.  And you didn't move because you weren't sure where

19  the gunshots were coming from.

20  A.  Yes.

21  Q.  Is that a fair statement?

22  A.  Yeah, that's fair.

23  Q.  After you heard the first series of gunshots did you

24  eventually look at the fence?

25  A.  Yes.

09:51:21
09:51:28
09:51:40
09:51:47
09:51:55

**Jeff Plooy - Direct Examination**

1  Q.  And what did you see?

2  A.  I saw Agent Swartz firing his service weapon.

3  Q.  Where?

4  A.  From what I could tell it looked like it was into Mexico.

5  Q.  And this was after you heard the first set?                    09:52:08

6  A.  After the first set, yes.

7  Q.  And how did you know it was Agent Swartz who was firing his

8  gun?

9  A.  At the time I didn't know exactly it was him, just later on

10 knowing it was him.  I just saw an agent in a green uniform        09:52:21

11 firing into Mexico.

12 Q.  How many times did you believe you recall him firing?

13 A.  Maybe -- maybe about three to five.  Afterwards I just

14 ducked -- you know, got up real quick to see what was going on,

15 saw him, and then went back down to cover again.                   09:52:42

16 Q.  The same cover you had before?

17 A.  Yes.

18 Q.  Did you continue to watch him on the fence?

19 A.  No.

20 Q.  You did not?                                                   09:52:52

21 A.  No.

22 Q.  Did there come a point in time where you heard more

23 gunshots?

24 A.  Yes.

25 Q.  So we're talking about three different times where you've     09:52:57

**Jeff Plooy - Direct Examination**

1    heard gunshots that night while you're up on top of the berm?

2    A.  For me it was more two.

3    Q.  Okay.

4    A.  And so the first few I heard.  And then as they were going

5    on, I saw him.  And then I remember the break -- I remember a          09:53:10

6    few second break in time between the shots.

7    Q.  Did you ever see Agent Swartz reload his weapon?

8    A.  No, I did not.

9    Q.  Are you certain?

10   A.  Yes.  Because I remember staying down the whole time.  I           09:53:24

11   remember hearing him -- I mean, hearing the shots,

12   assuming -- hearing the number of shots, hearing the break in

13   time, and then going again, I made the assumption that he

14   reloaded, just from the sound.

15   Q.  Do you recall being interviewed by Sarah Arrasmith, who is         09:53:38

16   with the Department of Homeland Security, just on March 5th of

17   this year about that night?

18   A.  Yes.

19   Q.  And do you recall telling her that you saw Swartz reload

20   his gun and shoot again?  Does that refresh your memory?              09:53:54

21   A.  No, it doesn't really.

22   Q.  Okay.

23   A.  I might have misspoke, because I honestly don't remember.

24   I remember just being on the ground and listening the whole

25   time.                                                                  09:54:08

───── **Jeff Plooy - Direct Examination** ─────

1    Q.  Now did you see anybody hit with any of the rocks?

2    A.  I saw no person get hit.

3    Q.  Did you see anybody -- anything else?

4    A.  I saw what I appeared to be the dog get hit.

5    Q.  What did it appear to be?  What does that mean?          09:54:23

6    A.  I saw -- like I said, it's unfortunate because it's been so

7    long my memory is getting real fuzzy on everything.

8              I remember seeing the dog.  I remember seeing it like

9    wince almost like it got hit by a rock.

10   Q.  But you didn't see a rock hit him?                       09:54:39

11   A.  I don't remember now if I do or not.  I mean, it's like I

12   said, it's a lot of stuff, like a lot of the things that

13   happened, my memory just being so long ago, it's kind of more

14   like in like chunks.

15             I remember seeing the dog, I remember seeing it kind 09:54:52

16   of move.  I mean, my prior testimony it looked like I said I

17   saw it.  But now due to the time passing I can't remember.

18   Q.  So you can't remember if you actually saw a rock hit the

19   dog?

20   A.  No.  At this time, no, I do not.                         09:55:05

21   Q.  Okay.  But you saw him move?

22   A.  I saw him move as if you're -- I saw him move like he moved

23   to like -- it was a move like if you had been hit by something,

24   or if you see something, you move -- not so much up like it was

25   scared, but more to the side, like it got hit -- something hit  09:55:22

**Jeff Plooy - Direct Examination**

1   it.

2   Q.  But that was just your speculation as to what might have

3   happened?

4   A.  Right now, yes.

5   Q.  Okay.

6   A.  Just due to my memory.  Sorry.

7   Q.  That's all right.  That's all right.  I understand.

8        MR. KLEINDIENST:  May the witness come down from the

9   stand, Your Honor?

10       THE COURT:  Yes.                                    09:55:37

11       MR. KLEINDIENST:  Agent, let me bring this aerial out.

12       If you could stand to the side to make sure you don't

13   block the jurors' view.  Okay?

14       THE WITNESS:  Sure.

15       MR. KLEINDIENST:  Can you all see that?              09:56:28

16   BY MR. KLEINDIENST:

17   Q.  Do you recognize what's depicted in Exhibit No. 311, which

18   has been admitted into evidence?

19   A.  Yes.

20   Q.  And what it is?                                      09:56:36

21   A.  It is an aerial view of West International.

22   Q.  And you've seen photographs like this before in this case;

23   correct?

24   A.  Yes.

25   Q.  And can you indicate to the jury where you were earlier   09:56:43

—Jeff Plooy – Direct Examination—

1    that night at 410?  Where it would be on the map?

2    A.  So you're talking about when the first group -- when the

3    first group came we were in this vicinity right here.

4    (Indicating.)

5    Q.  Okay.  And then where did you drive your vehicle when you            09:57:00

6    responded to the second set of individuals that were seen by

7    dispatcher -- the camera operator?

8    A.  It's going to be right in this area here is where we drove.

9    (Indicating.)

10   Q.  And that's where you parked your vehicle?                           09:57:12

11   A.  Yes.

12   Q.  Do you want to show us where you walked into the brush

13   area?

14   A.  We walked pretty much right into this right area.

15   (Indicating.)                                                          09:57:22

16   Q.  And there's a berm there you have to climb up?

17   A.  Yes.

18   Q.  Pretty steep berm?

19   A.  Not too bad, it's about three to five feet maybe, more or

20   less.                                                                  09:57:29

21   Q.  And you want to tell us where you were when you found the

22   bundle?

23   A.  Almost directly where this is right -- pretty much -- I

24   think the tree is right here, and I want to say it's right in

25   this vicinity.  (Indicating.)                                         09:57:40

**Jeff Plooy – Direct Examination**

1  Q.  Okay.  So the bundle was next to a tree?

2  A.  Yes, thereabouts.

3  Q.  And that's where you remained when you heard the rocks

4  coming over the fence; correct?

5  A.  Yes.                                                      09:57:50

6  Q.  And that's where you were when you heard the gunshots?

7  A.  Yes.

8  Q.  Why don't you -- just so we'll know down the road what

9  location you're talking about -- here's a pin that has your

10  initials on it.  Do you want to just stick it approximately   09:58:01

11  where you were with the tree and the bundle on Exhibit 311?

12  A.  I was roughly here.  (Indicating.)

13  Q.  And there's a pin there that has the initials JD; correct?

14  A.  Or P, yes.  Oh, mine right here, JP, yes.

15  Q.  No, your initials are JP.                                 09:58:25

16  A.  Yeah, okay.

17  Q.  The pin next to it has the initials?

18  A.  Oh, JD, yes.

19  Q.  And JD do you understand would be --

20  A.  Josh Devowe, I would assume.                              09:58:35

21  Q.  Josh Devowe.

22       And you've testified that he was up there with you and

23  you both found the bundles in the same general area; correct?

24  A.  Yes.

25  Q.  Okay.  Can you show us where you saw -- when you finally   09:58:42

1   for the first time after you heard the gunfire, and then you

2   saw Agent Swartz at the fence, can you indicate roughly where

3   he was?

4   A.  Approximate -- it's going to be somewhere in this like

5   vicinity right in here.  (Indicating.)                          09:58:59

6   Q.  And you only had a partial view of the fence; is that

7   correct?

8   A.  Yes, that's correct.  Due to the brush and the tree, I kind

9   of had like a little bit of a -- almost like a little bit of

10  weird panoramic view.  Like I couldn't see too far left or      09:59:10

11  right.  I had like a little kind of a cone area that I could

12  see, that was about it.  Especially with the cars and

13  everything.

14  Q.  When did you finally leave your position of cover?

15  A.  I would say not until the south side authorities arrived     09:59:20

16  and we saw their flashing lights, knowing that the scene on

17  that side was okay and cleared.

18  Q.  About how long was it after the gunshots had ended, the

19  gunfire had ended, did the south side police respond, if you

20  can recall?                                                      09:59:37

21  A.  Maybe a couple of minutes.

22  Q.  So they were there rather quickly?

23  A.  Yes.

24  Q.  And what made that make you leave your position, the

25  appearance of the south side police?                            09:59:45

**Jeff Plooy – Direct Examination**

1  A.  Knowing that it was -- the scene -- if there was going to

2  be anybody shooting at us or anything -- because at the time

3  we're kind of worried about more of retaliation.  Okay.  A, we

4  don't know if that was -- we don't know if that was totally

5  Swartz that was shooting the whole time himself.  Could have         10:00:05

6  been someone else.  We don't know -- if it was, if there's a

7  retaliation shot.  So it's just better just to stay put.

8         Once we saw the south side authorities arrive on the

9  south side, we know that they've got -- it's going to be more

10  distracting to them seeing the lights and everything on that        10:00:19

11  side.  So we just assumed, okay, scene's safe.  Other people

12  were -- we kind of all made like a recollection, okay, it

13  should be okay to come out of the -- out of the woods, I guess

14  you'd say.

15  Q.  Because at the time when you were undercover you didn't          10:00:30

16  have all the facts as to about what was going on.

17  A.  Not at all, no.

18  Q.  So there were a lot of questions in your mind as to what

19  was actually happening.

20  A.  Yes.                                                            10:00:38

21  Q.  Okay.  If you can resume your seat, sir.  Thank you.

22         I'll take the pointer.

23  A.  Okay.

24  Q.  Thank you, Agent.

25         (Discussion off the record between Government counsel.)      10:01:16

--- **Jeff Plooy – Direct Examination** ---

1    BY MR. KLEINDIENST:

2    Q.  Let me, if I could go back to the ELMO, and put on the

3    screen Exhibit 191, which we've looked at already.

4    A.  Okay.

5    Q.  Is it on the screen now?                                    10:01:40

6    A.  Yes.

7            Oh, sorry, them.

8    Q.  That's all right.  You're important too.  They're important

9    and you're important.

10           You identified these vehicles as Agent Devowe's,        10:01:55

11   yours, and Agent Brown's; correct?

12   A.  Correct.

13   Q.  What is the condition of the headlights of each of your

14   three vehicles at the time that this picture was taken?

15   A.  Looks like my headlights are on.                            10:02:06

16   Q.  How about Agent Devowe's?

17   A.  Can't really tell, just of the -- because it's cutting off

18   at the picture there.

19   Q.  Right.

20           And Agent Brown behind you?                             10:02:18

21   A.  Looks like his are on too.

22   Q.  Do you remember when you exited your vehicle or got out of

23   your vehicle to go to the berm and you left your headlights on?

24   A.  They would have -- they're usually on auto, so they would

25   have been on for a few -- at least ten, 20 seconds.            10:02:33

**Jeff Plooy – Direct Examination**

1   Q.  Well, do you see in this photograph there's a vehicle in

2   the middle of the road that has the flashing lights on?

3   A.  Yes.

4   Q.  Do you know what vehicle that was?

5   A.  I can make an assumption, but I don't want -- I     10:02:45

6   wouldn't -- I would assume -- the only person I know that was

7   in the middle was Pierce, because he drove through the scene

8   afterwards.

9   Q.  That was afterwards.

10   A.  Yeah, that was afterwards.     10:02:59

11   Q.  So if that was Pierce's vehicle, that was afterwards.

12   A.  That would be afterwards, yes.

13   Q.  And afterwards meaning?

14   A.  After the incident.

15   Q.  After the incident.     10:03:05

16       And so if he arrived, your headlights still seem to be

17   on; correct?

18   A.  Yes.  Mine were on because I remember we left -- I left my

19   car on to have the radio on.

20   Q.  Okay.

21   A.  So kind of more listening to the radio after everything's

22   going on, because so many people were going on.  We had

23   everything on to keep the radio on just in case I didn't hear

24   my hand mic.

25   Q.  Okay.  So would it be -- just to refresh your recollection,     10:03:27

─────── **Jeff Plooy - Cross-Examination** ───────

1    that you probably left your headlights on when you got out of

2    your vehicle and they stayed on?

3    A.  Yes.

4        MR. KLEINDIENST:  Okay.  That's all I have.  Thank you

5    very much, sir.                                    10:03:44

6        THE COURT:  Mr. Chapman.

7                  CROSS-EXAMINATION

8    BY MR. CHAPMAN:

9    Q.  Good morning, Agent Plooy.

10   A.  Good morning, sir.  How are you doing?          10:04:13

11   Q.  Good.  How are you?

12   A.  Good.

13   Q.  So I just want to cover -- just summarize a couple things

14   that happened that night, if that's okay with you.

15   A.  Absolutely.                                     10:04:28

16   Q.  So my understanding is that before this event occurred, you

17   saw two guys running north, and they crossed right in front of

18   you and jumped on the fence essentially?

19   A.  I believe we got there afterwards.

20   Q.  Okay.  But you found these bundles that had been discussed  10:04:45

21   in this vacant lot on top of the berm, and we saw the diagram.

22   A.  Yes.

23   Q.  And that's about 50 feet from the fence; is that right?

24   A.  Yes.

25   Q.  Okay.  And when you arrived -- or at some point after you   10:04:58

1    arrived, rocks started falling?

2    A.  Yes.

3    Q.  And they were being thrown from the Mexican side?

4    A.  Yes.

5    Q.  Could you see them in the air?                          10:05:12

6    A.  From my position, no.  Just because of the cover where I

7    was at, with the tree.  I'd have to have an open view of it.

8    Q.  Did you see -- did you hear any them pinging on the fence?

9    A.  Yes.

10   Q.  Did you hear any rocks falling through the trees hitting    10:05:28

11   the leaves?

12   A.  I don't remember any personally, no.  But it's been so long

13   it could have happened, I totally forgot about it, or it's out

14   of my memory.

15   Q.  It's fair to say that rocks were falling basically on all   10:05:42

16   sides of the road though.

17   A.  Yes.

18   Q.  Is that true?

19   A.  Yes.

20   Q.  And you heard somebody say -- warn the other agents that    10:05:50

21   rocks were falling.

22   A.  Yes.

23   Q.  True?

24         And Agent Devowe was right next to you on the berm at

25   that point?                                                10:06:07

1   A.  At what point are we talking about?  When I got the bundles

2   or after the --

3   Q.  When you were on the berm.

4   A.  At one point, yes, he was.

5   Q.  Okay.  And I think you testified earlier that you may have          10:06:16

6   seen the dog get hit by a rock.  Do you remember telling the

7   Grand Jury in December of 2012 that you saw the dog get hit by

8   a large rock?

9   A.  Yes.

10  Q.  Okay.  And do you remember telling investigators that at          10:06:38

11  least a dozen rocks were thrown, in your opinion?

12  A.  Yes.

13  Q.  And they were regular sized and some were decent size, I

14  think was how you described it?

15  A.  Yes.                                                              10:06:59

16  Q.  And I think at one point you told investigators that rocks

17  were, quote, all over the place?

18  A.  Yes.

19  Q.  Prior to when you heard the gunshots?

20  A.  Yes.                                                              10:07:08

21  Q.  You yourself had been rocked many times in the past; isn't

22  that correct?

23  A.  That's correct.

24  Q.  And you agree that rocks can have the -- carry the

25  potential to cause serious bodily injury?                            10:07:20

1   A.   Absolutely, yes.

2   Q.   And that's how you're trained as an agent?

3   A.   Yes.

4   Q.   From day one basically you're warned that rocks can maim or

5   kill --                                                          10:07:32

6   A.   Yes.

7   Q.   -- is that correct?

8        Getting back to one of the questions that

9   Mr. Kleindienst asked you, I just want to clarify.

10       So you think that the rocks were thrown in this case      10:07:51

11  either because the smugglers on the other side were aggravated

12  that you found the marijuana, or because two of the smugglers

13  were still on the fence trying to escape into Mexico?

14  A.   Yes.  It could be either they were aggravated we found it

15  or they don't know that -- I mean, they couldn't tell that I     10:08:15

16  found it yet.  So it could be that they're trying to keep us

17  away from the area, thinking that we'll clear out and they can

18  get it later.

19  Q.   And that's a pretty common tactic, isn't it, to throw rocks

20  at agents to keep them from getting the drugs or catching the    10:08:27

21  smugglers that are on the American side?

22  A.   Yes, that's correct.

23  Q.   We've heard a lot of testimony that generally the

24  international border fence is dangerous and agents should stay

25  away from it unless they have to be there.  I mean, that's fair  10:08:52

**Jeff Plooy – Cross-Examination**

1   to say, isn't it?

2   A.  Yes.

3   Q.  One legitimate reason to be there would be to defend a

4   fellow agent or assist a fellow agent, wouldn't it?

5   A.  Yes.                                                         10:09:04

6   Q.  But typically when these smugglers get up on the fence, you

7   guys just let them go; right?  Because then it becomes a safety

8   issue for both you and the smugglers.

9   A.  Yes.

10  Q.  I mean, if you Tase a smuggler that's 18 feet up on the     10:09:22

11  fence and he falls and injures himself, you're going to get

12  sued or you have to worry about that --

13  A.  Yes.

14  Q.  -- right?

15  A.  Yes.  All correct.  That, and I can't climb that fence       10:09:31

16  myself, so -- I tried.

17  Q.  Well, that's the other part of this, is if you go up the

18  fence you might hurt yourself.  It's just a safety issue for

19  you as well; correct?

20  A.  Yes, that's correct.                                        10:09:47

21  Q.  But on the other hand, for example, in this case, you

22  responded in an effort to apprehend these smugglers.  And

23  approaching the fence and making that effort was reasonable,

24  wasn't it?

25  A.  Yes.                                                        10:10:06

Jeff Plooy – Cross-Examination

1  Q.  The point is is that it isn't Border Patrol policy to avoid

2  the fence at all costs no matter what's going on; true?

3  A.  No, you don't avoid the fence.  If you need to do your

4  job -- if you got to do your job, and then if you got to be

5  there by the fence, then that's what you got to do.          10:10:23

6  Q.  You got to do your job, you do your job.

7  A.  Yes.

8  Q.  And being an agent is dangerous, isn't it?

9  A.  Yes, it is.

10 Q.  And chasing smugglers is dangerous, isn't it?           10:10:30

11 A.  Yes, sir, it can be.

12 Q.  I think you said at some point that rocks were being thrown

13 for about a minute prior to the shots being fired.  Does that

14 sound right?

15 A.  Sounds about right.                                       10:10:51

16 Q.  And rocking is a common event in this area where the

17 shooting occurred, isn't it?

18 A.  Yes.

19 Q.  It's also a known area where scouts set up on the hills on

20 the Mexican side, and scouts exist in the United States as      10:11:10

21 well.

22 A.  Yes.

23 Q.  And they basically -- just like you're monitoring their

24 actions, they're monitoring your actions --

25 A.  Yes.                                                       10:11:23

**Jeff Plooy – Cross-Examination**

1  Q.  -- with the scouts.

2       Are you trained that in all instances when someone

3  throws rocks at you you have to take cover?

4  A.  No.

5  Q.  Does your training allow you to use deadly force in          10:11:48

6  response to rocking events if the situation is appropriate and

7  you're applying your training, use of force of continuum, that

8  type of thing?

9  A.  Yes.

10  Q.  In your experience as an agent working down in Nogales,      10:12:04

11  have you ever observed drug smugglers to have rust on their

12  shoes or their clothing?

13  A.  Yes.

14  Q.  And what is that an indication to you of?

15  A.  Indication to me that they most likely were on the bollard   10:12:31

16  fence.

17  Q.  Why is that?

18  A.  Because the fence over time, of years of rain, you know,

19  dew in the air, it rusts over time, and it has almost an orange

20  hue to it due to the rust.                                      10:12:49

21  Q.  So that rust will transfer off if somebody climbs over the

22  fence --

23  A.  Yes.

24  Q.  -- in your experience?

25  A.  Yes.                                                         10:12:55

—————— **Jeff Plooy — Redirect Examination** ——————

1  Q.  Are you aware of situations where agents have responded

2  with deadly force to rock throwings?

3  A.  Yes.

4  Q.  Are you aware of events where agents have been seriously

5  injured by rockings?                                    10:13:11

6  A.  Yes.

7  Q.  Would you agree with the idea that because you were in a

8  different position than Agent Swartz, your perception of the

9  threat created by these rocks may have been different from his?

10 A.  Yes.                                                 10:13:36

11         MR. CHAPMAN:  No further questions.

12         THE COURT:  Mr. Kleindienst.

13                    REDIRECT EXAMINATION

14 BY MR. KLEINDIENST:

15 Q.  Agent Plooy, you testified on direct that you don't      10:14:46

16 remember seeing a rock actually hit the canine; correct?

17 A.  My memory is too fuzzy at this time for it, yes.

18 Q.  And that's your best memory today?

19 A.  Yes.

20 Q.  Do you remember where it was when you saw that?         10:15:00

21 A.  Where what was?

22 Q.  The canine.

23 A.  The canine?  Was between -- I just remember seeing it

24 between me and the fence.  It was on the road, in the middle of

25 the road.                                                10:15:12

Jeff Plooy – Redirect Examination

1  Q.  Where in relationship to any vehicles, do you remember?

2  A.  Definitely north of where my vehicle was -- I know it was

3  definitely north of where my vehicle was.  I don't know if it

4  was between the other vehicles that were on the north side or

5  if it was in the middle of the road.                    10:15:25

6        My view being able to see would be kind of hard to

7  tell where it was exactly.

8  Q.  Okay.  You didn't call out and say, hey, your canine dog

9  got hit, did you?

10 A.  Not until long after.                                10:15:37

11 Q.  Not until long after?

12 A.  Yes.

13 Q.  After everything had happened?

14 A.  After everything had happened I yelled at the PD officer,

15 hey, how's your dog?  He's like, what do you mean?  I said,    10:15:43

16 well, your dog got hit by a rock.

17 Q.  And he checked it out; right?

18 A.  Yeah.  As far as I know, yes.

19 Q.  Now you testified about rockings on cross-examination.

20 Since you've come to the Nogales Station in 2011, have you ever 10:15:58

21 heard about an agent in Nogales ever being hit by a rock,

22 Agent Plooy?

23 A.  I mean, I couldn't give you an exact example, but you hear

24 about it.

25 Q.  My question to you is, after you came to the Nogales       10:16:21

1   Station, did you ever hear about an agent being hit by a rock,

2   up to the present time?

3   A.  Not that I can recall.  From that year time, no.

4   Q.  From 2011 --

5   A.  From 2011, yeah.  2010's a different story.                    10:16:32

6   Q.  From 2010 to the present time you're telling this jury you

7   never heard of an agent in Nogales actually get hit by a rock;

8   is that correct?

9   A.  2010, yes.  Not 2011 on.

10  Q.  Okay.                                                          10:16:46

11  A.  When I was detailed there that was different.

12  Q.  Because you got there in 2011.

13  A.  Yes.

14  Q.  And that was my question.  When you arrived at the Nogales

15  Station in 2011, until the present time, you can't tell this      10:16:54

16  jury that you know of one agent who got hit by a rock.

17  A.  I can't recall at this time, no.

18  Q.  That would be important to recall; right?

19  A.  It happens so much, rockings happen all the time, and --

20  Q.  I understand rockings happen --                               10:17:09

21  A.  No, I'm just -- my thing is I just -- when I go home, I

22  don't really care about work, I don't really talk about it.  I

23  go to work, I do my thing, I go home.  I really don't really

24  talk -- I didn't really talk to other agents about it or

25  anything.  So just from my -- when I was on duty, I don't         10:17:22

1   remember anybody getting hit by a rock.

2   Q.  Well, you would have heard about it at muster; right?

3   A.  People talk about stuff.  I mean, I don't remember.

4   Q.  Okay.  But you never -- you never heard of an agent being

5   hit by a rock.                                                    10:17:34

6   A.  Not that I remember, no.

7   Q.  Okay.  Now, he told you -- or asked you, Mr. Chapman on

8   cross-examination, about do you always take cover when you're

9   being rocked.  And what was your response?

10  A.  It depends on the situation.  If you can, yes.               10:17:47

11  Q.  If you can.

12          What if cover is not available, do you do anything

13  else to avoid being rocked?  Do you move away?

14  A.  It just depends on the situation.  You either have to move

15  away or go forward to the threat.  If the threat is there you    10:18:04

16  have to go engage it, I guess.

17  Q.  If there's a reason to engage the threat.

18  A.  Yes.

19  Q.  If there's not a reason to engage the threat, do you move

20  forward when the rocks are coming down?                          10:18:13

21  A.  No.

22  Q.  You've never been hit by a rock in Nogales Station.

23  A.  In Nogales, no.

24  Q.  Okay.  And that's been, what, five, six years now?

25  A.  Yeah.                                                        10:18:23

Jeff Plooy – Redirect Examination

1  Q.  You don't know, because you were more concentrated on the

2  finding the bundles, what happened on the street that caused

3  Agent Swartz to go to the fence, do you?

4  A.  Yes, I don't know what happened, no.

5  Q.  And you don't know where the other agents were, other than          10:18:48

6  Agent Devowe, were located at point in time.

7  A.  Yes.

8  Q.  You do not know?

9  A.  I don't know.

10  Q.  Okay.  And all you know is you found the bundle, you heard          10:18:55

11  rocks coming down, and then you heard the gunshots.

12  A.  Yes.

13  Q.  And you looked at the fence and you saw Agent Swartz at the

14  fence shooting.

15  A.  Yes.                                                                10:19:06

16  Q.  And that's all really you remember about that night.

17  A.  Pretty much, yes.

18       MR. KLEINDIENST:  Okay.  I have nothing further.

19       THE COURT:  Jurors --

20       MR. CHAPMAN:  Your Honor, may I approach?                          10:19:13

21       THE COURT:  Sure.

22       Jurors have any questions, place them in writing.

23     (At sidebar on the record.)

24       MR. CHAPMAN:  Your Honor, he opened the door again.

25       THE COURT:  To what?                                              10:19:38

1          MR. CHAPMAN:  To specifics of rocking events.

2          THE COURT:  No.

3          MR. CHAPMAN:  Well, let me just --

4          THE COURT:  I'll let you make your record.

5          MR. CHAPMAN:  For example, between 2010 and 2014,          10:19:45

6     there were 1700 reported --

7          THE COURT:  Keep your voice down.

8          MR. CHAPMAN:  1700 recorded rockings incidents on

9     Border Patrol.

10          Second, he himself was rocked three different times.          10:19:56

11          THE COURT:  But not in the Nogales sector.

12          MR. CHAPMAN:  Third, in Nogales an agent had a cinder

13     block thrown over the fence, landed on his face.  Isn't that

14     right, Jim?

15          MR. CALLE:  Agent Simoti.          10:20:11

16          MS. FELDMEIER:  But that was prior to 2011.

17          MR. KLEINDIENST:  Right.  And those were my questions.

18          MR. CHAPMAN:  What he did was really misleading.  I

19     should be allowed to get into it.

20          THE COURT:  No.          10:20:20

21          All right.  Wait a minute, questions.

22          The area where this occurred, is it a common area for

23     rocks to be thrown at agents?

24          Where does the Border Patrol usually deploy the

25     vehicles with cages?          10:20:41

Jeff Plooy – Juror Questions

1          Did the lack of cages on the vehicles make them an

2     inappropriate option to retreat?

3          Is the Border Patrol concerned about the safety of

4     individuals who try and climb the fence?

5          Did the rocks that were being thrown pose a potential          10:20:56

6     threat to the safety of the individuals climbing the fence?

7          Do Border Patrol agents always follow the instructions

8     of the camera operators, or are there times that actually being

9     on the ground will dictate a different course of action?

10          How could those on the Mexican side know if you found          10:21:27

11     the bundles?

12          Did the location of the Border Patrol vehicles limit

13     your view of Mr. Swartz at the fence?

14          I'll ask all of them.

15     (End of discussion at sidebar.)          10:21:43

16          THE COURT:  Sir, the jurors have asked several

17     questions I'm going to ask on their behalf.

18          THE WITNESS:  Yes, Your Honor.

19          THE COURT:  Do Border Patrol agents always follow the

20     instructions of the camera operators, or are there times that          10:22:04

21     actually being on the ground will dictate a different course of

22     action?

23          THE WITNESS:  It varies on times.  Because sometimes

24     the camera operator has a great view of it, you're going to go

25     to it.  But due to, especially in Nogales, our terrain, we have          10:22:20

─── **Jeff Plooy – Juror Questions** ───

 1    some different areas as far as hills, ridges.  In that aspect

 2    it might look to them like, oh, okay, that person's right

 3    there, but your vision, you're going to see, no, that's not

 4    what's going on.  Or like they'll -- I've had cases where they

 5    almost -- if you kind of follow them to the letter of the law,                      10:22:37

 6    you might fall down a ledge or something.

 7            So it just -- it's a mixture of both.  You're going to

 8    go -- you're usually going to go -- and especially if it's a

 9    really good operator, you're going to go from where they're

10    telling you.  But if your observations are seeing something                         10:22:48

11    different, you're going to follow that yourself.

12            THE COURT:  Is the Border Patrol concerned about the

13    safety of individuals who try and climb the fence?

14            THE WITNESS:  Yes.  We don't try to -- we don't try to

15    like, you know, knock them off the fence or anything.  Once                         10:23:04

16    it's -- the vast majority -- I mean, the only time anybody

17    tries to get anybody off the fence is if they're first climbing

18    it.  There's been some circumstances of that.  Even then you

19    kind of, do it.

20            Otherwise, if they're going to fall off the fence                           10:23:17

21    -- kind of more, if they fall off the fence, someone's going to

22    die or someone's going to get really hurt and have to go to the

23    hospital, and then you're going -- you're dealing with the

24    consequences.

25            So I would say, yeah, we're concerned about them being                      10:23:27

1    on the fence.  We're not trying to knock them off the top of

2    the fence, no.

3    Q.  Did the rocks that were being thrown pose a potential

4    threat to the safety of the individuals climbing the fence?

5           I just asked you that.                                    10:23:41

6    A.  Absolutely they would have.  They could have easily hit

7    their guy on top -- if the rock hit the guy on top of the

8    fence, especially if it hits them in a nice place in the head

9    and knocks them out or knocks them off balance, yeah, he could

10   have fell 18 feet to the ground.                                 10:23:54

11          THE COURT:  The area where this occurred, is it a

12   common area for rocks to be thrown at agents?

13          THE WITNESS:  Pretty much the entire West

14   International, yes.  Rocks have been had for the most part in

15   this area.  The whole -- from the POE to where the dead end of 10:24:06

16   the road is where it becomes -- well, even then past there,

17   that whole area, at one point there's been stories where

18   there's been incidents of rockings.

19          THE COURT:  Where does the Border Patrol usually

20   deploy the vehicles with the cages?                              10:24:20

21          THE WITNESS:  So we have the two -- there's three

22   spots there.  There's been up to five areas on that fence, but

23   at the current time there's two vehicles deployed.  One by the

24   fence right where that camera pole is at.

25          There's one, it's called the 410 -- so right where the  10:24:36

Jeff Plooy - Juror Questions

 1   road dead ends, the paved portion and it goes up on top of a

 2   hill, the first hill to the west, that person -- there's

 3   another what we call an X that that person would be facing --

 4   on there facing the residential area, facing eastbound, he'll

 5   be right there.                                              10:24:53

 6        There's a third area, but that wasn't that night, it's

 7   called the Blind Center.  It's pretty much where the West

 8   International begins on the very bottom, the eastern most part

 9   of International, and they would be facing westbound.

10        THE COURT:  Did the lack of cages on the vehicles make  10:25:06

11   them an inappropriate option to retreat?

12        THE WITNESS:  Say that again, sir?

13        THE COURT:  Did the lack of cages on the vehicles make

14   them an inappropriate option to retreat?

15        THE WITNESS:  No, not necessarily.  I mean, it just     10:25:23

16   all depends.  If you're worried -- if you were worried that

17   your windshield was going to get busted, yeah, then you

18   wouldn't want to be there, per se.  But if you were in your

19   vehicle, yeah, if you're in your vehicle you'd probably just

20   drive away anyways, if you thought you were in danger.       10:25:38

21        THE COURT:  How could those on the Mexican side know

22   if you found the bundles?

23        THE WITNESS:  Most -- if they knew -- if they knew

24   it's because they had scouts.  They have scouts pretty

25   much -- it's a known fact they have scouts on the south side  10:25:57

─────── **Jeff Plooy – Juror Questions** ───────

1  that watches on hills.  There's a lot of the hills on the

2  Mexican south side that are higher where we're at and they can

3  see it.

4       They also have people that live in the neighborhood,

5  people that drive around the neighborhood, that watch us at all    10:26:08

6  times.

7       So unfortunately, yeah, you're pretty much being

8  watched 24 seven, either by a camera yourself, or the people on

9  the north and south side.  We've ran into plenty of scouts on

10  the I-19 that will -- go back and forth, and they'll drive    10:26:20

11  along that area, and if they see you with bundles, they'll call

12  the other side and tell them we got them.

13       THE COURT:  Did the location of the Border Patrol

14  vehicles limit your view of Mr. Swartz on the fence?

15       THE WITNESS:  Yes.  Partially their vehicles, but also    10:26:36

16  the brush that I was in as well.  The brush -- the -- pretty

17  much all -- I mean, there was multiple obstacles, not just the

18  Border Patrol vehicles.  The Border Patrol vehicles -- there

19  was the vehicles on the north side, there were, you know,

20  pedestrian vehicles that were just parked there.  And then    10:26:50

21  there was the tree that I was under that had branches, and the

22  brush and the weeds that I was under -- or in the middle as

23  well.

24       THE COURT:  Any questions based upon the jurors'

25  questions, Mr. Kleindienst?    10:27:03

UNITED STATES DISTRICT COURT

─────────── **Jeff Plooy – Redirect Examination** ───────────

1        REDIRECT EXAMINATION

2    BY MR. KLEINDIENST:

3    Q.  I think the question was about the caged vehicles, correct,

4    do you recall that one question?

5    A.  Yes.                                                          10:27:14

6    Q.  Now, you testified that night that neither you, Agent

7    Devowe or Agent Brown had a caged vehicle; right?

8    A.  I mean, what kind of cage -- like a caged vehicle for

9    detainees, yes, I had.

10   Q.  Well, caged in the sense of being protected from rocks.      10:27:26

11   A.  Like a rock proof.

12   Q.  Right.

13   A.  No, I did not have one, no.

14   Q.  Okay.  And Devowe didn't have one?

15   A.  Not that I recall.                                           10:27:33

16   Q.  And Brown didn't have one?

17   A.  Not that I recall.

18   Q.  Okay.  Isn't it true that usually you used vehicles like

19   that that have protection from rocking more on the east side

20   than on the west side?                                           10:27:44

21        MR. CHAPMAN:  Objection, leading.

22        THE COURT:  Overruled.

23        THE WITNESS:  Yes and no, because it just depended on

24   the sup that assigned those vehicles.  So sometimes -- I've

25   been -- I've been on the 410 X with a rock-proof vehicle.        10:27:55

1   BY MR. KLEINDIENST:

2   Q.  Okay.  But sometimes you've not.

3   A.  No.

4   Q.  And I guess my question is, are rockings more frequent on

5   the east side of the port than on the west side of the port?    10:28:05

6   A.  At that time, yes.

7   Q.  At that time?

8   A.  Yes.

9   Q.  In 2012.

10  A.  I want to say yes.    10:28:14

11  Q.  The fence that went up on -- in Nogales, did that decrease

12  the amount of rockings?

13  A.  Yes.

14  Q.  The new fence?

15  A.  Yes.    10:28:26

16  Q.  It did.  When did the new fence go up?

17  A.  Between when I left -- I was on detail -- I was on detail

18  in Nogales from December 2009 until March of 2010.  When I was

19  at the Calexico station we -- Nogales was having a lot of

20  traffic.  They sent people from other stations to go help them    10:28:42

21  out.  So I was there for a three-month period of time.

22          So when I left there that time, the old fence was up,

23  and when I came back in September 2011, a brand new fence was

24  up.

25  Q.  And that's the fence that we have today?    10:28:54

─ **Jeff Plooy – Redirect Examination** ─

1  A.  Yes.

2  Q.  And did that increase or decrease the amount of rockings?

3  A.  It decreased.

4  Q.  It decreased?

5  A.  Yes.                                                          10:29:00

6  Q.  Why was that?

7  A.  Because the old fence had a bunch of holes, it was floppy,

8  they can easily climb on top of it and throw rocks at you.  It

9  was a hazard in itself.

10  Q.  So the new fence made it safer down on West International?   10:29:10

11  A.  It made it safer, yes.

12          MR. KLEINDIENST:  I have nothing further.

13          MR. CHAPMAN:  No questions.

14          THE COURT:  Thank you.  You may step down.

15      (Further proceedings held on the record not included in

16  this transcript.)

17

18                          -oOo-

19

20

21

22

23

24

25

CR-15-1723-TUC-RCC – March 27, 2018

C E R T I F I C A T E

I, CANDY L. POTTER, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 4th day of June, 2018.


s/Candy L. Potter_____
Candy L. Potter, RMR, CRR