**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| **United States of America,** | ) | |
| | ) | No.  **CR-15-1723-TUC-RCC-DTF** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Tucson, Arizona |
| | ) | April 2, 2018 |
| **Lonnie Ray Swartz,** | ) | 9:55 a.m. |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE RANER C. COLLINS, JUDGE**

**REPORTER'S EXCERPTED TRANSCRIPT OF PROCEEDINGS**

**JURY TRIAL**
**DAY 8**

**(TESTIMONY OF ALLEN FORAKER)**

Official Court Reporter:
Candy L. Potter, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 36
Phoenix, Arizona 85003-2151
(602) 322-7246

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

CR-15-1723-TUC-RCC – April 2, 2018

**A P P E A R A N C E S**

For the Government:
    U.S. Attorney's Office Tucson
    By:  **Wallace Heath Kleindienst**, Esq.
        **Mary Sue Feldmeier,** Esq.
    405 West Congress Street, Suite 4800
    Tucson, Arizona 85701

For the Defendant:
    Law Offices of Sean C. Chapman
    By:  **Sean Christopher Chapman**, Esq.
    100 North Stone Avenue, Suite 701
    Tucson, Arizona 85701

    Law Office of Jim E. Calle
    By:  **Jamie Ernest Calle, III,** Esq.
    2315 East Hawthorne Street
    Tucson, Arizona 85719

1

2                          **I N D E X**

3   <u>**GOVERNMENT WITNESS:**</u>      <u>**DIRECT**</u>    <u>**CROSS**</u>    <u>**REDIRECT**</u>  <u>**RECROSS**</u>

4   ALLEN FORAKER
    By Mr. Kleindienst        4
5   By Mr. Chapman                      71
    By Mr. Kleindienst                          80
6   By the jury                         90
    By Mr. Kleindienst                          93

7

8

9   Discussion Held at Sidebar    14, 24, 33, 36, 62, 65, 70, 86

10

11                      **INDEX OF EXHIBITS**

12  <u>**EXHIBIT**</u>                                 <u>**IDENT**</u>   <u>**RECEIVED**</u>

13  <u>NO.</u>      <u>DESCRIPTION</u>

14  1A       Pistol                           15

15  1B       Magazine                         14

16  1C       Magazine                         14

17  280      USCBP Use of Force Policy
             Handbook 2010 (excerpts)         23
18
    281      USCBP Employee Acknowledgement
19           Use of Force Policy              30        31

20  282      USCBP Notice to Service Officers
             Re firearms responsibilities     30        31
21
    283      Judgment Pistol Shooting
22           PowerPoint                       33

23  284      Judgment Pistol Shooting
             Score Sheet for Swartz ·         49        50
24
    285      Certificate of Training
25           Use of Force Policy Training      49

─────── **Allen Foraker – Direct Examination** ───────

1      (The following excerpt is the testimony of Allen Foraker.)

2           THE COURT:  You may call your next witness.

3           MR. KLEINDIENST:  Thank you, Your Honor.

4           Good morning.

5           The Government would call Allen Foraker to the stand.    09:55:26

6           THE CLERK:  Raise your right hand, please.

7      (ALLEN FORAKER, GOVERNMENT WITNESS, SWORN.)

8           THE CLERK:  Thank you.  Please be seated.

9           Please pull the microphone over to you.  Speak

10     directly into it.                                             09:55:59

11          State your full name for the record and spell your

12     last name.

13          THE WITNESS:  My name is Allen Hugh Foraker.

14          THE COURT:  Mr. Foraker, you've been informed that the

15     Rule has been invoked in this case?                          09:56:12

16          THE WITNESS:  Yes, sir.

17                     DIRECT EXAMINATION

18     BY MR. KLEINDIENST:

19     Q.  Good morning, Mr. Foraker.

20     A.  Good morning, sir.                                       09:56:19

21     Q.  Speaking to the folks over here in the jury, can you please

22     tell them what you do for a living right now?

23     A.  I am retired right now.

24     Q.  Where do you live?

25     A.  In Thatcher, Arizona.                                    09:56:26

1   Q.  And prior to your retirement, did you work?

2   A.  Yes, sir.  I was a supervisory Border Patrol Agent.

3   Q.  For how long was that?

4   A.  My entire Border Patrol career was 28-and-a-half years.

5   Q.  When did it start?                                    09:56:40

6   A.  April of 1985.

7   Q.  Did you have military experience prior to that?

8   A.  Yes, I did.

9   Q.  And in what branch did you serve?

10  A.  I was a police officer in the United States Air Force. 09:56:49

11  Q.  And how many years did you spend doing that?

12  A.  Four.

13  Q.  And after you left the Air Force, what was the next

14  position that you had?

15  A.  For one year I actually did construction and drove a truck. 09:57:00

16  And approximately one year from my separation from the Air

17  Force I was picked up by the Border Patrol.

18  Q.  And what year was that again?

19  A.  1985.

20  Q.  And what year did you retire from the Border Patrol?    09:57:13

21  A.  2013.

22  Q.  So that's approximately 28 years, I believe?

23  A.  Yes, sir.

24  Q.  Can you kind of give the jury an idea of the types of

25  things you did as a Border Patrol Agent prior to your       09:57:26

—**Allen Foraker – Direct Examination**—

1    retirement?

2    A.  As a supervisory agent I dealt with the day-to-day issues

3    of scheduling, the problems, the managing the shift that I was

4    on, taking care of annual leave requests, basically setting up

5    schedules for the junior officers and work assignments for the          09:57:51

6    junior officers to follow.

7    Q.  What station was that at?

8    A.  That was at Wilcox, Arizona.

9    Q.  So just so it's clear, you ended your career as a

10   supervisory Border Patrol Agent at Wilcox?                              09:58:06

11   A.  Yes, sir.

12   Q.  When you first went into the Border Patrol, can you tell

13   the jury the types of assignments you had over those 28 years

14   before you retired?

15   A.  Yes.  My first assignment was on the southern border in            09:58:17

16   Capitola, California.  It was right on the border itself.  And

17   my job there was to patrol that border, and the mission was to

18   prevent and deter the entry of illegal aliens and contraband

19   into the United States.

20          And on a day-to-day basis we went out and patrolled            09:58:39

21   east and west along that border to do that job.

22   Q.  What else did you do as an agent?

23   A.  In California, that was pretty much it.

24   Q.  Okay.

25   A.  And when I transferred into Silver City, which was an             09:58:59

─────── **Allen Foraker – Direct Examination** ───────

1  interior station, I didn't patrol the border there, in Silver

2  City, New Mexico.  I did a lot of interior work and work site

3  enforcement.  Which I would go and look for overstays,

4  administrative violations of the Immigration law, and enforce

5  it that direction.  And set up a temporary checkpoint as needed    09:59:27

6  or as ordered on the highway that went out of town.

7  Q.  Silver City, New Mexico, for those of us who might know, is

8  kind of in the southwestern part of New Mexico?

9  A.  Yes, sir.

10 Q.  North of I-10?    09:59:41

11 A.  Yes, sir.

12 Q.  And the border with Mexico is just south of I-10; correct?

13 A.  Sixty miles south.

14 Q.  Sixty miles.

15      And so you still had people or contraband that was    09:59:51

16 coming across the border that you as a Border Patrol Agent in

17 Silver City were involved in apprehending or enforcing the

18 laws?

19 A.  Yes, sir.  We were a back-up to the line station of Deming

20 and Lordsburg.  And anything that would get past them would    10:00:05

21 channel up the highway through our area.

22 Q.  Did you ever work as a horse patrol officer?

23 A.  Yes, I did.

24 Q.  Where was that?

25 A.  I worked horse patrol in San Diego, California and in    10:00:15

**Allen Foraker – Direct Examination**

1    Colville, Washington.

2    Q.   And what did that include?

3    A.   The horse patrol, we patrolled the border on horseback.

4    The horses are a much more viable means of transportation in

5    rough terrain.  And the senses of the horse, their hearing,          10:00:34

6    their smell and their sight, are valuable tools to an agent,

7    because a horse can see, smell and hear things that an agent

8    can't, and will alert the agent to these things.

9            And, of course, when you get into the rough terrain

10   where a vehicle cannot go, the horses don't have any trouble,        10:00:54

11   the horses go right in and right out.

12   Q.   So this was on the southern border and the northern border?

13   A.   And the northern border.

14   Q.   And the northern border.

15           Did you ever work -- operate ATVs to patrol the              10:01:05

16   border?

17   A.   Yes, I operated ATVs at the Capitola Station.

18   Q.   ATV meaning?

19   A.   All-terrain vehicles, four wheelers.

20   Q.   Four wheelers.  Okay.                                           10:01:15

21           So it would be a fair statement to say that you ended

22   your career as a supervisory Border Patrol Agent at Wilcox,

23   that during your 28-year career you did a number of the types

24   of things that Border Patrol agents normally did on duty?

25   A.   Almost everything.                                             10:01:34

Allen Foraker – Direct Examination

1    Q.  Almost everything.

2    A.  Yes, sir.

3    Q.  Did there ever come a time when you became an instructor?

4    A.  Yes.

5    Q.  When did that happen?                                    10:01:41

6    A.  In 1999, while I was stationed in Silver City, New Mexico,

7    I was detailed to the Academy in Artesia for the firearms

8    instructor training program, where I received a certification

9    in firearms instruction.

10   Q.  Okay.  How long was that course?                         10:01:57

11   A.  Two weeks.

12   Q.  Two weeks?

13   A.  Yes, sir.

14   Q.  Did you pursue being an instructor after you received the

15   certification?                                               10:02:04

16   A.  Yes, I did.

17   Q.  And tell us about that.

18   A.  I did a lot of local station-to-station firearms training

19   between the Deming Station and Lordsburg Station.  My station,

20   we were residents, and my partner was also a firearms         10:02:18

21   instructor.  So between the two of us we would help Deming and

22   Lordsburg run their qualification courses.

23        And then when I transferred up to Colville,

24   Washington, I was the station firearms instructor and took care

25   of our station solely as far as making sure the qualifications  10:02:36

—Allen Foraker – Direct Examination—

1    were done and that the use of force was read and understood and

2    the documentation was signed.

3    Q.  As a firearms instructor, obviously you're not teaching the

4    whole curriculum that a Border Patrol Agent would have to study

5    for, you're just talking about use of force; correct?                    10:02:57

6    A.  Yes, sir.

7    Q.  And the use of a firearm.

8    A.  Yes, sir.  And that's only in the field.

9           Now, in 2009 I received orders to go to the Academy to

10   teach for a minimum of three years at the basic academy                  10:03:13

11   firearms instruction.

12   Q.  And that's in Artesia, New Mexico?

13   A.  That's in Artesia, New Mexico.

14   Q.  That would be in the central eastern part of the state of

15   New Mexico?                                                               10:03:29

16   A.  Yes, sir.

17   Q.  Is that south of the town of Roswell --

18   A.  Yes, sir.

19   Q.  -- that we all know with all the aliens?

20   A.  Forty miles south of Roswell.                                        10:03:35

21   Q.  How long had the Border Patrol Academy been there at

22   Artesia?

23   A.  Since 2005.  Prior to that the Academy was split between

24   Charleston, South Carolina and Glynco, Georgia.

25   Q.  Okay.  And so they relocated to Artesia?                             10:03:52

—Allen Foraker – Direct Examination—

1   A.   Yes.

2   Q.   And that's where every Border Patrol Agent who joined the

3   Border Patrol had to go through the Academy and successfully

4   graduate before becoming an agent?

5   A.   Correct.                                                    10:04:03

6   Q.   So you did that on a three-year detail?

7   A.   Yes, sir.

8   Q.   And what years again were you there as an instructor?

9   A.   I got there June of 2009 and left October of '12.

10  Q.   And that was your full-time responsibility?             10:04:14

11  A.   Full-time responsibility.

12  Q.   Can you just give the jury an idea of the training a Border

13  Patrol Agent receives at the Academy, including use of force,

14  but just the general topics that are covered?

15  A.   Firearms training at the Academy is very inclusive, with   10:04:32

16  presentation of a firearm, teaching the students what it looks

17  like, how to hold it, how to operate it, how to safely load it,

18  safely use it, how to holster it, how to draw it, how to

19  accurately shoot it.   And this goes on for a period of 15

20  weeks.                                                          10:05:06

21  Q.   Is that what's called basic marksmanship instruction?

22  A.   Yes, sir.   The first five weeks are basic marksmanship

23  instruction, the first five days out on the range.   And then

24  the second ten days is qualification training where we actually

25  teach them more accuracy and operating the firearm in different  10:05:24

---

**Allen Foraker – Direct Examination**

1    positions, different modes, using different hands, using

2    kneeling, using barricades, and using different distances.

3    Q.  I take it that when you have a new class of enrollees, your

4    presumption is is that whether or not they've had prior

5    experience with firearms, you're going to teach them the way          10:05:49

6    the Border Patrol wants them to know how to use a weapon.  Is

7    that a fair statement?

8    A.  Yes, sir.

9    Q.  So you start at the ground up, the very basic of how to

10   hold a pistol?                                                        10:06:00

11   A.  Yes, sir.

12   Q.  And you go through all the steps of finally then how to

13   shoot the pistol?

14   A.  Yes.

15   Q.  And how to safely handle the pistol.                             10:06:06

16          It's a gradual step up, in terms of at the end of the

17   course -- at the end of the marksmanship course, what's your

18   final objective?

19   A.  Qualification.

20   Q.  Qualification meaning?                                           10:06:19

21   A.  With a pistol.

22          A passing score of 70 percent or better, which would

23   be a score of 252 points out of 360.

24   Q.  Okay.  And if you didn't -- if you didn't make the

25   70-percent cut, then you were basically dismissed from the          10:06:33

—Allen Foraker – Direct Examination—

1  Academy?

2  A.  Not at that point.  They're given a remedial.  They're

3  given a chance to train for a couple of more days, and then we

4  give them a remedial training session.  And they are given a

5  chance to show us that they were capable of learning something.    10:06:51

6  Q.  How many hours total were spent on training agents how to

7  safely and accurately use a firearm, would you say, while you

8  were there as an instructor?

9  A.  I'm counting.

10  Q.  Okay.    10:07:09

11  A.  Fifteen days on the range, two hours every day.  So there's

12  30 hours.  Because every day they have a weapon in their hand,

13  safety is paramount, and is taught to them every second of the

14  day.  And they're watched.  The line instructors are down there

15  watching to make sure there's no safety violations.    10:07:29

16  Q.  And you as an instructor were actually hands on involved in

17  the instruction of the safe and accurate use of firearms by

18  Border Patrol Agents?

19  A.  Yes.

20  Q.  Okay.  Did you train them how to top off their weapon when    10:07:40

21  they -- they graduate from the Academy, they're assigned to a

22  station, and they're given a pistol; correct?

23  A.  Yes, yes.

24  Q.  And does the Border Patrol use one particular type of

25  pistol?    10:07:54

1  A.  Yes.

2  Q.  What kind is that?

3  A.  It's a Heckler & Koch, H&K P2000 semiautomatic pistol.

4  Q.  Was that in use when you were an instructor at the

5  Academy --                                                    10:08:04

6  A.  Yes, it was.

7  Q.  -- in 2013 (sic)?

8  A.  Yes, it was.

9  Q.  And do you know if that's the same pistol being used?

10  A.  I believe it is.                                         10:08:09

11        MR. KLEINDIENST:  May I approach the witness,

12  Your Honor?

13        THE COURT:  You may.

14     (Discussion off the record between counsel.)

15  BY MR. KLEINDIENST:                                          10:08:33

16  Q.  For the record I'm showing the witness Exhibits 1A, 1B and

17  1C, which have already been admitted into evidence.

18        If you want to open that up and take out 1A.

19        THE CLERK:  Do you need scissors?

20        MR. KLEINDIENST:  Yes.                                 10:09:01

21        MS. FELDMEIER:  Your Honor, can we approach at

22  sidebar?

23     (At sidebar on the record.)

24        MS. FELDMEIER:  Your Honor, the marshals tied it down

25  because they don't want us working the action in the courtroom. 10:10:05

—————Allen Foraker – Direct Examination—————

1          Is the Court going to permit us to work the action?

2          MR. CHAPMAN:  Why do we have to do this?  They've seen

3    the gun like four times already.

4          MS. FELDMEIER:  I think he wants to show him the way

5    they trained Mr. Swartz to load the gun and do the magazine          10:10:16

6    exchange.

7          THE COURT:  As long as we keep the gun and the bullets

8    separate, we'll be okay.

9          MS. FELDMEIER:  We don't have any bullets in this

10   courtroom.          10:10:27

11         MR. CHAPMAN:  It sounds like the marshal thinks it's a

12   security issue if he's moving the action back and forth.  Is

13   that what's going on, Mary Sue?

14         MS. FELDMEIER:  I have no idea what their issue is

15   when there's no bullets in the courtroom.          10:10:36

16         THE COURT:  I'm not concerned.

17      (End of discussion at sidebar.)

18         THE COURT:  All right.  I'm being asked to take

19   responsibility for a steak knife.

20         I'll do it.  I'm not going to use it myself.          10:11:22

21         All right.  Be careful.

22      (Discussion held off the record.)

23   BY MR. KLEINDIENST:

24   Q.  Now that we've gotten through that ordeal, can you raise up

25   to the jury and show them what's marked as Exhibit 1A?          10:12:09

1    A.  (Indicating.)

2    Q.  And do you recognize that pistol?

3    A.  Yes, I do.

4    Q.  And what is it?

5    A.  This is an H&K P2000 .40 Smith & Wesson semiautomatic          10:12:16

6    pistol.

7    Q.  And in that box there are two magazines; correct?

8    A.  Yes, there are.

9    Q.  Let me ask you this question -- I'm going to jump ahead a

10   bit.  But when agents are -- actually graduated from the          10:12:29

11   Academy and they're on duty, how many magazines do they

12   normally carry with them during their job?

13   A.  Basic is three.  One in the weapon, and two on their belt.

14   Q.  And the magazines that you see in front of you, are those

15   the types of magazines that a Border Patrol Agent uses?           10:12:47

16   A.  Yes, they are.

17   Q.  And how many bullets does a magazine hold?

18   A.  Twelve rounds.

19   Q.  Now are they taught when they first come on duty at the

20   Academy, when they first come on duty as an agent, how to load    10:13:01

21   their weapon and how to top it off?

22   A.  Yes.

23   Q.  Could you explain that to the jury, please?

24   A.  Yes.  Because the magazines only hold 12 rounds, if

25   you -- weapon is in this condition like this with the slide to    10:13:14

─────── **Allen Foraker – Direct Examination** ───────

1   the rear, and you insert a 12-round magazine in the magazine

2   well, and then drop the slide.  It takes one round out of the

3   magazines and puts it in the tube, in the barrel.  Now that

4   leaves one round less in the magazine.  So we'll take the

5   magazine out and refill that, top that magazine off with one          10:13:34

6   round.

7            Always carry the maximum amount that your system can

8   hold.  That's how we taught them.

9            And then once that is done there will be 13 rounds in

10  this pistol.  And then it's holstered up.                             10:13:49

11  Q.  Okay.  Thank you very much.

12           How long is the instruction at the Academy, how long

13  does it last for all the components of the course?

14  A.  For the firearms course is a total of 15 two-hour sessions.

15  Q.  Okay.  But for the length of the Academy itself -- because        10:14:12

16  obviously they're learning other things other than how to use a

17  firearm; correct?

18  A.  Yes, sir.

19  Q.  But the entire duration of the Academy is how long?

20  A.  At that time I believe -- it's changed since then.  At that       10:14:23

21  time I believe it was 51 days of Border Patrol training.  And

22  they were given a mock language test.  And depending on their

23  score of that test, whether or not they stayed an additional

24  eight weeks to learn Spanish.  If they had a high enough score

25  and proved that they could read, write and speak the language,       10:14:54

**Allen Foraker – Direct Examination**

1  they didn't have to stay the extra eight weeks and they were

2  released to the field then at graduation.

3  Q.  So everybody was required to learn how to speak Spanish?

4  A.  Yes, sir.

5  Q.  Why was that?                                              10:15:08

6  A.  Because the people that we deal with, majority of the time,

7  are from Latin America.

8  Q.  Okay.  Obviously we have the Canadian border, and that's an

9  English speaking -- at least part of the Canadian border --

10 A.  Yes, sir.                                                  10:15:24

11 Q.  -- is English speaking.

12        But a lot of the agents are going to the southwest

13 border; correct?

14 A.  Yes, sir.  And that's where, for the most part, everybody

15 starts there.                                                  10:15:32

16 Q.  So before you can actually graduate from the Academy you

17 have to show proficiency in Spanish?

18 A.  Again, 70 percent, yes, sir.

19 Q.  Seventy percent.

20        And if you don't measure up to that, then you're held   10:15:40

21 over to continue to take Spanish to improve your fluency?

22 A.  No, sir.  If you do not pass Spanish, you're asked to

23 leave.

24 Q.  You don't graduate?

25 A.  You don't graduate.                                        10:15:55

─────Allen Foraker – Direct Examination─────

1    Q.  Other than the basic marksmanship training that you talked

2    about, did you also teach what's called a police practical

3    course --

4    A.  Yes, sir.

5    Q.  -- to the agents?                                          10:16:10

6    A.  Yes, sir.

7    Q.  And can you tell the jury what that was about?

8    A.  Yes, sir.  The police practical course, we tried to show

9    them the movements and the positions that they would be in in

10   an everyday patrol situation.  We didn't get into vehicles     10:16:22

11   during basic, but we would start the training at the

12   one-and-a-half yard line.

13        At that point we would show them that you could

14   operate this weapon without the use of the front sights when

15   you're only a yard and a half away.  And how to accurately     10:16:42

16   point and shoot this weapon on your target.

17        And then we worked back from one-and-a-half to three,

18   and then to seven, and then to 15, and then to 25.  And at each

19   distance we introduced a different stance or a different

20   modification to the stance.  We also introduced switching      10:17:09

21   hands, we introduced kneeling, we introduced barricaded

22   shooting.

23   Q.  What's barricaded shooting?

24   A.  Barricaded shooting is, if you can draw a picture in your

25   mind of the corner of a building, you are behind the corner of  10:17:26

—— Allen Foraker – Direct Examination ——

1   that building.  Now the building is cover for you at the time,

2   and you have to step out from the edge of that cover to be able

3   to engage your target down the side of that building, and then

4   come back into cover.

5   Q.  Okay.  So that's a cover situation that they're taught?          10:17:49

6   A.  Yes, sir.

7   Q.  And how long is the police practical course that you

8   discuss -- or teach?

9   A.  Ten days.

10  Q.  Ten days.                                                        10:18:02

11          Of course, obviously while they're at the Academy

12  they're taking other classes in other subject matters, not just

13  the use of firearms; correct?

14  A.  Correct.

15  Q.  And you were just the use of force instructor?                  10:18:16

16  A.  And firearms.  Firearms and use of force.

17  Q.  And during the time you were at the Academy and you're

18  teaching use of force, would it all be in one block or would it

19  be spread out?

20  A.  It's spread out.                                                10:18:29

21  Q.  How so?

22  A.  After the PPC is done and they have qualified on the

23  handgun, we move them to a rifle course, which is the N4, and

24  at that time was only four hours.  And then after that course

25  we moved them into judgment pistol shooting.                       10:18:46

—Allen Foraker – Direct Examination—

1   Q.  Was the training on the use of firearms interspersed during

2   your other curriculum?

3   A.  Yes, it is.

4   Q.  Okay.  So it wasn't all one concentrated period of time?

5   A.  No, sir.                                                    10:19:00

6   Q.  It was spread out during the entire time they're there at

7   the Academy?

8   A.  We had them two hours a day.

9   Q.  Every day?

10  A.  Yes.                                                        10:19:06

11  Q.  Okay.  So it was a continual learning process on the safe

12  and accurate use of a firearm?

13  A.  Yes, sir.

14  Q.  Okay.  By the way, what's the typical size of a class say

15  back in 2010?                                                   10:19:18

16  A.  They normally started with 50 students, and the attrition

17  rate started very quickly.  An average graduation of a class

18  would be 25 to 30 students.

19  Q.  So you lose about half by attrition?

20  A.  Yes, sir.                                                   10:19:38

21  Q.  For whatever reason or various reasons?

22  A.  Yes, sir.

23  Q.  Okay.  Now that you've spent that time training the agents

24  how to safely and accurately use the pistol, are they given any

25  instruction on when to use lethal force?                       10:19:51

─────Allen Foraker – Direct Examination─────

1  A.  Yes, sir.  During judgment pistol shooting, we give them a

2  two-hour lecture via a PowerPoint, and we try to show them the

3  ideas that they'll have to incorporate to make a decision on

4  whether or not to utilize deadly force.

5  Q.  Let me back up just a minute before we get into that topic.  10:20:14

6         Are you familiar with a Use of Force Policy Handbook

7  that the Customs & Border Protection Agency published as to

8  when you can use lethal force?

9  A.  Yes, I am.

10  Q.  And were the students at the Academy given that Handbook?  10:20:32

11  A.  Yes, they were.

12  Q.  And what was the instruction to them with respect to that

13  Handbook?

14  A.  We would tell the students every day that we covered

15  something to go read their book.  This is your homework, go  10:20:43

16  read your book.  We had no way of enforcing that, but we told

17  them every day, read this book, you need to know it.

18  Q.  Does that book set forth, among other things, the standard

19  or the guideline as to when an officer can use lethal force

20  after he's been trained to use the firearm?  10:21:06

21  A.  Yes, it does.

22     (Discussion off the record between Government counsel.)

23         MR. KLEINDIENST:  May I approach the witness,

24  Your Honor?

25         THE COURT:  You may.  10:21:23

UNITED STATES DISTRICT COURT

─────Allen Foraker – Direct Examination─────

1    BY MR. KLEINDIENST:

2    Q.  I'm going to hand you what's called a Use of Force Policy

3    Handbook Office of Training and Development October 2010.

4         It's not marked, but is that the Handbook that you

5    have just discussed?                                    10:21:37

6    A.  Yes, it is.

7         MR. CHAPMAN:  What's the exhibit number?

8         MR. KLEINDIENST:  It's not marked.

9    (Discussion off the record between counsel.)

10   BY MR. KLEINDIENST:                                     10:22:00

11   Q.  You want to just hold that up to the jury?  I don't know if

12   you did or not.

13        Every student is given that book?

14   A.  Yes, they are.

15   Q.  And that's dated October of 2010?                   10:22:11

16   A.  Yes, sir.

17   Q.  And in that book, does it cover when an officer can use

18   lethal —— when I say "lethal" —— deadly force?

19   A.  Yes.

20   Q.  Let me show you what's marked as Exhibit 280.       10:22:22

21        MR. KLEINDIENST:  May I approach the witness,

22   Your Honor?

23        THE COURT:  You may.

24   BY MR. KLEINDIENST:

25   Q.  Take a look at Exhibit 280.                         10:22:49

─── **Allen Foraker – Direct Examination** ───

1        THE COURT:  Can I see counsel for a second?

2     (At sidebar on the record.)

3        THE COURT:  Do you have a copy of 280?

4        MR. CHAPMAN:  Yeah, I didn't -- he didn't know what

5   the exhibit number was.  But I have it on my computer.                   10:23:28

6        But just for the record, I'm going to object if he

7   tries to admit the Handbook or other written documents.  I

8   think they're hearsay and they're cumulative.

9        If he wants to have the witness explain the

10  policy -- specific policies, that type of thing, based on the            10:23:43

11  Handbook or even read out of the Handbook, that's something

12  else.

13        THE COURT:  All right.

14        MR. CHAPMAN:  But we're talking about hundreds of

15  pages.                                                                   10:23:51

16        MR. KLEINDIENST:  I'm not going to have him read

17  hundreds of pages.  But I have -- narrowing on when they can

18  use lethal force, there are two statements that the agents are

19  taught, and I'm going to have him tell the jury that's what

20  they were taught.                                                        10:24:04

21        So I am going to have him read a portion of that

22  excerpt.

23        MR. CHAPMAN:  I just don't want the document -- I'm

24  going to object to any documents being admitted.

25        MR. KLEINDIENST:  I'm going to put in the chapter on        10:24:11

—Allen Foraker – Direct Examination—

1    use of force, which is what they're taught.

2         MR. CHAPMAN:  That's what I'm objecting to, because

3    it's an entire chapter.

4         THE COURT:  I'm probably not going to let you put in

5    the written word, but you can have him read it.                    10:24:23

6         (End of discussion at sidebar.)

7         THE COURT:  You may continue.

8         (Discussion off the record between Government counsel.)

9    BY MR. KLEINDIENST:

10   Q.  Exhibit No. 280, which I've just handed you, is basically     10:24:56

11   the chapter in the Use of Force Policy Handbook that you use to

12   instruct the students on when they can use lethal force under

13   the law.  Is that a fair statement?

14   A.  That is.

15   Q.  There are other parts of the handbook that touch on it, but   10:25:11

16   aren't really germane, and so I'm not going to have you discuss

17   the entire handbook.

18   A.  Yes, sir.

19   Q.  Okay.  So looking at Exhibit 280, do you recognize that to

20   be that chapter on when you can use lethal force?                 10:25:23

21   A.  Yes, I do.

22   Q.  And did you use this Use of Force Policy Handbook when you

23   were training the agents on when they can use lethal force?

24   A.  I would refer to this in my office, but I never took this

25   into the classroom, because we used the PowerPoint for that.      10:25:43

26

—Allen Foraker – Direct Examination—

1    Q.  Okay.  Does a Use of Force Handbook which each agent got

2    set forth when lethal force can be used?

3    A.  Yes, sir, it does.  Chapter 4, the very first paragraph.

4    Q.  Okay.  Let me put it up on the ELMO.

5           This would be Chapter 4, page 14.                      10:26:10

6           Can you read what's highlighted in yellow for the

7    jury, please?

8    A.  Only that force which is both reasonable and necessary may

9    be used in any given situation.

10          Reasonable means that there are objective reasons that  10:26:33

11   justify the degree of force to be used in the given situation,

12   up to and including deadly force.  The reasonableness of a

13   particular use of force is judged from the perspective of a

14   reasonable officer or agent on the scene, and its calculus must

15   embody an allowance for the fact that law enforcement officers  10:26:58

16   and agents are often forced to make split-second decisions

17   about the amount of force necessary in a particular situation.

18          Necessary means that some force is required to carry

19   out one's duties as a law enforcement officer or agent.

20   Q.  So the two key words in that are what?                    10:27:19

21   A.  Reasonable and necessary.

22   Q.  And what is the word -- how is the word "necessary" taught

23   to the agents?

24   A.  Necessary is synonymous with last resort.

25   Q.  It's synonymous with what?                               10:27:34

27

—————— **Allen Foraker – Direct Examination** ——————

1    A.   Last resort.

2    Q.   What do you mean by that?

3    A.   All other means have failed.  All other means of viable

4    alternatives have failed, and deadly force is the only resort

5    left.                                                    10:27:55

6         MR. CHAPMAN:  I'm sorry, Your Honor, is he reading

7    from the manual or is this his opinion?

8         MR. KLEINDIENST:  No, this is his instruction.

9    BY MR. KLEINDIENST:

10   Q.   This is how they were instructed at the Academy?     10:28:03

11   A.   Yes.

12   Q.   Okay.  And turning to the next page, page 15, under

13   Subchapter C, Use of Deadly Force, the first paragraph just

14   indicates that the use of deadly force is governed by the

15   handbook that we've shown to the jury that we're not going to  10:28:28

16   read the entire thing; correct?

17   A.   Yes, sir.

18   Q.   And every agent gets that handbook?

19   A.   Yes, sir.

20   Q.   Okay.  Can you read paragraph 2 of chapter C -- or    10:28:35

21   paragraph C?

22   A.   Authorized officers or agents may use deadly force only

23   when necessary, that is, when the officer or agent has a

24   reasonable belief that the subject of such force poses an

25   imminent danger of death or serious physical injury to the   10:28:54

Allen Foraker - Direct Examination

1    officer or agent or to another person.

2    Q.  Again, the two concepts, that it must be necessary and it

3    must be a reasonable belief, are incorporated in that paragraph

4    as well?

5    A.  Necessary is mentioned in the paragraph.                    10:29:09

6    Q.  Now, looking at paragraph 4 -- or section 4, can you read

7    that to the jury?

8    A.  Discharging a firearm at a person shall be done only with

9    the intent of stopping that person from continuing the

10   threatening behavior that justifies the use of deadly force.    10:29:27

11   Q.  And these are concepts that are taught by you and the other

12   instructors to the students at the Academy?

13   A.  Yes.

14   Q.  Does that mean if you use deadly force and you don't kill

15   the individual, but you stop him from committing -- continuing  10:29:41

16   his threatening behavior, you have to stop shooting?

17   A.  Correct.

18   Q.  You're not allowed to just eliminate the person as a human

19   being?

20   A.  No.                                                         10:29:53

21   Q.  And the next paragraph?

22   A.  Deadly force is not authorized solely to prevent the escape

23   of a fleeing subject.  Deadly force against a fleeing subject

24   is only authorized, in accordance with paragraphs above, if

25   there is probable cause to believe that, A, the subject has     10:30:11

─── **Allen Foraker – Direct Examination** ───

1  inflicted or threatens to inflict serious physical injury or

2  death, and, B, the escape of the subject poses an imminent

3  threat of death or serious physical injury to the officer or

4  agent or to another person.

5  Q.  And this concept is also taught to the students during the    10:30:34

6  instruction program?

7  A.  Yes, it is.

8  Q.  So what does it basically mean in terms of when you can

9  shoot at somebody who is running away from you?

10  A.  If they have committed a felonious act that inflicted pain    10:30:47

11  or injury, a grievous bodily harm, and they still have the

12  means to inflict that injury or bodily harm on somebody else.

13  Q.  Let me give you an example of a gun.  If the agent was

14  confronted with somebody who had a gun and he shot him, and the

15  person with the gun fled but still had the gun with him, and    10:31:15

16  there are other people in the area where he was fleeing to,

17  could you use deadly force at that point in time, even though

18  his back was turned to you?

19  A.  Yes.

20  Q.  So it would depend on whether or not -- whatever weapon he    10:31:27

21  had was still -- had the potential of causing grievous

22  potential injury to another human being?

23  A.  Yes.

24  Q.  If that does not exist, is he authorized to shoot?

25  A.  No.    10:31:43

————Allen Foraker – Direct Examination————

```
 1   Q.  Are the students at the Academy required to acknowledge

 2   their receipt of the Use of Force Policy Handbook, and that

 3   they are to abide by the conditions therein?

 4   A.  Yes.

 5   Q.  Okay.  And is that -- is that done during their time at the        10:32:27

 6   Academy?

 7   A.  Yes.

 8          MR. KLEINDIENST:  May I approach the witness,

 9   Your Honor?

10          THE COURT:  You may.                                            10:32:36

11   BY MR. KLEINDIENST:

12   Q.  And actually let me show you Exhibit 282 as well.

13          Can you tell the jury what those two exhibits are, 281

14   and 282?

15   A.  281 is an employee acknowledgement of possession of a copy         10:33:23

16   of this book.

17          I need to step back.  281 is acknowledgement of a copy

18   of an interim book that was used prior to the issuance of this

19   book.  282 is acknowledgement of receipt of this book.

20   Q.  And does it impose some requirements or obligations on the         10:34:09

21   student to study the book and to abide by the provisions

22   therein?

23   A.  Yes.

24          MR. KLEINDIENST:  Now I would move for Exhibit 281 and

25   282 into evidence, Your Honor.                                         10:34:21
```

─────Allen Foraker – Direct Examination─────

1      MR. CHAPMAN:  No objection.

2      THE COURT:  They'll be admitted, 281 and 282.

3   (Exhibit No. 281 and 282 admitted into evidence.)

4  BY MR. KLEINDIENST:

5  Q.  Basically there are forms that each student is required to          10:34:28

6  fill out to acknowledge receipt of either the interim book or

7  the actual book itself, the one that came out in 2010?

8  A.  Yes, sir.

9  Q.  And who was the student that signed those two certificates?

10 A.  The students that signed them?                                      10:34:44

11 Q.  Yes.

12 A.  Mr. Swartz's signature is on both of these.

13 Q.  Does he have a first name?

14 A.  Lonnie R.

15 Q.  Lonnie R.                                                           10:34:57

16      And is there an instructor that also then signs off

17 saying that you're basically attesting to the fact that he's

18 been given the book and he's signed his name to it?

19 A.  Yes, sir.  And it's my signature on both copies.

20 Q.  Your signature is on both copies?                                   10:35:08

21 A.  Yes.

22 Q.  What does that mean, Mr. Foraker, as to whether or not

23 Mr. Swartz was a student at the time that you were there?

24 A.  That means that he was a student of mine at the Academy,

25 and that I gave him those books.                                       10:35:25

Allen Foraker – Direct Examination

1   Q.  Is every student required to sign an acknowledgement of the

2   receipt of these books?

3   A.  I didn't hear you.

4   Q.  Is every student required to sign them?

5   A.  Yes, sir.                                              10:35:46

6   Q.  Okay.  Now we've heard about the concept that in order to

7   use lethal force it must be reasonable under the circumstances

8   and necessary being the last resort; correct?

9   A.  Yes, sir.

10  Q.  Do you also then instruct the jury (sic) on how to within   10:35:57

11  that framework, of reasonable and necessary, how to make a

12  determination whether or not to use deadly force?  Do you

13  understand my question?

14  A.  Not really.

15          THE COURT:  So try another question.                10:36:14

16          MR. KLEINDIENST:  Neither did I.

17  BY MR. KLEINDIENST:

18  Q.  What else -- what other instructions do they receive, other

19  than the instruction on the guideline -- or not the guidelines,

20  but the law as to use of deadly force?  Did you provide them   10:36:28

21  with any other instruction to educate them on when to make the

22  assessment to use deadly force?

23  A.  Yes, sir.

24  Q.  Okay.

25  A.  We had a four-hour training block.  It was two days, two   10:36:38

—Allen Foraker – Direct Examination—

```
 1   two-hour blocks, of judgment pistol shooting.
 2   Q.  You call it judgment pistol shooting?
 3   A.  It was called judgment pistol shooting.  That was the name
 4   of the training block.
 5   Q.  And that was two hours in length?                          10:36:56
 6   A.  Two hours in length, for two days.
 7   Q.  For two days.
 8        And what was the purpose of the judgment pistol
 9   shooting?
10   A.  To expose the students to possible scenarios where they can 10:37:07
11   learn to make decisions on how and when to use deadly force.
12   Q.  If the conditions of reasonableness and necessary are
13   there?
14   A.  Correct.
15        MR. KLEINDIENST:  Okay.  May I approach the witness,      10:37:25
16   Your Honor?
17        THE COURT:  You may.
18        MR. KLEINDIENST:  Let me hand you what's been marked
19   as Exhibit 283.
20        Judge, I was going to move into evidence Exhibit 280,     10:37:37
21   which is an excerpt of a Use of Force Policy Handbook that I
22   showed on the ELMO.
23        THE COURT:  Let me see counsel.
24      (At sidebar on the record.)
25        MR. CHAPMAN:  Well, looking through it also there's       10:37:58
```

**Allen Foraker – Direct Examination**

1  citations to case law, there's references to other things not

2  covered by Mr. Kleindienst's testimony.  I think --

3          THE COURT:  You mean, Mr. --

4          MR. CHAPMAN:  Foraker's testimony.

5          So I think it's -- I think it's potentially misleading          10:38:12

6  to the jury.  It's hearsay.

7          THE COURT:  Can I see the exhibit that you're talking

8  about?

9          MR. KLEINDIENST:  Yes.

10          This is the excerpt.          10:38:36

11          THE COURT:  This is the whole excerpt?

12          MR. KLEINDIENST:  Just a checklist on the use of

13  deadly force.

14          THE COURT:  I don't think the whole excerpt comes in.

15          What I'll let you put in is those specific sections          10:38:58

16  that you had him read.

17          MR. KLEINDIENST:  That's fine.

18          MR. CHAPMAN:  You can redact those and submit them

19  later.

20          MR. KLEINDIENST:  Yeah, I'll to that.          10:39:07

21          THE COURT:  I'll let you do that.

22      (End of discussion at sidebar.)

23      (Discussion off the record between Government counsel.)

24          MR. KLEINDIENST:  Thank you, Your Honor.

25          THE COURT:  You may proceed.          10:39:40

Allen Foraker – Direct Examination

1    BY MR. KLEINDIENST:

2    Q.  Mr. Foraker we've handed you Exhibit No. 283; correct?

3    A.  Correct.

4    Q.  And do you recognize that?

5    A.  Yes, I do.                                              10:39:48

6    Q.  And what is that?

7    A.  This is the printed copy of the PowerPoint program that we

8    used during the first hour of judgment pistol shooting

9    training.

10   Q.  And how is this presented to the students?              10:40:01

11   A.  On an overhead projector in a classroom.

12   Q.  On an overhead projector.

13          And the instructors, when going through each slide, do

14   they make comments?

15   A.  Correct.                                                10:40:15

16   Q.  Do the comments amplify or add to what's on the slide?

17   A.  We answer questions if they exist.  If there are no

18   questions, we move on to the next one.  This is one case we

19   allow interruptions.

20   Q.  Okay.  By the student?                                  10:40:32

21   A.  Yes, if they have questions.

22   Q.  If they have questions.

23          Okay.  And the purpose of the judgment pistol shooting

24   is to do what?

25   A.  Is to provide them with the ability and the ideas to     10:40:41

UNITED STATES DISTRICT COURT

—————Allen Foraker - Direct Examination—————

1   hopefully teach them that they can make rational decisions

2   concerning deadly force.

3        MR. KLEINDIENST:  Okay.  I would move Exhibit 283 into

4   evidence, Your Honor.

5        THE COURT:  With the modifications that we spoke                    10:40:59

6   about, that can be admitted.

7        MR. KLEINDIENST:  It's a different exhibit.

8        THE COURT:  283 are the PowerPoints?

9        MR. KLEINDIENST:  283 is the PowerPoint presentation.

10  It's different from 280, which we discussed at the bench.              10:41:12

11       MR. CHAPMAN:  We haven't addressed that.  Before

12  that's admitted I'd like to address it.

13      (At sidebar on the record.)

14       THE COURT:  These are the actual PowerPoints?

15       MR. KLEINDIENST:  That are given to the students in               10:41:38

16  slides.

17       I don't intend to discuss every one of them,

18  Your Honor.  And I can just mark as an exhibit the ones I

19  intend to use, if that solves the objection.

20       MR. CHAPMAN:  Well, I just think it's cumulative.                  10:41:49

21       THE COURT:  It is kind of getting over the top.

22  They're going to get part of 280, they'll get part of the other

23  slides, and 280 and 283 are the same thing.

24       MR. KLEINDIENST:  But it gets into the concept of

25  jeopardy in terms of when they can make a determination when to         10:42:02

——————— **Allen Foraker – Direct Examination** ———————

1    shoot.  It goes beyond just the guideline itself.  This is how

2    they're taught.

3             THE COURT:  Let's do this:  Let's show the specific

4    slides you want to show at this point in time.

5             MR. KLEINDIENST:  Okay.                              10:42:13

6             THE COURT:  And only those particular slides will be

7    possibly admitted.

8             MR. KLEINDIENST:  Okay.

9             THE COURT:  Not this whole book.

10            MR. KLEINDIENST:  Okay.                              10:42:20

11       (End of discussion at sidebar.)

12            MR. KLEINDIENST:  I don't want to show you all the

13   slides because I'll bore the jury to death.  Okay?  So we'll

14   just go through some selective ones that are pertinent.

15            THE COURT:  When you do that, tell us which page      10:42:49

16   number.

17            MR. KLEINDIENST:  I will, Your Honor.

18   BY MR. KLEINDIENST:

19   Q.  If you want to follow along with me with your copy.  This

20   is the very beginning of the slide presentation; correct?     10:43:05

21   A.  Yes.

22   Q.  And what is it telling the student?

23   A.  It gives them a definition of judgment, why they're in that

24   class, what the class is set up to do for them.

25   Q.  This is the first -- actually the first page after the     10:43:21

1   cover sheet; correct?

2   A.  Correct.

3   Q.  The second page of the --

4   A.  Yes.

5   Q.  -- PowerPoint presentation, can you explain that to the          10:43:29

6   jury?

7   A.  This is telling them when they may and may not use deadly

8   force.

9   Q.  Okay.  Now it says the Department of Justice Policy

10  Statement and U.S. Customs and Border Protection is part of         10:43:45

11  Homeland Security.  What is the reason for the Department of

12  Justice's Policy Statement?  Is it the same at CBP's?

13  A.  Yes, sir.  The reason that says DOJ is because of the age

14  of this PowerPoint.  This is the same PowerPoint that's been

15  used at the Academy for years.  And this predates March of          10:44:04

16  2003, when INS basically dissolved and we became CBP.

17  Q.  Okay.  Does the U.S. Customs & Border Protection -- we've

18  read from the Use of Force Handbook, is it the same thing?

19  A.  Yes.

20  Q.  This will be the fourth page in the slide.  Can you explain      10:44:27

21  this to the jury?

22  A.  Yes.  Discharging of a firearm shall be done only with the

23  intent of stopping a person or animal from continuing the

24  threatening behavior which justifies the use of deadly force.

25          It's a reminder to the students that they're not            10:44:53

─── **Allen Foraker – Direct Examination** ───

1    trying to kill whatever they're shooting at, they're trying to

2    stop whatever they're shooting at.

3    Q.  Stop the threat.

4    A.  Stop the threat.

5    Q.  Not necessarily killing the person.                          10:45:11

6    A.  Correct.

7    Q.  Those two can be two different things.

8    A.  Yes, they could.

9    Q.  Could be the same, could be two different things.

10   A.  Yes, they could.                                             10:45:19

11   Q.  And then the second sentence?

12   A.  When deadly force is justified, an officer may use any

13   level of force necessary up to and including deadly force.

14   Q.  And the next page in sequence is Section 7.B-1.

15   A.  A firearm may be discharged when the officer reasonably      10:45:39

16   believes that the person at whom the firearm is to be

17   discharged possesses -- this says -- means, intent and

18   opportunity of causing death or grievous bodily harm upon the

19   officer or another person.

20   Q.  How is this explained to the students?                       10:45:59

21   A.  These three words that are italicized, means, intent and

22   opportunity, are the three corners of the jeopardy triangle.

23   Q.  And we'll get to that in a minute.

24   A.  Yes, sir.

25   Q.  And again, it emphasizes that it has to be either the        10:46:12

Allen Foraker – Direct Examination

1  ability to cause death or grievous bodily harm; correct?

2  A.  Correct.

3  Q.  Not just bodily harm, but grievous bodily harm.

4  A.  Grievous.

5  Q.  And that's explained later on in the PowerPoint                     10:46:25

6  presentation?

7  A.  There's an attempt to explain it.

8  Q.  Okay.  But do you all talk about that in class --

9  A.  Yes.

10  Q.  -- what that means?                                               10:46:33

11  A.  Yes.

12  Q.  I'm going to pass over a couple that aren't germane.

13       Now here's the definition of reasonableness of a

14  belief, which is one of the key components.  Can you explain it

15  to the jury?                                                          10:46:57

16  A.  Read it first, the reasonableness of a belief or decision

17  must be viewed from the perspective of the officer on the

18  scene, who may often be forced to make split-second decisions

19  in circumstances that are tense, unpredictable, and rapidly

20  evolving.                                                             10:47:16

21       And this was also contained in the first paragraph of

22  Exhibit 280.

23  Q.  Now does that mean that you can't second judge an officer

24  when he uses lethal force?

25  A.  That means you shouldn't second judge an officer without         10:47:29

─────── Allen Foraker – Direct Examination ───────

1  all the facts.

2  Q.  Without all the facts?

3  A.  Correct.

4  Q.  So it's important to know the facts that were confronting

5  him before you can make a determination if, in fact, it was          10:47:40

6  reasonable or not?

7  A.  Yes.

8  Q.  And that would be the totality of the circumstances facing

9  the officer?

10  A.  Correct.                                                        10:47:51

11  Q.  Okay.  And the next page is the definition page, and it

12  says, when necessary is defined as?

13  A.  Last resort.

14  Q.  Last resort means no other way out?

15  A.  No other way out.  All other avenues to come to a               10:48:05

16  resolution of the situation have failed.

17  Q.  Okay.  And then how does it define imminent danger of

18  grievous bodily injury?

19  A.  The impending, threatening, looming, or about to happen.

20      There's a person standing in front of you or in                10:48:30

21  proximity of you that has the ability and the intent to use a

22  chosen weapon against you, would put you in imminent danger.

23  Q.  Of death or serious bodily injury?

24  A.  Of death or serious bodily injury.

25  Q.  Now you've talked about the jeopardy triangle in your          10:48:55

────── **Allen Foraker – Direct Examination** ──────

1   PowerPoint presentation.  The slide I have up on the ELMO is

2   called Legal Justification.  Can you explain how you explain

3   that to the jury -- I mean, to the students?

4   A.  Two court decisions that a lot of our actions are based

5   on -- let me rephrase that.                          10:49:32

6        Two court decisions that a lot of the Border Patrol's

7   actions are based on are *Garner versus Tennessee* and *Graham*

8   *versus Connor*.

9        *Garner versus Tennessee* has to deal with a fleeing

10  felon, which I explained a little earlier.          10:49:48

11  Q.  And how about *Graham versus Connor*?

12  A.  *Graham versus Connor* has to deal with reasonableness of the

13  facts and circumstances observed by the officer, and the

14  inferences of those facts and circumstances that would lead

15  that officer to believe that what he's seeing is true.   10:50:10

16       If he has probable cause to believe that a crime is

17  being committed, then it is within reason to investigate that

18  crime, or that violation.

19  Q.  And now we get into the concept of jeopardy; correct?

20  A.  Yes.  Jeopardy must exist in order to be legally justified   10:50:34

21  in using deadly force.

22  Q.  That's assuming that both necessary and reasonableness are

23  in play?

24  A.  Yes.

25  Q.  Okay.  What are the elements of jeopardy the students are   10:50:44

─────Allen Foraker – Direct Examination─────

1    taught?

2    A.   This says, means, opportunity, intent.

3          The word "means" has been changed to "ability."

4    Q.   And the next page defines means or ability; correct?

5    A.   The definition of ability is, the person you are about to          10:51:01

6    use deadly force against must have the means to cause you or

7    someone else grievous bodily harm or death.

8          That means they must have access to something of a

9    tool, a club, a bottle, a knife, a gun, or their physical

10   stature and their physical capabilities.                               10:51:26

11   Q.   Does the concept of rocking come up during the training

12   under the judgment pistol shooting?

13   A.   Yes.

14   Q.   And is rocking described to the students as a potential

15   object that falls within means and ability as a weapon?               10:51:40

16   A.   Rockings are taught to them on -- it's as a case-by-case

17   basis.  Rocks can be lethal, and rocks, some are not lethal.

18   Q.   Okay.  Just because -- you don't teach students that just

19   because you're rocked you can shoot?

20   A.   No.                                                              10:51:57

21   Q.   That doesn't equal that?

22   A.   No.  It has to fall under these three items, these three

23   points of jeopardy.

24   Q.   Then the next slide deals with the second prong of the

25   triangle, opportunity.  Can you explain that to the jury, how         10:52:11

**Allen Foraker - Direct Examination**

1   you explain that to the students?

2   A.  The person you are about to use deadly force against -- on,

3   must have the opportunity to cause you grievous bodily harm or

4   death.  This involves proximity and/or control of their chosen

5   weapon.                                                              10:52:29

6   Q.  How do you talk about the concept of proximity under

7   opportunity?

8   A.  Let's use a rock thrower for an example.  A person can only

9   throw a rock so far.  It's not like a bullet from a gun.  If

10  the person is a vast distance away, then -- and he's a rock       10:52:49

11  thrower, he does not have the proximity, whereas the same

12  person with a gun would have proximity.

13  Q.  And would proximity with a rock thrower change if the

14  person with the rock was in close proximity to the agent?

15  A.  Yes.                                                           10:53:11

16  Q.  So the distance between the person with the rock and the

17  agent is an important role in determining proximity.  Is that a

18  fair statement?

19  A.  Yes.

20  Q.  And then the final part of the triangle is intent.  Can you   10:53:21

21  describe that as to how the students are taught?

22  A.  The intent -- the person that you are about to use deadly

23  force on must have displayed the manifested intent to cause you

24  or someone else grievous bodily harm or death.  And that is the

25  attempt to use the chosen weapon.  And the name for that is       10:53:46

1  deadly force movement.

2  Q.  Do you want to give an example of how that might be with,

3  say, a person who has a gun?

4  A.  Yes.  Because a person has a gun in his hand, and if he is

5  unaware of the officer's presence, we have no intent of this          10:54:05

6  person to use a weapon against an officer.

7          However, if the person is aware of the officer's

8  presence, and the person chooses to retrieve the weapon, that

9  shows intent to use that weapon.

10 Q.  What if he just kept the gun down by his side and didn't          10:54:29

11 point it at the officer, would jeopardy exist under this --

12 A.  There still is no intent.  He has not brought the weapon to

13 bear.

14 Q.  What would be an example of that?

15 A.  If he raises the muzzle of the weapon in the direction of         10:54:43

16 anybody, not just the officer, anybody.

17 Q.  Anybody.

18         Then again here we now have a summary of the jeopardy

19 triangle with the concepts that -- that is what the students

20 are instructed on as to making that assessment, the jeopardy         10:55:00

21 triangle?

22 A.  Yes.

23 Q.  And all three must exist together before jeopardy attaches?

24 A.  Yes, sir.

25 Q.  I'm going to skip ahead, and now the subject on fleeing           10:55:12

1  subject.  Again Department of Justice, because the

2  PowerPoint -- because of the -- yeah, the date of the

3  PowerPoint.

4          Can you explain to the jury how the students are

5  instructed on this concept?                                    10:55:36

6  A.  Yes.  As I read in Exhibit 280, the deadly force may be

7  used to prevent the escape of a fleeing subject if there is

8  probable cause to believe that the -- two items here, that the

9  subject has committed a felony involving the infliction or

10  threatened infliction of serious physical injury or death, and   10:56:03

11  the escape of a subject would pose an imminent danger of

12  serious physical injury to the officer or another person.

13          If an officer comes up on a person robbing at gunpoint

14  somebody on the street, comes up on this person, the person

15  turns -- the subject turns and sees the officer and takes off    10:56:34

16  running with the gun still in hand, fits the fleeing subject

17  part of this.

18  Q.  What if he dropped his gun and just ran away?

19  A.  Then it no longer has intent.

20  Q.  So if he no longer has the weapon that could have caused     10:56:53

21  death or serious grievous injury, then obviously you cannot

22  shoot --

23  A.  Correct.

24  Q.  -- in the back?

25  A.  He dropped the weapon, that was the corner of the triangle   10:57:04

─────── **Allen Foraker – Direct Examination** ───────

1    that disappeared.

2    Q.  Okay.  That's all I have for the PowerPoint presentation.

3    Thank you, Mr. Foraker.

4         Now, so you have the PowerPoint presentation that you

5    give to the students and you address the issues contained          10:57:29

6    therein.  What's the next part of judgment pistol shooting?

7    How are they next trained?

8    A.  After the PowerPoint presentation we take the students out

9    into a building that has video machines, reactive video

10   machines set up that plays scenarios.  And they use a training     10:57:50

11   gun -- and there's a supervisor with them, and the supervisor

12   operates the video for the students.

13        They're given five scenes, five different scenarios.

14   And they're coached through these scenarios to help them pay

15   attention to what they're looking at.  A lot of times we put       10:58:16

16   them in there and they don't understand what they're seeing.

17   So we coach them through these five scenes.  And this is all

18   training at this point.

19        The next day they come back, they're each given ten

20   scenes with no help.                                               10:58:34

21   Q.  What do the scenes include?

22   A.  Use of force situations, nonuse of force situations.

23   They're deadly force -- the scenes are all set up, they're

24   either deadly force or they're not deadly force.

25   Q.  And the purpose of that is to do what with the students?       10:58:52

—— **Allen Foraker – Direct Examination** ——

1   A.  Is to try to give the student an experience that he could

2   be watchful for out in the field.

3           The scenarios are based -- are made by the Border

4   Patrol out in Border Patrol conditions.

5   Q.  Okay.  Such as along the southwest border --                    10:59:10

6   A.  Yes.

7   Q.  -- those conditions would be duplicated in this exercise?

8   A.  Yes.

9   Q.  And I take it that -- so they are confronted with a

10  situation, and after having been given the instruction, they're    10:59:21

11  to determine whether or not to use deadly force or not?

12  A.  Yes.

13  Q.  Based on the guidelines that we've just seen?

14  A.  Yes.

15  Q.  And how long does that take, how many hours of instruction?     10:59:32

16  A.  It's a two-hour block of instruction.  And the students

17  come in, they take their ten scenes, which lasts probably 15 to

18  20 minutes per student.  And then use of force is over.

19          The ten scenes is a test, and it is pass or fail.

20  They pass all ten scenes or they fail the course.                  10:59:55

21  Q.  What happens if they don't -- well, what happens if they

22  fail the course?

23  A.  There is a remedial immediately, and they're given another

24  ten scenes.  And if they fail one of them again, they're

25  terminated.                                                        11:00:13

———Allen Foraker – Direct Examination———

1    Q.  From the Academy?

2    A.  Yes.

3            MR. KLEINDIENST:  May I approach the witness,

4    Your Honor?

5            THE COURT:  You may.                    11:00:25

6    BY MR. KLEINDIENST:

7    Q.  I'm handing you Exhibits 284 and 285.  Do you recognize

8    those documents?

9    A.  284 I do.

10           And I recognize 285 as a Certificate of Training, but    11:00:42

11   I've never seen this particular one.

12   Q.  Okay.  284, what is 284?

13   A.  It's a class roster.  Every day when the students come to

14   class we have them initial the right column of this.  It's an

15   attendance roster.                              11:01:00

16   Q.  And does it indicate on there their performance on the

17   judgment pistol shooting?

18   A.  Yes.  And it's either pass or fail.

19   Q.  And who fills out that sheet?

20   A.  I do.                                       11:01:13

21   Q.  You do, based on -- as the instructor for the class?

22   A.  Yes.

23   Q.  Do you see Lonnie Swartz's name on that list?

24   A.  Yes.

25   Q.  And did he pass or fail the judgment pistol shooting    11:01:23

────────Allen Foraker – Direct Examination────────

1  course?

2  A.  He passed.

3  Q.  He passed.

4          Now, the other document --

5          I would move that into evidence, Your Honor, 284.  11:01:32

6          MR. CHAPMAN:  No objection.

7          THE COURT:  284 can be admitted.

8      (Exhibit No. 284 admitted into evidence.)

9  BY MR. KLEINDIENST:

10 Q.  285 is the certificate; correct?  11:01:39

11 A.  Yes.

12 Q.  Do you recognize the type of certificate it is?

13 A.  I recognize it's a training certificate.

14 Q.  And what does it pertain to?

15 A.  Recognition of successful completion of CBP Use of Force  11:01:48

16 Policy Training.

17 Q.  Is that something that is issued to the students after

18 they've completed the use of force training?

19 A.  I do not recognize this.

20 Q.  Okay.  11:02:03

21 A.  Unless there was some use of force training provided by CBP

22 elsewhere, I don't recognize this.

23 Q.  Okay.  Fair enough.

24 A.  And this is a CBP issued.  And the academy is OTD.

25 Q.  OTD meaning?  11:02:20

—Allen Foraker – Direct Examination—

1   A.  Office of Training and Development.

2   Q.  Okay.  So let's set that exhibit aside.

3        MR. KLEINDIENST:  Your Honor, this might be a good

4   time to take a break.

5        THE COURT:  Let's take ten minutes.                    11:02:31

6     (Recess at 11:02 a.m., until 11:15 a.m.)

7        THE COURT:  Let the record show the jury has returned

8   back to the courtroom, the presence of all counsel and the

9   defendant.

10       You may continue, Mr. Kleindienst.                     11:15:50

11       MR. KLEINDIENST:  Thank you, Your Honor.

12  BY MR. KLEINDIENST:

13  Q.  Let me just go back to Exhibit 284, which was the score

14  sheet for the judgment pistol shooting, which you identified

15  Lonnie Swartz as being one of the students.                 11:16:03

16       What's the date of that score sheet?  Just so we have

17  an approximate date of when he came through the Academy.

18  A.  November 3, 2010.

19  Q.  Okay.  Do you know how long after you go through the

20  judgment pistol shooting and score it, are they towards the end  11:16:20

21  of their tenure at the Academy?

22  A.  No, this -- this is the second part of scoring for

23  firearms, second to last part of scoring for firearms.  I don't

24  remember what part of their tenure that firearms ended.

25  Q.  Okay.                                                   11:16:45

UNITED STATES DISTRICT COURT

─────── **Allen Foraker - Direct Examination** ───────

1   A.  Firearms did not start their first week in the Academy.  It

2   took them two to three weeks before they got to firearms.

3   Q.  Okay.  And when the jury looks at 284 --

4           Well, I'll just put it on the ELMO.

5           This is Exhibit 284 being publish to the jury.  Do you                11:17:22

6   see your name up there anywhere?  You can circle it with your

7   finger.  It's kind of a magic screen.

8   A.  My name?  Yes.  (Indicating.)

9   Q.  And that just indicates that you were -- well, what was

10  your capacity?                                                               11:17:40

11  A.  That identified me as the class coordinator for this class.

12  Q.  And the date of the score sheet?

13  A.  Pardon me, sir?

14  Q.  The date of the score sheet.

15  A.  The date, 11-3-2010.                                                     11:17:51

16  Q.  And do you see Mr. Swartz's name on the list of students?

17  A.  He's on line 22, which corresponds to his firing point.

18  Q.  I'm sorry?

19  A.  The students are assigned their position alphabetically for

20  firing points 1 through 25.                                                 11:18:12

21  Q.  Okay.  And then the initials on the other side of the page,

22  under 22, whose initials would that be?  Would that be one of

23  the instructors?

24  A.  These down at the bottom center?

25  Q.  I'm thinking more of right here where -- right across from             11:18:33

---

**Allen Foraker – Direct Examination**

1  his name, if you go across to the other column.

2  A.  These are the students' initials.

3  Q.  Okay.

4  A.  When they first come out on the range, the first thing they

5  do is sign in.  This is our attendance tracker.                    11:18:47

6  Q.  Okay.  Thank you.

7       Now, do you spend any time with the students,

8  including Mr. Swartz who was in your class, on what's called

9  cover and concealment?

10 A.  Yes.                                                            11:19:19

11 Q.  Can you discuss those concepts for the jury, please?

12 A.  Yes.  It's later in the firearms curriculum.  We bring them

13 out -- and, again, everything starts with a classroom

14 PowerPoint presentation.  The first day out is always two

15 hours.  And then the return day is going to be another two      11:19:38

16 hours.

17      And the first hour of the first day is the PowerPoint

18 presentation.  And in cover and concealment what we cover in

19 that PowerPoint is how to utilize available cover out in the

20 field.                                                          11:19:57

21 Q.  Why do you teach that to them?

22 A.  So that an agent doesn't feel that they're out there naked

23 with no protection.  There's different things that can be used

24 for cover, and we try to show them what it is, how much little

25 of something can be great cover.                                11:20:16

54

Allen Foraker – Direct Examination

1    Q.  And what's the purpose of taking cover?

2    A.  So you don't get hurt.

3    Q.  Does that mean that if you are standing out in the open and

4    there's a threat to you and cover's available, what decision do

5    you teach the students to make?                                    11:20:31

6    A.  Use cover.

7    Q.  To use cover?

8    A.  Use cover.

9    Q.  Do you teach them that if cover is available you can still

10   stand your ground and not take cover and be exposed to the        11:20:40

11   threat?

12   A.  No.

13          MR. CHAPMAN:  Object to the form of the question.

14          THE COURT:  Overruled.

15   BY MR. KLEINDIENST:                                                11:20:48

16   Q.  I'm sorry, your answer was no, they're not taught that?

17   A.  My answer was no.

18   Q.  Can you give the jury an idea of the types of cover that

19   the students are taught are available to them at the Academy?

20   A.  Yes.  When we take them out of the classroom we put them      11:21:00

21   out in a -- we still call it a range.  It's not a firing range,

22   but it's a paintball range.  And on the end is an instructor

23   with a paintball gun behind a sheet of plastic with a hole in

24   it.

25          Out in the field, the covered field, the students          11:21:17

UNITED STATES DISTRICT COURT

1    enter through a gate in the center of the back wall.  And the

2    first thing that's available to them are two different types of

3    vehicles.  One being a pickup truck with a very large custodial

4    box in the back, and that's a box that is used to secure the

5    subjects when they're arrested.  And then to the left of that,          11:21:43

6    in front of the other vehicle -- in front of that pickup truck

7    is a sedan.

8         We use both, because the students have no idea what

9    they're going to be patrolling in that day, any particular day.

10   So we give them an option and show them how to use different         11:22:03

11   parts of that vehicle for cover, and how to return fire from a

12   position of cover when fired upon.

13   Q.  So vehicles are a source of cover for the agent if he's in

14   a situation where he feels threatened with deadly force;

15   correct?                                                               11:22:26

16   A.  Yes.

17   Q.  Any other examples of cover that's available to an agent?

18   A.  Yes.  Once we move away from the vehicles, we show the

19   students that a telephone pole makes a good cover position.

20        And beyond that a very low wall, which is only about            11:22:40

21   18 inches in height, 12 to 18 inches.  And we teach them how to

22   lay behind that.

23        We teach them how to use the old style blue mail boxes

24   that you used to see on street corners.  A stack of tires is

25   another part of cover.  A barrel, just a round drum.                  11:23:01

1          Anything that you can put between you and the

2     offending fire can be cover.

3     Q.  And I take it that taking cover may mean that you might

4     have to move from one source of cover to another based on a

5     change in circumstance?                                    11:23:27

6     A.  Yes.  And we teach that in this range.

7     Q.  How do you teach that?

8     A.  After the students hit the Plexiglass sheet that the

9     instructor is shooting from, they hit it twice, the instructor

10    will give them -- the one firing the paintball gun, will give   11:23:45

11    them three seconds to advance to another type of cover.

12          And they have to do it correctly, the way that they

13    were taught.  If they don't do it correctly they get hit with a

14    paintball.

15    Q.  Those are things like my son would use when he was in grade  11:24:02

16    school?

17    A.  Yes, the exact same thing.

18    Q.  Okay.  How about concealment, what's the purpose of

19    concealment?

20    A.  Concealment is the protection from enemy observation, the   11:24:15

21    enemy being your suspect or your subject.  That's concealment

22    from observation.

23    Q.  Can you give us an example?

24    A.  A man hiding in the brush, he not necessarily has cover,

25    but he would have concealment, because you cannot observe the   11:24:38

1    person hiding in the brush.

2    Q.  Okay.  So concealment and cover can be interchangeable in

3    any deadly force situation or potential deadly force situation?

4    It depends on where you are and what's available.

5    A.  They can be intermixed.  If you have cover, you definitely      11:24:59

6    have concealment.  If you have concealment, you don't

7    necessarily have cover.

8    Q.  Even though there's not a written policy for an agent to

9    take cover when he's confronted with a threat, does that not

10   mean that it's a sound tactical practice of moving to a safe      11:25:24

11   position to avoid the threat?

12              MR. CHAPMAN:  Objection, form and foundation.

13              THE COURT:  Do you understand the question?

14              THE WITNESS:  I understand the question.

15              THE COURT:  Overruled.                                 11:25:33

16              THE WITNESS:  It is a sound tactical movement to find

17   cover.

18              The agent that does not find cover --

19              MR. CHAPMAN:  Object to the narrative of the response.

20              THE COURT:  Next question.                             11:25:47

21              MR. KLEINDIENST:  I will.

22   BY MR. KLEINDIENST:

23   Q.  And the agent who does not seek cover, what happens?

24              MR. CHAPMAN:  Objection --

25              THE WITNESS:  You usually get shot or hurt.            11:25:53

1    MR. CHAPMAN:  Object to the form and foundation.

2    There's no factual specifics.

3    THE COURT:  Sustained.

4    BY MR. KLEINDIENST:

5    Q.  Do you teach that at the Academy, what happens when you          11:26:03

6    don't take cover?

7    A.  You can get hit with a rock.  You can get shot.  And in the

8    cover course, if you're not using cover, you do get shot with a

9    paintball gun.

10    Q.  Is that -- is that decision not to use cover that's          11:26:21

11    available, is that consistent with the agent -- the way the

12    agents are taught at the Academy to remain safe on the job?

13    A.  No.

14    MR. CHAPMAN:  Objection to the form and foundation.

15    The statement is made in a vacuum with no clarity about the          11:26:37

16    circumstances.

17    THE COURT:  The objection is overruled.

18    BY MR. KLEINDIENST:

19    Q.  You can answer the question, please.

20    A.  Can I have it again, please?          11:26:45

21    Q.  Yeah.  Is there a reason why they're taught not to stand

22    their ground but to take cover?

23    A.  Yes, there is a reason for that.

24    Q.  What is that?

25    A.  Survival.          11:26:57

59

Allen Foraker – Direct Examination

1    Q.  Survival?

2    A.  Survival.

3    Q.  Now, if there is a legitimate law enforcement operation

4    going on that the agent has to respond to, it may not be

5    possible sometimes to take cover; correct?                        11:27:08

6    A.  Correct.

7    Q.  But if there's no legitimate enforcement operation going on

8    and you can take cover, that's how they're taught to operate?

9    A.  Correct.

10   Q.  Okay.  And I may have covered this before, but are they      11:27:19

11   trained that if they have to use some type of force, once the

12   threat is stopped their use of force ceases?

13   A.  It needs to deescalate.

14   Q.  Or deescalate.

15   A.  But not cease.                                                11:27:40

16   Q.  By the way, Mr. Foraker, I forgot to ask you and I

17   remembered at the break.  You're now retired from Border

18   Patrol?

19   A.  Yes.

20   Q.  And you've consulted with my office about this case;         11:27:52

21   correct?

22   A.  Yes.

23   Q.  In fact, you've gone down to the scene where the shooting

24   took place?

25   A.  Yes.                                                         11:28:01

Allen Foraker – Direct Examination

1  Q.  And you've seen the videotape that was recorded of the

2  shooting?

3  A.  Yes.

4  Q.  You're obviously doing this for monetary compensation?

5  A.  Yes.                                                          11:28:10

6  Q.  And do you know roughly how much you're paid an hour, just

7  so the jury knows?

8  A.  Per hour?

9  Q.  Per hour.

10  A.  $175 an hour.                                               11:28:16

11  Q.  Okay.  Going back to the jeopardy triangle, and let's talk

12  about means.

13        You had means/ability, we have proximity or

14  opportunity, and then we have intent on the three legs of the

15  triangle.  And we talked about rocking in specifics.          11:28:35

16        With respect to means and ability, does that

17  have -- does the size of the rock have an impact on whether or

18  not that part of the triangle is established?

19  A.  Yes.

20  Q.  How so?                                                    11:28:52

21  A.  A person with a baseball-sized rock in his hand as opposed

22  to a person with a marble-sized rock in his hand, present two

23  different -- two different issues.  It's not likely that a

24  person holding a marble in his hand can throw that hard enough

25  to cause grievous bodily harm.  Whereas a baseball-size rock,  11:29:17

61

Allen Foraker – Direct Examination

1   it most definitely has the possibility of causing grievous

2   bodily harm.

3   Q.  So not every rock is the same.

4   A.  No, sir.

5   Q.  And not every rocking is the same.                        11:29:30

6   A.  No, sir.

7   Q.  And with respect to the opportunity part of the triangle,

8   again in a rocking situation, does distance play a role in the

9   threat to the officer?

10  A.  Yes.                                                      11:29:43

11  Q.  And how so?

12  A.  Because rock throwers are limited on their distance, how

13  far they can throw that rock.

14  Q.  And the farther -- what happens when the distance between

15  the agent and the rock thrower is great as compared to close?  11:29:55

16  A.  When it's great, the greater it is, the less proximity

17  there is, and that part of the jeopardy triangle does not

18  exist.

19  Q.  Why not?

20  A.  Because the proximity is not there.                       11:30:12

21  Q.  You mean if they're so far away?

22  A.  They're so far away.  The rock thrower would be incapable

23  of making the rock go that far barehanded.

24  Q.  What happens if they are at a distance and rocks are still

25  falling near where the agents are at, do you still have        11:30:28

─────Allen Foraker – Direct Examination─────

1   proximity or opportunity?

2   A.  You would have proximity.  If the rocks are landing where

3   the agents can hear them or see them, there is proximity.

4   Q.  But in terms of whether or not they are able to cause

5   serious grievous injury is another issue; right?                  11:30:44

6   A.  Yes, sir.

7   Q.  And what factors play into that in that scenario?

8   A.  The velocity of the rock.

9   Q.  What do you mean?

10  A.  The speed at which the rock is impacting its intended         11:30:56

11  target.

12  Q.  Do you have any experience in that?

13  A.  Yes.

14  Q.  What's that?

15  A.  A lifetime of ballistic study and a whole career working on   11:31:08

16  the border, watching rocks come over the fences, watching the

17  damage that they do to the vehicles.

18  Q.  And what is the fact where a rock gets thrown up in the air

19  at a distance, how does velocity affect the dangerousness of

20  that rock?                                                        11:31:31

21  A.  As the rock is in its upward travel, when it reaches its

22  zenith --

23          MR. CHAPMAN:  Objection.  May I approach the bench?

24      (At sidebar on the record.)

25          MR. CHAPMAN:  I guess we have a rocking expert now, an    11:31:52

─── **Allen Foraker - Direct Examination** ───

1   aeronautical engineer on the velocity of rocks and their size

2   and shape.  This is kind of ridiculous.  And it hasn't been

3   disclosed that he's going to offer some sort of expert

4   testimony on this too.

5           I mean, this is all a matter of common sense.  The                 11:32:09

6   jury doesn't need to hear that he thinks he's an expert on what

7   rocks are and what rocks can cause harm or what can't cause

8   harm.

9           MR. KLEINDIENST:  Well, his testimony, based on his

10  experience, which he just indicated that it was based on, is    11:32:22

11  that, you know, rocks can lose their velocity and present less

12  of a threat.  I don't think it's about aeronautics, it's just

13  about -- Mr. Chapman says common sense, but I think it's

14  something beyond what the typical lay person would understand

15  would happen --                                                 11:32:42

16          THE COURT:  What's he going to say?

17          MR. KLEINDIENST:  He's going to say that it loses its

18  speed and its effectiveness.

19          THE COURT:  From going up in the air and then coming

20  down?                                                           11:32:48

21          MR. KLEINDIENST:  Because of gravity.

22          MR. CHAPMAN:  Just for the record, I think it also

23  opens the door for more information on the prevalence of

24  rocking incidents and assaults.

25          THE COURT:  You're going to ask him if he's been        11:32:59

**Allen Foraker – Direct Examination**

1    rocked before, aren't you?

2         MR. CHAPMAN:  I'd like to know if he's familiar with

3    the statistics.  Because the suggestion is there are no

4    injuries, this wasn't a dangerous situation.

5         MR. KLEINDIENST:  He hasn't suggested that.  And we                11:33:10

6    haven't asked him those questions.

7         MR. CHAPMAN:  You haven't asked him that, but that's

8    what you want the jury to think.

9         I'll ask what I think I can on direct.

10        THE COURT:  Okay.  Objection is overruled.                        11:33:20

11     (End of discussion at sidebar.)

12        THE COURT:  You may continue.

13        MR. KLEINDIENST:  What was the last question?

14        THE COURT:  It had to do with the apex of a rock.

15   BY MR. KLEINDIENST:                                                    11:33:39

16   Q.  The apex of a rock.

17   A.  As a rock is thrown in the air, it's fighting gravity

18   directly.  Gravity is going down, the rock is trying to go up.

19   There's a point where gravity overcomes the energy imparted in

20   that rock.  This is more so the steeper the rock is thrown up.        11:33:56

21   As the rock is thrown flat, gravity still has an effect down,

22   but the flat trajectory of the rock will carry farther and

23   carry more energy.  But if it's going up, gravity is pushing

24   down on it and decimating the energy contained in the rock.

25         As it reaches its zenith or its apex, the only thing            11:34:21

65

—Allen Foraker – Direct Examination—

1  affecting that now is gravity.  So --

2  Q.  And not the velocity that --

3  A.  Not the energy -- not the energy that was stored in it from

4  the throw.  It's run out of energy.

5       Momentum can still move the rock slightly away, but            11:34:39

6  gravity takes over now and pushes that rock down, and it has a

7  velocity or an acceleration factor.

8  Q.  And what's that factor?

9  A.  Acceleration in a vacuum is 32 feet per second, per second.

10  Q.  So if the apex of the rock -- let's say the apex of the       11:35:07

11  rock was 25 feet before it started to descend, how would

12  that -- how would you examine that?

13  A.  If the rock were aerodynamic, it would reach its

14  acceleration speed --

15       MR. CHAPMAN:  Judge, I object.                               11:35:31

16       THE WITNESS:  -- faster than --

17       THE COURT:  Just a second, just a second.

18    (At sidebar on the record.)

19       THE COURT:  I wasn't expecting 32 feet per second, per

20  second.  I wasn't expecting that.  Were you?                      11:35:51

21       MR. KLEINDIENST:  Uh-huh.

22       THE COURT:  Why?  How does he know that?

23       MR. KLEINDIENST:  He just knows it from his

24  experiences.

25       THE COURT:  How does he know it's 32 feet per second,        11:35:59

**Allen Foraker – Direct Examination**

1    per second?

2            MR. CALLE:  In a vacuum.

3            THE COURT:  In a vacuum.

4            MR. CHAPMAN:  When was this testimony disclosed to me,

5    other than ten seconds ago?                                  11:36:08

6            THE COURT:  I think we're moving way far afield, way

7    far afield.

8            MR. KLEINDIENST:  Okay.

9            THE COURT:  Let's leave the speed alone at this point.

10           MR. KLEINDIENST:  We'll leave the speed alone.         11:36:16

11           THE COURT:  All right.

12       (End of discussion at sidebar.)

13       (Discussion off the record between Government counsel.)

14   BY MR. KLEINDIENST:

15   Q.  We won't get into aeronautics --                          11:36:50

16           THE COURT:  Aerodynamics.

17           MR. KLEINDIENST:  Aerodynamics.  Thank you,

18   Your Honor.

19   BY MR. KLEINDIENST:

20   Q.  But gravity does play a part in terms of the amount of    11:36:58

21   energy the rock has by the time it lands on the ground?

22   A.  Nothing but gravity at this point.

23   Q.  Nothing but gravity at this point.

24           Going back just a bit, and I apologize.  Is there an

25   obligation by an agent when he's in the field and he's        11:37:13

———Allen Foraker – Direct Examination———

1   confronted with a threat to make assessments of that threat?

2   A.  Yes.

3   Q.  And is that an assessment that is just made once, or what's

4   he trained to do as the scenario plays out?

5   A.  Continually assess the threat.                          11:37:30

6   Q.  Can you give us an example of that?

7   A.  A threat can escalate or a threat can deescalate.  And it's

8   entirely on the obligation of the suspect -- or the subject, on

9   whether that threat escalates or deescalates.

10  Q.  You mean it's on the agent to make a determination or an   11:37:47

11  assessment?

12  A.  The agent is assessing what the subject is doing on a

13  continual basis.

14  Q.  From beginning to end?

15  A.  Beginning to end.                                         11:37:59

16  Q.  Always to make an assessment?

17  A.  Always.

18  Q.  And then you would make -- you might make a different

19  decision based on the assessment you made during this scenario;

20  is that correct?                                              11:38:12

21  A.  Yes.

22  Q.  Is that something that's trained and taught at the Academy?

23  A.  It's touched on, but that's one of the things that they

24  learn when they get out in the field.

25  Q.  Is that what you learned when you got out in the field     11:38:22

———— **Allen Foraker – Direct Examination** ————

1    yourself?

2    A.  It's been so long I don't remember.

3    Q.  But it's a concept that you're familiar with?

4    A.  Yes.

5    Q.  And it's a concept that agents are familiar with who work          11:38:30

6    in the Border Patrol about assessing the situation?

7    A.  Yes.

8    Q.  By the way, looking at the videotape, did you find any

9    evidence of cover that was available to the individuals on the

10   night of October 10th, 2012?                                          11:38:49

11   A.  Yes.

12          MR. CHAPMAN:  Objection.

13          THE COURT:  Overruled.

14   BY MR. KLEINDIENST:

15   Q.  And in your experience and in your expertise, what cover          11:38:56

16   did you see?

17   A.  Vehicles.

18   Q.  Which vehicles?

19   A.  The Nogales police cruiser, the Border Patrol truck that

20   was parked in the middle of the street, were two.                     11:39:10

21   Q.  Any other areas of cover?

22   A.  Just outside, which would increase the distance away from

23   the street, there was a building, there was a tree.

24   Q.  Okay.

25   A.  There was other cover.                                            11:39:27

1  Q.  Was there an opportunity for the agents to -- were they

2  caught in a situation where there was no point of escape?

3  A.  No.

4          MR. CHAPMAN:  Objection to the form of the question.

5          THE COURT:  Overruled.                          11:39:40

6  BY MR. KLEINDIENST:

7  Q.  There was an ability to escape?

8  A.  Yes.

9  Q.  And how so?

10 A.  The area to the north of the agents was not congested, it  11:39:47

11 was wide open.  There were no threats.  There was clear, open,

12 safe space to move to the north.

13 Q.  Just to avoid the threat?

14 A.  Just to avoid the threat.

15 Q.  And that's something that's taught at the Academy?        11:40:01

16 A.  It is taught, necessary.

17 Q.  Finally, let me ask you this:  Is lethal force by an agent

18 justified to kill somebody because they injured in this case a

19 canine dog?

20 A.  No.                                                       11:40:21

21 Q.  No?

22 A.  No.

23 Q.  And why is that?

24 A.  According to CBP policy, you can only use deadly force in

25 the defense of yourself or another person.                    11:40:33

—————— Allen Foraker – Direct Examination ——————

1  Q.  So even though a canine who is a part of the operation

2  might be in danger, that does not justify under the law the use

3  of lethal force?

4  A.  No, sir, it does not.

5           MR. KLEINDIENST:  That's all the questions I have.          11:40:49

6  Thank you.

7           MR. CHAPMAN:  Your Honor, can I approach?

8      (At sidebar on the record.)

9           MR. CHAPMAN:  Would it be possible to break for lunch

10  now so I can get my stuff set up?          11:41:20

11           THE COURT:  We can.  But I have a lunch meeting that I

12  probably won't be able to get back until 1:30.  But that's okay

13  with me.

14           MR. CHAPMAN:  That's fine with me.

15           THE COURT:  How long do you think you're going to be?          11:41:32

16           MR. CHAPMAN:  I don't think it's going to be more than

17  a half hour, but I'm not sure.

18           MS. FELDMEIER:  Okay.

19           THE COURT:  I don't want you to rush.  Take your time.

20           MR. CHAPMAN:  Okay.          11:41:39

21           MR. KLEINDIENST:  So we're taking a recess?

22           THE COURT:  We're going to take a recess, we're going

23  to take our break.

24           MR. CALLE:  Until 1:30, Your Honor?

25           THE COURT:  Yes.          11:41:44

**———— Allen Foraker – Cross-Examination ————**

1       (End of discussion at sidebar.)

2       THE COURT:  Rather than interrupt Mr. Chapman's

3   cross-examination, we'll go ahead and take our lunch recess at

4   this point in time.

5       And because I have a lunch meeting, we won't start    11:42:10

6   back until 1:30.

7       So remember the admonitions I've given you before.

8   We'll be starting on time at 1:30.

9       Remember the admonitions.  No news, no talking, no

10  thinking about it.                                      11:42:24

11      (Recess at 11:42 a.m., until 1:29 p.m.)

12      THE COURT:  Let the record show the jury's returned

13  back to the courtroom, the presence of all counsel and

14  defendant.

15      Mr. Chapman, you may proceed whenever you're ready.   13:29:34

16      MR. CHAPMAN:  Thank you, Judge.

17                  CROSS-EXAMINATION

18  BY MR. CHAPMAN:

19  Q.  Good afternoon, Mr. Foraker.

20      Do you have the microphone up there?                 13:29:42

21  A.  How's this?

22  Q.  That's great.

23      All right.  I'm going to ask you a couple background

24  questions.

25      Did you ever work at the Nogales Station?            13:29:52

**Allen Foraker – Cross-Examination**

1    A.  No, sir.

2    Q.  So you never worked the international boundary line, either

3    east or west of the DeConcini Port of Entry?

4    A.  No, sir.

5    Q.  Do you know -- you don't know what the 410 location is or                13:30:06

6    what it involves in terms of smuggling activity?

7    A.  No, sir.

8    Q.  And you don't know what the Blind Center is or what that

9    involves either, do you?

10   A.  No, sir.                                                                 13:30:19

11   Q.  I'm going to ask you some questions about your discussion

12   of policy earlier.  I want to see if --

13           I'm not sure if that's being displayed to the jury.

14           THE COURT:  It's not.

15   BY MR. CHAPMAN:                                                             13:30:42

16   Q.  I want to see if you can just agree with me on certain

17   concepts.  Okay?

18   A.  Yes, sir.

19   Q.  First of all, agents can use deadly force when they have a

20   reasonable belief that the subject of such force poses an                   13:30:52

21   imminent danger of death or serious physical injury.

22   A.  I agree.

23   Q.  And that can be not just to the agent in particular, but it

24   can also be to a third person; correct?

25   A.  Yes, sir.                                                               13:31:08

Allen Foraker – Cross-Examination

1   Q.  So if you're out in the field with your fellow agents, or

2   maybe you have an arrestee in custody, this policy affords you

3   the opportunity to use deadly force to protect those

4   individuals as well --

5   A.  Yes, sir.                                                13:31:24

6   Q.  -- is that right?

7          And when -- and I think this is important.  I want to

8   make sure I understand your testimony.  When deadly force is

9   justified, an agent may use any level of force necessary up to

10  and including deadly force; correct?                         13:31:40

11  A.  That is correct.

12  Q.  So if you envision a scenario where someone is getting

13  attacked, an agent is getting attacked, and the agent has

14  lethal force in the form of his handgun, but he may also have

15  less lethal device like pepper spray or a PLS launcher,      13:31:59

16  something like that, it's within his discretion what force he

17  employs under the circumstances.

18  A.  Yes, sir.

19  Q.  Because I want to make clear, you're not here to testify

20  that when agents are under assault by rocks they have to in all 13:32:18

21  circumstances take cover.  That's not your testimony, is it?

22  It depends on the circumstances.

23  A.  That's not my testimony.

24  Q.  You agree with me?

25  A.  They should attempt cover.                               13:32:35

**Allen Foraker – Cross-Examination**

1   Q.  But there may be situations where that is not reasonable.

2   A.  Yes, sir.

3   Q.  Let me give you an example.

4   A.  Yes, sir.

5   Q.  Okay.  Defending a third person, and the agent reasonably          13:32:44

6   believes that it's necessary to use deadly force to defend that

7   third person.

8   A.  Yes, sir.  Agree.

9   Q.  And the other thing that I think it's important for us to

10  think about, and what you testified about, is that the                 13:33:03

11  reasonableness of the agent's action can't be viewed from the

12  calmness of a courtroom like this, in hindsight, it has to be

13  viewed in the context that the agent is being forced to make a

14  split-second decision; right?

15  A.  Yes.                                                               13:33:28

16  Q.  And that the circumstances when deadly force are -- is

17  applied are frequently tense, unpredictable and rapidly

18  evolving.

19  A.  That is correct.

20  Q.  And you could have a situation -- you're not also                  13:33:43

21  testifying -- let me -- that's a horrible question.

22         You're not saying either that agents in the same event

23  may see -- be looking or hearing or seeing something different

24  and they act differently in response to the threat, are you?

25  That's a reasonable possibility.                                      13:34:06

─────── **Allen Foraker – Cross-Examination** ───────

1    A.  That would be that agent's observation.

2    Q.  Right.  What I'm trying to get at is, if two agents are out

3    in the field, one may hear rocks landing around him and one may

4    not.

5    A.  Yes, sir.                                                    13:34:20

6    Q.  So they may react differently.

7    A.  That is correct.

8    Q.  One may be close to cover and one may be not --

9    A.  That is correct.

10   Q.  -- right?                                                    13:34:27

11          The bottom line is, is that the decision to shoot

12   someone takes place in the blink of an eye.

13   A.  Yes, sir.

14   Q.  And when we're asked to think about that decision, what we

15   have to factor in is that we're not in a courtroom, protected    13:34:57

16   by security, in front of a judge, prosecutors, defense

17   attorneys, that agent may be out there in the middle of the

18   night perceiving a threat, trying to figure out if he or

19   someone else is about to get seriously injured or killed, and

20   he may -- has to make a decision like that.                      13:35:23

21   A.  That's right.  He might have to, yes, sir.

22   Q.  And that's what you train for.

23   A.  Yes, it is.

24   Q.  And you agree with me that rocks can be considered

25   dangerous weapons under the right circumstances.                 13:35:38

**Allen Foraker - Cross-Examination**

1  A.  Yes, sir.

2  Q.  One of the things that you talked to people -- these agents

3  that you're training about, or you did, was that these events

4  are so stressful, whether it's getting rocked or shot at or

5  whatever, that the stress can actually impact their gross motor        13:35:57

6  skills.

7  A.  Yes.  And that is taught at the Academy.

8  Q.  And what I mean by that is, they can lose a sense of where

9  they're at?

10  A.  Yes.                                                               13:36:15

11  Q.  They may not be as coordinated?

12  A.  Correct.

13  Q.  Because of the adrenaline coursing through their body.

14       Their heart rates get too high.

15  A.  Correct.                                                           13:36:31

16  Q.  You got to talk to them about, hey, this is scary, but what

17  I want you to think about if you're ever in this situation is,

18  get your heart rate down, understand that your body is reacting

19  to the threat; right?

20  A.  Correct.                                                           13:36:44

21  Q.  And they can even get tunnel vision; right?

22  A.  Absolutely.

23  Q.  Where they're actually focusing on something, the threat,

24  to the exclusion of everything else around them.

25  A.  Correct.                                                           13:36:57

UNITED STATES DISTRICT COURT

Allen Foraker – Cross-Examination

1   Q.  Once they decide to make that decision to employ deadly

2   force and use their weapon, they may not even hear their

3   firearm go off when they fire it.

4   A.  Agreed.

5   Q.  And they may only see the target; correct?                    13:37:11

6   A.  Agreed.

7   Q.  And the whole thing may seem like it took an eternity to

8   them, but it may have only took five or ten seconds.  Is that

9   true?

10  A.  Yes, sir.                                                     13:37:24

11  Q.  And that's because these events are so stressful and so

12  scary that it impacts the mind in incredibly powerful ways.

13  True?

14  A.  Yes, sir.

15  Q.  And I'm sure in your experience you've even -- would agree   13:37:35

16  that sometimes memories -- memories of the shooting event are

17  impaired.

18  A.  Memories are.

19  Q.  Exactly what happened, or the sequence, that type of thing

20  is impaired.                                                     13:37:51

21  A.  After a shooting the officer is given 72 hours to go and

22  relax, get away from the office, whatever it is that makes them

23  relax.  And so they can calm down and try to recollect what has

24  happened in the past 72 hours.

25  Q.  I mean the job of the Border Patrol is not like what most    13:38:11

**Allen Foraker – Cross-Examination**

1  people do.

2  A.  No, sir, it's not.

3  Q.  One of the things that's unique about it is that, unlike a

4  lot of other agencies, Border Patrol agents will actually go

5  out in the field by themselves and attempt to apprehend 20, 30          13:38:26

6  people.

7  A.  That is correct.

8  Q.  And there's a reason why they wear a handgun; isn't that

9  true?

10  A.  That's correct.          13:38:40

11  Q.  It's because their job is dangerous.

12  A.  That is correct.

13  Q.  And they're trained because they're expected to make

14  split-second life-and-death decisions.

15  A.  I agree.          13:38:53

16  Q.  You can have a month of boredom, and then the next thing

17  you know, boom --

18  A.  I agree.

19  Q.  -- you have to react, react right now.

20  A.  Yes, sir.          13:39:01

21  Q.  And if you make the wrong reaction, maybe somebody dies.

22  A.  Absolutely, sir.

23  Q.  You die, a fellow agent dies; right?

24  A.  Correct.

25  Q.  This is a dangerous business that these guys are in.          13:39:11

**Allen Foraker – Cross-Examination**

1    A.  Yes, sir, it is.

2    Q.  There was no training about shooting across the border into

3    Mexico, was there?

4    A.  No, sir.

5    Q.  That was never addressed?                                        13:39:26

6    A.  No, sir.

7    Q.  But we can agree that you don't have to take an assault

8    just because it's coming from Mexico; true?

9    A.  You don't have to take an assault at all, sir.

10   Depend -- and the location of the assault doesn't matter, if   13:39:45

11   it's an assault and a viable alternative does not exist.

12   Q.  Well, agents are not trained to fire warning shots at

13   people; right?

14   A.  They are forbidden.

15   Q.  In fact, they're trained basically if they're going to use  13:40:07

16   deadly force they're going to fire at center mass; right?

17   A.  Yes, sir.

18   Q.  Can you tell the jury what that means?

19   A.  Yes, sir.  Center mass is the middle of the available mass

20   of the target you intend to shoot.  If it's a human being, from  13:40:20

21   the waist up, between the shoulder, center mass would be right

22   in the middle of the chest.

23   Q.  And they're also trained not to shoot warning shots; right?

24   A.  Correct.

25   Q.  If they make the decision to shoot, they're essentially      13:40:39

80

Allen Foraker – Redirect Examination

1   employing deadly force.

2   A.  They are employing deadly force.

3   Q.  It's not like in the movies where the movie star shoots

4   somebody in the arm just to wing them?

5   A.  No, sir.                                                    13:40:54

6   Q.  In fact, they're told they can't do that; right?

7   A.  We are told -- I tell them, everybody, you cannot do that.

8   Q.  It sounds like what you're saying is that any rocking

9   event, number one, could turn into a deadly force incident.

10  A.  Could; correct.                                             13:41:20

11  Q.  And two, each one has to be looked at on a case-by-case

12  basis.

13  A.  Yes, sir.

14  Q.  And then finally, we don't look at these events from -- we

15  have to try to put ourselves in the shoes of the agent and     13:41:36

16  understand, when assessing whether they're acting reasonably or

17  not, that these are split-second decisions based on the

18  environment that existed at the time.

19  A.  Yes, sir.

20      (Discussion off the record between defense counsel.)       13:41:59

21          MR. CHAPMAN:  No further questions.

22          THE COURT:  Mr. Kleindienst.

23                      REDIRECT EXAMINATION

24  BY MR. KLEINDIENST:

25  Q.  Mr. Foraker, it is true that sometimes agents have to make 13:42:11

1    split-second decisions to fire or not fire; correct?

2    A.  It is correct.

3    Q.  But that doesn't mean that every time an officer fires it's

4    a split-second decision.

5    A.  That is correct.                                                          13:42:25

6    Q.  There are instances when the agent has ample time to assess

7    the situation and make a decision to fire that doesn't call for

8    a split-second decision.

9    A.  That is correct.

10   Q.  So when Mr. Chapman asked you about agents have to make        13:42:37

11   split-second decisions, that's not true in every case.

12   A.  Not every case.

13   Q.  And, in fact, you would agree with me that if an agent had

14   the time it took to walk across the street, at a walk and not

15   at a run, and the street was about 30 feet wide, that that        13:42:54

16   wouldn't be a split-second decision.

17   A.  I would agree.

18   Q.  You would agree; right?

19   A.  I would agree.

20   Q.  There would be ample time there for him to make an             13:43:06

21   assessment.

22   A.  Yes, sir.

23   Q.  Okay.  The reason why agents are required to make decisions

24   about whether or not to use lethal force is why they're trained

25   at the Academy; correct?                                          13:43:24

82

1    A.  Correct.

2    Q.  And even though their jobs may be dangerous, the purpose of

3    the Academy is to educate them enough so that when they're

4    placed in the situation they make the right decisions.

5    A.  Correct.                                                    13:43:41

6    Q.  You don't want them to make the wrong decisions.

7    A.  I didn't hear you, sir.

8    Q.  Well, you don't want an agent to wrongfully shoot an

9    individual when that was the wrong decision to make.

10   A.  Correct.                                                    13:43:53

11   Q.  And even though you don't look at what the officer did in

12   hindsight, in terms of whether or not what he did was

13   reasonable, you still look at all the circumstances that

14   surrounded the agent when he made the decision to fire his gun;

15   correct?                                                        13:44:11

16   A.  Correct.

17   Q.  And the one concept that Mr. Chapman left out was, other

18   than reasonableness, is that before you can use lethal force it

19   must be necessary; correct?

20   A.  Correct.                                                    13:44:22

21   Q.  And that means it must be the last option available before

22   you take a human life.

23   A.  Correct.

24   Q.  Because we value the integrity and sanctity of the human

25   life, don't we --                                              13:44:32

Allen Foraker - Redirect Examination

1   A.  Correct.

2   Q.  -- in this society?

3   A.  Correct.

4   Q.  Okay.  Now, you talked about the agents, when they're in a

5   stressful situation they might get tunnel vision, they may have      13:44:42

6   memory gaps, it may seem like an eternity.  Those are all

7   phenomena that you're familiar with; correct?

8   A.  Yes, sir.

9   Q.  But that doesn't happen to every agent.

10  A.  No, sir.                                                        13:45:01

11  Q.  And is every situation different?

12  A.  Yes.

13  Q.  Okay.  So those are typical phenomena that agents involved

14  in shootings have experienced, that doesn't mean that they take

15  place in every shooting.                                           13:45:12

16  A.  Correct.

17  Q.  Okay.  Okay.  I just wanted to make sure we're clear on

18  that.

19         Now, when an agent comes to the Border Patrol Academy,

20  is it made clear to him that the job, typically along the          13:45:26

21  southwestern border, can be dangerous?

22  A.  Yes, it is.

23  Q.  Is it made clear to him that sometimes you get things

24  thrown at you over the fence or through the fence along the

25  border?                                                            13:45:39

1    A.  Yes, it is.

2    Q.  Is that something that's impressed upon them as one of the

3    risks of the job?

4    A.  Yes, it is.

5    Q.  Now, they're not -- no one's forcing them to become a        13:45:46

6    Border Patrol Agent, are they?

7    A.  They're not what, sir?

8    Q.  I mean, no one's forcing somebody to become an agent.

9    A.  No, sir, it is not a draft.

10   Q.  So when they're told that the job that they are going to     13:45:56

11   undertake if they graduate has an element of dangerousness into

12   it, they know that going into it.

13   A.  Yes, they do.

14   Q.  And the whole purpose of the Academy is to train them to

15   make the right response and make the right decision when          13:46:10

16   there's a dangerous situation.

17   A.  Yes, sir, it is.

18   Q.  But they're given a heads up, a forewarning of what might

19   happen along the southwest border.

20   A.  Yes, sir.                                                     13:46:23

21   Q.  Finally, agents are trained to shoot, I think Mr. Chapman

22   said, at critical mass; is that correct?

23   A.  Center of mass.

24   Q.  And can you tell me what center of mass is again?

25   A.  Center of mass is the center of the available target.  If a  13:46:42

**Allen Foraker – Redirect Examination**

1    human being is your target, the center between the points of

2    the shoulders and the waist is in the middle of the chest.

3    That would be center of mass.

4    Q.   You're talking about the front of a human body?

5    A.   Yes, sir.                                                        13:47:01

6    Q.   That's center mass.

7    A.   Yes.

8    Q.   Now, if we have an example where somebody doesn't have a

9    threatening weapon, and his back is to the shooter, if the

10   shooter shoots at his back is he shooting at center mass?        13:47:15

11   A.   That can be center mass.  It doesn't have to be the chest.

12   Q.   But if it's not justified is it center of mass?

13        Can he shoot in the back --

14   A.   I see no intent.

15   Q.   Right.  If there is no intent, he has no weapon in his       13:47:29

16   hand, if somebody shoots him in the back six times, has he shot

17   him in center mass?

18   A.   There is no intent, there's no opportunity.

19   Q.   Is that center mass?

20   A.   That is center mass.                                         13:47:44

21   Q.   But when there's no intent, it's not the center of mass

22   that --

23   A.   Well, that doesn't change.  Center mass is always center

24   mass.  We always train the officers to shoot to the middle of

25   the mass.                                                         13:47:56

Allen Foraker – Redirect Examination

1   Q.  Right.

2   A.  Which reduces the risk of a miss or a ricochet into

3   innocent bystanders.

4   Q.  And my question to you is, if the person doesn't have the

5   intent anymore to do any harm, is that an appropriate center          13:48:06

6   mass to shoot at, his back?

7   A.  Yes.

8   Q.  It is?

9   A.  Well, if it's not appropriate, it's not a shot, he should

10  not have shot anyway.                                                  13:48:16

11  Q.  Okay.  That's my question.

12  A.  Okay.

13  Q.  Is that right?  That's all I'm asking.

14       If he has his back turned to the shooter and he no

15  longer has a deadly weapon and he shoots him in the back,             13:48:25

16  they're not trained to shoot them?

17  A.  That is an unjustified shooting.

18       MR. KLEINDIENST:  Okay.

19       THE COURT:  Jurors have any questions, please place

20  them in writing.                                                      13:48:38

21    (At sidebar on the record.)

22       MR. CHAPMAN:  Judge, I'm going to move for a mistrial.

23  If you want me to make the record on it now.

24       THE COURT:  Yeah, why don't you, while we're waiting

25  for the jurors.                                                       13:49:06

─── CR–15–1723–TUC–RCC – April 2, 2018 ───

 1        MR. CHAPMAN:  First of all, they established him as an

 2   expert on rocks somehow without ever disclosing it, and I made

 3   my objection on that.

 4        The second thing is, what they've done over and over

 5   again is they've elicited this claim that you can only employ          13:49:17

 6   deadly force as a last resort.  And that's simply false.  And

 7   it's not in comport -- it's not in conformance with the law.

 8   And they're creating a very misleading presentation of what use

 9   of force policy actually is.

10        I'd move for a mistrial based on that.                            13:49:37

11        And I'd also move that you order them not to make that

12   argument anymore.  It's simply false.

13        The law is, is that you have a myriad of options, one

14   of them is to take cover.  And deadly force isn't always the

15   option that's employed as a last resort.  What they're trying         13:49:55

16   to do is give the jury the misimpression that that is true and

17   it's not.

18        So I move for a mistrial.

19        THE COURT:  I think that the jurors have been very

20   attentive of what's been going on.  I think they've found that        13:50:08

21   there's a full range of possible options available.  And I

22   think even this witness has made that clear.

23        MR. CHAPMAN:  But, Judge, I think that -- I don't

24   think, I know that the statement that deadly force should only

25   be employed as a last resort is simply false.  And the                13:50:23

UNITED STATES DISTRICT COURT

1    Government --

2            MR. KLEINDIENST:  The part --

3            MR. CHAPMAN:  I'm not done yet.

4            The Government knows that too.  And it is incredibly

5    prejudicial and misleading to continue to present that theme to          13:50:31

6    the jury.

7            MR. KLEINDIENST:  Well, that was part of his

8    PowerPoint presentation at the Academy was that it had to be

9    both reasonable under the circumstances and necessary.  And

10   necessary to these students was defined as last resort.  That          13:50:45

11   was his testimony.

12           MR. CHAPMAN:  That's not true.  That's not legally

13   correct.

14           THE COURT:  I think --

15           MR. CHAPMAN:  It doesn't say that.  The use of force          13:50:57

16   policy never says that.

17           MR. KLEINDIENST:  You can say whatever you want and

18   you can have somebody else testify, but that's what the record

19   is according to this agent.

20           MR. CHAPMAN:  I'm saying this is a false statement of          13:51:07

21   the law.  And it's incredibly prejudicial and misleading.  I

22   don't think you should continue to allow this.

23           THE COURT:  All right.  Objection is overruled for

24   this point.

25           Here are the questions:          13:51:19

1          Is the Use of Force Handbook a copy of the actual law,

2     an excerpt of the law, or an interpretation of the law?

3          Why is the PowerPoint presentation dated 10-16-2013 if

4     it predates 2003?

5          MR. CHAPMAN:  Can I address that first one?                    13:51:38

6          I was thinking about that over the lunch hour, is that

7     the Use of Force Handbook really is kind of an instruction on

8     the law, which may deviate from the instructions you give under

9     *Graham versus Connor* on the appropriate use of force and the

10    application of self-defense.                                        13:51:56

11         And I want to supplement my objection to the admission

12    of that Handbook for that reason as well, because I think when

13    they get it back they may be looking at this and going, well,

14    how does it square with the Judge's jury instructions?

15         THE COURT:  All right.                                         13:52:12

16         How much training time is spent on nighttime and low

17    light shooting situations?

18         Have you ever discharged your weapon in the line of

19    duty or been present when another agent has?

20         Are the students given a test on the contents of the          13:52:45

21    Handbook?

22         MR. KLEINDIENST:  We would object to that other

23    question, Judge, as to whether or not he ever fired his weapon

24    or he was with an agent who fired a weapon.

25         THE COURT:  No, it gives the jurors some sort of              13:52:57

───── **Allen Foraker – Jury Questions** ─────

1  context as to how his training and experience fits into what

2  he's teaching.

3          Can you tell if Mr. Swartz passed the judgment pistol

4  shooting the first time or was it taken and passed the second

5  time?                                                              13:53:17

6          MR. CHAPMAN:  That's fine.  I think he passed the

7  first time.

8          He probably won't remember.

9          THE COURT:  Was a written test given over the Use of

10  Force Handbook material?  Why or why not?                         13:53:29

11          Why did the jury see a PowerPoint from October 16, '13

12  versus a PowerPoint from 11-3-10?

13          MR. KLEINDIENST:  There's an answer to that.

14          THE COURT:  Okay.  Did the simulations offer use of

15  nonlethal weapons as well as pistol use, or was it just shoot    13:53:56

16  versus cover or retreat?

17          MR. CHAPMAN:  That's a good question.

18          MR. KLEINDIENST:  What was the question?

19          THE COURT:  Did the simulations offer use of nonlethal

20  weapons as well as pistol use, or was it just shoot versus        13:54:07

21  cover or retreat?

22      (End of discussion at sidebar.)

23          THE COURT:  I have several questions from the jury

24  that I'm going to ask on their behalf.

25          Is the Use of Force Handbook a copy of the actual law,   13:54:39

1    an excerpt of the law, or an interpretation of the law?

2                THE WITNESS:  Excerpts of the law.

3                THE COURT:  Why is a PowerPoint presentation dated

4    October 16, 2013, if it predates 2003?

5                THE WITNESS:  That PowerPoint on the thumb drive that    13:55:01

6    it was on, part of the programming was it defaults to the last

7    date it was opened.  And we opened that on October 16th,

8    2013 -- 2013.

9                THE COURT:  How much training time is spent on

10   nighttime and low light shooting situations?    13:55:19

11               THE WITNESS:  At the Academy there's only two -- four

12   hours of nighttime shooting.  And once they get out into the

13   field, they have to qualify quarterly at nighttime.  That means

14   once every three months they have to show up at night to do a

15   nighttime qualification.    13:55:44

16               THE COURT:  Have you ever discharged your weapon in

17   the line of duty or been present when another agent has?

18               THE WITNESS:  No, sir.

19               THE COURT:  Are the students given a test on the

20   contents of the Handbook?    13:55:58

21               THE WITNESS:  No, sir.

22               THE COURT:  Can you tell us if Mr. Swartz passed the

23   judgment pistol shooting the first time it was taken or the

24   second time?

25               THE WITNESS:  The first time.    13:56:11

1      THE COURT:  Was there a written test given over the

2  Use of Force Handbook material?

3      THE WITNESS:  Yes, there was.

4      MR. KLEINDIENST:  I'm sorry, Judge, what was the

5  question?                                          13:56:33

6      THE COURT:  Was a written test given over the Use of

7  Force Handbook material?

8      THE WITNESS:  I'm sorry, it's not the Handbook

9  material.  There is a written test at the conclusion of the

10  PowerPoint program in the classroom.  That's when a written   13:56:45

11  test is given to them.

12      THE COURT:  Did the simulations offer use of nonlethal

13  weapons as well as pistol use, or was it just shoot versus

14  cover retreat?

15      THE WITNESS:  I don't understand that one, sir.     13:57:01

16      THE COURT:  Let me -- did the simulations offer use of

17  nonlethal weapons as well as pistol use, or was it just shoot

18  versus cover retreat?

19      THE WITNESS:  Shoot versus cover and retreat.  Shoot,

20  don't shoot, is exactly how those simulations were designed.  13:57:17

21      THE COURT:  All right.  Mr. Kleindienst, any questions

22  based on the jurors' questions?

23      MR. KLEINDIENST:  Yeah, I have a couple, Judge.

24      I think that last question dealt with nonlethal force;

25  is that correct?  Was that the last question?

——— **Allen Foraker – Redirect Examination** ———

1        THE COURT:  Yes.

2        THE WITNESS:  In the simulation.

3                REDIRECT EXAMINATION

4    BY MR. KLEINDIENST:

5    Q.  Is there a separate course on non -- the use of nonlethal          13:57:38

6    force?

7    A.  It's not at firearms.

8    Q.  It's not at firearms?

9    A.  No.

10   Q.  So you don't teach that?                                           13:57:45

11   A.  No.

12   Q.  And it wasn't taught when Mr. Swartz was there at the

13   Academy?

14   A.  Not by firearms.

15   Q.  Not by firearms, it's taught by a different division of the        13:57:52

16   Academy?

17   A.  Yes, physical training department.

18   Q.  On the day the PowerPoint --

19        MR. KLEINDIENST:  May I approach the witness,

20   Your Honor?                                                            13:58:04

21        THE COURT:  You may.

22   BY MR. KLEINDIENST:

23   Q.  I'm showing you Exhibit 283, just for an example.

24        There is a date on the bottom of the second page which

25   is the first slide; right?                                            13:58:17

Allen Foraker – Redirect Examination

1   A.  Yes.

2   Q.  And what's that date?

3   A.  October 16th, 2013.

4        MR. KLEINDIENST:  May I approach the witness again,

5   Your Honor?                                                    13:58:25

6        THE COURT:  You may.

7   BY MR. KLEINDIENST:

8   Q.  Do you remember, Mr. Foraker, appearing before the Grand

9   Jury in this case?

10  A.  Yes, I do.                                                 13:58:37

11  Q.  And do you remember the first time you appeared?

12  A.  Yes, I do.

13  Q.  And what date was that?

14  A.  October 17th, 2013.

15  Q.  Did you have to come from Artesia to -- or Wilcox to the   13:58:44

16  Grand Jury here to testify?

17  A.  Yes, sir, from Wilcox.

18  Q.  Is it possible that the reason why the PowerPoint slides

19  that the jury saw has the date of October 16th, 2013, is that

20  you downloaded it the day before you came to Grand Jury?       13:59:00

21  A.  Yes, sir.

22       MR. KLEINDIENST:  Okay.  That's all I have.

23       THE COURT:  Mr. Chapman, any questions based upon the

24  jurors' questions?

25       MR. CHAPMAN:  No, Your Honor.                             13:59:10

1        THE COURT:  Thank you.  You may step down.

2     (Further proceedings held on the record not included in

3   this transcript.)

4

5                            -oOo-

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

─CR-15-1723-TUC-RCC – April 2, 2018─

C E R T I F I C A T E

       I, CANDY L. POTTER, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

       I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

       DATED at Phoenix, Arizona, this 4th day of June, 2018.




                              s/Candy L. Potter_____
                              Candy L. Potter, RMR, CRR