**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| **United States of America,** | ) | No.  **CR-15-1723-TUC-RCC-DTF** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Tucson, Arizona |
| | ) | April 4, 2018 |
| **Lonnie Ray Swartz,** | ) | 3:26 p.m. |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |


**BEFORE:  THE HONORABLE RANER C. COLLINS, JUDGE**


**REPORTER'S EXCERPTED TRANSCRIPT OF PROCEEDINGS**


**JURY TRIAL**
**DAY 10**

**(TESTIMONY OF JAVIER DIAZ-TREJO)**


Spanish Interpreter:  Carlos Arvizu, Lucinda Bush &
Clark Feaster

Official Court Reporter:
Candy L. Potter, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 36
Phoenix, Arizona 85003-2151
(602) 322-7246

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

CR-15-1723-TUC-RCC – April 4, 2018

1

2                          **A P P E A R A N C E S**

3

   For the Government:
4        U.S. Attorney's Office Tucson
         By:  **Wallace Heath Kleindienst**, Esq.
5              **Mary Sue Feldmeier,** Esq.
         405 West Congress Street, Suite 4800
6        Tucson, Arizona 85701

7  For the Defendant:
         Law Offices of Sean C. Chapman
8        By:  **Sean Christopher Chapman**, Esq.
         100 North Stone Avenue, Suite 701
9        Tucson, Arizona 85701

10       Law Office of Jim E. Calle
         By:  **Jamie Ernest Calle, III,** Esq.
11       2315 East Hawthorne Street
         Tucson, Arizona 85719

12

13

14

15

16

17

18

19

20

21

22

23

24

25

────CR-15-1723-TUC-RCC – April 4, 2018────

1

2                              **I N D E X**

3   **GOVERNMENT WITNESS:**        **DIRECT**     **CROSS**      **REDIRECT**  **RECROSS**

4   JAVIER DIAZ-TREJO
    By Ms. Feldmeier            4
5   By Mr. Chapman                          12
    By Ms. Feldmeier                                      18
6

7

8

9                      **INDEX OF EXHIBITS**

10  **EXHIBIT**                                   **IDENT**   **RECEIVED**

11  NO.        DESCRIPTION

12  18A        Autopsy Report (Spanish)            6

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

─────────── **Javier Diaz-Trejo – Direct Examination** ───────────

1       (The following excerpt is the testimony of Javier

2   Diaz-Trejo.)

3              THE COURT:  You may call your next witness.

4              MS. FELDMEIER:  Dr. Diaz-Trejo, Javier Diaz-Trejo.

5              THE CLERK:  Raise your right hand, please.                    15:26:57

6       (JAVIER DIAZ-TREJO, GOVERNMENT WITNESS, SWORN.)

7              THE CLERK:  Thank you.  Please be seated.

8              Please state your full name for the record, and please

9   spell your last name.

10             THE WITNESS:  My name is Javier Diaz-Trejo.               15:27:17

11             MS. FELDMEIER:  May I proceed?

12             THE COURT:  You may.

13                        DIRECT EXAMINATION

14  BY MS. FELDMEIER:

15  Q.  Where are you employed, Dr. Diaz?                                 15:27:34

16  A.  I currently work with the State Prosecutor General's Office

17   for the State of Sonora.

18             THE COURT:  They need you to speak up a little bit.

19             THE WITNESS:   I currently work for the State

20   Prosecutor General's Office for the State of Sonora.              15:27:54

21  BY MS. FELDMEIER:

22  Q.  And what is your job?

23  A.  I'm a forensic examiner in Nogales, Sonora.

24  Q.  And how long have you been employed there?

25  A.  At the State Prosecutor General's Office, it's been 28        15:28:14

**Javier Diaz-Trejo – Direct Examination**

1    years approximately.

2    Q.  And all that time as a medical forensic examiner?

3    A.  Yes, yes, I'm a medical examiner.

4    Q.  And prior to that did you also work as a doctor in a

5    different location?                                               15:28:43

6    A.  And I worked at PC at Yecora, Sonora.  I split my time

7    between being a forensic doctor and a doctor in a family

8    practice, just for three years.  And then as a medical

9    examiner.

10   Q.  Okay.  And where did you go to medical school?              15:29:19

11   A.  In the City of Mexico at the Polytechnic Institute.

12   Q.  And what year did you receive your medical degree?

13   A.  In '80 –– '85.

14   Q.  Are you currently on leave from your job for medical

15   reasons?                                                         15:29:58

16   A.  Yes.  I have a medical disability for an accident that

17   happened at my house.

18   Q.  When did that happen?

19   A.  That happened on February 10th of this year.

20   Q.  And briefly, you had an explosion of an indoor gas tank;    15:30:26

21   correct?  And suffered some severe injuries as a result?

22   A.  Yes, I got second degree burns on my body, on my two arms

23   and on my face.

24   Q.  And you are still experiencing some medical issues, so you

25   are not back to up 100 percent and back to work?                15:31:00

——— Javier Diaz-Trejo – Direct Examination ———

1    A.  Yes.  Yes, because a doctor needs that.

2    Q.  Okay.  I'd like to direct your attention to October 10th of

3    2012.  On that day were you involved in an investigative team

4    that responded to a crime scene on West International involving

5    a deceased unidentified male?                                     15:31:29

6    A.  Yes, that's right.

7    Q.  And did you participate in the inspection of the crime

8    scene?

9    A.  That's right.

10   Q.  And the inspection of the body?                               15:31:46

11   A.  Also.

12   Q.  Did you also conduct the autopsy on the unidentified male

13   along with Dr. Absalon Madrigal?

14   A.  Indeed, yes.

15          MS. FELDMEIER:  Okay.  May I approach, Your Honor?         15:32:14

16          THE COURT:  You may.

17   BY MS. FELDMEIER:

18   Q.  Dr. Diaz, I'm showing you what's been marked as Exhibit

19   18A.  Do you recognize that?

20   A.  Yes, that's the document we prepared.                         15:32:30

21   Q.  And that is the autopsy report relating to the event that's

22   on trial today?

23   A.  Yes, that's right.

24   Q.  And did you co-sign that report along with Dr. Madrigal?

25   A.  Indeed, yes.                                                  15:32:53

1   Q.  And that contains yours and Dr. Madrigal's findings;

2   correct?

3   A.  I didn't hear that well.

4   Q.  Does that report contain the findings by both you and

5   Dr. Madrigal?                                                    15:33:13

6   A.  Yes, yes, yes, yes.

7   Q.  Okay.  Now we've already gone through that report

8   extensively, so we're not going to go through it again with

9   you.

10          But what I'd like to do is direct your attention to     15:33:25

11  approximately 18 months after you prepared that report, to

12  August 19th of 2014.

13          On August 19th of 2014, do you recall attending a

14  meeting with American authorities?

15  A.  Yes.                                                         15:33:51

16  Q.  And prior to going to that meeting did you prepare yourself

17  by reviewing anything relating to the homicide?

18  A.  Yes.  My colleague, Mr. Absalon, as well as I went over the

19  document.

20  Q.  In August of 2014?                                          15:34:16

21          I believe you met with us and told us that you

22  hadn't --

23          MR. CHAPMAN:  Objection, leading.

24          THE COURT:  Sustained.

25  BY MS. FELDMEIER:                                                15:34:24

---

**Javier Diaz-Trejo – Direct Examination**

1  Q.  Okay.  I want to make sure we're clear, we're talking about

2  August 19th of 2014.

3          Do you recall that day in Mexico?

4  A.  In Nogales, Arizona; right?

5  Q.  No.  There's a meeting in 2014 in Nogales, Sonora.        15:34:42

6  A.  Oh, is that when you went to the PGR?

7  Q.  Yes, that meeting.

8  A.  Oh, yes, yes, I do remember.

9  Q.  Okay.  So before you went to that meeting, did you prepare

10 yourself by reviewing any documents, for that meeting?        15:35:03

11 A.  Yes.

12 Q.  Okay.  And when you came to the meeting, did you talk about

13 your opinion as to which shot was the first shot to the victim?

14 A.  Yes.

15 Q.  And did you opine at that time that the first shot was the   15:35:31

16 one number 2 to the head?

17 A.  Yes, yes.

18 Q.  And that one brought him to the ground.

19 A.  That's right.

20 Q.  And that was supported, you stated, because of abrasions to  15:35:49

21 the backs of the hands and to the face.

22 A.  Yes.  He had scrapes on the back of his hands, and that's

23 why I thought it could have been the shot -- gunshot to the

24 head.

25 Q.  Okay.  And then in 2016 did you have an opportunity to meet  15:36:16

--------Javier Diaz-Trejo – Direct Examination--------

1   with us, the United States team, here in the United States

2   Courthouse at the United States Attorney's Office?

3   A.  Yes, that's right.

4   Q.  And at that time did we go through your autopsy report

5   paragraph by paragraph?                                     15:36:40

6   A.  Yes, yes.

7   Q.  At that time did you identify another wound that could also

8   potentially have been the first shot?

9   A.  That's right.  A change of opinion, that it could have been

10  number 4 to the back.                                       15:37:07

11  Q.  So at that time your change of opinion was that the first

12  shot could have been either number 2 or number 4?

13  A.  Yes.

14  Q.  At that time was the United States team withholding the

15  United States' evidence from you?                           15:37:22

16          MR. CHAPMAN:  Objection, form of the question.

17          THE COURT:  Sustained.

18  BY MS. FELDMEIER:

19  Q.  By 2016 had the United States team shared any of the United

20  States' evidence with you?                                  15:37:35

21  A.  No.

22  Q.  Would it be fair to say that we were just accepting the

23  information you gave but not providing any in return?

24  A.  We were studying this together with Dr. Madrigal and you

25  and going over these notes.                                 15:38:11

**Javier Diaz—Trejo – Direct Examination**

1    Q.  Okay.  But what I want to do is just kind of move through

2    how your opinion progressed and why changes were made as we

3    went through it.

4              So did you have an opportunity to have a pretrial

5    meeting with me and Mr. Kleindienst and Agent Arrasmith in        15:38:30

6    Arizona within the last week or so?

7    A.  Yes.

8    Q.  At that time did we provide you with a hypothetical that

9    the victim may have hit the ground and remained alive for a

10   period of time before another volley of shots hit him?          15:38:57

11   A.  Yes.

12   Q.  Is that the first time that we told you that?

13             MR. CHAPMAN:  Object to the form of the question.

14   They're asking him a question, they're not presenting evidence

15   to him, Your Honor.                                              15:39:17

16             THE COURT:  Rephrase the question.

17   BY MS. FELDMEIER:

18   Q.  Had we ever given you that evidence previously?

19             MR. CHAPMAN:  Object.  It's not evidence, it's a

20   question.                                                        15:39:26

21             THE COURT:  That question previously.

22   BY MS. FELDMEIER:

23   Q.  Had we ever provided you previously with that hypothetical?

24   A.  Yes, studying that.

25   Q.  Okay.  I'm not -- I'll move on.                              15:39:45

—— Javier Diaz-Trejo – Direct Examination ——

1           And after you heard the hypothetical, asking whether

2    or not there was an order of shots that could work with the

3    idea of there being a gap between shots, and the victim still

4    being alive, did you come up with another opinion?

5           MR. CHAPMAN:  Objection, it's an incomplete                  15:40:13

6    hypothetical, and the question is unclear.

7           THE COURT:  Overruled.

8           THE WITNESS:  Yes, yes, yes.

9    BY MS. FELDMEIER:

10   Q.  Okay.  And what new opinion did you come up with?              15:40:24

11   A.  That the person, the person who was wounded received --

12        (Court reporter interruption.)

13          THE COURT:  The court reporter asked you to start over

14   with the answer.

15          THE WITNESS:  That the person who was wounded, the          15:41:06

16   first impact could have been to the posterior trunk of the

17   body, that is the back.

18   BY MS. FELDMEIER:

19   Q.  Continue.

20   A.  An impact on the right side, slightly on the right to the      15:41:24

21   back of the person, at the height of the thorax, which enters

22   the body and hits the vertebrae on the spinal column.

23          And in the middle of this vertebrae there is a -- is

24   the spinal cord, and it damages it.  And the person becomes

25   paraplegic from where the wound is down.  And logically from      15:42:32

─── Javier Diaz-Trejo ─ Cross-Examination ───

1   here on up he would continue to have movement, would be alive.

2       And afterwards the other bullets were -- arrived at

3   his body, and that is the head.

4   BY MS. FELDMEIER:

5   Q.  Did the other bullets arrive also at the back?        15:43:12

6   A.  Yes.  The bullets, he had five in the back, all which

7   entered the thoracic cavity.

8   Q.  And did you notice anything about the position of the exit

9   wounds on the left arm?

10  A.  Indeed the person when it was impacted had movement of the   15:43:38

11  upper part and moved, and the bullet went in the left arm where

12  we removed it surgically.

13      MS. FELDMEIER:  Thank you.

14      Those are all my questions, Your Honor.

15      THE COURT:  Mr. Chapman.        15:44:28

16                  CROSS-EXAMINATION

17  BY MR. CHAPMAN:

18  Q.  Good afternoon, sir.  I hope you're feeling better.

19      I'm going to ask you some follow-up questions.

20      My understanding from hearing Dr. Madrigal testify    15:45:17

21  earlier was that you were the lead forensic investigator at the

22  scene; is that right?

23  A.  Yes, that's right.

24  Q.  So in terms of the forensic aspect of this case, you were

25  the one that was in charge of coordinating the investigation?    15:45:44

─── Javier Diaz-Trejo ─ Cross-Examination ───

1   A.  Yes.  In the expert sense, yes.

2   Q.  And that would also involve how the autopsy was conducted;

3   is that correct?

4   A.  Yes, that's right.

5   Q.  And my understanding is that you performed the autopsy          15:46:05

6   with Dr. Madrigal, and then a report was prepared; is that

7   correct?

8   A.  Yes.

9   Q.  And obviously this was an unusual case for you because it

10  involved an international incident where a federal law            15:46:23

11  enforcement officer from the United States had shot and killed

12  someone in Mexico.  Can we agree on that?

13  A.  Yes.

14  Q.  I want to talk to you about this meeting that you had on

15  August 19th, 2014.  Do you recall that meeting?                   15:46:53

16  A.  Yes, yes, I do.

17  Q.  The Government has disclosed that this meeting occurred in

18  the offices of the PGR in Nogales, Sonora; is that correct?

19  A.  That's right.

20  Q.  And that the following individuals were present, if you       15:47:23

21  know.  I'll read them off and then ask you if you know.

22        Robert Ciaffa, attache for Department of Justice to

23  Mexico; Wallace Kleindienst, Assistant U.S. Attorney; Karen

24  Rolley, Assistant U.S. Attorney; Henry Leventis, Department of

25  Justice lawyer; Michael Haag; Lucien Haag; Alfonso Villasenor,    15:47:52

1    who was the interpreter; Mexican attorney Martin Felix Araiza;

2    Mexican attorney Guillermo Avilez Encinas; Dr. Absalon Godinez;

3    you; and Julio Cesar Trejo Villareal.

4          Does that sound right to you, sir?

5    A.  Yes.                                                          15:48:23

6    Q.  So the context of this meeting is that 18 months earlier

7    there had been this shooting, it was an international incident,

8    you prepared the autopsy, and then you were asked to attend

9    this meeting with U.S. officials and Mexican officials to

10   discuss your results; is that correct?                           15:48:55

11   A.  Yes.

12   Q.  The Government has disclosed to me handwritten notes

13   from -- and typewritten notes from federal DOJ attorney Henry

14   Leventis and AUSA Karen Rolley that purport to document

15   statements that you made during the meeting.                     15:49:48

16          So I'm going to ask you questions based on those notes

17   and ask if you recall saying various things.  Fair enough?

18   A.  Yes.

19   Q.  Do you recall saying that a metal stylus was used to

20   determine the nature of the decedent's wounds and photographs    15:50:25

21   were taken with the stylus in each wound?

22   A.  Yes, yes, I do.

23   Q.  Do you recall saying that you believed the bullet wound to

24   the head -- which is identified in your autopsy report in

25   paragraph number 2 as the bullet that entered behind the right   15:50:55

— **Javier Diaz-Trejo – Cross-Examination** —

1    ear and transected the brain.  Do you recall which one I'm

2    referring to?

3    A.  You're referring to number 2?

4    Q.  Paragraph number 2 of your report talks about an

5    injury -- if you want to read paragraph number 2 to refresh        15:51:30

6    your recollection, that's fine.

7    A.  Yes, yes.

8    Q.  Are you done?

9    A.  Yes.

10   Q.  Okay.  Do you recall saying that that injury, which was a      15:51:44

11   bullet injury that went from transecting the right ear and

12   coming to lodge under the skin on the left forehead, that that

13   wound was the first wound, because all of the other wounds had

14   a rear-to-forward, right-to-left trajectory?

15        Do you remember saying that?                                  15:52:14

16   A.  But -- yes, I do.

17        THE INTERPRETER:  But the interpreter needs a

18   clarification.

19        THE WITNESS:  Yes, but it's from above to below, from         15:52:44

20   head to feet.

21   BY MR. CHAPMAN:

22   Q.  Instead of rear to forward, it would be pointing up in this

23   direction coming out here?

24   A.  From below and then ascending, from back forward.

25   Q.  Thank you.                                                     15:53:09

───── **Javier Diaz-Trejo – Cross-Examination** ─────

1          Do you remember telling investigators at this meeting

2   that you believed that the shot to the head killed the deceased

3   and caused him to lose his balance, and that the scrapes to the

4   backs of the deceased's hands and face were the result of being

5   propelled forward by that impact?                                    15:53:36

6   A.  At that time we believed that.

7   Q.  And that's what you said at that time; correct?

8   A.  Yes.

9   Q.  And you specifically ruled out the theory at that time that

10  the injury identified in paragraph 4 of your report to the          15:53:57

11  thoracic vertebrae could have happened first while the decedent

12  was running, and then he collapsed and received the injury

13  number 2 to the head.

14          You specifically rejected that theory; isn't that

15  right?                                                               15:54:26

16  A.  I said specifically that wound number 4 could have been the

17  first one, by the way that the other wounds were shown to be,

18  yes, that's true.

19  Q.  Well, I understand that that's your testimony now.  But

20  I'm asking you what you told investigators back in August of        15:54:59

21  2014.

22          And the notes that the Government has given me from

23  attorneys at the meeting say that you specifically ruled that

24  out.  And one of the reasons you ruled it out, you explained to

25  them, was because of the abrasions to the backs of the hands of    15:55:21

**─── Javier Diaz-Trejo ─ Cross-Examination ───**

1    the deceased and to the face.

2              Do you remember telling them that?

3    A.  Yes.

4    Q.  And I understand you changed your opinion later.  But the

5    first opportunity that you had to meet with U.S. officials and    15:55:42

6    Mexican officials about this, that's what you told them;

7    correct?

8    A.  Yes, that's right.

9       (Discussion off the record between defense counsel.)

10   BY MR. CHAPMAN:                                                  15:57:40

11   Q.  Didn't you also tell investigators at that time -- and I'm

12   looking through the notes now -- that the impact to the head,

13   number 2, propelled the deceased forward?  Do you remember

14   saying that?

15   A.  Yes, I do.                                                   15:58:15

16   Q.  And that he may have hit the wall of the building near

17   where he was found with his face?

18   A.   I said that it was against the ground.

19             THE INTERPRETER:  The interpreter needs a repetition.

20             MR. CHAPMAN:  Sure.                                    15:58:54

21             THE WITNESS:  Falling forward, falling forward to the

22   ground.

23             THE INTERPRETER:  The interpreter has a slight

24   correction.

25             Falling face first forward toward the ground.         15:59:30

─────── **Javier Diaz-Trejo – Redirect Examination** ───────

1   BY MR. CHAPMAN:

2   Q.  Okay.  Did you tell the investigators that the body had

3   blood and cranial injuries, it had come in complete contact

4   with the wall of the house or dwelling, the upper portion of

5   the body had come into contact against the wall?                15:59:51

6   A.  I said it came in contact with a surface, and it was

7   against the ground.

8          THE INTERPRETER:  The interpreter has --

9          A hard surface, and it was the ground.

10          MR. CHAPMAN:  I have no further questions.  Thank you.    16:00:31

11                      REDIRECT EXAMINATION

12   BY MS. FELDMEIER:

13   Q.  Just a clarification.

14          Miss Rolley's notes state that the body had blood and

15   cranial injuries.  Is that something you said in 2014?         16:00:58

16   A.  We're talking about the cranial injury, that's deep.  And

17   superficially the head had wounds, hits.

18   Q.  I understand.

19          The way she put it was, the body had blood and cranial

20   injuries.                                                      16:01:31

21          So somewhere on the body, would you agree, there was

22   blood?

23   A.  Yes.

24   Q.  Okay.  And it -- probably referring back to the body -- had

25   come in complete contact with the wall of the house or         16:01:42

─────── **Javier Diaz-Trejo – Redirect Examination** ───────

1   dwelling.

2           Do you remember when you were out on the crime scene,

3   is my question, and whether or not any portion of the body was

4   up against the wall?

5   A.  It was ventral decubitus, that is face down.  And on                16:01:59

6   the -- on the floor of the sidewalk.

7   Q.  Okay.  And where was the left side of the body?  Was it

8   against the wall?

9   A.  Yes, yes, that's right.

10  Q.  And then it said, the upper portion of the body had come in         16:02:36

11  contact against the wall.

12  A.  That's right.

13  Q.  So when we say "the upper portion of the body," are you

14  referring to the arm?

15  A.  The arm and that part of his face; right?  The part -- the          16:02:57

16  upper part is this, his arm and head.

17  Q.  Okay.  But the face, when you came to the scene, was not in

18  contact with the wall.

19  A.  No.

20  Q.  And as you sit here today, and when you did the autopsy             16:03:24

21  back in 2012, what do you believe the face came in contact with

22  to cause the injuries to the left side?

23  A.  These are abrasive wounds on the left side of his body.

24  And these logically could have been caused by contact with the

25  ground at the time of the fall.  That's what I think.                   16:03:58

**Javier Diaz-Trejo – Redirect Examination**

1   Q.  Okay.  And you also related back in 2014 that the body had

2   recent bullet wounds and particles of the wall on top of the

3   body.

4   A.  Yes.  Could you repeat that question?

5   Q.  Did you state that the body had recent bullet wounds?    16:04:26

6   A.  Yes, yes, yes.

7   Q.  And did you state that the particles of the wall, or pieces

8   of the wall, were on top of the body?

9   A.  Yes.  Those are impacts that he received, and logically

10  they would be there because it was on the wall.    16:04:55

11  Q.  Okay.  So parts of the wall fell onto the victim's body?

12  A.  Well, you could say yes.

13  Q.  Did you have any evidence that as the victim was falling

14  any part of his face actually hit the wall?

15  A.  Well, yes, it could be, it could be.    16:05:21

16  Q.  What do you mean?

17  A.  Yes, falling forward, it could have been with the wall or

18  with the ground.

19  Q.  Okay.  And you don't have an opinion onto which of those

20  two it was?    16:05:48

21  A.  I think it was against the ground.

22      MS. FELDMEIER:  Okay.  I don't have any other

23  questions.

24      THE COURT:  Jurors have any questions, please place

25  them in writing.    16:06:02

UNITED STATES DISTRICT COURT

**Javier Diaz-Trejo – Redirect Examination**

1          It appears there are none.

2          Thank you, sir, you may step down.

3      (Further proceedings held on the record not included in

4   this transcript.)

5

6                              -oOo-

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

CR-15-1723-TUC-RCC – April 4, 2018

1

2

3

4                          C E R T I F I C A T E

5

6          I, CANDY L. POTTER, do hereby certify that I am duly

7   appointed and qualified to act as Official Court Reporter for

8   the United States District Court for the District of Arizona.

9          I FURTHER CERTIFY that the foregoing pages constitute

10  a full, true, and accurate transcript of all of that portion of

11  the proceedings contained herein, had in the above-entitled

12  cause on the date specified therein, and that said transcript

13  was prepared under my direction and control.

14         DATED at Phoenix, Arizona, this 4th day of June,

15  2018.

16

17

18

19                          s/Candy L. Potter_____
                            Candy L. Potter, RMR, CRR

20

21

22

23

24

25

UNITED STATES DISTRICT COURT