# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| **United States of America,** | ) | |
| | ) | No. **CR-15-1723-TUC-RCC-DTF** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Tucson, Arizona |
| | ) | April 5, 2018 |
| **Lonnie Ray Swartz,** | ) | 2:13 p.m. |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**BEFORE:   THE HONORABLE RANER C. COLLINS, JUDGE**

**REPORTER'S EXCERPTED TRANSCRIPT OF PROCEEDINGS**

**JURY TRIAL**
**DAY 11**

**(TESTIMONY OF SARAH ARRASMITH)**

Official Court Reporter:
Candy L. Potter, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 36
Phoenix, Arizona 85003-2151
(602) 322-7246

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

CR-15-1723-TUC-RCC – April 5, 2018

**A P P E A R A N C E S**

For the Government:
    U.S. Attorney's Office Tucson
    By:  **Wallace Heath Kleindienst**, Esq.
         **Mary Sue Feldmeier**, Esq.
    405 West Congress Street, Suite 4800
    Tucson, Arizona 85701

For the Defendant:
    Law Offices of Sean C. Chapman
    By:  **Sean Christopher Chapman**, Esq.
    100 North Stone Avenue, Suite 701
    Tucson, Arizona 85701

    Law Office of Jim E. Calle
    By:  **Jamie Ernest Calle, III**, Esq.
    2315 East Hawthorne Street
    Tucson, Arizona 85719

**I N D E X**

| DEFENSE WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| SARAH ARRASMITH | | | | |
| By Mr. Chapman | 4 | | | |
| By Mr. Kleindienst | | 9 | | |
| By the jury | | 14 | | |

Discussion Held at Sidebar      13, 14

**INDEX OF EXHIBITS**

| EXHIBIT | | IDENT | RECEIVED |
|---|---|---|---|
| NO. | DESCRIPTION | | |
| 311 | Aerial photograph of crime scene | 5 | |
| 733 | Arrasmith: Second interview of AO 12-7-16 | 4 | |

Sarah Arrasmith - Direct Examination

1    (The following excerpt is the testimony of Sarah
2  Arrasmith.)
3       MR. CHAPMAN:  Your Honor, I'd like to call Agent
4  Arrasmith.
5       THE COURT:  All right.                                14:13:50
6       THE CLERK:  Raise your right hand, please.
7    (SARAH ARRASMITH, DEFENSE WITNESS, SWORN.)
8       THE CLERK:  Thank you.  Please be seated.
9       Please speak directly into the microphone.
10      State your full name for the record and spell your    14:14:09
11 last name.
12      THE WITNESS:  Sarah Arrasmith, A-R-R-A-S-M-I-T-H.
13      THE COURT:  Whenever you're ready.
14      MR. CHAPMAN:  Thank you, Judge.
15                    DIRECT EXAMINATION                      14:14:22
16 BY MR. CHAPMAN:
17 Q.  Agent Arrasmith, you were just present in the room when the
18 witness identified as AO testified; is that right?
19 A.  That's correct.
20 Q.  All right.  I'm going to ask you some questions about her    14:14:31
21 testimony.
22      Did you interview her on December 7th, 2016?
23 A.  Yes.
24 Q.  And by the way, I have cued up on the monitor for you your
25 report.  It's Defense 733.  In case you need to refer to your    14:14:48

Sarah Arrasmith - Direct Examination

1  report at any point, just let me know.
2  A.  Thank you.
3  Q.  And where did that interview take place?
4  A.  It took place at AO's residence.
5  Q.  And that is on West International Street?    14:15:02
6  A.  Yes.
7  Q.  Without giving the specific address, is it roughly four
8  blocks west of the DeConcini Port of Entry?
9  A.  That's correct.
10 Q.  And can you tell the jury how you would access her    14:15:17
11 residence from West International?
12 A.  From West International you would have to take a right down
13 a dirt driveway for approximately 120 feet, to encounter her
14 residence.
15 Q.  And is her house -- actually, you know what, I'll use one    14:15:35
16 of the Government's exhibits.  I think that might be helpful.
17        MR. CHAPMAN:  Your Honor, I assume it's okay that the
18 witness step down.  I should have asked, I apologize.
19        THE COURT:  She already got down, so it's okay.
20        THE WITNESS:  I'm sorry, Your Honor.    14:16:18
21        THE COURT:  That's okay.  It's fine.
22        MR. CHAPMAN:  Your Honor, I'm going to have the
23 witness refer to the Government's Exhibit 311.
24 BY MR. CHAPMAN:
25 Q.  And, Agent Arrasmith, can you point out on the map where    14:16:27

UNITED STATES DISTRICT COURT

**Sarah Arrasmith – Direct Examination**

1  AO's house is located?
2  A.  Yes.  It's right here.  (Indicating.)
3  Q.  Right there.  Okay --
4  A.  I'm sorry, correction.  It's right here.  (Indicating.)
5  Wrong dirt road.                                                    14:16:42
6  Q.  All right.  So if this is east going this way, the
7  DeConcini Port of Entry is over here; right?  (Indicating.)
8  A.  Yes, it would be about where your hand is, off the board.
9  Q.  And Mr. Kleindienst conveniently had numerous witnesses
10 place pins where everything -- every witness was at some point     14:17:06
11 during the shooting event.
12        We can agree that her house is, what -- you said it's
13 150 feet down a driveway, and then how far up West
14 International from where the shooting occurred?
15 A.  So the driveway is right here.  (Indicating.)  I estimated     14:17:26
16 it was about 100 to 120 feet.  It does go downward, so she sits
17 lower than West International Street.
18        I'm sorry, what was the second part you wanted me to
19 identify?
20 Q.  Roughly how far up West International from her driveway was    14:17:41
21 the shooting event?
22 A.  The shooting event occurred along this portion of the
23 fence.  This is the entrance to get to AO's residence.
24 (Indicating.)  I would estimate it's within 40 -- 30 to 40
25 feet.                                                              14:18:03

Sarah Arrasmith - Direct Examination

1  Q.  All right.  And is there another residence next to her
2  house?  Can you point it out?
3  A.  Yes.  This residence right here.  (Indicating.)
4  Q.  Okay.  Thank you, you can be seated.
5      Now, when you interviewed AO, did she say whether or
6  not she knew Jose Antonio Elena Rodriguez?
7  A.  Can I refer to my report?
8  Q.  Yeah.  I know the whole thing isn't on the screen.
9  A.  I think I need paragraph 2.
10 Q.  Okay.  Paragraph 2 is on the screen.
11 A.  Thank you.
12     So AO provided information to me that indicated
13 potentially her grandson knew Jose Elena.
14 Q.  She said that her grandson would have gone to school with
15 him in Mexico?
16 A.  Yes.
17 Q.  All right.  And did you ask her about the events of October
18 10th, 2012?
19 A.  I did.
20 Q.  And what happened that night?
21 A.  AO told me that she saw two Border Patrol agents by her
22 house that were carrying long arms.  And she said she -- her
23 assumption was that Jose Elena had made the Border Patrol
24 agents chase him.  Prior to that she said that she saw Jose
25 Elena run by her house in a southbound direction towards the

14:18:22
14:19:00
14:19:25
14:19:39
14:20:04

**Sarah Arrasmith – Direct Examination**

1 fence.
2 Q. Did you also verify that her bedroom window faces
3 southbound toward the international boundary fence?
4 A. I did.
5 Q. Did you ask her about the lighting at the time that she saw   14:20:17
6 this event, Elena Rodriguez and the agents running by her
7 house?
8 A. I did.
9 Q. And what did she tell you?
10 A. Can you scroll to the next page?   14:20:38
11 Q. Yeah, sure.
12 A. And back up again.
13 　　　AO indicated to me that her porch light is always on.
14 Q. Did she say anything about her neighbor's porch light?
15 A. Yes. She indicated that her neighbor's porch light was on   14:21:06
16 that evening as well.
17 Q. Did she say -- did she tell you what she did after she saw
18 Elena Rodriguez run by her house followed by the agents?
19 A. I'm sorry, can you repeat that?
20 Q. Did she tell you what she did after she witnessed these two   14:21:33
21 different events, first Elena Rodriguez running by her house
22 and then these two Border Patrol agents, what happened
23 after -- did she tell you what happened after that?
24 A. She said that the agents were chasing him, and that the
25 agents were speaking in Spanish.   14:21:54

| | |
|---|---|
| 1 | Q.  After that did she go to bed? |
| 2 | A.  Yes, she did.  She went to bed and then she said she heard |
| 3 | the shots being fired. |
| 4 | Q.  All right. |
| 5 | (Discussion off the record between defense counsel.) |
| 6 | MR. CHAPMAN:  I have no further questions.  Thank you. |
| 7 | THE WITNESS:  Thank you. |
| 8 | CROSS-EXAMINATION |
| 9 | BY MR. KLEINDIENST: |
| 10 | Q.  Good afternoon, Miss Arrasmith. |
| 11 | A.  Hello, Mr. Kleindienst. |
| 12 | Q.  You went to her house on December 7th of 2016; correct? |
| 13 | A.  Correct. |
| 14 | Q.  That was about four years after the shooting had taken |
| 15 | place? |
| 16 | A.  Two years. |
| 17 | Q.  I'm sorry.  No, four. |
| 18 | A.  Four.  That's why I'm not a math major. |
| 19 | Q.  That's all right. |
| 20 | A.  My dad would be so mad at me right now. |
| 21 | Q.  It was four years after -- actually more than four years |
| 22 | after Jose was shot and killed; correct? |
| 23 | A.  Yes. |
| 24 | Q.  Okay.  And which would have been about a year and a half |
| 25 | ago, according to my calculations.  Does that sound right? |

Timestamps: 14:22:18, 14:22:37, 14:22:54, 14:23:05, 14:23:14

**Sarah Arrasmith – Cross-Examination**

1  A.  Yes.  I'm going to rely on yours.
2  Q.  Okay.  And she told you that she had known Jose through her
3  grandson because they went to school together as children?
4  A.  Yes.
5  Q.  But did she indicate that she had not seen Jose in quite a                14:23:28
6  while because her grandson stopped associating with Jose?
7  A.  Yes.
8  Q.  Okay.  Now, the reason why you went there -- you went there
9  for a specific reason; correct?
10 A.  I did.                                                                     14:23:43
11 Q.  And was the reason because right after the shooting took
12 place in October of 2012, an FBI agent by the name of Stacey
13 Gutierrez, who was working on the investigation that this case
14 is about, went to her house, same house you went to, and
15 interviewed her; correct?                                                      14:24:05
16 A.  Correct.
17 Q.  And Agent Gutierrez -- in fact, she talked to her on
18 October 19th, 2012.
19 A.  Correct.
20 Q.  And that was seven days after -- nine days after the                       14:24:15
21 shooting; correct?
22 A.  Correct.
23 Q.  And during that interview with the FBI agent,
24 Miss Gutierrez, AO never mentioned that she saw Jose or two
25 Border Patrol agents with long guns the night of the shooting,                 14:24:30

-Sarah Arrasmith - Cross-Examination-

1  did she?
2  A.  It was not indicated in Gutierrez's report, no.
3  Q.  That was about nine days after the events had taken place;
4  correct?
5  A.  Correct.                                                           14:24:41
6  Q.  Now you know from your work on the case that the shooting
7  was well publicized, both -- on both sides of the border,
8  Nogales, Sonora and Nogales, Arizona; correct?
9  A.  Correct.
10 Q.  And there was continuous news coverage that went on for a          14:24:54
11 long, long time; correct?
12 A.  Correct.
13 Q.  But in any event, she didn't mention to Miss Gutierrez that
14 she had seen Jose or the two agents with long guns; correct?
15 A.  Correct.                                                           14:25:10
16 Q.  And you went and talked to her more than four years later
17 and that's what she told you; correct?
18 A.  Yes, it is.
19 Q.  Now you sat through the trial in this case; correct?
20 A.  Yes.                                                               14:25:18
21 Q.  Have you -- you heard all the agents who were out there
22 that night working this operation?
23 A.  Yes, I have.
24 Q.  And did you hear any of the agents -- Devowe, Plooy,
25 Porter, Wynecoop, Zuniga, Brown -- any of the ones that we've          14:25:33

**Sarah Arrasmith – Cross-Examination**

1  heard from testify that they had long guns that night?
2  A.  No, no one testified they had a long gun.
3  Q.  And what's a long gun, just so the jury will know?
4  A.  In law enforcement it's usually a shotgun or a rifle.
5  Q.  None of them testified that they had a long gun that night?    14:25:52
6  A.  Not on them.
7  Q.  Not on them.
8  A.  On the scene, no.
9  Q.  And according to what Mr. Chapman brought out from you, is
10 that Miss AO said that she saw them running up her driveway up    14:26:05
11 to West International; correct?
12 A.  Correct.
13 Q.  You heard the testimony of Agent Porter and Officer
14 Quinardo Garcia talk about going down the driveway; right?
15 A.  Correct.    14:26:19
16 Q.  Did they talk about running down the driveway to her house
17 or away from her house up to the street?
18 A.  On arrival at the scene they initially ran down her
19 driveway, which would be northbound.
20 Q.  Northbound.  Not southbound?    14:26:31
21 A.  No.
22          MR. KLEINDIENST:  That's all I have.
23          THE WITNESS:  Thank you.
24          MR. CHAPMAN:  May I approach the bench briefly?
25     (At sidebar on the record.)    14:26:50

| | | |
|---|---|---|
| 1 | MR. CHAPMAN: Judge, I just want to make a further | |
| 2 | record on this. | |
| 3 | Mr. Kleindienst brought out the fact that their family | |
| 4 | dissociated from the victim's family. | |
| 5 | When our investigator interviewed her in -- on | 14:27:06 |
| 6 | February of this year, she told them she was afraid to testify | |
| 7 | and worried for her safety. | |
| 8 | She also at various points in time told our | |
| 9 | investigator that narco traffickers are constantly going down | |
| 10 | her driveway. And at one point when the investigator showed up | 14:27:27 |
| 11 | her son angrily told the investigator, we're being watched | |
| 12 | right now. You're putting her in danger right now. | |
| 13 | And what the Government has skillfully done is | |
| 14 | they've -- they've made her look like a liar that just got some | |
| 15 | information off the news and made it up. And that's not why | 14:27:47 |
| 16 | she's lying. And I just think the jury's entitled to hear | |
| 17 | about this. | |
| 18 | THE COURT: You made your record. | |
| 19 | Who's your next witness? | |
| 20 | MR. CHAPMAN: I think we -- have we verified I have | 14:28:00 |
| 21 | the right transcript? | |
| 22 | MS. FELDMEIER: We do. | |
| 23 | MR. CHAPMAN: We can finish reading that transcript | |
| 24 | and then I'll call -- | |
| 25 | THE COURT: That may take us to almost the break | 14:28:13 |

Sarah Arrasmith - Juror Questions

1  anyway.
2       (Discussion held off the record.)
3       (End of discussion at sidebar.)
4           THE COURT:  I forgot, any questions for Agent
5  Arrasmith?                                                              14:29:05
6           You may step down.
7           Do you have one?
8       (At sidebar on the record.)
9           THE COURT:  She said, have you interviewed her husband
10 too, and the child that lived with them?                                14:29:43
11          Do you have an interpreter when you interviewed her?
12          MS. FELDMEIER:  Good question.
13          THE COURT:  I'll ask those two.  And then we'll take
14 our break.
15      (End of discussion at sidebar.)                                    14:29:54
16          THE COURT:  A couple of questions from the jury.
17          Have you interviewed her husband also?
18          THE WITNESS:  No, I have not.
19          THE COURT:  And the child that lives with them, did
20 you interview him or her?                                               14:30:12
21          THE WITNESS:  There was another grandson present at
22 the interview I did -- I conducted on December 7th, he was with
23 her.
24          THE COURT:  Did you have an interpreter with you when
25 you interviewed her?                                                    14:30:25

Sarah Arrasmith - Juror Questions

1  THE WITNESS:  I had a Spanish speaker -- another
2  Senior Special Agent from my field office with me for
3  translation.
4  THE COURT:  All right.  Thank you.
5  Mr. Chapman, anything further?
6  MR. CHAPMAN:  No questions.
7  THE COURT:  Thank you.  You may step down.
8  (Further proceedings held on the record not included in
9  this transcript.)

11  -oOo-

14:30:37

```
                        C E R T I F I C A T E


        I, CANDY L. POTTER, do hereby certify that I am duly
appointed and qualified to act as Official Court Reporter for
the United States District Court for the District of Arizona.
        I FURTHER CERTIFY that the foregoing pages constitute
a full, true, and accurate transcript of all of that portion of
the proceedings contained herein, had in the above-entitled
cause on the date specified therein, and that said transcript
was prepared under my direction and control.
        DATED at Phoenix, Arizona, this 4th day of June,
2018.



                                    s/Candy L. Potter_____
                                    Candy L. Potter, RMR, CRR
```