**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| **United States of America,** | ) | |
| | ) | No.  **CR-15-1723-TUC-RCC-DTF** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Tucson, Arizona |
| | ) | April 12, 2018 |
| **Lonnie Ray Swartz,** | ) | 11:44 a.m. |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE RANER C. COLLINS, JUDGE**

**REPORTER'S EXCERPTED TRANSCRIPT OF PROCEEDINGS**

**JURY TRIAL**
**DAY 15**

**(TESTIMONY OF PETER HERMANSEN)**

Official Court Reporter:
Candy L. Potter, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 36
Phoenix, Arizona 85003-2151
(602) 322-7246

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

CR-15-1723-TUC-RCC – April 12, 2018

1

2                    **A P P E A R A N C E S**

3

    For the Government:
4        U.S. Attorney's Office Tucson
         By:  **Wallace Heath Kleindienst**, Esq.
5            **Mary Sue Feldmeier,** Esq.
         405 West Congress Street, Suite 4800
6        Tucson, Arizona 85701

7   For the Defendant:
         Law Offices of Sean C. Chapman
8        By:  **Sean Christopher Chapman**, Esq.
         100 North Stone Avenue, Suite 701
9        Tucson, Arizona 85701

10       Law Office of Jim E. Calle
         By:  **Jamie Ernest Calle, III,** Esq.
11       2315 East Hawthorne Street
         Tucson, Arizona 85719

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CR-15-1723-TUC-RCC – April 12, 2018

1

2                                **I N D E X**

3    **DEFENSE WITNESS:**          **DIRECT**    **CROSS**    **REDIRECT**    **RECROSS**

4    PETER HERMANSEN
     By Mr. Chapman               4
5    By Mr. Kleindienst                        20
     By Mr. Chapman                                         46
6    By the jury                               55
     By Mr. Chapman                                         56
7    By Mr. Kleindienst                                                    57

8

9

10   Discussion Held at Sidebar            33, 53

11

12

13                         **INDEX OF EXHIBITS**

14   **EXHIBIT**                                    **IDENT**    **RECEIVED**

15   280      USCBP Use of Force Policy
              Handbook 2010 excerpts               20
16
     288      Border Patrol Agent
17            Position Description                  32         34

18   386      Memo from Chief Fisher
              dated 3-7-14                         43         46
19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

─────────── Peter Hermansen – Direct Examination ───────────

```
 1        (The following excerpt is the testimony of Peter

 2    Hermansen.)

 3              THE COURT:  You may call your next witness.

 4              We're going to go into the lunch hour a little bit.

 5              MR. CALLE:  Your Honor, the screens?                    11:44:12

 6              THE COURT:  Can you push them down?  Or are you not

 7    tall enough?

 8        (Discussion held off the record.)

 9              THE CLERK:  Raise your right hand, please.

10        (PETER HERMANSEN, DEFENSE WITNESS, SWORN.)                    11:45:59

11              THE CLERK:  Thank you.  Please be seated.

12              Please speak directly into the microphone.

13              State your full name for the record and spell your

14    last name.

15              THE WITNESS:  Peter Allen Hermansen, Jr.              11:46:10

16    H-E-R-M-A-N-S-E-N.

17              THE COURT:  You may proceed.

18                        DIRECT EXAMINATION

19    BY MR. CHAPMAN:

20    Q.  Why don't you pull the mic up a little closer.             11:46:20

21              Good afternoon, sir.

22              Can you tell us what your occupation is?

23    A.  Yes, sir.  I am currently a CETA contractor under the

24    Department of Defense for the Assistant Secretary of Defense

25    for Special Operations Low Intensity Conflict with the         11:46:35
```

Peter Hermansen – Direct Examination

1    Combatting Terrorism Technical Support Office.  I serve as a

2    principal law enforcement advisor to that organization, and I

3    also support our military troops, primarily the SOF community,

4    with new equipment and kit.  And I serve as a border -- subject

5    matter expert for border security events --                          11:46:53

6    Q.  Slow down a little bit.

7    A.  Yes, sir.

8    Q.  Our court reporter has been --

9          THE COURT:  She's been tested.

10         MR. CHAPMAN:  She's been tested.                               11:47:05

11         THE WITNESS:  Understood.

12   BY MR. CHAPMAN:

13   Q.  How long have you been in that position?

14   A.  Coming up on a year, about 11 months.

15   Q.  And before that were you -- what occupation were you?           11:47:13

16   A.  I served as a United States Border Patrol Agent for a

17   little over 21 years.

18   Q.  All right.  You've been retained as an expert by the

19   defense in this case; is that right?

20   A.  That's correct, sir.                                            11:47:26

21   Q.  And how much are you charging the defense for your

22   services?

23   A.  $250 an hour.

24   Q.  Okay.  Roughly how much time do you have in on the case at

25   this point?                                                         11:47:36

Peter Hermansen – Direct Examination

1  A.  I probably will at the end have about 24 hours into the

2  case, sir.

3  Q.  Okay.  I want to walk through your career with the Border

4  Patrol.  Tell the jury when you started.

5  A.  I started in 1996 in Douglas, Arizona as a Border Patrol    11:47:47

6  Agent.  I joined their special response team down there and

7  started working across the sector.  Most of the stations across

8  the sector, it was a very busy time during that era.

9  Q.  Can I ask you a question?

10  A.  Yes, sir.

11  Q.  What is a special response team?

12  A.  A special response team is a tactical unit that you train

13  for and become a part of once you gain some seniority in the

14  organization.  And we would support our anti-smuggling unit,

15  and we would support other investigative entities by doing    11:48:16

16  high-risk operations on the border, or by serving search

17  warrants or things of that nature in relation to primarily drug

18  smuggling and alien and narcotics investigations.

19  Q.  All right.  What did you do after that?

20  A.  In 2002 I moved over to the United States Border Patrol    11:48:33

21  Tactical Unit, which I joined in 1999.  And became a team

22  leader over there for BORTAC.  BORTAC stands for the Border

23  Patrol Tactical Unit.  And we do operations throughout the

24  United States, supporting all sectors.  We serve as tactical

25  advisors and tactical support to the chiefs in the field, and    11:48:53

Peter Hermansen – Direct Examination

1  to the chief patrol agent of the U.S. Border Patrol.  And we

2  would also go oversees into Central and South America

3  primarily, and train host force nation forces in border

4  security related matters.  I primarily worked in Honduras,

5  Columbia and Guatemala.                                    11:49:13

6  Q.  After that what did you do?

7  A.  After that in approximately 2004 I went to Washington, D.C.

8  where I served as both a deputy director and the director of

9  use of force for the entire organization, Customs & Border

10  Protection, which the three primary operational components    11:49:26

11  are the Office of Field Operations, Air and Marine, and the

12  United States Border Patrol.

13  Q.  Okay.  So in that position, that was in Washington, D.C.?

14  A.  That's correct, sir.

15  Q.  What was your job title at that time?            11:49:48

16  A.  Job title was both deputy director and director.

17  Q.  Okay.  Were you involved in the development of use of force

18  policies for the Border Patrol at that time?

19  A.  Yes, sir.  I served as the principal individual

20  helped -- helping craft the policy and shepherd the policy    11:50:03

21  through the process within CBP under the assistant commissioner

22  in the Office of Training and Development.

23  Q.  The Government has presented testimony regarding the 2010

24  Use of Force Policy Manual for the Border Patrol.  Are you

25  familiar with that?                                    11:50:21

1    A.  Yes, sir, I am.

2    Q.  Did your policy involvement earlier mean that some of the

3    policies that are reflected in the manual were actually

4    reflected as a result of input by you?

5    A.  Yes, sir, that's correct.                                    11:50:37

6         My -- there was an individual that preceded me that

7    began the effort when we merged into Homeland Security.  I

8    shepherded it from '04 to '07, working with the operational

9    components and CBP legal and some of the other entities within

10   CBP.  And then my deputy who took over for me in 2007, John    11:50:54

11   Steblein, shepherded it the rest of the way through the process

12   until it was signed in 2010.

13   Q.  We've heard a lot about the use of force continuum, and I

14   don't want to spend a lot of time on it right now, other than

15   to have you briefly explain to the jury how agents were trained  11:51:13

16   on the use of deadly force back in 2012.

17   A.  Specific to deadly force, the best information that I can

18   give you in a quick synopsis is, means, opportunity and intent.

19        If the individual that's presenting the threat has the

20   means -- which could be anything, could be a weapon, could be   11:51:33

21   their hands, could be a vehicle -- if they have the

22   opportunity -- they're in close proximity to you or they're in

23   proximity with the device that they have -- and they have the

24   intent -- they're displaying to you that they're

25   confrontational with you, they're making contact with you,      11:51:50

1    they're saying things to you, their intent is to do harm to

2    you, grievous bodily injury or harm, or grievous bodily injury

3    or harm to any other innocent third party.

4    Q.  All right.  After you completed your work in D.C., what did

5    you do?                                                                    11:52:11

6    A.  I served there until 2007, and I came back out and I was

7    the patrol agent in charge for the Casa Grande Border Patrol

8    Station from '07 to 2010.

9              In 2010 I became the director of all special

10   operations for the U.S. Border Patrol in El Paso, Texas.  And I            11:52:26

11   served there from 2010 to 2012.

12             And then in 2012 I came back to Tucson in order to be

13   with my family, and finished my career in Tucson in several

14   patrol agent in charge positions with special operations and

15   intelligence.                                                              11:52:44

16   Q.  And when did you formally retire?

17   A.  I retired in May of 2017.

18   Q.  All right.  You're familiar with the duties and obligations

19   of agents in the Nogales Station?

20   A.  I am familiar with the duties and obligations of agents,              11:52:56

21   yes, sir.

22   Q.  Have you worked down there?

23   A.  I've worked in the Nogales Station during my career in the

24   U.S. Border Patrol, yes.

25   Q.  What are -- what is the primary responsibilities of a field           11:53:06

1   agent in Nogales?

2   A.  It's to enforce the laws that we are statutorily authorized

3   to do, which is Title 8, Title 18, Title 19 and Title 21, to

4   effect arrests and to defend the homeland.

5   Q.  What are the typical types of dangers that field agents                11:53:22

6   face down there?

7   A.  We face –– different from police work we face aliens,

8   undocumented subjects, or we face narcotics.  Those are usually

9   the two biggest threats that we face.

10          And in conjunction with those, you can face weapons or            11:53:42

11  you can face assaults or things of that nature, which are

12  pretty much a recurring theme on the border in some of those

13  urban areas.  I served primarily in Douglas, but have

14  experience across the stations within the Tucson Sector.  And

15  rockings are a significant event that occur down in those                  11:53:57

16  areas, especially in the urban areas in Douglas and Nogales.

17  Q.  Do you have any idea roughly how many rocking assaults on

18  agents occurred let's say between the year 2010 and 2014?

19  A.  Between 2010 and 2014, I couldn't venture to estimate a

20  guess.  I can tell you from Chief Fisher's memo, he                        11:54:20

21  references –– in the 2014 memo he references just under a

22  couple thousand events.

23          But I can tell you from my experience in seeing it,

24  being in Washington, D.C., being a part of the reporting

25  process and seeing the reports that come in, rockings are a                11:54:35

1  daily occurrence in the Border Patrol.

2  Q.  Is the Border Patrol a different -- different from typical

3  law enforcement agencies?  And if so, how?

4  A.  So if you compare it to a police organization or a police

5  department, the Border Patrol is different in that we do a lot    11:54:55

6  of things in a very solo environment.  We go out into the

7  field, we make large arrests, we apprehend subjects that are

8  transporting narcotics, often times in very remote locations,

9  with little or no backup a long way away.

10       So it's different also in that when we make traffic    11:55:14

11  stops, most law enforcement officers approach vehicles very

12  slowly with their safety in mind and the safety of the subjects

13  in mind.  We generally run to the vehicles in order to try and

14  contain what's in the vehicle, because many times you'll see

15  subjects attempting to abscond from the vehicle and run away,    11:55:32

16  and that's our job is to arrest subjects that are in those

17  vehicles.

18  Q.  How many -- is it uncommon for one agent to arrest several

19  subjects at the same time without -- at one time without any

20  backup?    11:55:49

21  A.  No, it's not uncommon at all.  I personally have arrested

22  groups between 50 and 200 on the east side of Douglas, Arizona

23  back in the late '90s when we were seeing a huge influx.  And

24  that was not an uncommon theme.  We go out as 15 to 20 agents

25  on a shift and arrest a couple thousand people.    11:56:05

1  Q.  All right.  I want to move forward and ask you some general

2  questions about use of force.

3      Do agents have an obligation under the use of force

4  policy to retreat when they're being rocked?

5  A.  There's nothing to my knowledge in the policy that is          11:56:30

6  written that forces agents to retreat.  Agents have a

7  multiplicity of things that they can do, or things that they

8  can contemplate, or things that they can react to and use their

9  skill sets and use the tools that they have and use their

10  training to help them respond to events.                          11:56:48

11      So when you look at a use of force continuum, the

12  FLETC model is a staggered model, you really think of the

13  individual or the person as a person right in the middle, and

14  you have that ability to move into those different areas.

15  Whether it be your officer presence, how you present yourself    11:57:04

16  in your uniform, you polish your boots, how do you look, to

17  uncooperative subjects, to actively resistant subjects, to

18  assaultive subjects, and then to obviously the greatest threat

19  that we face, which is deadly force, when means, opportunity

20  and intent are present.                                           11:57:23

21  Q.  So there's no policy that you're aware of that mandates

22  that if an agent is getting rocks thrown at him he has to take

23  cover?

24  A.  No, sir.

25  Q.  And to your knowledge was that ever a policy at the Nogales   11:57:37

1    Station?

2    A.  The 2014 memo that Chief Fisher put out, the use of safe

3    tactics, talks about rocking incidents, and agents know rocking

4    incidents.  But I've spoken with many people down at the

5    Nogales Station over my career, and I am not aware of anyone          11:57:57

6    ever having been trained or told that your first response

7    should be to seek cover when being rocked.

8              You have to assess the situation quickly, and you have

9    to understand what's going on.  You have to understand your

10   position, where you're at.  You have to understand if any other     11:58:13

11   people are around and what's occurring at that time.

12             So we ask officers to make split-second decisions that

13   are reasonable in nature in very unreasonable circumstances.

14   Q.  So -- and again, we've heard a lot about the use of force

15   policy.  But in any potential dangerous situation, the officer      11:58:31

16   is supposed to assess the situation with the means, opportunity

17   and intent.  Meaning that if the potential assailant possesses

18   all three of those things, and the agent is at risk of deadly

19   force, the agent may respond with deadly force.  Essentially

20   that's the policy; right?                                           11:58:55

21   A.  That's correct, sir, when it comes to deadly force.

22   Q.  And that policy is applied to the defense of third persons

23   as well?

24   A.  Yes, sir.  Any other people that are in the vicinity,

25   whether they be other agents, general public, any person that's    11:59:08

1   in that area.

2   Q.  How does the equation get changed, if it does, when an

3   agent makes the decision not just to defend himself but a

4   fellow agent?

5   A.  I can speak from personal experience, my personal          11:59:24

6   experience, and my personal experience is that there are times

7   that I'm willing to assume more risk on myself as an

8   individual.  You'll hear comments such as sheep dogs and

9   wolves, and law enforcement officers refer to themselves as

10  sheep dogs.  I'm willing to accept more risk against myself.    11:59:42

11  I'm not willing to assume as much risk for someone else, a

12  fellow sheep dog that's out there.  I don't know what's going

13  on with them, where they're at, where they are in the location

14  at the time when I'm dealing with a deadly threat situation,

15  because I am focused on that deadly threat situation.           12:00:05

16          So while I may be willing to assume more risk against

17  myself, I'm not willing to assume that risk for a fellow agent.

18  So it's a difficult situation to be put in as an officer when

19  you're worried about an innocent third party that's out there

20  or worried about a fellow agent and you don't know exactly      12:00:27

21  what's occurring potentially behind you, at the side, or

22  somewhere that you can't see.

23  Q.  Sounds like what you're saying is that in a situation where

24  you're concerned about the safety of a fellow agent, that

25  raises the stakes and elevates the situation in your mind,      12:00:48

Peter Hermansen – Direct Examination

1    because although you're willing to possibly get hit with a rock

2    yourself, when it comes to another agent getting hurt, that

3    makes things much more serious for you; is that true?

4    A.  Yes, sir, I would say that's a true statement.

5    Q.  All right.  Now, Border Patrol, we've heard over and over          12:01:06

6    again, trains that rocks are potentially deadly weapons that

7    can cause serious bodily injury or death; is that right?

8    A.  Yes, sir.

9    Q.  And in those situations where an agent may have to use

10   deadly force in response, and we're asked to assess his or her       12:01:33

11   behavior later on, how do we -- what lens do we do that from?

12   How do we look at that?

13   A.  So the lens you want to look at it from is putting yourself

14   into the shoes of the officer at the time who is on the scene

15   and who is dealing with what's occurring at the scene and is         12:01:55

16   responding to what he or she is seeing at the scene, and basing

17   their actions off of what's occurring to them at the scene.

18   Q.  So what you're saying is that an agent may make a

19   split-second decision to use deadly force, and we should look

20   at it from the -- that perspective, how much time he had to          12:02:21

21   make the decision, not with the benefit of 20/20 hindsight?

22   A.  Yes, sir.

23          MR. KLEINDIENST:  I object, lack of foundation for

24   this, Your Honor.  And it goes beyond the scope of what was

25   disclosed as to his opinions.                                        12:02:35

1          THE COURT:  Objection is overruled.

2    BY MR. CHAPMAN:

3    Q.  Well, is that Border Patrol -- is that what you

4    train -- used to train agents in terms of how to assess another

5    agent's use of deadly force?                                    12:02:48

6    A.  So *Graham versus Connor* is a case that we use significantly

7    to look at totality of the circumstances.  And you have to take

8    the totality of the circumstances in consideration when you're

9    looking at a specific scenario.

10          So if you don't put yourself in the position of that     12:03:01

11   officer and look at everything that occurred at that time, and

12   things like experience and things like being tired, and

13   different tools available to you, all those things are taken

14   into consideration at the time when you're assessing that

15   situation.  So you have to put yourself into that lens when      12:03:17

16   you're assessing it from that perspective.

17   Q.  The idea, just by way of example, as we're standing here in

18   this nice courtroom, you're sitting down, and we're not in

19   danger.  And we're not being asked to make a decision on

20   whether deadly force is appropriate in a second or half a        12:03:37

21   second; right?

22   A.  Correct.

23   Q.  We have time to think about it, contemplate it; correct?

24   A.  Yes, sir, that's correct.

25   Q.  But an agent in a deadly force event, he may have less than  12:03:50

Peter Hermansen – Direct Examination

1    a half second; true?

2    A.  Yes, sir, that is absolutely correct.  Which is why we

3    teach the use of force policy, that you can move from where

4    you're at as an officer or agent, to any parts of that use of

5    force policy at any time.                              12:04:08

6         And the whole purpose of training is to get you

7    thinking.  Training is not designed to teach you specifically

8    how to respond to a certain scenario, it's designed to help you

9    think, if it's done right.

10   Q.  If a supervisor or someone at Nogales told an agent, you   12:04:20

11   should always take cover if rocks are coming in your direction,

12   and that agent is presented with a situation that may be

13   inconsistent with that training, but consistent with the use of

14   force policy, what is he supposed to do?

15   A.  Use of force policy always supersedes.               12:04:48

16   Q.  Okay.  And that, again, gets back to means, opportunity and

17   intent.  If there's a rock thrower, he's within a distance

18   where he could throw a rock and hurt you, and he's demonstrated

19   the intent to do that by cocking back with his arms -- I mean,

20   I'm not going to get too detailed, but the point is, maybe some   12:05:09

21   guy at the station told him you have to take cover, but if

22   that's not consistent with what the agent feels that he has to

23   do at that point, then the agent has to rely on his use of

24   force policy training, not what somebody told him at the

25   station.                                               12:05:28

Peter Hermansen – Direct Examination

A.  If means, opportunity and intent are present, then the
agent is authorized to use deadly force.

Q.  Does the use of force policy mandate that deadly force only
be used as a, quote, last resort?

A.  All of the officers or agents that I've talked to feel that          12:05:47
deadly force should be a last resort.  The use of deadly force
does not require that you go through a use of force continuum.
You may have to move directly into it and draw your weapon and
fire because of the events at the time.

        But I can't speak for all law enforcement officers,             12:06:07
but the ones that I have personally spoke to, and my feelings
are, I would prefer to do anything else that I could as opposed
to that.

Q.  In your experience as an agent, how quickly can someone
throw a rock at you?                                                      12:06:38

A.  Within seconds.  They can retrieve a rock, they're in the
immediate area, they're on the ground, and they can be thrown
very rapidly and in succession.  And I've seen some significant
injuries from rocks, sir.

Q.  Have you yourself been hit by a rock in the past?                     12:06:52

A.  I was struck by a rock in the leg, and it was a deflection
off of the ground as other individuals were being rocked in
downtown Douglas, Arizona early in my career, and I caught it
in the lower left leg.

Q.  If an assailant with a rock throws a rock and then begins            12:07:08

Peter Hermansen – Direct Examination

1  to move to a different position, does that mean that person's

2  no longer a threat?

3  A.  It would be based on the actions of the subject as they're

4  continuing.  Are they moving to more rocks?  Are they moving to

5  a better vantage point?  Or are they stopping to throw rocks?            12:07:25

6        So again, means, opportunity and intent would tell us

7  whether or not we could continue.

8  Q.  Can you tell us what your understanding is of the cartel

9  operations that occur down west of the DeConcini Port of Entry

10  and the Blind Center area, 410 area?                                     12:07:58

11  A.  So based on my intelligence experience I can tell you that

12  there are organizations that operate in that area that are

13  minimally structured, fly-by-night, quick opportunists, all the

14  way up to highly structured, highly organized elements that

15  have scouts, response elements, scaling fence elements, they            12:08:21

16  have lookouts, they have communication elements.

17        So there's a myriad of capabilities in that area

18  depending on the organization you're dealing with.  But there

19  are some that are very structured and very capable at what they

20  do.                                                                      12:08:39

21      (Discussion off the record between defense counsel.)

22  BY MR. CHAPMAN:

23  Q.  I guess my last question -- I think you may have answered

24  it.  But the idea that agents are trained to use a gun

25  potentially in response to a rocking event; is that true?               12:09:22

—— Peter Hermansen – Cross-Examination ——

1   A.  Yes, it can be one of the responses that you use.

2          MR. CHAPMAN:  All right.  I don't have any further

3   questions.  Thank you.

4                      CROSS-EXAMINATION

5   BY MR. KLEINDIENST:                                        12:10:19

6   Q.  Nice to see you again, Mr. Hermansen.

7   A.  Yes, sir, good to see you too, sir.

8   Q.  How is Washington, D.C.?

9   A.  Very good, very good.

10  Q.  You testified that you worked -- you were the head of the    12:10:30

11  Department of the Use of Force Policy back in Washington, D.C.?

12  A.  Yes, sir, that's correct.

13  Q.  And you would agree with me that the handbook that came out

14  in 2010 which set forth the use of force policy, you left about

15  three years before that handbook came out; correct?            12:10:54

16  A.  Yes, sir, that's correct.

17  Q.  And the operative words in the Use of Force Policy

18  Handbook --

19          May I approach the witness, Your Honor?

20          THE COURT:  You may.                                   12:11:06

21  BY MR. KLEINDIENST:

22  Q.  Let me show you Exhibit 280.

23          Would you recognize that as at least an excerpt of the

24  2010 Handbook?

25  A.  Yes, sir.                                                  12:11:17

Peter Hermansen – Cross-Examination

1    Q.  And that's a handbook that you were working on, although

2    you left before it was finished.

3    A.  That's correct, sir.

4    Q.  What exactly did you do with respect to the use of force

5    policy while you were there?                                    12:11:25

6    A.  So with the use of force policy, I would meet with the

7    operational components, we would discuss portions of the policy

8    and areas of the policy.  We would then staff those documents,

9    route them back through the command structures of the

10   operational components, get feedback, and then we would move    12:11:38

11   into the attorney's office or general counsel's office and

12   discuss those, and continue to refine and craft the policy for

13   movement forward.

14   Q.  You had a number of different people working for you;

15   correct?                                                        12:11:52

16   A.  Correct, yes, sir.

17   Q.  And you were trying to coordinate -- because the Department

18   of Homeland Security was created in 2004, I believe?

19   A.  Yes, sir.

20   Q.  You were trying to come up with one consistent policy that  12:12:00

21   covered the different components in CBP.  Is that a fair

22   statement?

23   A.  That is absolutely correct.

24   Q.  And the Use of Force Policy Handbook is quite extensive;

25   correct?                                                        12:12:15

1    A.  That's correct, sir.

2    Q.  And it contains a lot of different topics in addition to

3    when you can use lethal force; correct?

4    A.  Yes, sir, that's correct.

5    Q.  Can I get that exhibit back?                          12:12:22

6    A.  Yes, sir, absolutely.

7    Q.  Are you familiar enough with it so I can ask you some

8    questions?

9    A.  I have a copy here in front of me, sir.

10   Q.  You have a copy?                                      12:12:28

11   A.  I do have a copy.

12   Q.  Okay.  Great.

13          Now, you talk about means, opportunity and intent;

14   correct?

15   A.  That's correct, sir.                                 12:12:37

16   Q.  That's what's called the jeopardy triangle; correct?

17   A.  Yes, sir.

18   Q.  And you have to have all three before you can use lethal

19   force; correct?

20   A.  That's correct.                                      12:12:45

21   Q.  But there's also a legal standard that we need to address

22   that is in the Handbook, and which is instructed to the agents

23   who go through the Academy; correct?

24   A.  Yes, sir.

25   Q.  It's just not the jeopardy triangle; right?          12:13:01

1   A.   That's correct.

2   Q.   There's more to it than that.

3   A.   Yes, sir.

4   Q.   Right.

5   A.   There's the whole policy.                                    12:13:08

6   Q.   There's the whole policy.

7           Well, actually the policy is -- let me see.  If you

8   can turn to page -- if you have it in front of you, do you want

9   to turn to page 214 -- I mean to page 14.

10  A.   Yes, sir, Chapter 4, Use of Force.                          12:13:29

11  Q.   Yeah.

12  A.   Yes, sir.

13  Q.   And that's -- in the Handbook itself, there's just one

14  chapter on the use of force; correct?

15  A.   Correct.  And then there's an appendix, Appendix 5.        12:13:39

16  Q.   Exactly.

17          MR. KLEINDIENST:  Can I somehow get rid of this thing?

18  I don't mean to call it a thing, but I'm not --

19          MR. CALLE:  It's a monitor.

20          MR. KLEINDIENST:  A monitor.                            12:13:59

21          I call it a thing, but anyways.

22  BY MR. KLEINDIENST:

23  Q.   I believe this was -- this is -- I'm looking at Exhibit

24  280.  And this was shown to the jury during Mr. Foraker's

25  testimony.                                                      12:14:17

1          Before we even get to the jeopardy triangle, which is

2   means, opportunity and intent, there is a starting point;

3   correct?

4          And I've highlighted in paragraph 1 the starting

5   point.  Would you agree with me, Mr. Hermansen?          12:14:41

6   A.  Yes, sir.

7   Q.  And the starting point is that only force which is both

8   reasonable and necessary may be used in any given situation.

9          Right?

10  A.  Correct.                                             12:14:55

11  Q.  So when you're talking about the jeopardy triangle, you

12  still have to evaluate the use of force with respect to two

13  concepts; was it reasonable, and was it necessary.

14  A.  Yes, sir.

15  Q.  You wouldn't disagree with that at all?             12:15:07

16  A.  I wouldn't disagree with that at all.

17  Q.  Okay.  And reasonableness means that there are objective

18  reasons that justify the degree of force to be used in a given

19  situation, up to and including deadly force.

20         Correct?                                          12:15:21

21  A.  Correct.

22  Q.  There has to be objective reasons for the agent to use

23  deadly force.  It can't just be subjective on his part;

24  correct?

25  A.  Correct.                                             12:15:31

Peter Hermansen – Cross-Examination

1  Q.  That's part of the policy that you helped write; right?

2  A.  Yes, sir.

3  Q.  And the reasonableness of a particular use of force is

4  judged with respect to not of the agent himself, but of what a

5  reasonable officer or agent on the scene would do; right?    12:15:44

6  A.  Correct.

7  Q.  So we're not looking at whether or not a particular agent,

8  based on what his conception of use of force is, or the

9  triangle or whatever, it has to be based on what a reasonable

10  officer or agent who was dutifully trained would do in that    12:16:00

11  situation.

12  A.  Objective reasonableness, yes, sir.

13  Q.  Exactly.

14       And then it goes on to say that -- it does say that:

15  Law enforcement officers and agents are often forced to make    12:16:16

16  split-second decisions about the amount of force required --

17  necessary in a particular situation.

18       Correct?

19  A.  Correct.

20  Q.  But not all -- not all shootings take place in split-second    12:16:25

21  decisions.

22  A.  No, that's correct.

23  Q.  Right.

24       And you're not telling the jury that every time an

25  officer decides to draw his gun and shoot it's always a    12:16:35

UNITED STATES DISTRICT COURT

1    split-second decision, it varies from case to case.

2    A.  Absolutely.

3    Q.  Okay.  Okay.

4        And then it says:  "Necessary" means that some force

5    is required to carry out one's duties as a law enforcement          12:16:47

6    officer/agent.

7        Correct?

8    A.  Correct.

9    Q.  What does that mean, Pete?

10   A.  That means that the force that's necessary is required to       12:16:55

11   effect an arrest, make a seizure, you're working with your

12   fellow agents, protecting your fellow agents.  That's what it

13   means.

14   Q.  Okay.  If there's not an enforcement objective that needs

15   to be carried out, then the use of deadly force isn't              12:17:13

16   necessary.  Do you agree with me?

17   A.  Not just an enforcement.  I mean, if you're protecting or

18   defending -- like, if we're not making a seizure or we're not

19   seizing aliens --

20   Q.  Right.

21   A.  -- and an individual attacks, yes, deadly force is

22   authorized.

23   Q.  Right.  Let's assume that you're making a seizure on a

24   street and there's agents out there who are apprehending some

25   drug dealers and they've got backpacks, and all of a sudden        12:17:35

Peter Hermansen – Cross-Examination

1  there's some type of deadly threat, that's an enforcement

2  operation that you can defend; correct?

3  A.  Yes, sir.

4  Q.  But if the street is vacant and there is no operation going

5  on because all of the agents are behind the street, there's                12:17:52

6  nothing to really enforce, no law enforcement objective going

7  on at that point in time.  Would you agree with me?

8  A.  There's no enforcement going on, yes, sir.

9  Q.  Exactly.  Exactly.  That was my question.

10         But the law is -- and let's just go to page 15.  And        12:18:07

11  is this on the same chapter, and this is paragraph C2.  This is

12  really the nuts and bolts of when an officer can use deadly

13  force; correct?

14  A.  It's part of it, yes, sir.

15  Q.  Well, it is the definition of when an officer can use          12:18:30

16  deadly force in the policy handbook.

17  A.  It's part of the definition, yes, sir, that's correct.

18  Q.  And they can only use deadly force when necessary.

19         Again, we had this concept of necessary; right?

20  A.  Yes, sir.                                                              12:18:49

21  Q.  And in your testimony you say yourself that you will only

22  use deadly force as a last resort; correct?

23  A.  I don't use it only as a last resort, but in my mind, I

24  would like it to be my only resort.  Because my job is to

25  defend and protect life, that's my overall --                              12:19:05

Peter Hermansen - Cross-Examination

```
 1    Q.   Exactly.

 2    A.   That's my mission.

 3    Q.   You're not going to kill somebody when it's not necessary.

 4    A.   That's correct.

 5    Q.   Because human life, even though you might not like the        12:19:14

 6    person --

 7    A.   Has value.

 8    Q.   -- is still a human being.

 9    A.   Has value, yes, sir.

10    Q.   Has value.                                                    12:19:18

11         And did you know that at the Academy where Mr. Swartz

12    was training -- and they were trained on these elements of the

13    law, "necessary" meant that it was the last resort.  It was

14    your only final option available to you.  And that's how

15    Mr. Swartz was trained.                                           12:19:39

16         Would you disagree with that?

17    A.   I don't know how Mr. Swartz was trained at the Academy.

18         What I do know is that if -- as I spoke earlier, you

19    can be in the middle of that use of force continuum, and you

20    can move to cooperative controls, you can move into an active     12:19:51

21    resistant subject, or you can move into an assaultive subject,

22    or you could potentially move directly into a deadly force

23    situation from just showing up on scene and getting out of your

24    vehicle.

25    Q.   Right.  But again, when you actually use deadly force to     12:20:06
```

29

1    kill another human being, it should be the last option

2    available, if you have other options to avoid using that force.

3    Would you agree with that?

4    A.  If means, opportunity and intent are present, deadly force

5    is authorized.                              12:20:23

6    Q.  My question was, is -- as to whether or not necessary

7    means, it's your last option available, there are no other

8    options available, and you have to use deadly force.

9    A.  If you in your mind as an officer or agent have gone

10   through that process and have determined that deadly force is   12:20:41

11   warranted, and means, opportunity and intent are present, and

12   it's objective reasonable as we discussed --

13   Q.  Right.

14   A.  -- then deadly force is authorized, yes, sir.

15   Q.  So getting back to the law because, you know, policy is one  12:20:54

16   thing, but the law is something else; right?  You would agree

17   with me?

18   A.  I would agree that they should merge, they should be

19   together, and they should be communicated.

20   Q.  Right.

21   A.  That's what we did in CBP with our legal department.

22   Q.  But the use of force policy manual is based on Supreme

23   Court law; right?

24   A.  Correct.

25   Q.  Not on some policy at some station along the southwest   12:21:13

Peter Hermansen – Cross-Examination

1    border.  We look to what the Supreme Court says you can do, not

2    to what other agents think you can do.

3    A.  Which is why I referenced *Graham versus Connor* and things

4    of that nature, yes.

5    Q.  Exactly.  *Garner versus Tennessee.*                    12:21:27

6    A.  *Garner versus Tennessee.*

7    Q.  And Graham versus O'Connor (sic) are the Supreme Court

8    cases that are -- guide you, because they're the law from the

9    Supreme Court.

10   A.  Yes, sir.                                              12:21:38

11   Q.  And the law from the Supreme Court would supersede what

12   agents in the particular station might think when necessary

13   force can be used; correct?

14   A.  Correct.

15   Q.  You would agree.  Okay.                                12:21:47

16          So not only does -- they may use deadly force only

17   when necessary, it's when the officer or agent has a reasonable

18   belief that the subject of such force poses an imminent danger

19   of death or serious physical injury to the officer/agent or to

20   another person.                                           12:22:06

21          You agree with that?

22   A.  Yourself and other parties, yes, sir.

23   Q.  That's the law?

24   A.  Yes, sir.

25   Q.  Okay.  And the jeopardy triangle is a way to articulate how 12:22:12

Peter Hermansen – Cross-Examination

1  to determine it; correct?

2  A.  It's a way to articulate how to do it, and it's a way to

3  help agents remember it in their head when they're looking at a

4  significant threat like that.

5  Q.  Now necessary -- if I were to tell you that when Agent                12:22:27

6  Swartz went through the Academy --

7          Have you ever taught at the Academy?

8  A.  I've taught as a physical training instructor, which has

9  use of force to it.  But not at the Academy, at the stations

10  and at BORTAC.                                                            12:22:40

11  Q.  It's a pretty top notch academy, isn't it?

12  A.  I think so.

13  Q.  There are people there who devote their careers in teaching

14  new agents how to be an effective and safe agent on the scene;

15  correct?                                                                  12:22:52

16  A.  Yes, sir.

17  Q.  Okay.  If I were to tell you that in this case the

18  instructor instructed Officer Swartz -- he was told, Agent

19  Swartz, that when necessary means last resort.

20          You wouldn't disagree with that as being incorrect?              12:23:08

21  A.  If that was printed and that was what was taught to him,

22  then that's what was taught to him, sir.

23  Q.  And that impending -- imminent danger means impending,

24  threatening, looming, or about to happen.

25          Does that sound reasonable?                                      12:23:21

1   A.  Yes, it sounds reasonable.

2   Q.  And grievous bodily harm which must exist was critical,

3   grave, serious, painful or agonizing.

4       Pretty frickin bad; right?

5   A.  Yes, sir.                                                    12:23:34

6       THE COURT:  What was that word?

7       MR. KLEINDIENST:  Pretty bad.

8       I didn't mean to say it like that, Judge, and I

9   apologize.

10  BY MR. KLEINDIENST:                                             12:23:52

11  Q.  You're familiar with -- let me show you Exhibit 288.

12      May I approach the witness, Your Honor?

13      THE COURT:  You may.

14  BY MR. KLEINDIENST:

15  Q.  You want to take a look at that?                            12:24:11

16  A.  Position description for an entry level Border Patrol

17  Agent.

18  Q.  You're familiar with this?

19  A.  Yes, sir.

20  Q.  And, in fact, when an individual is offered a job as a      12:24:35

21  Border Patrol Agent, as Agent Swartz was in this case, they

22  will send this position description along with the acceptance

23  letter; right?

24  A.  I'm not familiar that they send it along.  I didn't get

25  one.                                                            12:24:56

──────────── **Peter Hermansen – Cross-Examination** ────────────

1   Q.  You didn't get one?

2   A.  I had five days to report to Douglas, Arizona when I got

3   hired, never got a PD.

4   Q.  Of course, that was back in the early '90s, and we're

5   talking about the 2000s; right?                              12:25:04

6   A.  Correct, absolutely, sir.

7   Q.  So would you recognize the position description as a

8   description of the duties of a Border Patrol Agent?

9   A.  Yes, sir, crafted by our HRM department.

10          MR. CHAPMAN:  What's the number?                     12:25:15

11          MR. KLEINDIENST:  It's 288.

12          I would move 288 into evidence, Your Honor.

13          MR. CHAPMAN:  I object, it's hearsay, Your Honor.

14          THE COURT:  Can I see it?

15      (At sidebar on the record.)                              12:25:38

16          THE COURT:  This is a job description?

17          MR. KLEINDIENST:  Yes, a position description given to

18  all Border Patrol agents.

19          THE COURT:  How much more you got?

20          MR. KLEINDIENST:  Twenty minutes, Your Honor.         12:25:52

21          THE COURT:  How much you think you got on redirect?

22          MR. CHAPMAN:  Not much.

23          THE COURT:  My experience tells me if I break now

24  you'll use less time when we come back.

25          MR. CHAPMAN:  I don't think so.                       12:26:34

1          MR. KLEINDIENST:  Why would you say that?

2          THE COURT:  It's just been my experience throughout

3    the case.

4          MS. FELDMEIER:  But you're never giving him breaks.

5          THE COURT:  Yes, I have.                              12:26:42

6          I think we'll break until 1:30.  Is that sufficient?

7    Let the jurors get a chance to get lunch.

8          MR. KLEINDIENST:  Do you want to rule on that, Judge?

9          THE COURT:  Yeah, I'm going to rule on it, but I have

10   to look at it.                                              12:26:56

11         MR. CHAPMAN:  He said he'd never seen the document.

12         MR. KLEINDIENST:  He said he's familiar with it.

13         THE COURT:  He did say he's familiar with it.  He said

14   he didn't get one when he came in.

15         It is hearsay, but I think it's a Border Patrol        12:27:19

16   policy -- it's a Border Patrol application, it belongs to Agent

17   Swartz, I see his --

18         MS. FELDMEIER:  Signature.

19         THE COURT:  -- signature on it.

20         So I'm going to overrule the objection.                12:27:37

21         When you finish with this we'll take our break.

22      (End of discussion at sidebar.)

23         THE COURT:  Objection is overruled.  It may be

24   admitted, 288.

25      (Exhibit No. 288 admitted into evidence.)                12:27:54

———— Peter Hermansen – Cross-Examination ————

1    BY MR. KLEINDIENST:

2    Q.  288 is –– it's called a Position Description, and it

3    basically sets out in quite detail the duties of a Border

4    Patrol Agent; right?

5    A.  Yes, sir.                                              12:28:07

6    Q.  The different factor levels, things that they're supposed

7    to be aware of; correct?

8    A.  Yes, sir.

9    Q.  In fact, there's about eight or nine different factors that

10   they set forth.                                            12:28:19

11          This is basically telling the Border Patrol Agent, or

12   the Border Patrol Agent to be, these are the things that you

13   have to take into account when you become an agent.  Is that a

14   fair statement?

15   A.  Yes, sir, that's a fair statement, giving them an initial  12:28:31

16   assessment of what it's going to be.

17   Q.  Right.

18          And looking at –– if you could look at the last page.

19   Do you see Factor 8?

20   A.  Yes, sir.                                              12:28:50

21   Q.  Factor 8 deals with physical demands; correct?

22   A.  That's correct.

23   Q.  And as you've testified, being a Border Patrol Agent can be

24   a very strenuous job.

25   A.  It can.                                                12:29:12

UNITED STATES DISTRICT COURT

Peter Hermansen – Cross-Examination

1    Q.  You can be out in canyons, you can be in rough terrain, and

2    it requires a lot of physical exertion, things of that sort;

3    correct?

4    A.  Correct.

5    Q.  And also it talks about how an agent must be prepared to          12:29:22

6    defend not only himself, but other individuals against physical

7    attack; right?

8    A.  Correct.

9    Q.  But it goes on to say that when you are -- you must be

10   prepared to defend yourself and others against physical attack,     12:29:42

11   resorting to the use of firearms only as a last resort.

12          Do you see that?

13   A.  Yes, sir.

14   Q.  You wouldn't disagree with this policy statement, would

15   you?                                                                 12:29:52

16   A.  It's not policy statement.

17          MR. CHAPMAN:  It's not a policy statement, Your Honor.

18          MR. KLEINDIENST:  This program description.

19          THE COURT:  Whoa, whoa, whoa.

20          It's a description of the position --                         12:29:59

21          THE WITNESS:  Yes.

22          THE COURT:  Not necessarily a policy statement.

23          MR. KLEINDIENST:  And I don't want to use the word

24   "policy statement."

25          THE COURT:  You did.                                          12:30:06

UNITED STATES DISTRICT COURT

1          MR. KLEINDIENST:  I'll correct myself.

2    BY MR. KLEINDIENST:

3    Q.  It's a description of the position of a Border Patrol

4    Agent; correct?

5    A.  Correct.                                              12:30:12

6    Q.  And the agent is advised that resorting to the use of

7    firearms should only be as a last resort; correct?

8    A.  Yes, it does.

9    Q.  You don't disagree with that, do you?

10   A.  I don't disagree with the fact that you should, yes,  12:30:22

11   correct.

12          MR. KLEINDIENST:  Okay.  You want to break now, Judge?

13          THE COURT:  Yes.  We'll take our lunch recess.  We'll

14   be back at 1:30.  1:30.

15          Remember the admonitions.                          12:30:32

16          And I'm aware that one of you has to be somewhere by

17   5:30, so we won't go past 5:00 o'clock.

18      (Recess at 12:30 p.m., until 1:30 p.m.)

19          THE COURT:  Let the record show the jury's returned

20   back to the courtroom, the presence of all counsel and the  13:30:55

21   defendant.

22          Mr. Kleindienst, you may continue.

23   BY MR. KLEINDIENST:

24   Q.  Good afternoon again, Mr. Hermansen.

25   A.  Good afternoon, sir.                                  13:31:12

Peter Hermansen – Cross-Examination

1   Q.  Just a couple questions.

2         The agents are trained at the Academy intensively on

3   always assessing the situation around them; correct?

4   A.  Correct.

5   Q.  Why is it important for an agent to continue to assess the          13:31:26

6   situation around him when he is out in the field?

7   A.  You want to teach your agents to use as much thought as

8   they possibly can in a situation, use all their skills, use

9   everything that they've learned, their experience and their

10  cognition, in order to absorb everything that they have.          13:31:42

11  Because specifically *Graham versus Connor* talks to us about the

12  totality of the circumstances.

13  Q.  Right.

14  A.  And you want those agents to have that ability, to have as

15  much information as possible.  So in training we focus on          13:31:53

16  thinking.  We don't necessarily focus on the scenario itself.

17  We do a lot more scenario-based training, but we have the

18  agents focus on thinking and then articulating at the end of

19  the training scenario, telling us why they took the actions

20  that they took.  Because it's important for them to understand          13:32:11

21  that process.

22  Q.  Exactly.  Because when we're talking about the use of

23  lethal force, as we just heard before lunch, you look whether

24  or not the agent's conduct was reasonable under all the

25  circumstances; right?          13:32:26

UNITED STATES DISTRICT COURT

1   A.  Correct.

2   Q.  So do you train the agents that before you use deadly force

3   you should acquire as much information as you can before you

4   make that decision?

5   A.  You want that to be the norm, yes.  You want that to be the    13:32:38

6   norm.  It's not always the case, but you want that to be the

7   norm.

8   Q.  And that's how they're trained?

9   A.  Correct.

10  Q.  Now sometimes you have to make a split-second decision and    13:32:48

11  maybe you don't have a chance to evaluate all the

12  circumstances; right?

13  A.  You may not have all the information at the time because

14  you have to make that split-second decision.

15  Q.  But when you don't have to make a split-second decision,    13:32:57

16  you should -- the agent is trained to at least assess the

17  situation around him to make the best decision possible.

18  A.  Yes.

19  Q.  Okay.  And just a couple of concepts.

20          Isn't the ultimate goal of the agent -- I think you    13:33:10

21  touched on it by his attire, demeanor in the field on direct.

22  That the ultimate goal for an agent by his attire and demeanor

23  is to control the situation that confronts him; correct?

24  A.  Correct.

25  Q.  And that also means that he should utilize the least amount    13:33:26

Peter Hermansen – Cross-Examination

```
1   of force necessary in controlling that situation.  You would

2   agree with me?

3   A.  We teach that -- we teach that in use of force training,

4   yes.

5   Q.  Right.  That you should only use that amount of force          13:33:38

6   that's necessary to control the situation.

7   A.  To control the situation.

8   Q.  And you also expect them, based on their training, that

9   when they're out in the field you expect agents to exercise two

10  things:  One, good judgment; right?                                13:33:51

11  A.  Yes.

12  Q.  And act reasonably?

13  A.  Yes.

14  Q.  Okay.  Now, with respect to cover, is cover considered a

15  safe tactic and technique?                                         13:34:06

16  A.  It can be, yes.  And it should be in your repertoire, and

17  you should think about it if you have time.

18  Q.  Can you explain that to the jury, please, why that should

19  be in your repertoire and why you should utilize it when

20  necessary?                                                         13:34:17

21  A.  Yes.  You want to use cover so that you can help

22  potentially properly assess the situation more, depending on

23  how things are occurring, or depending on how rapid they occur

24  or when events are occurring.  If you have the opportunity to

25  seek cover, and you're presented with a significant scenario       13:34:31
```

UNITED STATES DISTRICT COURT

1    instantaneously, then if you seek cover it gives you a little

2    bit more time to assess the situation and get more information,

3    which is good.

4    Q.  And if one has the ability to seek cover, assuming that

5    nobody else is at risk for serious bodily injury or death, that    13:34:47

6    would be the appropriate thing to do?

7    A.  If means, opportunity and intent are not present and you

8    can seek cover, yes, it is a good course of action.

9    Q.  Is cover -- I know it's not a policy, but -- well, we know

10   from Allen Foraker, who instructed Mr. Swartz, that they spend    13:35:05

11   at least a day or two on cover and concealment.  You're aware

12   of that?

13   A.  I'm aware that they cover --

14   Q.  Right.

15   A.  -- cover and concealment, yes.  I'm not aware to the degree    13:35:17

16   that they do that, but I'm aware that they cover it.

17   Q.  Okay.  So it is something that's covered, it's something

18   that is stressed to the agents that that's something that they

19   should think about before they make decisions; correct?

20   A.  Yes.    13:35:29

21   Q.  And, in fact, the policy on the use of deadly force

22   includes the practice that agents should continue whenever

23   possible to avoid placing themselves in positions where they

24   have no alternative to using deadly force.  Isn't that true?

25   A.  Are we referring to the 2014 memo from Chief Fisher?    13:35:53

1    Q.  We are referring to the --

2    A.  Yes.  Yes, sir, he has that in the 2014 memo, when

3    possible.

4    Q.  Can you tell the jury what the 2014 memo was about?

5    A.  Yes.  The 2014 memo was a clarifying additional information    13:36:04

6    from Chief Fisher at the time, under a lot of pressure to

7    address a perception that law enforcement was utilizing use of

8    force --

9    Q.  Inappropriately or to excess.

10   A.  More often than necessary.    13:36:25

11        And Chief Fisher came out to clarify this with the

12   agents in the field, to remind them to think about their

13   training, to remind them to think about all the tools that they

14   have in their tool box.  Which is what our purpose was in the

15   use of force policy division, give them as many tools as    13:36:42

16   possible.  You may not always have those tools, but the tools

17   that you do have, and the time that you do have to think, you

18   want to use that to your best ability.

19        That's what the intent of the memo was.

20   Q.  Right.    13:36:55

21        You were still with the Border Patrol when that memo

22   came out?

23   A.  Yes, sir, I was.  And I speak frequently with Chief Fisher.

24        MR. KLEINDIENST:  May I approach the witness,

25   Your Honor?    13:37:03

1          THE COURT:  You may.

2     BY MR. KLEINDIENST:

3     Q.  Let me hand you what's been marked as 386.

4          This is the memo that we've been speaking about by

5     Chief Fisher that came out on March 7th, 2014?            13:37:28

6          THE COURT:  He wants you to agree or disagree.

7          THE WITNESS:  Yes, sir.

8          MR. KLEINDIENST:  Oh, I'm sorry.

9          THE WITNESS:  I'm sorry.

10    BY MR. KLEINDIENST:

11    Q.  Is that the memo that we've been talking about?

12    A.  Yes, sir.  Yes, sir.

13    Q.  It's dated March 7th, 2014?

14    A.  Yes, sir.

15    Q.  What role does the chief of the U.S. Border Patrol play,   13:37:49

16    what position is that in the hierarchy?

17    A.  That's the highest position that the United States Border

18    Patrol has.  The chiefs in the field report to him.

19    Q.  And as part of this memo -- and I take it this was

20    distributed across the country to all Border Patrol agents?   13:38:10

21    A.  That's correct.

22    Q.  Let me have you turn to page 2, if you could.

23          And, in fact, the title of Chief Fisher's memo is Use

24    of Safe Tactics and Techniques; right?

25    A.  Correct.                                             13:38:32

UNITED STATES DISTRICT COURT

**Peter Hermansen – Cross-Examination**

1    Q.  Which we touched on a little bit.

2    A.  Correct.

3    Q.  Right.

4         If you could go to the bottom of page 2, under the

5    directive.  Where I have it highlighted, could you read that                13:38:49

6    out loud?

7    A.  Agents should continue, whenever possible, to avoid placing

8    themselves in positions where they have no alternative to using

9    deadly force.  Agents shall not discharge firearms in response

10   to thrown or hurled projectiles unless the agent has a                      13:39:04

11   reasonable belief, that based on the totality of the

12   circumstances, to include size and nature of the projectiles,

13   that --

14              THE COURT:  The other way.

15              THE WITNESS:  I can't see it, sir.                               13:39:19

16              MR. KLEINDIENST:  I'm sorry.

17              THE WITNESS:  -- that the subject of such force poses

18   an imminent danger of death or serious injury.

19         Agents should obtain a tactical advantage in these

20   situations, such as seeking cover or distancing themselves from            13:39:30

21   the immediate area of danger.

22   BY MR. KLEINDIENST:

23   Q.  So when Chief Fisher used the words in the previous

24   sentence, "they should continue," that means that this is a

25   policy or practice that's in effect, and he's reminding them               13:39:44

1    that this is what you should be doing; correct?

2    A.  Reminding them to focus on their training.  He talks about

3    the totality of the circumstances with *Graham versus Connor*,

4    and he says whenever possible.

5           MR. KLEINDIENST:  I would move -- no, I won't move it    13:40:00

6    in, Your Honor.

7    BY MR. KLEINDIENST:

8    Q.  Finally, I guess it seems to me -- and here's my question,

9    that if you have the opportunity to play -- to take cover

10   safely, and nobody else is in danger under the jeopardy    13:40:10

11   triangle of serious or grievous bodily injury or death, the

12   best alternative would be to take cover; correct?

13   A.  The information you just presented me, yes, it would not

14   warrant deadly force, you would want to seek cover or other

15   alternatives.    13:40:34

16   Q.  And if an agent says, well, I can elect to do either one,

17   in a sense the agent is almost playing God, isn't he?

18   A.  If means, opportunity and intent are not present, you

19   cannot employ deadly force.

20   Q.  He'd be playing God because he'd make an election to use    13:40:46

21   force when it's not necessary when he could take cover;

22   correct?

23   A.  If means, opportunity and intent are not present.

24           MR. KLEINDIENST:  Thank you very much.

25           THE WITNESS:  Yes, sir.    13:40:59

─────── Peter Hermansen – Redirect Examination ───────

1          THE COURT:  Mr. Chapman, anything further?

2          MR. CHAPMAN:  Yes.  Thank you.

3          So actually I move to admit Government's 386, which is

4     the document Mr. Kleindienst just referred to.

5          MR. KLEINDIENST:  Why not?                        13:41:31

6          THE COURT:  It will be admitted.

7       (Exhibit No. 386 admitted into evidence.)

8                      REDIRECT EXAMINATION

9     BY MR. CHAPMAN:

10    Q.  Okay.  I'm going to ask you some questions about this.   13:41:36

11         You knew -- you know Chief Fisher; right?

12    A.  Correct.

13    Q.  You were interacting with him around the time that this

14    memo was generated.

15    A.  I was his principal tactical advisor from 2010 to 2012, and   13:41:55

16    have remained in constant communication with him throughout

17    that time fame, and from then until now as well.

18    Q.  All right.  So you know -- I assume that you agree with his

19    statement that I've highlighted here, where he says:  Since

20    2007 there have been over 6,000 assaults against Border Patrol   13:42:14

21    agents resulting in numerous injuries to our agents and the

22    tragic death of three agents.

23         You agree with that?

24    A.  Yes, I do.

25    Q.  You agree with this statement:  In the face of these   13:42:28

1    dangers, Border Patrol agents continue to show exemplary

2    restraint and professionalism.  Since 2010, agents have been

3    assaulted with rocks 1,713 times.  In these situations agents

4    responded and used deadly force 43 times, which regrettably

5    resulted in the death of ten individuals.                    13:42:51

6            Is that all correct?

7    A.  That is all correct, sir.

8    Q.  So I want to clear something up.  This is a clarifying

9    document --

10   A.  Correct.                                                 13:43:03

11   Q.  -- correct?

12   A.  Correct.

13   Q.  Which means that there was a belief among some at the

14   Border Patrol that the use of force policy that existed prior

15   to this document was not sufficiently clear?                 13:43:14

16   A.  Needed additional clarification.

17   Q.  So back in 2002 they didn't have -- people like Agent

18   Swartz didn't have the benefit of this clarification; true?

19           THE COURT:  2002 or 2012?

20           MR. CHAPMAN:  2012.  Sorry, Judge.                   13:43:34

21           THE WITNESS:  2012, this is not a document that they

22   would have seen or been able to absorb and think about in that

23   thinking process that I talked about that helps agents make

24   reasonable decisions.

25   BY MR. CHAPMAN:

Peter Hermansen – Redirect Examination

1    Q.  The idea is this -- this is an effort to amend use of force

2    policy, to give more guidance to agents.  And it was -- came

3    out in 2014 though; right?

4          MR. KLEINDIENST:  Objection.  I think that misstates

5    his testimony.  It wasn't to amend, it was to clarify a                13:43:59

6    practice that was already in place.

7          THE COURT:  Objection is overruled.

8    BY MR. CHAPMAN:

9    Q.  If I used the wrong term, that's fine, just tell me what

10   you think.                                                             13:44:08

11   A.  It's a clarifying document, yes, sir.

12   Q.  And specifically, it attempts to give more information and

13   guidance to agents on what to do in the face of projectiles

14   like rocks, doesn't it?

15   A.  It's helping them to continue that cognitive process, where        13:44:25

16   they're thinking when events are going on.  And it's reminding

17   them of those things, the totality of the circumstances,

18   reasonable belief, size and nature of the projectiles, and

19   things of that nature, yes.

20   Q.  I'm on page 2 now under the directive that he issues.  He          13:44:41

21   says:  In order to lessen the likelihood of deadly force

22   situations and reduce the risk of injury or death to agents and

23   others, I am implementing the following directive immediately,

24   which clarifies existing guidelines contained in CBP use of

25   force policy.                                                          13:45:03

Peter Hermansen – Redirect Examination

1    Do you see that?

2  A.  Yes, sir, I do.

3  Q.  Subparagraph 2, agents should continue whenever possible to

4  avoid placing themselves in positions where they have no

5  alternative to using deadly force.  Agents shall not discharge

6  firearms in response to thrown or hurled projectiles unless the

7  agent has a reasonable belief, based on the totality of the

8  circumstances, to include the size and nature of the

9  projectiles, that the subject of the force poses an imminent

10  danger of death or serious injury.

11    Now, somebody at the Border Patrol thought that this

12  directive would help agents assess how to respond in deadly

13  force situations, and particularly in rocking incidents; is

14  that true?

15  A.  To help them to continue to think.

16  Q.  Yeah.  But this document, this clarifying document did not

17  exist in 2012 when this shooting occurred.

18  A.  Correct.

19  Q.  So it's fair to say that the use of force policy from 2014

20  on was a lot clearer in this regard than it was in 2012.

21  A.  This document helped the agents in the thinking process,

22  gave them clear guidance from the chief on clarifying it, and

23  helped them think.

24  Q.  And it also recognized implicitly how dangerous rocking

25  events are when it stated that between 2010 and 2014 there were

13:45:14
13:45:42
13:46:00
13:46:15
13:46:40

Peter Hermansen – Redirect Examination

```
 1   over 1,700 rocking assaults on Border Patrol agents.
 2   A.  So the restraint that I see in the first part of this in
 3   where he talks about the restraint, is the moral dilemma that
 4   we've talked a little bit already, where an officer, like me,
 5   which I said previously, has that moral dilemma of, the last        13:47:02
 6   thing I want to do is have to shoot and kill someone, I have to
 7   weigh that moral dilemma against, am I willing to allow someone
 8   else to be injured.
 9          And as I said, a lot of times agents, us sheep dogs
10   out there, like to assume the risk on ourselves, but I'm not        13:47:17
11   willing to assume that risk for others.  And that's the
12   dilemma, that's the coin that that agent has to proverbially
13   flip in their head as to where they're at morally.  Is there a
14   threat to fellow agents, a threat to bystanders, and does that
15   outweigh the moral desire I have to not kill another human          13:47:35
16   being?
17   Q.  And that's why when -- that's what we're really talking
18   about when we use the term "last resort;" is that right?
19   A.  Correct.
20   Q.  It's a moral issue as much as it is a policy issue.  You        13:47:50
21   have to balance the abhorrent thought of using deadly force
22   against someone with the thought that maybe one of your fellow
23   agents might be seriously injured or hurt.
24   A.  Correct.
25   Q.  In a split second.                                              13:48:10
```

UNITED STATES DISTRICT COURT

Peter Hermansen – Redirect Examination

1  A.  At times in a split second, yes, sir.  Even less than a

2  second at times.

3  Q.  Once an agent elects to use deadly force, what does his

4  training dictate that he do at that point?

5  A.  Address the threat.  Once the threat has been eliminated,        13:48:27

6  cease the use of deadly force and assess the situation.

7  Q.  So if an agent elects to use -- he makes the election to

8  use deadly force, his focus is on the threat until the threat's

9  eliminated, not what may be going on behind him.

10 A.  Correct.                                                          13:48:47

11 Q.  Sometimes is deadly force the first resort?

12 A.  Sometimes, unfortunately, it has to be.

13 Q.  Because circumstances happen so quickly that --

14 A.  Circumstances dictate that you're in the middle of that use

15 of force continuum standing, and you have to move directly to       13:49:14

16 deadly force, which is a very unfortunate situation.

17 Q.  Is the position description that Mr. Kleindienst showed you

18 a reflection of Border Patrol policy?

19 A.  No, sir, it's a position description that's distributed to

20 new agents coming into the organization.                            13:49:31

21 Q.  Is the PowerPoint slide that Mr. Kleindienst showed you

22 Border Patrol policy?

23 A.  No, it's not policy.

24 Q.  It's a PowerPoint?

25 A.  It's a PowerPoint slide that's helping to try to pass           13:49:43

**Peter Hermansen – Redirect Examination**

1  experience from senior agents to younger agents coming into the

2  patrol.

3  Q.  Can agents that are in the same or similar event see and

4  perceive things or a threat differently?

5  A.  So when we look at *Graham versus Connor* and we look at the          13:50:00

6  totality of the circumstances, it takes many things into

7  consideration.  The quick analogy that I can give you is, let's

8  say you have a 200-pound male and a 110-pound female.  They may

9  see things completely differently in a situation and may

10  respond completely differently.          13:50:16

11        You also have to understand that you may have two

12  200-pound males that have perceived or seen or not seen things

13  that are occurring in the scenario.  And they are both going to

14  potentially respond different based on the information that

15  they have at the time.          13:50:30

16  Q.  So we heard testimony from an Agent Wehrli a day or two ago

17  who testified about an event with -- where he and Agent Swartz

18  were rocked.  But he said that Agent Swartz realized that they

19  were being rocked before Agent Wehrli did.  Is that an example

20  of how things can -- agents can perceive and respond          13:50:52

21  differently?

22        MR. KLEINDIENST:  I think this goes beyond the scope

23  of cross, Judge.

24        THE COURT:  Overruled.

25  BY MR. CHAPMAN:          13:51:01

—— Peter Hermansen – Redirect Examination ——

1  Q.  I guess the idea is that Agent Wehrli for a certain amount

2  of time didn't perceive a threat and Agent Swartz did.  And to

3  that extent they acted differently.

4  A.  You can have different information.  You cannot have some

5  of the same information, or you can be perceiving things                13:51:15

6  differently as well too.

7        MR. CHAPMAN:  Nothing further.

8        THE COURT:  Jurors have any questions, please place

9  them in writing.

10     (At sidebar on the record.)                                          13:51:48

11        THE COURT:  Just so the record is clear, when we broke

12 for lunch Mr. Kleindienst said he had about 15 or 20 minutes

13 left with the witness.  When we actually came back he only used

14 11.

15        MR. KLEINDIENST:  Do I have nine minutes in the bank,          13:52:06

16 Judge?

17        THE COURT:  No, you don't have anything in the bank.

18        Have you ever had to discharge your weapon and why?

19        If so, how did you react emotionally?

20        I'm a little concerned about that.  I'm not going to            13:52:18

21 ask about emotionally.

22        After reviewing this case, do you feel that all three

23 factors -- means, opportunity and intent -- were present?

24        I'm not going to ask that.

25        When the person is down, do you still consider it a            13:52:30

─────────── Peter Hermansen – Redirect Examination ───────────

1    threat?

2              MS. FELDMEIER:  I guess he could --

3              THE COURT:  Do you still fire your gun if that threat

4    is already down?

5              How many shots on fire -- how many shots --            13:52:44

6              MS. FELDMEIER:  On fire.

7              MR. CHAPMAN:  -- are an agent allowed?

8              How many shots are an agent allowed to fire.

9              THE COURT:  I think that's what that means.

10             Are you aware that the victim's entry wounds were all   13:53:05

11   in the back?  What can you say about this?

12             I can't ask him that.

13             MS. FELDMEIER:  Do you need a pen?

14             THE COURT:  No, I'll be okay.  I'll remember it.

15             But if you are not at the scene you can't know all the  13:53:18

16   circumstances that were going on.

17             That's correct.

18             If an agent chooses to seek cover or distance himself

19   from the immediate area of danger and leaves other agents at

20   risk, could they face disciplinary action?                       13:53:34

21             MR. CHAPMAN:  That's an interesting question.

22             THE COURT:  All right.  Who's next, Mr. Rini?

23             MR. CALLE:  Rini.

24             THE COURT:  How long are you going to take with him?

25             MR. CALLE:  A little bit longer than Wally took.        13:53:46

1            THE COURT:  Okay.  12 minutes?

2            MR. CALLE:  A little longer than that.  Maybe 30.

3        (End of discussion at sidebar.)

4            THE COURT:  Sir, I have several questions the jurors

5    have asked I'm going to ask on their behalf.                    13:54:01

6            Have you ever had to discharge your weapon and why?

7            THE WITNESS:  No, sir, I have not.

8            I assume we're talking about a shooting in the field

9    as opposed to qualifications or --

10           THE COURT:  Yes.                                        13:54:17

11           THE WITNESS:  Yes.

12           THE COURT:  Shooting in the field.

13           When the person is down, do you still consider it a

14   threat?

15           THE WITNESS:  If the person is no longer               13:54:25

16   presenting -- no longer has the means or the opportunity, if

17   they're laying on the ground or not available to throw a rock

18   or not presenting that -- that threat then, no, they're no

19   longer a threat.

20           THE COURT:  How many shots is an agent allowed to       13:54:41

21   fire?

22           THE WITNESS:  There is no amount of shots, it is up to

23   the agent, and it is to eliminate the threat.

24           THE COURT:  If you were not at the scene, you can't

25   know all the circumstances that were going on.                 13:54:56

Peter Hermansen – Redirect Examination

1          THE WITNESS:  That's correct.

2          THE COURT:  If an agent chooses to seek cover or

3    distance themself from the immediate area of danger and leaves

4    other agents at risk, could they face disciplinary action?

5          THE WITNESS:  I've never dealt with that scenario.          13:55:19

6    I've never seen that scenario in our organization.  But we

7    don't train that.  We train our officers to defend and protect

8    each other, and stay with each other to control the situation,

9    sir.

10          THE COURT:  Mr. Chapman?                                    13:55:37

11                    REDIRECT EXAMINATION

12    BY MR. CHAPMAN:

13    Q.  Although you haven't discharged your weapon, have there

14    been events in your career you've drawn your weapon in response

15    to a rocking?                                                     13:55:50

16    A.  Yes, sir.  In Douglas, Arizona where my partner was being

17    rocked in the ditch, I had my weapon out, I was already

18    collapsing on the trigger, and the subject chose not to pick up

19    another rock and fled, fled back into Mexico.  And I holstered

20    my weapon.                                                        13:56:07

21          MR. CHAPMAN:  Thank you.

22          THE COURT:  Mr. Kleindienst.

23                    RECROSS-EXAMINATION

24    BY MR. KLEINDIENST:

25    Q.  When you say that they're trained to eliminate the threat,   13:56:14

Peter Hermansen – Recross–Examination

1    that doesn't always mean to eliminate the person as a human

2    being, does it?

3    A.  No, sir.  They're trained to eliminate the threat, stop

4    means, opportunity and intent.

5    Q.  Okay.  So if somebody was a threat and had a rock in his            13:56:25

6    hand that met the jeopardy triangle, if that's the case, and

7    dropped the rock after he was shot and wasn't killed, you

8    couldn't go on and kill the person just because he had had a

9    rock previously; correct?

10   A.  Correct.                                                            13:56:46

11   Q.  He no longer has the means, opportunity and intent.

12   A.  He no longer has the means.  He may have the opportunity

13   and the intent, but the means are not there if there's not a

14   rock --

15   Q.  So eliminating the threat is not synonymous with               13:56:55

16   eliminating the person as a human being.

17   A.  Correct.

18          THE COURT:  You may step down.  Thank you.

19          THE WITNESS:  Thank you, Your Honor.

20      (Further proceedings held on the record not included in

21   this transcript.)

22

23                          -oOo-

24

25

1

2

3

4                        C E R T I F I C A T E

5

6          I, CANDY L. POTTER, do hereby certify that I am duly

7    appointed and qualified to act as Official Court Reporter for

8    the United States District Court for the District of Arizona.

9          I FURTHER CERTIFY that the foregoing pages constitute

10   a full, true, and accurate transcript of all of that portion of

11   the proceedings contained herein, had in the above-entitled

12   cause on the date specified therein, and that said transcript

13   was prepared under my direction and control.

14          DATED at Phoenix, Arizona, this 4th day of June,

15   2018.

16

17

18

                              s/Candy L. Potter_____
19                            Candy L. Potter, RMR, CRR

20

21

22

23

24

25