# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| **United States of America,** | ) | |
| | ) | No. **CR-15-1723-TUC-RCC-DTF** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Tucson, Arizona |
| | ) | April 16, 2018 |
| **Lonnie Ray Swartz,** | ) | 11:21 a.m. |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

BEFORE:  THE HONORABLE RANER C. COLLINS, JUDGE

REPORTER'S EXCERPTED TRANSCRIPT OF PROCEEDINGS

JURY TRIAL
DAY 16

(CLOSING ARGUMENTS)

Official Court Reporter:
Candy L. Potter, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 36
Phoenix, Arizona 85003-2151
(602) 322-7246

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

CR-15-1723-TUC-RCC – April 16, 2018

1

2                              **A P P E A R A N C E S**

3

    For the Government:
4       U.S. Attorney's Office Tucson
        By:  **Wallace Heath Kleindienst**, Esq.
5            **Mary Sue Feldmeier,** Esq.
        405 West Congress Street, Suite 4800
6       Tucson, Arizona 85701

7   For the Defendant:
        Law Offices of Sean C. Chapman
8       By:  **Sean Christopher Chapman**, Esq.
        100 North Stone Avenue, Suite 701
9       Tucson, Arizona 85701

10      Law Office of Jim E. Calle
        By:  **Jamie Ernest Calle, III,** Esq.
11      2315 East Hawthorne Street
        Tucson, Arizona 85719

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CR-15-1723-TUC-RCC – April 16, 2018

1

2                               **I N D E X**

3

4    Government Closing Argument            4
     Defense Closing Argument               40
5    Government Rebuttal Closing Argument   83

6

7    Discussion Held at Sidebar            35

8

9

10                        **INDEX OF EXHIBITS**

11   **EXHIBIT**                          **IDENT**   **RECEIVED**

12   NO.      DESCRIPTION

13   74       Photograph of JAER back and
              waist on sidewalk              31
14
     78       Photograph of close-up of
15            JAER face and head             28

16   356      Photograph of MX scene
              (JAER on scene)                32
17

18

19

20

21

22

23

24

25

—Government Closing Argument—

1      (The following excerpt are counsel's closing arguments.)

2          THE COURT:  Both sides have now rested.  We're now

3    about to begin closing arguments in this case.

4          What the attorneys said in their opening statements,

5    what they say in their closing arguments, is not evidence.    11:21:05

6    It's offered to help you understand their view of the evidence.

7    If they say something that's not the way you recall it, your

8    memory controls, not theirs.  I'm sure that neither side will

9    intentionally misstate anything to you when they make their

10   closing arguments.                                            11:21:23

11         You'll find that the Government have two closing

12   arguments.  They have the opening closing argument, they have a

13   rebuttal closing argument.  The defense only gets to speak to

14   you once.  And that's because the Government has the burden of

15   proof of beyond a reasonable doubt, not to give them some sort  11:21:36

16   of advantage.

17         At this point in time, Mr. Kleindienst, on behalf of

18   the Government, you may begin with your opening closing

19   argument.

20         MR. KLEINDIENST:  Thank you, Your Honor.                11:21:49

21         May it please this Court.

22         Good morning, you all.

23         JUROR:  Good morning.

24         MR. KLEINDIENST:  Lonnie Swartz on October 10th, 2012,

25   intentionally, without legal justification, ended the life of  11:22:12

─────── **Government Closing Argument** ───────

1    Jose Antonio Elena.

2         It wasn't about eliminating a threat, because there

3    was no threat.  It was about eliminating a human being.  And

4    that's what he did that day, was he eliminated a human being.

5         Jose would have been 21 years old today.  But due to                11:22:35

6    the actions of that man over there, he never had the chance to

7    finish an education, raise a family, see his family grow old.

8    His family never had the chance to see him grow old and live a

9    long and productive life.  That life was extinguished on

10   October 10th, 2012.                                                       11:23:00

11        Now, we're not saying that law enforcement agents do

12   not have difficult jobs.  And we all owe a debt of gratitude to

13   any person who decides to become a law enforcement officer.

14   They are there to serve and protect us.  We owe them gratitude.

15   We look up to them.                                                       11:23:23

16        But they are still just like us, imperfect human

17   beings.  And they can't use their badge as to shield from -- or

18   as a license to commit murder.  They have a badge to protect

19   and to serve.

20        And in this case Lonnie Swartz used his badge because         11:23:45

21   of whatever reason he decided that Jose Antonio Elena was just

22   not going to live anymore, he was fed up with rockers.

23        Now, we all believe, all of us, that human life is

24   precious.  We all believe in the sanctity of the human life,

25   that no matter who you are, where you come from, what you do,          11:24:12

1  your socioeconomic background, every human life is precious.

2  And because of that, when we talk about law enforcement

3  officers, we ask them to uphold that sanctity of human life.

4  And we apply laws to their use of lethal force.  Laws in place

5  to regulate when they have an awesome power to use a gun to          11:24:40

6  kill somebody.  You just can't do it on a whim or a wish or

7  will or suspicion or out of anger.  There are laws in place,

8  and the Court will read those laws to you, about when you can

9  use lethal force to kill another human being.

10         Now we've heard in this case that Lonnie Swartz chose       11:25:03

11  to become a Border Patrol Agent.  It was a matter of choice.

12  And he went to the Academy and he was trained.

13         And you heard about the training from Allen Foraker a

14  couple weeks ago.  You heard about the training by Pete

15  Hermansen, the defense expert.  You heard that when he was at       11:25:20

16  the Academy he was told that the job that he was going to enter

17  into is a dangerous job at times.  All police officers face

18  dangerous jobs.

19         But before you are given the ability to use lethal

20  force, you're trained when to use it and when not to use it.        11:25:41

21  And we know from Allen Foraker that the guiding principle, all

22  the agents at the Academy, including Lonnie Swartz, were

23  taught, was this -- this comes from the officer Use of Force

24  Policy Handbook.  And it says that:  Authorized officer or

25  agents may use deadly force only when necessary.                    11:26:12

─────────── Government Closing Argument ───────────

1        As Allen Foraker told you, "necessary" means last

2   resort.  That before you do -- take somebody's life, you have

3   to explore other alternatives and other options before you

4   finally fire that gun to try to kill somebody.

5        Only when necessary.  That's when the officer or agent     11:26:31

6   has a reasonable belief that the subject of such force poses an

7   imminent danger of death or serious physical injury to the

8   officer or agent or to another person.

9        That's a high standard.  You have to believe, one,

10  that it's necessary, that there are no other options available.   11:26:54

11  You have to believe based on a reasonable belief, on all the

12  circumstances that you're confronted with when you're an

13  officer, that somebody is in danger of either death or serious

14  bodily injury.

15       Those are the cardinal rules of law enforcement.  And     11:27:14

16  that's what you have to judge Lonnie Swartz's conduct by.  Was

17  the killing of Jose Elena necessary?  Did it have to happen?

18  Did he have a reasonable belief, based on his training, of all

19  the circumstances that justified him leaving Officer Zuniga's

20  vehicle, walking across the street, and shooting Jose Elena ten   11:27:40

21  times?

22       That's the roadmap.  That's what you have to guide

23  your decision by, necessary and reasonableness.

24       You're also taught -- or he was also taught about the

25  jeopardy triangle.  That when you decide to use lethal force,    11:28:01

UNITED STATES DISTRICT COURT

─── **Government Closing Argument** ───

1    you can only use it when three conditions are met.  And as

2    Allen Foraker told you in the judgment pistol shooting class,

3    you can only use deadly force when you have jeopardy, and

4    jeopardy exists.

5         And jeopardy is defined as intent.  The person you are    11:28:30

6    about to use deadly force on must have displayed the manifested

7    intent to cause you or somebody else grievous bodily injury.

8         Number one, they have to have the intent to cause

9    death or grievous bodily injury.

10        Secondly in the jeopardy triangle, the person you are    11:28:58

11   about to use deadly force on must have the opportunity to cause

12   you grievous bodily harm or death, involving proximity and/or

13   control of their chosen weapon.  That's the second prong of the

14   triangle.

15        And finally they're taught that the person you are    11:29:32

16   about to use deadly force must have the means to cause you or

17   someone else grievous bodily harm or death.  Access to

18   something; club, bottle, knife, gun, or physical capabilities.

19        Only when you have all three, means and ability,

20   opportunity and intent, does the jeopardy triangle come into    11:29:58

21   place.

22        They're taught this.  They're spent many hours in the

23   classroom schooled on the rules of engagement, schooled on when

24   they can use lethal force.  This is something that the Academy

25   took seriously.  And I'm sure Agent Swartz paid attention and    11:30:20

UNITED STATES DISTRICT COURT

1    he passed the class.

2          Because the fact of the matter is, is we only use

3    lethal force as a law enforcement agent when it's absolutely

4    necessary.

5          Now when you look at the facts in this case,                    11:30:37

6    remember -- you all had a chance to go out to the scene.  You

7    have to think back, the people that were throwing rocks that

8    night, did they have the opportunity?  Did they have proximity

9    to cause somebody grievous bodily injury and death?

10          This was not a situation where you had a rocker            11:30:59

11    advancing on an officer four or five feet away and has a rock

12    cocked in his hand.  The officer may very well then have the

13    right to fire.  But these are rocks that are coming from 90

14    feet away, having to scale a fence that's 25 feet high, and

15    finally landing on the sidewalk.                                     11:31:18

16          Was there opportunity?  Was there proximity in this

17    case?

18          Ability and means.  What kind of -- what kind of

19    weapon was involved in this based on the jeopardy triangle?

20          You have small rocks.  Now I'm not saying that rocks        11:31:37

21    don't hurt.  But when they're thrown from 90 feet away, and

22    they're this size, yeah, it might hurt you.  But that's not the

23    rule.  That's not the standard.  Are these rocks capable of

24    causing death or grievous bodily injury?

25          And I submit to you that although the rocks made it          11:31:59

Government Closing Argument

over the fence and they were losing velocity as gravity brought
them down, that although they may have hurt you, it was not
going to cause somebody death or grievous bodily injury.  Means
and ability.

   And the other part about means and ability that
Agent Wehrli told us last week is that if you can take cover
when rocks are coming, there is no means and ability.  That
part of the triangle doesn't exist, it's broken.

   The other thing that they're taught at the Academy is
that you don't shoot somebody in the back when they're running
away unless they pose an imminent danger of grievous bodily
injury or death.

   And when you go back in the jury room in this case,
you find one bullet wound that entered the front of Jose
Elena's body.  You find one.  They're not there.  Every bullet
that hit his body was from the back.  He was no longer a
threat.  He was running away.  He had no longer manifested the
intent to throw any rocks.  The jeopardy triangle was broken
irrevocably at that point in time.

   That's how Officer Swartz was trained.  That's how all
Border Patrol agents are trained.  Because when you have that
awesome power to use lethal force, there is laws that tell you
when you can and cannot kill another human being.

   Officer Swartz joined the Border Patrol, he went
through the Academy.  We all know that rockings along the

11:32:16

11:32:51

11:33:09

11:33:35

11:33:56

─────── Government Closing Argument ───────

1   southwest border is a problem.  We all know that it happens

2   quite frequently.  But you only heard in this case -- actually,

3   no agent, in all the agents that took the stand, ever told you

4   about an agent being killed by a rock.  The only examples they

5   could come up with, the agents in Nogales, were two; an                11:34:21

6   Officer Donnelly and an Officer Simoti.

7           Officer Simoti had a concrete brick dropped on his

8   head.  That's a far cry from a rock being thrown 90 feet away

9   at a lower elevation landing on the sidewalk on the American

10  side.                                                                   11:34:40

11          Yes, they are dangerous.  But just because they're

12  dangerous -- and not every rocking is the same, and not every

13  rock is the same -- doesn't mean just because you're getting

14  rocked you can shoot to kill.  You have to evaluate the

15  situation.  You have to assess the situation.  And that's how          11:34:57

16  Lonnie Swartz was trained, to assess the situation, to take

17  into account all the facts and circumstances before he pulled

18  the trigger.

19          They have a hard job, no doubt about it.  And we tip

20  our hat to Border Patrol agents.  But that just comes with the         11:35:19

21  territory.  And as we know, that rockings can be rockings and

22  rockings can be other kinds of rockings.  And in the case that

23  happened this night, it was not intentional rocks thrown to

24  hurt somebody at close contact.  These were rocks that were

25  thrown from 90 feet away at a lower elevation that made it over        11:35:39

──────── Government Closing Argument ────────

1    the fence and hit the sidewalk.

2          And I submit to you the reason why those rocks were

3    thrown was not to hurt the agents, because the people down

4    below couldn't see them from their vantage point.  I submit to

5    you the reason why there was rockings was that they were trying          11:36:00

6    to cause a distraction so that their compadres on top of the

7    fence could finally get down.

8          There was not the intent to kill in this case by those

9    people throwing those rocks.  And we don't condone what they

10   did.  What they did was wrong.  But it was not a capital          11:36:18

11   offense.  No matter what they did, and no matter how many rocks

12   came over, it was not a capital offense.  Jose Antonio did not

13   deserve to be executed.

14         And if we had caught them, they'd be prosecuted and

15   sent to jail.  And that's just punishment.          11:36:42

16         There are lot of agents who testified in this case

17   about being rocked.  Some had never been rocked.  Agent

18   Wynecoop, if you remember, testified that he'd been on the

19   force for about two years and the only time that he was ever

20   rocked was the night on October 10th, 2012.          11:37:09

21         You never heard one agent take the stand and say he'd

22   been injured by a rock.  And most of them talked about taking

23   cover.

24         Now, John Chapman, the defense counsel in this case, I

25   suspect will talk about, well, we can't expect our Border          11:37:26

1   Patrol agents to retreat, because we would secede the border to

2   the cartel, that they can't run away, that that would be a

3   cowardly thing to do.

4        But taking cover is not retreating.  Taking cover is

5   safe tactics.  Taking cover is the reasonable thing to do.          11:37:42

6        And Allen Foraker told you that during the Academy

7   they spend at least a day on the concept of taking cover.  That

8   it is an option that you can take before you get to the very

9   last option.  And if you can take cover and avoid shooting

10  somebody, then it's not the last resort.                            11:38:05

11       And even Pete Hermansen, their expert, said that if

12  you can take cover and avoid taking a human life, that's the

13  moral thing to do.  It's also the lawful thing to do.

14       So Lonnie Swartz knew about cover, agents who

15  testified in this case talked about cover.  It's not being a       11:38:25

16  coward, it's being smart, and it's being safe, and it's being

17  responsible.

18       Now Lonnie Swartz was an agent for less than two years

19  prior to the death of Jose Antonio Elena.  And in those months

20  preceding his death, what do we know about Agent Swartz?            11:38:47

21       We know that, as he testified on the stand, he had

22  probably been rocked six or seven times in his career.  He was

23  rocked on -- and I'll just go through the dates -- September

24  2nd, 2011, April 25th, 2012, April 29th, 2012, July 4th, 2012,

25  July 9th, 2012, November 15th, 2011, and finally on December       11:39:18

─ **Government Closing Argument** ─

1    30th, 2011.

2         Every time that he was rocked in this case, what did

3    he do?  He did not take cover, he used force.  That was his

4    modus operandi.  That was his belief, that every time I'm

5    rocked I'm going to use force.  And the force he had was                11:39:44

6    nonlethal force, but that's how he approached the rockings.

7         And I submit to you by the time that October 10th,

8    2012, came around, he was fed up with being rocked.  He was

9    angry that these people were throwing rocks at the fence, at

10   the American fence that separated the border of Mexico.  He was      11:40:10

11   fed up.  And he was going to use force no matter what force he

12   had that night, if it happened.

13        That's how we know Lonnie Swartz's state of mind, that

14   he's going to stop the threat no matter what.

15        This night was another -- another night on West               11:40:33

16   International.  You all had a chance to go out there.  You all

17   had a chance to assess the terrain, the elevation difference,

18   whether or not it really was a scary place or not.

19        Most of the agents who took the stand in this case

20   testified that when they were rocked they were rocked on the        11:40:59

21   east side on Hamburger Hill.  Most of the times that Lonnie

22   Swartz was rocked was on the east side on Hamburger Hill.

23        And this night, as you all know, there was an

24   operation to smuggle a couple backpacks of marijuana into the

25   country.  That was wrong.  That was illegal.  And that had to       11:41:17

15

1    be stopped.

2            And you heard the testimony that night that Officer

3    Garcia, after he heard from the dispatch that there were people

4    climbing the fence, he and Officer Zuniga were talking at the

5    Wells Fargo Bank, he heard the broadcast of the people coming    11:41:35

6    over the fence, and he responded right away to West

7    International, three or four minutes away.

8            And you saw on the video and you heard his testimony

9    that as he pulled up on West International, the two people who

10   had climbed the fence with bundles on their back ran in front    11:41:53

11   of him.  Typical drug smuggling operation.  He didn't see any

12   guns, he didn't see any weapons, just backpacks on their back.

13           And he chased after them down the driveway of Miss AO.

14   He stopped because it was so dark he didn't want to go in there

15   and confront them by himself.  But we know that other agents    11:42:15

16   showed up on the scene to help out when the dispatcher, Cassie

17   Clarke, called out about people with bundles climbing the fence

18   and going across the street.

19           And as we all know, the objective is to get to I-19

20   and get the bundles in a car and they go north.  And we're    11:42:36

21   talking about marijuana in this case, not heroin, not cocaine,

22   marijuana that's legal in how many states in this country?  But

23   it was a violation of federal law.

24           Officer Garcia testified that Agent Porter from the

25   Port of Entry came up to him and they both went searching for    11:42:59

─────── **Government Closing Argument** ───────

1    the bundles.  And I submit to you that what happened was, is

2    that they got there so quick, that the two suspects dropped the

3    bundles, didn't have a chance to accomplish their objective,

4    and ran back across the street and got onto the fence.

5            Officer Garcia did his job, stopped the smuggling in          11:43:20

6    process.

7            But what do we know about earlier that night?  We know

8    that Agent Swartz and Agent Wynecoop and Agent Porter were

9    working the southbound Port of Entry at the DeConcini Port of

10   Entry.  He did not have less lethal force available to him just     11:43:41

11   because they don't want to give people the idea that they're

12   armed people at the Port of Entry going southbound.  All he had

13   was his pistol.

14           And he told you about being -- hearing on the radio

15   from Officer Porter -- Agent Porter, about what was going on      11:43:57

16   down the street on West International.

17           Now Agent Swartz had a crystal clear memory about the

18   conversation at the Port of Entry between he and Wynecoop and

19   Porter.  He can remember word for word what was said.  He can't

20   remember who he was shooting at, and he can't tell us where        11:44:17

21   that person was, but that night he had a crystal clear memory

22   as to what was going on and what was said.

23           And they decided to go ahead and help out, to their

24   credit.  They were doing their job.  And so what happened?

25           If you can play, Mary Sue --                               11:44:40

─── Government Closing Argument ───

1        (Video played.)

2            MR. KLEINDIENST:  You're looking at the screen, and

3    you know that we've highlighted the individuals in this case.

4            Here's Officer Wynecoop, and he's running up the

5    street.  Officer Porter you see disappears down the driveway.    11:45:04

6    Other agents have started to respond.  The smugglers are

7    somewhere in the bushes, having dropped their bundles.

8            And then we see Lonnie Swartz in red and he's walking

9    down the street.  Not running, walking.

10            But if you look to the left screen, the daylight          11:45:40

11    screen --

12            And if you could pause it right there.

13            -- what does Officer Swartz do?  He pulls out his gun.

14    Nobody else has their gun drawn that night.  Agent Swartz,

15    before he even gets to where all the activity is going on, gets  11:45:58

16    to where the people are on the fence, he's decided that he's

17    pulled out his gun because he's going to be locked and ready,

18    locked and loaded in case something happens.

19            That's him.  He uses force.  And the only thing he had

20    available that night was not a less than lethal, but his          11:46:19

21    handgun.  But he pulls it out and he never puts it away.

22            Now he's got it in both hands walking up the street.

23    You see Officer Zuniga in green, and Officer Wynecoop in blue.

24            Wynecoop doesn't have his gun out, Zuniga doesn't have

25    his gun out, but Lonnie Swartz has his gun out.                   11:46:56

UNITED STATES DISTRICT COURT

1          Stop right here.

2          This operation is over.  They recovered the bundles in

3    the bushes.  They're waiting for these two guys on the fence to

4    either climb over and drop down on the Mexican side, or

5    unfortunately fall down on the American side.  It was done.  It    11:47:12

6    was just a matter of waiting out the end of this event.

7          You see Officer Zuniga taking his dog up to the fence.

8    I submit to you the people on the fence may have called down to

9    the people down below that there's a dog.  Who knows why they

10   started throwing rocks.                                            11:47:43

11         And as you recall the testimony, one of the suspects

12   got stuck and that delayed everything.  And at some point in

13   time the rocks started coming over.

14         Officer Swartz still has his gun out in the ready

15   position.  Rockings haven't started.  Agent Wynecoop is next to   11:48:33

16   him.

17         Now you can stop right there.

18         It's apparent that there were at least three

19   individuals.  We don't deny that Jose Elena was one of them.

20   But -- and they were probably part of this operation.  I submit   11:49:32

21   to you that they started throwing rocks, either because their

22   friends were afraid of the dog on the ground, or because they

23   were trying to provide a distraction so their friends could

24   finally jump down off the fence and get back to Mexico.

25         They could not see what they were throwing at from          11:49:51

1    their vantage point.

2         Okay.  You can stop it right there.  Actually if you

3    can back it up.

4         Apparently right around this point in time --

5         Stop it right now.                                    11:50:25

6         -- the rocking has started.

7         Now Agent Swartz told you that when the rocks started,

8    number one, he never saw a rock.  What he told you was, I was

9    standing next to Officer Zuniga's car next to Wynecoop -- and

10   he went into great detail about how Wynecoop said, we're being  11:50:41

11   rocked.  He goes, shit, I've been rocked in the foot.  I've

12   been rocked.  He never looked at Wynecoop's foot to see if he

13   had been hit with a rock and how large the rock was.

14        Agent Wynecoop, when he testified, had a different

15   recollection.  This is his direct examination.  Wynecoop said:  11:51:01

16        And I think you said Agent Swartz was with you

17     at the back of the vehicle?

18     Right.

19     Do you remember noticing what he did when this

20     was all going on?                                        11:51:23

21     Right.  He moved towards the fence.

22     He moved towards the fence?

23     Right.

24     Did you tell him you had been hit by a rock?

25     Not that I recall.                                       11:51:34

Government Closing Argument

1            You don't remember telling him, hey, I got hit

2       with a rock on my foot?

3            I don't remember saying anything.

4            It really wasn't much of a consequence, was it?

5            No.                                                              11:51:46

6            Did you feel like you were under -- that this

7       was a serious threat to your life at that point in

8       time?

9            I mean, I was scared.

10           When the rocks starting coming over, I submit to you    11:51:53

11   that Agent Swartz decided that he had had enough, that he had

12   made the decision, when he heard the rocks coming over or

13   hitting the fence, that he had to stop this.

14           He did not, as he admitted to you, know where Officer

15   Zuniga went to take cover, where Officer Wynecoop went to take    11:52:23

16   cover, where the other agents were out there in the field.  He

17   did not take the time to assess, as he was taught, the

18   situation, to determine whether or not lethal force was

19   necessary, whether or not anybody out there was in danger of

20   death or serious bodily injury.                                    11:52:44

21           That was his failing as an officer.  That was his

22   failing in his training.  He just made up his mind that he was

23   going to do what he was going to do, and he was going to send a

24   message to the rockers, no more.

25           Had he decided to stop and assess the situation and      11:53:03

UNITED STATES DISTRICT COURT

— Government Closing Argument —

1   realize what most of the people -- as you can tell by the board

2   with the thumbtacks where they indicated they were outside of

3   where the rocks were coming down.  If he had taken the time to

4   get on his radio and say, hey, is anybody in danger.  If he had

5   taken the time to look to see where Officer Zuniga went and          11:53:26

6   Officer Wynecoop went, to realize that they had taken cover, it

7   was not necessary for him, it was not the last resort, to walk

8   across the street.

9            But he did not, because he had had enough.  And as he

10  told you, what he was thinking was, this had to stop, right        11:53:48

11  now, right here.  He was going to send a message to the

12  rockers, no more.

13           But he did not have that power.  And he had the

14  training that he neglected to determine and assess the

15  situation as it evolved.  It was not a split-second decision by   11:54:08

16  Agent Swartz.  He had time to reflect on what was happening, he

17  had time to decide whether or not anybody was in serious danger

18  of bodily harm or death.

19           But he was going to send a message to whoever was out

20  there, no more rockings.  And he walks across the street.         11:54:29

21           Mary Sue, if you can change to --

22           And he goes to the fence.

23           Want to stop right there?

24           He's not afraid.  He's walking deliberately, not

25  dodging rocks.  In fact, he never sees a rock that night.  He's   11:54:54

──────── Government Closing Argument ────────

1    walking with the intent, with the purpose that whoever is down

2    there throwing rocks, and all I've got is my gun, he's made up

3    his mind he's going to use lethal force.  And you know that

4    because when he hits the fence, he has his gun drawn the entire

5    time, he goes to one bollard, doesn't like the view he sees,      11:55:13

6    and switches to the next one and sticks his gun through.

7          That's his state of mind.  That's his intent.  Before

8    he sees what's going on down there.

9          Mary Sue.

10         And he starts shooting.  And what do the rockers do?        11:55:31

11   They start running.  They're gone.  They're no longer there.

12         But what does Agent Swartz do?  Does he even stop and

13   say, okay, there's no more threat, no more danger, the rocks

14   have stopped?  Every agent told you that night that when the

15   gunfire started, the rocking stopped.  There was no more threat  11:55:56

16   to address.

17         Does he stop and back up?  Even though he had no

18   justification to shoot those rockers based on the small rocks

19   that were coming over the fence.  No, he continues down the

20   fence for a period of eight seconds.  And he goes to shooting    11:56:14

21   position number 2.  He's had eight seconds and the opportunity

22   to determine if there is a threat, a lethal threat.  And he's

23   walking down the fence.

24         We know that Jose Elena is on the sidewalk down.  And

25   as Agent Swartz even testified, I knew a person went down.       11:56:44

---
**Government Closing Argument**
---

1    He is all alone.  And if you really think there was a

2    second rocker that night, if you really believe that story, I

3    submit to you that the other rockers who were there that night

4    were half way to Mexico City after Agent Swartz fired his third

5    bullet.  Are you going to hang around and get shot just like          11:57:05

6    your friend?  Really?  Do you really believe that they hung

7    around after Jose Elena went down to the ground and there's

8    gunshots being fired at you?

9    There is nobody else out there except Jose.

10    But he goes to shooting position number 2, and what          11:57:27

11    does he do?  He shoots ten more rounds.

12    And what's he shooting at?  He's not shooting at walls

13    or other buildings.  He's shooting at Jose.  Ten more rounds.

14    He wasn't trying to eliminate any threat, he was trying to

15    eliminate a person.  And the fact that he goes from shooting          11:57:50

16    position number 1 to shooting position number 2, that's a

17    window into his mind.  That's a mirror of the reflection of his

18    intent that night, that night, that he was going to eliminate a

19    person.  It was a window into his mind.  And it's there in

20    front of you for you to look at and to assess.          11:58:17

21    He fires ten more rounds.  He's emptied his pistol at

22    a person laying on the ground helpless.  What kind of man does

23    that?  Where is the humanity?

24    But he's not done.  He's emptied his pistol.  And what

25    does he do?  He drops his magazine and he reloads, and then he          11:58:49

Government Closing Argument

1    comes back to the fence.  And you watch him come back.  And he

2    shoots three more times.

3         Where is the humanity?  The only one there is Jose,

4    and he's on the ground.

5         Then he finally backs up, picks up his clip, and he          11:59:19

6    goes back to the fence.

7         Ask yourself, why did he stop shooting after three

8    rounds?  He had loaded his gun.  He'd had 12 rounds in it when

9    he reloaded it.  He'd only shot three rounds.  He didn't finish

10   off the nine.  What made him stop?          11:59:50

11        I submit to you what made him stop was that he no

12   longer saw movement on the ground of the person that he'd just

13   hit.

14        Why does he continue to shoot at Jose Elena?  When you

15   go back to the jury room, think about these things.  We          12:00:49

16   know -- we know that he fired 16 rounds because we recovered 16

17   shell casings from the ground after the shooting was over.  And

18   we know that his one clip was emptied, and there were nine

19   rounds left in the second clip.  He fired 16 rounds.  How many

20   times was Jose Elena shot in the back?  Ten times.          12:01:31

21        We know there were ten entrance wounds from Dr. Lew

22   and from the mannequin that you see in front of you.  Of the 16

23   rounds, ten hit him.

24        We also know from Luke Haag that there were at least

25   three rounds that hit the wall.          12:02:02

UNITED STATES DISTRICT COURT

1    You remember Luke Haag went to the scene a couple

2  years later and did a sodium rhodizonate test on the wall where

3  Jose Elena fell, and he looked for evidence of lead, which is

4  consistent with gunshot bullets -- or bullets.  And he found a

5  number of sites that looked like potential bullet impact sites.    12:02:31

6  Mind you, this was two years later.  But nonetheless, we did

7  the investigation.

8    We don't know whether or not bullets actually struck

9  the wall or not, but we do know that with respect to number 1,

10  number 4 and number 7, he found, even two years later, traces    12:02:48

11  of lead consistent with a bullet that's made of lead.  And his

12  testimony is that's consistent with a bullet hitting the wall

13  and leaving that deposit.

14    Those are three rounds that hit the wall right above

15  where Jose was laying.    12:03:21

16    Of the 16 rounds that he fired that night, a total of

17  13 either hit Jose or hit the wall right above where he was.

18  13 out of 16.  I did some computations last night on my iPad,

19  and that came out to a percentage of accuracy of 81 percent.

20  And you can check my math.  81 percent that we can account for,    12:03:54

21  if not more, hit Jose or hit that wall.

22    We know that he had an accuracy as a marksmanship, as

23  an expert marksmanship.  And on the range he would go from 91

24  to 96 percent.

25    Agent Swartz was an expert marksman.  He knew where to    12:04:23

1    shoot.  And he knew -- if he wanted to hit a target, he knew

2    how to aim his gun.  He was not a novice.  He was not somebody

3    who was just wildly shooting his pistol.  81 percent landed in

4    Jose or right next to him.  That was intentional.  That was

5    deliberate.  There was no second mystery rocker who was hanging          12:04:47

6    around that he said he was shooting at.  81 percent.

7          Do you remember Agent Swartz was a firearms instructor

8    because he was such an accurate shooter?  Of the ten bullets

9    that hit Jose Elena, six hit center mass, as he was trained,

10   trained to hit center mass.  Six in the back.  He just missed         12:05:48

11   with one here on the arm, and just missed with one here on the

12   other arm.  And the final two, although they didn't strike

13   center mass, struck a vulnerable position of one's body, and

14   that's his head here and his head here, 9 and 10.

15         It was just another day on the practice range for             12:06:25

16   Agent Swartz.  He was shooting as he was trained to do so.  He

17   didn't stop.  He didn't assess the situation.  He just kept

18   shooting.

19         And the question is why?  Why does he continue to

20   shoot from three different positions?  What explains that            12:07:07

21   conduct?  It's because he saw movement.  He's not just shooting

22   into a dead body, a callous act in itself.  He's shooting

23   because he sees movement.  And he's trained to eliminate the

24   threat.  At least that's what he was supposed to be trained to

25   do.                                                                  12:07:31

1      That's the only thing that explains why he shot Jose

2   ten times.  It's the only thing that explains why 13 of the 16

3   bullets ended up in his body or right next to his body.  He

4   sees movement.  Jose Elena is fighting for his life on the

5   ground.                                                              12:07:56

6      Agent Swartz said that when he fired the first three

7   rounds he saw the person go down.  And I submit to you that the

8   forensic evidence, based on Dr. Lew's testimony -- who's not

9   getting paid $10,000 to come in here and testify, or 20,000,

10   she just gets paid her salary at Miami Dade.  She has no dog in    12:08:16

11   the fight.  She reviewed all the evidence in the case.

12      MR. CHAPMAN:  Objection, Your Honor.

13      THE COURT:  Overruled.

14      MR. KLEINDIENST:  She reviewed all the photographs.

15   She went to the crime scene, just like you.  She looked at the    12:08:29

16   video.  All the things that the Mexican pathologists didn't

17   have available to them.  And she used her training and

18   intelligence to try to reconstruct what happened to Jose Elena

19   after those first three shots.

20      And what she told you that, in her opinion the one            12:08:49

21   that brought him down was bullet number 4.  We keep on

22   referring to it as gunshot wound number 4.  And in the

23   mannequin, this is number 4.  And it is just to the right of

24   the spine.

25      And as she testified, bullet number 4, which you know        12:09:13

Government Closing Argument

1   travels at 1,000 feet per second, was traveling up his spinal

2   area, shattered four vertebra, T4 to T8, before finally ending

3   up coming out -- or lodging in his chest at about right here as

4   he lay on the ground or as -- after he was hit.

5          She told you that that damage to the vertebra most                12:09:37

6   likely damaged the spinal cord.  Now we can't say the spinal

7   cord was dissected or nicked or whatever.  But even Dr. Wecht

8   admitted that you can have a concussive effect on the spinal

9   cord by a bullet breaking all the vertebra, and it can cause

10  somebody to fall quickly to the ground without having a chance    12:10:00

11  to break his fall.

12         And that's exactly what happened in this case.

13         He's hit in the back, the bullet ends up in his chest.

14  And we know he falls like this to the ground, because we see

15  all of the abrasions on the outsides of his hands.  That's what   12:10:15

16  he's doing.  He feels the pain here and he falls down.

17         But he's not dead.  He can move his upper body.  And I

18  submit to you that Jose, once he came to, after the shock of

19  hitting the ground -- if you remember from the evidence that

20  when he did hit the ground --                                     12:10:43

21         This was after his body was turned over, Exhibit 78.

22  Look at all the abrasions on the right side of his face.

23         Pay particular attention to the bruise next to his

24  left eye and the blood trail that goes over the eye and comes

25  down the nose.                                                    12:11:15

1    Dr. Lew testified that when he hit the ground, he hit

2    the ground on the left side of his face.  He was able to move

3    his upper body.  And what does she say to her means that he's

4    still alive and he's still moving, he's struggling to stay

5    alive.                                                        12:11:36

6    Dr. Lew said that bullets 5 and 8 entered the body,

7    and at some point in time his arm had to be extended like that

8    as he was trying to get up, trying to escape, although it was a

9    futile cause.  Because the only way you can explain bullets 5

10   and 8 that entered the lower back here ending up in the left   12:12:03

11   arm -- if you look at the left screen, this is at the autopsy,

12   we know that there is an exit wound on the side of his arm and

13   his arm itself, there's three bullets that line up.

14   And Dr. Lew testified that the bullets 5 and 8 from

15   the back traveled in a straight line and went up his arm, one   12:12:33

16   leaving the arm where the bruise is, and then one coming to

17   rest at the bottom of his forearm.

18   The only way that can happen is if you have your arm

19   outstretched as if you're trying to get up.  Bullets don't make

20   U turns in the body.  Even Tom Bevel told you that.  His arm as  12:12:55

21   it was found at the end was like this.  But there was no way

22   possible for those two bullets to travel up his body into his

23   left arm in the manner in which they did.

24   That tells you there's movement, number one.

25   Number two, Dr. Lew testified that at some point in   12:13:14

Government Closing Argument

1   time he most likely raised his head to look up to see what's

2   going on, to see what he can do to save himself.  He's fighting

3   for his life.

4        If you look at the picture on the left, that's how

5   he's found before the blanket is put over him.  Look at the          12:13:41

6   abrasions on the palms of his hands.  And you see over on the

7   left arm the bloodstain that Tom Bevel said was a transfer,

8   that could only occur if there was a blood source over the arm

9   at some point in time prior to his final rest.  There had to be

10  something above that to leave that trail.  That's movement.          12:14:04

11       But if you look at Jose's face, you see the blood

12  coming down his nose in a straight line.  And Dr. Lew told you

13  that what's consistent with that is that his head was now in a

14  second position.  He had hit his head, the abrasions had been

15  inflicted on his face, and he's starting to lift his head up.        12:14:29

16  And that explains how the trail of blood can perfectly flow

17  down the nose.  There's no other way to explain that.

18       And as she testified, not only does that mean that his

19  head was up, but when the final shot hit him and left him in

20  this position, it caused his chin to hit the ground hard, an         12:14:52

21  abrasion that wasn't inflicted when he first fell to the

22  ground, and he lost a tooth in the process.  Until he was

23  finally hit with the fatal shot, which was number 2.

24       There was movement here, and that's what Lonnie Swartz

25  was looking at, movement.                                            12:15:16

31

1    What else did Dr. Lew tell you was consistent with the

2    fact that Jose Elena was still alive and fighting for his life

3    after he was shot in the back?  All of the blood that was in

4    his lung cavities that the Mexican pathologist testified about,

5    as much as 1500 milliliters.  That means that he was alive for            12:15:40

6    an appreciable period of time and his heart was pumping and the

7    blood was filling his body.  He was alive.  He was not dead.

8    He was not brain dead.

9    Here's a picture of Jose at the autopsy, you can see

10   the missing tooth in his mouth.                                           12:16:07

11   Jose was fighting for his life.  He couldn't get up

12   because he was partially paralyzed.  He raised his head, he put

13   his arm outstretched.  And Dr. Lew said, if you look at the

14   photograph of the back of his body and the bloodstain, it shows

15   the blood's falling to the right.                                         12:16:56

16   Can you put that picture up, Mary Sue?  74.

17   Do you remember Dr. Lew testified about the wound to

18   the -- bullet wound number 4 which hit his vertebra?  All the

19   bloodstain around it on the upper right part of his back.  She

20   testified it was also consistent with movement by Jose before            12:17:40

21   he was finally shot with the fatal shot to the head, was the

22   fact that the blood was flowing to the right as if he was

23   trying to get up with his left hand extended and trying to

24   raise his body as best he could.  And that explains all the

25   blood flowing to the right side.                                         12:17:59

Government Closing Argument

1          He was not brain dead after the first shot.  He was

2     alive and he was fighting to stay alive.

3          And remember the transfer stain that Tom Bevel talked

4     about on his left arm, and how there had to be a blood source

5     above that for that to happen?  And the blood drippings next to          12:18:19

6     his head, there had to be a blood source elevated above that

7     for those blood drips to hit the cement.

8          I submit to you that when Lonnie Swartz brought him

9     down and ran down the fence in those eight seconds, he was

10    looking at movement of the person he had just shot.  He had          12:18:48

11    forgotten his training.  He had forgotten what his job was.  He

12    had thrown his training out the window and his obligation to

13    make sure that only lethal force is used when necessary.  And

14    he goes to the fence and he shoots ten more times.  And the

15    only possible explanation is is because he's seeing movement in          12:19:12

16    a person that's still trying to struggle to get up.

17         And the last three, the very last three stop because

18    one of those last three hit him right here in the head, going

19    through, and as Dr. Lew testified, damaged his brain stem, went

20    through his brain, and then his head drops down to the last          12:19:36

21    position, which is in Exhibit 356.

22         Lonnie Swartz has emptied his magazine, reloaded,

23    fired three more shots, and he backed away.  And I submit to

24    you, ladies and gentlemen of the jury, that at that moment in

25    time Lonnie Swartz was a person who had a darkened heart.  He          12:20:24

---

**Government Closing Argument**

---

1    doesn't get on the radio and say, there might be somebody

2    injured over in Mexico, can you alert the Mexican authorities

3    to get medical aid?  He gets on the radio and says, 865, in

4    case you hadn't heard, shots fired, and there's a 10-7 on the

5    Mike side.  10-7 means somebody who's dead on the right side.    12:20:50

6    And you heard that radio broadcast, and you heard the calmness

7    in his voice.  He was a person who realized what he had done,

8    but he had carried out his objective.

9           And if you remember from Agent Devowe who testified

10   after Lonnie came back to the sidewalk, Agent Devowe went up to    12:21:12

11   him, and this is what his testimony was on direct examination.

12          Did you hear Agent Swartz on -- key in his mic

13       and say anything?

14          No, I didn't.  I didn't hear him key his mic.  I

15       heard him say it was a good shoot or a clean shoot,    12:21:41

16       something along those lines.

17          He said it was a clean shoot?

18          Yes.

19          What does that mean?

20          It means it's within policy.  He felt his life    12:21:52

21       was in danger or those around us were in danger.

22          And he just said that, he volunteered that?

23          Yeah, as he was backing away he mumbled it out.

24          He mumbled it out?

25          Yes.    12:22:06

──────Government Closing Argument──────

1    If you know it's a clean shoot, if you know it's a

2  good shoot, you don't have to say that to yourself to justify

3  what you just did.  And he was trying to justify taking a human

4  being's life, knowing that he didn't have the legal authority

5  to do so.  And he was trying to convince himself that what he          12:22:22

6  did was all right.

7    And as Dr. Trompetter said, he's never heard of

8  somebody who's gone over and vomited after an officer-involved

9  shooting.  And I submit to you that the reason why he vomited

10  is because he realized that he killed a human being and he took       12:22:41

11  his life without justification.

12    Whatever Jose Elena did that night, throwing rocks or

13  being there with the rockers, it wasn't a capital offense.  He

14  did not deserve to be executed.  And Agent Swartz is guilty of

15  intentional killing with malice aforethought.  He intended to         12:23:10

16  kill Jose.  He intended to eliminate him as a person.  And

17  that's what was in his mind that night, I'm not going to stand

18  for it anymore.

19    Thank you.

20    THE COURT:  I indicated we would take a break.  How              12:23:28

21  about 45 minutes?  That means we'll be back here at 1:00 -- my

22  math is bad.  About 1:10.  1:15?  1:15 is better.  I can handle

23  that.  1:15.

24    Remember the admonitions that I've given you.

25    (Jury left at 12:24 p.m.)                                        12:24:01

UNITED STATES DISTRICT COURT

─── **CR-15-1723-TUC-RCC – April 16, 2018** ───

1          (At sidebar on the record.)

2          MR. CHAPMAN:  When Mr. Kleindienst said that Lew was

3  not getting paid and had no dog in the fight, he was bolstering

4  his own witness improperly and vouching for the credibility of

5  his witness.  I'd move for a mistrial on that basis.          12:25:26

6          THE COURT:  The motion for mistrial is denied.

7          For the record also, indicate that Mr. Chapman renewed

8  his motion for directed verdict at the close of the defense

9  case.  He did so again at the end of the rebuttal case by the

10  Government.  Each time the Court denied those motions.          12:25:43

11          MS. FELDMEIER:  Okay.  Jury instructions.

12          Let me show you what we got here.  Mostly typos,

13  Your Honor.

14          THE COURT:  How bad of a typo?

15          MS. FELDMEIER:  Question for you, do you want this          12:25:57

16  bracketed thing in there?

17          THE COURT:  I thought it would be easier for my

18  secretary just to print it and leave it.

19          MS. FELDMEIER:  Okay.  Then she wants to insert a

20  bracket then here, because it didn't end with a bracket.          12:26:06

21          THE COURT:  No one is going to notice that but you,

22  Mary Sue.

23          MS. FELDMEIER:  I know.  This one is missing three

24  paragraphs.

25          THE COURT:  Three paragraphs?          12:26:14

─ **CR-15-1723-TUC-RCC – April 16, 2018** ─

1    MS. FELDMEIER:  Yes.  This is number 3.9, which is

2  credibility of the witnesses.

3        THE COURT:  I just had that printed from this morning.

4        MS. FELDMEIER:  Yeah, it looks like it's part of

5  the -- it kind of looked like notes.                    12:26:24

6        THE COURT:  Okay.  I'll have it redone.

7        You're right, it added that new additional language,

8  3.9.

9        MS. FELDMEIER:  I'll just give you everything with the

10  green on it.                                            12:26:34

11        And then this one, I didn't see an expert witness

12  instruction.  Do they have them anymore?

13        THE COURT:  You have heard a witness -- expert

14  witness.

15        MS. FELDMEIER:  Do we have an expert witness         12:26:43

16  instruction anymore?  Because I can't find one.

17        THE COURT:  This is it.

18        MS. FELDMEIER:  Well, I don't see it here anywhere.

19        THE COURT:  This is it.

20        MS. FELDMEIER:  Well, I know, but -- we just don't    12:26:51

21  have one?

22        THE COURT:  We still have one.

23        MS. FELDMEIER:  I just don't have a book.

24        THE COURT:  We do have one.  I took that out of the

25  new ones.                                               12:26:58

——— CR-15-1723-TUC-RCC – April 16, 2018 ———

1          MS. FELDMEIER:  Oh, you did?  Awesome.

2          Okay.  That's what I wanted to know.

3          And then, the defendant made a statement.

4          THE COURT:  Yes.

5          MS. FELDMEIER:  That's out of the new one too?          12:27:06

6     Because I don't have that.  And it's not here anywhere in mine.

7          THE COURT:  Everything should be out of the new one.

8          MS. FELDMEIER:  Let's hope.  Okay.

9          THE COURT:  But even not, that's still good law, the

10    defendant made a statement.                                  12:27:20

11          I had her do all new ones today.

12          MS. FELDMEIER:  Okay.  Self-defense.

13          I'm going to go through this and make sure -- I didn't

14    actually check the case for this one.  But this language all

15    just needs to be cleaned up a little bit.  The defendant's    12:27:32

16    charged in, put a space here, second indent, the fourth comes

17    up here before this part.  That's all.  Because it's the fourth

18    element, the defendant acted.

19          THE COURT:  You're right.

20          Something else after that?                             12:27:47

21          MS. FELDMEIER:  Yeah, there's more.

22          Here, I'll keep these in order.

23          Do you want the brackets gone?

24          THE COURT:  No.

25          MS. FELDMEIER:  And do you want her to do "or."         12:28:00

─ CR-15-1723-TUC-RCC ─ April 16, 2018 ─

1      THE COURT:  I'm going to say "or" when I read the

2  instructions.

3      MS. FELDMEIER:  Oh, they're not getting this?  Should

4  we just have them --

5      THE COURT:  If you want me to I'll say, write in the        12:28:07

6  word "or," if that will make you feel better.

7      MS. FELDMEIER:  Just that there's no "or," it just has

8  the two brackets.  So I just wanted to make sure that the jury

9  was properly instructed.

10      MR. CHAPMAN:  Yeah, I think it should say "or" --        12:28:20

11      THE COURT:  I'll have them put in the word "or."

12      MS. FELDMEIER:  Okay.

13      THE COURT:  But I'm not going to do the indenting.

14      MS. FELDMEIER:  Well, I was only doing the indenting

15  because these As go under second.  And then third is its own,    12:28:30

16  fourth is its own.

17      THE COURT:  They should be able to figure that out.

18      MS. FELDMEIER:  Okay.

19      And this one was indented, so I thought maybe you

20  wanted that one indebted.  I don't know, it just looks funny.    12:28:44

21      This, the "and" needs to get moved down one paragraph

22  because we added this other element.

23      THE COURT:  Oh, "and" in front of the sixth?

24      MS. FELDMEIER:  Yeah, because we added the seventh.

25  The "and" should be up here because we now have the seventh      12:28:58

─ **CR-15-1723-TUC-RCC – April 16, 2018** ─

1    element.  So this needs to be the "and."

2           And then these are just poorly spaced.

3           And this was both, presiding juror bracket, foreperson

4    bracket.  So you call it foreperson here.

5           THE COURT:  All right.                              12:29:12

6           MS. FELDMEIER:  That was my only thought.

7           That's it.

8           THE COURT:  Thank you.

9           MS. FELDMEIER:  Oh, credibility of the witness wasn't

10   in there.                                                  12:29:17

11          THE COURT:  That's the one where we had to add the

12   additional paragraph, 3.9.  That was the first one you told me

13   about.

14          MS. FELDMEIER:  No, no, it's not that one.  It was

15   something else.  Circumstantial evidence isn't in there.   12:29:29

16          THE COURT:  It's not?

17          MS. FELDMEIER:  Not in my stack.

18          THE COURT:  It may not be.

19          MS. FELDMEIER:  Actually it hasn't changed since --

20          THE COURT:  I'll find circumstantial evidence and I'll  12:29:36

21   put it there.

22          MS. FELDMEIER:  3.8.

23          THE COURT:  3.8, 3.9.

24       (End of discussion at sidebar.)

25       (Recess at 12:29 p.m., until 1:16 p.m.)              13:16:32

Defense Closing Argument
───────────────────────────

1         THE COURT:  Let the record show the jury's returned

2    back to the courtroom, the presence of all counsel and the

3    defendant.

4         Mr. Chapman, whenever you're ready you may proceed.

5         MR. CHAPMAN:  Thank you.                          13:16:45

6         What you just heard from Mr. Kleindienst about the

7    border and what happened that night is a gross distortion of

8    reality.

9         In Mr. Kleindienst's version, the Government's

10   version, rocks aren't really that dangerous.  And, in fact,   13:17:13

11   rocks aren't even thrown to hurt agents, they're just thrown to

12   distract.

13        You tell me what's going to happen if a rock the size

14   of the palm of your hand lands -- it drops into your eye.  It's

15   going to take your eye out.  You tell me what's going to happen  13:17:39

16   if a rock the size of a baseball lands on the top of your head.

17   It's going to fracture your skull.

18        Border Patrol agents don't have to accept that risk.

19   They don't have to accept that risk.

20        The Government even suggested that because this was      13:18:02

21   marijuana and not some other drug, it wasn't as big of a deal.

22   This is from the same office that prosecutes thousands of

23   marijuana cases every year.

24        People like Agent Swartz don't have the option or the

25   discretion to say, well, this is probably marijuana, it's not   13:18:27

UNITED STATES DISTRICT COURT

1    that big of a deal.  They're out there to enforce the law,

2    whatever it is.

3           I want to spend some time with you talking about what

4    really happened in this case, and why it was so dangerous.

5           Is this published to the jury, Judge?                    13:18:50

6           THE COURT:  It is.

7           MR. CHAPMAN:  I'm going to start with what happened

8    that day.

9           You heard that Lonnie Swartz was a two-year agent and

10   he was working southbound traffic at the DeConcini Port of     13:19:03

11   Entry.  He was working with Wynecoop and Agent Porter, along

12   with the U.S. Customs agent.

13          Although Agent Swartz had been certified and liked to

14   carry less lethal weapons, he was discouraged from doing so on

15   this day because a large PLS launcher or some weapon like that  13:19:23

16   would be intimidating to the public at the port.

17          He'd been in several prior rocking incidents, and

18   every time he had the opportunity to use less lethal force he

19   chose to do so, every single time.  Does that make him a hot

20   head?  Does that somehow make him someone that was, quote, fed  13:19:52

21   up?  I don't think so.  It makes him a conscientious agent who

22   did his job according to his training, and when he had options

23   other than lethal force, he employed them.

24          Jose Elena Rodriguez was a Mexican national.  In the

25   minutes before his death he was seen by AO -- and you know      13:20:22

1    where she lives, you went to see the scene of the shooting.

2    She lives very close nearby, she lives 150 feet from the

3    international border fence.

4         She knew him because he was a child -- he was a friend

5    of her grandson as a child, they attended the same elementary    13:20:45

6    school.

7         And she saw him running by her house south towards the

8    international border, possibly being pursued by two Border

9    Patrol agents.

10        After the shooting Mr. Rodriguez was found to have    13:21:03

11   rust stains on his shoes and pants, which is consistent with

12   climbing over the iron bollard fence.

13        Now, she denied it.  She denied everything I just said

14   when she testified.  Why do think?  She called Agent Arrasmith

15   a liar.  She said, I never said that to Agent Arrasmith.  Why    13:21:26

16   do you think she's lying?

17        Well, use your common sense.  Think about where she

18   lives.  She has drug smugglers running up and down her driveway

19   day and night.  She lives within feet of the international

20   boundary fence.  And when you think about this case, and    13:21:53

21   whether it was dangerous that night, you should think about her

22   unwillingness to talk about what she said in open court.

23        What makes sense to you, Agent Arrasmith is lying or

24   AO is lying?  She has to go home to that house along the

25   border.  She's scared.    13:22:17

1     So let's not pretend that this isn't what it is.  It's

2   a dangerous, scary area.  And whether drug smugglers are

3   smuggling marijuana or methamphetamine or crack cocaine, it

4   doesn't matter, it's dangerous and it's scary and it's a hard

5   job for a Border Patrol Agent.                            13:22:44

6         And we know that Mr. Rodriguez was involved in the

7   smuggling operation.

8         So on this day, October 10th, 2012, Cassandra Clarke

9   is in the camera room and she documents a smuggling attempt

10  across the international border just minutes before this one.  13:23:11

11  Then there's a second attempt.

12        She testified, if you'll remember, that smuggling is a

13  daily and even hourly event.  She helps deploy agents on the

14  radio in this cat-and-mouse game involving narcotics that are

15  worth tens of thousands of dollars.                       13:23:36

16        At 11:09 she spots the two smugglers coming over the

17  fence.  And you can see them in this screen capture on the top.

18        At 11:11 they begin to run north with backpacks, which

19  turns out to have marijuana.

20        Officer Quinardo Garcia arrives within seconds, and he   13:24:05

21  turns onto West International to try to apprehend these

22  smugglers.

23        At 11:13 Officer Zuniga arrives with his police dog,

24  and Swartz is approaching the scene at that point.

25        11:13 he arrives at the scene, and Officer Zuniga now   13:24:29

1    has his police dog out.

2          At 11:14 one of the smugglers is having trouble

3    scaling the fence.  And somebody says, and Agent Swartz hears

4    it, that this person has an eight-inch double-edged knife in

5    his back pocket.                                              13:24:55

6          Swartz and Wynecoop at this point are around the rear

7    of Zuniga's vehicle.  At 11:15 Swartz and Wynecoop are standing

8    right there.

9          At 11:15:26 -- and this video is going to be in

10   evidence, you can check on this -- that's when the rocking     13:25:21

11   begins.  Swartz and Wynecoop are still at the northeast corner

12   of Zuniga's vehicle, and Zuniga is south of his vehicle between

13   his car and the border fence.

14         23:15 -- 11:15:36, if you look at the lower left

15   corner of the left slide you can see possibly three rock        13:25:47

16   throwers.  Then the rocking starts.

17         In the following seconds, Swartz testified that

18   Wynecoop expressed his belief that he was getting rocked.

19   Swartz heard Wynecoop say that he had been hit by a rock.

20         At this point it doesn't really matter whether           13:26:15

21   Wynecoop was hit by a rock or not.  What matters is Agent

22   Swartz's perception, whether he believes that Agent Wynecoop

23   was hit by a rock.

24         He heard a thud and heard someone yell that Officer

25   Zuniga's dog had been hit by a rock.  He heard a rock hit the   13:26:38

1    international boundary fence.

2         So it was at this point when he decides that he needs

3    to do something to protect himself, but also his fellow agents.

4    At 23:15:40, 11:40 -- 11:15 and 40 seconds, he begins to move

5    towards the fence.  He approaches the fence with his gun drawn,    13:27:13

6    mindful that rocks are coming, possibly a bottle could be

7    thrown into the fence and explode on his face.

8         The rock throwing continues as he approaches the

9    fence.  And all you have to do is look at the videos that are

10   in evidence to confirm that.                                       13:27:34

11        At 11:15:49 he reaches the fence and he sees two rock

12   throwers and adjusts his position.  There were actually three

13   there at that point.  He only saw two.

14        The rock throwing continues as he gets to the fence,

15   and he fires his weapon.  And he did it to defend his fellow       13:27:59

16   agents, to defend Officer Zuniga.  At the moment that he

17   elected to fire, the rocking was ongoing.

18        From the very first day that he joined the Border

19   Patrol, or even before when he was at the Academy, like other

20   agents it had been ingrained into him that rocks are dangerous     13:28:27

21   and they can cause serious physical injury or death.

22        He knows that Agent Wynecoop -- or he believes Agent

23   Wynecoop has been hit.  He believes that the police dog has

24   been hit.  And because the police dog has been hit, and the

25   police dog is on a leash attached four or five feet away from      13:28:52

1    Officer Zuniga, not only is the police dog in danger, Officer

2    Zuniga is in danger.

3            At the moment that he fired, he was aiming at an

4    adult-sized person in Mexico who had cocked back to throw

5    another rock.  When this person began to fall, he stopped          13:29:15

6    firing and began moving to another position, as his training

7    had taught him.

8            And let me point out something here about that

9    decision.  The Government's arguing that he fired intentionally

10   into Mr. Elena Rodriguez as he was on the ground over and over     13:29:40

11   again, that it was intentional and it was malicious.  If that's

12   true, if that's really true, why didn't he just do that from

13   the first position?

14           Think about it.  If it really was his intent to just

15   keep shooting this man on the ground over and over and over in     13:30:00

16   a malicious fashion, why did he change his position?  It

17   doesn't make sense.  If that's what he wanted to do, he never

18   would have changed his position, he would have fired until his

19   magazine was empty and that would have been it.

20           11:15:57, this is seconds of Swartz firing, Zuniga and     13:30:25

21   Wynecoop are still in the area.  And you can see them on the

22   left side of the slide.  They're still exposed.

23           So why did this happen?  As I said before, he was

24   trying to protect his fellow agents and himself during the

25   course of a drug operation, during the course of a drug           13:31:01

—— Defense Closing Argument ——

1   operation.

2       On the second day of trial in its opening statement

3   the Government conceded that Mr. Elena Rodriguez was part of

4   that operation and he was throwing rocks.

5       He chose to use deadly force, because he did not have          13:31:20

6   less lethal options available to him because of where he was

7   working that night, and because those in Mexico were trying to

8   hurt him and his fellow agents.  And that's what his training

9   dictated.

10      Rocks are dangerous and they're deadly.  In his               13:31:39

11  experience, and in the experience I think of a lot of the

12  agents that testified, most of them are baseball sized.  Agents

13  are trained that they can use deadly force in response if the

14  appropriate circumstances exist.

15      Now, maybe as a society or maybe some of us personally         13:32:04

16  don't think that's right, but that's not how they're trained.

17  That's not the law.  The law is, you can employ deadly force

18  against a rock thrower if he poses a risk of serious bodily

19  harm.  That's the law.  And that's what he did.  He followed

20  his training and he followed the law.                             13:32:34

21      Agents are not always required to take cover.  You've

22  heard a lot -- you've heard this argument from the Government

23  over and over again, that you can only use deadly force as a

24  last resort.  But that's not really what they're trained.  What

25  they're trained is, if you have means, opportunity and intent     13:32:58

1   and all those three things come together, then deadly force is

2   appropriate.  So it's a little misleading to say that they

3   always have to take cover, it's not true.  And it's not the

4   policy.

5        And if they did have to take cover all the time, what        13:33:13

6   do you think that the drug smugglers would do?  Every time they

7   were trying to smuggle drugs they'd throw rocks at the agents,

8   because they would understand that that was the best way that

9   they could get their drugs into the country.

10       Pete Hermansen was the use of force expert that the          13:33:34

11   defense called.  He helped actually develop the use of force

12   policy.  And one of the things that he said -- and I'm

13   paraphrasing here, because this isn't exactly what he said, but

14   it was memorable, which is, agents are attempting to gauge a

15   reasonable response in a very unreasonable situation.            13:33:56

16       And I'm going to talk to you a little bit more about

17   that later on.  But what he was saying was that they have a

18   split second to make a decision.  And they do the best they can

19   under the circumstances.  They do what they think is reasonable

20   and necessary under the circumstances.                           13:34:18

21       And they're authorized to defend third persons against

22   the risk of serious bodily harm, it's not just themselves.

23   They know that rocks are dangerous and they don't have to wait

24   until someone is hit before they respond.

25       And we've already -- we already know that if Agent           13:34:39

─────── **Defense Closing Argument** ───────

1    Swartz had had less lethal he would have used it.

2         But, once an agent elects to use lethal force, as

3    Agent Swartz did, his focus is on the threat until there is no

4    longer a threat.  And what that means is, once he decided to

5    advance to the fence and stop the threat, his focus was                13:35:09

6    forward, not backward.  His training did not require him -- in

7    fact, it would have been against his training to turn back and

8    see if agents were safe.  His training did not require it and

9    it would have been opposed to him calling out on the radio

10   while rocks are frying in mid air to ask if everyone was save.         13:35:30

11        His training dictated that once he decided he needed

12   to use deadly force, his focus remained on the threat and

13   that's it.

14        You're not supposed to turn around periodically and

15   check to see if third parties are no longer at risk.  You're           13:35:48

16   not supposed to attempt to determine the trajectory and the

17   size of every rock flying over the fence.

18        How fast does a baseball-sized rock need to go to

19   seriously injure you?  Not that fast.  The Government seems to

20   be saying that the agents -- Agent Swartz and the other agents         13:36:18

21   just seemed to -- they just have to accept this risk, you know.

22   They have to accept that maybe they'll have their eye taken

23   out, or maybe their skull will be fractured.  The truth is,

24   they don't have to.

25        The truth is, their training dictates that they don't             13:36:38

UNITED STATES DISTRICT COURT

1    have to wait until somebody is smashed in the face.  Their

2    training dictates that they react and they respond, especially

3    when they're defending third parties or fellow agents.

4         You know -- and this is an interesting point I heard

5    from the trial, Officer Zuniga didn't even know his dog was          13:37:04

6    hit.  Agent Swartz did.  Two of the agents said they saw the

7    dog get hit.  But that's an example of how perceptions of what

8    happened can vary wildly.

9         I'm changing the subject a little bit.  But just

10   because Officer Zuniga chose to take cover, or Agent Plooy said      13:37:31

11   he felt okay, doesn't mean that that's what Agent Swartz

12   perceived, or that they heard what Agent Swartz heard and saw

13   what Agent Swartz saw.

14        You heard testimony that several officers at a scene

15   may perceive and react to a threat differently depending on         13:37:53

16   what they see and hear.  And that's true.

17        So was it dangerous?  Are rockings dangerous?

18        Well, Chief Fisher, the memo -- Chief Fisher was the

19   chief of the entire Border Patrol in 2014, and he wrote the

20   memo that's now in evidence.  And it says that the dangerous        13:38:20

21   situations that require -- require you to make split-second

22   decisions in circumstances that are tense, uncertain and

23   rapidly evolving.

24        And this is amazing.  Since 2007 -- so between 2007

25   and 2014, there were over 6,000 assaults against Border Patrol      13:38:40

1    agents resulting in numerous injuries to the agents.  Since

2    2010 to 2014 there were 1,713 rocking assaults where agents

3    responded and used deadly force 43 times, resulting in the

4    death of ten people.

5         The point is, is this idea and the suggestion by the      13:39:07

6    Government that rocks aren't dangerous, is just not supported

7    by the evidence.  It's just not.  This is a common risk.  It's

8    a daily risk that all these agents face.

9         Some of the things that the Government said are just

10   not true.  And they're unrealistic.                            13:39:31

11        Smugglers -- you may remember this question by the

12   Government.  Smugglers don't carry knives just to cut the

13   straps on their bundles.  Smugglers don't have rust stains on

14   their shoes and their pants because they're climbing the fence

15   to visit their grandma in the United States.  They don't throw  13:39:51

16   rocks just to distract agents.

17        They -- they aren't really trying to hurt agents.

18   That's not true, they're desperate.  A lot of money is

19   involved.  You heard evidence that this marijuana was worth

20   roughly 18 or $20,000.  If they get caught, they go to prison.  13:40:12

21        Let's not pretend that this isn't a big deal.  There's

22   a reason why agents put on Kevlar vests in the morning.

23   There's a reason that they carry sidearms.  It's because they

24   have a dangerous and unpredictable job.  And this is a

25   dangerous area.  And that's why AO testified and denied she saw  13:40:43

— Defense Closing Argument —

1    anything.

2          Was this dangerous?  Listen to the voice of Quinardo

3    Garcia.

4      (Audio played.)

5          MR. CHAPMAN:  Does he sound a little concerned to you?    13:41:13

6    Did he sound concerned?

7          This is dangerous stuff.  Let's not pretend that it

8    isn't.

9          How about this?  Listen to the voice of Officer

10   Zuniga.                                                          13:41:45

11     (Tape played.)

12         MR. CHAPMAN:  I'm sorry, this is dangerous, this is

13   not a game.  The Government may try to minimize this and tell

14   you it's not a big deal.  It is a big deal.  It's dangerous.

15         When Agent Swartz elected to use deadly force he was    13:42:17

16   trying to protect himself and the other officers from the

17   danger of harm that existed from these rocks.

18         When the rocking started, there were three officers

19   and agents in immediate danger of serious bodily injury or

20   death.                                                          13:42:49

21         The next slide I'm going to show you shows the

22   movement -- or the moment the camera panned and zoomed to the

23   smugglers on the fence.  And later you can see Officer Zuniga

24   reporting they were getting rocked.  A moment after that you

25   see Agent Swartz move to the fence.                             13:43:05

UNITED STATES DISTRICT COURT

—— Defense Closing Argument ——

1        Now what's significant about this exhibit is that the

2   red dots on the ground are just some of the rocks that were

3   recovered.  And it's pretty clear that the Government did not

4   make a serious effort to recover all the rocks.  They only

5   picked up seven.                                                    13:43:29

6        But if you can see the position of Zuniga's vehicle,

7   you can see rocks on the ground in the front, two in the back,

8   one by the sidewalk, two on the sidewalk.

9        The point is, is that every single person standing in

10  the slide on the left side -- Zuniga, Swartz and Wynecoop --       13:43:49

11  were at risk of getting rocked at that point when Agent Swartz

12  elected to approach the fence and defend his fellow agents.

13       Agent Swartz was standing in that exact area.  He

14  himself was at risk of getting seriously injured.

15       The next slide I'm going to show you shows that the           13:44:17

16  entire time Officer Zuniga was exposed, and at least two Border

17  Patrol agents had seen his dog get hit, and one of them yelled

18  out that Zuniga's dog had been hit.

19       He placed his dog in his vehicle after Swartz began

20  firing, but these -- this slide shows his position on -- the       13:44:42

21  one on the left when the rocking started, and the one after

22  where he went back.  And you can see there are -- even though

23  he's taking cover behind the vehicle, there are still rocks

24  landing behind him, if you see those red dots.  And there's

25  rocks landing to his left before he moves when the rocking         13:45:08

─── Defense Closing Argument ───

 1    started.

 2          This diagram shows his movement.  And again, the red

 3    dots here show where rocks were located and his movement.  And

 4    you can see that he was still -- whether he realized it or not,

 5    he was in the zone of danger from these rocks.                    13:45:28

 6          So let me show you the same thing with Agent Wynecoop.

 7          By the way, he says he doesn't remember saying he was

 8    hit by a rock, but he also says he feared for his life, he had

 9    his gun drawn, and he was thinking of his wife and children.

10    So think about that when you decide whether or not this was a     13:45:58

11    seriously dangerous situation or not.

12          So Wynecoop is initially on the left slide, he's out

13    near where the rocks are landing.  Then he backs up to the

14    sidewalk.  And again, there are rocks found in the area where

15    he was -- where he was standing.  He never was out of danger     13:46:20

16    from these rocks until they stopped.

17          Same thing, zone of danger, you can see his movement

18    and you can see these red dots where the rocks are landing.  So

19    for the Government to claim that he wasn't in danger of getting

20    hit by a rock is just incorrect.                                 13:46:41

21          So I'm going to show you this video where Agent Swartz

22    moves from his first firing position to his second.  And it

23    shows that as he's doing that, Zuniga and Wynecoop are still

24    exposed in a position where they could get hit by rocks.

25          And what you need to do when you look at this is, I        13:47:10

1    believe on the upper right corner you're going to see Zuniga

2    and you're going to see Wynecoop in the background as Agent

3    Swartz is moving up the fence line.

4            I'm going to play that again.  So even at this point,

5    he's moving up the fence line, these two officers, Wynecoop and    13:47:47

6    Zuniga, are still out in the street and still potentially

7    exposed to rocks.

8            This is a diagram showing basically where every agent

9    involved was.  And including -- we haven't talked about Joshua

10   Devowe and Quinardo Garcia or Stephen Porter.  They testified    13:48:21

11   that they were behind, I believe it's a water treatment

12   building, and they heard -- they heard rocks hitting the trees

13   to their southwest, or they heard something falling through the

14   leaves, which we can assume was rocks.

15           They kind of establish the outer limit of the range of    13:48:46

16   these rocks.  They weren't in danger, but everyone south of

17   them in the range of the rock throwers was.

18           And so the -- if you can see the purple for Stephen

19   Porter, that purple circle at the bottom of the slide, they're

20   saying that they heard rocks landing -- or sounds of something    13:49:09

21   landing through the leaves of the trees in front of them, which

22   basically puts everyone else that was in front of them at risk.

23           Now, Mr. Kleindienst showed you this picture of this

24   little chunk of concrete and implied that that couldn't

25   possibly be dangerous.  I just want to remind you of what    13:49:36

Defense Closing Argument

1    several agents said.

2           They said -- Agent Brown saw, for example, concrete

3    chunks exploding on the ground.  So it's misleading to take a

4    small piece of concrete and say this is how big it was.  It

5    wasn't.  These were bigger and they blew up on the ground.                    13:49:55

6           By the way, Agent Brown saw Officer Zuniga's dog get

7    hit.  He saw -- Brown and Devowe did not think they were in

8    immediate danger, but they didn't have the benefit at that

9    point of knowing how far these rocks were going.

10          Again, here's Agent Plooy.  He testified.  He's within    13:50:37

11   that same zone of danger, that's 100-foot throwing radius.

12          So let me move on.

13          Is it dangerous to arrest a smuggler?  Here's what

14   Stephen Porter said:  Smuggling is routine, but it's dangerous,

15   you just get used to it.                                           13:50:58

16          But he also said on cross-examination:  We aren't

17   required to ask smugglers if they're dangerous, we know they

18   are.  And that's why agents drive around in vehicles that look

19   like this, and this.  (Indicating.)

20          Corey Brown, he told his own story.  He said that he      13:51:23

21   was hit with a rock in the arm, his arm went numb, then he had

22   to engage in this harrowing struggle with a smuggler --

23          MR. KLEINDIENST:  Objection, Your Honor, that

24   misstates the evidence.

25          MR. CHAPMAN:  -- who was trying to get his gun.           13:51:40

UNITED STATES DISTRICT COURT

─────── Defense Closing Argument ───────

1    THE COURT:  The jury will determine what the evidence

2  was.

3    You may continue.

4    MR. CHAPMAN:  That actually may be -- Mr. Kleindienst

5  may be right.  I think it was actually -- it was Porter that    13:51:49

6  said that.  I don't know if you remembered the evidence on

7  that, but he said he was pursuing a drug smuggler.  The

8  smuggler turned around, threw a big rock, hit him in his right

9  arm, his right arm went numb, and then he had to apprehend him

10  while the guy was trying to take his gun from him.    13:52:07

11    You're right, it was Agent Porter.

12    Corey Brown also said that he saw the rocks hit the

13  police dog.  He said rocks exploded on the ground.  He said,

14  when you're along the border fence smugglers are constantly

15  watching you.  And the closer you get to the fence, the more    13:52:32

16  violent it gets.

17    The prosecutor mistakenly said that no one else took

18  their gun out that night before this happened.  Corey Brown

19  said that he did take his gun out.  He told his story about how

20  dangerous rocks are.    13:52:49

21    Agent Devowe testified, he said, you don't have to ask

22  a smuggler what he's going to do with the knife if he has one.

23  He said that the marijuana, which was roughly 20 pounds, was

24  worth about $800 a pound.  He said, you don't have to wait

25  until a rock hits you in the face before you respond with    13:53:23

1    deadly force.

2         Jamal Srour says that he always takes his gun out when

3    he pursues drug smugglers.  He says when there's drugs there's

4    guns, and when there's guns there's drugs.

5         Now I want to move on and talk to you about the timing                    13:53:47

6    of the shots and when death occurred here.

7         Mr. Elena Rodriguez was killed about ten seconds after

8    Agent Swartz elected to use deadly force and walked to the

9    first firing position.

10      (Video played.)                                                             13:54:17

11      MR. CHAPMAN:  All right.  That was about ten seconds

12   from the time he decided deadly force was necessary until the

13   time that he used deadly force.

14        By the time he moved to his second position, Mr. Elena

15   Rodriguez was dead.                                                            13:54:42

16        There's no question that at the time he used deadly

17   force he was reasonably acting to defend his fellow agents from

18   injury.  And there's no question really that when he fired from

19   that first position Mr. Elena Rodriguez was killed.  By the

20   time he got to the second position he was shooting at someone                  13:55:16

21   that was already dead.

22        He made a mistake, but that's not a crime.  He was in

23   a high-stress shooting environment and he didn't perceive

24   things correctly.  But at that point Mr. Elena Rodriguez was

25   dead.                                                                          13:55:35

Defense Closing Argument

1        The Government hasn't proved beyond a reasonable doubt

2   that he was not killed in the first volley of shots.  The

3   Government's claim that shot number 4 brought him down and he

4   remained alive is not supported by any scientific evidence in

5   this case, it's speculation.                                    13:55:55

6        The problem in trying to figure out what happened here

7   is this was an incredibly dynamic, fast and unpredictable event

8   that really wasn't recorded by any reliable evidence.  The only

9   thing that we have to figure out exactly what happened is the

10  autopsy, the conclusions of the pathologists, and this grainy    13:56:20

11  video.

12       But I'm going to explain to you why now the defense is

13  right that he was killed instantly with the first -- one of the

14  first three shots.

15       So ask yourself what makes sense.  The Government has      13:56:40

16  decided -- or presented evidence that gunshot wound number 4,

17  which hit Mr. Elena Rodriguez in the thoracic vertebrae,

18  paralyzed him and caused him to fall.  They've concocted this

19  theory that he fell forward, and even though he could control

20  his upper extremities, even though he could, he did not.  So he  13:57:14

21  fell forward and was unable to stop his fall with his hands.

22  Even though they concede that that injury would not have caused

23  paralysis of his upper body.  Think about that.

24       They want you to believe through Dr. Lew, he's shot in

25  the back, he can still control his upper extremities, and he    13:57:40

1    falls and somehow he lands on the backs of his hands instead of

2    bracing his fall.  All right?

3            Does that make sense?  No.

4            Let me ask you if what Dr. Wecht said and

5    Dr. Diaz-Trejo said about this event makes sense.                    13:58:04

6            So before I finish, Dr. Lew says, fell forward, lands

7    on the backs of his hands, that's why you have abrasions there.

8    Then somehow he lifts himself up and receives a fatal injury

9    later after Agent Swartz has taken a second position behind his

10   right ear, gunshot wound number 2.                                   13:58:28

11           Does that make sense or does this make sense?

12           Throws a rock, his body turns, he gets shot behind the

13   right ear, possibly gets the thoracic shot at that point too,

14   and collapses.  What happens when he falls down then?  What

15   happens?  He's got a gunshot wound that goes behind his right       13:58:56

16   ear in an upward trajectory, and goes through and lodges under

17   the skin in his left forearm.

18           Well, everyone agrees that that would cause -- it was

19   fatal and it would cause instantaneous loss of all motor

20   function.  Okay?                                                     13:59:21

21           So unlike number 4, he would not only be able to not

22   control his lower extremities, he wouldn't be able to control

23   his upper extremities.  So he throws, he turns, gets that shot,

24   falls forward.  Is he going to be able to arrest his fall with

25   his hands and protect his head?  No, no way.                        13:59:45

1        That's why he has the injuries and abrasions to the

2    backs of the hands.  That's why he has abrasions to the left

3    side of his face.  That's why his teeth are damaged, because

4    that's the first shot he got -- or one of the first three, hit

5    him here and killed him, and he couldn't control his upper          14:00:10

6    extremities.  And that is why abrasions on the backs of the

7    hands and the face.

8        And of all the evidence that you heard, all the

9    evidence, that is the most convincing about what happened when

10   Agent Swartz fired those first three shots.                         14:00:34

11       And it is total conjecture for someone to come in here

12   and say, I looked at this infrared video, and I have this

13   theory about the timing of the shots.  And so even though he

14   was falling forward and he had control of his upper

15   extremities, because he hadn't been shot in the head, he just       14:01:02

16   chose not to put his hands out and protect his fall.  That

17   doesn't make sense.

18       What makes sense is what Dr. Wecht testified about,

19   which is exactly how it happened, what I just described to you.

20       You got to -- you know, as a jury, you have to apply            14:01:22

21   your common sense.  And you have to be able to disregard

22   evidence that is basically just conjecture and hone in on

23   evidence that's persuasive.

24       And of all you've heard about this, I would submit

25   that the most credible thing you heard was that.  And you heard     14:01:41

1    our expert come in and say, it is impossible to definitively

2    say how this happened.  There isn't enough evidence.  What

3    Dr. Lew is doing is conjecture.

4          But this is what we know.  This is the hard evidence

5    that we know about.  These abrasions.  This is why he --      14:02:03

6    Dr. Wecht thought the person fell down forward.  And it makes

7    sense.  Doesn't it?  It makes sense.

8          So I've gotten away from my PowerPoint.

9          But if that's the case, and if that means that Agent

10    Swartz took that action from the first firing position, that's   14:02:35

11    the end of the case right there, because he was legally

12    authorized to do what he did.  And it is sad that anyone dies,

13    but he was justified in taking the action that he did.  And

14    Mr. Elena Rodriguez was killed at that point.

15          I'd also point out that the second gunshot that     14:02:57

16    Dr. Lew says made Mr. Elena Rodriguez fall to the ground,

17    gunshot wound number 4, and that he was somehow still alive

18    after Agent Swartz took his second position, that was fatal

19    too.

20          You know, both those shots happened from the first   14:03:22

21    position, and both were fatal.  There could have been five

22    surgeons and a hospital right next to him and he wouldn't have

23    survived.

24          Just use your common sense here.  You know, you've

25    heard a lot of evidence over the last month.  You're going to   14:03:58

— Defense Closing Argument —

1    pick and choose what is persuasive and what isn't.  This the

2    most persuasive evidence you're going to hear about this, about

3    when the death occurred.

4          By the way, Dr. Lew claimed that somehow this injury,

5    gunshot wound number 2 that went like this, this trajectory,          14:04:36

6    injured the brain stem, which is just physically impossible.

7    The brain stem is at the base of the skull.  Dr. Wecht

8    testified about it.  It's just completely wrong.  It's not only

9    wrong, she didn't put it in her report.  It wasn't in the

10   Mexican pathologists' report.  Nobody ever said it before.  And  14:04:58

11   it just came up out of the blue.

12         You know, five years later she testifies that she

13   talked to Dr. Madrigal and he said, oh, there was some damage

14   to the brain stem.  It's wrong on so many levels, and it makes

15   you question, what can you believe?  There's no way this           14:05:21

16   injury's going to injure the brain stem.  You heard that from

17   Dr. Wecht.  And you didn't hear any rebuttal testimony on that.

18   None.  Because she got it wrong.  What she's trying to do is

19   fill in the gaps for the Government and persuade you that this

20   event happened in a way that it didn't happen.                     14:05:46

21         That's what I was trying to say.  There's an infinite

22   number of possibilities as to how this could have happened.

23   We've explained to you what makes sense based on the evidence

24   that exists.  But we can speculate forever if we want to.

25         By the way, Dr. Diaz-Trejo -- I mean, we just read         14:06:19

─────── Defense Closing Argument ───────

1    this stipulation into the record.  And you'll have it, you can

2    review it.  But, you know, I mean, when they met in 2014, there

3    was a high-level international meeting with, I think, four

4    federal prosecutors, several Mexican officials, Mexican

5    attorneys, in August of 2014, much closer in time to what            14:06:55

6    happened.

7          And they asked Dr. Diaz-Trejo at that point, how do

8    you think this happened?  And he said, I think he was shot in

9    the head first, gunshot wound number 2, and he collapsed.  And

10   that's why he's got abrasions on the backs of his hands and on      14:07:16

11   his face.  Nothing complicated about it, it just makes sense.

12   Right?

13         They specifically asked him, well, what about our

14   theory, the Government's theory, that he was moving and he got

15   shot in the back, number 4, collapsed, then at some later point     14:07:40

16   he was still alive, raised his head, and was shot behind the

17   right ear?  Diaz-Trejo is like, no.  That doesn't explain the

18   abrasions.  It doesn't explain the damage on the face.

19         Common sense.  It's just common sense.

20         So you can read that stipulation, and it's basically a        14:08:05

21   compilation of the notes of two federal prosecutors that were

22   present and recorded what Dr. Diaz-Trejo said.

23         But when he had an opportunity at this high-level

24   meeting, closer in time to this event, to tell them what

25   happened, he utterly rejected the Government's theory in this        14:08:28

—— **Defense Closing Argument** ——

1    case, utterly.  Because it doesn't make sense.

2          What they're trying to do -- and I'm going to talk to

3    you about this as we proceed.  But it's like that infrared

4    video, and I'll show it to you in a minute, they're trying to

5    stitch together their theory with evidence that isn't          14:08:57

6    scientifically based and is conjecture.  They're trying to

7    stitch it all together.  They're trying to fit a round peg in a

8    square hole, just to convince you that Mr. Elena Rodriguez

9    remained alive when he was on the ground after the first volley

10   of shots.                                                      14:09:19

11         Here are the facts:

12         Number 2 caused complete loss of motor function.  He

13   couldn't arrest his fall.  He couldn't put his hands out to

14   protect himself.  The backs of his hands, I've talked about

15   this already, his face, his teeth, got damaged.               14:09:37

16         The fact that he ended up on the right side of his

17   face or sort of a little bit, I mean, that could be the

18   momentum.  There's no way to tell for sure.  But if he throws

19   and he gets hit and he collapses into the wall of the building,

20   and falls forward, he -- the momentum can move his face in one 14:10:00

21   direction or another.

22         To say, as Dr. Lew did, this is how it happened, it's

23   just conjecture, it's speculation.  It's possible.  But the

24   evidence -- there's just not enough evidence there for anybody

25   to say with a reasonable degree of medical certainty or        14:10:22

─── Defense Closing Argument ───

1    scientific certainty that's how it happened.

2           Could have been agonal movement.  We heard about

3    agonal movement.

4           There's a theme here when you look at our experts and

5    what they have to say and what their experts are saying.  Our          14:10:42

6    experts acknowledge the limitations of science.  They

7    acknowledge -- you know, our graphics expert acknowledges the

8    weaknesses in the available evidence.  Our pathologist

9    acknowledges the uncertainty of what happened because

10   the -- there's just not enough evidence to say with any -- with        14:11:08

11   any level of certainty.

12          Theirs pushed the envelope, push, push, push, round

13   peg in a square hole.  That's what they're trying to do.  You

14   got to get back to your common sense and ask yourself, what

15   makes sense?  What's the best evidence here as to what                 14:11:27

16   happened?

17          So why did Agent Swartz continue to fire from a second

18   and third position?  Do you really think it's because he was

19   fed up?  He was fed up?  Tell me one scintilla of evidence the

20   Government -- one scintilla of evidence that was offered that          14:12:14

21   shows that he has a temper, that he was frustrated, that he was

22   angry, one scintilla of evidence that he was fed up.  There is

23   none.  None.  And you can bet if there was you would have heard

24   about it.

25          So, he made a mistake.  He did it because of                    14:12:37

UNITED STATES DISTRICT COURT

1    distortions brought on by the brain's emergency response

2    system.

3            And remember, their expert, Trompetter, on this issue,

4    he conceded, these studies that have been going on for a long

5    time, some of them are 20 years old, 30 years old, it's                14:13:06

6    well-known in the scientific community that police officers in

7    officer-involved shootings experience extreme distortions

8    during the shooting event.  He conceded that a study documented

9    that 84 percent of officers involved in shootings experienced

10   auditory distortions, 52 percent reported memory loss for part         14:13:29

11   of the event, and 46 percent reported loss for some of their

12   own behavior.  They couldn't remember what they did, 46

13   percent.  Not all of it, part of it.

14           Do you remember the examples we talked about with

15   Mr. Trompetter, an officer said I told the SWAT team that the          14:13:55

16   suspect was firing at me from down a long, dark hallway about

17   40 feet long.  When I went back to the scene the next day, I

18   was shocked to discover that he had actually only been about

19   five feet in front of me in an open room.  There was no dark

20   hallway.                                                               14:14:16

21           This is the type of thing that happens when you're

22   involved in a high-stress event like this.

23           Another officer reported, I saw the suspect suddenly

24   point his gun at my partner.  As I shot him I saw my partner go

25   down in a spray of blood.  I ran over to my partner and he was         14:14:37

1    standing there unharmed.  The suspect never got off a shot.

2           This is what happens, this kind of stuff.  This

3    is -- their perception gets completely messed up.

4           56 percent in the study that we discussed saw events

5    in slow motion.  79 percent experienced tunnel vision.  74 go        14:15:00

6    on auto pilot with little or no conscious thought, they just

7    revert to their training.

8           Agent Swartz didn't hear his gun go off.  He didn't

9    know how many rounds he fired.  He did not know that he ejected

10   a magazine until his foot bumped into it later.  He had           14:15:23

11   impaired memory of all the details of the event, and does not

12   remember even whether he gave verbal commands to the rock

13   throwers to stop throwing rocks.  And he thought he was

14   shooting at a second rock thrower from that second position.

15          Now, Mr. Trompetter, the Government's expert, claims        14:15:44

16   that that's unusual, that he might have memory impairment of

17   some but not -- some events, but not the actual shooting.  The

18   only thing I'll say in response to that is that Dr. Miller

19   disagreed.

20          And Mr. Trompetter claimed that there was no such           14:16:07

21   thing as threat magnification.  I don't know if you remember

22   that, which Dr. Miller testified.  And we pointed out while we

23   were cross-examining Mr. Trompetter that we actually just

24   pulled up an article on threat magnification on the internet.

25          So you can take that for what it's worth.                   14:16:29

69

1      The lighting and the natural obstructions also

2  affected his perception of what was going on.

3      And again, from this second position, tell me -- tell

4  me, somebody tell me -- maybe the Government will, I'm sure

5  they will because they're going to get to go last.  But there's      14:16:58

6  no evidence here that he would intentionally fire on this man

7  when he was on the ground.  There's no evidence that he was

8  angry, that he was frustrated, that he was fed up.  That's just

9  pulled out of the air.  That's just pulled out of the air.

10      Why did he cry afterwards if he was so fed up?  Why      14:17:23

11  did he throw up afterwards if he was so fed up?

12      You know, he testified.  And you can assess his

13  credibility.  It's up to you.  I submit there's no evidence at

14  all that he was fed up or angry.

15      Malice?  Every single time he had the opportunity for      14:17:51

16  this to useless lethal force, he did.  Tell me how that's

17  malicious, somebody.

18      Use your common sense.  They're trying to paint him as

19  a hothead that lost his temper.  That doesn't make sense.

20  That's not what happened.      14:18:16

21      Mr. Elena Rodriguez was participating in a drug

22  operation.  Let's not forget that.  He had rust on his shoes

23  and his pants.  And I can guarantee you if the Government

24  didn't really think that was rust, you would hear about it.

25  They have the FBI crime lab, they have a huge amount of      14:18:40

1   resources.  If they didn't think there was rust on his shoes

2   and it was something else, you would have heard about it.

3          Agents look for rust.  And they don't test -- you

4   know, when they arrest a drug suspect that has rust on his

5   shoes, they don't send the shoes out for testing, it's rust.          14:18:58

6          Mr. Elena Rodriguez was throwing rocks.  He probably

7   was on the American side as a scout earlier and that's why he

8   had the rust on his clothing.  He was trying to hurt agents to

9   help his fellow smugglers get back into Mexico.

10          This idea that you heard that smugglers are throwing          14:19:25

11  rocks at agents but they're not really trying to hurt them,

12  really?  Think about that.  If they weren't trying to hurt

13  them, the rocks were landing pretty close to where they were,

14  pretty close.  That's just not supported by any evidence in

15  this case.          14:19:57

16          Now we read the transcript of what the FBI informant

17  said, too.  Someone that had been paid over $200,000 and was

18  considered a reliable informant by the FBI, spoke to

19  co-conspirators and said that Mr. Elena Rodriguez was part of

20  this operation.  And the video confirms it.  And the Government          14:20:19

21  conceded it.

22          I'm not going to spend a lot of time on this,

23  Mr. Tavernetti and Mr. Fredericks' competing testimony about

24  the video analysis.  But it's pretty -- it's pretty -- the one

25  thing that you can take from Mr. Fredericks' testimony is there          14:20:47

1    just isn't enough evidence, and the video just isn't clear

2    enough to allow Mr. Tavernetti to generate the exhibits that he

3    did and claim as he did that they were reliable, there just

4    isn't.

5         I mean, here's an example.  This is a picture of the        14:21:13

6    rock throwers.  There aren't enough pixels to say how many

7    there were or where they were.  But somehow Mr. Tavernetti

8    creates a video animation with these people walking all around.

9    It's just not supported by the evidence, it's unreliable.

10        The thermal video is what I really want to talk about,      14:21:41

11   because the thermal video is one of the linchpins of the

12   Government's case.  This blurry, out-of-focus video, that's

13   taken while this infrared camera is panning over the body of

14   Mr. Elena Rodriguez, and they claim that it shows movement, is

15   just preposterous.                                               14:22:10

16        Cassandra Clarke is the best witness on that.  If you

17   remember her testimony, she had been working the camera room

18   for two years.  She'd used the thermal video.  She knew how to

19   use it.  She said that the video that the Government's using to

20   show movement was out of focus.  She also said that in her job   14:22:31

21   she's literally seen rocks out in the desert moving, and honed

22   in to them to see if they were smugglers, and it turned out

23   that it was just rocks because the thermal was so bad, so

24   unreliable.

25        Mr. Liscio says that Tavernetti's work basically is         14:22:53

Defense Closing Argument ─────────

1    art, it's not science, it has no scientific foundation.

2            And this is -- I wanted to talk to you about this,

3    because this is really manipulative.  They -- the Government

4    came in here and they took a dark blob on the ground and they

5    put a figure over it and purported to you, represented to you          14:23:25

6    that that was scientific proof of the position of the decedent

7    on the ground.

8            This is just pulled out of whole cloth.  It is absurd.

9    Think about that.  What they're doing here is creating an image

10   for you in your mind, because they want you to think about this         14:23:57

11   image, even though it has no scientific basis at all.  But they

12   want you, when you go back and deliberate and think about

13   whether he was alive on the ground or not, they want you to

14   think about that image.  They're trying to manipulate you.

15   There's no scientific basis for that at all, none.  It's art           14:24:17

16   posing as science.

17           Now, I don't know if you remember, you probably do,

18   Eugene Liscio showed you these slides.  And I want to show them

19   to you again because it's important.

20           The thing that's important about these slides is they          14:24:49

21   represent how quickly someone can throw a rock.  And the

22   Government has argued that he was intentionally shot in the

23   back, boom, boom, boom, that's point 33 of a second, roughly

24   speaking.  That's how long it could have taken him, no more, to

25   throw a rock.                                                          14:25:14

UNITED STATES DISTRICT COURT

1          If you're cocking back to shoot at a rock thrower, and

2     that happens, you're not intentionally shooting someone in the

3     back, you're shooting at a rock thrower and he moves.

4          And this gets back to the fact that this was a

5     dynamic, fluid, scary event.                                    14:25:34

6          By the way, because he turns like that doesn't mean

7     he's no longer a threat.  How quickly would -- how fast would

8     it take him -- or how long to do it again?  So the idea that

9     because he was shot behind the right ear, that somehow that

10    means that Agent Swartz did that intentionally and he wasn't   14:26:03

11    responding to a threat, that's just not true.

12         The thermal video -- and I'm going to -- I'll get back

13    into this -- is deeply flawed.  It's completely misleading.

14    It's out of focus.  It's blurred.  You know what Cassandra

15    Clarke said about it.  And here's the example of how unreliable 14:26:34

16    it is.  After the shooting you see a screen shot from the right

17    side -- on the right side that shows the scene with a level of

18    clarity.  Before the shooting, while the figure of Mr. Elena

19    Rodriguez is shown on the ground, you can see how blurry it is,

20    and out of focus.  And the video was moving, it was panning.   14:26:59

21         This is really interesting, this is an example of how

22    unreliable the thermal video was.  This is just screen shots

23    taken of -- from the exhibits that are in evidence in this

24    case.  23:22:03, look at the streak kind of running diagonally

25    through the middle, and you can see kind of dark blobs that     14:27:39

**Defense Closing Argument**

1    represent street lights.  Now look again.

2         Okay.  This is the camera panning, and now we're at

3    23:22:03.  Before we were at 22:03.  And you can see, the

4    shapes of the lights have changed.  And the point I'm trying to

5    make here is that it's completely unreliable if you're trying          14:28:13

6    to look at something like this and determine if there's

7    movement.  The lights weren't moving, that's just the nature of

8    infrared video.

9         Here's another example.  Look at the difference and

10   how the lights look different.                                          14:28:40

11        I'll talk to you a little bit about the blood spatter

12   experts.  This is another example of the Government pushing the

13   envelope in terms of the evidence.  They are -- they are

14   claiming that the transfer stain on the decedent's left

15   forearm, and some passive drops of blood on the ground,                 14:29:06

16   indicate that he was moving on the ground.

17        But if you really think about what we know and what we

18   heard from the evidence, all they really indicate is that when

19   this stain occurred, and when the stain on the ground occurred,

20   the decedent was above those positions.  Right?                         14:29:33

21        But they've gone farther than that.  They've said, no,

22   he's not just above those positions, he has to be on the ground

23   in a certain position.

24        Our expert, Stuart James, says, look, all you can

25   conclude from these stains is that he was above the various            14:29:56

75

1    positions on the arm and the ground when they happened.  He

2    could have been standing, he could have been falling, he could

3    have been on the ground, his head could have been prone on the

4    ground or up.

5              But, what Mr. James said, is to go farther than that    14:30:11

6    is going outside the realm of what bloodstain pattern analysts

7    do into the realm of forensic pathology.

8              So, it was not appropriate for their expert to say

9    that, because he's not a forensic pathologist.  It's just

10   another example of how they're pushing the envelope and trying   14:30:39

11   to make a round peg fit a square hole, because they want it to

12   dovetail with their theory that he was still alive and moving

13   on the ground.

14             I'm going to talk to you a little bit about the jury

15   instructions.                                                    14:31:05

16             The Judge has decided to instruct you on three

17   different counts.  He's going to instruct you on the charge in

18   this case, which is second degree murder.  Then he's also going

19   to instruct you that if you can't reach a verdict on that

20   count, you can also assess Agent Swartz's conduct under          14:31:25

21   voluntary manslaughter and involuntary manslaughter.

22             But let's talk about second degree murder for a

23   second.

24             The Government has to establish that the killing was

25   unlawful.  I've already talked about that.  It was -- it was     14:31:45

Defense Closing Argument

1   lawful, it was in response to deadly -- it was in response to

2   the risk posed by Mr. Elena Rodriguez, and they're not going to

3   be able to prove that, that it was unlawful.

4        They have to prove that he acted with malice, which

5   means he intentionally or recklessly with extreme disregard for       14:32:11

6   human life killed the decedent.  But it's not malicious if

7   you're suffering from extreme visual and memory distortions of

8   an event --

9        MR. KLEINDIENST:  Judge, that's not part of the

10  instruction, that last paragraph.                                     14:32:32

11       MR. CHAPMAN:  No, that's right, this is not the

12  instruction.  This is my argument.

13       He'll read you the instruction.  But it's not

14  malicious to suffer extreme visual and memory distortions of an

15  event such that you don't perceive something the way it is.          14:32:49

16       He'll talk to you about voluntary manslaughter.  And,

17  again, this is not the instruction, it's a paraphrase, and it's

18  my thought on it.  But it's the same thing, they have to

19  establish that when he killed him from that first position,

20  that that firing in the first position was unlawful.  And it         14:33:12

21  was done, in the case of voluntary manslaughter, upon a sudden

22  quarrel or heat of passion, which just doesn't exist in this

23  case.

24       Again, you have to assess his conduct in the context

25  of the brain's emergency response system and the perceptual         14:33:34

Defense Closing Argument

1    issues that he was dealing with.

2          And the last one is involuntary manslaughter.  But

3    truthfully, you're not -- if you just apply your common sense

4    here, and look at the best evidence of what happened, what

5    happened was, he responded to deadly force and the decedent was          14:34:03

6    killed from the first firing position.  And that's the end of

7    it.  From there on his actions don't matter because he was

8    shooting a dead person.

9          Now, the Government has argued that Agent Swartz was

10   not acting in self-defense.  The judge is going to give you an          14:34:33

11   instruction on self-defense.  And part of it, the very end, is

12   going to say that the Government must prove that -- beyond a

13   reasonable doubt that he did not act reasonably in defending

14   himself and others from the risk of death or great bodily harm.

15         And they can't prove that.          14:34:56

16         The thing that makes this case unusual and different

17   from a typical homicide case is that when you're dealing with a

18   law enforcement shooting, law enforcement officers come in with

19   specific training on use of force.  And the reasonableness of

20   their actions has to be viewed not just from the perspective of          14:35:22

21   a normal person, but from a reasonable officer on the scene.

22   And not with the benefit of 20/20 hindsight.

23         And you're going to get an instruction on this.

24         And this is out of the instruction he's giving you,

25   the calculation of reasonableness must embody allowance for the          14:35:43

UNITED STATES DISTRICT COURT

1   fact that the police officers are often forced to make

2   split-second judgments in circumstances that are tense,

3   uncertain and rapidly evolving about the use of force that is

4   necessary in a particular situation.

5          Reasonableness of an officer's use of force requires          14:36:00

6   careful attention to the facts and circumstances of each

7   particular case, including the severity of the crime at issue,

8   whether the suspect poses an immediate threat to the safety of

9   the officers, and whether he's actively resisting or attempting

10  to evade arrest by flight.                                           14:36:22

11         And most importantly, this is the last paragraph of

12  this instruction, reasonableness is determined by the

13  information possessed by the officer at the moment force -- at

14  the moment that force is employed.  Knowledge of facts and

15  circumstances gained after the fact cannot be considered in          14:36:41

16  evaluating the reasonableness of the officer's use of force.

17         And that's really important to think about.  What

18  essentially this instruction is asking you to do is put

19  yourself there and not try to think about this case from your

20  perspective now five years later.                                    14:37:06

21         But instead, with the training that Agent Swartz has,

22  on the dark street, by the international boundary fence, where

23  it's dangerous and scary and rocks are coming down, and you

24  assess his actions in that context, not based on what you

25  learned later or what you think now.  That's how you have to         14:37:30

1    think about this case.

2          And it doesn't matter whether this dog was hit or not.

3    What matters is that someone said the dog was hit.  Why?

4    Because that impacted Agent Swartz's perception of the danger.

5    Two Border Patrol agents said the dog was hit.  Officer Zuniga          14:37:59

6    said the dog wasn't hit.  It doesn't matter.  In terms of his

7    application of the use of force, it's what he thinks.

8          It doesn't matter whether Agent Wynecoop's foot was

9    hit or not.  What matters is that he heard somebody say that

10   he'd been hit by a rock.                                               14:38:18

11         It doesn't matter that he didn't see the knife in the

12   back of the drug smuggler's pocket that was on the fence.  What

13   matters is that an agent said out loud, he's got a knife.

14         It doesn't matter how big the rocks were.  What

15   matters was that in his experience they're baseball-sized          14:38:46

16   rocks.  And what he heard that night was someone was hit, a dog

17   was hit, and the smuggler had a knife.  Reasonableness is

18   determined by the information possessed by the officer at the

19   moment that force is employed.  That's the information he had

20   available to him.                                                      14:39:07

21         He heard all these things.  He elected to use deadly

22   force.  He approached the fence.  He knew rocks were coming

23   down.  He knew somebody had been hit.  And he had to make a

24   split-second decision.  He didn't have the benefit of 20/20

25   hindsight.  He didn't have years to make a decision like the          14:39:27

---

**Defense Closing Argument**

1    Government did on this case.  He didn't have the benefit that

2    we have now sitting in this courtroom five years later.  He had

3    a second.  You have to evaluate his conduct in that context.

4            Knowledge of facts and circumstances gained after the

5    fact cannot be considered in evaluating the reasonableness of          14:39:55

6    his force -- the use of force.  And what that means is -- the

7    Government may come in after I'm done and say, well, these

8    rocks weren't very big.  It's what he thought.  It's what he

9    reasonably thought based on his experience.

10           Or they may say, well, a fellow agent, he wasn't          14:40:19

11   actually hit in the foot.  But that doesn't matter, it's what

12   Agent Swartz thought.

13           The Government has to prove that Agent Swartz

14   committed a crime beyond a reasonable doubt.  If they can't do

15   that, your verdict has to be not guilty.          14:40:51

16           If you think he maybe committed a crime, but it hasn't

17   been proven beyond a reasonable doubt, the verdict's not

18   guilty.

19           You don't have to find him innocent.  There's a

20   difference.  What you have to do is assess the evidence, and if          14:41:12

21   they haven't met that burden, if there's still a reasonable

22   doubt in your mind that he committed a crime, you have to find

23   him not guilty.

24           Let me talk to you about reasonable doubt in this

25   case.          14:41:27

---

Defense Closing Argument

1     The Government has not proven beyond a reasonable

2 doubt that when Agent Swartz elected to take action he acted

3 unreasonable.  The Government has not proven that Mr. Elena

4 Rodriguez was not killed with one of the very first shots.  The

5 Government has not proven that Agent Swartz was not suffering          14:41:46

6 perceptual distortions in the event that caused him to

7 reasonably believe that he was shooting at a second rock

8 thrower.

9     The Government has to prove beyond a reasonable doubt

10 that he did not act in reasonable self defense.                        14:42:03

11     Now I'm done here, or almost.  But the Government gets

12 to stand up and they get to respond to what I said.  And

13 they -- he may be up here for an hour, I don't know.  But

14 there's a reason for that.  And the reason is because the

15 Government has to prove this case beyond a reasonable doubt.           14:42:28

16 This is the cornerstone of our justice system.

17     You have listened to the evidence carefully.  You've

18 asked insightful questions.  I think everyone in this

19 courtroom, the judge, everyone, the prosecutors believe that

20 you've been incredibly attentive.  So we thank you for that.          14:43:01

21     But I want you to remember something here.  This is a

22 federal law enforcement agent that is on trial here.  He is a

23 human being.  He has human frailties.  He went out there and he

24 did the best he could.  And when the Government dehumanizes him

25 the way they did, and calls him an executioner, and says that         14:43:44

1   he was fed up, and that he just shot somebody intentionally on

2   the ground because he wanted to, that's just plain wrong.

3   That's just not supported by the evidence in this case.

4           We have in front of us -- or what you have in front of

5   us, is a man in a very dangerous situation that did the very          14:44:13

6   best he could.  And he did what was right.  He tried to defend

7   his fellow agents.  And for someone to suggest that that's not

8   everything he did, and that there's some ulterior motive, well,

9   that's just flat wrong.

10          He elected to use deadly force.  He was scared to           14:44:46

11  death, just like Agent Wynecoop.  And he did.  Because rocks

12  are dangerous.  And no agent has to get injured before they can

13  respond.

14          The Government may not like the fact that agents can

15  use deadly force in response to rocking events, but that's law      14:45:15

16  right now, that's the law, that's what he was trained on.  And

17  that's what he did.

18          And it is unfortunate, it's truly unfortunate when

19  anyone dies.  But Agent Swartz was following his training.  And

20  from that first position when he fired those first shots, he        14:45:41

21  was lawfully authorized to exercise that force, and he killed

22  Mr. Elena Rodriguez.  And that is truly what happened.  And you

23  cannot find him guilty of anything as a result of that.  He was

24  acting on his training.  And that's really the end of it.

25          Beyond that, he had perceptual distortions.  But it         14:46:07

Government Rebuttal Closing Argument

1    doesn't matter because Mr. Elena Rodriguez was dead by the time

2    that Agent Swartz got to that second position.

3         I'm done.  Thank you for listening to me.

4         When Mr. Kleindienst gets up, he's going to say some

5    stuff, and I'm probably going to disagree with it, but I'm not

6    going to be allowed to say anything.  It's going to be very

7    frustrating for me.  So what I want you to do is remember that

8    he's standing up now because it's their burden to proof to

9    prove this case beyond a reasonable doubt.  And if he says

10   something that you don't agree with, think about the evidence,

11   and talk about it when you deliberate.

12        But what you should do, what the right thing to do

13   here, the just thing to do here, is to find Agent Swartz not

14   guilty.

15        Thank you for your time.

16        THE COURT:  Let's recess until 3:00 o'clock.

17     (Recess at 2:47 p.m., until 3:06 p.m.)

18        THE COURT:  Show the jury's returned back to the

19   courtroom, the presence of all counsel and the defendant.

20        Mr. Kleindienst, whenever you're ready you may

21   proceed.

22        MR. KLEINDIENST:  Good afternoon again.

23        I was listening to Mr. Chapman's argument, and what

24   really occurred to me is that what his central premise is, is

25   that a law enforcement agent, a Border Patrol Agent, has almost

14:46:38

14:46:54

14:47:08

15:06:39

15:07:04

Government Rebuttal Closing Argument

1   the powers of God to decide when to use lethal force and

2   nonlethal force.

3           And according to Mr. Chapman, based on the facts in

4   this case, that Mr. Swartz had enough information to make the

5   decision to walk calmly across the street, not a split-second        15:07:24

6   decision, but to walk calmly across the street, go up to the

7   fence, and shoot three rounds at Jose Elena.

8           Now, Mr. Chapman apparently has decided and I guess

9   knows more than all of us, that he was killed in those first

10  three shots.  That's really important.  That's a really             15:07:47

11  important fact that he put forward, and he was certain of that

12  fact, that he was killed in those first three shots.

13          Because then he doesn't have to explain why he put

14  nine more shots into that body as he lay on the ground.

15  Because he can't put a square -- a round peg in a square hole        15:08:06

16  and explain to you why it is that his client continued to shoot

17  at a body on the ground.

18          And I guess what he wants you to believe, that it's

19  okay for Agent Swartz, and you can excuse him, if he decided

20  just to fire into a dead body.  That's what he wants you to          15:08:26

21  believe.

22          Now, not every rocking, not every rocking justifies

23  the use of lethal force.  Every rocking is different.  What

24  Mr. Chapman wants you to believe is that if there are rocks

25  being thrown, and his client made a determination that he had        15:08:48

UNITED STATES DISTRICT COURT

1    to stop those rockings, and they were a danger to his fellow

2    agents, that that was sufficient for him to commit second

3    degree murder.  That's what he wants you to believe.

4          That once rocks are thrown, he can use whatever force

5    he wants to to stop the rocking.  And that's just not the law.    15:09:12

6    Those aren't the facts.  And that's not how they're trained.

7          They're trained from the moment they get to the

8    Academy until they come to the station that you only use lethal

9    force as a last resort.

10          Why is that?  Because we don't kill people unless    15:09:31

11   there's a reason, a good reason, a really good reason to kill

12   people, because you either have to protect yourself or somebody

13   else from death or serious bodily injury.  It's just not a free

14   killing zone for a Border Patrol Agent, as Mr. Chapman wants to

15   point out to you in his closing.    15:09:53

16          What he didn't address is what the defendant assumed

17   but didn't know.  And yes, officers are required sometimes to

18   make split-second decisions.  And yes, they are required

19   to -- they can evaluate the situation as it's occurring.  But

20   it also has to be done reasonably.    15:10:21

21          And in this case the defendant, by his own admission

22   on the witness stand, by his own admission, the moment he made

23   the decision to use lethal force, he had no idea that anybody

24   else there on the street was in danger.  He made no inquiry.

25   He didn't determine that Agent Wynecoop had taken cover behind    15:10:43

**Government Rebuttal Closing Argument**

1   the taxicab.  He didn't determine that Agent Wynecoop then

2   moved further back to the brick wall.  He didn't seek to

3   determine that Officer Zuniga stood behind his car which was

4   sufficient cover.  He didn't do any of that.

5           In fact, he never even saw a rock.  All he told you is   15:11:01

6   two things.  One, that he thought he heard a hollow thud, and

7   assumed that the dog had been hit.  A dog that the handler

8   himself said, I know Tesko, and I'd know if he was hit.  And he

9   didn't react like he was hit.  And there was no injury to him.

10          Now I'm not saying it's made up, I'm just saying that   15:11:27

11  there is an excuse there that doesn't quite fly with what's

12  reasonable in this case.

13          And the second premise for moving to the fence to use

14  lethal force to commit second degree murder is that

15  Mr. Wynecoop made these statements.   15:11:46

16          Now, Agent Wynecoop, and you saw his testimony on the

17  overhead, testified that he was hit by a rock.  And he wasn't

18  even hit by a rock.  A rock hit the ground where he was

19  standing and rolled up and hit his shoe.  That's not grievous

20  bodily injury.  That's not a threat of physical injury.  He was   15:12:08

21  not in danger of being killed or threatened seriously by this

22  rock that rolled on the ground and hit his boot.

23          Now Agent Wynecoop testified that he doesn't ever

24  remember telling Agent Swartz, hey, we're getting rocked.  I've

25  been hit by a rock.  Shit, I've been hit by a rock.  He doesn't   15:12:31

Government Rebuttal Closing Argument

1    remember saying that.  And you'd think he would if it was such

2    a stressful event for him.  But he didn't say that.

3         Agent -- Agent Swartz says he heard that.  And whether

4    or not that's something that came up later on and he just

5    integrated it into his story to justify what he did, we don't         15:12:51

6    know.

7         We do know with respect to this perception of threat,

8    that Agent Wynecoop -- when he was approached by Supervisor

9    Cruz-Mendez -- if you remember in the case, after the shooting

10   is over, Supervisor Mendez came to the scene, he was the only        15:13:10

11   supervisor there, he found Lonnie Swartz over by the telephone

12   pole.  He goes up to him and asks him what happened.

13        And this is what Agent Swartz had to say when he had

14   the chance to explain that he thought Agent Wynecoop was in

15   danger.                                                               15:13:32

16        And this is Agent Mendez's testimony on, I believe,

17   April 10th, 2018.

18        Did he tell you -- did he volunteer to you --

19        "He" being Lonnie Swartz --

20        -- what had happened?                                           15:14:03

21        He said that -- he said that -- initially he

22        said something in regards to individuals coming

23        across with bundles of marijuana, two individuals

24        on the fence, and rocks being thrown.

25        Did he say anything else about what happened?                   15:14:15

UNITED STATES DISTRICT COURT

1    And this is right after the event.

2        He said that he had -- he said that he had fired

3    his weapon, and he thinks he had hit someone, or

4    something within those lines -- it was in a frantic

5    state, in a very nervous state.                              15:14:28

6        Question:  Did he indicate whether or not

7    anybody was hit with rocks or anything?

8        Answer:  He mentioned something about a dog

9    getting hit by a rock.

10       A dog getting hit by a rock?                             15:14:41

11       Yeah, a canine, a canine dog, NPD.

12       Question:  Did he mention any other agents'

13   names who got hit by a rock?

14       No, sir.

15       How many times did he tell you that the canine          15:14:53

16   had been hit by a rock?

17       In that period of time, one or two times, I

18   believe.

19       This is right after the event.  And he knows he's

20   killed somebody.  And this is his first chance to explain to a   15:15:05

21   supervisor why it was he put ten rounds in Jose Elena

22   Rodriguez, and not one mention about Mr. Wynecoop.

23       So when you go back in there and judge the credibility

24   in this case, you judge Agent Swartz's credibility, think

25   about, he has to come up with a reason to justify why he walked   15:15:27

UNITED STATES DISTRICT COURT

**Government Rebuttal Closing Argument**

1    across the street.  But he had no knowledge that anybody behind

2    him was in danger of death or serious bodily injury.

3         And he admitted that to you.  He didn't take the time

4    to assess what an officer reasonably has to assess.  Is there a

5    threat here?  What's the reasonable response to the threat?          15:15:51

6    What should I do?  Is somebody going to be killed?

7         Because unlike what Mr. Chapman wants you to believe,

8    every rocking is not the same.  And every rock is not the same

9    as every rock.  And, yes, it's true that sometimes rockings can

10   hurt you.  But you have to look at it in this case not based on   15:16:12

11   the picture that Sean Chapman wants to give you, it's based on

12   what happened.

13        And all we have are seven pieces of concrete rubble,

14   and one big large rock that was collected that probably

15   shouldn't have been collected because it really belonged where   15:16:31

16   it was in the scene.  And you've seen the scene, and you've

17   seen the berm.

18        So when you go back and look at the rocks in this

19   case, you're looking at small pieces of concrete rubble.  Every

20   rock is not the same.                                              15:16:45

21        And the jeopardy triangle, again, think about the

22   situation here.  You don't have somebody approaching you to hit

23   an agent with a rock and maybe he's justified in drawing his

24   pistol.  You've got three people on the other side of the

25   international border fence.  They can't see what they're          15:17:04

1    throwing at other than the lights of the cars.

2        And I'm not saying that they didn't necessarily want

3    to hurt the agents, I'm not saying that at all.  All I'm

4    saying, it was an indiscriminate throwing of pieces of concrete

5    rubble that barely made it over the fence.  That doesn't          15:17:20

6    justify second degree murder.  That doesn't justify abandoning

7    your training, assessing the situation, and deciding that the

8    best course of action is to take cover myself, which he could

9    have done and he did not, behind Officer Zuniga's car.  That's

10   what was reasonable in this case.                                 15:17:45

11       Because he didn't know if anybody else was threatened.

12   He didn't know the size of the rocks.  He didn't know anything

13   other than hearing a hollow thud that he thought came from the

14   canine.  But you can't kill people because canines are injured,

15   unfortunately.  But that is the law.                              15:18:03

16       So you have to assess his state of mind at the moment

17   he made that decision not to take cover, not to assess the

18   situation, not to determine if anybody was in danger and walk

19   across the street.

20       And unfortunately that night, as even himself told          15:18:25

21   you, if I had less lethal force I would have used it.

22       He's not God.  He's not God.  He can't decide who

23   lives and dies.  And if he's acting unreasonably, without all

24   the facts, because for whatever reason he wants to take care of

25   these rockers, which is exactly what he did, without any         15:18:50

**Government Rebuttal Closing Argument**

1    justification, that's second degree murder.

2         It wasn't a split-second decision.  He calmly walked

3    across the street.  And he calmly went to the fence.  And he

4    fired three rounds.  It was not necessary.  It was not the last

5    resort.  He had other options available to him.                      15:19:17

6         Sean Chapman says that what would be the reason for

7    him to move down the fence?  And I just remind you of the video

8    clip that was played that showed what your vantage point is.

9    And I submit to you the reason why he moved down to the fence

10   after the first position was because he wanted to get a better      15:19:40

11   view of the person laying on the ground.

12        MS. FELDMEIER:  Sherry, can you play this on the

13   defense table?

14        MR. KLEINDIENST:  James Tavernetti talked to you about

15   what you would see as you walked down the fence from position 1     15:20:03

16   to position 2.  And you can see why he's moving, because he's

17   trying to get a better view of the body on the ground.

18        You want to go back?

19        That's why he's moving.  He's moving to get a better

20   advantage.  It's like shooting the fish in the barrel, and he's    15:20:26

21   trying to get to the barrel with the fish in it and Jose is the

22   fish.  He can't move.  He's laying there.  And he moves to get

23   a better position.  That's why he moves from position 1 to

24   position 2.

25        Now, Mr. Chapman wants you to believe and tells you          15:20:45

Government Rebuttal Closing Argument

1   that Jose Elena was killed in the first three shots, that he

2   was dead, that he was not capable of movement, so all the rest

3   of the shots don't matter.

4           Is that not insulting?  The fact that somebody even

5   believed him to be dead, and how would he know anyway, puts          15:21:09

6   nine more rounds into the person?  Does that not show his

7   intent?  Does that not show his malice for that particular

8   person that night?  Is not that the best evidence if it really

9   did happen that way?

10          Who does that?                                               15:21:29

11          Now, according to Sean Chapman he was killed when he

12  was shot first, he hits the ground.  But that defies the

13  physical and forensic evidence that we have in this case.  And

14  I'm not going to tell you what happened.  I wasn't there.  I

15  don't have a crystal ball.  But we do know what the evidence       15:21:49

16  shows.  We do know from Dr. Lew that there was several facts

17  that indicated that after the first time he was shot, that when

18  he hit the ground, it was likely that he fell on his hands.

19          Now, I'm not an expert on what happens to people when

20  they get shot in the back.  Nobody's an expert.  We all react      15:22:11

21  differently when we've been shot in the back as we're running

22  away.  And it's not inconceivable to believe that when the

23  bullet came up to his chest, the one that hit him in the back,

24  number 4, that he put his hand up there to where it hurt the

25  most.  And when he falls down, he's falling down, and that's       15:22:31

UNITED STATES DISTRICT COURT

Government Rebuttal Closing Argument

1   why he has the abrasions on his right hands.  He may not be

2   completely paralyzed.  We know he was partially paralyzed.  But

3   it doesn't mean that he was not stunned by what had just

4   happened to him.

5        But Mr. Chapman tells you, it couldn't have happened                    15:22:48

6   that way.  It had to happen the other way, it had to be the

7   head shot.

8        And by the way, how does Officer Swartz, 90 feet away,

9   know which shot went where?  How does he know when he's dead?

10  According to Mr. Chapman's theory he must have known right away    15:23:08

11  he was killed in the first three shots.

12       I submit to you that the evidence in this case shows

13  movement by Jose Elena from the time he was first shot until

14  the last shot, and the movement indicated he was still alive.

15  The defendant knew he was still alive.  And for whatever reason    15:23:27

16  that night he wanted to eliminate him as a human being.

17       But Dr. Lew, who reviewed all the evidence in this

18  case, who wasn't getting paid $20,000 like Dr. Wecht, who just

19  got paid her salary for coming in here, who went to the scene,

20  who looked at the video, and did an exhaustive analysis of the    15:23:53

21  pattern of gunshot wounds that entered the body.  And she used

22  the knitting needles.  And you can see her handy work right

23  there.  And she placed every wound that entered Jose's body.

24  Not one in the front, every one in the back or in the head.

25       And one of the important things that she said was,            15:24:17

Government Rebuttal Closing Argument

1    bullet number 5 and 8, these two right here, had a slightly

2    different trajectory than the other ones that entered the back.

3    And she followed their trajectory and determined that they

4    ended up going through the arm of Jose Elena.  That was her

5    testimony.  One of them exited and one ended up right at the          15:24:46

6    bottom of the forearm.

7         Now you tell me how, if, as Mr. Chapman wants you to

8    believe, Jose Elena fell down to the ground dead, and he ends

9    up in this position, if this is what Mr. Chapman believes

10   happened, his theory, how did those two bullets make it all the       15:25:22

11   way up his shoulder, down his arm and around?  How does that

12   happen if that's where he was when he fell down dead, according

13   to Mr. Chapman?  It's not possible that could happen.

14        And Dr. Lew explained to you, the only way you could

15   have those bullets enter the arm is if the arm is outstretched.       15:25:56

16        Now, James Tavernetti tried his best, working with all

17   the available evidence, to at least help you decide what

18   happened in this case.  We're not saying that you have to

19   believe everything he did.  But he was trying to make an honest

20   effort to make sense of the evidence.  And he tried to make          15:26:19

21   sense of the arm being extended.

22        And you saw the Camera Match.  Now, yeah, it was

23   infrared, and yeah, it was blurry.  But I believe if you go

24   back to the jury room, there's a frame there where you see his

25   arm outstretched.  And the next frame is, it's pulled back to         15:26:36

**Government Rebuttal Closing Argument**

1    where it is when he finally dies.

2        Dr. Wecht corroborates that.  Excuse me, Dr. Lew.

3    Dr. Wecht never addressed that.  They never asked Dr. Wecht,

4    how do you explain the trajectory of the bullets that ended up

5    in the arm?  They just forgot to ask him that question.    15:26:58

6        If he's dead instantly, why are his lung cavities

7    filled with blood?  How do you explain that if he's killed

8    instantly?

9        If he's killed instantly, how is it that gunshot

10   number 4, the blood is seeping towards the right as if he's    15:27:19

11   trying to get up, if he's killed instantly?  It doesn't make

12   sense.  It doesn't make sense.

13       What Dr. Lew tried to tell you was, based on her

14   experience, what was the most plausible explanation in this

15   case, and that was that Jose Elena was alive, and most likely    15:27:40

16   it was gunshot number 4 that caused him to fall down.

17       Mr. Bevel and Mr. James, the blood spatter experts,

18   both agreed, they both agreed there was movement after he hit

19   the ground, they just disagreed on how much movement.

20       MR. CHAPMAN:  Objection, that misstates the testimony,    15:28:03

21   Your Honor.

22       THE COURT:  The jurors will determine exactly what the

23   testimony was.  It will be the facts for jury to determine.

24       MR. KLEINDIENST:  How do you get this bloodstain on

25   the wrist if there wasn't a blood source above it at some point    15:28:17

1    in time for that to develop?

2          How do you get the blood drops that come down from his

3    head unless at some point in time the head was above?

4          There are scientific foundations for Dr. Lew's

5    opinions.  It isn't just guesswork.  It's scientifically based.          15:28:36

6          Even Dr. Wecht doesn't agree with Mr. Chapman.

7    Dr. Wecht said he could have lived for minutes, wasn't killed

8    instantly.  And why is this important?  It's because he was

9    still alive and he was struggling to stay alive and struggling

10   to get up.                                                              15:29:06

11         Agent Swartz can't play God.  He can't decide on his

12   own, even though he doesn't have all the facts -- in fact, he

13   has very little facts -- to make the decision that in this case

14   Jose Elena, whether he was throwing a rock or not, deserved to

15   die.                                                                    15:29:34

16         Mr. Chapman talked about the memo by Chief Fisher that

17   we heard about, Chief Fisher in 2014 talked about the number of

18   assaults against Border Patrol agents.  And there's an

19   interesting fact here that I want to point out.

20         Yes, it's true that since 2007 there have been 6,000             15:30:08

21   assaults against Border Patrol agents.  We don't know what kind

22   of weapons were involved, not all rocks.  Resulted in numerous

23   injuries to our agents and the tragic death of three agents.

24         And we all mourn for that.  Every time we hear a

25   police officer who is killed, we mourn, because we know that           15:30:27

1    they gave their life in the line of duty.

2         But it goes on to say, in the face of those dangers,

3    Border Patrol agents continue to show exemplary restraint and

4    professionalism.  Since 2010 agents have been assaulted with

5    rocks 1,713 times.  1,713 times.  In those situations agents       15:30:46

6    responded and used deadly force just 43 times.  43 out of

7    1,713.

8         And I did my math last night, and that comes out to an

9    agent in all of those rockings used deadly force at .02472

10   percent.                                                           15:31:20

11        A lot of agents showed restraint.  A lot of agents

12   used their training.  And very few ever pulled their gun and

13   fired at a rocker.

14        The other thing that makes Officer Swartz's conduct

15   unreasonable is Chief Fisher's admonition down at the bottom of   15:31:48

16   the page.  Agents shall not discharge firearms in response to

17   thrown or hurled projectiles unless the agent has a reasonable

18   belief, based on the totality of the circumstances, to include

19   the size and nature of the projectiles, that subject of such

20   force poses an imminent danger of death or serious injury.        15:32:20

21        That's the law.  That's what Agent Swartz is held to

22   abide by.

23        But he goes on to say, agents should obtain the

24   tactical advantage in these situations, such as seeking cover

25   or distancing themselves from the immediate area of danger.       15:32:39

**Government Rebuttal Closing Argument**

1    That's the Chief of Border Patrol telling the agents,

2  look, yeah, rocking can be dangerous, rocking does happen.  But

3  if you can take cover, if you can back away, that's what you

4  should do.

5    And that's what Agent Swartz did not do that night.    15:32:57

6    MR. CHAPMAN:  Your Honor, I object to that too,

7  because the memo was issued in 2014, two years after this

8  event.

9    THE COURT:  I'm sure the jury's well aware of that,

10  Mr. Chapman.    15:33:14

11    MR. KLEINDIENST:  The defendant in this case is

12  charged with second degree murder.  And that means that he has

13  to have intended -- it means he had to kill an individual, in

14  this case Jose Elena, with malice aforethought.

15    And that's not a really complicated word.  Malice    15:34:00

16  aforethought only means that he either intended to kill him or

17  he acted with extreme reckless disregard for the life of Jose

18  Elena.  That's what second degree murder is.  The intent to

19  kill or acting in extreme disregard for the life of Jose Elena.

20    I submit to you that when you walk across the street    15:34:24

21  and you have the time to reflect on your conduct, and you go to

22  the bollard, and you see somebody who may have thrown a rock,

23  that you don't even know is going to hurt anybody, and you

24  shoot, that that's an intentional killing, that's second degree

25  murder.  And if it's not that, it's with extreme reckless    15:34:43

1    disregard for the life of that human being.

2            That's what he's charged with in this case.

3            Now he's also charged with involuntary manslaughter as

4    a lesser included offense.  And I would submit to you that

5    involuntary manslaughter is not an appropriate charge in this          15:35:01

6    case for you to consider as a lesser included offense.

7            The Judge will read the instructions to you on the

8    elements of these charges, but as to involuntary manslaughter,

9    it's basically the same as somebody who's at a bar and getting

10   drunk and decides not to call Uber, and gets in his car and            15:35:19

11   drives home and he's drunk, and he doesn't know what he's

12   doing, and he runs a red light and he hits a car and kills

13   somebody.  That's gross negligence.  That's involuntary

14   manslaughter.

15           That's not this case.  That is not this case.                  15:35:38

16           Then there's voluntary manslaughter, which is the

17   other lesser included.  And voluntary manslaughter is where you

18   have the intention to kill, but because of heat of passion

19   caused by adequate provocation you kill that person.  Heat of

20   passion caused by adequate provocation.  And the provocation           15:36:03

21   must be adequate.  And there must be heat of passion.

22           Agent Swartz acted deliberately, coolly, and calmly.

23           An example of involuntary manslaughter is where you're

24   happily married and you have kids and you think everything is

25   fine, and you come home and you find your spouse in bed with           15:36:25

--- Government Rebuttal Closing Argument ---

1    somebody else and you pull out a gun and shoot him.

2            That's voluntary manslaughter, that's heat of passion

3    caused by adequate provocation.  That's not this case.

4            So when you go back to the jury room and look at the

5    charges in this case, I want you to look at second degree    15:36:41

6    murder and decide whether or not the evidence supports the

7    intentional killing without any justification of Jose Elena.

8            Mr. Chapman touched on the pathologists from Mexico.

9            First of all, the autopsy report that they wrote,

10   Dr. Madrigal and Dr. Diaz, did not list gunshot wound to the    15:37:16

11   head as the first gunshot wound.  They did not list that as the

12   first gunshot wound.  They didn't even order the sequence in

13   the shots.

14           And I would submit to you that two busy pathologists

15   in 2012, who are performing an awful lot of autopsies, prepared    15:37:38

16   the autopsy in this report, and a couple years later, when

17   they're asked at a meeting, with probably little warning, about

18   what happened, they're going off of memory.

19           But is it not natural that when you're a pathologist

20   like Dr. Lew and you have all the facts available to you, and    15:37:59

21   you're later given those facts about what really happened, the

22   sequence of the shooting, the fact that he shot from three

23   different positions, is it not reasonable for a pathologist to

24   say, maybe I was mistaken?  Maybe number 2 is not the first

25   shot?  Maybe he didn't die instantly?    15:38:20

UNITED STATES DISTRICT COURT

**Government Rebuttal Closing Argument**

1    Is that not what reasonable people do when they're

2    presented with additional evidence they didn't have before?

3    Somehow Mr. Chapman wants to suggest that we

4    manipulated their opinions.  But their opinions were the same

5    in the end as Dr. Lew, who had all the evidence available to          15:38:38

6    her to make a decision.

7    The difficulty with Mr. Chapman's argument is this:

8    Agent Swartz did not have to take the stand in this case.  He

9    could have sat there and made the Government prove his guilt

10   beyond a reasonable doubt without taking the stand and              15:39:11

11   testifying.

12   But he chose to take the stand, and he chose to

13   testify.  And the problem that Agent Swartz had was, how do you

14   explain to this jury why he was shot all the times he was in

15   his back, and why he fired his gun 16 times?  How do you           15:39:32

16   explain that to this jury?

17   And his explanation was, is that, I fired, the person

18   went down, he was no longer a threat obviously because he's on

19   the ground.  The threat is now disappeared.  And I ran down the

20   fence and I thought I saw a second rocker.                          15:39:53

21   And if you believe that the other rockers out there

22   were actually going to hang around and find out what Agent

23   Swartz was going to do, you have to be kidding.  They're gone.

24   They're no longer there.

25   But he can't admit that he fired the gun intentionally             15:40:09

1   into Jose Elena when there was movement going on on the

2   sidewalk.  He can't admit that to you.  You can't admit it to

3   himself even, because the act is so horrendous to do that to a

4   human being.

5          So he comes up with this story about a phantom second         15:40:28

6   rocker.  And Dr. Trompetter told you that officers in

7   officer-involved shootings, they might have perceptual

8   distortions, but they don't hallucinate.  They don't put things

9   there that weren't there.  And that's what Agent Swartz did.

10          He wants you to believe that he was shooting his gun         15:40:50

11   at a second rocker, despite the fact that almost all the

12   bullets ended up either in the body or the wall next to Jose

13   Elena.  It's trying to fit a round peg in a square hole.

14          So he has to come up with some reason to explain why

15   he continued to shoot.  And it makes no sense whatsoever.  And   15:41:10

16   you can call it whatever you want, but it's just fabrication.

17          The thing about his memory gap, it's not a memory gap

18   that day, it's an honesty gap.  Agent Swartz was able to tell

19   you verbatim the conversation they all had at the Port of Entry

20   about the two backpackers on the fence.  He was able to tell    15:41:35

21   you in detail what happened when he walked down the street,

22   what Agent Wynecoop supposedly said to him, what he heard with

23   respect to the dog.  Had vivid details, a vivid memory of all

24   of that.  And for some reason after he fired his gun the first

25   time, it all went away magically, because he can't justify it.  15:41:54

Government Rebuttal Closing Argument

1    And then all of a sudden after the shooting is over,

2    he now remembers picking up his magazine, he now remembers

3    getting on the mic and saying there's a 10-7 on the Mike side.

4    He remembers telling them shots were fired.  He remembers

5    vomiting.  All of a sudden his memory comes back.                    15:42:19

6    And as Dr. Trompetter told you, memory gaps don't

7    occur in officer-involved shootings.  Hallucinations, seeing

8    something there that's not there, does not happen.

9    And the reason why he had a memory gap is because he

10   couldn't admit to himself, much less to you, why he continued     15:42:39

11   to shoot at somebody who was struggling to get up off the

12   ground.

13   You all have a hard job.  It's a hard job to judge a

14   law enforcement agent.  And I don't envy your task.  But

15   they're not above the law.  And they're held to the same           15:43:03

16   standards that we are as human beings.  And even though they're

17   a law enforcement agent, and even though their job is to

18   protect and to serve, it doesn't make them immune from a

19   judgment by a jury beyond a reasonable doubt that he murdered

20   Jose Elena without justification.                                    15:43:21

21   It's not an easy job.  I don't envy you.  But I submit

22   to you in this case that the evidence is clear and

23   unmistakable, that that's exactly what happened.  That Agent

24   Swartz, for whatever reason, decided he was going to use the

25   only force he had to stop the rockers that night, and that's        15:43:39

1    what he did.

2            And he's guilty of second degree murder.

3            Thank you.

4        (Further proceedings held on the record not included in

5    this transcript.)

6

7                              -oOo-

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

———CR-15-1723-TUC-RCC – April 16, 2018———

1

2

3

4                      C E R T I F I C A T E

5

6          I, CANDY L. POTTER, do hereby certify that I am duly

7    appointed and qualified to act as Official Court Reporter for

8    the United States District Court for the District of Arizona.

9          I FURTHER CERTIFY that the foregoing pages constitute

10   a full, true, and accurate transcript of all of that portion of

11   the proceedings contained herein, had in the above-entitled

12   cause on the date specified therein, and that said transcript

13   was prepared under my direction and control.

14          DATED at Phoenix, Arizona, this 4th day of June,

15   2018.

16

17

18                           s/Candy L. Potter_____
19                           Candy L. Potter, RMR, CRR

20

21

22

23

24

25