**Sean C. Chapman**
**Law Offices of Sean C. Chapman, P.C.**
100 North Stone, Suite 701
Tucson, AZ 85701
1-520-622-0747
FAX: 1-520-628-7861
State Bar #012088
Seanchapmanlaw@yahoo.com
Attorney for Swartz

**Jim Calle**
**Law Office of Jim E. Calle, P.C.**
2410 W. Ruthrauff Road, Suite 100
Tucson, Arizona 85705
520-275-0199 Phone
520-293-6044 Fax
Ariz. Bar No. 14985
jimcalle@mac.com
Attorney for Swartz

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **CR 15-1723 TUC RCC (DTF)** |
| | ) | |
| Plaintiff, | ) | **MOTION FOR CHANGE** |
| | ) | **OF VENUE** |
| v. | ) | |
| | ) | |
| LONNIE RAY SWARTZ, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Excludable delay under 18 U.S.C. § 3161(h)(1)(F) may occur as a result of this motion or an order based thereon.

*1*

The defendant Lonnie Swartz, by and through counsel undersigned and pursuant to Fed. R. Crim. P. 21(a), hereby moves this Court for its order transferring this case to the United States District Court in Phoenix because the Defendant cannot be guaranteed a fair trial due to pervasive pretrial, trial and post-trial publicity in the division of the District Court that includes Nogales, Arizona where the shooting in this case took place. This motion is supported by the attached Memorandum of Points and Authorities.

Dated this 22th day of August, 2018.

**LAW OFFICE OF JIM E. CALLE, P.C.**

s/jimcalle
Jim Calle
Attorney for Lonnie Swartz

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   FACTS

### A. The Shooting

Defendant Lonnie Swartz is a U.S. Border Patrol Agent ("BPA"). On October 11, 2012, BPA Swartz was working at the DeConcini Port of Entry checking vehicles headed into Mexico when he and fellow agents heard about a smuggling effort several hundred yards to the west. Swartz and the other agents responded and came upon a scene where two smugglers, who had just dumped their marijuana-filled backpacks in the United States, were trying to return back to Mexico by scaling the 20-foot-high border fence. Numerous BPAs and Nogales Police Department ("NPD") officers responded, with some heading south to locate the marijuana bundles and others staying close to the fence where the smugglers were struggling to reach the top. At least two border cameras recorded the incident.

Several men soon converged in Mexico southwest of where the officers and agents had congregated. Their presence and their ensuing actions were established at trial as being part and parcel of the cartel's smuggling operation. The men began throwing rocks and concrete at the law enforcement officers north of the border. The rock throwing was intended to give the smugglers more time to successfully return to Mexico. The rocks and concrete landed near several officers and agents, with one agent and one police dog being struck.

*3*

Agent Swartz, responding to the danger being faced by his fellow agents and officers, approached the border fence, identified a rock thrower and fired. Swartz's shots struck and killed the decedent, Elena Rodriguez, who fell on the sidewalk in Mexico. Swartz then moved west along the border fence and twice more fired volleys of shots at Elena Rodriguez.

### B. The Media Coverage

The Tucson Division of the U.S. District Court for the District of Arizona draws its jurors from Southern Arizona and includes the counties of Cochise, Graham, Greenlee, Pima and Santa Cruz. These Southern Arizona communities are served by Tucson-based television stations KVOA-NBC 4, KGUN-ABC 9, KMSB-Fox 11, KOLD-CBS 13 and KHRR-Telemundo 40 (Spanish language). In addition, several print and virtual newspapers circulate news in Southern Arizona, including the Arizona Daily Star, Tucson Sentinel, Nogales International, Douglas Dispatch, Bisbee Daily Review, Eastern Arizona Courier, Gila Valley Central, Sierra Vista Herald and the Tucson Weekly. The circulation and broadcast areas for these stations and newspapers overlap and therefore ensure that coverage of an event reaches every location from where this Court draws potential jurors.

In addition, today's internet access means that potential jurors in Southern Arizona have a limitless ability to access and read news and opinions and see photos and graphics from online publications originating anywhere in the world. This means

potential jurors could have viewed coverage of this case in the New York Times, Huffington Post, Washington Post, Mexican Trucker, El Diario, Arizona Republic, CNN, Fox and Friends, Brietbart and NPR, to name a small sampling of sources that are readily accessible online.

There have been two types of media coverage relevant to this motion.  The first is ongoing coverage of this case that started shortly after the shooting occurred, continued through the first trial, and continues to the present date.  This coverage was periodic during the pretrial phase of the case and increased to daily media coverage immediately prior, during and after the trial.  In particular, there were days of protest immediately after the jury's verdict in this case that closed several roads in the downtown Tucson area and were widely broadcast. There also have been numerous print and television stories on all manner of border issues directly related to the mission and activities of the U.S. Border Patrol.  These stories include reports of drug and alien seizures, BP vehicle chases, smuggling vehicle rollovers, alien-involved shootings and murders, immigrant deaths, alien rapes, border security programs, the development of physical and electronic border fences, and numerous other reports. The intensity of the rhetoric surrounding these issues is unprecedented in the recent history of the United States and has resulted in deep divisions within our culture and extreme opinions on each and every one of the issues discussed. The stories of these divisions and opinions are reported on a daily basis across the entire

nation, and certainly in Southern Arizona and they often represent the top print and television stories of the day.

These two types of media coverage are inextricably intertwined, exceedingly pervasive, and have led to the extreme politicization of border issues for people living in Southern Arizona. Although some potential jurors from Southern Arizona may not have heard of Swartz's criminal case, they have all heard at least some of the immigration-related and border-related issues that are covered daily by the local and national press.

### 1.  Pre-Trial and Trial Coverage

Media coverage of this case was geographically pervasive and persistent before and during the first trial. There was television and print coverage of this case beginning Oct. 10, 2012 and continuing to the first day of trial, March 20, 2018. In just Southern Arizona, there were 602 television segments aired about the case prior to trial. (*See* Media Monitoring Report, attached as **Exhibit A**.) This coverage continued through the 5-week trial, during which 211 television segments aired. (*See* Media Monitoring Report, attached as **Exhibit B**.) These segments were broadcast on KVOA-NBC 4, KGUN-ABC 9, KMSB-Fox 11, KOLD-CBS 13 and KHRR-Telemundo 40 (Spanish language). In contrast, the Phoenix market had 187 television segments published about the Swartz case prior to trial and 65 segments published during the trial. (*See* Media Monitoring Report, attached as **Exhibit C**.)

1    Television segments about the Swartz case in Phoenix appeared less than one-third
2    as frequently than in Tucson and Southern Arizona.

3         In addition, there were hundreds of new articles published about this case
4    before and during the trial in the Arizona Daily Star, Tucson Sentinel, Nogales
5    International, Douglas Dispatch, Bisbee Daily Review, Sierra Vista Herald, Tucson
6    Weekly and other Southern Arizona print and online publications. (*See* Sampling of
7    published stories, attached as **Exhibit D**.) Finally, there were thousands of
8    television, newspaper and online articles and video segments published in the United
9    States, Mexico and around the world that were easily accessible to potential jurors
10   in this case.

11        The single most pervasive image of this case is the photo, below, of Jose Elena
12   Rodriguez provided by his family to numerous media outlets. Although the jurors in
13   the first trial of this matter were presented with a more recent photo of Elena
14   Rodriguez, the image below has been published thousands of times across the
15   country and hundreds of time in Southern Arizona and it inaccurately depicted Elena
16   Rodriguez as being younger than he actually was at the time of the incident.



1

2     This photo has been extremely prejudicial to the Defendant because its wide

3   publication in southern Arizona left anyone touched by the pervasive news coverage

4   with the impression that Elena Rodriguez was much younger and, by appearance,

5   less capable than a more recent photograph of him depicted. Importantly, although

6   admitted into evidence at trial, the more recent photo of Elena Rodriguez, see below,

7   was not released to the media so the inaccurate photo of Elena Rodriguez continues

8   to be widely published.



9

1     The pretrial coverage in this case also frequently depicted Elena Rodriguez as

2    a mere passerby in Mexico, who was unarmed and who had nothing to do with the

3    ongoing smuggling effort at the international border fence. Trial testimony clearly

4    established that these assertions were false. Elena Rodriguez was proved to be an

5    active participant in the smuggling effort who was in the midst of assaulting federal

6    and local law enforcement officials when he was shot. A jury of 12 men and women

7    listened to the evidence and unanimously determined that BPA Swartz was not guilty

8    of second-degree murder and they were unable to reach a unanimous verdict on the

9    additional charges of voluntary manslaughter and involuntary manslaughter.

10    The jury's verdict caused an eruption of protest in Tucson and Nogales that

11    underscores and supports the granting of this motion. A retrial of Swartz in Tucson,

12    with jurors drawn from Southern Arizona locations, would be patently unfair.

13    **2. Post-Trial Media Coverage**



14

15    Within minutes of the jury's verdict, protestors began gathering in front of the

1  federal courthouse in downtown Tucson.



2

3  Their numbers swelled until they lined the sidewalks next to the federal court.



4

5  The protestors then moved into Tucson's downtown streets and began

6  blocking traffic.

7



1

2      The protests continued into the evening and eventually resulted in the closing

3  of the Interstate 10 frontage road at Congress because protesters began blocking

4  traffic.

5      The verdicts and ongoing protests also resulted in a flurry of television and

6  print media reports being published in the ensuing days. In the Tucson area, there

7  were 61 television segments aired after the trial ended on April 23, 2018 through

8  May 2018. (*See* Media Monitoring Report, attached as **Exhibit E**.) There were also

9  numerous print and internet stories published with the general tenor that Elena

10 Rodriguez had been denied justice. Again, in contrast, there were only 29 television

1    segments aired in the Phoenix area, less than half the number aired in southern

2    Arizona. (*See* Media Monitoring Report, attached as **Exhibit F**.)

3            The day after the jury's verdict, Edward Weisenburger, Bishop of the Catholic

4    Diocese of Tucson, published a guest opinion in Tucsonsentinel.com providing as

5    follows:

6                        Yesterday's deeply troubling jury decision related to the Border
7                        Patrol agent stationed in the Nogales area, who fired multiple
8                        shots across our border with Mexico, killing a 16-year-old boy
9                        on October 10, 2012, raises serious issues of justice and
10                       accountability.
11
12                       While we are privileged to live in a nation whose greatness is
13                       rooted in its democracy and fair treatment of all, such decisions
14                       reveal that our democratic institutions are not without flaws and
15                       occasionally grave injustices. I find myself in a close bond of
16                       fraternity and solidarity with the family of Jose Antonio Elena
17                       Rodriguez and the many who have been unable to achieve the
18                       kind of authentic justice upon which our nation was founded.
19
20   (*See Tucson Bishop: Not-guilty verdict 'deeply troubling' in border shooting death*,

21   TUCSON SENTINEL, Guest Opinion, April 24, 2018, attached as **Exhibit G**.) As is

22   obvious, the spiritual leader for the tens of thousands of Catholics in Southern

23   Arizona was criticizing the decision of Swartz's 12-member jury and asserting that

24   "authentic justice" had not been achieved. Of great concern to BPA Swartz is the

25   fact that Bishop Weisenburger appears to be asserting that "authentic justice" cannot

26   be achieved unless Swartz is convicted.

27           Four days after the verdict, the Nogales International published a story that

also raised the question of whether justice had been served in the Swartz trial. In

fairness, the story quoted people reflecting several views but it is nevertheless

problematic because, as with the Bishop, the story reflected a belief that justice could

come only if BPA Swartz was convicted.

> "This isn't justice," said Analizabeth Martinez, tearing up as she spoke about a jury's decision Monday to acquit Border Patrol Agent Lonnie Swartz of second-degree murder in the 2012 fatal shooting of a 16-year-old Mexican boy through the border fence in Nogales. The victim, Jose Antonio Elena Rodriguez, "wasn't an animal. He was a person, a human life," said Martinez, 53, of Nogales. "And after all this time his family has been waiting for justice, what brutality, what grief they must feel."

> Martinez, like others in the Ambos Nogales community, said she was shocked, angered and heartbroken over the news that Swartz might walk free after a federal jury in Tucson found him not guilty of the murder charge and were unable to reach a verdict on two lesser charges of manslaughter.

(*See Justice served? Locals respond to BP Trial Verdict*, NOGALES INTERNATIONAL,

April 27, 2018, attached as **Exhibit H**.)

   A few days thereafter, the Nogales International reported that the U.S.

Attorney's Office had elected to retry BPA Swartz on the voluntary and involuntary

manslaughter charges and it ran a picture of protesters outside the federal courthouse

in Tucson on the day the decision was made.



1

2  (*See Prosecutors will retry Swartz on manslaughter charges,* NOGALES

3  INTERNATIONAL, May 11, 2018, attached as **Exhibit I**.) The clear sentiment in the

4  picture is that, despite BPA Swartz's acquittal on murder charges, some people

5  refuse to accept this jury determination and continue to believe that Swartz is guilty

6  of murder.

7       In Tucson, two days after the verdict, the Arizona Daily Star published an

8  opinion piece by editorial writer Luis Carrasco. (*See Luis Carrasco: Juries must stop*

9  *believing law enforcement officers are infallible,* ARIZONA DAILY STAR, April 25,

10  2018, attached as **Exhibit J**.) In it, Carrasco laments the difficulty of successfully

11  prosecuting law enforcement officers who employ "excessive force" and, in the

12  process, he said: The Swartz case was "particularly egregious. At best, Swartz acted

13  recklessly, firing repeatedly across the border toward homes in Nogales. At worst,

14  he shot — over and over and over — a 16-year-old who represented no threat." *Id.*

1   Carrasco also lambasted the defense's contention that if Elena Rodriguez had died

2   early in the encounter with BPA Swartz that any subsequent shots suffered by Elena

3   Rodriguez "didn't matter …" *Id.* Carrasco called this "legal hairsplitting" despite the

4   fact that this is what the law provides. *Id.* He believed it was "unconscionable that

5   the [Swartz] jury could not reach a decision." In short, Carrasco's opinion was

6   simultaneously criticizing the Swartz jurors for having firmly held beliefs that

7   precluded a unanimous verdict and suggesting that any future Swartz jurors had no

8   choice but to reach a unanimous verdict in what he believed to be a case of

9   "excessive force." *Id.*

10   These examples conclusively demonstrate that the jury pool in Southern

11   Arizona is getting increasingly poisoned by a belief held by many influence-makers

12   and potential jurors that justice will only be achieved if BPA Swartz is convicted.

13   They further demonstrate that any lesser verdict on retrial will subject those jurors

14   to public criticism, scrutiny, or even denunciation within their religious

15   communities.

16   **C. The Impact of Immigration and Border Stories on Swartz's**
17   **Trial**
18

19   As previously noted, Southern Arizona - like the rest of the United States -

20   has been bombarded by thousands of media stories involving immigration, border

21   security, a border wall, alien family separation, Immigration and Customs

1   Enforcement actions, border apprehensions, alien crimes and so on. These issues

2   have increasingly divided and polarized the citizenry of our country. According to a

3   recent 2018 NPR/Ipsos poll, the polarization on these issues is frequently split along

4   political party lines:

- One in four Americans believe immigration is the most worrying issue facing America, including 20% of Democrats, 34% of Republicans and 25% of Independents.
- 28% support separating families who cross the border illegally as a deterrent, including 52% of Republicans and 11% of Democrats.
- 40% of Americans support building a wall along the entire U.S.-Mexico border including 74% of Republicans and 16% of Democrats.
- 38% believe that refugees and asylum seekers are taking an unfair advantage of the U.S immigration system, including 65% of Republicans, 19% of Democrats and 40% of Independents.
- 65% believe the government should fine U.S. employers found to hire undocumented immigrants, including 81% of Republicans and 56% of Democrats, and 67% of Independents
- 60% believe in giving legal status to undocumented or illegal immigrants brought to the U.S. as children, including 76% of Democrats, 45% of Republicans, and 60% of Independents.

26   (*See NPR/Ipsos Poll: American Views on Immigration Policy*, NPR, July 16,

27   2018, attached as **Exhibit** K**.)**

28      The defense is convinced that proximity to the border amplifies the impact of

29   these stories on the residents of Southern Arizona who hear them.  In contrast, the

30   citizens of Maricopa County, being farther from the border, are less likely to feel the

1    impact of border issues.

2        One study supports the contention that border proximity increases media

3    coverage of immigration and border issues. (*See e.g.* "Geographic Media Agenda

4    Setting: Spatial Proximity to the US-Mexico Border and Local News Coverage of

5    Immigration Issues," Presented to the Annual Meeting of the Midwest Political

6    Science Association, Chicago, Ill., April 20-23, 2006, at 21-22, attached as **Exhibit**

7    **L**.)   The study asserts that the frequency of such media publications impacts the

8    opinions and behavior of the public.

9        The literature on media impact illustrates the effect media
10       coverage can have on political attitudes. According to this
11       literature, what the media decides to cover has important
12       implications for public opinion and political behavior through
13       the effects of agenda setting, framing, and priming. Agenda
14       setting describes the process by which the news media shows the
15       public what is important by giving more salience to certain
16       events and issues than others. Because of increased media
17       attention, certain issues and events are more salient in the minds
18       of citizens. As a result, they believe the issues receiving the
19       majority of the coverage to be most important. This implies that
20       heightened coverage of immigration in areas proximate to the
21       border will disproportionately increase the salience of
22       immigration and other border issues in the minds of the public.
23       Priming occurs when the way information is presented
24       influences audiences' beliefs (Iyengar et al 1982). For example,
25       Valentino, Hutchings and White (2002) demonstrate that subtle
26       racial cues embedded in political advertisements can prime
27       negative racial attitudes by making negative images and
28       stereotypes of minorities more accessible in the audience's
29       memory. This suggests that in areas proximate to the US-Mexico
30       border, the frequency of negative news coverage featuring
31       Latinos may exacerbate perceptions of threat by priming latent

*17*

negative stereotypes about Latino immigrants or Latinos more
generally.

*Id.* at 4-5 (internal citations omitted). In sum, the content and presentation of media

messages can have a powerful effect on political attitudes. *Id.* at 5.

The available research supports the premise that the intense media coverage

along Arizona's borders intensifies and polarizes the political views of people

exposed to such coverage. People who believe the border is too porous and that

illegal immigrants are not welcome will carry commensurate political views that will

impact their ability to be fair. Likewise, people who believe the United States is too

harsh on immigrants or who think the U.S. Border Patrol treats aliens unfairly will

also have disparate, yet equally politicized views that impact their ability to be fair

jurors.

**II.    THE LAW**

The Sixth Amendment of the United States Constitution guarantees criminal

defendants the right to trial by an impartial jury of the state and district where the

crime was committed. U.S. Const. amend. VI. The prosecution generally occurs in

a district in which the offense was committed. Rule 18, Fed. R. Crim. Proc. Upon

the defendant's motion, however, the court must transfer the proceedings to another

district "if the court is satisfied that so great a prejudice against the defendant exists

1   in the transferring district that the defendant cannot obtain a fair and impartial trial"

2   here. Rule 21(a), Fed. R. Crim. Proc.

3        "In essence, the right to jury trial guarantees to the criminally accused a fair

4   trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a

5   fair hearing violates even the minimal standards of due process." *Irvin v. Dodd*, 366

6   U.S. 717, 722 (1961). In the present case, after a highly publicized first trial, it will

7   be impossible for people living in southern Arizona, given the pervasive media

8   coverage of the case, to separate their personal viewpoints from the facts of this case.

9        Because a criminal defendant has the right to an impartial jury, a court must

10   grant a motion to change venue "if prejudicial pretrial publicity makes it impossible

11   to seat an impartial jury." *Ainsworth v. Calderon*, 138 F.3d 787, 795 (9th Cir. 1998),

12   *as amended*, 152 F.3d 1223. Prejudice can be either presumed or actual. *Jeffries v.

13   Blodgett*, 5 F.3d 1180, 1189 (9th Cir. 1993). "Prejudice is presumed when the record

14   demonstrates that the community where the trial was held was saturated with

15   prejudicial and inflammatory media publicity about the crime." *Harris v. Pulley*, 885

16   F.2d 1354, 1361 (9th Cir. 1988). Actual prejudice is demonstrated where a sufficient

17   number of the jury panel "had such fixed opinions that they could not judge

18   impartially the guilt of the defendant" so that it is clear that a trial before that panel

19   would be inherently prejudicial. *Id.* at 1364, *quoting Patton v. Yount*, 467 U.S. 1025,

20   1035 (1984).

1     In deciding whether there was actual prejudice against a defendant in the

2  district, we "must determine if the jurors demonstrated actual partiality or hostility

3  that could not be laid aside." *Id.* at 1363. "[A] key factor in gauging the reliability of

4  juror assurances of impartiality is the percentage of veniremen who 'will admit to a

5  disqualifying prejudice.' " *Id.* at 1364, *quoting Murphy v. Florida*, 421 U.S. 794,

6  803 (1975). A trial judge has substantial discretion in gauging the effects of allegedly

7  prejudicial publicity and in taking measures to insure a fair trial. *U.S. v. McDonald*,

8  576 F.2d 1350 (9th Cir. 1978).

9     Ordinarily, the proper time for determining whether widespread prejudice

10  prohibits selecting an impartial jury and, hence, warrants a change of venue, is

11  during voir dire; however, if the probability of prejudice is great because of deeply

12  rooted passions or recent massive publicity, the efficacy of voir dire in screening the

13  prospective jurors is diminished; in such a situation the court may become satisfied

14  even prior to voir dire that the probability of a fair trial in the district is minimal.

15  *U.S. v. Holder*, 399 F.Supp. 220 (D.C.S.D. 1975); *U.S. v. Marcello*, 280 F. Supp.

16  510 (E.D. La 1968).

17  **III.   ANALYSIS**

18     The pervasive and engrained media coverage of this case and the protests,

19  opinions and news stories critical of the first jury's decisions is more than sufficient

20  evidence for this Court to find that prejudice must be presumed. The media in Tucson

and Southern Arizona has saturated the geographic location of potential jurors with numerous and persistent news stories in English and Spanish. The increased frequency of such media coverage focuses citizens on the issues covered and politicizes their opinions on immigration-related issues including the treatment of smugglers at the border. These opinions are shaped by immigration and border issues separate and apart from issues of guilt or innocence in an individual case. These polarized opinions nevertheless taint jurors sufficiently in their reasoning and decision-making in criminal trials to result in an unfair trial for a criminal defendant accused of crimes such as those in this case.

More specifically, the Swartz case involves the highly publicized and controversial shooting of a 16-year-old boy who was throwing rocks from Mexico at U.S. law enforcement officers. This case resulted in substantial pretrial, trial and post-trial publicity. Moreover, following a jury determination that Swartz was not guilty of second-degree murder, community members from across southern Arizona protested in downtown Tucson, shutting down several streets including the frontage road to Interstate 10. These protests resulted in additional media coverage throughout Southern Arizona, including criticism by a prominent religious leader, that clearly left many people believing that justice had not been served despite an independent determination by a 12-person jury.

1    This latter point is crucial to the consideration of where Swartz's retrial should

2    take place. Although he was able to seat a fair jury in the first instance, there now

3    exists a substantial risk that potential jurors may purposefully hide their strong

4    beliefs of this case solely so they can participate in the proceeding. In short, the risks

5    are greater than at any previous time in this case for jurors to be selected who have

6    purposefully hidden their strong passions – and perhaps their belief of injustice in

7    the first trial – from this Court. Thus, there is a substantial danger that Swartz will

8    not be judged by 12 dispassionate, open-minded jurors. In light of this risk, the

9    appropriate remedy is for this matter to be moved to a location that has not been

10   subjected to the intense media coverage or to the passionate days of protest that

11   ensued following the first trial. As the defendant has shown, jurors in the Phoenix

12   area have been subjected to only one-third to one-half of the media coverage

13   bombarding potential jurors in southern Arizona. As a result, Phoenix would be a

14   good alternative to both mitigate the prejudicial impact of the publicity and increase

15   the likelihood that BPA Swartz will get a fair trial. *See Jones v. Gasch,* 404 F.2d

16   1231 (D.C. Cir. 1967) (Rule 21 was intended to rectify deficiency in law by affording

17   accused opportunity to avoid provincial emotion so intense as to doom objectivity

18   of trial).

19   **IV.   CONCLUSION**

20        Based on the foregoing, the Defendant respectfully requests this Court to find

*22*

1   that the publicity pervading this matter up to and including this day warrants a

2   change of venue.

3        Dated this 22th day of July, 2018.

5                      **LAW OFFICE OF JIM E. CALLE, P.C.**

9                      s/Jim Calle

10                     Jim Calle

11                     Attorney for Lonnie Swartz

13   Copy electronically filed this date with:

15   United States District Court

17   Wallace Kleindienst

18   Mary Sue Feldmeier

19   U.S. Attorney's Office

                              *23*