**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

———————————

| | | |
|---|---|---|
| **United States of America,** | ) | |
| | ) | No.  **CR-15-1723-TUC-RCC-DTF** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Tucson, Arizona |
| | ) | April 11, 2018 |
| **Lonnie Ray Swartz,** | ) | 9:36 a.m. |
| | ) | |
| Defendant. | ) | |
| ———————————————— | ) | |

**BEFORE:  THE HONORABLE RANER C. COLLINS, JUDGE**

**<u>REPORTER'S EXCERPTED TRANSCRIPT OF PROCEEDINGS</u>**

**<u>JURY TRIAL</u>**
**<u>DAY 14</u>**

**(TESTIMONY OF CYRIL WECHT)**

Official Court Reporter:
Candy L. Potter, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 36
Phoenix, Arizona 85003-2151
(602) 322-7246

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

CR-15-1723-TUC-RCC – April 11, 2018

1

2                       **A P P E A R A N C E S**

3

4   For the Government:
         U.S. Attorney's Office Tucson
5         By:  **Wallace Heath Kleindienst**, Esq.
               **Mary Sue Feldmeier,** Esq.
6         405 West Congress Street, Suite 4800
         Tucson, Arizona 85701

7   For the Defendant:
         Law Offices of Sean C. Chapman
8         By:  **Sean Christopher Chapman**, Esq.
         100 North Stone Avenue, Suite 701
9         Tucson, Arizona 85701

10        Law Office of Jim E. Calle
         By:  **Jamie Ernest Calle, III,** Esq.
11        2315 East Hawthorne Street
         Tucson, Arizona 85719

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          **I N D E X**

3   **DEFENSE WITNESS:**      **DIRECT**    **CROSS**   **REDIRECT**  **RECROSS**

4   CYRIL WECHT
    By Mr. Chapman           6
5   By Mr. Kleindienst                    46
    By Mr. Chapman                                  109
6   By the jury                           112
    By Mr. Kleindienst                                          116
7   By Mr. Chapman                                  119

8

9

10  Discussion Held at Sidebar        45, 85, 111

11

12

13                     **INDEX OF EXHIBITS**

14  **EXHIBIT**                                **IDENT**  **RECEIVED**

15  **NO.**      **DESCRIPTION**

16  18A       Autopsy Report – Spanish        73

17  18B       Autopsy Report
              (English translation)           64
18
    74        Photograph of JAER back and
19            waist on sidewalk               23

20  224       Photograph of Autopsy
              damage to the lungs            118
21
    225       Photograph of Autopsy
22            damage to the lungs            118

23  278       Lew, Emma – Forensic Pathology
              Consultant Report               54
24
    279       Lew, Emma – GSW Diagram         80
25

CR-15-1723-TUC-RCC – April 11, 2018

1

2                        **INDEX OF EXHIBITS**

3    EXHIBIT                                    IDENT    RECEIVED

4    NO.        DESCRIPTION

5    384        Letters to Government
                from defense regarding
6                Dr. Wecht's opinions           53

7    1548       Film showing fencing response   30

8    1550       Diagram of brain                40       40

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

─CR-15-1723-TUC-RCC – April 11, 2018─

1       (The following excerpt is the testimony of Cyril Wecht.)

2       (Proceedings begin at 9:36 a.m.)

3           THE COURT:  Let the record reflect the jury's returned

4    back to the courtroom, the presence of all counsel and the

5    defendant.                                                    09:36:41

6           Good morning.

7           JURY:  Good morning.

8           THE COURT:  Mr. Chapman, you may call your next

9    witness.

10          MR. CHAPMAN:  Thank you, Judge.                         09:36:47

11          The defense calls Dr. Cyril Wecht.

12          THE CLERK:  Raise your right hand, please.

13       (CYRIL WECHT, DEFENSE WITNESS, SWORN.)

14          THE CLERK:  Thank you.  Please be seated.

15          Please pull the microphone over to you.                 09:37:22

16          State your full name for the record and spell your

17   last name.

18          THE WITNESS:  Cyril H. Wecht, W-E-C-H-T.

19          MR. CHAPMAN:  Your Honor, as a preliminary matter I've

20   asked Dr. Wecht to review the testimony of Dr. Lew, her       09:37:42

21   transcript.  And with your permission I'm going to have it

22   available for him at the witness stand in case he needs to

23   review it during his testimony.

24          THE COURT:  All right.

25                                                                 09:38:05

UNITED STATES DISTRICT COURT

—Cyril Wecht – Direct Examination—

                    DIRECT EXAMINATION

BY MR. CHAPMAN:

Q.  Can you tell us what your occupation is, sir?

A.  Could you speak just a little bit louder, please,

Mr. Chapman?                                              09:38:13

Q.  Sure.

A.  You asked me my occupation.

Q.  Yes.

A.  I'm a physician specializing in forensic pathology.

Q.  All right.  And tell us a little bit about your educational   09:38:20

background.

A.  I graduated from the University of Pittsburgh with an M.D.

degree in 1956.  One-year internship at St. Francis General

Hospital and Rehabilitation Institute in Pittsburgh.

        When I furnished that I started a residency in          09:38:41

anatomic and clinical pathology at the University of Pittsburgh

Veteran's Administration Hospital in Pittsburgh.  I was there

for two years, '57 to '59.

        I was called into the Service.  I spent two years as a

captain in the United States Air Force and served as a          09:38:58

sociopathologist at Maxwell Air Force Base Hospital,

Montgomery, Alabama '59 to '61.

        As soon as I got out of the military I went to

Baltimore where I spent one year as a sociopathologist and

research fellow in forensic pathology in the Office of the      09:39:17

—Cyril Wecht – Direct Examination—

1    Chief Medical Examiner of Maryland, '61 to '62.

2              And then I returned to my home in Pittsburgh where I

3    have been practicing in southwestern Pennsylvania in various

4    capacities since 1962 to the present time.

5    Q.  Tell us a little bit about your training in terms of the          09:39:35

6    field of pathology, beyond that.

7    A.  Well, there's four years is for anatomic and clinical,

8    which are the two major divisions of pathology.

9              Anatomic, you study tissues, surgical specimens in a

10   hospital, of all kinds, and sitology, cell studies like Pap          09:39:55

11   smears and so on.

12             Clinical pathology, body fluids and excreta of all

13   kinds; hematology, bacteriology, urinalysis, spinal fluid --

14       (Court reporter interruption.)

15             THE WITNESS:  I'm sorry, I'll slow down.  I'm sorry.        09:40:12

16             So those are the two major divisions.

17             Forensic pathology, you utilize all that you have

18   learned and all the equipment and diagnostic techniques and

19   modalities of the four years of anatomic and clinical

20   pathology, and you apply it to the investigation of violent,         09:40:33

21   sudden, suspicious, unexpected, unexplained, medically

22   unattended deaths.  That's what forensic pathologists do,

23   determining cause and manner of death in those kinds of cases,

24   generally thought of as coroner or medical examiner cases.

25   Q.  How long have you been a forensic pathologist?                   09:40:55

─────── Cyril Wecht – Direct Examination ───────

1   A.  Well, I finished that training in the Summer of '62.  So to

2   the present time, 56 years; '62, 38 and 18, 56 years I have

3   been practicing.  And I also practiced in hospital pathology

4   and private laboratory pathology too, up until 2000, during all

5   of that time, as well as forensic pathology.                    09:41:23

6   Q.  Over the course of your career how many autopsies have you

7   performed?

8   A.  Beginning from 1957 of my residency until the present time

9   I estimate I have done about 20,000 autopsies.  I've reviewed

10  and supervised, signed off on about 40,000 other autopsies in   09:41:46

11  that period of time.

12  Q.  When was your most recent autopsy?

13  A.  I did four autopsies yesterday before I caught the plane

14  here.  I did three autopsies on Monday.

15  Q.  Have you been involved in teaching and writing publications 09:42:03

16  in the field of forensic pathology?

17  A.  Yes.  I've had teaching appointments since I returned to

18  Pittsburgh in 1962.  For many years at the present time I'm

19  clinical professor of pathology at University of Pittsburgh,

20  adjunct professor of epidemiology at the Graduate School of     09:42:34

21  Public Health at Pitt.

22          And at Duquesne University I'm adjunct professor in

23  the school of law, adjunct professor in the school of pharmacy,

24  and adjunct professor in the graduate school of health

25  sciences.  At Carlow University in Pittsburgh I'm distinguished 09:43:00

—Cyril Wecht - Direct Examination—

1  professor of pathology.

2         And then I have some adjunct professorships at --

3  there's a medical school in New Mexico, American University of

4  Sovereign Nations, and a medical school in Nigeria.

5  Q.  Do you still continue to perform autopsies on a regular          09:43:18

6  basis?

7  A.  Yes, as I told you, I'm very actively involved.  I do

8  autopsies for coroners and district attorneys in four counties

9  surrounding Allegheny County, Pittsburgh.  And also private

10 autopsies, families, upon request.                                    09:43:36

11         I did 576 autopsies last year.  Actually I did about

12 500.  About 76 were done people covering for me, then I review

13 and sign off on those also.

14 Q.  Have you testified before as an expert in court in the

15 field of forensic pathology?                                          09:43:59

16 A.  Yes, I have.

17 Q.  How many times?

18 A.  Well, I've always testified as a pathologist, and most

19 frequently as a forensic pathologist.  And I guess I started to

20 testify 1962, early 1963.  So that's about 55 years.  You know,      09:44:15

21 several hundred.  I was the Allegheny County Coroner for 20

22 years and chief forensic pathologist for four years in the

23 Coroner's Office before then.  So I testified very often in

24 those cases, as I do now for district attorneys in the counties

25 for which I do autopsies.                                             09:44:44

────Cyril Wecht – Direct Examination────

1          And then private consultations, I do medical/legal

2     consultations for attorneys in civil and criminal matters and

3     workers' compensation.

4          I would estimate I've testified in this 55-year

5     period, I don't know, more than 500 times, just figuring ten --    09:45:06

6     maybe 750, something like that.

7     Q.  Okay.  Have you worked on cases, I assume you have, that

8     involve gunshot wounds and interpretation of wound

9     trajectories, that type of thing?

10    A.  Yes, I have.  I had a gunshot wound autopsy on Saturday,    09:45:27

11    and I had a gunshot wound autopsy on Monday.

12    Q.  Can you give us just one example of a notable case that

13    you've worked on where gunshot trajectory was significant and

14    important to the matter?

15    A.  Yes.  Without getting into details, but gunshot wounds,    09:45:50

16    direction, trajectory, sequence, number of shots, correlation

17    with other physical matters and so on.  Two examples in which

18    I've been officially involved as a consultant, the

19    assassination of President John F. Kennedy and the

20    assassination of Senator Robert F. Kennedy.    09:46:18

21    Q.  Can you tell us in a general sense what materials you've

22    reviewed in this case?

23    A.  Yes.

24    Q.  I'm not going to ask you specifically each item.

25    A.  Well, I've reviewed the autopsy done by the two    09:46:42

UNITED STATES DISTRICT COURT

───── **Cyril Wecht – Direct Examination** ─────

1  pathologists in Mexico.  I've reviewed all kinds of

2  investigative reports.  I've reviewed many dozen photographs of

3  the scene, of the body of Jose Rodriguez.  I have reviewed

4  various investigative reports from different kinds of experts,

5  both consulted by you and by the U.S. Attorney's Office in this       09:47:16

6  matter.  I've reviewed several videos, including one at the

7  scene where this incident occurred, and others, reconstruction

8  videos.

9         I've reviewed a transcript of the testimony of blood

10  spatter expert Mr. Bevel.  I've reviewed the transcript          09:47:42

11  testimony of Dr. Lew.  I've reviewed reports from Dr. Lew.  I

12  have reviewed earlier reports from Dr. Vincent Di Maio.

13         So all together it's several dozen different items,

14  all pertaining to this case.

15  Q.  Okay.  Thank you.                                              09:48:09

16         I want to ask you some questions about this case in

17  particular, and your opinions.  Before I do that, let me ask

18  you, were you able to review the initial conclusions of the

19  Mexican pathologists who actually performed the autopsy in this

20  case?                                                             09:48:28

21  A.  Well, yes, I did.  I reviewed their report and then

22  subsequent discussions that you and others have had with them.

23  Q.  All right.  So you're aware that their testimony

24  essentially evolved over time?

25  A.  Yes.                                                          09:48:45

───── **Cyril Wecht – Direct Examination** ─────

1    Q.  As to their initial statements regarding the timing and the

2    trajectory of various wounds, bullets, were you in agreement

3    with that?

4    A.  Yes.

5    Q.  Just tell us briefly what their opinions were.                09:49:01

6    A.  Well, the main thing to which you refer, and with which I

7    agree, was that the first shot that struck the decedent was the

8    shot to the right side of his head, just slightly above and

9    slightly to the rear of the right ear.  And that that wound

10   caused him to fall to the ground.  Then he sustained other       09:49:30

11   wounds.

12        I do not recall their giving any sequence to the other

13   wounds, including one other wound to the back of the head on

14   the left side.  And then multiple wounds on the chest on both

15   sides, posterior chest, the back, and wounds of the arms, I do   09:49:50

16   not recall any sequence.

17        But I recall that, and I agreed with what they stated

18   based upon their autopsy findings at the time that they

19   conducted that postmortem examination.

20   Q.  So I want to just talk to you about specifically gunshot     09:50:07

21   wound number 2 for a second, and your review of that.

22        That, as you indicated, is the wound behind the right

23   ear that transects the brain and comes out -- comes to rest

24   under the skin of the left forehead; right?

25   A.  Yes.                                                         09:50:30

--------- Cyril Wecht – Direct Examination ---------

1    Q.  All right.  Let's talk about that.

2         What damage did that injury cause?

3    A.  That bullet transected the brain on the right side, went

4    through what we call the mid brain area, and came to rest

5    beneath the scalp in the left parietal temporal region.  That          09:50:52

6    bullet moved from right to left, from down upward, and from

7    back to front.

8         It damaged then the -- I'd call basically the mid

9    portion of the brain, and a little bit more toward the front of

10   the brain on the left side as it moved in the direction I just         09:51:14

11   cited.

12   Q.  What would be the immediate consequence of that injury?

13   A.  In most people it would knock you down and knock you out.

14   You might have some temporary moments of decreasing

15   consciousness.  And that would be then a fatal, irreparable            09:51:44

16   wound.

17   Q.  Would it cause loss of motor function in the extremities?

18   A.  It could produce some diminution of motor function, but not

19   complete loss.  It would not have totally destroyed those areas

20   of the brain that control motor activity, but certainly there         09:52:06

21   would be some diminution.  But not total, and not immediate

22   cessation of life.

23   Q.  If an individual receiving this injury was standing, would

24   he be able to -- he or she be able to arrest his fall, if he

25   was falling forward, by using his hands, putting out his hands        09:52:35

UNITED STATES DISTRICT COURT

——— **Cyril Wecht – Direct Examination** ———

1  in front of him?

2  A.  No, I think not.  I believe a shot of this nature, with the

3  concussive force, would just cause the individual most likely

4  to pitch forward.  I don't believe that there would be a

5  conscious ability to protect one as he is falling, as there          09:52:54

6  would be in other kinds of situations.

7  Q.  In your opinion, if the decedent was standing when he

8  received this injury, were there any other injuries on his body

9  that suggested to you that he may not have been able to arrest

10  his fall as he was going to the ground?          09:53:23

11  A.  At the time that he sustained that head wound?

12  Q.  Yes.

13  A.  No, I believe that that was the first shot that was fired,

14  as I've stated earlier, consistent with what the Mexican

15  pathologists have ascertained at that time.          09:53:39

16  Q.  But what about injuries sustained after he fell to the

17  ground?

18  A.  Oh, as he falls to the ground?

19  Q.  Yes.

20  A.  Well, as he falls to the ground, then I believe, as was          09:53:48

21  noted, he sustained -- we call it abrasions.  These are

22  scratches on the left side of the face, the forehead, and the

23  cheek area, as well as on the backs of the hands.  I believe

24  those injuries were sustained when the decedent fell to the

25  ground in that kind of uncontrolled protective fashion.          09:54:12

─────── **Cyril Wecht – Direct Examination** ───────

1    Q.  So just to demonstrate for the jury, if he is shot behind

2    the ear, and he's moving forward and he falls, what you're

3    saying is, he won't be able to put his hands out in front of

4    him to stop the fall at that point.

5    A.  That is correct.  He would be falling and your hands would          09:54:34

6    be in what we call the anatomic supine position, just falling

7    down, rather than that kind of pronation, where you turn and

8    you hold your hands out to protect yourself.

9    Q.  And are you saying that that could account for abrasions on

10   the backs of his hands and on the face?                                  09:54:54

11   A.  Yes.

12   Q.  Could that also account to damage to his front teeth?

13   A.  Yes, the impact would be, as I've already said, on the

14   face.  And in addition to the abrasions, which are the external

15   manifestations of that fall, you have, of course, the force as          09:55:22

16   the head in uncontrolled fashion impacts against the earth, and

17   that force can come in and damage the teeth.  In this case a

18   tooth was, I think, dislodged and another tooth was damaged.

19          Yes, that would fit in, I believe, quite logically

20   with that scenario.                                                      09:55:47

21   Q.  Do you have an opinion as to whether the decedent was

22   likely standing or on the ground when he received that injury,

23   number 2?

24   A.  Mr. Chapman, I'm sorry, can you speak a little bit louder,

25   sir?                                                                     09:55:59

——Cyril Wecht – Direct Examination——

1   Q.  I apologize.

2        Do you have an opinion as to whether the decedent was

3   likely standing or on the ground when he received gunshot

4   number 2?

5   A.  I believe the decedent was standing when he received that          09:56:06

6   head shot which we have been talking about.

7   Q.  All right.  Let's move forward and talk about gunshot wound

8   number 4, the injury to the thoracic area of his back.

9        Do you recall that from the autopsy?

10  A.  Yes, sir.                                                          09:56:24

11  Q.  Tell us, based on your review of the records and the

12  testimony, what the likely impact of that injury would be.

13  A.  The bullet to which you're referring, labeled as gunshot

14  wound number 4, entered the back I think about two centimeters,

15  which is less than an inch, to the right of the mid vertebral      09:56:50

16  line.  And that bullet then moved upward into what we call the

17  suprasternal area, the notch at the top of your breast bone.

18       That bullet then moved back to front, a little bit to

19  the left, and down upward.  I believe that that is the bullet

20  that produced damage to the aorta, and possibly other smaller     09:57:17

21  vessels, and the soft tissues in that area we call the

22  mediastinum, the area between the two lungs, leading to a large

23  amount of bleeding.

24  Q.  Was that a fatal injury?

25  A.  Yes, I believe that wound, that injury, would have been        09:57:40

—Cyril Wecht – Direct Examination—

1    irreparable, even if you had emergency facilities available.

2    When you perforate the aorta and you have that massive

3    bleeding, there's nothing that could be done about that.  I

4    think that would have been a fatal wound.

5    Q.  Let me jump back to number 2 again, because I don't think I    09:58:01

6    asked you that question about wound number 2.

7         Was wound number 2 fatal as well?

8    A.  Yes, I believe that that would have been a fatal wound, not

9    susceptible to interventive neurosurgical procedure.

10   Q.  All right.  So let's move back to wound number 4.    09:58:17

11        Would the decedent, Mr. Elena Rodriguez, have been

12   able to control his upper extremities after having received

13   this injury?

14   A.  Yes.

15   Q.  Would he have been able to, if he was upright, continue to    09:58:39

16   be upright after this injury?

17   A.  Which bullet wound are you talking about, sir, now?

18   Q.  Number 4.

19   A.  Number 4.

20        And your question is would he -- I'm sorry.    09:58:51

21   Q.  Would he be able to continue standing or moving after

22   receiving this injury?

23   A.  Yes.  Well, I don't believe he would have remained standing

24   after receiving the head injury.  But if you're setting that

25   aside, if I understand your question, when he sustained that    09:59:08

Cyril Wecht - Direct Examination

1    wound of the back, number 4 that we're talking about, I think

2    that most likely would have knocked him down, if he had been

3    standing, if I understand your question.

4        And second part of your question is, would he have

5    been able to move the upper part of his body?  Yes.  He may          09:59:30

6    have been able to move the lower part of his body.  It depends

7    on whether or not there was any damage to the spinal cord,

8    something that we do not know scientifically, medically,

9    anatomically, pathologically in this case.

10        So -- but to answer your question completely, even if          09:59:53

11   the spinal cord had been damaged, the upper part, chest, and

12   then the arms and the head and neck and so on, would have been

13   able to move.

14   Q.  Okay.  So I want to ask you some follow-up on that.

15        In your experience have you -- have you done autopsies          10:00:16

16   or worked on cases where individuals have been shot and

17   sustained similar injuries and been able to -- have been not

18   paralyzed as a result of those injuries?

19   A.  Yes.

20   Q.  Tell -- so tell us about that.  Elaborate on that.              10:00:32

21   A.  Well, I believe -- you're asking me about wound number 4,

22   sir?

23   Q.  Yes, sir.

24   A.  Wound number 4, where they described some fractures of the

25   vertebral bodies.  They don't mention what parts of the             10:00:48

UNITED STATES DISTRICT COURT

—Cyril Wecht – Direct Examination—

1    vertebral bodies.

2         The vertebral bodies have processes that stick out,

3    two on the top that articulate with the two at the bottom of

4    the vertebral body above it, and two in the front that

5    articulate with the back part of the -- so anyway, we don't    10:01:08

6    know, they just say vertebral bodies.

7         Answer to the question you've asked me is, yes, I have

8    had many cases over the years where you could have some

9    injuries to the vertebral bodies without having damage to the

10   spinal cord.    10:01:27

11        The spinal cord is within the spinal canal.  The

12   spinal canal is surrounded by bone on all four sides, and it's

13   well protected.  So some fractures externally do not in any way

14   connote damage to the spinal cord.

15        It's pure conjecture to say that there was damage to    10:01:46

16   the spinal cord.  Unfortunately the spinal cord in this autopsy

17   was not removed, it was not examined.

18   Q.  So what you're saying is, in order to determine whether

19   there was any paralysis from this injury, the -- definitively

20   the spinal cord would have been -- needed to be removed and    10:02:07

21   examined?

22   A.  Yes.  And keep in mind, for there to be paralysis

23   definitely you'd have to have transection of the cord.  You

24   could even have some damage to the cord, you can have bleeding

25   around the cord, that doesn't lead to total paralysis.  You    10:02:20

—Cyril Wecht – Direct Examination—

1    have gradations, we call paresis, weakening, not complete

2    paralysis.

3            So you can have even a partial tear, you can have some

4    bleeding.  That doesn't produce total paralysis.  You have to

5    transect the entire cord, or almost the entire cord, to get          10:02:42

6    complete, total paralysis occurring immediately.

7    Q.  Let's assume for a minute that even though we haven't

8    inspected the spinal cord, that there was paralysis.  You've

9    indicated that Mr. Elena Rodriguez would still be able to

10   control his head and upper extremities; is that right?             10:03:03

11   A.  Yes.  The spinal cord only controls structures at that

12   level and below.  It does not work in retrograde fashion.

13           So with the fractures, those thoracic vertebra 4

14   through 8, come down, the bony prominence at the base of your

15   neck is C7, the last of the cervical vertebra, and then count       10:03:24

16   down, so you're in the chest.

17           So there would be no innervation to the arms, to the

18   head and face in any way compromised or damaged by that bullet

19   wound.

20   Q.  You've indicated that you believe that Elena Rodriguez was      10:03:38

21   standing when he received gunshot wound number 2.

22           In your opinion could he have also received gunshot

23   wound number 4 while he was upright?

24   A.  Yes.  It's not that far away.  Come down, you're talking

25   12, 18 inches, something like that.                                 10:04:06

─────────── Cyril Wecht – Direct Examination ───────────

1        Yes, I'm not a gun expert, but shooting, yeah, I mean,

2   they both come in from the back.  You know, they're not greatly

3   and widely distributed.  I don't see any reason why the two

4   wounds could not have been sustained in that fraction, in that

5   second in which the shooting occurred.                          10:04:34

6   Q.  Let's assume for a minute that gunshot wound did

7   not -- number 2 didn't happen when he was standing, let's just

8   make that assumption, and let me just ask you:  If he was

9   upright when he received gunshot wound number 4 to the thoracic

10  vertebra, and it caused him to fall, wouldn't he be able to use  10:04:55

11  his hands to arrest his fall and protect his face?

12  A.  Yes.  As we've already talked, that mobility, that

13  innervation of arms, head, face, would not have been

14  compromised by bullet wound number 4 in the back.

15  Q.  So you wouldn't expect to see abrasions on the backs of his  10:05:17

16  hands or on the left side of his face?

17  A.  Well, there might be abrasions on the left side of the

18  face, falling down.  But I would expect someone in your

19  hypothetical, who is conscious, to then put his hands down to

20  try to break the fall.                                          10:05:38

21  Q.  In your opinion as a forensic pathologist, should the

22  spinal cord have been removed and checked for damage?

23  A.  Yes.

24  Q.  In your opinion as a forensic pathologist, should

25  it -- assuming that photos of styluses in the wounds showing    10:06:20

1    trajectories were taken, should they have been preserved?

2    A.  Yes.

3    Q.  You've stated that you believe that the head shot number 2

4    was likely the shot that caused Mr. Elena Rodriguez to

5    collapse, that it was fatal; is that true?                    10:06:53

6    A.  Yes.  Not instantaneously, but yes, it would have led to

7    death.  I do not believe that it could have been repaired.

8    Q.  What in your mind is the most compelling evidence that

9    you've seen in this case that supports that conclusion?

10   A.  That the what?                                            10:07:13

11   Q.  What in your mind is the most compelling evidence that

12   supports the conclusion that gunshot wound number 2 occurred

13   while Elena Rodriguez was upright and standing?

14   A.  Well, as we discussed, number one, I look at the pathology

15   report and what they thought.  They were there, the           10:07:33

16   pathologists who did this autopsy, with no bias, I believe.

17       Number two, I studied the anatomic information they

18   set forth about that wound, and I studied the reports about

19   what took place and so on.

20       We've discussed the abrasions being on the backs of       10:08:01

21   the hands as opposed to the palmar surfaces and so on.

22       Putting that all together, that is the basis of my

23   conclusion.

24   Q.  I'm going to show you what's been marked as Defendant's

25   Exhibit 1193.                                                 10:08:39

────────Cyril Wecht – Direct Examination────────

1              It's previously been admitted under a Government

2    exhibit number, judge.  I'm just not sure which one it is.  But

3    I've shown it to the Government.

4              THE COURT:  All right.  Do you remember the number?

5              MS. FELDMEIER:  I can look it up.                10:09:01

6              It's in the 70 range.  I want to say it's 74, but I'll

7    pull it right now and make sure.

8              MR. CHAPMAN:  And, Your Honor, this is a somewhat

9    gruesome photo, so I wanted to alert the Court about that.

10             MS. FELDMEIER:  And we've alerted, Your Honor.       10:09:20

11             THE COURT:  All right.

12             MS. FELDMEIER:  That would be Exhibit 74, Your Honor.

13        (Discussion held off the record.)

14   BY MR. CHAPMAN:

15   Q.  Dr. Wecht, we discussed this photograph earlier today.  I   10:10:15

16   have some questions about it.

17             First of all, you see -- do you see bullet holes in

18   the lower part of the shirt?

19   A.  Yes.

20   Q.  All right.  And they correspond to three bullet injuries in  10:10:31

21   the back -- lower part of the back; is that right?

22   A.  Yes.

23   Q.  Does the absence of blood from those injuries indicate

24   anything to you?

25   A.  Yes, the absence of blood in those three bullet holes is    10:10:50

─────── **Cyril Wecht – Direct Examination** ───────

1    overwhelmingly suggestive of the conclusion that Jose Rodriguez

2    had died.  There was no movement of blood, not only any kind of

3    spurting, but not even any kind of flowing.  They're totally

4    without blood in their periphery and surrounding portions of

5    the shirt, the three that we see.                                         10:11:25

6    Q.  All right.  Now, there are two additional injuries above,

7    one below his -- kind of in the center line below his head and

8    the other one on the left that appear to have some fluid around

9    those injuries.  Do you see those?

10   A.  Yes.                                                                  10:11:44

11   Q.  Is that amount of fluid consistent with life at that point?

12   A.  Yes, I believe there's some flow.  Of course, if the photo

13   was taken as he was lying there and the body had not been

14   moved, then gravity would not have come into play because he

15   would have been face down.  The amount of blood indicates there  10:12:09

16   was some pouring out, not in a dynamic fashion, but some

17   fluidity of blood through those two bullet holes that show

18   bloodstains, the one higher up on the right side from the

19   midline toward the right, and the one over toward the left

20   below the armpit area.                                                    10:12:37

21   Q.  So assuming that Mr. Elena Rodriguez received gunshot wound

22   number 2 and collapsed, even though that was a fatal injury,

23   could his heart have continued to beat for a period of time?

24   A.  Assuming that he received that wound when?

25   Q.  Assuming he received gunshot wound number 2, the head         10:12:57

—Cyril Wecht – Direct Examination—

1   wound, and collapsed, could his heart continued to have beat

2   and created blood pressure that could account for

3   this -- these -- the blood on the shirt here?

4   A.  Yes.

5   Q.  Even though he was dead or dying?                      10:13:14

6   A.  Well, he wasn't dead, he was dying.  The brain has oxygen

7   for four and six minutes, number one.

8           Number two, that part of the brain which controls

9   cardiac and respiratory functions, the brain stem, was intact.

10  The autopsy makes no mention of damage to the brain stem.    10:13:41

11  Photographs I've studied show no evidence of damage to the

12  brain stem.  And most significantly and clearly, the trajectory

13  of the bullet comes nowhere near the brain stem.

14  Q.  All right.  We'll talk --

15  A.  The brain stem is where the respiratory and cardiac centers  10:13:59

16  are present.  And that's why people with massive strokes,

17  massive injuries, may remain alive and be kept alive with some

18  support, because the cardiac and respiratory centers are still

19  functioning.  If they're not functioning, then it doesn't make

20  a difference, you're gone.  But if they're functioning, your   10:14:22

21  brain may be irreparably damaged.  And, you know, people are

22  kept in these conditions for years sometimes because the

23  cardiac and respiratory centers are still intact.

24  Q.  So let me apply that to this case, if I can.  We agree that

25  the head injury number 2 was fatal.  Whether it was seconds or  10:14:43

—————————— Cyril Wecht – Direct Examination ——————————

1   minutes, it was fatal.  Is that true?

2   A.  Yes.

3   Q.  And my question was, even that could have been instantly

4   fatal.  What you're saying is that the heart can still continue

5   to pump for a period of time after an injury like that.                10:15:03

6   A.  Well, be careful of the word "fatal."  Fatal is synonymous

7   with lethality, synonymous with death.  So not to use the word

8   fatal -- it's going to be fatal.  It's not instantaneously

9   fatal.

10  Q.  There's just no way to determine?                                   10:15:21

11  A.  You're going to die, regrettably, tragically, you're going

12  to die.  But during those final moments, those final minutes,

13  then the cardiac and respiratory centers are still in tact in

14  the brain stem, and the heart beats, the lungs respire,

15  diminish and continually -- continuously diminish, we call         10:15:45

16  ingravescent course, downhill course.  Doesn't happen

17  dramatically.

18          But you're going to still have some function.  And

19  that is why you can still have then some bleeding.  The heart

20  is still continuing to beat.  There's still some movement.             10:16:03

21  Q.  But even if a team of surgeons had been standing right next

22  to him when this shot occurred, he wouldn't -- he would not

23  have been able to have been saved?

24  A.  No, I think the damage to the brain was too extensive to

25  have permitted recovery.                                                10:16:21

───── **Cyril Wecht - Direct Examination** ─────

1  Q.  With respect to the other bullet injuries that he received,

2  we haven't talked about them, but is there any way for you to

3  tell within a reasonable degree of medical certainty when and

4  exactly how those injuries occurred?

5  A.  You're referring to the various other bullet wounds?                10:16:53

6  Q.  Yes.

7  A.  No.  No.  I could not tell you the scenario of how the

8  decedent was moving, the angularity, slight changes, no.  I

9  could not do that.

10  Q.  After an injury like gunshot wound number 2 --                      10:17:18

11       Well, let me back up.

12       Can you tell us what agonal movement is, what that

13  means?

14  A.  Agonal refers to the dying moments.  It's synonymous with

15  what we call perimortem, around the time of death.  You know,    10:17:44

16  unless somebody gets guillotined or his head gets blasted off

17  with a gunshot wound, in all other instances, you know, you

18  don't die in a split second, literally die.

19       But talking about this case, agonal referred to those

20  moments, those seconds, the couple of minutes or so on after     10:18:07

21  Jose Rodriguez sustained these bullet wounds, before he was

22  completely dead, that's called the agonal period.

23  Q.  Now after receiving gunshot wound number 2, is it possible

24  that he could have agonal movement?

25  A.  Yes.                                                         10:18:37

—— Cyril Wecht – Direct Examination ——

1    Q.  Is there any way to tell based on the available evidence

2    whether he did or not?

3    A.  No, I could not tell you for certain based upon the

4    evidence.  But he certainly can.  There can be these various

5    spasmodic involuntary movements called decerebrate movements,     10:18:52

6    decorticate movements.  You know, it just -- all of it happens.

7    I'm just showing you as I'm sitting here.  (Indicating.)

8         You know, you're not talking about something of a

9    deliberate, prolonged nature.  You're talking about

10   movements -- and particularly of these parts of the body that    10:19:18

11   have multifaceted potential movements.

12        Just if I may (Indicating.)  I did that in one second,

13   I went up, I went down, I went to the right and the left.  This

14   is called hyperextension, this is called hyperfunction, left,

15   right, one second.  And I'm not a young man.  (Indicating.)      10:19:48

16        Look at the arm and the wrist, look, look.

17   Supination, pronation.  (Indicating.)

18        I mean all of that, literally.  I'm not -- I'm not

19   trying to be the least bit -- I mean, I'm trying to be, you

20   know, serious and scientific.  But just to demonstrate those     10:20:10

21   movements of which we are capable literally in a fraction of a

22   second.

23   Q.  Okay.  So let me ask you, have you heard the term "fencing

24   response" as well?

25   A.  Yes.                                                         10:20:27

—Cyril Wecht – Direct Examination—

1   Q.  And does that bear any connection or relationship to what

2   you've been telling us about agonal movement?

3   A.  Yes.  It's another kind of movement to consider.  It's

4   something that I've studied previously for another purpose, and

5   which is well recognized and scientifically acknowledged and          10:20:46

6   demonstrated dramatically in visual fashion.

7            It's a reflex that occurs when there's been a very

8   significant concussive force to the brain.  And while those

9   cases which I studied were not gunshot wound cases, they were

10  sports related.  The bullet impacting the brain, in addition to      10:21:10

11  the damage that it does, is also producing that concussive-type

12  force.  And then you get the flexing reflex.  They call it

13  flexing up left hand and forward right hand, fencing.  And it's

14  well-known.

15  Q.  Okay.  So the similarity between the two is that                   10:21:29

16  both -- it's just a level of severity, but both involve a

17  concussive force to the brain?

18  A.  It's the concussive force of the brain --

19  Q.  Right.

20  A.  -- that does that, yes.                                           10:21:42

21           You have tremendous force, obviously, from the bullet,

22  it's a concussive force.

23           And then your concussions mostly are of no great

24  moment.  And then you have concussions with a 300-pound

25  football player moving with great velocity smashing into your         10:22:01

──────── Cyril Wecht - Direct Examination ────────

1    head, that's one heck of a concussive force also.  There's

2    soccer-related injuries, and so on.

3    Q.  All right.  And you were able to compile some video clips

4    for me of events that demonstrated this fencing response you've

5    been discussing?                                                    10:22:29

6    A.  Yes.

7    Q.  Obviously we can't do that for agonal movement because

8    that's part of -- that's when somebody's killed and that's

9    normally not on film.

10   A.  Yes.  Yeah, people, you know, are not -- we don't have film   10:22:40

11   and documentation of people being shot.  I'm sure it's

12   happened.  But I'm not aware of anybody putting something

13   together in documentary form.

14          MR. CHAPMAN:  All right.  Your Honor, with your

15   permission I'd like to show the witness and publish to the jury   10:23:04

16   certain excerpts of Exhibit 1548 as demonstrative exhibits

17   only.

18          THE COURT:  Go ahead.

19          MR. KLEINDIENST:  I'm sorry, Your Honor.  Was

20   there -- I was talking to co-counsel.  I apologize.               10:23:34

21          THE COURT:  He wants to make sure you had no objection

22   to him showing parts of 1548.

23          MR. KLEINDIENST:  I don't think it's relevant, but I

24   have no objection.

25          THE COURT:  All right.                                     10:23:44

─────── **Cyril Wecht – Direct Examination** ───────

1      (Exhibit 1548 played.)

2    BY MR. CHAPMAN:

3    Q.  All right.  Go ahead and tell me to stop when you see a

4    fencing response.

5    A.  Look at the arms, look at the arms of the injured player.    10:24:25

6    Watch.

7    Q.  I'll let it cue forward a little bit.

8    A.  Left arm.  Watch, you'll see it again.

9          There are other --

10          See the arms forward?  They call it fencing, the    10:25:04

11   posture of somebody who would be fencing.

12   Q.  So he's unconscious but he still has his arms out in front

13   of him?

14   A.  Yes.  He's been knocked unconscious.

15   Q.  Here again we have somebody knocked unconscious?    10:25:18

16   A.  Look at the arms, look at the legs.  These are spasmodic,

17   involuntary, uncontrolled movements.  They're not gunshot

18   wounds, but they're powerful, powerful -- look, look.

19          There you have what they call the fencing reflex.

20   Q.  Okay.  The idea is this severe, concussive force to the    10:26:18

21   brain causes the involuntary movement of the upper extremities;

22   is that right?

23   A.  Yes.

24   Q.  And that -- why is -- why is that relevant to what happened

25   in this case?    10:26:35

─Cyril Wecht – Direct Examination─

A.  From my perspective, it's relevant because I'm aware that
there are questions about whether or not Jose Rodriguez could
have moved, how did he move, did the arm go up, did the arm
come back.

        And it is my opinion, expressed with a reasonable                10:26:55
forensic scientific certainty, that that cannot be done.  I'm
not saying these are not things that can be intelligently
addressed, honestly reviewed, and genuinely expressed.  I do
not believe that one can conclude with reasonable medical
certainty or reasonable forensic scientific certainty that                10:27:17
there had to have been or there would not have been certain
movements.

        You do not know, when someone has sustained a head
injury like this, what kinds of movements there are.  And
they're still being discussed and argued 55 years later with              10:27:35
President Kennedy when he's shot and the body moves backward
and to the left.  Was that decerebrate?  Did the shot come from
the front, did the shot come from the back.  I mean, 55 years
later.

        So it's a very real thing.  And the best of experts             10:27:49
can argue about this.  I'm not suggesting that my opinion is
the only opinion in the world.  In fact, I'm saying I can't
give you an opinion with reasonable medical certainty.  I
recognize various possibilities.  But to say that you can
reconstruct and somebody could not have moved or did move in             10:28:10

─── **Cyril Wecht - Direct Examination** ───

1    this fashion or that fashion, no, I'm sorry, I do not believe

2    that it could be so stated with reasonable forensic certainty,

3    which means a probability versus a possibility, which means

4    something more likely than not, something more than 50 percent.

5    I do not believe that.                                            10:28:28

6    Q.  So to the extent that Dr. Lew testified that she believed

7    there was conscious movement of the decedent after he fell to

8    the ground, it's your opinion that that just can't be stated to

9    a reasonable degree of medical certainty?

10   A.  Well, you know, doctor -- I'm sorry.  You know, Dr. Lew is    10:28:44

11   a competent, experienced forensic pathologist, and she has her

12   opinions.  I can't -- you know, I can only express my opinions.

13   I've already said what I believe.

14   Q.  All right.  But what you're allowing for is the possibility

15   that if there was movement on the ground, it could have been     10:29:05

16   agonal movement post gunshot wound number 2?

17   A.  Yes.  Spasmodic, involuntary, agonal, yes.

18   Q.  I want to go over with you some of the testimony of Dr. Lew

19   and just ask you if you agree with it.

20          You reviewed her transcript; right?  Of her trial          10:29:28

21   testimony.

22   A.  Yes.

23   Q.  Early in her testimony she spent a great deal of time with

24   that mannequin right there behind you, reconstructing the

25   shooting scenario with the exact position of the decedent when   10:29:46

─────── Cyril Wecht – Direct Examination ───────

1    he received each wound.  And then she went on, as we talked

2    about before, and talked about whether the head or the arm

3    moved.

4         What are your thoughts about that?

5    A.  I've expressed them, Mr. Chapman.  I cannot tell you that    10:30:03

6    what she has said is physically impossible.  I can only tell

7    you that I do not believe that you can reconstruct the multiple

8    wounds in this case in a sequential fashion, specific

9    trajectories and correlation with involuntary

10   pathophysiological movements that we have discussed.    10:30:40

11        Those are my opinions based on my experience and my

12   studies about these things, and my studies about concussion,

13   which I had to do to a great extent in matters in our office

14   when I was Allegheny County Coroner in discussing concussions

15   and injuries to football players and so on.    10:31:03

16   Q.  We've used this term "reasonable degree of medical

17   certainty" or "probability."  Is that a term commonly used in

18   your field?

19   A.  Yes.  I've -- the courts and honorable judges in federal

20   and state courts to my knowledge have applied this -- this is    10:31:25

21   my experience -- the reasonable medical certainty or reasonable

22   medical probability.

23        And if you're another kind of forensic scientist

24   dealing with forensic matters, reasonable forensic scientific

25   certainty, or reasonable forensic scientific probability, more    10:31:49

─────── Cyril Wecht - Direct Examination ───────

1    likely than not, probable versus just possible.  A lot of

2    things are possible, cannot be ruled out.  It doesn't make them

3    wrong, but it does not, you know, in my experience make them

4    usually acceptable.

5    Q.  In your review of Dr. Lew's transcript, did she appear to          10:32:11

6    render any opinions beyond a reasonable degree of medical

7    certainty or probability?

8    A.  Well, I can't speak to Dr. Lew and tell you what was in her

9    mind semantically.  My recollection is, I do not recall that

10   phraseology in the 100-page plus transcript that I reviewed.          10:32:31

11   That's my recollection.

12   Q.  Do you recall her testifying that gunshot wound number 4

13   would have struck the spine and injured the spinal cord

14   paralyzing him from the waist down?

15   A.  Yes.                                                              10:33:03

16   Q.  Do you have any quarrel with that statement?

17   A.  Yes.  I've already expressed it.  I do not see how she can

18   make that statement, because the spinal cord was not examined.

19   And no visual studies, no X-rays, MRIs, CAT scans, nothing was

20   done.  I do not -- it's just not physically possible to say          10:33:22

21   that.

22   Q.  Do you --

23   A.  If a person -- if a person remained alive and then you had

24   paralysis, you -- you could engage in that kind of reasonable

25   conjecture.  But you can't make that determination in this           10:33:40

——Cyril Wecht – Direct Examination——

1   case.

2   Q.  Let me jump back, because I forgot to ask you a question

3   about agonal movement as well.

4        Have you worked on cases in the past where there's

5   been evidence of agonal movement following death?      10:33:51

6   A.  Yes.

7   Q.  More than one?

8   A.  Yes.

9   Q.  It's not uncommon.

10  A.  No.      10:34:03

11       It doesn't usually become an issue.  Such movements

12  are not at all uncommon.  As issues in matters of litigation,

13  you know, they're infrequent.  But sometimes they're important.

14  Could somebody have done this, could somebody have done that,

15  when you attempt to reconstruct, and there's an argument, and      10:34:24

16  maybe somebody is saying something was self-defense or

17  somebody's arguing about the position and so on.

18       So, yeah, it's not a rarity.  It's not -- I'm not

19  telling you something that is novel here that I have created.

20  Q.  All right.  Do you recall Dr. Lew's testimony where she      10:34:44

21  described the scenario where the decedent was running bent

22  forward --

23  A.  I'm sorry, with what?

24  Q.  Do you recall Dr. Lew testifying about a scenario where the

25  decedent was running bent forward when he received gunshot      10:34:59

——Cyril Wecht – Direct Examination——

1    wound number 4?

2    A.  Yes, I do.

3    Q.  Thoughts on that?

4    A.  Well, I do not understand how Dr. Lew concludes with that

5    degree of certainty that permits her then to follow through          10:35:19

6    with a scenario associated with where the body lands and so on.

7         I -- think about running, think about -- go and look

8    at Olympics and other national and international races.  Think

9    of that magnificent Jamaican Usain Bolt, the world's fastest

10   man, how is he running?  You're running straight up.  You don't     10:35:54

11   bend down.  You can't run fast bending down.

12        If you're scared, and I don't know, I've never been

13   shot at, but I'm going to be running and I'm going to be

14   getting the heck out of there very, very fast.  I'm not going

15   to be running and jerking and ducking.  I'm going to be            10:36:12

16   standing up.  That's the way people run when they are in a

17   hurry to get out of someplace fast.  They run straight up, they

18   are looking and getting the heck out of there.

19        So I don't know how she comes to the conclusion that

20   Jose Rodriguez was bent over when he was running.  I don't know    10:36:30

21   where that comes from, on what basis.

22   Q.  She also concluded that -- or testified that the gunshot

23   wound number 4 was the one that caused a collapse -- caused him

24   to fall, and was consistent with the abrasions that he had on

25   his face.                                                          10:36:53

1  A.  Well, I've already expressed opinions about that,

2  Mr. Chapman.  I believe number 2 came first.  I believe it's

3  quite possible -- I can't say with a reasonable medical

4  certainty, that 2 and 4 were inflicted at about the same time.

5  But that's a distinct possibility, given the relatively close          10:37:11

6  anatomical positions, locations of those two wounds.

7        And in any event, the 4 followed 2.  The wound number

8  2 to the head, I believe, as did the pathologists who did this

9  autopsy at that time, that he sustained the head wound, the

10 decedent, causing him to fall.  And wound number 4, either          10:37:39

11 inflicted then or after he has fallen.  That is my opinion, and

12 I do express that opinion with reasonable forensic scientific

13 certainty.

14 Q.  She also testified that 1500 ccs of blood in the chest

15 cavity meant that he was alive on the ground.          10:38:02

16        What are your thoughts on that?

17 A.  Yes.

18 Q.  Do you have any thoughts on that?

19 A.  Well, I do believe that he remained alive, as we were

20 talking before.  I said that the brain stem remained intact,          10:38:17

21 contrary to what Dr. Lew has concluded.  And I don't know on

22 what basis.  And the cardiac and respiratory centers were

23 intact and functioning.  The bullet had damaged and perforated

24 the ascending aorta, the major blood vessel.  And that blood

25 just comes out fast.  And that's how you get the accumulation          10:38:41

─────Cyril Wecht – Direct Examination─────

1   of blood, 1200 ccs, 1500 ccs.  It was not quantitated.

2       And there again is somebody -- Dr. Lew assumes, and I

3   think she came up with the number 3,000 ccs.  I don't know.  I

4   accept that there was a voluminous amount of blood.  And I have

5   no problem in understanding where that came from, damage to the          10:39:00

6   aorta and then other vessels and some structures.  That's where

7   the blood came from.

8       And Mr. Rodriguez continued to have that kind of

9   bleeding.  Not then -- initially there was some dynamic

10  velocity, and then it would continue.  As long as there is any          10:39:22

11  kind of heart beating, you're going to have some movement, some

12  movement of that fluid, the blood.

13  Q.  So --

14  A.  And it's right there too.  And it just comes right out and

15  it just goes into the chest cavities.                                    10:39:39

16  Q.  So the point is, is that even though he received this

17  injury transecting the brain that was fatal, his heart could

18  have continued to beat for a period of time and cause that dump

19  of blood from the ascending aorta into the chest?

20  A.  Yes.  It permitted bleeding to continue, yes.                        10:39:59

21      It doesn't take long for that kind of volume of blood

22  to accumulate when you perforate the aorta.

23  Q.  We talked about this a little bit, but Dr. Lew made the

24  claim that gunshot wound number 2 damaged the brain stem.  Do

25  you recall that?                                                         10:40:33

─────────── Cyril Wecht – Direct Examination ───────────

1   A.  Yes.

2   Q.  Okay.  I'm going to pull up a demonstrative exhibit and ask

3   you to look at it.

4          MR. CHAPMAN:  Your Honor, I'm showing the witness

5   what's been marked as Defense 1550, and I'd ask that it be          10:41:05

6   admitted for demonstrative purposes only.

7          MR. KLEINDIENST:  No objection.

8          THE COURT:  It can be admitted for that purpose.

9      (Exhibit No. 1550 admitted into evidence.)

10  BY MR. CHAPMAN:                                                     10:41:18

11  Q.  All right.  Dr. Wecht, can you give us a little primer on

12  where the brain stem is in relation to the trajectory of bullet

13  number 2?

14  A.  The artist who made this very accurate sketch has already

15  done that for us.                                                   10:41:34

16          If you look at the bottom right, brain stem, and see

17  where the line goes in.  Look at the two lines, bottom left,

18  medulla and pons.  That is where the respiratory and cardiac

19  centers are located.  We refer to that as the brain stem.

20          That structure to the right below in yellowish, darker     10:41:54

21  yellow is the cerebellum.  It's a separate part, so to speak,

22  balance coordination.

23          In the main part you're looking at a cerebral

24  hemisphere cut in half.  You're looking at one half.

25          Look -- there's -- there's no proximity.  The bullet       10:42:13

──── **Cyril Wecht – Direct Examination** ────

1    wound -- the bullet wound went in right there somewhere, where

2    we're seeing on the inside.  (Indicating.)

3          But if I could go straight out to the decedent's head,

4    it would be, you know, around in there.  And then it moved.  It

5    moved --                                                    10:42:39

6          Can I do this?

7          MR. CHAPMAN:  Sherry, can you clear the screen?

8    BY MR. CHAPMAN:

9    Q.  Dr. Wecht, go ahead and draw a line which you think

10   represents --                                              10:42:50

11   A.  Well, you don't have a view of the brain from the other

12   side?

13   Q.  I don't.

14   A.  You don't?  I thought you had another one.

15   Q.  This is the only one I have.                           10:42:58

16   A.  Well, the brain has these areas, frontal, going in from the

17   forehead; occipital, back here, base of your head; temporal,

18   around the ears.  And everything in between is parietal.

19          So frontal, front, occipital, back, temporal, sides.

20   And then everything else is parietal.  (Indicating.)       10:43:24

21          So the bullet went in like back in there somewhere.

22   (Indicating.)  Think of it on the other side of the brain.  And

23   then the bullet moved.  It moved upward, and it moved forward,

24   and it moved leftward.  And it came out and moved there.

25   (Indicating.)                                              10:43:48

**Cyril Wecht – Direct Examination**

1          There is no proximity at all to the brain stem.  It

2    doesn't come anywhere near the pons or the medulla.

3          And it should be emphasized that the pathologist who

4    did the autopsy made no mention of brain stem damage.

5    Q.  Did Dr. Lew in her report even indicate that there was          10:44:07

6    damage to the brain stem?

7    A.  Yes.

8    Q.  She didn't indicate that, did she, in her report?

9    A.  Oh, in the report, no.  Not in the report, in the testimony

10   she did.          10:44:18

11   Q.  But in her report --

12   A.  On the written report, no.  I do not recall a reference to

13   brain stem damage in her written report.

14   Q.  And that wasn't in the Mexican autopsy report either.

15   A.  No, it was not.          10:44:28

16   Q.  Have you reviewed the photos from the autopsy?

17   A.  Yes.

18   Q.  Do you see any damage to the brain stem?

19   A.  No.

20   Q.  Assuming that an individual receives a wound like this,          10:44:35

21   gunshot wound number 2, falls to the ground unable to control

22   his extremities, hits the left side of his face, does that mean

23   that he automatically comes to rest in that exact position?

24   A.  No.  We've discussed spasmodic involuntary movements at

25   some length.  And so it does not mean that the position in          10:45:13

────── Cyril Wecht – Direct Examination ──────

1    which he falls remains that position with no movement of any

2    kind.  Not movement of getting up and running around or so on,

3    or doing things of a great deliberate, conscious nature.  But

4    movements of extremities, movements of head and face, no.

5    These things can take place, you're not completely dead.          10:45:38

6    Q.  And also just the idea of this momentum carrying you

7    forward.  You could hit a wall, bounce or roll when you hit the

8    ground; right?

9    A.  Yes.

10   Q.  So even though your face might hit in a certain position,    10:45:55

11   that may not be the --

12   A.  Mr. Chapman, would you stand over by the microphone.

13   Q.  Sorry.

14        Even though your face might hit the ground in a

15   certain position, that doesn't mean that's going to be the       10:46:07

16   ultimate position.

17   A.  That's right.  That's right.

18        Just think of your head on your neck, and you can

19   understand that.  I think if you get smacked in the head,

20   whacked in the head, bump your head, strange hotel room, or in   10:46:21

21   your own home getting up in the middle of the night or

22   whatever.  Just think about that.

23        I mean, you're talking about the most minute of

24   movements, you're talking about centimeters, not even inches.

25   Q.  In a very dynamic situation.                                  10:46:39

UNITED STATES DISTRICT COURT

Cyril Wecht - Direct Examination

1  A.  Yes, a very dynamic situation.

2  Q.  One last question.  Dr. Lew testified that the T-shirt of

3  Mr. Elena Rodriguez could somehow have caused a bruise under a

4  bullet wound on his neck.  Do you remember that?

5  A.  Yes.                                                          10:47:01

6  Q.  Do you have any thoughts on that?

7  A.  I do not comprehend that at all.  As I understand it, we're

8  not talking my throwing a shirt at you with some force, or you

9  falling down upon some garment you're wearing.  If I understand

10 what Dr. Lew says, that when he fell face down and the T-shirt   10:47:26

11 came up, that the T-shirt impacted the base of the skull on

12 left side and produced a bruise.

13         I -- I can't remember ever attributing a bruise to

14 some soft garment that moved on the body.

15         Dr. Lew went on to say like, she said, jewelry or        10:47:50

16 other -- or other like objects.  Well, jewelry is not a shirt.

17 A necklace or an earring is not a T-shirt.

18         I'm sorry, I don't understand that.  I don't know what

19 the relevance is, a little bruise in the back of the head.  I

20 don't know, but that's not for me to determine.                  10:48:19

21         But I'm answering your question about could it have

22 been caused by that T-shirt, rolling up and impacting the base

23 of the skull, no.

24 Q.  Assuming that it's true that the ascending aorta was

25 damaged -- and we've talked about the draining of the blood      10:48:40

─────── Cyril Wecht – Direct Examination ───────

1   into the chest cavity.  Could that have happened in a matter of

2   seconds?

3   A.  Oh, yes.  Just seconds the blood would pour out.  You know,

4   as I said the heart is still beating.  Oh, yeah, just seconds

5   to accumulate that amount of blood.  And then some more blood         10:49:01

6   could have flowed out too, a little bit of gravity.  But most

7   of the bleeding would have occurred when he was alive as a

8   result of the damaged aorta.

9           MR. CHAPMAN:  May I have a moment?

10          THE COURT:  You may.                                          10:49:19

11      (Discussion off the record between defense counsel.)

12          MR. CHAPMAN:  No further questions.  Thank you.

13          THE COURT:  Ten minutes?

14          MR. KLEINDIENST:  Yeah.

15          THE COURT:  Ten minutes.  And I really mean ten               10:49:37

16  minutes.

17      (Recess at 10:49 a.m. until 10:59 a.m.)

18      (At sidebar on the record.)

19          MR. CHAPMAN:  Dr. Wecht was prosecuted for something,

20  and acquitted.  And we asked Wally if he was going to get into       11:00:01

21  that, and he told us he wasn't.  I just want to confirm that.

22          MR. KLEINDIENST:  You doubt my word?

23          THE COURT:  All right, guys.

24          MR. KLEINDIENST:  No, I'm not going to get into it.

25          THE COURT:  Come here.                                       11:00:14

Cyril Wecht – Cross-Examination

1          I can tell this is week four of a trial.  You guys

2   were getting along so well when this case first started, and

3   it's started to deteriorate.

4          MR. CHAPMAN:  I'll work on it.

5          MR. KLEINDIENST:  I'll work on it too, Judge.          11:00:28

6          THE COURT:  All right.

7      (End of discussion at sidebar.)

8          THE COURT:  Bring them in.

9      (Jury in at 11:03 a.m.)

10         THE COURT:  Show the jury's returned back to the      11:04:22

11  courtroom, presence of all counsel and the defendant.

12         Mr. Kleindienst, whenever you're ready you may

13  proceed.

14                      CROSS-EXAMINATION

15  BY MR. KLEINDIENST:                                          11:04:45

16  Q.  Good morning, Dr. Wecht.  How are you?

17  A.  I'm fine, sir.  Good morning.  How are you?

18  Q.  Nice to meet you.

19         I just have some preliminary questions.

20         You mentioned that you obviously are a forensic       11:05:43

21  pathologist, you went to medical school, you received post

22  medical school training, and your practice has been in forensic

23  pathology for your entire life; correct?

24  A.  Yes, sir.

25  Q.  But you're also a lawyer as well.                        11:05:58

Cyril Wecht – Cross-Examination

1    A.  Yes.  I earned a law degree.  I don't practice as a lawyer.

2    I don't do anything.  But I did go to law school and I did get

3    a law degree, yes, sir.

4    Q.  Well, isn't some of your practice involving advising

5    clients on legal medical issues in cases, drawing on your                    11:06:12

6    degree as a lawyer and your experience as a lawyer?

7    A.  No, sir, not clients.  Attorneys, yes.  I do medical legal

8    consultations --

9    Q.  Right.

10   A.  -- for attorneys in all kinds of civil and criminal cases,              11:06:25

11   worker's comp.  But not with clients.  They're not might

12   clients.  I work with the attorneys.

13   Q.  I understand.  But you use your legal training in those

14   consultations.

15   A.  Oh, I'm sure that what I learned in law school and what                  11:06:38

16   I've learned in courtrooms and in talking to lawyers over

17   years, I'm sure that that has permeated my brain and helped me

18   understand things in forensic pathology better, yes.

19   Q.  In fact, I think you've written a book about how best to

20   testify in court to win your case; correct?                                 11:06:58

21   A.  Not a book.  I've written articles, I think, on testimony,

22   various articles I have.  There's a three-volume set called, I

23   think, winning cases, winning negligence cases, or so on.  And

24   that's from both sides, defense or plaintiff, just what to do

25   to -- that was written with two attorneys.                                  11:07:23

UNITED STATES DISTRICT COURT

Cyril Wecht – Cross-Examination

1  Q.  It deals with how to present testimony in court to convince

2  a jury --

3  A.  I believe it does.  That mostly came from them on that

4  aspect of it.

5  Q.  But you were one of the authors; correct?                    11:07:37

6  A.  Yes, I am.

7  Q.  Okay.

8  A.  Pardon me?

9  Q.  I'm sorry?

10  A.  Yes, I'm one of the three authors, that's correct.          11:07:44

11  Q.  Okay.  Now how much did you charge in this case?

12  A.  I asked for -- I get a $5,000 consultation fee when a case

13  is submitted to me.  And then there have been some other

14  charges in this case for supplemental review of materials

15  submitted to me, meetings with attorneys Chapman and Calle.     11:08:03

16  And then, of course, coming here.  And when I travel I charge

17  $5,000 per diem and reimburse of travel expenses.

18  Q.  5,000 per day --

19  A.  Per diem.

20  Q.  -- for your testimony in court?                             11:08:20

21  A.  Yes.  Well, for my time, including my testimony, meeting

22  with Mr. Chapman, Mr. Calle.  And, you know, all the time, yes,

23  sir.

24  Q.  And so how much have you charged them in this case,

25  Dr. Wecht?                                                      11:08:32

───────Cyril Wecht – Cross-Examination───────

1    A.  I would -- I haven't calculated the bill on this.  5,000

2    was originally sent.  I think probably some supplemental bills

3    might have accumulated to about another 5,000 or so.  And then

4    there will be at least a couple of days here will be another

5    10,000, and reimbursement for travel expenses.              11:08:52

6    Q.  So you're talking about getting paid over $20,000 for

7    your --

8    A.  That's it will be at the end, yes.  At least that, yes.

9    Q.  Okay.  And that's how you make your living, you go around

10   and testify as an expert witness in various --              11:09:05

11   A.  Well, most --

12        (Court reporter interruption.)

13        THE COURT:  One of you at a time.

14        THE WITNESS:  I'm sorry.

15        MR. KLEINDIENST:  Sorry, Judge.

16        THE WITNESS:  I'm sorry.  I apologize.

17        MR. KLEINDIENST:  We both apologized, Mr. Wecht.

18        THE WITNESS:  I mostly make my living, sir, by doing

19   autopsies.  I did 576 autopsies last year.  That comes to a

20   considerable amount of money.                               11:09:23

21        I do charge for consultations.  Testimonies are not

22   that frequent.  As, I said, maybe ten 12 year, most of them for

23   district attorneys in homicide cases where I have done the

24   autopsies for the counties for which I do autopsies.

25        I'll be testifying two days from now for the district    11:09:43

─────Cyril Wecht – Cross-Examination─────

1   attorney in Westmoreland County in a double homicide that I did

2   some years ago.

3           So, yes, I do make money in that.  Most cases,

4   fortunately, are settled and don't require testimony.

5   Q.  Okay.  The $5,000 initial consultation fee that you          11:09:59

6   initially charged in this case.

7   A.  Yes.

8   Q.  You usually charge that to write a report; right?

9   A.  I ask for submission of the payment when the records and

10  materials are submitted.                                         11:10:14

11  Q.  Okay.

12  A.  Not after the report.

13          Sometimes when there's a governmental agency and they

14  have to await -- but private attorneys, I ask -- and if it's a

15  court-appointed, I ask for an order from the court approving     11:10:27

16  payment.

17          So, yes, I do wish to have payment or acknowledgement

18  that payment will be forthcoming at the time that the materials

19  are submitted, no matter what my report is going to be.

20  Q.  Right.                                                       11:10:42

21          And did you write a report in this case?

22  A.  I wrote several small reports, yes.  I think there were two

23  or three over a period of years, yes, that were submitted.

24  Q.  That you authored in this case?

25  A.  Yes, that I authored.                                        11:10:57

1          I think a couple were then set forth by Mr. Chapman to

2   you, to your office, as I recall, taking what I had told him.

3   He presented it.  In one or two other cases it was directly

4   from me.

5   Q.  Well, okay.  So I guess that's my question.  You normally        11:11:17

6   as a matter of your practice write a report after you review

7   the material in the case and come up with not only factual

8   findings, right, based on the material you've reviewed; right?

9   A.  Yes.

10  Q.  And then you come up with certain opinions; correct?          11:11:33

11  A.  Yes.

12  Q.  And you know that as a lawyer, as well as a doctor, that a

13  report is important so it tells the other opposing lawyer -- it

14  gives him advance notice as to what you're going to be

15  testifying about; right?                                          11:11:49

16  A.  Yes.  I set forth my opinions and conclusions for the

17  attorney who has consulted me.

18  Q.  And isn't that only fair, that if you are going to testify

19  as an expert witness, that the other attorney in the case have

20  a copy of your report so they know in advance what you're going    11:12:04

21  to be testifying about; correct?

22  A.  That's entirely up to the attorney who has consulted me and

23  the judge that is presiding over the case.  I don't get into

24  that.  I don't communicate with other people or attorneys on

25  the other side.  I submit my report orally and/or in writing to    11:12:23

Cyril Wecht - Cross-Examination

1    the attorney who has consulted me.  Then that attorney, as

2    his/her obligations based upon the rules and regulations of

3    that jurisdiction, they have to follow through.  What they do

4    is their business, not mine.

5    Q.  Well, I have in my hand a whole stack of reports that I've          11:12:44

6    gathered pertaining to you, where you've actually written a

7    formal report, and given that that to the attorney who retained

8    you.

9         Would you like to take a look at them?

10   A.  No.  I just said that, sir.  I just said that.  Of course,        11:12:59

11   I do.

12   Q.  My question in this case, did you author any type of

13   report?  Did you?

14   A.  Yes, I wrote a couple of reports.  And others, Mr. Chapman,

15   his decision, took what I had told him and submitted those to         11:13:17

16   you or your office.

17   Q.  I've not seen your reports.  Do you have copies with you?

18   A.  I don't know.  Everything that I have submitted has gone to

19   Mr. Chapman.  I know -- I recall that they were addressed

20   to -- a couple of them were addressed to you or to your office,       11:13:36

21   I recall that.  I know that you received reports from

22   Mr. Chapman, I know that.

23   Q.  All I'm asking is that, I've never seen or been given a

24   report that you authored.  And you said you authored a couple

25   reports in this case.                                                 11:13:51

─── Cyril Wecht ─ Cross-Examination ───

1    A.  Sir, I cannot answer it any differently than I have.  I've

2    given my information, my reports to Mr. Chapman.  I know that

3    he submitted to you.  And I know that he was doing so in

4    compliance with the court and federal rules of procedure.

5    That's what has to be done.  I don't establish the rules.                    11:14:07

6            MR. KLEINDIENST:  May I approach the witness,

7    Your Honor?

8            THE COURT:  You may.

9    BY MR. KLEINDIENST:

10   Q.  I'm going to hand you Exhibit 384, Dr. Wecht.                            11:14:28

11           And tell us if you recognize what's in that exhibit.

12   A.  I'm sorry, what was the question?

13   Q.  Yeah, do you recognize the documents in that exhibit?

14   A.  Yes.  It looks like a report submitted to you and

15   Miss Feldmeier from -- let's see, there's more than one.                    11:14:48

16   Q.  Right.

17   A.  There's several reports.

18   Q.  What's the date of the first report, Mr. Wecht?

19   A.  February 8th, 2017, March 20, 2017, December 21st, 2017,

20   February 7th, 2018, February 14th, 2018.                                    11:15:16

21   Q.  And they're all letters from Mr. Chapman to me and

22   Miss Feldmeier; correct?

23   A.  That is correct.

24           April 9th --

25           They're all to you from Mr. Chapman.  That's correct.              11:15:37

—Cyril Wecht - Cross-Examination—

1    Q.  Okay.  None of them in that packet are reports that you

2    authored.

3    A.  They're all reports containing my opinions.  If you're

4    asking me, did I author them, and did it come in my stationary

5    signed by me, the answer is, no, they did not.  They're all      11:15:56

6    from Mr. Chapman to you containing the essence and the details

7    of my opinions and conclusions in this case.

8            That's the way Mr. Chapman chose to handle it.

9    Q.  He didn't ask you for a report?

10   A.  No.  No, he did not ask me to submit a separate report, no.  11:16:14

11   Q.  Now you've talked about Dr. Lew in this case.  And you --

12   actually you've had the advantage of reading her trial

13   testimony from last week; right?

14   A.  Yes.

15   Q.  And you've had the advantage of reading her report; right?   11:16:27

16   A.  Yes.

17          MR. KLEINDIENST:  Well, let me -- if I could approach

18   the witness.

19          THE COURT:  You may.

20   BY MR. KLEINDIENST:                                              11:16:37

21   Q.  Do you want to take a look at that, Exhibit 278.

22   A.  Yes.  I've seen this.

23   Q.  That's Dr. Lew's report.

24   A.  Yes.

25   Q.  And it's fairly comprehensive; right?                        11:16:47

Cyril Wecht – Cross-Examination

1   A.  Yes.

2   Q.  And that's the type of report that you normally write when

3   you're hired as a consultant.

4   A.  I usually do write a report myself, yes, that's correct.

5   Q.  Of course, the issue is, is that a lot of what you've          11:17:01

6   testified here today didn't show up in any of the letters that

7   I got from Mr. Chapman that you said you reviewed.

8   A.  Sir, I cannot tell you exactly what came up or what did

9   not.  These are things that His Honor will determine, and the

10  attorneys.  I'm just giving you my testimony, to the extent       11:17:22

11  that I have been asked questions and the Court has permitted me

12  to answer.  I don't know what else to tell you.

13       If I were doing anything improper, I'm certain that

14  His Honor would have so informed me.  I don't know what more to

15  tell you.                                                         11:17:40

16       I did what I did.  There's no secret here.

17  Mr. Chapman chose to have my opinions and conclusions set forth

18  in multiple reports to you, which collectively would probably

19  be more voluminous than Dr. Lew's report.

20       I don't know what else to tell you.  That's the way          11:17:54

21  Mr. Chapman worked.  I've not worked with Mr. Chapman before.

22  That was his decision.  He wrote those things and submitted

23  them to you.

24  Q.  I'm not accusing you of any misconduct, Dr. Wecht, I'm just

25  trying to establish that the letters that we got from             11:18:07

UNITED STATES DISTRICT COURT

Cyril Wecht - Cross-Examination

1   Mr. Chapman, that was based on, I guess, your opinions, did not

2   include a lot of the things that you testified here today.

3   That's all I'm trying to establish.  Yes or no?

4   A.  Sir, I -- I can't correlate every single thing that I've

5   said.  I can tell you I've had many discussions with        11:18:25

6   Mr. Chapman and Mr. Calle.  A couple where they both came to

7   Pittsburgh, on the phone multiple times, here today this

8   morning.  And I'm answering questions.

9        If there was anything that was out of line, I have no

10  question about how that would have been handled by this      11:18:46

11  Honorable Court.  I don't know what else I can tell you.

12  Q.  I'm not accusing you doing anything out of line.

13  A.  Well, you're indirectly, sir, suggesting that I have

14  withheld.  That's for you to assert, sir, with the Court.

15  Okay?                                                        11:19:03

16       I'm giving you my opinions.  I don't know what more I

17  can tell you.  I've been asked questions and I have answered

18  them truthfully under oath.  And if you think that there's

19  something that should not have been included, that's for you to

20  address with His Honor, sir, not for me to handle.           11:19:20

21  Q.  I'm just addressing it with you.  That's the appropriate

22  forum, Dr. Wecht, as you know.  Okay?

23       We'll move on.

24       Let me ask you this:  Did you review every letter that

25  Mr. Chapman sent to us that is in front of you as exhibit --  11:19:35

Cyril Wecht - Cross-Examination

1    A.  Yes, I believe so.  Yes, they all look familiar to me as I

2    hastily go through them.

3    Q.  Well, take your time.  Take your time.  I don't want you --

4    I want you to be fully informed.

5    A.  There's some repetition here.  As far as I can see in terms    11:20:38

6    of there's -- some things are duplicated.  As far as I can see,

7    substantively, I have seen these before.

8    Q.  And you would have approved them before they were sent to

9    me, because in consultation with Mr. Chapman you --

10   A.  I would have discussed them with Mr. Chapman.  There were a    11:21:00

11   couple of times he did just send me what he was going to

12   submit.  But there's nothing that I was unaware of, whether it

13   was before or during.  But all set forth things that I had

14   stated.

15   Q.  Okay.  Let me ask you this:  Your testimony --    11:21:28

16          By the way, did you -- did you visit the crime scene

17   in this case?

18   A.  No, I haven't been there.

19   Q.  Did you ask to visit the crime scene?

20   A.  No.    11:21:40

21   Q.  Have you ever visited a crime scene in a case --

22   A.  No.

23   Q.  You've never --

24   A.  Well, no, I've -- no.  I cross the border a very long time

25   ago and I don't know whether that's the scene.    11:21:50

UNITED STATES DISTRICT COURT

Cyril Wecht – Cross-Examination

1         No, I have not been to this scene.

2  Q.  No, but in the past have you ever visited the crime scene

3  in connection with your --

4  A.  Oh, in the past, yes, sure, sure.

5  Q.  Right.  Because it was -- it was of some importance to you;   11:22:02

6  right?

7  A.  Well, sometimes it is.  Many times it's of no consequence

8  or relevance.  Most of the time I do not go to the scene.  It's

9  quite infrequent that I go to the scene.

10  Q.  Well, do you remember the case of State of New Jersey   11:22:17

11  versus Stephen Scharf, that's in the Superior Court of

12  New Jersey Law Division in Bergen County?  Do you remember

13  testifying in that case?

14  A.  Is that the case of somebody falling off the cliff?

15  Q.  Yes.   11:22:33

16  A.  Yes, I did go there.

17  Q.  You went to the scene --

18  A.  Yes.

19  Q.  -- because it was important to look at the scene.

20  A.  Oh, yes, that one was quite important.   11:22:37

21  Q.  Okay.  Now you know the jury in this case has gone to the

22  crime scene.

23  A.  I don't know that.

24  Q.  Oh, you didn't know that?

25  A.  No.   11:22:44

Cyril Wecht – Cross-Examination

1  Q.  But you didn't think that it was important enough for you

2  to take the time to visit the crime scene, because there are

3  issues of elevation, lighting and angles?  You didn't -- didn't

4  think to ask?

5  A.  No, I did not ask, and I was not instructed or asked by                11:22:58

6  Mr. Chapman or Mr. Calle, in charge of the case, to go there.

7          Insofar as lighting and other matters of a physical

8  nature, these are not matters that I dealt with, or am dealing

9  with, or expressing opinions upon.  I had dozens of

10  photographs, sketches, diagrams, extensive discussions for              11:23:21

11  complete clarification with the attorneys.  And, no, I did not

12  feel that it was critical for me to go there to the scene.  I'm

13  aware of how the shooting occurred.  And I'm dealing with the

14  questions regarding the shots, particularly the sequence of the

15  shots.                                                                   11:23:43

16  Q.  Did you look at the videotape in this case?

17  A.  Yes, I've seen videos.

18  Q.  When did you see the videotape?

19  A.  Well, they have been sent to me before.  And I looked at a

20  video again this morning, one of the videos.                            11:23:52

21  Q.  When was the last time before this morning that you

22  actually looked at the video of this case?

23  A.  Oh, it would have been some months ago, I guess.

24  Q.  Maybe years ago?

25  A.  Maybe -- well, years ago to begin with.  Well, not years.           11:24:05

─────── **Cyril Wecht - Cross-Examination** ───────

1    I wasn't involved in this case until just about 14 months ago.

2    So it's not years, but months.

3           And then when Mr. Chapman, Mr. Calle came, I think we

4    reviewed.  And then we've discussed it on the phone.

5    Q.  And you're aware that in the video that was captured in          11:24:28

6    this case, there was evidence of the decedent, the victim, the

7    young boy who was killed, that he had his arm at one point

8    outstretched, and at one point it was retracted.

9    A.  I'm aware that this is what your witnesses have claimed,

10   witness or witnesses.                                                11:24:51

11          I am also aware and have been so informed by

12   Mr. Chapman that there's a serious dispute about this by their

13   photographic experts, and that they questioned this because it

14   was blurred film.

15          I myself am not a photographic expert, so I would not      11:25:08

16   interpret that video insofar as addressing the question as to

17   whether or not there was movement.  I have seen it.  And I have

18   no opinion to express about that, because I am aware there is a

19   dispute and the film does look blurred to me, and I cannot

20   state with reasonable medical certainty.  It's not my field.       11:25:31

21   Q.  Well, you know that the jury has had the opportunity to

22   look at the video in this case.

23   A.  I do not know what the jury has seen.

24   Q.  You would assume that the Government would have played the

25   video in this case; right?                                          11:25:48

Cyril Wecht – Cross-Examination

1    A.  Yes, I think that's a reasonable assumption.

2    Q.  So they can make up their own minds as to whether or not

3    the video is of sufficient quality; right?

4    A.  It ultimately comes down to the ladies and gentlemen of the

5    jury.                                                               11:25:59

6    Q.  That's right.

7    A.  I'm well aware of that.

8    Q.  Right.

9         Now how many cases have you worked on where you've

10   actually had a video of the actual shooting in a homicide?        11:26:07

11   A.  Aside from present account, I don't know if I've seen a

12   shooting of somebody as it occurred.  I'm trying to think of

13   the cases of people videoing it.

14        There's some video of Senator Robert Kennedy.

15        I don't remember.                                            11:26:56

16   Q.  Okay.

17   A.  If -- there may have been one or two, but people don't

18   usually go around taking pictures before they shoot somebody.

19   Q.  Exactly.

20        And in your case, as a medical examiner, you             11:27:07

21   normally -- what you see is the remains of the deceased brought

22   to the morgue when you do your autopsy; correct?

23   A.  Yes.  And then I get information many times from the state

24   troopers or the detectives.  But you're right, I'm dealing with

25   the body.  But then I get correlative information from law        11:27:25

Cyril Wecht – Cross-Examination

1  enforcement, and then, you know, toxicology and criminalistics

2  and so on.

3  Q.  I understand that.

4       But in many cases -- because all you do is when you

5  first get involved in the case, you just have the body in the     11:27:37

6  morgue and you do your autopsy, and you rely on the other

7  information and you come up with some type of conclusion;

8  correct?

9  A.  Well, Yes.  Except for all the coroner's cases.  And when I

10  was coroner, I usually will have some information going in.        11:27:51

11  Not all, but some.  Most of the time.

12  Q.  So you don't have the benefit obviously, and maybe the

13  question is so obvious that I shouldn't ask it, but obviously

14  you don't have the benefit of actually witnessing what happened

15  on October 10th when Jose Antonio Elena was gunned down?          11:28:08

16  A.  No, I do not.

17  Q.  Okay.  And you don't have the evidence of what happened to

18  him after he fell down to the ground; correct?

19  A.  When you say "the evidence," sir, no --

20  Q.  Eyewitness --                                                  11:28:25

21  A.  I'm sorry.

22  Q.  You don't have -- you did not observe what happened when he

23  fell down to the ground because obviously you weren't there.

24  A.  No, no.

25  Q.  Okay.                                                          11:28:35

Cyril Wecht - Cross-Examination

1   A.  No, I was not.

2        And I just want to say that, you know -- then as you

3   know, you know, the reconstruction was, you know, not as finite

4   and detailed and focused and specific as it usually might be.

5   But, again, that gets into the area of criminalistics, and          11:28:52

6   these are matters that I'm not addressing.

7   Q.  Okay.  So my question is, is that when you come up with

8   opinions as to order of gunshots, when a gunshot was sustained,

9   and what was the next gunshot was sustained, you're looking at

10  a dead body and trying to make those determinations; correct?     11:29:11

11  A.  Oh, but then, sir, correlated with much additional

12  information that came to me, along with the autopsy report from

13  the Mexican physicians.  I received a lot of information.

14  Q.  Okay.

15  A.  Because the -- the initial contact set forth what another      11:29:28

16  pathologist, not now involved, had stated.  So I was already

17  aware of, you know, what the questions were, what the issues

18  were, and what the controversies were.

19  Q.  But the Mexican pathologists on whose report that you

20  reviewed, they were not at the scene either as eyewitnesses;      11:29:48

21  correct?

22  A.  Pardon me?  What was not at the scene?

23  Q.  The Mexican pathologists who wrote the report that you

24  relied upon, they were not eyewitnesses to the shooting, were

25  they?                                                              11:30:02

**Cyril Wecht – Cross-Examination**

1    A.  No, of course not.

2    Q.  Okay.  Now you say you reviewed the Mexican pathologists'

3    report; correct?

4    A.  Yes.

5    Q.  And based on the review of that report, you determined that          11:30:07

6    in this case the first shot to Jose was to the back of his

7    head.

8    A.  Correlated then with subsequent information, yes.

9    Q.  Okay.  Where in the Mexican pathologist report does it

10   indicate -- did the doctors, Dr. Madrigal and Dr. Diaz,                 11:30:23

11   indicate that the first shot that was sustained by Jose came to

12   the head -- to his head --

13          I'll give you the report, do you have it in front of

14   you?

15   A.  Yeah, would you give it to me, sir?                                  11:30:38

16   Q.  Just let us know where you find that in there.

17   A.  Yes.

18   Q.  This is the English translated version, Dr. Wecht.

19          MS. FELDMEIER:  It's Exhibit 18B.

20          THE WITNESS:  On the last page under Observations, the            11:31:02

21   last paragraph, by the vital reaction of the bodily injuries

22   found on the face and both hands, it is determined that the

23   injuries were caused when he fell forward, when his body

24   reacted to the impact of the bullets fired from a firearm.

25   BY MR. KLEINDIENST:

Cyril Wecht - Cross-Examination

1   Q.  They don't indicate which bullet though, do they?

2   A.  No.  I inferred from that that it was the -- referring to

3   the head.

4       And then there is a subsequent statement -- the

5   question was put to Dr. Madrigal, and he said that he believed                    11:31:37

6   that the head wound came first.  That goes back some years.  I

7   remember seeing that in a separate document.

8   Q.  Let me just stick with my question.

9       They do not in the autopsy report, the two doctors

10  doing the autopsy, list an order and sequence of the gunshots                     11:31:55

11  wounds that were sustained by the young boy in this case?

12  A.  No, they do not get into sequence.

13  Q.  Okay.

14  A.  Other than to say that he fell forward.

15  Q.  Now, you know that -- or do you know that both Dr. Madrigal                    11:32:06

16  and Dr. Diaz, when they did the autopsy in this case, they

17  didn't have access to other evidence that's been developed.

18  You know that.

19  A.  Yes.  I assume that they did the autopsy then, and I'm sure

20  they did not have -- yes, that's right.                                           11:32:33

21  Q.  Right.

22  A.  I would assume that.

23  Q.  And you would assume that only if they were told by the

24  prosecutors or the Government other facts in this case, that

25  they didn't have available to them, that would be something                       11:32:44

──────Cyril Wecht – Cross-Examination──────

1    that would be -- that they would take into account?

2    A.  Well, yes, I'm also aware that that information which they

3    took into account and began to express some difference of

4    opinion or some indecision, that occurred years later, did not

5    occur back then by the U.S. Government or the U.S. Attorney's        11:33:09

6    Office, to my knowledge, at or around the time of this

7    incident, but occurred years later.

8    Q.  Well, you understand that they are in the Republic of

9    Mexico and we're in the United States of America; correct?

10   A.  Yes.  But Mexico has always been there, and Arizona has         11:33:25

11   always been there, so -- and the U.S. Attorney's Office has

12   always been there too.

13          I'm just saying that there was quite an interval of

14   time before such a communication was made, and quite an

15   interval of time before they began to not be quite so sure as       11:33:41

16   they were in the early years.

17   Q.  Well, you know that when they were interviewed again in

18   2016, and they were given more information to look at that they

19   didn't have before, that they adjusted their opinion based on

20   new information that they didn't have; right?                       11:33:58

21          MR. CHAPMAN:  Objection.

22          THE WITNESS:  Yes.  As the U.S. Attorney's Office

23   filed charges and decided to proceed, and developed this

24   scenario from another pathologist and so on, then the

25   U.S. Attorney's Office went and met with the Mexican                11:34:14

UNITED STATES DISTRICT COURT

─────Cyril Wecht ─ Cross-Examination─────

1    pathologist, I'm aware that that's when things began to change

2    a little bit.  I'm very much aware of that.

3             THE COURT:  The answer may stand.

4             MR. KLEINDIENST:  I'm sorry?

5             THE COURT:  I said the answer may stand.                11:34:27

6             There was an objection by Mr. Chapman I didn't get a

7    chance to rule on.

8    BY MR. KLEINDIENST:

9    Q.  But that's not uncommon for a pathologist who all they have

10   is a deceased body on a gurney, and that's all they're working   11:34:37

11   with, for them to be given in the future additional facts that

12   they can then take and put into the total equation to maybe

13   readjust their opinion.  There is nothing unusual about that,

14   that happens.

15   A.  It depends, sir, on the case.  I like --                     11:34:54

16   Q.  Does it happen?  Yes or no.

17   A.  It can happen, sir.  But my answer is, that as a forensic

18   scientist, I deal with things that I determine in a scientific

19   way.  And I do not consider myself to be an extension or an arm

20   of the prosecution.                                              11:35:12

21            I have very strong feelings on this, as did the

22   National Academy of Science in their report in 2009, that

23   medical examiner and coroner offices and forensic science

24   centers should be independent of and not a part or an extension

25   or an arm of a prosecution or law enforcement office.           11:35:28

1        I'm very much aware.  And I can tell you this, that I

2    don't write an autopsy report and make a decision, and then

3    years later, because the district attorneys comes to me and

4    tells me something, that I just change over.  If it's something

5    that is vital and significant and pertinent and tangible, of     11:35:44

6    course, I'm not obstinate, I'm not intellectually arrogant.

7        But when I make a decision from the autopsy, and I

8    have reports and information for some -- for years in place, as

9    in this case, and then years later, now I'm contacted by the

10   U.S. Attorney's Office, and I'm told that, well, maybe it        11:36:06

11   wasn't quite that way when you said it before.  No -- no, I'm

12   sorry, sir, I do not function in that fashion.  And I do not

13   believe that a forensic scientist should function in that

14   fashion.

15   Q.  Are you suggesting that we manipulated their testimony,      11:36:21

16   Dr. Wecht?

17   A.  Not in a malevolent way, sir, but in the pursuit of your

18   prosecutorial activities, I do suggest that, yes.  That's why

19   you are a prosecutor.  And that's what prosecutors do.  And

20   then you were armed with a opinion from a very fine forensic     11:36:37

21   pathologist.

22       I'm not suggesting you did anything improper.  You did

23   your job.  But you did your job well, and you took that

24   information to the pathologist and you confronted them with it.

25   And then things began to change a little bit.  That's a matter   11:36:52

1    of record.  You didn't do anything that was unethical, immoral,

2    you did your job.  And you did your job well.

3    Q.  Do you have a list of all the items that were given to you

4    by the defense in this case?

5    A.  Yes, I believe there is such a list.                          11:37:09

6    Q.  And can I see it?  Do you have it with you?

7    A.  Yes, here's the list.

8           MR. KLEINDIENST:  May I retrieve it, Your Honor?

9           THE COURT:  You may.

10   BY MR. KLEINDIENST:                                                11:37:41

11   Q.  The list which you've given me is quite extensive, you'd

12   have to agree; right?

13   A.  Yes.

14   Q.  And it's actually four pages in length?

15   A.  Whatever it is.                                                11:37:51

16   Q.  Okay.  You wouldn't doubt me when I told you it was four

17   pages?

18   A.  Of course not.

19   Q.  You trust me to get the right pages.

20   A.  Yes.                                                          11:37:59

21          MR. KLEINDIENST:  Okay.  I'll mark this as the next

22   exhibit.

23          MR. CHAPMAN:  That's fine.

24   BY MR. KLEINDIENST:

25   Q.  You had all this material available to you before you came    11:38:42

1  up with your opinions in this case; correct?

2  A.  I'm not sure, I think some things I may have gotten -- when

3  was the last opinion that I had provided to Mr. Chapman?  The

4  first -- the first opinion, going back to February 8th of 2017,

5  I do believe -- oh, no, I've received some things since then.      11:39:09

6  I didn't have everything then, that's listed there, from the

7  outset.

8  Q.  When did you get this four-page list of evidence?

9  A.  I did not have all of that -- if I understood your

10 question, I did not have all of that at the time that I was       11:39:22

11 initially consulted back in February of 2017, no, I did not.

12 Q.  When did you get this?

13 A.  Pardon me?

14 Q.  When did you get this?

15 A.  Well, like the documents and transcripts, I just got          11:39:33

16 that -- and Mr. Bevel's transcript, you know that, I just got

17 that last week.

18 Q.  Here's my point, is that you were given a laundry list of

19 evidence in this case, statements, reports, videos; correct?

20 A.  Yes.                                                            11:39:49

21 Q.  Yes.  And it goes on for four pages; correct?

22 A.  Yes.

23 Q.  And then you had access to all this before you came up with

24 your opinions; correct?

25 A.  No, I just told you that some of my opinions were expressed    11:39:58

1  before I had access to some of the things that are listed on

2  those four pages.

3  Q.  And my question to you is that the pathologists in Nogales,

4  Sonora, who are doing the autopsy and writing the report, they

5  didn't have the benefit of all this evidence, did they?          11:40:13

6  A.  I don't know what they had the benefit of.  I have no

7  knowledge of that.  I have not dealt with the Mexican

8  pathologists.  I don't know what they had.  And I don't know

9  when they received information from the U.S. Attorney's Office.

10 I don't know -- I do not know that.  You know that, I don't     11:40:28

11 know that.

12 Q.  No, when they wrote the day the day after the homicide.

13 A.  I have no knowledge of when -- well, when they did the

14 autopsy report, I know when they did the autopsy, the

15 report --                                                        11:40:43

16     Let me see if it's dated.  The autopsy is dated -- no,

17 wait a minute.

18     Sir, would you give me back their report then, please?

19 You took it back from me.

20 Q.  Absolutely.                                                  11:41:07

21     I just want to ask you -- my question is simply this,

22 is that Dr. Madrigal and Dr. Diaz when they first did their

23 autopsy report, they didn't have all this evidence that shows

24 up on this list that you got.

25 A.  Oh, I'm sure they didn't have all of it.  I don't know what  11:41:21

―Cyril Wecht – Cross―Examination―

1   they had, and when they wrote their report.  I don't know the

2   date of the report.

3   Q.  It's on the report I gave you.

4   A.  Where is it?

5   Q.  I gave you the Spanish -- the English translation.  And I        11:41:35

6   believe that the English translation says --

7   A.  I think, sir, you may have taken it back.  I don't have it

8   here.

9   Q.  Okay.  If you look at the first page, it says, beginning

10  the medical legal autopsy at --                                     11:41:54

11          Do you not have the English translation?

12  A.  I'm not sure if I have it.  You just showed it to me but

13  you took it back.

14  Q.  I'm sorry.  Here, let me give it back to you.

15          It indicates on the first top part of the page when       11:42:12

16  they did their autopsy.  Do you see that, Dr. Wecht?  It's --

17  A.  You say on the first page is the date?

18  Q.  Yeah.  And actually on the last page it has the date.

19  A.  They begin the autopsy on October 11th of 2012.  And --

20  Q.  And you understand that the young boy was killed on October     11:42:56

21  10th?

22  A.  Pardon me?

23  Q.  You understand the young boy was killed on October 10th?

24  A.  Yes.

25  Q.  Right.  So they did the autopsy the next day.                   11:43:04

─────Cyril Wecht – Cross-Examination─────

1    A.  Yes.  But the report wasn't written the next day.

2    Q.  I think the report is dated October 11th, if you look at

3    it, sir.

4    A.  Well, we always date the autopsy reports on the date of the

5    autopsy.  But this report was not written the next day.  And if    11:43:17

6    you look at page 1, the translation was done on July 11th, some

7    months later.  I don't know when it was submitted for

8    translation.  But --

9    Q.  No, that's just the English translation.

10   A.  Yes, I understand.                                              11:43:35

11        I do not disagree with you that the Mexican

12   pathologists would not have had most of the things that are set

13   forth in that four-page list of items.  I agree with you.

14   Q.  Okay.

15   A.  What I'm saying is that this report by them in the original    11:43:49

16   Spanish was not typed up and written on the day of the autopsy.

17   Q.  Let me give you the Spanish copy, okay.  Because you're

18   looking at the English translation.  I'm going to hand you

19   Exhibit 18A.

20        MR. CHAPMAN:  Your Honor, objection, this is                   11:44:09

21   irrelevant and cumulative.

22        THE COURT:  Overruled.

23        THE WITNESS:  Yes, it says October 11th, and I just

24   said that's the date that you put on an autopsy report, the

25   date that you do the autopsy.                                       11:44:23

Cyril Wecht – Cross-Examination

1    BY MR. KLEINDIENST:

2    Q.  The date that they wrote the report.

3    A.  Sir, if you want to have them sitting down and writing the

4    report on that day, fine.  You show me a forensic pathologist

5    in America with extensive secretarial capacities that write a          11:44:36

6    report the same day.

7             You have to look at microscopic slides, you have to

8    get toxicology reports, you have to get investigative reports.

9    You do not write a report the same day.

10            If that's important to you, fine, you can have it that        11:44:50

11    way.  I'm -- it's of no relevance to me.  But it's absurd to

12    say that it was written the day of the autopsy.  It might have

13    been dictated.  It was not written and typed up the day of the

14    autopsy.  No where in the world has that been done.

15   Q.  Dr. Wecht, with respect to the letters that I got from           11:45:08

16   Mr. Chapman that, as I understand it he wrote them to me after

17   consultation with you about your opinions; correct?

18   A.  Yes.

19   Q.  And you reviewed what he was going to send to me because

20   that was important; correct?                                          11:45:28

21   A.  Yes.

22   Q.  And my question to you is, the first letter that I got was

23   dated in December of 2017; correct?  Do you have that in front

24   of you?

25   A.  What was the date you gave?                                       11:45:39

Cyril Wecht – Cross-Examination

1    Q.  I think, because I don't have a copy.  --

2    A.  The first thing that I see here is dated February 8th,

3    2017.

4    Q.  Sorry.  Okay.  So it was February 8th, 2017.

5    A.  Yes.                                                        11:45:52

6    Q.  And then there's a series of letters follow; correct?

7    A.  Yes.

8    Q.  Now when was the first time in all of those letters that

9    you indicate that the decedent, the young boy, sustained

10   gunshot number 2 and gunshot number 4 at the same time?       11:46:05

11          Do you want to just go through there and let us know

12   when you came up with that opinion?

13   A.  Yes, it's dated December 21st, 2017.  In that report the

14   decedent could have received both the injury described in

15   paragraph 2 of the autopsy report, parenthesis, head shot, end 11:46:30

16   of parenthesis, and paragraph 4, parenthesis, wound 2 or near

17   thoracic vertebrae, end of parenthesis, while he was standing.

18          December 21st, 2017, Mr. Chapman had posed that

19   question to me and that was my answer to him, which he

20   submitted to you.                                             11:46:50

21   Q.  Can you tell the ladies and gentlemen of the jury how that

22   would have happened, the trajectory of the bullets that you say

23   in your opinion that number 2 and number 4 happened in

24   sequence?

25   A.  No, I said, sir, could have happened.  And I expressed the 11:47:08

UNITED STATES DISTRICT COURT

**─── Cyril Wecht - Cross-Examination ───**

1    opinion even here today that I could not express that opinion

2    with reasonable medical certainty.  I said it was something

3    that could have happened.  That's what I said in the report,

4    and that's what I said here today.

5            As far as how it could have happened, I'm not a                    11:47:21

6    shooter, but if I'm shooting -- (Indicating.)

7            Excuse me folks.  I have other targets.

8            If I'm -- --

9            THE COURT:  He's now pointing at you.

10           THE WITNESS:  If I were shooting and I shoot somebody            11:47:35

11   and one shot hits him behind the ear and one shot hits him

12   several inches down in the back, I don't know.  I mean, just

13   boom, boom.  I mean, with guns, I don't know, you just pull the

14   trigger and it keeps going.

15           I'm sorry, I mean, what is the problem?  I'm                    11:47:52

16   not -- I'm not -- I don't shoot guns.

17   Q.  What is the basis for that opinion, that they occurred one

18   after the other in sequence?

19   A.  No, I have not given a sequence.  I've been asked whether 2

20   was number -- was the first wound sustained.  And I expressed        11:48:08

21   my reasons for that.  I was asked about 4 being sustained

22   later.  In fact, Mr. Chapman specifically asked me if I had an

23   opinion on the sequence of shots, and I specifically stated

24   here that I do not have an opinion as to the sequence of the

25   shots, other than to say I believe that wound number 2 to the        11:48:25

1    right side of the head was the first shot that caused this

2    young man to fall.

3    Q.  Maybe I misunderstood your testimony, but I thought that

4    you testified on direct exam that the head shot and the back

5    shot occurred one after the other or almost simultaneously.    11:48:44

6    A.  I said 2 and 4 -- I was asked by Mr. Chapman, and I said

7    could have.  And I specifically stated I cannot state that with

8    reasonable forensic scientific certainty, but it's certainly a

9    reasonable thing that the two of them could have been fired one

10    after the other.    11:49:02

11    Q.  But you're not certain of that?

12    A.  No, no, I'm -- no, I'm not certain.

13    Q.  You can't say with reasonable medical certainty that that

14    happened; correct?

15    A.  That they were fired at -- that one immediately followed    11:49:11

16    the other.  In other words, that those two were in

17    juxtaposition --

18    Q.  Yes.

19    A.  No, I cannot state that.

20    Q.  Okay.  So the jury can't take that to the bank, that based    11:49:19

21    on reasonable medical certainty number 2 and number 4 were

22    fired in sequence together.  Is that your testimony?

23    A.  I've expressed my thoughts on that.  What the jury does is

24    their deliberations.  I won't be present.  What they'll infer

25    from my testimony and from the -- your comments and    11:49:40

─────Cyril Wecht - Cross-Examination─────

1   Mr. Chapman's will be for them to decide.

2   Q.  My question though is, even if it was possible, what is the

3   basis for that opinion?  In terms --

4   A.  You mean even the possibility?

5   Q.  Yeah.                                                    11:49:57

6   A.  Well -- not to be the least bit flippant, turn around, sir,

7   turn around, turn around, turn around, if I may, turn around.

8   Face the back of the courtroom.  Okay.

9           THE COURT:  He doesn't have a real gun.

10          THE WITNESS:  And now I have a gun.  Bang, bang.        11:50:08

11          So there's the possibility.  I just shot you twice.

12   But you're incredibly strong, you're still standing.  But I

13   just shot you twice.  Didn't you feel it?

14          MR. KLEINDIENST:  I felt something.

15          THE WITNESS:  I don't have that degree of antipathy     11:50:28

16   either.

17   BY MR. KLEINDIENST:

18   Q.  If this is what you say --

19   A.  It's possible.  You just asked me a moment ago about the

20   word possible, and I'm just saying that it's possible.         11:50:37

21   Q.  Because one bullet is coming this way perpendicular to the

22   head, and the other bullet is coming straight into my back.

23   A.  Well, you know what, when you got hit in the head, sir, you

24   immediately turned, you immediately, in a millisecond -- you

25   just got your head whacked by a bullet, and a millisecond you   11:50:55

Cyril Wecht – Cross-Examination

1  just turned a little bit to your left.

2  Q.  So you think that's what happened in this case?

3  A.  That's a possibility.  You just asked me a moment ago how

4  can I say it's possible, and I just explained how it is

5  possible.                                                        11:51:11

6  Q.  Now, you had the opportunity to view Dr. Lew's report;

7  correct?

8  A.  Yes.

9  Q.  Did you see her diagram of the gunshot wounds in this case?

10 A.  Yes.                                                         11:51:25

11 Q.  And did you have any problems with that?

12 A.  No, that's her diagram, and that's her putting it together.

13 I haven't -- do I have any problem with it?  No, I don't have

14 any problem with it.

15       I just have said I do not believe it's possible to       11:51:38

16 ascertain, as she has purported to do, the specific sequence

17 and the specific positions of --

18 Q.  Can I ask you a question?

19 A.  That was my answer.

20 Q.  Okay.  Here's my question -- it's a different question,     11:51:53

21 just so we stay on track.

22       She did a diagram where she plotted the entrance

23 wounds of the ten bullets; correct?

24 A.  Yes.

25 Q.  And she also plotted any exit wounds; correct?              11:52:04

1   A.  Also plotted what?

2   Q.  Any exit wounds that were found on the body.

3   A.  Yes.

4   Q.  Okay.  She did not in your diagram order the sequence in he

5   which they were inflicted; correct?                             11:52:18

6   A.  No, I was referring to her testimony.

7   Q.  I was referring to her diagram.

8   A.  No, I don't think she did -- I don't think she did the

9   sequence in the report.

10  Q.  Okay.  Let me just show that to you.  And it's Exhibit 279.  11:52:26

11          You've had a chance to review that diagram by Dr. Lew?

12  A.  I have seen this.

13  Q.  And you have -- you don't take any issue with her placement

14  of the entrance and exit wounds, do you?

15  A.  No, they're okay.                                           11:52:54

16  Q.  They're okay?

17  A.  Yeah.

18  Q.  Okay.

19  A.  We don't have specific measurements for every one of them

20  from the Mexican pathologist, but these are okay.  I have no    11:52:59

21  problem with this.

22  Q.  Okay.  Did you verify them with the autopsy report?

23  A.  Yeah, that these wounds are there.  I'm just saying the

24  exact location -- but they're in the general -- for the most

25  part they're in the correct areas, yeah.                        11:53:13

**Cyril Wecht – Cross-Examination**

1    Q.  Okay.  That's all I need to know.  Thank you.

2        Now, when the bullet entered the brain of this young

3    boy, did it have -- what was -- what was the -- if you can tell

4    me, walk me through, once it went into the head about right

5    here, you agree it entered right here, and it lodged about          11:53:42

6    right here; right?  (Indicating.)

7    A.  Yes.

8    Q.  So it was an upward trajectory back to front; correct?

9    A.  Back to front, upward, and right to left.

10   Q.  Right.                                                          11:53:54

11       And can you tell the jury the dynamics of that

12   bullet -- by the way, did you know that the bullet was

13   traveling at 1,000 feet per second?

14   A.  Yes.

15   Q.  Okay.  Pretty fast; correct?                                    11:54:05

16   A.  Yes.

17   Q.  Lot of power?

18   A.  Yes.

19   Q.  Lot of velocity?

20   A.  Force equals one half mass times velocity squared, yes.        11:54:09

21   Q.  I didn't learn that.  Thanks.

22   A.  You just forgot it from your high school physics.

23   Q.  I did.  I did.

24       So tell the jury, what was the damage that was

25   sustained by this bullet coming into the head at that speed?       11:54:22

UNITED STATES DISTRICT COURT

— Cyril Wecht – Cross-Examination —

```
1   A.  It produced a lot of damage in both the right and left

2   cerebral hemispheres.  It produced fractures of the calvarium,

3   the top of the skull.  And it produced fractures on the basilar

4   skull, which is the bony floor of the skull upon which the

5   brain rests.  It produced damages to those structures.        11:54:39

6   Q.  Devastating damages.

7   A.  Pardon me?

8   Q.  Devastating damages.

9   A.  Yes, I've said that they were irreparable.

10  Q.  Irreparable.                                                11:54:48

11        And when the bullet comes into the skull, you know

12  about bullet cavity, that the cavity is made by the bullet

13  traveling through, say, the head, that there is a force that's

14  exerted where the brain expands to account for the velocity of

15  the bullet.  You know that.                                    11:55:06

16  A.  Well, the brain does not immediately expand.  If the person

17  remains alive, it did begin to swell.  It doesn't immediately

18  expand.  The bullet goes through and produces a hemorraghic

19  path.  This bullet did not fragment.  It wasn't the kind of

20  bullet -- it wasn't a frangible bullet.  The bullet was intact, 11:55:25

21  the spent bullet, and recovered from beneath the scalp.

22        So, yes, it produced significant damage, but the

23  pathway was, as I said, through the right cerebral hemisphere

24  moving upward, leftward and forward into the left cerebral

25  hemisphere, coming to rest beneath the scalp.                  11:55:48
```

UNITED STATES DISTRICT COURT

1   Q.  Okay.  So you're not familiar with the concept of a bullet

2   when it enters in the body, it creates momentarily,

3   momentarily, a cavity around it because of the force in the

4   bullet itself, and then the cavity closes up?  Are you familiar

5   with that?                                                        11:56:04

6   A.  Yes, there's going to be some -- yeah, the cavity -- of

7   course, the bullet produces that cavity as it traverses in that

8   millisecond.

9   Q.  Okay.  It's going to open up, and then it's going to

10  collapse, right, behind it?                                       11:56:17

11  A.  Well, it will come back together a little bit.  It doesn't

12  collapse.  But it won't be as wide as it was at that precise

13  millisecond that the bullet was traversing it.

14  Q.  Right.

15          And in this case is it not possible that when the        11:56:33

16  bullet came into the brain and it created that momentary

17  cavity, that it had some impact on the brain stem?

18  A.  No, sir.

19  Q.  Why do you say that?

20  A.  Too far removed.  I demonstrated that on a diagram.  Too      11:56:44

21  far removed.  Whatever effect there would be would be in the

22  surrounding tissues of the right and left cerebral hemispheres,

23  it would not go down into the brain stem.

24  Q.  So would you disagree with Dr. Madrigal in this case on

25  that point?                                                       11:57:04

Cyril Wecht - Cross-Examination

1    A.  No, I thought Dr. Madrigal said that -- had originally --

2    that the brain stem was not damaged.  The autopsy report refers

3    to no damage in the brain stem.

4         If he is now saying that -- I thought he was saying

5    now that he cut the brain stem, I remember I saw that.  When he    11:57:17

6    was asked by Dr. Lew, that he said he cut the brain stem.

7         And so I don't know what his latest opinion is.  If

8    you're asking me if Dr. Madrigal has now said that the brain

9    stem was damaged, my answer to you is, yes, I disagree.  I

10   disagree with what he said then, and I disagree with what he    11:57:36

11   said subsequently.  I mean, I agree with what he said then, no

12   brain stem damage.  I agree with what he said subsequently, no

13   brain stem damage.  And I disagree with what he has said now

14   finally as the case proceeded to trial.

15   Q.  Now you understand that Dr. Lew also said that the bullet    11:57:53

16   going to the brain could have had an impact on the brain stem.

17   You know that was her opinion?

18   A.  Dr. Lew states more than that, she said the brain stem was

19   damaged.  She said she sees damage to the brain stem.

20   Q.  I'm sorry, I was talking to my co-counsel.    11:58:16

21   A.  Dr. Lew states more than a concussive reverberation, which

22   is what you've been describing.

23   Q.  Right.

24   A.  She specifically states that she sees in a picture damage

25   to the right side of the brain stem, that's what she says.  And    11:58:31

1    I don't see that.  And -- I don't know what more I can say.

2         MR. KLEINDIENST:  One second, please.

3        (Discussion off the record between Government counsel.)

4    BY MR. KLEINDIENST:

5    Q.  Maybe let me ask a question this way:  I'm not saying that        11:59:33

6    the bullet passed through the brain stem.  What I'm saying is

7    that when the bullet entered the brain, it fractures the brain;

8    correct?  There is fractures to the skull.

9    A.  Fractures of the skull, and a hemorraghic pathway through

10   the cerebral hemispheres.                                             11:59:51

11   Q.  And the force of the bullet causing fractures to the skull

12   could have an impact on the brain stem.  Is that not possible?

13   A.  No.  My answer is no.

14        MR. KLEINDIENST:  Judge, this is going to be a good

15   time to stop.  I have some more.                                      12:00:04

16       (At sidebar on the record.)

17        THE COURT:  We're not going to take the normal lunch

18   hour, so how much more you think you got?

19        MR. KLEINDIENST:  Fifteen, 20 minutes.

20        THE COURT:  Let's do that, then we'll stop.                      12:00:25

21        MR. KLEINDIENST:  How come you never give me a lunch

22   break me I ask for it?

23        THE COURT:  Remember, this is the day Mr. Chapman's

24   got to leave at 3:00 o'clock.

25        MR. CHAPMAN:  If he needs a break I can postpone the             12:00:35

───────── Cyril Wecht – Cross-Examination ─────────

1    appointment.

2              THE COURT:  I don't want you to have to do that.

3              MR. CHAPMAN:  My secretary tells me that the brother

4    of the victim is glaring at Mr. Swartz, and has been all

5    morning.  So just --                                              12:00:45

6              THE COURT:  All right.

7              MS. FELDMEIER:  The brother of the victim is in the

8    courtroom.  He may be looking at him.  I don't know.

9              MR. CHAPMAN:  He's glaring.

10             MS. FELDMEIER:  We can't tell him not to look at him.    12:00:54

11             THE COURT:  Tell him not to do that.  Okay?  All

12   right.

13        (End of discussion at sidebar.)

14             THE COURT:  Mr. Kleindienst is going to continue.  I

15   was able to persuade him.                                         12:01:12

16   BY MR. KLEINDIENST:

17   Q.  Dr. Wecht, let's move on to a different matter.

18             Well, let me ask you this:  Once the bullet entered

19   the head -- and we may have a disagreement as to the effect of

20   the bullet on the brain -- but within your interpretation, how    12:01:37

21   soon would death have occurred?

22   A.  I think death would occur -- actual death would occur in

23   seconds, minutes, with a rapidly deteriorating state of ever

24   deepening unconsciousness and irreversibility.

25             But death, in terms of inability to recover, would      12:02:13

UNITED STATES DISTRICT COURT

Cyril Wecht – Cross-Examination

1    have occurred right then.  The dynamics played out in seconds,

2    and then the unconsciousness deepening, and then actual death,

3    if you had him hooked up to an electroencephalogram and so on,

4    I'm sure within a couple minutes.

5    Q.  But as little as seconds?                                        12:02:40

6    A.  Yeah, but -- yeah, it could be measured in seconds.

7    Q.  Okay.  So he could have -- once that bullet entered his

8    brain, he could have died within seconds?

9    A.  Well --

10   Q.  Yes or no?                                                       12:02:50

11   A.  Well --

12   Q.  I just want to be sure I'm clear.

13   A.  Yes.  As I'm trying to -- I'm trying to -- I'm not evading

14   a yes or no, I'm just trying to explain that you have that

15   residual capacity, that continuing capacity of the brain stem's  12:03:04

16   functions.  It's the control mechanism of our bodies in terms

17   of vital reactions.  That's why when they want to determine if

18   someone is dead for organ donation, they do all that and

19   measure those things.

20        So that's what I'm saying, you want to measure it in          12:03:30

21   seconds, in one sense, yes.  But, you know, is there some

22   evidence of brain activity mediated through the brain stem

23   centers, then that can go into a minute or two.

24   Q.  How soon would the heart stop beating, on the quick side,

25   within seconds?                                                     12:03:53

Cyril Wecht – Cross-Examination

1   A.  Same thing, same answer.  Within some seconds to a minute

2   or two, with -- it's not a matter of beat, beat, beat, and then

3   silence.  It's a matter of beat, beat, beat, beat, beat, beat,

4   beat, beat, beat, beat.

5   Q.  So it would a gradual -- not a gradual, but it would be          12:04:08

6   a --

7   A.  As the damage to the brain -- he's bleeding out too,

8   hypovolemia is coming into the picture now too.  And yes, you

9   know, then several seconds into, you know, getting toward a

10  minute.  Around in that time.  I cannot be more specific than       12:04:31

11  that.

12  Q.  And as the heart -- taking your range, if it's on the

13  seconds side, the heart will stop beating pretty quickly;

14  correct?

15  A.  Yes.  If you're saying seconds, yeah.  And then what I'm         12:04:45

16  saying, it doesn't just happen like that, in a second, for the

17  reasons that I've said.

18  Q.  But you did say on the low side it could be within seconds,

19  compared to a minute.

20  A.  Seconds.  There's 60 of those in a minute.                       12:04:56

21  Q.  Okay.  I just -- I want to make sure I'm clear.

22          So my question is that the heart could have

23  stopped -- well, the heart would have rapidly stopped beating

24  after the bullet entered the brain; correct?

25  A.  After what, sir?                                                 12:05:11

UNITED STATES DISTRICT COURT

—Cyril Wecht – Cross-Examination—

1    Q.  After the bullet entered the brain, the heart would

2    have --

3    A.  No, it would not stop beating.  The bullet's gone through

4    the brain.  And what I'm saying is, the heart does not stop at

5    that -- at that moment, at that second.  It doesn't.          12:05:23

6    Q.  If we're on the low side of seconds it would; right?

7    A.  In the matter of some seconds, yeah.

8    Q.  And you know in this case that there was evidence from

9    Exhibit 74, which is a photograph of the young boy on the

10   ground with blood on the back of his shirt.  Do you remember  12:05:43

11   that photograph that was shown?

12   A.  Yes.

13   Q.  Do you have that in front of you?

14   A.  No, but I remember it.  I remember it.

15   Q.  Okay.                                                      12:05:51

16   A.  The T-shirt with the holes -- three holes that showed

17   nothing and two holes that showed blood.

18   Q.  Extensive bleeding.

19   A.  Yes.

20   Q.  Okay.  So would you agree with me that there was a period  12:05:58

21   of time -- okay, even accepting your hypothesis -- where the

22   heart was still beating, he was still alive, and blood was

23   coming out of those wounds.

24   A.  Yes.

25   Q.  Now he's laying on his stomach; correct?                   12:06:10

Cyril Wecht – Cross-Examination

1   A.  Yes, sir.

2   Q.  And the heart would have to be pumping pretty hard to be

3   able to overcome gravity and come up to the top of the body

4   rather than seep down.

5   A.  Well, it doesn't have to be beating hard.                    12:06:22

6       First of all, you're going to get some bleeding

7   immediately upon impact as the smaller vessels burst, and then

8   as the aorta is burst.  And even in those several seconds then,

9   a significant amount of bleeding back through the hole.

10      Fluid always seeks an opening, and in this case the       12:06:41

11  opening was the gunshot wound in the back.  And so blood will

12  come out there.  And you're right, gravity then is not going to

13  send blood upward.

14  Q.  But if there's falling blood pressure as a heart is

15  starting to stop, then you don't have the pressure to exert the  12:06:57

16  blood to come up --

17  A.  That's correct.

18  Q.  -- right?

19  A.  As it's weakening, you're not going to have pressure to

20  send the blood upwards.                                          12:07:08

21  Q.  So with the blood that was on the back of his shirt, it

22  appears to me, based on your testimony, that he was alive for

23  quite a while because the blood was able to rise to the top,

24  the heart was still pumping.

25  A.  Not quite a while, no.  All that happens in second.          12:07:21

Cyril Wecht – Cross-Examination

1  Q.  Seconds?

2  A.  Seconds.

3        When you perforate the aorta you've got tremendous

4  force from the aorta.  And you have that opening that's been

5  created by the bullet, and out comes the blood.  That doesn't      12:07:32

6  take a long time.

7  Q.  In fact, you even had the opinion at one point in time that

8  there was no blood on the back; right?  Do you remember that?

9  A.  In some parts of the back where I was asked in conjunction

10 with the three holes in the shirt that showed no blood, yes,      12:07:49

11 that's right.

12 Q.  Do you have the collection of letters that I got from

13 Mr. Chapman?

14 A.  Pardon me?  Do I have the compilation of letters?  No, sir,

15 you've taken that back.  You're an Indian giver.  Give that      12:08:02

16 back to me.

17        That's a terrible term to use.

18 Q.  Don't shoot.

19 A.  Native American giver.

20        No, I'm sorry, it's a terrible term.  I apologize,      12:08:14

21 Your Honor.  That is a terrible term.  Can't take the childhood

22 out of the man.

23 Q.  Well --

24 A.  I'm sorry, sir, what was your question?

25 Q.  Back on March 20th of 2017, in a letter --      12:08:26

Cyril Wecht – Cross–Examination

1   A.  At which date of the 17?

2   Q.  March 20, 2017.

3   A.  March?

4   Q.  Do you see that letter?

5   A.  Let me get it.                                          12:08:41

6            Yes, sir.

7   Q.  It says –– and this a letter from Mr. Chapman; right?

8   A.  Yes.

9   Q.  And I would assume that you would have approved this

10  letter?                                                     12:08:54

11  A.  Yes.

12  Q.  And this letter was addressed to the prosecutors in this

13  case; correct?

14  A.  Yes.

15  Q.  And doesn't it say, on March 20, 2017, that in addition to  12:08:58

16  what has been previously disclosed regarding Dr. Wecht, we

17  anticipate he will also render the following opinions:

18           One, the absence of blood from the decedent's back

19  wounds indicate they are postmortem injuries.

20           Two, the absence of blood from back wounds and the   12:09:18

21  trajectory head wound indicate the deceased most likely

22  suffered the first head wound in the first salvo of shots while

23  he was upright, and he was most likely dead before suffering

24  the wounds on his back.

25           Do you remember –– do you see that?                  12:09:36

---
Cyril Wecht – Cross–Examination
---

1    A.  Yes.

2    Q.  That's incorrect, isn't it?

3    A.  It's not as specific as it should be.

4         The three wounds, as depicted in the T-shirt with no

5    blood, and no blood on that portion -- those portions of the    12:09:47

6    back.  This was not as artfully stated as it should have been.

7    It's partially incorrect, but partially correct.  It should

8    have referred to specifically the wounds which did not show

9    bleeding.

10        And there were two wounds which did have some blood    12:10:05

11   that we've talked about, the two stains, number 4, and the

12   other one, I think it's number 6, if I'm not mistaken.  The one

13   over on the left side toward -- beneath the armpit.

14        But the other three holes in the shirt that

15   Mr. Chapman showed me and had me address, they show no blood.    12:10:24

16   Q.  So you made a mistake in the conveying this information

17   to --

18   A.  I made a mistake in not being specific as to which wounds I

19   was referring to.

20   Q.  Being specific is important; correct?    12:10:35

21   A.  It's a mistake in that it is not as clear as it should have

22   been.  It is correct as it pertains to those three wounds in

23   the back.

24   Q.  Can you tell me what the term "agonal movement" is, what

25   that means?    12:11:03

—Cyril Wecht – Cross-Examination—

1    A.  Yes, I discussed that.  It's when you're dying and –– oh,

2    that's the agonal period.  Agonal movements would be movements

3    that take place during that period of time.  They might be

4    conscious, semiconscious, or unconscious.

5    Q.  Now you never –– you never used that term in any of your          12:11:21

6    disclosure to the Government in this case.  You used the term

7    "involuntary spasmodic movements."  Do you remember that?

8    A.  I did use that term, yes.

9    Q.  You did not mention anything at all about what you say are

10   agonal movements, did you?          12:11:35

11   A.  No.  I was asked –– I was asked today what the word agonal

12   means.  I was more specific in talking in terms of the kinds of

13   movements that could be made, involuntary spasmodic movements.

14   And does it occur in the agonal period?  Yes.  Could they be

15   referred to as agonal moments, agonal movements?  Yes.          12:11:54

16   Q.  My question was simply that in the disclosure in your

17   reports, through those letters, you never referred to agonal

18   movements, it was involuntary spasmodic movements.  Yes or no.

19   A.  Yes, sir, those are the movements that occur in the agonal

20   period.  I did not use the word "agonal."          12:12:13

21   Q.  Okay.

22   A.  But I described it, that's what happens in the agonal

23   period.

24   Q.  Have you done any research of literature of involuntary

25   spasmodic movements?          12:12:24

A.  Yes.  Some that we showed here depicted in that film, the

fencing reflex.  And in other cases that I've dealt with over

the years, this case has come up.  Have I done primary

neurological, neurophysiological research?  No, I'm not a

researcher.  Have I studied this, have I applied it, and been

aware of it in cases over the years where somebody says, he

could not have moved, he could not have been there, could not

have been here, oh, yes, that has arisen many times over the

course of 55 years.

Q.  Now you know that the movement in this case the jury is

focusing in on is not just reflexes; right?  The hands or feet

reflexing.

A.  No, I don't know that.  I don't know what other people are

calling it.  So when you say, do I know that?  First of all,

I've already addressed that question as to whether or not there

is movement --

Q.  What --

A.  -- depicted in that.  That's number one.

        And number two, if there is movement, I never said

that it had to have been a conscious movement or -- and I've

said that if there is movement, it could well be spasmodic,

involuntary movements.

Q.  My question is, is that the jury's heard evidence in this

case that after the young boy fell down to the ground, that he

stretched his left arm out like that and retracted it.

1    (Indicating.)  Do you know that?

2    A.  I was not aware that Dr. Lew has reconstructed that in that

3    sense, yeah.  Whether that happened or not, I can't -- that's

4    her opinion.  I have no opinion as to --

5    Q.  Can you just say yes or no that you know that that's an                12:13:58

6    issue in the case?

7            MR. CHAPMAN:  Objection, Your Honor.

8            THE WITNESS:  Oh, I'm well --

9            THE COURT:  Whoa, whoa, whoa.  Now all three of you

10   talking at the same time now.  Slow down, everyone.                        12:14:05

11   BY MR. KLEINDIENST:

12   Q.  Just yes or no, do you know that that's an issue in the

13   case, whether or not the young boy had moved his left arm

14   forward and then retracted it back?  Just yes or no, do know

15   that that's an issue?                                                      12:14:23

16   A.  My hesitation is the word "issue," sir.

17           It will be up to the ladies and gentlemen of the jury

18   to determine whether it is an issue.  Is it something that has

19   been presented in the case?  I am aware of that.  Is it an

20   issue for the folks of the jury to determine?  That's another             12:14:36

21   matter, sir.  An issue is something they'll determine.

22   Q.  I'm sorry I used the --

23   A.  It is something that's been presented in the case, yes.

24   What you choose to make an issue, that's your determination as

25   a lawyer.                                                                  12:14:48

Cyril Wecht – Cross-Examination

1    Q.  I'm sorry I used the wrong word.  Presented.

2    A.  Yes.

3    Q.  Okay.  Can you tell me of any literature that you've

4    reviewed that when somebody is brain dead he's able to move his

5    arm, extend outward like that, and withdraw and retract that.                12:15:01

6    (Indicating.)  Can you tell me of any literature that you've

7    reviewed that says that that happens after brain death?

8    A.  Yes.  You look at any of the neurology textbooks and

9    neuropathology textbooks talk about decerebrate, decorticate

10   movement, absolutely.  When people are dying following all             12:15:19

11   kinds of injuries, whether they be gunshot or blunt force

12   trauma to the head, that's what they're called, decerebrate,

13   decorticate, those kind of movements, abduction, adduction.

14   Absolutely, any textbooks will talk about that, decerebrate and

15   decorticate movements.                                                 12:15:36

16   Q.  And then also the, as presented -- and I won't use the

17   offending word "issue" -- that the head moved from one side to

18   the other --

19   A.  Yes.

20   Q.  -- right?                                                          12:15:47

21   A.  I'm aware that that has been presented in this case, yes.

22   Yes, I'm aware of that.

23   Q.  Now, I did some research and couldn't find anything in the

24   medical research, with my librarian, that came up with any

25   article that said that brain dead patients, brain dead                 12:16:01

--- Cyril Wecht - Cross-Examination ---

1  patients, can move their arm in that kind of fashion, or move

2  their head in such an extreme fashion.  I'm just telling you.

3  Okay?

4          MR. CHAPMAN:  Is that a question, Your Honor?

5          MR. KLEINDIENST:  That is a question.                12:16:18

6          THE WITNESS:  What is the question?

7  BY MR. KLEINDIENST:

8  Q.  Are you aware -- are you aware --

9  A.  Am I aware of your research?  No, I'm not aware of your

10  research, that's number one.                                12:16:25

11          And number two, sire, you said "brain dead."  I

12  suggest you go back to your research, or researcher, and use

13  the term a patient who is dying following head injuries and is

14  moving into a deepening state of unconsciousness, and see

15  whether you find such movements then.                       12:16:41

16          If you say brain dead, no.  When you're brain dead

17  there's no movement.  As you are dying, and the brain is still

18  functioning, the brain stem, there can be movement.  There's a

19  difference.  That's why you're research was an abysmal failure,

20  because you used the term "brain dead."                     12:16:57

21  Q.  Well, I assume that, you know --

22          Well, I'm sorry that my research was an abysmal

23  failure.

24          But I did come across a number of articles that talk

25  about that spontaneous and reflex movement may occur in brain  12:17:15

─ **Cyril Wecht – Cross-Examination** ─

1    dead patients.  And they originate from spinal cord neurons and

2    do not preclude a brain death diagnosis.  They are considered

3    spinal reflexes, plantar responses --

4              What's a plantar response?

5    A.  What is a plantar?  Well, plantar, you know, the front of    12:17:35

6    your hands, called plantar.

7    Q.  Muscle stretch reflexes.

8              What would those be?

9    A.  Just stretching any muscle.

10   Q.  Abdominal reflexes.                                          12:17:49

11   A.  Some movement of the abdominal musculature.

12   Q.  Finger jerks.

13   A.  Pardon me?

14   Q.  Finger jerks.

15   A.  I'm not hearing.                                             12:18:01

16   Q.  Finger jerks.  Finger jerks.  F-I-N-G-E-R, J-E-R-K-S.

17             THE COURT:  He said finger jerks.

18             THE WITNESS:  Oh, finger.  Okay.  I didn't hear the

19   word.  Thank you, Your Honor.

20             Finger.  Yeah, yeah, finger.                          12:18:13

21   BY MR. KLEINDIENST:

22   Q.  And the classic Lazarus sign.  Okay?

23   A.  Yes.

24   Q.  And the Lazarus sign is when the person is on the back and

25   raises his arms up; right?                                       12:18:24

Cyril Wecht – Cross–Examination

1  A.  Yeah.

2  Q.  You're familiar with the Lazarus sign?

3  A.  Yeah.

4  Q.  Okay.  They don't talk in these articles about being able

5  to do the gross movement with the arm or the head that you       12:18:31

6  suggest in this case could happen.

7  A.  Muscle movements, movements -- any kind of muscle

8  movements.  If they talk about movement of musculature in

9  hands, and they talk about movement of muscles, I think you

10 said abdominal, and you said a couple of other things.  So       12:18:57

11 anything like that can -- anything that involves muscles or

12 head moves by virtue of the musculature of the neck and the

13 face.

14 Q.  You showed a video of what's called fencing responses; is

15 that correct?                                                    12:19:21

16 A.  Yes.

17 Q.  And it shows soccer players and football players --

18 A.  And hockey.

19 Q.  -- and hockey sustaining blows to the head; correct?

20 A.  Yes.                                                         12:19:31

21 Q.  And they fall down on the back; right?

22 A.  Yes.

23 Q.  And they raise their arms up; right?

24 A.  The one arm like this and the other arm like this, that's

25 fencing.  (Indicating.)                                          12:19:42

Cyril Wecht – Cross-Examination

1   Q.  And then they drop the arms down?

2   A.  Yeah.

3   Q.  Now are you saying that that is what could have happened in

4   this case?

5   A.  It could have that.  Yes, that's a possibility.  I'm not          12:19:49

6   saying -- I cannot express that opinion with a reasonable

7   medical certainty, but I'm showing what could happen, yes.

8   Q.  Now, in -- the difference is that in those cases the person

9   hasn't been shot in the head, he's just been hit in the head;

10  correct?                                                              12:20:09

11  A.  They were not shot.  They were just whacked in the head --

12  Q.  Right.

13  A.  -- in the fashion that was depicted.

14  Q.  They were not shot, a bullet didn't enter the brain of the

15  person's head, they were just hit?                                    12:20:19

16  A.  No.

17  Q.  Okay.  Number two, they fell on their back; right?

18  A.  Yes.

19  Q.  And those are two differences in this case; correct?

20  A.  Yes.  They're falling on the back.  That's right.  In this        12:20:30

21  case the decedent fell face down; that's correct.

22  Q.  And how would you --

23  A.  Pardon me?

24  Q.  How would you expect him to extend his arms up if he's

25  laying on his stomach?                                                12:20:44

1    A.  How I would expect that?

2    Q.  Yeah.  You say that that's --

3    A.  The arms are here, and they can move, they can move.

4    (Indicating.)  He's still alive.  He's not dead, he's not brain

5    dead yet in those few seconds.  He's not dead.  He's not brain                12:20:56

6    dead.

7    Q.  So you're saying the comparison is the same, that you can

8    look at the fencing responses and say the same thing happened

9    here, even though in this case we have somebody who's been shot

10   in the head and he's fallen down on his stomach; right?                        12:21:10

11   A.  Yes.  I'm saying that after the head wound, that he still

12   has the ability to move his arms, yes, he does.

13   Q.  Have you ever seen any studies done, or videotapes with

14   somebody who's been shot in the head and had the same response?

15   A.  I've seen cases -- I've been involved in cases where people               12:21:29

16   have been shot in the head and had to shoot themselves a second

17   time -- or shot a second time by an assailant because they were

18   still moving and running.  It depends.

19        You don't get shot in the head and you're just

20   automatically dead.  You're going to die, in this kind of a                    12:21:46

21   wound.  But you don't automatically just die like this.  People

22   recover from some gunshot wounds.  You don't just die like

23   that.  And, yes, there can be movement then.  After you've been

24   whacked or shot in the head, you can still have movement.

25   Q.  My question then as answered then is that you've not seen                  12:22:04

1    any videos where somebody has been shot and they have the same

2    type of response that we saw in the videos you played?

3    A.  No, because there's no videographer going around looking

4    for gunshot victims and being aware and in anticipation and

5    with foreknowledge that that person is going to be shot.  It                12:22:20

6    would be interesting to have such a study, but I don't know how

7    it could be worked out.

8    Q.  Now let's talk about the spine.

9            You know that there's damage to the vertebra and the

10   spine?                                                                      12:22:32

11   A.  Vertebral bodies had some fractures, yes.

12   Q.  How many?

13   A.  They said 4 to 8; 4, 5, 6, 7 and 8.

14   Q.  And you know it's because the bullet entered the back and

15   traveled up the vertebras that enclose the spine; correct?                  12:22:46

16   A.  Yes.

17   Q.  And you would have to admit that that's a pretty severe

18   injury to the vertebra when you damage that many --

19   A.  I don't know how severe.  You have the processes that go

20   off, and that would not necessarily be real severe.                         12:22:57

21   It's -- that's not the injury that will kill you.  It was the

22   damage caused by that bullet of the aorta that resulted in the

23   hemothorax blood into both chest cavities.  Fractures of the --

24   of the transverse processes, even fractures of the vertebral

25   bodies, do not kill you.  They can be dealt with by a                       12:23:23

Cyril Wecht – Cross-Examination

1  neurosurgeon with plates and screws and wiring, and you can

2  survive.  People have those injuries, skiing and motor

3  vehicular accidents, quite often.

4  Q.  My question simply is is that you have a bullet that's

5  entered the body at 1,000 feet per second, and it goes up the          12:23:41

6  spinal cord damaging --

7  A.  It didn't go up the spinal cord, sir.

8  Q.  Damaging at least four --

9  A.  Did not go up the spinal cord, sir.

10  Q.  No, I understand that.  And I'm sorry if I misspoke.          12:23:51

11       But it went up the vertebrae, damaging four of them.

12  You've seen the photographs of the damage; right?

13  A.  Yes.

14  Q.  So what you're saying, your testimony is, as I understand

15  it, is that unless somebody actually removed the spinal cord,          12:24:01

16  we can't tell if the spinal cord suffered damage; correct?

17  A.  That is correct.

18  Q.  But it's possible that when the bullet enters the body at

19  that speed and travels up the vertebra, fracturing the

20  vertebrae, it could have caused a concussion to the spinal          12:24:16

21  cord?

22  A.  Is it possible?  Yes, it is possible.  But you cannot make

23  that statement with reasonable medical certainty.  There's a

24  big difference.  There's a lot of things in this world that are

25  possible.          12:24:28

UNITED STATES DISTRICT COURT

Cyril Wecht – Cross-Examination

1   Q.  Have you heard of -- so it is possible the spinal cord

2   could have been concussed without being injured?

3   A.  That's possible.

4   Q.  And are you familiar with the term, and I'm sure you

5   probably are better than me, is that -- the term when there's a        12:24:48

6   concussion to the spinal cord known as a cervical cord

7   neurapraxia.  You've her heard of that; correct?

8   A.  Yes.

9   Q.  And it's called, by abbreviation, CCN, for cervical cord

10  neurapraxia; correct?                                                  12:25:05

11  A.  Yes.

12  Q.  And it involves a transient injury to the spinal cord that

13  causes brief disturbance of sensation and ability to move.

14          You would agree with me?

15  A.  Yes.                                                               12:25:17

16  Q.  And that it can include numbness and tingling in the hands

17  or feet, as well as weakness or even brief complete paralysis.

18          You agree that that could happen when the spinal

19  cord --

20  A.  Possible.  Cervical -- cervical is not thoracic.  And             12:25:31

21  cervical is higher up.

22  Q.  And affected areas can range from a single arm or leg to

23  all four limbs; correct?

24  A.  It is possible.

25  Q.  Okay.  Now in this case when bullet number 4 hit the              12:25:44

1  spinal -- the vertebra and traveled up the vertebra and damaged

2  the vertebra, it's possible, even though we don't have the cord

3  to look at, that there was a concussion to the spinal cord that

4  caused temporary paralysis.  That's possible?

5  A.  Is it within the realm of possibility, yes.  But by no          12:26:04

6  means proven at all.

7  Q.  You indicated that it's unlikely that, because -- it's now

8  your opinion that gunshot number 2 and number 4 were sustained

9  one after another, that it had to happen that way because, like

10  you saying Bolt running the hundred meter dash in this last        12:26:30

11  Olympics, you run upward like this; correct?  That's your

12  testimony?

13  A.  Yes.

14  Q.  And that would explain how the bullet could enter the back

15  and then also the head, that was your testimony?  Wasn't it?      12:26:43

16  A.  No, I was asked -- Dr. Lew said that Jose Rodriguez was

17  running bent down.  And I said, I don't know how she comes to

18  that conclusion, that's not the way people run.  When they are

19  scared and panicky or trying to get away from something, that's

20  not the way they run.                                             12:27:04

21  Q.  Let me pose this hypothetical to you:  Let's assume that

22  Jose Antonio Elena was standing upright, and all of a sudden

23  somebody starts shooting at him, and he starts to run.  Are you

24  saying that it's not a natural reaction to bend down to avoid

25  being hit by the bullet?  That that could not have happened?      12:27:24

―Cyril Wecht – Cross-Examination―

1    A.  I cannot tell you that it could not have happened.  I'm

2    telling you that when I reflect back on things that scared the

3    daylights out of me, and when I think of people running to get

4    away from something, I think of people standing up, running,

5    straight.                                                       12:27:48

6            So all I'm saying is, I was asked about Dr. Lew's

7    opinion, and I've said, sir, and I'll repeat it again, there is

8    no way with reasonable forensic scientific certainty, with

9    reasonable medical certainty, that she could make that

10   statement here sitting under oath that she knows how this young  12:28:01

11   boy ran.  That's what I'm saying.  Okay?

12           You don't know how he ran, I don't know how he ran,

13   and she doesn't know how he ran.  But she made that statement.

14   Okay?  That's what we're talking about.

15       (Discussion off the record between Government counsel.)    12:28:24

16   BY MR. KLEINDIENST:

17   Q.  You used the term "reasonable medical certainty" or

18   "reasonable scientific certainty" quite a bit in your

19   testimony; correct?

20   A.  Do I use it when?                                          12:29:03

21   Q.  In your testimony today you used the term reasonable --

22   A.  And when I could not express an opinion with that degree of

23   certainty, I have so stated.

24   Q.  Do you know or are you aware of fact -- and you're a

25   lawyer -- that back in 2013 the Department of Justice          12:29:18

Cyril Wecht - Cross-Examination

1   established a National Commission on Forensic Science?  Are you

2   familiar with that?

3   A.  Yes.

4   Q.  And are you familiar with the fact that they worked in

5   partnership with the National Institute of Standards and          12:29:29

6   Technology?  Are you aware of that?

7   A.  I have some vague knowledge of that.

8   Q.  Okay.  And it was to enhance the practice and improve the

9   reliability of forensic science; correct?

10  A.  Yes.                                                          12:29:42

11  Q.  Are you aware of the fact that after a study was done, the

12  Department of Justice, along with the National Institute of

13  Standards and Technology decided that the use of the term

14  "reasonable medical" or "reasonable scientific certainty"

15  should no longer be used?  Are you aware of that?                 12:29:58

16  A.  No, I'm not aware of that.  And I'm not aware of it that it

17  has been adopted by courts throughout this nation.  It was a

18  recommendation, their belief of that Commission, and I have not

19  encountered that being played out in the courts in which I have

20  testified through this country.                                   12:30:16

21  Q.  And they found that the use of that term, that you've used

22  quite often, can be confusing, because there is no common

23  definition within forensic science disciplines as to what

24  threshold establishes reasonable certainty.

25          Would you agree with that?                                12:30:31

UNITED STATES DISTRICT COURT

─────── **Cyril Wecht – Redirect Examination** ───────

1    A.  No, I do not agree.  There's a difference between a

2    probable and a possible.  There's a difference between

3    something being 51 percent and 49 percent, whether it's

4    becoming elected as president of the United States of America

5    or testifying in a courtroom.  I am aware of those differences.    12:30:46

6            MR. KLEINDIENST:  Thank you, Dr. Wecht, for your time.

7                     REDIRECT EXAMINATION

8    BY MR. CHAPMAN:

9    Q.  Dr. Wecht, I just have a few follow-up questions.

10           First of all, I sent letters summarizing your opinions    12:31:11

11   to the Government on December 21st, 2017, February 8th, 2017,

12   March 20th, 2017, and February 14th, 2018.  You're aware of

13   that?

14   A.  Yes, sir.

15   Q.  And before I sent each of those letters I talked to you,    12:31:38

16   and we were able to summarize your opinions in those letters as

17   accurately as possible.

18   A.  Yes.

19   Q.  And were you aware that after the first letter, each of the

20   subsequent letters was sent because the Government asked for a    12:31:55

21   clarification of what your opinions would be?

22   A.  Yes, I remember that.

23   Q.  And then I just cooperated with them and disclosed, had

24   supplemental information --

25   A.  Yes.  In fact, you have prefatory paragraphs in some of the    12:32:08

Cyril Wecht – Redirect Examination

1  reports directly addressing that point, that you were getting

2  back to them about questions they have raised, yes.

3  Q.  In your testimony you used the term "reports" in reference

4  to what your opinions were.  But what you're really talking

5  about was these letters that you helped me draft and send to    12:32:23

6  the Government about your opinions.

7  A.  Yes, those are what you submitted; right.

8  Q.  Just another point of clarification.

9          Dr. Lew's testimony was that she saw damage to the

10  brain stem in autopsy photos.  Did you look at those same       12:32:48

11  autopsy photos and did you see any damage to the brain stem?

12  A.  I did look at those photos, and I see no damage to the

13  spinal cord -- to the brain stem, brain stem, yes.

14  Q.  The fencing response that we've talked about is the result

15  of a concussive brain injury.                                   12:33:10

16  A.  Yes.  Yes, a bullet concusses.  You can get concussed

17  whether it's a sledgehammer or a bullet, or just bumping here

18  when I trip on the steps.  They produce concussions.  Some are

19  nothing and some lead to chronic traumatic encephalopathy in

20  years later.  It varies.  That's what the whole concussion      12:33:32

21  business is about.

22  Q.  The point is is that that the fencing response is relevant

23  in this case because, like a bullet injury to the head, it's a

24  concussive injury.

25  A.  Yes.  You saw -- you see those people getting clobbered      12:33:49

─── **Cyril Wecht – Redirect Examination** ───

1    like that?  It was enough to kill them.

2            MR. CHAPMAN:  Thank you, sir.  I have no further

3    questions.

4            THE COURT:  The jurors have any questions, please

5    place them in writing.                                         12:34:00

6        (At sidebar on the record.)

7            THE COURT:  That really was an unfair shot he took

8    about your research ability.

9            MR. KLEINDIENST:  Huh?

10           THE COURT:  That was an unfair shot he took about your   12:34:34

11   research ability.

12           MR. KLEINDIENST:  Why?

13           THE COURT:  No, that he took, not you.

14           MS. FELDMEIER:  He took a shot at your research.

15           THE COURT:  He took the shot at you.                    12:34:46

16           Did the autopsy explore if there was any damage to the

17   nasal and oral cavity from gunshot wound 2?

18           Could some of the blood in the thoracic cavity been

19   caused by aspiration?

20           How accurate is the process of estimating volumes of    12:34:59

21   blood?

22           Does the flexion of the left wrist and bilateral feet

23   inward support the possibility of posturing after gunshot wound

24   2?

25           Out of the evidence that was given to you, what         12:35:28

—————————— Cyril Wecht - Jury Questions ——————————

1    provided you the most information utilized to form your

2    opinion?

3        What kind of injury -- what kind of injury you will

4    sustain if a tennis ball sized rock hit you in your head, top

5    of the head?                                                    12:35:51

6        In your knowledge and experience, what is more lethal,

7    a gunshot in the head or a rock that hit in the head?

8        I'm not going to ask that last one.

9        In regards to the gunshot to the head, once the victim

10   was on the ground, would he still be conscious enough to try to   12:36:14

11   move and perhaps lift his head and turn it the other direction?

12       With the downward angle the bullet was traveling, what

13   position would the head need to be in for the upward angle of

14   shot 2 through the skull?

15       Would that position of the head be possible if             12:36:38

16   standing straight up and running, as you described?

17       We'll take a break after these questions.

18       MS. FELDMEIER:  Are you thinking a half hour lunch

19   break or something?

20       THE COURT:  Yeah.                                          12:36:52

21      (End of discussion at sidebar.)

22       THE COURT:  Doctor, the jurors have several questions

23   I'm going to ask on their behalf.

24       Does the flexion of the left wrist and bilateral feet

25   inward support the possibility of posturing after gunshot wound   12:37:15

—— Cyril Wecht – Jury Questions ——

1    number 2?

2          THE WITNESS:  I apologize, Your Honor, I'm sorry, sir,

3    I heard part of it.  I'm sorry.

4          THE COURT:  I have tendency to speak kind of soft.

5          How about this, is that better?                    12:37:29

6          THE WITNESS:  Thank you, sir.

7          THE COURT:  Does the flexion of the left wrist and

8    bilateral feet inward --

9          THE WITNESS:  Bilateral -- what kind of injury?

10         THE COURT:  Bilateral feet inward support the         12:37:38

11   possibility of posturing after gunshot wound number 2?

12         THE WITNESS:  Support the possibility of what, sir?

13         THE COURT:  Of posturing after gunshot wound number 2.

14         THE WITNESS:  Yes, sir.

15         THE COURT:  Did the autopsy explore if there was any   12:37:51

16   damage to the nasal and oral cavities from gunshot wound number

17   2?

18         THE WITNESS:  No.

19         THE COURT:  Could some of the blood in the thoracic

20   cavity been caused by aspiration?                          12:38:05

21         THE WITNESS:  No.  Aspiration is something that gets

22   into your bronchial system.  So that would be a different

23   terminology of aspiration of blood from blood in the chest

24   cavities.  The lungs were not injured in this -- in the autopsy

25   report, no damage to the lungs.                            12:38:27

––––– Cyril Wecht - Jury Questions –––––

1        THE COURT:  How accurate is the process of estimating

2   volumes of blood?

3        THE WITNESS:  How accurate is what, sir?

4        THE COURT:  The process of estimating volumes of

5   blood.                                                              12:38:38

6        THE WITNESS:  It's not accurate.  The thing -- what

7   you're supposed to do is you take the blood -- you scoop the

8   blood out in a ladle, and you put it into a measuring thing

9   like you find in kitchens, and you measure it.

10       I'm not saying it's wild but, you know, it's not -- it    12:38:57

11  could be off a few hundred ccs.  But I do not dispute the

12  presence of blood in the chest cavities.

13       THE COURT:  Out of the evidence that was given to you,

14  what provided you the most information utilized to form your

15  opinion?                                                           12:39:15

16       THE WITNESS:  The original autopsy report would be

17  number one.

18       Then investigative reports depicting the anatomical

19  locations of the shooter and the decedent, and the correlation

20  with then all the wounds together and the photographs.            12:39:45

21       That's -- those are the things that counted.

22       THE COURT:  What kind of injury would you sustain if a

23  tennis ball sized rock hit you in the head or top of the head?

24       THE WITNESS:  What size rock, sir?

25       THE COURT:  Tennis ball size.                                 12:40:07

─────── **Cyril Wecht – Jury Questions** ───────

1       THE WITNESS:  Tennis ball size.  If it's thrown with

2  some force, it could be enough to kill you.  That's a

3  significant weapon.  And we see it being played out on the Gaza

4  border with the Palestinians and Israelis.

5       It's a significant -- a tennis ball rock hitting your    12:40:28

6  head could be enough to kill you.

7       THE COURT:  In regards to the gunshot to the head,

8  once the victim was on the ground, would he still be conscious

9  enough to try to move and perhaps lift his head and turn it the

10  other direction?    12:40:45

11       THE WITNESS:  Yes.  After the head wound, he could

12  have a degree of some consciousness sufficient to permit him to

13  move his head, yes.

14       THE COURT:  With the downward angle the bullet was

15  traveling, what position would the head need to be in for the    12:40:59

16  upward angle of shot 2, that shot 2 took through the skull?

17       THE WITNESS:  But the angle was not downward,

18  Your Honor, the angle was upward.

19       Are we talking about the head wound, sir?

20       THE COURT:  Shot wound 2, yes.    12:41:17

21       THE WITNESS:  Yeah, no, that goes upward, sir, not

22  downward.

23       THE COURT:  Would that position of the head be

24  possible if standing straight up and running as you described?

25       THE WITNESS:  Yes.  Yes, Your Honor.    12:41:28

1          THE COURT:  Any questions based upon the jurors'

2    questions?

3          Mr. Chapman needs to going go first.

4          MR. CHAPMAN:  I don't have any questions.

5          THE COURT:  Go ahead, Mr. Kleindienst.                12:41:43

6                    RECROSS-EXAMINATION

7    BY MR. KLEINDIENST:

8    Q.  You understand that in this case the gun was pointed

9    downward at the person below him by about 30 feet; correct?

10   A.  Yes.                                                    12:41:59

11   Q.  And if he shot him in the head, you'd expect the bullet to

12   enter his head in a downward trajectory, wouldn't you?

13   A.  It would depend on the position that he was in in

14   relationship to the shooting at the time.  The head, if you

15   turn the head like this up and down, you can have different    12:42:13

16   angles --

17   Q.  Based --

18   A.  -- based on the position of the head on the neck.

19   Q.  Based on your testimony that he -- somebody runs upright

20   like this, his head would be upright and the angle would be    12:42:24

21   downward; correct?

22   A.  I was asked about running upright in relationship to

23   Dr. Lew's comment that after he was shot.

24          Before any shooting occurred, sir, and there was any

25   yelling or screaming or noise or whatever, or people throwing   12:42:38

─────────── **Cyril Wecht - Recross-Examination** ───────────

1   rocks, I can't know what the position was that he was in and

2   what the position of his head would have been.  That was before

3   he was shot.

4   Q.  Now you say that --

5            Was it a golf ball --                                    12:42:55

6            THE COURT:  Tennis.

7   BY MR. KLEINDIENST:

8   Q.  A tennis ball sized rock could cause serious injury;

9   correct?

10  A.  Yes.                                                          12:43:01

11  Q.  Of course that depends on a lot of different factors,

12  doesn't it?

13  A.  Depends on what?

14  Q.  A lot of different factors.

15  A.  Yes.                                                          12:43:07

16  Q.  How far away the person is who's throwing the rock?

17  A.  Yeah.  And whether it's being thrown by a professional

18  pitcher, or being thrown by an 80-year-old woman.

19           Yeah, but I would not like to be hit in the head with

20  a tennis sized rock thrown by anybody.                           12:43:27

21  Q.  But the fact that there might be a great deal of distance

22  between the rock thrower and the victim may not cause as

23  serious of an injury of the distance away.  Would you agree?

24  A.  May not, yes, it may not.  It may kill you, or it may just

25  produce a laceration, that's right.                              12:43:44

Cyril Wecht - Recross-Examination

1   Q.  You testified that there was no damage to the young boy's

2   lungs in this case?

3   A.  That's right.  Not depicted in the autopsy report.

4   Q.  Well let me show you Exhibit 224 and 225.

5       I'm sure you saw all the autopsy photographs; right?                12:44:03

6   A.  Yes, I believe so.

7       Yes.

8   Q.  What do those depict, Dr. Wecht?

9   A.  Pardon me?

10  Q.  What do those depict?                                               12:44:22

11  A.  They look like bullet holes -- bullet holes through the

12  lung entrance and exit, is what it depicts.  The pulmonary

13  parenchyma, the lung tissue, is pink, and it shows no

14  hemorrhage except at the wounds of entry where the bullet went

15  in and went out.                                                        12:44:43

16  Q.  My question to you is:  It shows damage to the lungs caused

17  by --

18  A.  Damage to the lungs there, but no intraparenchymal

19  bleeding.

20  Q.  So you were mistaken; correct?                                      12:44:50

21  A.  No, sir, I'm not mistaken.  No, I'm not mistaken.  The

22  bullet went in and out.

23      We're talking about the question from one of the

24  members of the jury was bleeding into the lungs, and I said

25  there's no bleeding into the lungs.  And these pictures clearly         12:45:00

1    show there's no bleeding into the lungs.

2            THE COURT:  Don't show it to the jury.

3            THE WITNESS:  Pardon me?

4            THE COURT:  I said, don't show those pictures to the

5    jury.                                                       12:45:08

6            THE WITNESS:  No, Your Honor.

7            MR. KLEINDIENST:  That's all I have, Your Honor.

8            MR. CHAPMAN:  Can I just follow up on that?

9            THE COURT:  Sure.

10                    REDIRECT EXAMINATION

11   BY MR. CHAPMAN:

12   Q.  So I think the question actually wasn't whether there was

13   bleeding to the lungs, I think the question was, was there

14   damage to the lungs?

15   A.  Well, there's damage at those points of entrance and exit.  12:45:19

16   We're talking here about, was there pulmonary hemorrhage,

17   somebody asked.  And I'm saying, because they're questioning

18   about aspiration bleeding.  So for me to have blood coming out

19   up from my mouth there's got to be something happening in my

20   lungs.  Okay?  This bullet went in and out.  And you can see   12:45:37

21   this lung tissue is without hemorrhage.

22   Q.  Okay.

23   A.  The bullet went in and it went out.  So it there damage?

24   Of course, there's damage.  Did it produce any parenchymal

25   hemorrhage, any bleeding into the lungs?  The answer is no.     12:45:54

1          MR. CHAPMAN:  Thank you, sir.

2          THE COURT:  Doctor, thank you.

3          THE WITNESS:  Your Honor, I appreciate very much your

4    courtesy.

5        (Further proceedings held on the record not included in

6    this transcript.)

7

8                              -oOo-

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CR-15-1723-TUC-RCC – April 11, 2018

1

2

3

4                    C E R T I F I C A T E

5

6            I, CANDY L. POTTER, do hereby certify that I am duly

7    appointed and qualified to act as Official Court Reporter for

8    the United States District Court for the District of Arizona.

9            I FURTHER CERTIFY that the foregoing pages constitute

10   a full, true, and accurate transcript of all of that portion of

11   the proceedings contained herein, had in the above-entitled

12   cause on the date specified therein, and that said transcript

13   was prepared under my direction and control.

14           DATED at Phoenix, Arizona, this 11th day of April,

15   2018.

16

17

18                                  s/Candy L. Potter_____

19                                  Candy L. Potter, RMR, CRR

20

21

22

23

24

25